UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

NICOLE DAEDONE and
RACHEL CHEROWITZ,

No. 23 Cr. 146 (DG)

                              Defendants.


**MOTION TO EXCLUDE THE GOVERNMENT'S
PROFFERED EXPERT WITNESS**

BONJEAN LAW GROUP, PLLC
Jennifer Bonjean, Esq.
Ashley Cohen, Esq.
303 Van Brunt Street, 1st Fl.
Brooklyn, New York 11231
(718) 875-1850
jennifer@bonjeanlaw.com

AIDALA, BERTUNA & KAMINS, P.C.
Arthur L. Aidala, Esq.
Imran Ansari, Esq.
Michael  Jaccarino, Esq.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
arthur@aidalalaw.com
iansari@aidalalaw.com
jaccarino@aidalalaw.com


*Attorneys for Defendants*

Filed: October 11, 2024

# TABLE OF CONTENTS

**Page**

ARGUMENT……………………….…………………………………………………………1

I.   The Testimony of the Government's "Coercive Control" Expert Should
Be Excluded………………………..……………………………………………3

   A.  The proffered  testimony is not relevant or proper
under Rule 702………………………………………………………………5

   B.  The proffered testimony is not based on any reliable methodology
and improperly transmits hearsay to the jury…………………………….…...…11

   C. The proffered testimony seeks to improperly bolster the credibility and
narrative of government fact witnesses…………………………………………..15

   D.  The proffered testimony's probative value is substantially outweighed by the
risk of undue prejudice and juror confusion……………..……………….…….…….19

II.   Alternatively, The Testimony of the Government's "Coercive Control"
Expert Should Be Limited…………………………………………………...…..23

   A.  The Court should preclude Dr. Raghavan from testifying about
"organizational" tactics, "cults, "grooming," or the targeting of individuals
with traumatic pasts………………………………..………………………………..23

   B.  The Court should preclude Dr. Raghavan from testifying about sex abuse………….24

   CONCLUSION……………………………………………………………………...25

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>Page(s)</u>

*Amorgianos v. Nat'l R.R. Corp.*,
   303 F.3d 256 (2d Cir. 2002) ........................................................................... 12, 14

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*
   No. 09 Civ. 3020 (SAS), 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .............................. 13

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
   239 F.3d 179 (2d Cir. 2001) ........................................................................... 13, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .............................................. 1, 2, 6, 9, 11, 12, 13, 14, 15, 19, 22, 23, 24

*Highland Capital Mgmt., L.P. v. Schneider,*
   379 F. Supp. 2d 461 (S.D.N.Y.2005) ................................................................... 13

*Hygh v. Jacobs,*
   961 F.2d 359 (2d Cir. 1992) ........................................................ 17Psych_Cite_91, 18

*In re Omeprazole Pat. Litig.*,
   490 F. Supp. 2d 381 (S.D.N.Y. 2007) ..................................................................... 1

*In re Rezulin Prod. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 2, 13

*Kumho Tire Co. v Carmichael,*
   526 U.S. 137 (1999) ................................................................................... 12

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) ......................................................................... 12-13

*N.K. by Bruestle-Kumra v. Abbott Labs.,*
   No.14 Civ. 4875 (RER), 2017 WL 2241507 (E.D.N.Y. May 22, 2017) ................................ 12

*Nimely v. City of New York*,
   414 F. 3d 381 (2d Cir. 2005) ........................................................ 3, 6, 12, 15, 16, 18, 19, 20

*People v. Abdur-Razzaq,*
   60 Misc. 3d 63 (N.Y. Sup. Ct. 2018) ................................................................... 8, 9

*Plourde v. Gladstone,*
   190 F. Supp. 2d 708–21 (D. Vt. 2002), 69 F. App'x 485 (2d Cir. 2003).................................. 2

*Raskin v. Wyatt Co.*,
   125 F.3d 55, 67–68 (2d Cir. 1997) ....................................................................... 1

*Riegel v. Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006) ................................................. 6

*U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*,
    No. 06 Civ. 2860 (DLC), 2009 WL 1110577 (S.D.N.Y. Apr. 22, 2009) .............................. 15

*United States v. Castillo*
    924 F.2d 1227 (2d Cir. 1991) ...................................................... 6, 16, 17

*United States v. Cruz*,
    363 F.3d 187 (2d Cir. 2004) ...................................................... 1

*United States v. Cruz*,
    981 F.2d 659 (2d Cir. 1992) ...................................................... 16

*United States v. Dugue*,
    763 F. App'x 93 (2d Cir. 2019) ...................................................... 15

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) ...................................................... 2-3, 12, 13

*United States v. Kidd*,
    385 F. Supp. 3d 259 (S.D.N.Y. 2019) ............................................. 8Psych_Cite_46

*United States v. Lombardozzi*,
    917 F.2d 691 (2d Cir. 1990) ...................................................... 15

*United States v. Long*,
    917 F.2d 691 (2d Cir. 1990) ...................................................... 2

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999) ............................................. 15Psych_Cite_80, 17, 18

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008) ............................................. 6, 13Psych_Cite_64, 17

*United States v. Randall*,
    No. 19 Cr. 131 (PAE) (S.D.N.Y.) ............................................. 7, 8Psych_Cite_86

*United States v. Raniere*,
    No. 18 Cr. 204 (NGG) (E.D.N.Y.) ...................................................... 22

*United States v. Rijo*,
    508 F. App'x 41 (2d Cir. 2013) ...................................................... 16

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ...................................................... 6

**STATUTES AND RULES**                                                  **Page(s)**

18 U.S.C. § 1591(e) .......................................................................................... 11

18 U.S.C. § 1589 ............................................................................................. 10

Fed. R. Evid. 401 .............................................................................................. 2

Fed. R. Evid. 403 .................................................................. 2, 3, 9, 19, 20, 21

Fed. R. Evid. 702 ........................................ 1, 2, 3, 5, 9, 10, 11, 12, 14, 23

Fed. R. Evid. 703 ................................................................................ 2, 12, 13

**TREATISES AND OTHER SOURCES**                                          **Page(s)**

Basra, I. K., Kenney, T., Forrest-Bank, S., Zottarelli, L. K., & Raghavan, C. (2023).
*Predatory Helpfulness: An Empirical Framework to Identify Fraudulent Tactics Used by Pimps to Recruit and Commercially Sexually Exploit Young Girls and Women.*
*Journal of Human Trafficking*, 1–16. https://doi.org/10.1080/23322705.2023.2259263 ...............
7

Charles A. Wright & Victor J. Gold, 29 FED. PRAC. & PROC. EVID. § 6273 (2d ed. April 2021 Update) ............................................................................................. 2

Hagan, E., Raghavan, C., & Doychak, K. *Functional Isolation: Understanding Isolation in Trafficking Survivors,* Sexual Abuse, 107906321988905.
doi: 10.1177/1079063219889059 (2019)....…………………………………………..…. 8, 14

Kenney, T. (2023). *Predatory Helpfulness: A Replication (And Expansion) Study Examining Grooming and Recruitment Tactics in Sex Trafficking*
CUNY Academic Works. https://academicworks.cuny.edu/jj_etds/279........................................
7

Nicole Daedone and Rachel Cherwitz jointly and respectfully submit this motion to exclude the government's proffered "coercive control" expert witness from testifying at trial. In the alternative, the Court should limit the scope of the proffered expert's testimony and hold a *Daubert* hearing at which the government must establish the admissibility of each its proffered expert opinions.

## <u>ARGUMENT</u>

The testimony of the government's purported expert, whose testimony in previous trials has focused primarily on the relationships between pimps and prostitutes, should be excluded because it lacks a sufficient scientific basis within the meaning of FRE 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), and is likely to confuse, rather than assist, the jury.

Pursuant to Federal Rule of Evidence 702, the Court acts as a "gatekeeper" for expert testimony to ensure that such testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597 (1993); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004).

Before admitting proffered expert testimony, the Court must conclude not only that such testimony is reliable, but also that it "fits" the facts of the case and will thereby assist the jury in understanding the evidence or some factual issue in dispute. *See, Daubert*, 509 U.S. at 591; Fed. R. Evid. 702. "[E]ven if the methodology used by the expert is considered to be reliable, the expert's testimony will nevertheless fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *In re Omeprazole Pat. Litig.*, 490 F. Supp. 2d 381, 401 (S.D.N.Y. 2007) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 67–68 (2d Cir. 1997)).

This "fit"/helpfulness requirement is "akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence, but goes beyond mere relevance because it also requires expert testimony to have a valid connection to the pertinent inquiry." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) . As the Supreme Court put simply, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

In addition, under Rule 703, if the facts or data relied upon by an expert are otherwise inadmissible, the expert may not disclose them to the jury unless the Court determines that "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703; *See, also United States v. Long*, 917 F.2d 691, 702 (2d Cir. 1990) (holding that trial court erred in permitting expert testimony that was marginally relevant, not directly related to the case, substantially more prejudicial than probative). Rule 703 "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert." Fed. R. Evid. 703, 2000 Advisory Committee Note. Expert testimony that merely recites inadmissible hearsay is improper. *See, e.g.*, *Plourde v. Gladstone*, 190 F. Supp. 2d 708, 720–21 (D. Vt. 2002) (finding expert opinion inadmissible when it "amounts to nothing more than inadmissible 'hearsay in disguise' under Rule 703"), *aff'd* 69 F. App'x 485, 487 (2d Cir. 2003); *see also* Charles A. Wright & Victor J. Gold, 29 FED. PRAC. & PROC. EVID. § 6273 (2d ed. April 2021 Update).

Expert testimony must also satisfy Rule 403 and may be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; *See, United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir.

2003) ("Even if the testimony is admissible under Rule 702, it still must pass muster under Rule 403"). As the Second Circuit has cautioned, "[t]he very breadth of the discretion accorded trial judges in admitting [expert opinions] under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should . . . weigh carefully the risk of prejudice." *Nimely v. City of New York*, 414 F. 3d 381, 397 (2d Cir. 2005) (quotations omitted).

## I. The Testimony of the Government's "Coercive Control" Expert Should Be Excluded.

The government has disclosed that it intends to call Dr. Chitra Raghavan as an expert witness at trial. *See,* September 16, 2024 Letter, ECF No. 148-1. According to the government, Dr. Raghavan is a licensed clinical psychologist whose research and publications focus on "trauma and coercive control in the context of domestic violence." ECF No. 148-1, at 7. Per the government, Dr. Raghavan will testify about "methods of coercive control employed against individuals," whereby they use a "variety of emotional, psychological, material, sexual, and/or physical tactics that together seek to control the victim," including "surveillance, micro-regulation, manipulation/exploitation, isolation, intimidation, deprivation, degradation, and sexual coercion." ECF No. 148-1, at 2.

Although Dr. Raghavan has primarily researched and testified regarding the dynamics within intimate relationships and domestic violence, the governments seeks to broaden the scope of her expertise to cover nearly every tactic used in any situation where "two or more individuals are in a work, romantic, or familial relationship wherever there is a power imbalance between individuals." *Id* at 4. The government intends to rely on this testimony to support its claim that individuals in this case engaged in behavior they otherwise would not have, had they not been coerced. The government's attempt to expand Dr. Raghavan's expertise and to mold her

testimony to fit the conduct in this case is improper and irrelevant to the issues the jury will be deciding.

According to Dr. Raghavan, her "work focuses in three areas, domestic violence, sex trafficking, and sexual coercion." *See*, *People v Adeleke,* 2002A-2017, Supreme Court, State of New York, Suffolk County, Trial Transcript, Pages 9-19, December 11, 2019. Regarding sex trafficking, she focuses "primarily [on] pimp based" trafficking, as "many times intimate partners are also traffickers, and other times, who we call traffickers, the women call pimps." *Id.* Dr. Raghavan uses her "coercive control" theory to explain why certain prostitutes do not leave their pimps and, instead, engage in sex work.

As such, despite the government's claim, Dr. Raghavan's actual expertise is much narrower and, thus, her proposed testimony is not relevant to the facts of this case, which, as charged, only involves allegations of forced labor. Additionally, the facts here involve organizational and group dynamics, something Dr. Raghavan's professional experience, publications, and clinical work have not focused on.

Moreover, according to the government's notice, Dr. Raghavan has not spoken with any complaining witnesses here and does not intend to offer testimony "regarding any specific victim" or whether anyone in *this* case was coercively controlled. ECF No. 148-1, at 1. Instead, she will reportedly provide "background" information and discuss her general theory of "coercive control" to explain why the government's witnesses voluntarily engaged in certain conduct. *Id.* This proffered testimony is improper, unnecessary, and unduly prejudicial considering the allegations made by the government thus far. Other factors similarly weigh against the admissibility of Dr. Raghavan's testimony:

First, because Dr. Raghavan has no knowledge of the specific facts of this case and because the government has not identified any individual who engaged in any "coercive control tactic" toward any victims or intended victims or even that any intended victim engaged in labor out of fear generated by these tactics, her testimony is irrelevant.

Second, her proposed testimony is not proper expert testimony, because it does not go to matters outside the ken of the average juror, or which require specialized training or knowledge.

Third, the testimony appears to be largely the recitation of inadmissible hearsay and not based on any reliable methodology or true expertise, particularly because Dr. Raghavan's research and clinical practice focuses primarily on relationships between intimate partners.

Fourth, permitting this testimony would improperly intrude upon the jury's functions of making credibility determinations and deciding the ultimate issues in this case.

Finally, any limited probative value of this testimony is substantially outweighed by the risk of juror confusion and undue prejudice to Ms. Daedone and Ms. Cherwitz. For all of these reasons, the testimony should be excluded.

## A.    The proffered testimony is not relevant or proper under Rule 702.

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
b) The testimony is based on sufficient facts or data;
c) The testimony is the product of reliable principles and methods; and
d) The expert has reliably applied the principles and methods to the facts of the case.

Expert testimony must be relevant and must rest on a reliable foundation. *See, Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005). Any expert opinion "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).

The testimony must also assist the trier of fact. *See, e.g.*, *Nimely*, 414 F.3d at 397. That is, it must help the jury by explaining some matter outside the ken of the average juror, while not usurping the jury's functions. *Id.* "Testimony is properly characterized as 'expert' testimony only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *See also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (stating that if expert testimony is directed to matters the jury is capable of understanding on its own, the testimony is properly excluded). The proponent of expert testimony must establish its admissibility. *See, e.g.*, *Williams*, 506 F.3d at 160.

To start, Dr. Raghavan's proffered opinions do not appear to be relevant to the forced labor conspiracy as charged, and are not properly characterized as expert testimony. The government has made only generalized and overly broad disclosures regarding the opinions and conclusions Dr. Raghavan will offer in this case. But, as the government admits, she does not know any of the specific facts here and has not spoken with any complaining witness. Instead, she plans to testify, generally, that "abusers" use a "variety" of methods to control their victims, and that the methods could take any form – including "emotional, psychological, sexual or "physical," and that the relationship between the abuser and victim can occur at "work," "in the home", in a "romantic" relationship, or in a "familial relationship. According to Dr. Raghavan's

6

expert disclosure, there is hardly any situation where her particularized "coercive control" theory does not apply.

Dr. Raghavan will also testify that victims often feel "fear and obedience that impacts" their decision-making and "free will," whereby a "target through a gradual process is tricked, deceived or coerced into engaging in activities that they would have otherwise resisted." ECF No. 148-1 at 5. These proffered generalities about abusive relationships have no real relevance to the issues that will be before this jury. The bulk of Dr. Raghavan's expertise appears to relate to either intimate, domestic relationships, or sex trafficking, but particularly to situations and tactics used by pimps when recruiting and controlling prostitutes, many of whom are foreign born or runaways, all of which has nothing to do with this case, where the pertinent social circumstances differ so starkly than those in Dr. Raghavan's research.[1] Moreover, such testimony details relationship dynamics well within the grasp of the average juror where the proposed expertise is not necessary.

The government has represented that in other cases Dr. Raghavan's "research, publications, and teaching have focused on trauma and coercive control in the context of sex trafficking." ECF No. 266-1 at 1; *United States v. Randall*, No. 19 Cr. 131 (PAE) (S.D.N.Y.). Consistent with this representation, the publications of Dr. Raghavan's that the government provided to the defense in this case primarily discuss abuse and coercive control in the context of sex trafficking and pimp/prostitute relationships, or address entirely different matters. Similarly, all of the cases the government points to as those in which Dr. Raghavan has given expert

---

[1] Basra, I. K., Kenney, T., Forrest-Bank, S., Zottarelli, L. K., & Raghavan, C. (2023). Predatory Helpfulness: An Empirical Framework to Identify Fraudulent Tactics Used by Pimps to Recruit and Commercially Sexually Exploit Young Girls and Women. *Journal of Human Trafficking*, 1–16. https://doi.org/10.1080/23322705.2023.2259263; Kenney, T. (2023). "Predatory Helpfulness: A Replication (And Expansion) Study Examining Grooming and Recruitment Tactics in Sex Trafficking" CUNY Academic Works. https://academicworks.cuny.edu/jj_etds/279.

testimony about "domestic abuse" have involved allegations of sex trafficking and/or testimony about the dynamics of pimp/prostitute relationships. For example, in *United States v. Randall*, the defendants were charged with sex trafficking offenses and the government's disclosure notice specifically characterized Dr. Raghavan's proffered testimony as regarding "[t]rauma and coercive control in the context of sex trafficking, including the psychological relationship between pimps and the women prostituted by them; the use and impact of control methods by the pimp; why prostituted women do not leave their pimps; [and] tactics of coercion used by sex traffickers." Tr. at 23:24–24:6 (Feb. 25, 2020), No. 19 Cr. 131 (PAE) (S.D.N.Y.), ECF No. 335. The district court permitted this testimony in light of Dr. Raghavan's work relating to sex trafficking. *Id.* at 27–37. Similarly, in *United States v. Kidd*, 385 F. Supp. 3d 259 (S.D.N.Y. 2019), in which the defendant was charged with commercial sex act exploitation, the court permitted expert testimony "regarding the psychology of the pimp-prostitute relationship." *Id.* at 263–64. So too, in *People v. Abdur-Razzaq*, 60 Misc. 3d 63 (N.Y. Sup. Ct. 2018), a sex trafficking case in which Dr. Raghavan was permitted to testify regarding "trauma bonding to explain the behaviors of prostitutes and pimps" because the theories of "trauma bonding and coercive control" were "generally accepted in the context of sex trafficking." *Id.* at 632, 642.

Dr. Raghavan's testimony in the other transcripts provided by the Government also discussed long-term patterns of abuse and control of women, whereby men engaged in an array of abusive tactics that are not alleged here. These tactics largely comprise Dr. Raghavan's definition of "coercive control" and include micro-regulation of women, such as controlling their clothes, their physical appearance, and how much they eat. ECF No. 148-1. Here, Dr. Raghavan's research regarding sex trafficking does not apply. And her own research deals with a shockingly small, nonrepresentative sample of subjects whose social characteristics are so different from the

anticipated complainants in this case, that no meaningful generalization or application can be made. *See*, Hagan, E., Raghavan, C., & Doychak, K. *Functional Isolation: Understanding Isolation in Trafficking Survivors,* Sexual Abuse, 107906321988905. doi: 10.1177/1079063219889059 (2019) [sample consists of *14* women who were primarily immigrants, mostly Spanish speaking, who had begun relationships with their pimps while minors and in their country of origin].

The government seeks to have Dr. Raghavan use the theory of "coercive control" and "traumatic bonding" to explain why sex workers do not leave their pimps, even when abused. But this case does not involve allegations of any such "pimp"/prostitute relationship. Moreover, the government has not charged either defendant with sex trafficking. The absence of such allegations here underscores the minimal (if any) relevance to this case of Dr. Raghavan's testimony about abuse and control derived from treatment and studies of sex trafficking victims. Combined with the fact that Dr. Raghavan knows nothing about the witnesses or the facts of this case, the probative value of her testimony is thus limited.

At the same time, there is a substantial risk that Dr. Raghavan's testimony about sex trafficking, "pimp"/prostitute relationships, and prolonged subjection to abusive acts will confuse the issues, mislead the jury, and unduly prejudice the defendants. The minimal possible relevance of Dr. Raghavan's testimony is far outweighed by the significant risks it would introduce. Because Dr. Raghavan's anticipated testimony about sex trafficking, pimp/prostitute relationships, and other acts and circumstances not alleged here does not "fit" the facts of this case and would introduce a substantial risk of unfair prejudice, confusing the issues, and misleading the jury, such testimony should be precluded at trial. *See, Daubert*, 509 U.S. at 591; Fed. R. Evid. 702; Fed R. Evid. 403.

Lastly, Dr. Raghavan's generalized testimony about other people's intimate relationships is simply not relevant at this trial. Nor do the proffered generalities of Dr. Raghavan's testimony go to matters that are beyond the grasp of the average juror or which require specialized knowledge and training to understand. It seems straightforward that a victim of intimate partner violence may experience fear or feel a need to obey their abuser. The government has not shown why an expert is necessary to explain these ideas to the jury. Again, the government has charged the defendants with conspiracy to commit forced labor, not sex trafficking. No expert testimony is necessary. If a witness testifies that they were coerced and/or threatened, the jury will be capable in deciding whether to believe their claim, as this case involves questions well within the grasp of the average juror. Therefore, because the government has failed to show that its proffered expert testimony concerns a matter the average juror is incapable of understanding on their own, the testimony is inadmissible under Rule 702.

Here, the defendants are charged with forced labor conspiracy, under 18 U.S.C. Section 1589(a), which penalizes any person who "knowingly provides or obtains the labor or services of a person through, among other things, the actual use or threatened use of "force," "serious harm or threats of serious harm to that person or another person." The government has provided no evidence whatsoever that the Defendants personally engaged in any conduct toward any individual that could objectively be characterized as causing or threatening serious harm. To the extent the government contends that other employees of OneTaste caused or threatened serious harm toward any victims or intended victims, the government has not identified these individuals or *any* unindicted co-conspirators. Until the government identifies specific *conduct* by specific individuals, it is unclear how Dr. Raghavan's testimony could ever be relevant or helpful to the trier of fact. The government is not at liberty to elicit testimony about "coercive control tactics"

that play absolutely no role in this case and which no witness will identify constituted harm so serious that it compelled a reasonable person of the same background and in the same circumstances to perform labor or service in order to avoid incurring that harm. Additionally, unless the government can show (and they have made no such showing thus far) that Defendants had *knowledge* that other individuals engaged in any such tactics for *the purpose* of obtaining labor and services, this expert testimony serves no purpose othen than to prejudice and mislead this jury into believing these tactics were utilized by co-conspirators with the knowledge of the Defendants *for the purpose* of obtaining services and that the intended victims performed those services out of fear of serious harm. The expert testimony must have some nexus to the actual evidence and the government has shown none. It simply seeks to have a witness to tell the jury about tactics used by abusers to signal to the jury that there was abusive and coercive conduct in this case which it will never be able to prove occurred with the knowledge of Defendants.

The government clearly intends to dilute the statutory definition of "coercion" with testimony about "various tactics" such as "intimidation, deprivation, micro-regulation, manipulation, and isolation," that do not amount to the "serious harm" or "physical restraint" expressly contemplated by § 1591(e). Even permitting this witness to use the word "coercion," when her definition of the term is contrary to the statutory definition, risks serious confusion of the issues for the jurors, and should be prohibited by the Court. Under Rule 702, such testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Here, it will do the opposite. Furthermore, the application of 'coercive control' theory to organizational contexts, as proposed by the government, is inherently flawed and lacks scientific consensus, as the concept of 'coercive control' in organizational settings is not sufficiently developed or accepted in the scientific community to meet the *Daubert* standard.

**B.** **The proffered testimony is not based on any reliable methodology and improperly transmits hearsay to the jury.**

Next, the defendants request a *Daubert* hearing with respect to Dr. Raghavan's proffered conclusions and opinions because they do not appear to be grounded in any reliable methodology. Instead, they seem to be nothing more than a means of transmitting inadmissible hearsay to the jury. A threshold issue is, of course, whether a witness "is qualified as an expert" to render a proposed opinion. *See, Nimely*, 414 F.3d at 396. Determining whether a witness has the requisite expertise to offer the specific opinions proffered is a key question the trial court must answer in performing its "gatekeeping" role regarding expert testimony. *See, Kumho Tire Co. v Carmichael*, 526 U.S. 137, 150 (1999) (holding that "the gatekeeping inquiry must be tied to the facts of a particular case"); *Amorgianos v. Nat'l R.R. Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (noting that the trial court's gatekeeping analysis under Rule 702 and *Daubert* "will necessarily vary from case to case"). As the Second Circuit has emphasized, just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13. The trial court "retains the screening function traditionally played by trial judges, and must determine whether the expert is qualified to testify in the specific or specialized area at issue." *N.K. by Bruestle-Kumra v. Abbott Labs.*, No. 14 Civ. 4875 (RER), 2017 WL 2241507, at *3 (E.D.N.Y. May 22, 2017) (quotations and alterations omitted).

The Court should exclude Dr. Raghavan's opinions about organizational coercive control because she is not qualified to provide such testimony. Experts may rely upon otherwise inadmissible facts or data in reaching their conclusions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. In particular, an expert may rely on hearsay if that is reasonable within her field and if

she is applying expertise or a reliable methodology to that hearsay to reach her own expert opinion. *See, e.g.*, *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003). However, an expert may not simply transmit hearsay statements to the jury. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013); *Mejia*, 545 F.3d at 197; *Dukagjini*, 326 F.3d at 58 (finding that such improper testimony in a criminal trial violates Rule 703 and the Confrontation Clause).

It appears that a significant portion of Dr. Raghavan's proffered expert testimony would violate this prohibition. When Dr. Raghavan states that victims in abusive relationships "often do not feel free to leave" their relationship or location, she appears to be simply repeating hearsay statements of these victims, which she has either heard or read somewhere. There is no expert methodology or analysis at work, and her proposed expertise in interpersonal dynamics do not extend to organizational dynamics.

The government has also disclosed that Dr. Raghavan is expected to testify about a broad range of topics that focus on the subjective motivations, thought processes, and mental states of alleged perpetrators of sexual and other interpersonal abuse. However, as stated above, this is overly broad, generic, unhelpful, and prejudicial. Indeed, as courts in this District have repeatedly held, "opinions concerning state of mind are an inappropriate topic for expert opinion." *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 3020 (SAS), 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011); *e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y.2005) (excluding testimony where proffered expert offered "his opinion as to the state of mind and knowledge possessed by defendants and non-parties to this action"); *Rezulin Prods.*, 309 F. Supp. 2d at 546 (excluding proffered expert testimony concerning "intent, motives or state of mind").

In *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The trial court must conclude that the "proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597). In performing this inquiry, the Court should "should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). Because Dr. Raghavan's proffered opinions regarding sexual and interpersonal violence, coercive control tactics, and stripping individuals of their agency, as well as her opinions regarding trauma bonding, grooming, and especially, coercive control within and organizational structure, do not satisfy Rule 702 or *Daubert*, they must be excluded from the upcoming trial. To the extent the Court does not preclude such testimony, it should be evaluated in a pre-trial *Daubert* hearing.

Here, the government seeks to elicit expert opinion that "members within an organizational structure can exert collective or peer pressure to ensure the victim's obedience," and other coercive group dynamics that not only appear to be beyond the purview of their disclosed expert, but also do not satisfy Rule 702 or *Daubert*, and these opinions must also be excluded. As stated, Dr. Raghavan's research regarding "coercive control" focuses almost exclusively on intimate relationships, particularly those involving pimps and prostitutes, and her proposed testimony regarding coercive control within organizational structures is not supported by her research. To the extent that Dr. Raghavan has examined these concepts in "trafficked

victims," she and her colleagues examined narratives from a very small sample of 14 women who were primarily foreign born, spoke little English, and had begun relationships with their pimps while minors in their county of origin. Hagan, E., Raghavan, C., & Doychak, K. *Functional Isolation: Understanding Isolation in Trafficking Survivors*, Sexual Abuse, 107906321988905. doi: 10.1177/1079063219889059 (2019). Such research has no scientific applicability to organizations and should be precluded. To the extent the Court does not preclude such testimony, it should be evaluated in a pre-trial *Daubert* hearing.

### C. The proffered testimony seeks to improperly bolster the credibility and narrative of government fact witnesses.

Even assuming *arguendo* that Dr. Raghavan's proffered testimony rests on some reliable methodology and is relevant, it should be precluded because it seeks to improperly bolster the credibility of government fact witnesses and intrudes upon the jury's core functions. Expert testimony that constitutes an evaluation of witness credibility, even if rooted in scientific or technical expertise, is inadmissible. *See, e.g.*, *Nimely*, 414 F.3d at 398. This is true even when an expert does not address a particular witness or piece of testimony, but speaks only to categories of witnesses or types of statements. *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *United States v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) (summary order). "It is appropriate, therefore, to exclude expert testimony offered to bolster the credibility of fact witnesses." *U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, No. 06 Civ. 2860 (DLC), 2009 WL 1110577, at *2 (S.D.N.Y. Apr. 22, 2009) (citing *United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007)). For example, in *United States v. Lumpkin*, the Second Circuit approved exclusion of an expert witness who would have discussed the lack of any correlation between a witness's confidence and the accuracy of his identification, since

this testimony would have usurped the jury's role of assessing witness credibility. *See,* 192 F.3d at 289.

Similarly, the only possible purpose of Dr. Raghavan's testimony that a victim of abuse would not "feel free to leave" the relationship or physical location they shared with an abuser, or that certain victims only engage in certain behavior because of a variety of coercive tactics employed by their abusers, would be to support the complaining witnesses claims that they did not feel free to leave organization to which they belonged, and that they only engaged in certain behavior because the defendants coerced them to do so. Indeed, the purpose of Dr. Raghavan's testimony that "coercive control" is used to trick, deceive, or coerce another into engaging in activities that they ordinarily would have resisted, is to claim that such techniques were used here, by a multitude of people, as well as within the structure of an organization which Dr. Raghavan knows nothing about. What other purpose could there be to Dr. Raghavan's proffered testimony? It is a blatant attempt to bolster the account of a government fact witness by means of a government expert. This is improper and it would be manifest error to admit such testimony where the credibility of the government's fact witness will be a critical issue at trial. *See, e.g.*, *Nimely*, 414 F.3d at 400 (holding that admission of such expert testimony was prejudicial where "witness credibility was the central issue").

Dr. Raghavan's proffered testimony is also problematic in that it seeks to describe a "typical" pattern of criminal behavior in a way that mirrors the government's factual claims, thereby using "expert" testimony to summarize and bolster the government's factual narrative. The Second Circuit has repeatedly criticized this type of testimony in drug cases. As the Circuit has explained, it is improper for the government to call an expert to testify as to how drug dealers "typically" work, while offering testimony that seeks to mirror that of government fact

witnesses—this "expert" often explains concepts well within the average juror's understanding and "implicitly encourage[s] the jury to draw the government's preferred inferences." *United States v. Rijo*, 508 F. App'x 41, 45 (2d Cir. 2013) (summary order); *see also United States v. Cruz*, 981 F.2d 659, 665 (2d Cir. 1992) (cautioning that expert testimony must speak to "esoteric aspects reasonably perceived as beyond the ken of the jury" and not be used "solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events"); *Castillo*, 924 F.2d at 1233-34 (finding prejudicial error where court admitted "expert" drug testimony aimed at corroborating another government witness's account).

As the Circuit observed in drug cases,

> An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately 'expert' matters, … the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them. … In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict ….

*Mejia*, 545 F.3d at 190-91.

Following *Cruz*, *Castillo*, *Mejia*, and similar cases, this Court should not permit the government to call a purported expert witness to describe how particular relationships "typically" work or how women in abusive relationships typically feel, simply to encourage the jury to draw the government's preferred inferences from any factual evidence about the defendants, particularly when Dr. Raghavan's research deals with small subsets of women in significantly different situations than the individuals in this case.

Dr. Raghavan's proffered testimony is particularly problematic in a forced labor case such as this. Experts must not offer testimony that usurps the role of the fact finder or that takes

the form of a legal conclusion. *See, e.g.*, *Lumpkin*, 192 F.3d at 289; *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). In a forced labor case, one of the elements the jury must decide is whether a victim provided labor due to force, threats of force, physical restraint, or threats of serious harm. With "expert" opinion testimony that suggests that victims in abusive relationships are subject to coercive control tactics and thus manipulated to engage in acts they otherwise would not have, the government's proffered witness is "essentially instruct[ing] the jury as to an ultimate determination that [is] exclusively within its province." *Nimely*, 414 F.3d at 398.

The only possible purpose of Dr. Raghavan's proffered testimony about the use of coercive control to "maintain compliance" and to "trick" and "deceive" would be to support the government witness's current narrative about their past behavior, and to bolster the credibility of these witnesses' testimony about their past conduct and statements. Aware that the evidence does not support the charge, the government seeks to make an end-run around the requirement that it prove use of force or threats of force. Instead, under the government's theory, force and threats of force will be replaced by "coercive control tactics," which their proffered expert will claim includes things such as "micro-regulation," "isolation" and "erosion of self-worth." Indeed, the government will proffer their expert to re-educate the members of the jury and to forget all of their own knowledge of what it means to act autonomously, and instead replace it all with the academic theory of its paid expert.

Here, the Court should not permit the government to call a purported expert witness to describe the "common" elements or "methods of control" or how victims lose their "autonomy," simply to encourage the jury to draw the government's preferred inferences from factual evidence about the defendants and the government's witnesses. Dr. Raghavan's proffered

testimony is particularly problematic in this case, where the mental states of the government's witnesses are crucial to the ultimate questions that the jury must decide for itself—including whether the alleged victims engaged in certain conduct of their own volition or were forced to do so, and particularly when there is objective evidence to discredit them. Experts must not offer testimony that usurps the role of the fact finder or that takes the form of a legal conclusion. *See, e.g.*, *Lumpkin*, 192 F.3d at 289; *Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir. 1992).

Essentially, the purported role of the proposed expert witness would be to give improper opinion testimony about the credibility of these "victims." The government, through its proffered expert, is attempting to explain away anticipated testimony from the witnesses that does not comport with the prosecution's theory. The proposed experts should not be permitted to contradict testimony that may be harmful to the government's case. If permitted to do so, they would be usurping the role of the jury in making findings on critical elements of the offenses alleged. The government is inherently conceding that its fact witnesses will not be credible and will not provide the testimony necessary to establish the element of "force, fraud, or coercion" that exists in the charges against the defendant. As a result, the government is seeking to use its expert witness to encourage the jury to replace its own assessment of the critical element and replace it with the assessment of the expert witness. This is not within the permissible confines of merely helping the jury understand the testimony. As such, the proffered testimony does not satisfy the standards of *Daubert* and its progeny and should, therefore, be excluded.

By offering "expert" opinion testimony that suggests there are "common elements" in all "coercive control" situations, and that purports to describe how all victims of interpersonal abuse feel or act, Dr. Raghavan is "essentially instruct[ing] the jury as to an ultimate determination that [is] exclusively within its province." *Nimely*, 414 F.3d at 398.

**D.** **The proffered testimony's probative value is substantially outweighed by the risk of undue prejudice and juror confusion.**

Finally, under Federal Rule of Evidence 403's balancing test, any potential relevance of this testimony is far outweighed by its unduly prejudicial effect. Even if an expert's proposed testimony is relevant, Rule 403 requires exclusion of the evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See, e.g.*, *Daubert*, 509 U.S. at 595. Because expert evidence can be "both powerful and quite misleading because of the difficulty in evaluating it," a "judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Nimely*, 414 F.3d at 397 (citations and internal quotations omitted.).

In discussing certain abusive relationships in general terms, Dr. Raghavan will offer inflammatory and prejudicial testimony that has no place in this trial. As the government admits, Dr. Raghavan knows nothing about the facts of this case or the particular relationship between the defendants and the complaining witness(es). By letter dated September 16, 2024, the government indicates that Dr. Raghavan described abusive relationships in which, *inter alia*, (i) men engage in sex trafficking of women; (ii) abusers groom individuals in order to trick them into engaging in certain activities; (iii) abusers seek "damaged" individuals who they will be able to control; (iv) pimps use similar tactics to control young women; and, (v) women form "trauma bonds" with their abusers. Dr. Raghavan's inflammatory testimony about these sorts of abusive relationships implicitly links them to the defendants and suggests to the jury that Ms. Daedone and Ms. Cherwitz are akin to men who sex traffic women, abusers who deprive their victims of access to outside sources, and pimps who traffic young prostitutes. The testimony improperly encourages the jury to convict the defendants on a guilt-by-association basis.

Besides her extensive research regarding the relationship between pimps and prostitutes, Dr. Raghavan claims women form "trauma bonds" with their abusers, which Dr. Raghavan analogizes to the bonds formed between "Nazi Germany survivors in the Holocaust" and their "prison guards," or prisoners of war and their torturers. *People v. Abdur-Razzaq*, 60 Misc. 3d 63 (N.Y. Sup. Ct. 2018), Hearing Transcript, December 21, 2017, Pages 112, 124. Dr. Raghavan's inflammatory testimony about these sorts of abusive relationships is improper and should be precluded.

Even putting aside these extremes, it appears that Dr. Raghavan will testify about patterns of control, coercion, and abuse not just between individuals in an intimate relationship, but also "within an organizational structure." ECF No. 148-1.  These baseless and hypothetical claims are not the product of clinical research or experience, but based on pure speculation and in an attempt to fit the government's theory in this particular case. Despite no citations or bases for the statements, the government indicates that Dr. Raghavan will testify that within an organization, "perpetrators *may* pick a subset of members as target," or they "*may* target a particular individual through his or her vulnerabilities", or "perpetrators *may* use different strategies with different targets." (emphasis added)  ECF No. 148-1, at 4. Again, without any identifiable basis, the government claims Dr. Raghavan will testify that "other members within an organizational structure *can* exert collective or peer pressure…to ensure obedience," and that "such pressure *can* take the form of love and support," or such pressure *can* take the form of "withdrawal of support," or such pressure *can* take the form of "threats." (emphasis added) *Id*.  It is apparent that, despite Dr. Raghavan's lack of clinical and research experience within greater organizational structure, she is willing to testify to any hypothetical fact, no matter how general

or obvious, in order to fit the government's narrative and to bolster the incredible testimony of their witnesses. It should not be permitted.

All of this testimony risks confusing the jurors about the actual issues before them and inflaming their passions about conduct that has nothing to do with Ms. Daedone or Ms. Cherwitz, but which will be held against them as the defendants at trial. Any limited probative value of Dr. Raghavan's testimony is far outweighed by this improper impact, and the testimony should be excluded under Rule 403.

## II. Alternatively, the Testimony of the Government's "Coercive Control" Expert Should Be Limited.

### A. The Court should preclude Dr. Raghavan from testifying about "organizational" tactics, "cults," "grooming," or the targeting of individuals with traumatic pasts.

The Court should preclude Dr. Raghavan from offering any testimony about so-called "grooming" tactics because the government has not established the reliability of this opinion. Similarly, the Court should preclude Dr. Raghavan from offering any testimony about the generalized tactics or large groups or organizations or the targeting of individuals with past trauma as a tactic, as the government has not established the reliability of these opinions.

Here, the government has repeatedly alleged that the defendants targeted individuals with vulnerabilities or traumatic histories, alluding to allegations of purported sexual "grooming." In its expert disclosure, the government states that Dr. Raghavan intends to offer an opinion that "coercive control is used to groom – whereby a target through a gradual process is tricked, deceived, or coerced into engaging in activities that they would have otherwise resisted." ECF No. 148-1, Page 5. They also state that Dr. Raghavan will testify to the behaviors within an

"organizational structure" and its "members," particularly in relation to coercive control that are "targeted to exploit the vulnerabilities of specific victims," whom *they* recruit. *Id* at 4.

First, the opinion about "grooming" is notable because a similar expert was not permitted to offer this same opinion in the *Raniere* matter. *See, United States v. Raniere*, No. 18 Cr. 204 (NGG) (E.D.N.Y.), Dkt. No. 685. The District Court in *Raniere* found that the government had not disclosed "any studies establishing the reliability" of the expert's opinions about grooming, and had not established that "Dr. Hughes's opinion about grooming techniques [were] reliable under the *Daubert* standard." *Raniere*, 2019 WL 2212639, at *7.

Here, the Court should not allow the government to improperly elicit Dr. Raghavan's opinion about "grooming," including references to behaviors commonly associated with grooming, without properly establishing this opinion's reliability. Likewise, as argued above, the Court should similarly preclude Dr. Raghavan's opinions about "organizational" coercive control and the intentional targeting and manipulation of individuals with traumatic pasts, without properly establishing this opinion's reliability, as they do not satisfy the fit or reliability requirements of FRE 702 and *Daubert*. Lastly, the Court should preclude Dr. Raghavan from applying her coercive control theory within the context of "cults," which would be inappropriate, overly prejudicial, and which represents a complete departure from Dr. Raghavan's documented research. The government's efforts to extrapolate her research in this manner to imply or analogize the conduct in this case with cult-like behavior, is an attempt to backdoor cult-related concepts before the jury. It lacks scientific basis and exceeds Dr. Raghavan's expertise and documented research and is overly prejudicial to the defendants.

**B.    The Court should not permit Dr. Raghavan to testify about sex abuse and other inflammatory topics.**

The government has characterized Dr. Raghavan as a "licensed clinical psychologist" with the majority of her experience relating to domestic violence and trafficking. ECF No. 148-1, Page 7. A significant portion of the government's disclosure letter highlights Dr. Raghavan's professional experience and research related to domestic violence, trafficking, and tactics used by pimps to sexually exploit young girls and women. As a result, it would appear that much of her opinion testimony draws from and expressly relies upon the research and her experiences with survivors and victims of sexual violence. The government here seeks to have Dr. Raghavan extrapolate from this basis of knowledge to offer opinion testimony about "coercive control," particularly in the context of an organization where individuals are charged with forced labor conspiracy. The Court, however, should preclude Dr. Raghavan's testimony on sexual assault, sexual violence, and sexual abuse because it would not be helpful to the jury in this case and the limited probative value of any such testimony would be substantially outweighed by the risk of undue prejudice to Ms. Daedone and Ms. Cherwitz.

Lastly, as discussed, the Court should preclude Dr. Raghavan from testifying about (1) sex trafficking and the relationship dynamics between pimps and prostitutes, as well as (2) torture survivors, cult members, Nazi guards, Holocaust survivors, and prisoners of war.


**CONCLUSION**

For these reasons, the Court should exclude the testimony of the government's proffered expert witness. In the alternative, the Court should hold a *Daubert* hearing at which the government must establish the admissibility of each its proffered expert opinions.

Dated:      October 11, 2024
             New York, New York

                                     Respectfully submitted,

                                     BONJEAN LAW GROUP, PLLC

                                  _____/s/ Jennifer Bonjean_____
                                  Jennifer Bonjean, Esq.
                                  Ashley Cohen, Esq.
                                  303 Van Brunt Street, 1st Fl
                                  Brooklyn, NY 11231
                                  (718) 875-1850
                                  jennifer@bonjeanlaw.com

                                  AIDALA, BERTUNA & KAMINS, P.C.

                                  _____/s/ Arthur L. Aidala_____
                                  Arthur L. Aidala, Esq.
                                  Imran Ansari, Esq.
                                  Michael Jaccarino, Esq.
                                  546 Fifth Avenue, 6th Floor
                                  New York, NY 10036
                                  (212) 486-0011
                                  arthur@aidalalaw.com
                                  iansari@aidalalaw.com
                                  jaccarino@aidalalaw.com