UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------X

UNITED STATES OF AMERICA

    - against -                    23-CR-146 (DG)

RACHEL CHERWITZ and
NICOLE DAEDONE,

                Defendants.

---------------------------------------------------X


**DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION TO EXCLUDE THE DEFENDANTS' PROFFERED EXPERT TESTIMONY**

AIDALA, BERTUNA & KAMINS, P.C.
Arthur L. Aidala, Esq.
Imran H. Ansari, Esq.
Michael Jaccarino, Esq.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
arthur@aidalalaw.com
iansari@aidalalaw.com
jaccarino@aidalalaw.com


BONJEAN LAW GROUP, PLLC
Jennifer Bonjean, Esq.
Ashley Cohen, Esq.
303 Van Brunt Street, 1st Fl.
Brooklyn, New York 11231
(718) 875-1850
jennifer@bonjeanlaw.com


*Attorneys for Defendants Rachel Cherwitz
and Nicole Daedone*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. i

PRELIMINARY STATEMENT........................................................................................... 1

BACKGROUND .................................................................................................................. 2

    1.   Dr. Ley's Expected Testimony ........................................................................ 3
    2.   Dr. Klein's Expected Testimony ..................................................................... 4
    3.   Dr. Kriegman's Expected Testimony .............................................................. 5
    4.   Dr. Leonard's Expected Testimony ................................................................ 7
    5.   Defendants' Reservation of Rights under the Circumstances.......................... 9
    6.   The Government's Motion ............................................................................... 9

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ..................................................................................................................... 13

I.    Defendants' Expert Disclosures Are Not Deficient. ............................................ 13

II.   Dr. Ley's Proposed Expert Testimony Should Not Be Precluded.................... 15
    A.   Testimony Concerning the Science of Orgasmic Meditation. ..................... 16
    B.   Dr. Ley Should Be Permitted to Offer Rebuttal Testimony Concerning the Government's Coercive Tactics Expert.................................................................... 18
    C.   Dr. Ley Should be Permitted to Testify as to Whether Defendants Targeted Vulnerable Victims................................................................................................... 19

III.   Dr. Klein's Proposed Expert Testimony Should Not Be Precluded ............................ 20

IV.   Dr. Kriegman's Proposed Expert Testimony Should Not Be Precluded...................... 21
    A.   The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding Whether Other Businesses, Entities, and Social and Scientific Movements Qualify as Cults ............ 21
        i.   Dr. Kriegman is Qualified to Provide Expert Testimony on Cults ................. 22
        ii.   Dr. Kriegman's Expert Testimony as to Cults is Reliable, Relevant, and Bears no Risk of Undue Prejudice .................................................................................... 23
    B.   The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding the Importance of Evidence-Based Assessment of Cults............................................................. 24
    C.   The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding Whether OneTaste Is a Pernicious Cult .................................................................................. 25
        i.   Dr. Kriegman's Bases, Reasons, and Materials Underlying His Opinion Do Not Warrant Preclusion of His Expert Testimony ............................................... 28
        ii.   Dr. Kriegman's Expert Testimony Does Not Invade the Jury's Role ............... 29
        iii.   Dr. Kriegman's Expert Testimony Does Not Cause Any Unfair Prejudice ......... 30

V.   Dr. Leonard's Proposed Expert Testimony Should Not Be Precluded ............................ 31

VI.  A Daubert Hearing is Not Warranted .................................................................... 36

CONCLUSION.................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianas v. Nat'l R.R. Passenger*,
   303 F.3d 256 (2d Cir. 2002) ........................................................ 11, 12

*Ams. United For Separation of Church & State v. Prison Fellowship Ministries*,
   432 F. Supp. 2d 862 (S.D. Iowa 2006) ........................................ 25

*Borawick v. Shay*,
   68 F.3d 597 (2d Cir. 1995) ......................................................... 11, 12

*Boucher v. United States Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ........................................................... 12, 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................. 10, 11, 35

*Elec. Contrs., Inc. v. Pike Co.*,
   2014 US Dist LEXIS 77128 (D Conn, 2014) ............................. 23

*Frye v. United States*,
   293 F. 1013 (D.C. Cir. 1923) ..................................................... 10

*In re Fosamax Prods. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) ....................................... 12

*Indeed, in United States v. Mahaffy*,
   2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) .......................... 14-15

*Kleiman v. Wright*,
   2020 US Dist LEXIS 213482 (SD Fla 2020) ............................. 32, 33

*Kopf v. Skyrm*,
   993 F.2d 374 (4th Cir. 1993) ..................................................... 22, 27

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................... 11

*Linde v. Arab Bank*,
   922 F Supp 2d 316 [EDNY 2013] .............................................. 29

*United States v. Locascio*,
   6 F.3d 924 (2d Cir. 1993).................................. 23, 25, 27, 28, 29

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ...................................................... 10

*Noyes v. Kelly Servs.*,
   2008 US Dist LEXIS 108250 (ED Cal, 2008) .......................... 22, 23

*People v. Vieira,*
  35 Cal. 4th 264 (2005) ............................................................................. 23

*Presicion Trenchless, LLC v. Saertex Multicom LP,*
  2022 US Dist LEXIS 34199 (D Conn, 2022) ...................................... 31, 34

*Raskin v. Wyatt Co.,*
  125 F.3d 55 (2d Cir. 1997) ...................................................................... 34

*Scott v. Ross,*
  140 F.3d 1275 (9th Cir. 1998) ........................................................ 23, 28-29

*Travelers Property & Cas. Corp. v. General Elec. Co.,*
  150 F. Supp. 2d 360 (D. Conn. 2001) ...................................................... 11

*UMG Recordings, Inc. v. Lindor,*
  531 F. Supp. 2d 453 (E.D.N.Y. 2007) ...................................................... 23

*United States v. Daly,*
  842 F2d 1380 (2d Cir 1988) ..................................................................... 29

*United States v. Ho Wan Kwok,*
  2024 US Dist LEXIS 74281 (SDNY 2024) ...................................... 14, 15, 31

*United States v. Kaufman,*
  2021 US Dist LEXIS 170367 (SDNY 2021) ............................................. 15

*United States v. Valle,*
  2013 US Dist LEXIS 14864 (SDNY 2013) ............................................... 15

*United States v. Zhong,*
  26 F.4th 536 (2d Cir 2022) ...................................................................... 24

*United States v. Anderson,*
  446 F.3d 870 (8th Cir. 2006) ................................................................... 25

*United States v. Dukagjini,*
  326 F.3d 45 (2d Cir. 2003) ...................................................................... 10

*United States v. Duncan,*
  42 F.3d 97 (2d Cir. 1994) ................................................................... 10, 34

*United States v. Dupree,*
  2011 U.S. Dist. LEXIS 139810 (E.D.N.Y. 2011) ...................................... 13

*United States v. Jakobetz,*
  955 F.2d 786 (2d Cir. 1992) .................................................................... 36

*United States v. Mulder,*
  273 F.3d 91 (2d Cir. 2001) ............................................................ 23, 26, 29

*United States v. Raniere,*
  384 F. Supp. 3d 282 (E.D.N.Y. 2019) ...................................................... 13

*United States v. Romano*,
    794 F.3d 317 (2d Cir. 2015) ................................................................ 11

*United States v. Sparks*,
    949 F.2d 1023 (8th Cir 1991) .............................................................. 26

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004) .................................................................. 10

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................. 10, 36

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
    112 F. Supp. 3d 122 (S.D.N.Y. 2015) ................................................. 20

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009) ............................................................. 13, 12

**Page(s)**

**Statutes**

18 U.S.C. § 3500 ...................................................................................... 2, 9, 21
Fed. R. Crim. P. 16 ..................................... 1, 2, 9, 12, 13, 14, 15, 19, 21, 32, 37
Fed. R. Evid. 402 ........................................................................................... 9
Fed. R. Evid. 403 ........................................................................ 9, 24, 33, 35, 36
Fed. R. Evid. 702 ................................................................ 10, 11, 22, 27, 34, 35
Fed. R. Evid. 703 .......................................................................................... 28

## PRELIMINARY STATEMENT

Defendants RACHEL CHERWITZ and NICOLE DAEDONE (collectively "Defendants"), by and through their undersigned attorneys, Aidala, Bertuna & Kamins P.C. and Bonjean Law Group, PLLC, respectfully submit this Joint Memorandum of Law in Opposition to the Government's Motion to Exclude Defendants' Proffered Expert Testimony (the "Government's Motion"), respectfully requesting that the Court issue an Order (1) denying the Government's Motion in its entirety; (2) permitting Defendants' Proffered Expert Testimony, as laid out in Defendants' 16(a)(1)(C) notice pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") and supportive materials (ECF Dkt. 177-178) without holding a *Daubert* hearing; and (3) any such other and further relief to Defendants as the Court deems just and proper.

Like its Motions *In Limine*, the Government's Motion to Exclude Defendants' Proffered Expert Testimony aims to unreasonably and unconstitutionally curtail Defendants' right to a complete and fair defense in this prosecution. Defendants have identified four expert witnesses based solely on their best guess as to what the Government's case will entail. Unlike the Government, which bears the burden of proof and knows precisely what evidence on which it will rely to prove its case, Defendants are not obligated to present any evidence of any kind (although they certainly will) and are left to speculate as to what the Government's evidence will be and what expert testimony might be needed to rebut it. Since the Government refuses to make a timely and reasonable production of witness statements, Defendants cannot point specifically to potential Government witness testimony that the Court should consider in determining whether the Defendants' proposed expert testimony is relevant and whether its probative value outweighs any prejudicial effect. Frankly, it is unclear how this Court could even rule on the admissibility of

1

expert testimony without knowing more about the Government's case. Accordingly, Defendants reserve the right to expound on their arguments contained herein if witness disclosures demonstrate the importance and need of certain expert testimony.

As set out in detail below, Defendants' expert disclosures comply with Fed. R. Crim. P. 16(b)(1)(C). To the extent the Court believes that any such disclosures are deficient, Defendants must be the afforded the opportunity to cure any deficiencies, including by modifying or fine-tuning any proffered opinions. This is particularly so where the Government has not made any § 3500 disclosures, has made a meaningless disclosure of potential witnesses (including someone who are deceased), and where this Court's ruling on the parties' Motions *In Limine* will shed significant light on the relevance of certain expert testimony. Just by way of example, the proposed expert testimony of Dr. Kriegman will depend largely on whether this Court permits the Government to present evidence or otherwise suggest that OneTaste is a "cult." An Order precluding any expert testimony would be grossly premature under the current circumstances. Both the Defendants and the Court must have a full understanding of the Government's case before the Court can properly exercise its discretion on the admissibility of certain expert testimony.

## **BACKGROUND**

On October 17, 2024, the Court extended Defendants' expert disclosure deadline to October 21, 2024. On October 21, 2024, Defendants provided notice that, at trial, they anticipate calling the following experts:

1.      Dr. David J. Ley Jr., Ph.D ABPP ("Dr. Ley");

2.      Dr. Marty Klein, Ph.D ("Dr. Klein");

3.      Dr. Daniel Kriegman, Ph.D ("Dr. Kriegman"); and

4.      Dr. Robert A. Leonard, Ph.D, Linguist ("Dr. Leonard").

*See*, ECF Dkt. 177 ("Defendants' Expert Notice"). Additionally, on the same date, Defendants provided additional materials related to the aforementioned experts and their respective expected testimonies. *See*, ECF Dkt. 178.

    1.    <u>Dr. Ley's Expected Testimony</u>

    As set forth in Defendants' Expert Notice, Defendants intend to call at trial Dr. Ley, a board-certified clinical psychologist and a board-certified sex therapist and supervisor of sex therapy, author of numerous books and articles on human sexuality and psychology, among other things, and expect him to offer the following testimony, in summary:

> Dr. Ley is expected to offer his expert opinions on the scientific effects of Orgasmic Meditation, the potential benefits of Orgasmic Meditation, and the relationship of Orgasmic Meditation to existing sexual therapeutic techniques as well as to historical spiritual practices, as specifically identified below. Based on his long experience working with sexual offenders, Dr. Ley will offer opinions concerning the subject matters of coercive behaviors and grooming in response to the Government's expert Dr. Rhagavan. Dr. Ley will testify that there remain no well-validated, normed assessments to objectively or consistently measure 'coercive control' or grooming. Dr. Ley will also refute the contention that that Onetaste, Cherwitz and Daedone targeted vulnerable individuals by engaging in grooming or coercive behaviors consistent with that of sexual predators.
> . . .
> Dr. Ley will review and discuss the body of scientific research that has examined the practices, effects and outcomes of Orgasmic Meditation. […] Dr. Ley will discuss a selection of some of the research which has been conducted on OM[.][1]
> . . .
> Dr. Ley will testify that OM has a likelihood of producing positive effects on a number of psychosexual disorders and disparities, to include, but not limited to: increasing relational and emotional closeness between intimate and non intimate partners; addressing gender disparities in sexual pleasure and orgasm; relieving sexual symptoms of historical trauma. Contrary to the Government's assertion that defendants targeted persons with histories of trauma and used OM to exploit them, Dr. Ley will testify that OM is an intervention with substantial likelihood of increasing sexual function and confidence in trauma victims. Dr. Ley is expected to testify that OM is consistent with recent and established published research on the overall health impacts of female orgasm and mutual orgasm.
> . . .

---

[1] Defendants' Expert Notice proceeds to mention and thoroughly analyze, without limitation, specific studies and topics that Dr. Ley is expected to discuss, also citing and referencing to specific publications object of the expert's analysis conducted for the purposes of his expected testimony at trial.

The defense expects that Dr. Ley will testify that, while not developed as a clinical intervention by licensed sex therapists or sex researchers, OM bears striking resemblance to a number of established, tested and frequently used sexual therapy techniques. These include: sensate focus; directed masturbation; somatic sexuality therapies; treatments for sexual symptoms of historical trauma; and experiential therapies and processes. Dr. Ley will explain this further with . . . examples[.][2]

. . .

The defense expects that Dr. Ley will testify to the extent that OM is consistent with, and fits in, a long history of sexual cultural practices involving similar forms of touch and stimulation for the purpose of mental and spiritual growth and celebration of female sexuality. These include, but are not limited to: Tantric sexuality; Greek medicine; Sex Magick; feminist sexuality; bondage discipline sadomasochistic (BDSM) practices; and what is known as 'collective sex environments.' Dr. Ley will also relate the practice of OM to continued social shifts in attention to female sexual autonomy and pleasure.

. . .

Dr. Ley will testify as to the challenges with use of the term 'grooming,' explaining the scientific and clinical limitations of this concept, particularly in matters of law. [...] The prosecution has introduced expert witness Dr. Chitra Raghavan, to testify on the concept of 'coercive control,' as it allegedly applies to actions by the defendants. The defense expects Dr. Ley to testify as to how the concept of 'coercive control' is an extension of the vague concept of grooming to a broader group of persons and behaviors, including domestically-violent relationships and sexually exploitive relationships, and that the concept still suffers from the same methodological and theoretical limitations as grooming. Dr. Ley will testify that there remain no well-validated, normed assessments to objectively or consistently measure 'coercive control.'

. . .

*See*, ECF Dkt. 178.

2. <u>Dr. Klein's Expected Testimony</u>

As set forth in Defendants' Expert Notice, Defendants intend to call at trial Dr. Klein, an experienced Licensed Marriage & Family Therapist, certified Sex Therapist, Sex Therapist Supervisor, and Provider of Continuing Education, with a Ph.D. in Human Sexuality, an M.A. in Sociology, and an M.A. in Clinical Psychology, with further expertise in the study of memory, the

---

[2] Defendants' Expert Notice proceeds to mention and thoroughly analyze, without limitation, specific examples that Dr. Ley is expected to use for the purposes of explaining this aspect of his expected testimony, also citing and referencing to specific techniques and related publications the expert is going to use as examples.

misinformation effect, particularly in the context of human sexual experience and relationships, among other things, and expect him to offer the following testimony, in summary:

> Dr. Klein is expected to offer his opinion that people commonly change their narrative (or 'memory') of their experiences retrospectively, particularly experiences pertaining to sexuality and sexual experiences.
> . . .
> Dr. Klein will focus his opinion on *memory as it relates to sexuality and the human sexual experience*. [emphasis added] He will testify about how societal expectations about sexuality have changed over the past 10 years and how those shifts in attitude can impact perspectives on issues related to consent.
> Dr. Klein will also discuss the 'Misinformation Effect,' which describes how recall of personal memories can become less accurate upon the receipt of post-event information. Misinformation, or reinterpretation, presented to a person after an experience, and sometimes years later, commonly interferes with their ability to retain and recall previously encoded, and typically more accurate, information.
> . . .
> Dr. Klein will focus on factors an individual may experience that may affect memory, perceptions and recollections, such as challenges to sexual identity over time, confusion about the nature and definitions of consent (both their own and their partners'), conflicts between their personal sexual experiences, and social, religious, ethnic, or family norms and expectations, changes in their narratives of experiences ("memories"), such as infidelity, and other sexual experiences. He derives his opinion as to these factors from his clinical and professional experience, and studies and research in the field[.][3]
> . . .

*See*, ECF Dkt. 178.

### 3.    Dr. Kriegman's Expected Testimony

As set forth in Defendants' Expert Notice, Defendants intend to call at trial Dr. Kriegman, a licensed psychologist with clinical experience and training, with expertise in evolutionary psychology, forensic psychology involving risk assessment for civil commitments, the prediction of dangerousness, and organizational behavior, who researched the nature of the tie between cult members and their leaders and published papers in peer reviewed journals focusing on the process

---

[3] Defendants' Expert Notice proceeds to mention and thoroughly analyze, without limitation, specific studies and topics that Dr. Klein is expected to discuss, also citing and referencing to specific publications object of the expert's analysis conducted for the purposes of his expected testimony at trial.

of psychotherapy, cults, risk assessment, and models of the human psyche, among other things, and expect him to offer the following testimony, in summary:

> Dr. Kriegman will testify about organizational behavior and the nature and characteristics of pernicious cults, providing an empirical understanding that distinguishes between organizations that may display characteristics commonly considered to be "cult-like" and those that can be classified as pernicious cults based on an exploitative relationship between the organization and those who participate in it. […]
> . . .
> *1. Definition of Cult Characteristics:* Dr. Kriegman will identify four key characteristics typical of cults: (a) Adoption of unorthodox beliefs that diverge significantly from the larger culture; (b) Beliefs not based on direct experience or testable ideas, but on faith in authoritative declarations; (c) Significant investment of life energy by participants in supporting and spreading the belief system; and (d) Considerable group participation required.
> *2. Distinction between Cults and Pernicious Cults:* Dr. Kriegman will testify that while an organization may exhibit some cult-like characteristics, this alone does not make it harmful or exploitative. He distinguishes pernicious cults by the following additional feature: (e) Exploitation of participants, where the organization operates to the detriment of participants and/or larger society, often benefiting leaders to a degree that is abusive to the participants.
> *3. Context of Cult Characteristics:* Dr Kriegman will testify that the characteristics of a cult as defined by this four-part test are also all characteristics of the early versions of all modern, successful religions as well as many successful businesses, many scientific revolutions, and many positive social movements (e.g., women's suffrage and abolitionism). Today, half the population of the world are believers in two religions that started out as unmistakable cults (Christianity and Islam). Because they no longer are inconsistent with the beliefs of the larger communities within which the believers practice their religion, they no longer meet the first criterion (unorthodox or strange) and thus they are no longer cults; they are religions.
> *4. Importance of Evidence-Based Assessment:* Dr. Kriegman will emphasize the necessity of thorough, evidence-based evaluation of an organization's practices, impact on participants, and leadership dynamics before classifying it as a pernicious cult.
> . . .
> Dr. Kriegman will present his analysis of OneTaste based on his cult assessment framework:
> 1. Evaluation of Cult Characteristics in OneTaste: (a) Unorthodox Beliefs: Dr. Kriegman will discuss how some OneTaste practices and philosophies diverged from mainstream culture, particularly regarding sexuality and personal development. (b) Basis of Beliefs: He will testify about the existence of an empirical basis for OneTaste's core practice (Orgasmic Meditation), citing peer-reviewed studies on its effects. (c) Participant Investment: Dr. Kriegman will

present data on the varying levels of involvement and investment by OneTaste participants, noting that intense commitment was not typical for most participants. (d) Group Participation: He will discuss the range of participation options in OneTaste, from casual involvement to more intensive community experiences.

2. Assessment of Potential Exploitation: The defendants expect that Dr. Kriegman will present his findings on: (a) Financial practices, including refund policies and profit margins (b) Leadership and executive management dynamics, particularly the founder's approach to idealization (c) Participants' ability to leave the organization (d) Impact on external relationships of participants

3. Comparative Analysis: Dr. Kriegman will contextualize OneTaste's practices within the broader landscape of self improvement organizations, highlighting distinctions from typically exploitative pernicious cult practices.

4. Conclusion on OneTaste Classification: Based on his analysis, Dr. Kriegman will present his expert opinion on whether OneTaste meets the criteria for a pernicious cult, emphasizing the importance of distinguishing between unconventional practices and exploitative behaviors.

. . .

*See*, ECF Dkt. 178.

### 4.    Dr. Leonard's Expected Testimony

As set forth in Defendants' Expert Notice, Defendants intend to call at trial Dr. Leonard, a Ph.D. in linguistics and tenured Professor of Linguistics at Hofstra University, with significant research experience and expertise in semantic theory (theory of language meaning) and sociolinguistics, who was qualified and served as an Expert in Linguistics, under *Frye* and under *Daubert*, in 15 States and 11 Federal Districts, among other things, and expect him to offer the following testimony, in summary:

Dr. Leonard is expected to offer his opinion that [Jane Doe 1] is not the sole author of a set of disputed documents referenced as Q Journal.
. . .
Dr. Leonard will testify about the principles of Linguistics. His testimony will include the following: Linguistics, the scientific study of language, is a well-established science[.] . . . Forensic linguistics is the application of the science of linguistic investigation to issues of law. Forensic linguistics augments legal analysis by applying rigorous, scientifically accepted principles of analysis to legal evidence like contracts, letters, confessions, and recorded speech. Linguists seek—as do all scientists—to explain the non-random distribution of data. Words are not found to randomly issue from the keyboards and mouths of speakers of English or any other language. Words adhere to patterns; these patterns are the subjects of systematic

7

observation of scientific linguists. As in all other sciences, linguistics solves problems by constructing competing hypotheses and then testing which hypothesis better explains the non-random distribution of the data. […]

. . .

Dr. Leonard will testify that he was asked to analyze the language patterns of a set of documents known to have been written by [Jane Doe 1], referred to as known or K [Jane Doe 1]. Dr. Leonard will testify that he was also asked to analyze the language patterns of a set of disputed documents purported to have been written by [Jane Doe 1], referred to as the questioned or Q Journal or Q Data (two sets of type-written documents alleged to be journal writings of [Jane Doe 1]).

Operating under the assumption of potential co-authorship (that is, K [Jane Doe 1] language makes up at least some part of the Q data), Dr. Leonard will testify that he considered the following:

Hypothesis 1 – the Q data – the Journal – demonstrates NO indicia of co-authorship (there are no features that do not match or are inconsistent with K [Jane Doe 1])

Hypothesis 2 – the Q data – the Journal – demonstrates indicia of co-authorship (i.e., there are features that do NOT match or are inconsistent with K [Jane Doe 1])

Hypothesis 3 – Inconclusive.

Based on the degree and type of differences, Dr. Leonard will testify to his opinion that Hypothesis 2 is the superior hypothesis: there are data that demonstrate indicia of co-authorship.

. . .

Based on the data provided for analysis, Dr. Leonard offers the opinion that ONLY SOME – NOT ALL – of the Q data share likely common authorship with K [Jane Doe 1.] Specifically, he concludes that the distribution of the features in the linguistic data supports his opinion that the entirety of the Q data was not authored solely by Ms. [Jane Doe 1.]

This finding is based upon a number of linguistic features. The analysis of linguistic features and their internal variations is based upon the feature environments that occur in two or more datasets for comparison. Linguistic features are comparable where there are environments, or opportunities, for a given feature to occur.

At the termination of likely common authorship requires a constellation of features co-occurring in the same linguistic environments and patterns in both datasets without patterns of deviation (inconsistencies) that would suggest exclusion. Conversely, a determination of inconsistency requires co-occurring linguistic environments in both datasets in which the patterns of features differ, to the point that the datasets can be excluded from sharing likely common authorship. Finally, a determination of inconclusive would require either a mixture of co-occurring and contrasting features (that could be explained by e.g., a shared peer group, random chance, or specific rhetorical functions), or co-occurring features that only demonstrate highly standardized usage and no systemic variations, or a lack of comparable environments.

[…] A conclusion of 'co-authorship' is an inference that can be made only by the trier of fact, based on the findings presented here and weighed together with non-linguistic evidence that supports conclusions of means, motive, and opportunity.

> While some overlap between any two authors might be expected – particularly when those authors belong to the same community of practice – the degree and type of differences lead to Dr. Leonard's opinion that K [Jane Doe 1] is not the sole author of the Q. That is, if k [Jane Doe 1] were the sole author, Leonard would generally expect consistent patterns throughout all of the Q and K [Jane Doe 1], and if K [Jane Doe 1] contributed no language to the Q, he would expect less overlap with some pattens found in K [Jane Doe 1.]
> . . .

*See*, ECF Dkt. 178.

### 5. Defendants' Reservation of Rights under the Circumstances

Relevantly, in their notice dated October 21, 2024, Defendants reserved the right to supplement their expert disclosure with additional information, particularly since (i) there has been no §3500 production as of the notice's date; (ii) the appropriateness and admissibility of expert testimony relies largely on motions *in limine* which have not yet been ruled upon and may require the disclosure of additional experts; and (iii) the Government has not yet identified its proposed exhibits, which may result in the need to disclose additional experts. Moreover, Defendants reserved the right to call additional and/or substitute expert witnesses. *See*, ECF Dkt. 177.

### 6. The Government's Motion

On November 1, 2024, the Government moved to preclude Defendants' proffered expert testimony, claiming (i) that Defendants' Expert Notice is inadequate under Fed. R. Crim. P. 16(b)(1)(C), (ii) that said proffered testimony is largely irrelevant, unreliable, and unhelpful to any question to be decided by the jury, thus failing to satisfy the requirements of Fed. R. Evid. 402 and 702, and (iii) that said proffered testimony should be precluded under Fed. R. Evid. 403. *See*, ECF Dkt. 188 (the "Government's Expert Motion"). In the alternative, the Government requests the Court to conduct a *Daubert* hearing to evaluate the relevance and reliability of the Defendants' proposed experts' testimonies.

Based on the relevant applicable law and the argument set forth below, Defendants respectfully request the Court to deny the Government's Motion in its entirety and permit Defendants to introduce their proffered expert testimony at trial without conducting any *Daubert* hearing, subject to Defendants' reservation of rights and supplemental expert disclosures.

## LEGAL STANDARD

Federal Rule of Evidence ("Fed. R. Evid.") 702 permits the admission of expert testimony when, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). "The Rules of Evidence provide a liberal standard for the admissibility of expert testimony." *United States* v. *Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003).[4] Expert testimony is therefore generally admissible "if it is helpful to the trier of fact" and does not "undertake[] to tell the jury what result to reach." *See*, *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Under Fed. R. Evid. 702, the district court must first address "the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (internal citation omitted). To determine whether a witness qualifies as an expert, a court must "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The advisory committee notes to Fed. R. Evid. 702 make clear that to be admissible as expert testimony, the testimony need not necessarily be scientific, but instead may be based on "experience alone –

---

[4] The test set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) replaced the test set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which required that expert testimony be generally accepted among the scientific community, and which is still used by state courts in New York. The *Daubert* test "embodies a more liberal standard of admissibility for expert opinions" than the *Frye* standard. *United States v. Williams*, 506 F.3d 151, 161-62 (2d Cir. 2007) ("*Daubert* did make plain that Rule 702 embodies a more liberal standard of admissibility for expert opinions than did" *Frye*); *see also*, *Daubert*, 509 U.S. at 588 (the Federal Rules adopted a "liberal thrust" and a "general approach of relaxing the traditional barriers to 'opinion' testimony").

or experience in conjunction with other knowledge, skill, training or education." Fed. R. Evid. 702, Advisory Committee's Notes on 2000 Amendments. Moreover, the Supreme Court has verified that an expert can draw conclusions from observations based on "extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999).

Rule 702 also requires that expert testimony be reliable. Fed. R. Evid. 702(c)-(d); *see also*, *Daubert*, 509 U.S. at 589. But this "reliability" requirement should be understood in the context of the "liberal thrust of the Federal Rules [of Evidence] and their general approach of relaxing the traditional barriers to opinion testimony." *Id.* at 588 (internal quotations omitted). While *Daubert* sets forth a non-exclusive list of factors for the district court to consider that may be helpful in certain cases, there is no "definitive checklist or test" for reliability, as "there are many different kinds of experts, and many different kinds of expertise." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). *Daubert* also "emphasizes the need for flexibility in assessing whether evidence is admissible . . . permit[ting] the trial judge to weigh the various considerations pertinent to the issue in question." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). Thus, the central task of the trial court is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos v. Nat'l R.R. Passenger*, 303 F.3d 256, 265-66 (2d Cir. 2002) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 150). Courts in the Second Circuit have consistently applied this broad standard in determining the admissibility of expert opinion testimony under Rule 702 and *Daubert*. *See, e.g., Travelers Property & Cas. Corp. v. General Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001) (noting that a "review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule." [quoting Fed. R. Evid. 702, Advisory Committee's Notes on 2000 Amendments]).

11

Indeed, the Second Circuit has explained that, at bottom, the *Daubert* analysis is intended to give the district court the discretion "needed to ensure the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos*, 303 F.3d at 267. Last, a *Daubert* challenge does not require an inquiry into whether the process adopted by an expert was applied perfectly, or whether anyone could disagree with the application of such process in this case. The Second Circuit explained that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Id.* at 267. *See also*, *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267) ("only serious flaws in reasoning or methodology will warrant exclusion."). For example, expert testimony may be excluded as unreliable if the testimony "is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or [is] in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 [2d Cir. 1996]). "'[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *Id.* (internal quotation marks omitted). In determining whether to admit or exclude expert testimony, the district court "has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." *Id.* at 265. Indeed, the Second Circuit has instructed that "Daubert reinforces the idea that *there should be a presumption of admissibility of evidence*." *Borawick*, 68 F.3d at 610 (emphasis added).

Fed. R. Crim. P. 16(b)(1)(C) provides that, "[a]t the Government's request, the defendant must disclose to the Government in writing" certain information regarding any expert testimony the defendant intends to use at trial. Fed. R. Crim. P. 16(b)(1)(C). The disclosure must contain a

"complete statement of all opinions that the defendant will elicit from the witness," the "bases and reasons" for those opinions, the witness's qualifications, and a list of all other cases in which, during the previous four years, the witness has testified as an expert. *Id.* While Fed. R. Crim. P. 16(b)(1)(C) requires a complete statement of all opinions the expert will provide, it "does not require a verbatim recitation of the testimony the expert will give at trial." Fed. R. Crim. P. 16, Advisory Committee's Notes on 2022 Amendments. The Court has authority and discretion to regulate discovery under Fed. R. Crim. P. 16(d). *See*, *United States v. Dupree*, 2011 U.S. Dist. LEXIS 139810, *29 (E.D.N.Y. 2011) (emphasizing that a district court has "*broad* discretion" under Fed. R. Crim. P. 16 and describing preclusion as an "*extreme* remedy") (emphasis added); *United States v. Raniere*, 384 F. Supp. 3d 282, 327 (E.D.N.Y. 2019) (same).

## ARGUMENT

As discussed below, the Government's arguments with respect to Defendants' proffered expert testimony are without merit and their criticisms of said testimony, at best, go to the weight of the evidence rather than its admissibility.[5]

## I.    Defendants' Expert Disclosures Are Not Deficient

The Government contends that all of Defendants' expert disclosure fail to satisfy Rule 16(b)(1). The Government cites a series of cases that merely underscore the adequacy of Defendants' disclosures, no small feat given that the Defendants still have no idea what the Government's witnesses will testify to at trial. For example, in *United States v. Dizonara-Norsen,* the expert disclosures at issue there consisted of little more than two lines of proposed expert testimony. There, the court excluded the testimony of Dr. Alling where the defendant disclosed only "that Mr. Dzionara-Norsen is autistic, and that Mr. Dizonara-Norsen was prescribed

---

[5] *See*, *Zerega Ave. Realty Corp.*, 571 F.3d at 214; *Boucher*, 73 F.3d at 21.

medications that would have bearing on guilt." Similarly, the court precluded the expert testimony of Dr. Salamone who the defendant disclosed would testify that "he diagnosed Mr. Dzionara-Norsen with Autism Spectrum Disorder.'" *United States v. Dizionara-Norsen*,[6] 19-CR-6131 (W.D.N.Y. Aug. 20, 2020) [ECF Dkt. 87].

Similarly, in *United States v. Vaccarelli,* the defendant's expert disclosure purported to disclose that the expert would testify generally "as to the effect on a person's ability to manifest criminal intent . . . as to the defendant's psychiatric and neurological condition during the time period cited in the indictment." Although the disclosure referenced multiple medical evaluations that the expert purportedly based his opinion on, those evaluations were never disclosed, and the expert disclosure never actually articulated an opinion about the defendant's mental status. *United States v. Vaccarelli,* 18-CR-92 (D. Conn. Jan. 30, 2019) [ECF Dkt. 48].

In *United States v. Ulbricht,* the defendant's expert disclosure consisted of a letter with eight (8) bullet points identifying the subject matters that the expert would testify to (*e.g.,* "the origins of bitcoin" "the various purposes of Bitcoin"), but it was devoid of any proposed opinions or any identifiable bases for an opinion. *United States v. Ulbricht,* 14-CR-68, (E.D.N.Y. Jan. 29, 2015) [ECF Dkt. 165-1].

Defendants Rule 16 expert disclosures are fulsome, contain specific opinions, and disclose the bases for those opinions. The disclosures bear no resemblance to the disclosures at issue in the cases cited by the Government. But even if this Court agrees that the disclosures are deficient in some way, the proper and appropriate remedy is to permit the Defendants to cure the deficiency.

---

[6] Notably, in *Dzionara-Norsen* case, the Government's own expert disclosure for their two experts was far less comprehensive than those offered by the Defendants in this case. *See, Dzionara-Norsen,* 19-CR-6131 [ECF Dkt. 94-1]. The Government's expert disclosures in *Dzionara-Norsen* would have been excluded if the court applied the standard that the Government urges in this case.

"Courts regularly require parties to supplement their Rule 16 disclosures when they are insufficient." *United States v Ho Wan Kwok*, 2024 US Dist LEXIS 74281, *8 (SDNY 2024). Indeed, in *United States* v. *Mahaffy*, the court only precluded the defendant's expert testimony after the defendant's late submission on the first day of trial, in violation of a court-imposed deadline). *United States* v. *Mahaffy*, 2007 WL 1213738, *3 (E.D.N.Y. Apr. 24, 2007). Similarly, in *Dzionara-Norsen*, the expert testimony was precluded *after* the Court compelled additional disclosure. *Dzionara-Norsen*, 19-CR-6131, ECF Dkt. 102

In contrast, the trial in this case is more than two months away, with several additional weeks before the commencement of the defense's case. Moreover, Defendants still have no idea what the Government's witnesses will testify to, making it virtually impossible to provide optimal expert disclosures. Defendants have been forced to *anticipate* what the Government's case will entail and offer expert reports largely in the dark to rebut the Government's undisclosed evidence. Any decision to preclude expert testimony based on the alleged insufficiency of disclosures, particularly when the defense has already provided detailed – albeit initial – disclosures, rather than allowing Defendants the opportunity to make supplemental disclosure in due time, would be unprecedented under the circumstances.[7]

## II.    Dr. Ley's Proposed Expert Testimony Should Not Be Precluded

At the outset, it is virtually impossible to meaningfully discuss the relevance of Dr. Ley's testimony without an understanding of what evidence the Government intends to introduce, and more importantly, what evidence the Court will permit the Government to present.[8] That said, if

---

[7] *See*, *e.g.*, *Ho Wan Kwok*, 2024 US Dist LEXIS 74281 at *8; *United States v Kaufman*, 2021 US Dist LEXIS 170367, *18-19 (SDNY, 2021); *United States v Valle*, 2013 US Dist LEXIS 14864, *15-17 (SDNY 2013).

[8] The Government makes a summary statement in four words that Dr. Ley's testimony is "inadequately disclosed" but fails to flesh out this contention or explain how his lengthy and well-supported report fails to satisfy the criteria of Rule 16. If the Government had identified some deficiency, Dr. Ley surely could cure any deficiency, but the Government has failed to do so. Clearly, Dr. Ley's report satisfies Rule 16(b)(1).

the Government has its way, this case will be a sex trafficking case disguised as a forced labor conspiracy case, making Dr. Ley's testimony extraordinarily relevant.

### A.    Testimony Concerning the Science of Orgasmic Meditation

Although the Government has not identified what testimony their witnesses will offer at trial, the Government's Motion *In Limine* suggests, *inter alia,* that Defendants engaged in a conspiracy to force its employees to engage in Orgasmic Meditation ("OM"), a sexual act, with customers of OneTaste for the financial benefit of the Defendants. Make no doubt about it, the Government equates OM with sex and all but accuses the Defendants of running a prostitution ring. Whether OM is a legitimate meditative practice, rather than mere sex, is highly relevant to the Defendants' state of mind and whether they knowingly developed a scheme or plan to force individuals to participate in sex acts for financial gain, or whether OneTaste was genuine wellness program geared toward improving people's lives through the practice of OM. As her many books and lectures reveal, Ms. Daedone developed the practice of OM for reasons entirely unrelated to sexual pleasure. The Government seemingly takes the position that Ms. Daedone's life's work is a fraud, and that her sexual wellness company was akin to a prostitution operation wherein its employees were coerced to engage in sexual acts. Expert testimony that validates OM as a meditative practice backed up by science and scholarly study is highly relevant evidence that refutes the Government's position that Ms. Daedone developed this practice and used OneTaste simply as a sex for money scheme. While the Government certainly will argue that OM is a sexual act that was a labor or service and had a financial benefit to the Defendants, Defendants should likewise be able to argue, with the assistance of an expert, that OM was not a labor or service like traditional sex work, but rather a meditative practice with legitimate therapeutic benefits backed up by science and scholarly research.

16

Additionally, Defendants should be permitted to present expert testimony that educates jurors on sexual practices that may fall outside normative western sexual experiences that focus predominantly on male pleasure. The average juror unfamiliar with the practice of OM is likely to have a visceral negative reaction to the practice that will greatly prejudice the Defendants and distract the jury from determining whether the Government has proved its case of forced labor conspiracy. Defendants should have every opportunity through expert testimony to normalize OM, because it is conduct that is not inherently illegal or improper - so long as it consensual. There is a grave risk that a jury could punish the defendants simply for engaging in an unusual or unfamiliar practice that it deems perverse or aberrant. Dr. Ley's testimony detailing the long history of sexual cultural practices involving similar forms of touch and stimulation, for the purpose of mental and spiritual growth, will educate the jury and mitigate inherent prejudice that result from narrow views about sexual activity that the Government will invariably exploit.

The Government's argument that Dr. Ley's testimony educating jurors about the practice of OM, its validity in the scientific community, and its parallels to other historical and spiritual practices invites jury nullification is non-sensical. The real risk in this case is that Defendants are punished for their spiritual and meditative practices, not that the jury will ignore clear evidence of coerced sex because OMing is recognized by some as having health benefits. The Government simply seeks to prevent Defendants from defending the practice of OM with legitimate science and scholarly work and through its relationship to historical and cultural practices. The only potential for prejudice is if this Court denies Defendants the opportunity to present expert testimony about the practice of OM. The probative value of this evidence is clear, while the Government will suffer no prejudice by allowing the jury to learn about the practice of OM from an expert.

**B.** **Dr. Ley Should Be Permitted to Offer Rebuttal Testimony Concerning the Government's Coercive Tactics Expert**

As Defendants have already argued, the Government should be barred from presenting "expert" testimony about so-called coercive tactics. If this Court permits such testimony, Defendants should be permitted to refute it with testimony from Dr. Ley, who holds the opinion that there are no well-validated, normed assessment to objectively measure coercive control. Dr. Ley is sufficiently qualified to testify to this opinion as he is a board-certified clinical psychologist with a specialty in the intersections of sexual health, psychology, and mental health treatment. His CV reflects extensive clinical and research experience in the field even if his research has a slightly different perspective than that of the Government's expert. Unlike *Ray*, Defendants do not propose Dr. Ley as an expert simply because he is a clinical psychologist, he is offered because of his unique and relevant clinical and research experience which is obvious on in its face.

The Government quarrels with Dr. Ley's "bases and reasons" for his opinion, but it is simply not the case that Dr. Ley has failed to identify his "bases and reasons" for his opinion. Just as the Government did in its expert disclosure, Dr. Ley offers his opinion concerning coercive tactics at pages 12-15 of his report, citing to research as well as his two decades of work treating countless individuals with sex offense histories. The Government is free to challenge Dr. Ley's opinion, but it may not exclude it all together simply because it disagrees with it. If this Court concludes that Dr. Ley must provide more detailed "bases and reasons" for his opinion about coercive tactics, Dr. Ley should be afforded the opportunity to do so, including by offering additional research that speaks to this issue. If this Court excludes the Government's expert witness testimony as it should, Dr. Ley's testimony on this particular subject matter would prove unnecessary.

The Government's contention that it is the court's function to determine whether well-validated, normed assessment to objectively measure coercive control exist, is misguided. The Government inappropriately asks this Court to take up the role as expert on the issue of coercive control tactics, which it may not do. That other courts have permitted such testimony does not *ipso facto* mean that the coercive control tactics is well-validated and can be reliably measured. Frankly, the Government has offered no witness statements that suggests that any witness fell prey to coercive control tactics. None of these individuals have been examined (as far as Defendants know) and whether any tactics they identify resulted in "coercive control" is a question that cannot be reliably measured according to Dr. Ley. It is certainly not a question that this Court can answer.

### C.    Dr. Ley Should be Permitted to Testify as to Whether Defendants Targeted Vulnerable Victims.

Dr. Ley's opinion in connection with whether Defendants targeted "vulnerable" victims is admittedly not fleshed out in his disclosure, but the Government has not yet produced or disclosed *any* evidence that Defendants targeted vulnerable victims. Although the Government makes this conclusory statement in the Indictment, it has yet to produce a shred of evidence in discovery that supports the claim. It also has not explained how it defines vulnerable, which could be defined as individuals who are minors, uneducated or impoverished (all inapplicable to any witness in this case).

Dr. Ley will amend his Rule 16 expert disclosure once the Government makes some disclosure that puts Defendants on notice as to what witnesses will testify about their alleged "vulnerabilities" and how they define "vulnerabilities." Defendants do not intend to offer Dr. Ley to testify about the Defendants' state of mind or their intent.

III.    **Dr. Klein's Proposed Expert Testimony Should Not Be Precluded**

The Government argues that Dr. Klein should be prohibited from testifying about "memory" because he is not an expert in "memory." Dr. Klein is an expert in human sexuality and has vast clinical experience treating individuals about their sexual experience, including their recollections of sexual experiences over the course of time. While Dr. Klein has not done original research in the area of memory, he is familiar with that research and has seen that research play out in his own clinical practice over and over again. If Dr. Loftus was being proffered as a witness in this case, the Government would surely quarrel with her lack of clinical experience. Regardless, the Second Circuit has held that experts are permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert. *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015).

The Government also faults Dr. Klein for failing to provide a more specific and robust bases for his opinions. Dr. Klein's proffered opinions are not controversial and have been studied for decades, not only by Dr. Loftus, but by numerous scientists in the field of memory. Dr. Klein cited adequate support to justify his testimony that people often reframe or recharacterize their sexual experiences over the course of time and with the introduction of post-event information. That Dr. Klein did not conduct this research himself does not disqualify him from testifying about the research as supported by his own clinical experience. In fact, Dr. Klein is particularly qualified to testify in his proffered scope of expertise, and he is well-versed in the study of memory, the misinformation effect, but particularly in the context of human sexual experience and relationships,

Dr. Klein will not offer any specific opinions about whether any Government witness's memory of her experiences have changed or shifted over time. But the jury should understand that memory works in a way such that people may misremember events, may embellish events over

20

time adding new details or facts, or that people can come to believe an experience occurred in a particular way when it did not. Just by way of example, Dr. Klein can testify about treating individuals who come to believe over time that a particular sexual experience was a negative one based on feedback received by third parties or even a shift in attitudes. Dr. Klein has seen this occur in countless individuals and he can refer to the overwhelming body of research on memory that helps *explain* why people's recollections of their sexual experience may change retroactively.

This type of testimony is essential to the Defendants' case, where the Government may present witness testimony about their experiences that are contradicted by their prior accounts of those same experiences. One explanation, of course, is that a witness may simply be telling a falsehood. Another explanation is that a witness may simply come to remember the experience inaccurately. This is not merely a question of whether memory "decreases over time," which of course is common sense. What is not common sense is that memories can be completely changed or fabricated by the influence of third parties.

If this Court agrees that Dr. Klein's disclosure is inadequate, Dr. Klein should be permitted to amend or supplement his disclosure. Defendants reserve the right to supplement all of their expert disclosures after the production of § 3500 material which could impact the experts' opinions and raise new opinions.

## IV. Dr. Kriegman's Proposed Expert Testimony Should Not Be Precluded

### A. The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding Whether Other Businesses, Entities, and Social and Scientific Movements Qualify as Cults

The Government moves to exclude Dr. Kriegman's proposed expert testimony on whether other businesses, entities, social movements, and scientific movements meet the criteria to be classified as cults, due to purported deficiencies in Defendants' Expert Notice under Fed. R. Crim.

21

P. 16(b)(1)(C), an alleged failure to present the bases, reasons, and methodologies underlying his conclusions, questioning Dr. Kriegman's qualifications to render expert opinions on certain subjects, and labeling the proposed testimony as irrelevant and potentially prejudicial. The Government's arguments lack merit and should be rejected, as Dr. Kriegman's proposed testimony is directly relevant to the case and his insights are rooted in established expertise and sound methodology.

          i.     <u>Dr. Kriegman is Qualified to Provide Expert Testimony on Cults</u>

Under Fed. R. Evid. 702, an expert may be qualified to provide testimony on a specific matter either by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. This Rule "'contemplates a broad conception of expert qualifications' [and a]n expert need not possess a professional degree or certification." *Noyes v Kelly Servs.*, 2008 US Dist LEXIS 108250, *9 (ED Cal, 2008) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 [9th Cir. 1994]; citing *United States v. Majors*, 196 F.3d 1206, 1215 [11th Cir. 1999]). Nor an expert is required to have acquired his or her specialized knowledge by all of the methods enumerated in Fed. R. Evid. 702; a single basis is sufficient. *See*, *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). As outlined above and in Defendants' Expert Notice, Dr. Kriegman's qualifications include, without limitation, expertise in "evolutionary psychology" and "organizational behavior." His scholarly and academic work includes publication of "papers in peer reviewed journals focusing on the process of psychotherapy, cults, risk assessment, and models of the human psyche [and] original research into the nature of the tie between cult members and their leaders[,]" which was then "published in two peer reviewed journals and a book" *See*, supra, p. 5; ECF Dkt. 178. Dr. Kriegman's disclosure also clarifies that "Dr. Kriegman's testimony will be based on his training, experience, and research in this field" and that "through his teaching, supervision and research, he is familiar with the larger

body of qualitative research in this field." *See*, *Id.* Given Dr. Kriegman's specialized knowledge and as described in his disclosure, he is well-suited to provide expert testimony contextualizing cult-like characteristics within various organizations, entities, and movements. His qualifications allow him to reliably opine whether specific entities, including OneTaste, meet the criteria to be considered cults (and/or pernicious cults), thereby offering the jury critical insights drawn from his extensive background and established expertise.

  ii.  <u>Dr. Kriegman's Expert Testimony as to Cults is Reliable, Relevant, and Bears no Risk of Undue Prejudice</u>

   The Government's contention that Dr. Kriegman fails to adequately disclose the bases and reasons for his opinions is simply unfounded. Dr. Kriegman's disclosure thoroughly details an analytical framework useful to identify cult characteristics and discern cults from pernicious cults, supported by his extensive training, experience, research, and deep familiarity with the field. *See*, *supra*, p. 5; ECF Dkt. 178. The evidence so far proffered "is sufficient to demonstrate that the study of destructive cults is not an unreliable discipline." *Noyes*, 2008 US Dist LEXIS 108250 at *7. *See also*, *People v. Vieira*, 35 Cal. 4th 264, 307 (2005) ("[T]he subject of cult behavior [is] one beyond common knowledge and [can] suitably be addressed by an expert opinion."); *Scott v. Ross*, 140 F.3d 1275, 1285-86 (9th Cir. 1998) (discussing admission of expert testimony on the "history and general practice of deprogramming and the origin and practices of the 'anti-cult movement'"). In any event, expert testimony is generally presumed reliable (*see*, *e.g.*, *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 [E.D.N.Y. 2007]) and courts need not make specific findings on the reliability of the materials the experts use. *See*, *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (quoting *United States v. Locascio*, 6 F.3d 924, 938-39 [2d Cir. 1993]); *see also*, *Elec. Contrs., Inc. v Pike Co.*, 2014 US Dist LEXIS 77128, *3 (D Conn, 2014). In addition to being reliable and properly supported, Dr. Kriegman's testimony will equip jurors with essential insights

into what constitutes a cult, what distinguishes it from a pernicious cult, and how these frameworks apply to other evidence. This context will certainly be useful for the jury as they assess the nature of OneTaste and weigh the related evidence.

The Government has also failed to establish any basis for excluding Dr. Kriegman's testimony under Fed. R. Evid. 403. There is no indication that his testimony would cause unfair prejudice, confuse the issues, mislead the jury, or waste time. Furthermore, the Government's reliance on *United States v. Zhong* is misplaced, as the Second Circuit addressed entirely different circumstances and focused specifically on issues of ethnic or cultural stereotyping, which are irrelevant here. *See*, *United States v Zhong*, 26 F.4th 536, 557 (2d Cir 2022) (collecting cases).

## B.   The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding the Importance of Evidence-Based Assessment of Cults

The Government further seeks to exclude Dr. Kriegman's expert testimony as to the importance of evidence-based assessments of an organization and its surrounding context before classifying it as a pernicious cult. However, while arguing that this testimony would be irrelevant and misleading, the Government completely mischaracterizes the scope of expert testimony intended by Defendants. The Government speculates – without basis – that Dr. Kriegman's testimony would effectively direct the jury to determine whether OneTaste qualifies as a cult or "pernicious cult" before assessing Defendants' potential guilt. This mischaracterization of Dr. Kriegman's intended testimony is both speculative and unfounded, suggesting an attempt to mislead the Court as to Defendants' intentions. Defendants do not seek to have Dr. Kriegman instruct or otherwise influence the jury on the question of Defendants' guilt. Instead, his testimony will be limited to his specialized knowledge regarding cult characteristics and the importance of thorough, evidence-based evaluations when classifying groups as cults. Such testimony is intended solely to aid the jury's understanding of complex concepts beyond the sphere of their everyday

24

knowledge and will allow jurors to draw their own conclusions, assessing the value of Dr. Kriegman's insights at their discretion.

### C.    The Court Should Not Preclude Dr. Kriegman's Expert Testimony Regarding Whether OneTaste Is a Pernicious Cult

Finally, the Government argues that Dr. Kriegman's testimony regarding whether OneTaste qualifies as a pernicious cult should be excluded, claiming it is improper. The Government laments an alleged failure to disclose what Dr. Kriegman's opinion on OneTaste will be and the bases and reasons underlying his opinion, a purported "launder[ing]" of inadmissible hearsay about OneTaste's practices, alleged lack of reliability and relevancy, and risks of strong prejudice. The Government again mischaracterizes the proffered expert testimony that Defendants intend to elicit from Dr. Kriegman, inaccurately labeling it as an attempt to provide the jury with an overall conclusion of criminal conduct – which is not the case.

Expert testimony on the structures of businesses and organizations is routinely admitted. Courts have allowed expert analysis on topics such as the structure of gambling enterprises (*see*, *United States v. Anderson*, 446 F.3d 870, 875 [8th Cir. 2006]), the operation, structure, membership, and terminology of organized crime families (*see*, *Locascio* 6 F.3d at 937), and theological views and practices of para-church, mission-minded organizations, together with strong, associated characteristics of Evangelical Christians. *See*, *Ams. United For Separation of Church & State v. Prison Fellowship Ministries*, 432 F. Supp. 2d 862, 873-75 (S.D. Iowa 2006). Given these precedents, there is no reason for this Court to preclude expert testimony that would shed light on the inner dynamics and practices of a unique group as OneTaste as it faces charges of forced labor.

In *United States v. Mulder*, the court rejected a challenge to expert testimony on the grounds that the organizational knowledge at issue was "common sense" and not suited to expert analysis.

Instead, the court recognized that, even with well-known groups like the Mafia, expert insight on structure and practices remains helpful and admissible as it contextualizes the charged offenses and sheds light on the defendant's intent. *Mulder*, 273 F.3d at 100-02. Other courts, like in *United States v. Sparks*, in which defendants were convicted of drug charges, have also upheld expert testimony on topics such as gang operations, the significance of graffiti, and migration trends in relation to gang activity – all serving to provide context for the jury's understanding of the organization's dynamics. *See*, *United States v. Sparks*, 949 F.2d 1023, 1024-26 (8th Cir 1991). These authorities demonstrate that individuals with expert knowledge about the social dynamics, organization, structure, and practices of numerous groups are permitted to testify to those matters where they are relevant to understand significant circumstantial facts. Although the requirements of *Daubert* of relevance and reliability apply to specialized knowledge of all experts, those indicia of reliability vary depending on whether the knowledge in question has to do, for example, with a scientific test or, on the other hand, the operation, structure, membership or terminology of a group.

In this case, jurors are likely unfamiliar with OneTaste's practices and internal dynamics. OneTaste is an organization about which very little is known by the typical lay person. A juror who knows little about the group dynamics of OneTaste is at a disadvantage in fully understanding the evidence about the significance and the impact of the dynamics characterizing the organization. Without expert guidance, it is likely that most jurors will have no knowledge of OneTaste's internal practices, loyalty dynamics, or the philosophies underpinning its operations, together with the variety of topics outlined in Dr. Kriegman's disclosure and reported in part by the Government in its motion. *See*, supra, pp. 6-7; ECF Dkt. 178; Government's Motion, p. 14. Accordingly, the average juror can be assisted in understanding and weighing the evidence presented as it relates to several aspects characterizing the organization's setting. In light of OneTaste's peculiar

26

characteristics and in response to the Government's anticipated portrayal of it, the jury is entitled to and may benefit from some evidentiary assistance in understanding the dynamic of this unique organization to fully grasp the significance of its core philosophies and practices, and in determining whether the organization meets the criteria of a pernicious cult or not. Indeed, the Government's efforts to preclude this testimony are particularly disingenuous, considering their indication that they "anticipate that . . . certain of the Government's victim-witnesses may observe that the some of the defendants' practices appeared to them to be akin to those of a cult." *See*, Mot. at ECF 182. Fed. R. Evid. 702 is broadly interpreted and helpfulness to the trier of fact is its touchstone. *Kopf*, 993 F.2d at 377. Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror. *Id.* If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. *See*, Fed. R. Evid. 702. Dr. Kriegman has attained specialized knowledge about OneTaste through his experience, training, and education to assist the jury by imparting such specialized knowledge through testimony. The nature of unconventional groups, their internal dynamics, and the impact of these on members are rarely precepts within the general knowledge and experience of a lay juror. In *United States v. Locascio*, the Court of Appeals upheld the use of expert testimony on the structure and operations of crime families. The court recognized that, while the public may be increasingly familiar with organized crime, expert testimony remains valuable to explain the structure, hierarchy, rules of conduct, and internal "code of silence" that characterizes such groups. Notably, the court observed that public perceptions, often shaped by media portrayals, may not reflect the reality of these organizations and that expert analysis serves to clarify these misperceptions. *See*,

*Locascio*, 6 F.3d at 937. If expert testimony is warranted to explain the inner workings of organized crime – a well-known phenomenon – then it stands to reason that jurors will benefit even more from expert insight into OneTaste, a group with lesser public exposure and unconventional, unique practices. Without expert testimony on OneTaste's unique structure, organization, rules, and member dynamics, lay jurors would be at a significant disadvantage in fully understanding the evidence and context surrounding this case.

The Government also argues against Defendants presenting any testimony from Dr. Kriegman on the grounds that OneTaste is not on trial here. It is true that OneTaste is not a party. However, it is actually the Government who has made OneTaste's practices an issue in this case by alleging that Defendants conspired to engage in a forced labor scheme within OneTaste's unique environment and through the typical practices characterizing the organization. Defendants have the right to present evidence that may corroborate a conclusion that those practices and dynamics were not inherently pernicious. OneTaste's structure and characteristics, as compared to the standards outlined in Dr. Kriegman's proposed testimony – both unknown to most lay jurors – are therefore directly relevant, and Defendants would be significantly prejudiced without the ability to explain these through expert testimony. By drawing on his specialized knowledge, Dr. Kriegman can assist the jury in understanding OneTaste's nature, structure, and impact on its members, without inflaming prejudice, confusing the issues, misleading the jurors, and wasting any time.

     i.     <u>Dr. Kriegman's Bases, Reasons, and Materials Underlying His Opinion Do Not Warrant Preclusion of His Expert Testimony</u>

The Government's argument that Dr. Kriegman's expert testimony should be precluded to on the grounds that it may rely on out-of-court statements or other potentially inadmissible material is wholly without merit – and indeed, the Government appears to concede as much. *See*, Government's Motion, p.15. It is widely recognized that an expert may base an opinion on facts

28

or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. *See*, Fed. R. Evid. 703; *see also*, *Scott*, 140 F3d at 1286; *Mulder*, 273 F3d at 102; *Locascio*, 6 F3d at 938; *United States v Daly*, 842 F2d 1380, 1387 [2d Cir 1988]).

The Government's suggestion that Defendants may use Dr. Kriegman's testimony to "launder inadmissible hearsay about OneTaste" is as inapposite as improperly posed – suggesting yet another unfounded effort to cast Defendants' legitimate intentions in a negative light before the Court. Dr. Kriegman's expert role is not to serve as a mere "conduit" for inadmissible evidence. Rather, as established by the relevant legal standard, "the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." *Linde v Arab Bank*, 922 F Supp 2d 316, 323 [EDNY 2013]) (internal quotations omitted). Dr. Kriegman's disclosure amply demonstrates that he has rigorously applied his expertise and methodology to assess the underlying evidence. His analysis reflects a synthesis of multiple discrete sources, including sources that may be independently admissible, cross-referencing corroborative and contradictory information to reach a considered conclusion. Thus, the Government's unfounded contentions about the nature of Dr. Kriegman's testimony and Defendants' intended use of it should be disregarded by the Court.

  ii.  <u>Dr. Kriegman's Expert Testimony Does Not Invade the Jury's Role</u>

The Government's Motion concerning Dr. Kriegman raises concerns that his testimony could improperly intrude on the jury's role by offering an ultimate opinion regarding the purported criminality of OneTaste's conduct. However, Defendants do not intend to elicit any testimony from Dr. Kriegman on whether he holds a specific opinion about the criminality or legality of OneTaste's

practices. Instead, Dr. Kriegman will provide testimony based on his specialized knowledge of OneTaste's structure and dynamics, allowing him to present a reasoned analysis that informs jurors without dictating a conclusion as to guilt or innocence. This approach respects the jury's role in drawing their own inferences from the information and the evidence provided.

      iii.      <u>Dr. Kriegman's Expert Testimony Does Not Cause Any Unfair Prejudice</u>

On the other hand, the Government contends that Defendants seek to unfairly sway the jury by presenting expert testimony that ostensibly vouches for the legitimacy of OneTaste's practices. However, Dr. Kriegman will refrain from endorsing or legitimizing OneTaste's practices; rather, he will testify solely to the nature, structure, and internal dynamics of the organization, and apply his cult assessment framework to opine whether OneTaste meets the criteria for a pernicious cult, emphasizing the importance of distinguishing between unconventional practices and exploitative behaviors, allowing the jury to make reasonable inferences from his objective analysis. The trial judge retains full discretion to manage Dr. Kriegman's testimony, ensuring that it remains relevant and factual, without veering into unduly prejudicial territory, while permitting the jury to consider facts that may guide their inferences.

Based on the foregoing, the Court should reject the Government's baseless and speculative attempt to preclude Dr. Kriegman's proposed expert testimony. However, should the Court be inclined to consider precluding said testimony – a measure that would be both extreme and counter to standard practice – it should first allow Defendants to supplement their expert disclosure within a reasonable timeframe and instruct them as to any purported deficiencies in the original expert disclosures.[9]

---

[9] *See*, supra, p.15; footnote 7. Furthermore, Defendants make this request for any of the proffered experts.

## V.    Dr. Leonard's Proposed Expert Testimony Should Not Be Precluded

To begin, the Government has received sufficient and adequate notice regarding Dr. Leonard's anticipated testimony, as Defendants have not only specified the substance of "the expert[s'] actual opinions," but have also done more than just "identify[] the general topics about which the expert[s] will testify." *Ho Wan Kwok*, 2024 US Dist LEXIS 74281 at *5-6. Furthermore, contrary to its arguments, the Government's own motion demonstrates an understanding of the purpose of Dr. Leonard's testimony, which is to inform the jury's assessment of the likelihood that Jane Doe 1 may have co-authored some of the contested typewritten journals. *See*, Government's Motion at 10-11. As outlined above and in Defendants' Expert Notice, Dr. Leonard has sufficiently identified the documents object of his examination, namely "two sets of type-written documents alleged to be journal writings of [Jane Doe 1]," clearly distinguishing them as "a set of documents known to have been written by [Jane Doe 1], referred to as known or K [Jane Doe 1]" and "a set of disputed documents purported to have been written by [Jane Doe 1], referred to as the questioned or Q Journal or Q Data." *See*, supra, pp. 7-8; ECF Dkt. 178. Thus, the Government's characterization of Dr. Leonard's proposed opinion as ambiguous, unclear, and overlapping is unfounded and appears solely intended to undermine his proposed expert testimony without basis.[10] All the remaining contentions raised by the Government are speculative at best and pertain to aspects beyond the intended scope of Dr. Leonard's testimony. As such, they should be disregarded. Moreover, while the Government argues that Dr. Leonard's disclosure does not identify the analytical framework he applied to support his opinion, Defendants have provided

---

[10] *See, Presicion Trenchless, LLC v Saertex Multicom LP*, 2022 US Dist LEXIS 34199, *78 (D Conn, 2022) ("While courts exclude expert testimony grounded in 'subjective belief or unsupported speculation,' […] 'the fact that an expert witness speaks in probabilities […], rather than certainties, does not by itself make his testimony unreliable.' […] Here, . . . [the expert's] deposition testimony makes clear that he did not speculate, but rather applied his specialized knowledge to evaluate and analyze the available data and reach an opinion to a degree or reasonable engineering certainty.") (citing *Daubert*, 509 U.S. at 590; *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 472 [S.D.N.Y. 2010]).

sufficient description of the methodology, reasoning, and bases underlying his opinions, and his testimony is well supported by established scientific principles. As set forth above and in Defendants' Expert Notice, Dr. Leonard was asked to analyze "language patterns" of "two sets of type-written documents alleged to be journal writings of [Jane Doe 1]." To do so, Dr. Leonard operated "under the assumption of potential co-authorship (that is, K [Jane Doe 1] language makes up at least some part of the Q data)", considered three different hypotheses, and came to opine that "there are data that demonstrate indicia of co-authorship."[11]  *See*, supra, pp. 7-8; ECF Dkt. 178. This disclosure fully satisfies the requirements of Fed. R. Crim. P. 16(b)(1)(C) and is consistent with the applicable Federal Rules of Evidence.

The reasoning and methodology applied to Dr. Leonard's opinions are reliable. Notably, another federal court has already dismissed a similar criticism against Dr. Leonard, emphasizing that the concepts and methodologies adopted by Dr. Leonard have broad applicability and that certain arguments go to the weight rather than admissibility of the testimony, as underscored by the District Court for the Southern District of Florida in *Kleiman v Wright*, 2020 US Dist LEXIS 213482 (SD Fla 2020). In *Kleiman*, as in the present case, Dr. Leonard was retained to provide an opinion on the likelihood of common authorship between certain "Q documents" and certain "K documents," with K Documents consisting of documents known to have been authored by the defendant and Q Documents being comprised of documents the defendant denied authoring and documents the defendant reported to be partly written by an imposter. To reach his conclusions, Dr. Leonard applied a comparative analysis of "language patterns" across both sets of documents, evaluating various competing hypotheses. *Kleiman*, 2020 US Dist LEXIS 213482 at *116. Similarly to the Government in this case, the moving party in *Kleiman* sought expert testimony

---

[11] *See*, supra, footnote 10.

preclusion based on non-compliance with *Daubert* standards, the relevant Federal Rules of Evidence, and purported inadequacies in the factual basis for Dr. Leonard's report. *Id*. at *117-18. In response, the opposing party successfully argued that Dr. Leonard's methodology to determine authorial attribution of written documents is reliable as it is peer-reviewed, has been accepted and relied upon by federal courts in major cases, and is completely transparent and replicable. The analysis was also grounded in sufficient facts and data, meeting the standards of both *Daubert* and the Federal Rules. Opposing party also asserted that the moving party's remaining arguments went to the weight of Dr. Leonard's opinions rather than to its admissibility or preclusion thereof. *Id.* at *119-20. It was further argued that Dr. Leonard's testimony did not contravene Fed. R. Evid. 403 and was highly relevant to disproving Defendant's claims as to authorship. *Id.* at *121. In a comprehensive ruling, the *Kleiman* court sided with the opposing party, rejecting all the moving party's arguments similar to those now raised by the Government, and denying the motion to preclude Dr. Leonard's expert testimony. The court also emphasized that other federal courts have rejected efforts to exclude expert testimony on the basis that the forensic stylistics approach is unreliable or fundamentally flawed. *Id.* (citing *Dutcher v Bold Films LP*, 2019 US Dist LEXIS 5809 [D Utah, 2019]). Dr. Leonard's testimony was found to be not only admissible in *Kleiman*, but also instrumental in other fora's evaluation of authorship issues referenced therein[12] – a role it is equally poised to fulfill in the instant case.

The Government mischaracterizes the Defendants' proposed expert testimony, suggesting that it aims to undermine the credibility of any testimony from Jane Doe 1 regarding the authorship of certain materials. However, Defendants' Expert Notice makes clear that they do not intend to

---

[12] *Kleiman*, 2020 US Dist LEXIS 213482 at *119 ("Defendant's attacks on Dr. Leonard's methodology have been rejected by other federal courts. In particular, [the opposing party] cite[s] to three federal district court cases, two from the District of Utah and one from the Western District of New York.").

have Dr. Leonard assess the credibility of Government witnesses or offer opinions on whether portions of the journals may have been authored by others. Rather, Dr. Leonard's role is to provide essential context – grounded in his training, research, and experience[13] – on linguistic principles beyond the knowledge of the average juror. His insights will "assist the trier of fact," Fed. R. Evid. 702, and will not "undertake[] to tell the jury what result to reach" or "attempt[] to substitute the expert's judgment for the jury's." *Duncan*, 42 F.3d at 101. His proposed testimony is thus designed solely to furnish the jury with general background knowledge which will be relevant and helpful in their evaluation of evidence and witness testimony in this case. *See*, Fed. R. Evid. 702, Advisory Committee's Notes on 2000 Amendments ("[U]sing expert testimony to educate the factfinder on general principles" is a well-recognized and "venerable practice."); *see also*, *Presicion Trenchless, LLC*, 2022 US Dist LEXIS 34199 at *80 (recognizing that "expert testimony may be 'admissible where it synthesizes or summarizes data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'") (quoting *Lassen v. Hoyt Livery, Inc.*, 2016 U.S. Dist. LEXIS 169506, *33 [D. Conn., 2016]). Moreover, if Dr. Leonard's testimony is permitted, the Court will properly instruct the jury on how they may evaluate and use that testimony.

The Government further challenges Dr. Leonard's proposed testimony casting doubts over its relevancy. However, Dr. Leonard's proposed testimony easily surpasses the low bar for relevancy. In fact, it is clearly relevant to the evidence that the Government intends to introduce. The Government's arguments to the contrary are meritless. Generally speaking, "evidence, including expert testimony, is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

---

[13] The Government does not challenge any of these elements and therefore tacitly concedes Dr. Leonard's qualifications as an expert witness.

be without the evidence.'" *Id.* (quoting Fed. R. Evid. 401). To be relevant, expert testimony need only relate to any issue in the case. *See*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). The Government's assertion that Jane Doe 1's typewritten journals contain excerpts from her handwritten physical journals – and that Dr. Leonard's awareness of their existence would somehow alter his analysis – is unfounded and misguided, seemingly intended to mislead and sway the Court.

Finally, the Government contends that Dr. Leonard's testimony should be precluded under Fed. R. Evid. 403, arguing that any probative value is substantially outweighed by potential confusion of the issues, risk of misleading the jury, and waste of time. Yet the Government provides no authority in support of its argument that Dr. Leonard's proposed testimony would somehow be unduly prejudicial. It also relevantly fails to specify and articulate any concrete risk of "confus[ion]" or time-wasting that could result from the expert's testimony, let alone sufficiently explain how these risks would "substantially outweigh[]" the testimony's probative value. Fed. R. Evid. 403. The probative nature of Dr. Leonard's testimony – consistent with Fed. R. Evid. 702 and 403 – outweighs any prejudice imagined by the Government. Its arguments as to potential confusion and misleading impact do not withstand scrutiny and are, in any event, outweighed by the relevant and probative testimony Dr. Leonard will provide. Regardless, any valid concerns the Government might have about Dr. Leonard's testimony would at most go to the weight of the evidence and could be adequately addressed during cross-examination. *See*, *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Based on the foregoing, the Court should reject the Government's baseless and speculative attempt to preclude Dr. Leonard's proposed expert testimony. However, should the Court be inclined to consider precluding said testimony – a measure that would be both extreme and counter to standard practice – it should first allow Defendants to supplement their expert disclosure within a reasonable timeframe and instruct them as to any purported deficiencies in the original expert disclosures.[14]

## VI.    A *Daubert* Hearing is Not Warranted

Finally, while district courts must exercise the gatekeeping function regarding expert testimony, a separate hearing is often not required. *Williams*, 506 F.3d at 161 (citing *Kumho Tire*, 526 U.S. at 152 (district courts possess "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into . . . reliability must take . . . .")). "This is particularly true if, at the time the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *Williams*, 506 F.3d at 161. Given the regularity with which experts testify in this Circuit about the topics set forth in the Defendants' Expert Notice, no *Daubert* hearing is necessary here. *See*, *United States v. Jakobetz*, 955 F.2d 786, 799 (2d Cir. 1992) ("[W]e do not think that such extensive hearings and findings should be conducted in every case").

## <u>CONCLUSION</u>

Based on the foregoing, Defendants respectfully request that the Court issue an Order (1) denying the Government's Motion in its entirety; (2) permitting Defendants' Proffered Expert Testimony, as laid out in Defendants' Fed. R. Crim. P. 16(a)(1)(G) notice and supportive materials

---

[14] *See*, supra, p.15; footnote 7. Furthermore, Defendants make this request for any of the proffered experts.

(ECF Dkt. 177-178), without holding a *Daubert* hearing; (3) should the Court be inclined to preclude the testimony of any of the aforementioned experts, it should first provide an opportunity to the Defendants to supplement and/or amend their expert disclosures to cure any purported deficiencies;[15] and (4) any such other and further relief to Defendants as the Court deems just and proper.

Dated: New York, New York
           November 12, 2024

Respectfully submitted,

**AIDALA, BERTUNA & KAMINS, P.C.**

/s/ Imran H. Ansari
Arthur L. Aidala, Esq.
Imran H. Ansari, Esq.
Michael Jaccarino, Esq.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011
arthur@aidalalaw.com
iansari@aidalalaw.com
jaccarino@aidalalaw.com

*Attorneys for Defendant Rachel Cherwitz*

**BONJEAN LAW GROUP, PLLC**

/s/ Jennifer Bonjean
Jennifer Bonjean, Esq.
Ashley Cohen, Esq.
303 Van Brunt Street, 1st Fl.
Brooklyn, New York 11231
(718) 875-1850
jennifer@bonjeanlaw.com

*Attorneys for Defendant Nicole Daedone*

---

[15] *See*, supra, p.15; footnote 7. Furthermore, Defendants make this request for any of the proffered experts.