UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                                :

UNITED STATES OF AMERICA,         :
                                                :

-vs-                                             :
                                                :            23-CR-146 (DG)
                                                  :

RACHEL CHERWITZ, NICOLE       :
DAEDONE,                                 :
                                                :

                          Defendants.     :
-----------------------------------------------------X

## DEFENDANTS CHERWITZ AND DAEDONE'S MEMORANDUM OF LAW IN SUPPORT OF A JUDGMENT OF ACQUITTAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………...……………iii

INTRODUCTION………………………………………………...……………………….…..1

APPLICABLE LAW……………………………………………..…….………………...1

ARGUMENT……………………………………………...………………………………...2

    I.    The Forced Labor Statute Should be Narrowly Construed to
           Avoid Violating the First and Fifth Amendments …………………………..2

    II.    A Narrow Application of the Forced Labor Statute Requires
           a Judgment of Acquittal……...……………………………………...………11

          A.    The statute requires Defendants to obtain another's labor
                 "by means of" serious harm, which does not include
                 Defendants' spiritual beliefs or their acts of teaching them …..……....11

          B.    "By means of" or "serious harm" does not include the
                 necessary consequences of joining and participating in
                 a spiritual community. …………………………………………..…...14

          C.    The evidence failed to meet a properly construed
                 reasonable person standard …………………………………………16

          D.    The jury could not have found that Defendants intended
                 to obtain forced labor or that they reached an agreement
                 to violate the statute…………………………………………………..18

    III.    In Violation of the First Amendment, the Government Asked the Jury to
           Convict Defendants Because of the Alleged Immorality of their Spiritual
           Practices…………………………………………………..…………………20

CONCLUSION……………………………………………...……………………….22

## CASES

*Birzon v. King*, 469 F.2d 1241 (2d Cir. 1972)………………………………………....8

*Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*,
145 S. Ct. 1583 (2025) …………………………………………………………………5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520 (1993) …………………20

*Dettmer v. Landon*, 799 F.2d 929 (4th Cir. 1986) …………………………………………..5

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988) ……………………………………………………………………2, 8

*Edwards v. Aguillard*, 482 U.S. 578 (1987) …………………………………………………20

*Equal Opportunity Emp't Comm'n v. United Health Programs of Am., Inc.*,
213 F. Supp. 3d 377 (E.D.N.Y. 2016) …………………………………………………....4

*F.C.C. v. Fox Television Stations, Inc.* 556 U.S. 502 (2009) ………………………………..8

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006) ……………………………………………8

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) …………………………………………...4

*Frazee v. Ill. Dep't Emp't Sec.*, 489 U.S. 829 (1989) …………………………………....4

*Haupt v. United States,* 330 U.S. 631 (1947) ……………………………………………13

*Headley v. Church of Scientology Int'l,* 687 F.3d 1173 (9th Cir. 2012) …...8, 9, 14, 15, 17, 18, 20

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
565 U.S. 171 (2012) ……………………………………………………………………15, 16

*Larson v. Valente*, 456 U.S. 228 (1982) …………………………………………....21

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018) …………...4, 14

*Muchira v. Al–Rawaf*, 850 F.3d 605 (4th Cir. 2017) …………………………9, 16, 17, 18, 19, 20

*Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875 (9th Cir. 1987) …………………………14

*Pierre v. Holder*, 738 F.3d 39 (2d Cir. 2013) ……………………………………………………2

*Taylor v. Salvation Army Nat'l Corp*., 110 F.4th 1017 (7th Cir. 2024) ……………...14, 17, 18, 19

*Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, 2023 WL 2504744
(S.D.N.Y. Mar. 14, 2023) ………………………………………………………...16, 17, 18, 19

*Thomas v. Rev. Bd. Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981) ………………………………4, 21

*United States v. Allen*, 760 F.2d 447 (2d Cir. 1985) ………………………………………………...5

*United States v. Alvarez*, 567 U.S. 709 (2012) …………………………………………………13

*United States v. Ballard,* 322 U.S. 78 (1944) ………………………………………………...21

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004) ………………………………………..7

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) …………………………………………12

*United States v. Chaudhri*, 134 F. 4th 166 (4th Cir. 2025) ………………………………...19

*United States. v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ………………………………14, 18, 19

*United States v. Davis*, 588 U.S. 445 (2019) ……………………………………………………...2

*United States v. Hardin*, 2020 WL 1922594 (S.D.N.Y. April 21, 2020). ………………………...2

*United States v. Jackson,* 368 F. 3d 59 (2d Cir. 2004) ………………………………………...2

*United States v. Kaziu*, 559 Fed. Appx. 32 (2d Cir. 2014) …………………………………12, 13

*United States v. Kozminski* 487 U.S. 931 (1988) ………………………………8, 9, 10, 16, 18, 21

*United States v. Reyes,* 302 F. 3d 48, 52 (2d Cir. 2002)…………………………………………1

*United States v. Rivera*, 799 F.3d 180 (2d. Cir. 2015) ………………………………………..3, 16

*United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) …………………………………………9, 11

*Watson v. Jones*, 13 Wall. 679 (1872) …………………………………………………………..16

*Wisconsin v. Mitchell,* 508 U.S. 476 (1993) …………………………………………………12

## RULES AND STATUTES

18 U.S.C. § 1584………………………………………………………………………8, 9

18 U.S.C. § 1589…………………………………………………………………..2, 3, 8, 9, 11, 18

22 U.S.C. § 7101…………………………………………………………………………..9

Fed. R. Crim. Pro. 29………………………………………………………...............1, 22

## OTHER AUTHORITY

H.R. Conf. Rep. No. 106-939 (Oct. 5, 2000) …………………………………………..16, 17

# INTRODUCTION

This Court should set aside the verdict of guilt entered against Defendants Rachel Cherwitz and Nicole Daedone and enter a judgment of acquittal because the government presented insufficient evidence of the offense of the forced labor conspiracy. Applying a properly narrow and constitutional construction of the forced labor statute, the evidence presented fell far short of satisfying the government's burden of proof. The government's case attacked Defendants' protected First Amendment rights using after-the-fact tales of regret from alleged victims who admitted that they possessed the capacity and free will to remove themselves from their later-believed objectionable circumstances.

The government charged Defendants with one count of forced labor conspiracy. The jury returned a guilty verdict. This Court denied Defendants' Rule 29 motion after the government rested its case and its renewed motion following the close of the government's case. Defendants rely on and incorporate their prior oral and written Rule 29 motion in full. *See* ECF No. 401; Tr. 4685:15-4722:22. Defendants supplement that motion herein.[1]

# APPLICABLE LAW

Federal Rule of Criminal Procedure 29(c) provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." A court may enter a judgment of acquittal on the grounds of insufficient evidence "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes,* 302 F. 3d 48, 52 (2d Cir. 2002). To sustain a conviction, the jury

---

[1] To complete the record, attached as Exhibits A and B are certain defense exhibits that were not admitted at trial.

must have been able to find each of the essential elements of the crime beyond a reasonable doubt. *United States v. Jackson,* 368 F. 3d 59, 63 (2d Cir. 2004).

## ARGUMENT

### I. The Forced Labor Statute Should be Narrowly Construed to Avoid Violating the First and Fifth Amendments.

Under the canon of constitutional avoidance, courts should construe statutes to avoid "serious constitutional problems . . . unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *United States v. Davis*, 588 U.S. 445, 464 (2019) ("Respect for due process and the separation of powers suggest a court may not, in order to save Congress the trouble of having to write new law, construe a criminal statute to penalize conduct it does not clearly proscribe."); *Pierre v. Holder*, 738 F.3d 39, 48 (2d Cir. 2013). This accords with the rule of lenity, which requires that ambiguities in a criminal statute's interpretation be resolved in the defendant's favor. *United States v. Hardin*, 2020 WL 1922594, at *11 (S.D.N.Y. April 21, 2020).

The forced labor statute, 18 U.S.C. § 1589 states, in relevant part:

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

The statute defines "serious harm" as "any harm, whether physical or nonphysical, including psychological . . . harm, that is sufficiently serious, under all of the surrounding circumstances, to compel a reasonable person of the same background . . . to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). A victim's acquiescence to the forced labor at issue must be "objectively reasonable under the circumstance" in light of the particular vulnerabilities of the victim. *United States v. Rivera*, 799 F.3d 180, 186–89 (2d. Cir. 2015). In other words, the law requires the Court to ask whether the serious harm was "sufficiently serious to cause both the victims and reasonable people of the same background and in the same circumstances to feel coerced." *Id.* at 799 F.3d at 186—87.

Here, the government impermissibly used Defendants' spiritual beliefs in connection with its burden to prove every element of the forced labor statute beyond a reasonable doubt.

*First*, the record shows Defendants engaged in and taught a meditative spiritual practice that was religious in character and encouraged sensual activity outside of a practitioner's comfort zone. GX3120; Tr. 1679:11-1680:2, 1680:25-1681:13, 2479:1-8, 2889:18-25, 3104:14-3105:12, 3700:17-3701:9, 4017:11-15. To Defendants, and the alleged victims who sought out their teachings, "orgasm was synonymous with God and synonymous with [] a soul." Tr. 4007:1-22; *see also* GX3500-RW-12 at 2 ("[O]rgasm is the basis of all activities"). According to these spiritual teachings, "orgasm" was a source of spiritual energy that was to be cultivated, like prayer, in a pursuit of enlightenment. *Id.* ("[O]rgasm is . . . the thing that keeps your body plugged in. It is your teacher. And it is your power source"); Tr. 190:22-191:7. These spiritual beliefs trace to ancient religious principles from the Hindu and Buddhist traditions. *See, e.g.,* Tr. 4002:17-23; *see also* ECF No. 171 at 13. The practices included orgasmic meditation ("OM"), which involved consensual physical relations among practitioners. Tr. 106:17-107:16, 1264:15-1266:2, 2970:24-

2971:4, 3386:2-6; GX3500-RW-12 at 2; DX1AB at 3 (providing guidelines to ensure consensual physical relations). The alleged victims conceded time and time again they understood the full nature of these spiritual practices and voluntarily engaged in them. Tr. 1140:16-25, 1733:25-1734:9, 3299:25-3300:6. Practitioners signed waivers acknowledging that they were "deliberately coming to a place" to "lose control," and they further agreed to hold "myself fully responsible for my experience of other people's actions . . ." DX9FC. Accordingly, the record amply established that the very practices the government used to prove its forced labor conspiracy were part of a spiritual practice for which the alleged victims not only signed up for voluntarily, but sought out specifically.

Although the government may not approve of the practice or the spiritual beliefs that inform the practice, the evidence established that these beliefs and activities are religious in nature and are protected under "an expansive conception of religious belief." *Equal Opportunity Emp't Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 395 (E.D.N.Y. 2016) (internal quotations omitted); *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."); *Frazee v. Ill. Dep't Emp't Sec.*, 489 U.S. 829, 834 (1989) ("[W]e reject the notion that, to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."). Non-traditional spiritual beliefs, including those that the government may condemn—or, as in the instant case, deem "not okay"—are nonetheless protected by the First Amendment. *See Thomas v. Rev. Bd. Ind. Emp. Sec. Div.*, 450 U.S. 707, 714, 715–16 (1981); *compare Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 649 (2018) ("Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove this country's commitment to serving as a

refuge for religious freedom.") *with* Tr. 5218-19:14-9 (government rebuttal arguing that Defendants' spiritual beliefs and teachings were "not okay."). Even a "conglomeration" of various beliefs and practices, "none of which would be considered religious practices standing alone," receives protection under the First Amendment's Establishment, Free Exercise, and Free Speech Clauses, as well as the First Amendment's implicit recognition of freedom of association. *Dettmer v. Landon*, 799 F.2d 929, 931-32 (4th Cir. 1986) (rejecting that contrary argument by the government in holding that the Church of Wicca is a religion because it "occupies a place in the lives of its members parallel to that of more conventional religions"). Under this approach, "a touchstone of a religion is the believer's categorical disregard [of] elementary self-interest . . . in preference to transgressing the religion's tenets." *United States v. Allen*, 760 F.2d 447, 450 (2d Cir. 1985); GX2500-RW-12 at 1.[2] Therefore, the OM practice and Defendant's spiritual beliefs and teachings are protected under the First Amendment.

*Second*, the forced labor statue must be read in light of the spiritual community created by Defendants that included shared practices and beliefs. *See, e.g.,* Tr. 3279:11-13; 3672:4-10 (describing "Darshan," the communal process of teaching Defendants' spiritual beliefs). Practitioners voluntarily chose their level of involvement in this community, which included

---

[2] Although OneTaste like all religious institutions, involved some secular components, that does not limit the First Amendment's protections of its activities and teachings. *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1597 (2025) (Thomas, J., concurring) ("Religious institutions do not exist apart from the secular world. They need to buy and sell property. They need to hire and pay staff. They need to form contracts and file lawsuits. They need their property arrangements to persist when personnel changes, and they need their property to remain secure when individual members of the institution become insolvent. These and other considerations make the formation of corporate entities essential for many religious institutions. . . . In short, the corporation is made for the church, not the church for the corporation.").

working at OneTaste or volunteering their services while exercising free will. For example, serious practitioners could reside in monastic residences with policies intended to ensure commitment to the practices and teachings. Tr. 1142:3-1144:2, 1146:23-1147:23 2080:9-2081:16, 2218:11-2219:18, 2221:7-2222:7. Indeed, all twelve of the government's witnesses who participated in OneTaste chose to live in these monastic residences. Before entering these residences, practitioners agreed to and were advised of the requirements through the "Rules of Play":

> Congratulations on your decision to dive into the waters of living in an OM House! It means you are making a commitment: to your desire, to the community, and to staying connected. It is a cooker, where your emergent behavior will arise. It is a container that we agree to enter in to, in order to see who we are, know each other, and support the practice and growth of Orgasmic Meditation.
>
> [. . .]
>
> Many institutions offer themselves as a refuge. This is not one of them. An OM House is intended for adults- spiritual, emotional, psychological, and physical adults. You are moving in because you want something: a deeper sense of your orgasm, actualization, and connection. The nature of this work is that, on your path to search for these things, you will be confronted. At some point, you'll probably want to blame the people around you for your experience. You'll most likely be up against your demons. We find that these rules of play help us remember, that we are coming into the house as fully volitional Beings ready to take responsibility for our own experiences.
>
> Stay connected (no matter what). This rule of play is probably the most difficult and the most crucial. It means you agree to break the pattern of disconnection. You agree to let the other person in when your feelings are hurt, when you're mad, or when you love them. You don't get to check out from the house for a week without telling your house manager and housemates what is going on. You recognize that all of your actions have impact on the people around you.
>
> Staying connected means that even in the face of the most uncomfortable realization, you let the other people you live with in. It is disconnection that causes the destruction in our relationships. If we stay connected no matter what, we always know each other better on the other side.

GX3500-RW-12 at 1.

Other practitioners could enjoy free events or pay for classes focused on these beliefs. *See, e.g.,* Tr. 114:2-4, 4731:7-16, 426:13-427:6. All of the alleged victims attended these free events and practice opportunities, Tr. 425:10-426:15, 1019:22-1020:18, 1185:20-1186:7 2114:8-2115:16., and, unlike the vast majority of people who merely attended OneTaste classes and events, the alleged victims also chose to live in monastic residences and practice OneTaste's teachings, Tr. 695:3-697:25, 2477:6-2479:8, 4214:2-25. Indeed, the practitioners freely committed to: practicing OM; engaging in a movement practice (typically Bikram yoga); attending OneTaste events (called TurnOns); following a journaling practice known as "fear inventory"; remaining in close communication with others in the community (referred to as "stay connected no matter what"); refraining from drinking alcohol or using drugs; and maintaining the cleanliness of the monastic house Tr. 701:12-704:15, 1142:3-1144:2, 1146:23-1147:23, 1772:5-12, 1773:25-1774:11, 2080:9-2081:16, 2218:11-2219:18, 2221:7-2222:7, 2312:6-24, 4144:5-4115:15.

Similar to religious communities throughout history, practitioners here sought spiritual growth and enlightenment beyond their current existence. GX2604; GX3500-RW-12 at 1; Tr. 4966:16-23 (describing the process of "aversion practice," which encouraged sexual encounters with partners who would not be their typical preference). Indeed, spiritual growth and exploration in a communal setting was the very reason practitioners freely engaged in these activities. Tr. 1143:12-1144:2, 1182:15-1183:2, 2355:11-15; DX9FC at 2 (OneTaste waiver requiring participants to acknowledge they are deliberately entering a place where they can lose control); *see also* Tr. 2843:18-2844:21, 4045:15-21, 4136:19-4137:3. Such spiritual environments are also defined by volunteerism and freely giving one's time, energy, and labor for the benefit of the community, as reflected at OneTaste. *See, e.g.,* Tr. 2132:22-23, 2437:20-25, 2964:20-23, 2972:7-18, 2982:18-21, 2984:3-8, 2992:18-19, 3399:3-7, 3423:18-25, 3808:22-23, 4043:10-13.

The forced labor statute should not be interpreted to characterize the spiritual teachings and voluntary activities of Defendants as "improper means" or "serious harm." *See, e.g.*, Tr. at 1015:4-9, 1121:8-1122:5, 2321:12-18, 2686:24. Interpreting the forced labor statute to include Defendant's teachings, practices, and spiritual beliefs would render the statute unconstitutionally vague.[3] *See Farrell v. Burke*, 449 F.3d 470, 491 (2d Cir. 2006) (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972)); *Burke*, 449 F.3d at 485 (Vagueness in the law is "particularly troubling" when First Amendment rights are involved). This Court should, therefore, narrowly interpret the statutory language to avoid violating the First Amendment's Free Speech, Expression, Free Association, and Religion Clauses, as well as the Fifth Amendment's Due Process Clause. *See F.C.C. v. Fox Television Stations, Inc.* 556 U.S. 502, 216 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts) (citing *Edward J. DeBartolo Corp.*, 485 U.S. at 575).

Moreover, such narrow construction is constitutionally required. The forced labor statute was not intended to regulate "day-to-day activity," like a "political leader who uses charisma to induce others to work," or "a religious leader who obtains personal services by means of religious indoctrination." *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179–80 (9th Cir. 2012); *United States v. Kozminski*, 487 U.S. 931; 949 (1988) (although the Court was analyzing U.S.C. § 1584, the same principles apply to § 1589). Nor was it intended to redress every bad employment relationship, or to, for example, "punish immigrants for adhering to cultural rules and

---

[3] For the avoidance of doubt, Ms. Cherwitz and Ms. Daedone renew their as-applied vagueness challenge and incorporate by reference all prior briefing and oral argument. *See* ECF No. 401 at 10-14; Tr. 4694:19- 4695:14; *see also* ECF No. 222 at 15-19; ECF No. 234-1 at 8, 10-12; Hr'g Tr. 6:24-9:8-15 (Jan. 7, 2025).

restrictions that many in this country would refuse to abide by." *Muchira v. Al–Rawaf*, 850 F.3d 605, 625 (4th Cir. 2017). Instead, it was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Id.* at 617 (quoting *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014)). Specifically, it was designed to "combat" the "transnational crime" of "trafficking in persons," particularly defenseless, vulnerable immigrant women and children. *Church of Scientology Int'l,* 687 F.3d at 1181 (quoting 22 U.S.C. § 7101(a), (b)(24)).

Courts have long been wary of a labor statute's ability to invade traditional, widely accepted practices. Although in *Kozminski*, the applicable statute was the involuntary servitude statute, 18 U.S.C. § 1584, and not the forced labor statute under § 1589, the same principles applied in that case apply here as well. Specifically, the Supreme Court held that there was no violation of the statute because the use or threat of coercion to obtain involuntary servitude was purely psychological. *Kozminski*, 487 U.S. at 952. While the government urged the *Kozminski* Court to adopt a broad construction of "involuntary servitude" that would "prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice," the Court unanimously rejected that argument. *Id.* at 949. It held that "involuntary servitude necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* at 952 (internal quotations omitted). In doing so, the Court issued a warning about the government's overbroad reading of the statute:

> Under this interpretation, involuntary servitude would include compulsion through psychological coercion as well as almost any other type of speech or conduct intentionally employed to persuade a reluctant person to work. This interpretation would appear to criminalize a broad range of day-to-day activity. For example, the Government conceded at oral argument that, under its interpretation, [the statute] could be used to punish a parent who coerced an adult son or daughter into working

in the family business by threatening withdrawal of affection. It has also been suggested that the Government's construction would cover a political leader who uses charisma to induce others to work without pay *or a religious leader who obtains personal services by means of religious indoctrination*. As these hypotheticals suggest, the Government's interpretation would delegate to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes. It would also subject individuals to the risk of arbitrary or discriminatory prosecution and conviction. Moreover, as the Government would interpret the statutes, the type of coercion prohibited would depend entirely upon the victim's state of mind. Under such a view, the statutes would provide almost no objective indication of the conduct or condition they prohibit, and thus would fail to provide fair notice to ordinary people who are required to conform their conduct to the law.

*Id.* at 949 (internal citations omitted) (emphasis added). The Supreme Court predicted exactly what happened in the instant case – the prosecutors and jury determined what type of coercive activities are so morally reprehensible that they should be punished as crimes. The government (mis)used the forced labor statute in a manner never previously conceived or carried out, and the application of the statute was "absurdly remote" from the drafters' intent. In fact, the government stretched the Liberal Construction Clause well beyond the intent of Congress not to effectuate the purpose of the statute, but to specifically prosecute Defendants for their beliefs and spiritual practices.

Without the Defendants beliefs and spiritual practices used by the government as psychological coercion, there was no evidence of forced labor. Notably, there was not a single government witness that was defenseless, vulnerable, or without options. Every single alleged victim was educated, spoke English, and had upward economic mobility, and all of them communicated with their families while participating in OneTaste. Likewise, they all elected to live in residences associated with its practices and beliefs. To combat these facts, the government bootstrapped Defendant's spiritual practice, teachings, and beliefs in an attempt to establish forced labor.

Courts have rejected such tactics. In *Toviave*, for example, the Sixth Circuit explained how a combination of non-criminal actions could be improperly "bootstrapped" into a forced labor violation. *Toviave*, 761 F.3d at 623-24. In that case, the Sixth Circuit reversed a forced labor conviction when the defendant (a parent) forced his child to perform chores and babysit the children of his girlfriend under the specter of actual and threatened physical force. *Id.* at 624. The *Toviave* Court explained that the government's interpretation "would make a federal crime of the exercise of these innocuous, widely accepted parental rights," as "it has always been true that parents can make their children perform this kind of work." *Id.* The forced labor statute "could not have been intended to overturn this longstanding parental right," and the type of "labor" performed by the child in question was "not beyond the bounds of what a guardian can reasonably expect from his child." *Id.* Like *Toviave,* here, the practices that the government used to establish forced labor in Defendants' case were the very practices that the alleged victims sought out at OneTaste, including by moving into residences devoted to these practices, and once practicing it, also requested the ability to work and volunteer for OneTaste. Accordingly, as in *Toviave*, the government, here, criminalized not only religious practices, but practices and work that grown, educated adults chose to do.

## II.    A Narrow Application of the Forced Labor Statute Requires a Judgment of Acquittal.

### A. The statute requires Defendants to obtain another's labor "by means of" serious harm, which does not include Defendants' spiritual beliefs or their acts of teaching them.

The forced labor statute bars an employer from obtaining another's labor "by means of" force, physical restraint, serious harm, threats, or an improper scheme. 18 U.S.C. § 1589(a)(1), (a)(2), (a)(4). At trial, the government repeatedly argued Defendants obtained forced labor "by means of" teaching their spiritual beliefs (*i.e.* that the teachings themselves were "serious

harm"), which is constitutionally impermissible. Tr. 5250:1-20 (government rebuttal: "She is on trial because she . . . used aspects of her teachings to force OneTaste employees to provide labor . . ."). To avoid a constitutional violation, the Court should interpret the statutory text narrowly to exclude claims that Defendants' spiritual beliefs and their acts of teaching were "means" to obtain forced labor. Interpreting the statute in this manner ensures that the government cannot criminalize religious beliefs, religious conduct, free association, or speech, all of which are protected by the First Amendment.

With the forced labor statute properly, and narrowly, interpreted to exclude arguments that a religion or its teachings are "force," the government failed to present sufficient evidence to support a conviction. Indeed, the prosecution in effect conceded at trial that its theory of the case violated the First Amendment:

> I think, as your Honor understands, our theory of the case is that the defendants put some the testifying witnesses, our victims, in psychological distress and also taught them concepts that taught them basically to consent to everything and to be willing to engage in certain sexual activities that even at the time they would have viewed as something they wouldn't consent to, but they did so because they were taught this was a philosophy or a religious practice that was good for them, and if they continued to do it they would reach enlightenment. This all goes to the psychological aspect of how the labor is forced.

Tr. 190:22-191:7.

The government simply cannot use spiritual beliefs to prove the elements of criminal conduct. *United States v. Kaziu*, 559 Fed. Appx. 32, 35 (2d Cir. 2014). In other words, the government may not communicate to the jury that the spiritual beliefs or speech at issue was itself the proscribed conduct. *United States v. Caronia*, 703 F.3d 149, 161 (2d Cir. 2012); *Wisconsin v. Mitchell,* 508 U.S. 476, 489–90 (1993) (instructing that, when speech is introduced as evidence of intent, "[s]uch testimony is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government")

(quoting *Haupt v. United States,* 330 U.S. 631, 642 (1947)). This is exactly what the government has done here. The government used Defendants' core spiritual beliefs, and the act of teaching them, as a criminal agreement and a "means to" to inflict "serious harm." Tr. 4975:22-26 (government closing describing OneTaste philosophies, and Nicole Daedone's act of teaching them, as crime tactics).

Moreover, the government argued that Defendants' spiritual teachings were a fraud to obtain free labor: "And that's not because OMing was actually spiritual. They connected OMing to spirituality for legal protection, and so people would follow Nicole Daedone's teachings," and that Ms. Daedone only taught these concepts "so that her employees would only say yes to her." Tr. 4977-78:10-9. This line of argument also violated the First Amendment. *See Kaziu*, 559 Fed. Appx at 35. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 715–18 (2012).

The government impermissibly used protected practices and beliefs to meet its burden of proof while arguing that a deviation from moral norms should result in a criminal conviction. In its rebuttal, the government argued that the victims "were grown women . . . adults . . . educated . . . they walked in here with degrees . . . that just shows how powerful the coercion was in this case . . . they testified to performing labor after or services after they had been psychologically damaged." Tr. 5220-21:17-1. The government maintained that the jury should find severe psychological harm from the alleged victims' voluntary decisions to live and work in a spiritual communal setting, and to continue to follow their shared beliefs while living in that setting—a communal setting that was referred to by the government's own witnesses as a monastic residence. Tr. 4261:20-4262:6. Stripped of its constitutional infirmities, the government's case cannot

establish the requisite "means" or "serious harm" under the forced labor statute. At the end of the case, the government's entire summation was a plea to the jury to find a crime based on Defendants' non-traditional spiritual beliefs and practices, an argument that is expressly forbidden by the First Amendment. *See Masterpiece Cakeshop, Ltd.*, 584 U.S. at 649.

### B. "By means of" or "serious harm" does not include the necessary consequences of joining and participating in a spiritual community.

Spiritual practitioners who freely choose to associate with and work in a community based on a shared desire to further common goals and follow its teachings are not victims of forced labor. *See Church of Scientology*, 687 F.3d at 1178. The "means of" or "serious harm" at issue must compel that person to remain in servitude when she otherwise would have left. *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).. For this reason, consequences of leaving the spiritual group and warnings of spiritual harm should they leave, do not constitute serious harm, as "a church is entitled to stop associating with someone who abandons it." *Id.* at 1180 (shunning—or "los[ing] contact with family, friends, or each other"—"is not 'serious harm'—and warning of such a consequence is not a 'threat'—under the   Victims Protection Act."). The act of shunning "has its roots in early Christianity," and this practice is protected by the rights of freedom of association and free exercise of religion under the First Amendment. *Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875, 876–77, 883 (9th Cir. 1987); *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1031 (7th Cir. 2024); *see also Kozminski*, 487 U.S. at 960 (Brennan, J., concurring) (stating involuntary servitude statute not intended to criminalize "religious leader who admonishes his adherents that unless they work for the church they will rot in hell."). Despite this, the government introduced evidence that such consequences would befall the alleged victims should they leave. Tr. 254:12-15, 283:17-19, 370:19-371:14, 370:16-371:14, 373:11-17, 1080:5-21,

1121:1-1122:5, 1288:4-12, 2784:11-24. Without this constitutionally impermissible evidence, the prosecution fails as a matter of law.

Moreover, when narrowly construing the forced labor statute to this prosecution, the Court should not interpret "serious harm," to include Defendants' relationship with practitioners or leadership or the spiritual community. *See, e.g,.* Tr. 4902:10-23 ("you heard how Daedone was in charge . . . She controlled who was in and out of the community . . ."); Tr. 830:15-20, 3025:7-3026:2, 3132:8-20, 4226:6-22. The alleged victims practiced their spiritual beliefs in a voluntary spiritual community, whose activities are religious in character and, therefore, constitutionally protected. *See* GX3500-RW-12 at 1 (describing a communal OM house as a "cooker" and a "container that we agree to enter into, in order to see who we are, know each other, and support the practice and growth of Orgasmic Meditation.").

This freedom of association is "implicit" in the First Amendment and is, therefore, a right enjoyed by religious and secular groups alike. *See Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 189 (2012). Communal spiritual groups like the residences in which the government witnesses chose to live, and the related community practices, are the "archetype of associations formed for expressive purposes," because their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 656 U.S. at 201 (Alito, J., Concurring). As such, these types of groups inherently exercise a level of "control" over their members." *Id.* at 200. Because a spiritual belief or religion "cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses," a degree of influence is "an essential component of its freedom to speak in its own voice, both to its own members and to the outside world." *Id.* at 201. This respect for the self-governance of spiritual groups is essential to our

society, and our legal traditions recognize all who choose to participate in religion "do so with an implied consent to this government, and are bound to submit to it." *Watson v. Joens*, 13 Wall. 679, 728-29 (1872). In this type of community, Defendants were entitled to, and indeed expected to, advance the "critical process of communicating the faith." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). Without these impermissible arguments, the government could not meet its burden of proving every element of a forced labor conspiracy beyond a reasonable doubt.

### C. The evidence failed to meet a properly construed reasonable person standard.

The forced labor statute requires a jury to "consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances." *Rivera*, 799 F.3d at 186. Congress intended these vulnerabilities to be known objective conditions, like age, immigration status, or mental disability. H.R. Conf. Rep. No. 106-939, at 101 (Oct. 5, 2000); *United States v. Bradley*, 390 F.3d 145, 153 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101 (2005); *Muchira*, 850 F.3d at 620; *Tegete*, 2023 WL 2504744, at *9; *see also Kozminski* 487 U.S. at 952 (holding psychological harm is not the type of coercion required for involuntary servitude, even where the victims were mentally disabled). The hidden emotional state of the alleged victim is not an objective circumstance and would negate the scienter element required to establish forced labor. *See Bradley*, 799 F.3d at 153.

Furthermore, the statute was not intended to encompass voluntary spiritual communal practices when considering whether Defendants' actions were "sufficiently serious to cause both the victims and reasonable people of the same background and in the same circumstances to feel coerced." *Rivera*, 799 F.3d at 186–87. Indeed, it cannot be reasonable for alleged victims to fully embrace spiritual practices, yet allege years later that their voluntary participation in those practices was a result of psychological coercion or "brainwashing." *See, e.g., Church of*

*Scientology Int'l*, 687 F.3d at 1180-81 (no forced labor claim when alleged victims had "innumerable opportunities" to leave the Church of Scientology as evidenced by travel, access to vehicles, phone, and internet, and leaving would result in losing contact with Church members); *Salvation Army Nat'l Corp.*, 110 F.4th at 1031 (finding no TVPA violation when alleged victims could have regained both the ability to do other work and the ability to access their cell phones and internet); *Tegete,* 2023 WL 2504744, at *10 (discussing alleged victims' ability to travel, access to internet and cell phone as evidence that alleged victim was not performing forced labor); *see also Muchira*, 850 F.3d at 618-22 (employee who worked for a family was not "coerced" when she had ample opportunities to walk away from the situation). Based on witnesses' contemporaneous statements from the time, which the defense was only permitted to use to refresh their recollection, it is apparent that the alleged victims fully embraced OneTaste's spiritual practices, and only regret it now, ten to fifteen years later.

Furthermore, none of the alleged victims possessed objective vulnerabilities that "bear on whether the employee's labor was obtained by forbidden means." *Bradley,* 390 F.3d at 153 (quoting H.R. Conf. Rep. N. 106-939, at 101 (Oct. 5, 2000)) (internal quotations omitted). The government acknowledged that the alleged victims were educated women capable of rational decision-making. Tr. 5220-21:17-1 (government's rebuttal) (describing alleged victims: these "were grown women . . . adults . . . educated . . . they walked in here with degrees . . . that just shows how powerful the coercion was in this case . . . they testified to performing labor after or services after they had been psychologically damaged."); DX1AB at 3 (requiring certain OneTaste participants to disclaim that they did not suffer from any hidden conditions "that could pose a threat of harm to myself or other course participants" or other OneTaste employees). Government witnesses testified that they exercised their own free will to immerse themselves in a spiritual

community of shared beliefs and practices. Tr. 4261:16-4262:6. Under these circumstances, the Court should hold that it would be unreasonable, as a matter of law, for an individual who voluntarily submits herself to the requirements of a spiritual community in this case to later claim that such a choice was the result of psychological coercion. *Church of Scientology Int'l*, 687 F.3d at 1178; *Tegete.* 2023 WL 2504744 at *10. To hold otherwise would be fundamentally incompatible with the First Amendment, and would subject many, if not most, religious organizations to similarly intolerable claim that "a regime of religious indoctrination psychologically coerced adherents to work for the church." *Kozminski*, 487 U.S. at 964 (Brennan, J., concurring).

### D. The jury could not have found that Defendants intended to obtain forced labor or that they reached an agreement to violate the statute.

Finally, the scope of the statute is narrowed by the express scienter requirement. *Dann*, 652 F.3d at 1170. The "linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim[s] to believe that such harm would befall" them if they left employment. *Muchira*, 850 F.3d at 618 (quoting *Dann*, 652 F.3d at 1170). The Court should determine that the scienter element was not met as a matter of law. Government's witnesses, through digital evidence and trial testimony, admitted they communicated to Defendants that they were voluntary participants in these spiritual practices, that they exercised free will to leave the community, and that they loved the practice. *See, e.g.,* Tr. 498:11-22; 660:12-15; 705:1-3; 1455:22-23; Tr. 1455:25-1456:1; 1902:14-20; 2821:15-17; *Salvation Army Nat'l Corp.*, 110 F.4th at 1031("it is difficult to see how the [employer] could have harbored such an intent" when the alleged victim voluntarily associates themselves with the employer.). These communications to Defendants, as well as the surrounding facts and circumstances of the evidence, make clear that Defendants could have never formed the necessary scienter to violate the statute.

Tr. 704:7-705:3, 1184:8-22, 1553:1-20, 2251:4-14, 3950:23-3951:7. In fact, the alleged victims, in addition to living in residences dedicated to OneTaste practices and beliefs, wanted to work for the company, and could have left to obtain other employment—indeed, they did so when they eventually left. Thus, Defendants could not have believed that they were forcing anyone to work, and indeed there was no evidence that Defendants "intend[ed] to cause a person in [their] employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputational harm—that would compel someone in her circumstances to continue working to avoid that harm." *Dann*, 652 F.3d at 1169-70; *United States v. Chaudhri*, 134 F. 4th 166, 186 (4th Cir. 2025) ("The Government was required to establish that defendants were aware the victim could have regarded their statements as serious harm."). Accordingly, because Defendants did not have the requisite scienter, it follows that there was insufficient evidence that Defendants entered into a conspiratorial agreement to force labor.

Indeed, Defendants' awareness that the practitioners were voluntarily engaging in spiritual practices, and that they had the ability to leave the spiritual community, would negate any unlawful intent or agreement. *See, e.g., Salvation Army Nat'l Corp.*, 110 F.4th at 1031 ("As the district court stressed, given the voluntary nature of participation in the program, it is difficult to see how the Salvation Army could have harbored such an intent"); *Tegete,* 2023 WL 2504744 at *10 (discussing alleged victims' ability to travel, access to internet and cell phone as evidence that defendant did not intend to obtain forced labor); *see also Muchira*, 850 F.3d at 618-22 (insufficient evidence to show defendant intended forced labor where employee was not especially vulnerable, was not subjected to squalid living conditions, had ample opportunities to walk away from the situation). While the statute does not require victims be kept under "lock and key," where defendants know that the alleged victims had the ability to leave and always exercised free will in

their spiritual practices, there could be no criminal intent. *See, e.g., Muchira*, 850 F.3d at 621-23 (insufficient evidence of intent where alleged victim began to view traditional Saudi cultural house rules to be "oppressive and archaic" after working in America, but failed to exercise her free will to leave); *Church of Scientology Int'l*, 687 F.3d at 1177-78 (insufficient evidence of intent to obtain forced labor where alleged victims labored because it was "the right thing to do," and successfully left "the first time [they] tried.") Here, the alleged victims all testified they were physically free to leave but felt "brainwashed" to stay. Tr. 768:25-770:11, 1203:16-23. Accordingly, because Defendants were aware that the alleged victims chose to live in monastic residences, chose to work for OneTaste and were able to leave either or both at any time, there was insufficient evidence to establish the statutory element of *mens rea. See Muchira,* 850 F.3d at 618.

### III.    In Violation of the First Amendment, the Government Asked the Jury to Convict Defendants Because of the Alleged Immorality of their Spiritual Practices.

In its rebuttal, the government made clear the entire case was a moral condemnation of Defendants' spiritual beliefs and practices: "[D]o not let the defense normalize what happened here by conventional or unconventional standards . . . it is not okay to teach your employees that their spiritual purpose is to fuck the war out of men and that if they stray from the past set by OneTaste and Nicole Daedone, they will be spiritually ruined . . . it is not okay to instruct your employees to go have sex . . . it is not okay to demand that women open up the most sensitive part of their bodies . . ." Tr. 5218-19:14-9; *see also* Tr. 4937:15-20, 4989:4-6. While the teachings and practices may be offensive to the prosecution, it is this very idiosyncratic repulsiveness that garners First Amendment protection. Tr. 2306:12-24, 2934:25-2935:18, 3030:14-25, 3990:25-3991:1; *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 5732 (1993) ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion"); *Edwards v. Aguillard*, 482 U.S. 578, 593 (1987) ("The Establishment Clause . . . forbids . . . the prohibition of

theory which is deemed antagonistic to a particular dogma"); *Larson v. Valente*, 456 U.S. 228, 246 (1982) (the First Amendment mandates a strict "principle of denominational neutrality.").

In fact, the government specifically used the core principles of OneTaste, Defendants' beliefs, and Ms. Daedone's teachings to argue that the alleged victims were so indoctrinated that they lost their free will. But there was no evidence that any of the government's witnesses lost their free will. Instead, the government used this First Amendment protected activity to improperly argue that anyone who would adhere to what the government believes are abhorrent principles must be forced into doing so. But as the Supreme Court has stated, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas,* 450 U.S. at 714; *see also United States v. Ballard,* 322 U.S. 78, 87 (1944) (And "[i]f one could be sent to jail because a jury in a hostile environment found [particular religious] teachings false, little indeed would be left of religious freedom.").

Furthermore, the use of these practices in the government's argument made it difficult for the jury to distinguish between someone who has lost agency and the ability to make her own decisions from someone who has been influenced by love, charisma, religious practices, or teachings. *See Kozminski*, 487 U.S. at 960-61 (J. Brennan, concurring (agreeing with "the Court that the difficulty of distinguishing the victim deprived of "the capacity for rational calculation" from the victim influenced by love, charisma, persuasive argument, or religious fervor is sufficiently great that the standard fails to define the criminal conduct with sufficient specificity"). The fact that these alleged victims may look back and regret being influenced by these religious and spiritual practices does not make the activity criminal, and when the government conflated the practices with labor, it confused the issue at hand and infringed upon their First Amendment rights.

# CONCLUSION

In sum, where the forced labor statute is properly construed to exclude evidence of constitutionally protected beliefs and teachings like much of the government's evidence presented at trial, the government was left with insufficient evidence to sustain its charge of forced labor conspiracy. Accordingly, the Court must set aside the Defendants' conviction under Rule 29. For the reasons set forth above, and the reasons set forth in their prior oral and written Rule 29 motion in full, Ms. Cherwitz and Ms. Daedone respectfully request that the Court grant their motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* ECF No. 401; Tr. 4685:15-4722:22.

Respectfully submitted,

/s/JENNIFER BONJEAN

JENNIFER BONJEAN
Bonjean Law Group, PLLC
233 Broadway, Suite 707
New York, NY 10279
718-875-1850

/s/CELIA A. COHEN
/s/MICHAEL P. ROBOTTI
Celia A. Cohen
Michael P. Robotti
*Counsel for Rachel Cherwitz*
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY 10019
212-223-0200