UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-00146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 27, 2025
Defendant. : 9:30 a.m.
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Stacy A. Mace
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group

Richard Hobbs, Paralegal, Ballard Spahr

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Stacy A. Mace, RMR, CRR, RPR
Official Court Reporter
United States Courthouse, Room N377A
225 Cadman Plaza East
Brooklyn, New York 11201
smacerpr@gmail.com

(In open court; jury not present)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati is now presiding. You may be seated.

Your Honor, this is United States of America versus Rachel Cherwitz and Nicole Daedone.

Is the Government ready?

MS. FARRELL: We are, Your Honor.

THE COURT: Sorry. We're just going to wait for Ms. Bonjean. She is right there.

MS. FARRELL: Thank you. And Ms. Bensing stepped out to get the witness.

THE COURT: Okay.

MS. FARRELL: But I can --

THE COURT: Go ahead.

MS. FARRELL: Thank you. Kayla Bensing will be coming in shortly.

Kaitlin Farrell, Nina Gupta and Sean Fern for the United States. With us are Paralegal Specialists Marlane Bosler and Liam McNett. And Tricia Quintero from the FBI will also be joining us at counsel table.

THE COURT: Okay. Good morning, everybody.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler

LaBarge, Kelly Lenahan-Pfahlert.

And, Your Honor, we have a new controller for our -- paralegal for our trial direct today.

THE COURT: Okay. Who is it?

MS. COHEN: Richard Hobbs.

THE COURT: Can you spell it for me, please?

MS. COHEN: H-O-B-B-S.

THE COURT: Okay. Well, good morning to everybody.

MS. COHEN: On behalf of Rachel Cherwitz. Thank you.

THE COURT: Okay.

MS. BONJEAN: Good morning, Your Honor.

Jennifer Bonjean, Kelsey Killion and Ashley Cohen, on behalf of Ms. Daedone. Along with our paralegal, Galila Assefa. One of these days.

THE COURT: Okay. Good morning, everybody.

So as we discussed on Friday, we will start with the issue that needs to be taken up outside the presence of the jury. Not all the jurors are here in any event yet, so we have a bit of time in any event.

So, I think the Government can call its next witness.

MS. BENSING: Thanks very much.

The Government calls Robert Kandell.

Your Honor, if we could have just one minute,

please. The witness needs one minute.

THE COURT: Sure. We can't do anything without him, so that's fine.

(Pause.)

THE COURT: And while we're waiting, I know that there were filings over the weekend. I don't think any of them were urgent that we need to deal with them before this witness, but we will address them later.

MS. BENSING: Thank you, Your Honor.

(Pause.)

(Witness enters.)

THE COURT: And, sir, you can just come right up here.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Sir, please step up, remain standing, and raise your right hand.

Do you solemnly swear or affirm that the answers and testimony you are about to give this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: So help me God.

(Witness sworn/affirmed outside the presence of the jury.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell your last name slowly, and please use the microphone.

THE WITNESS: Robert Kandell, K-A-N-D-E-L-L.

THE COURT: Good morning.

Before you start, Ms. Bensing, I just -- I understand that the witness has counsel, is that correct?

THE WITNESS: Yes.

THE COURT: If at any time during this proceeding right now, before the jury is here, you wish to speak to your counsel, just let me know and I'll give you the opportunity to do that.

THE WITNESS: Thank you.

THE COURT: Go ahead, Ms. Bensing.

MS. BENSING: Thank you very much.

Good morning, Mr. Kandell.

THE WITNESS: Good morning.

**ROBERT KANDELL**,

called as a witness by the Government outside the presence of the jury and having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q When you are called to testify today, do you plan to refuse to answer question on the matters about which you may testify at this trial on the basis of, and assert your Fifth Amendment privilege against self-incrimination as to the

questions asked of you?
A Yes.
MS. BENSING: Your Honor, I'd now like to read into the record an Order signed by the Court dated December 13th, 2024, which has bean marked Government Exhibit --
THE COURT: I am going to stop you at this point, Ms. Bensing. I think you need to lay more of the foundation as to the scope of what the witness would intend to refuse to answer on the basis of his privilege against self-incrimination.
MS. BENSING: Of course.
BY MS. BENSING:
Q Mr. Kandell, do you intend to assert your Fifth Amendment right with respect to every question asked of you during this court proceeding?
A Yes.
THE COURT: Ms. Bensing, you need to lay a different foundation for the nature of the topics.
MS. BENSING: Okay.
Q And you understand that you are going to be called today to testify in the trial of United States versus Cherwitz, et al, criminal docket number 23-CR-146?
A Yes.
Q And do you understand that that pertains to your previous employment and previous involvement with respect to an

organization called OneTaste and your work with Nicole Daedone and Rachel Cherwitz?

A Yes.

Q And, again, with respect to the questions that will be asked of you today in this proceeding, do you anticipate asserting your Fifth Amendment privilege with respect to any topics about which you are going to be asked to testify to at this trial?

A Yes.

MS. BENSING: Your Honor, at this time I think the Government has laid its foundation and would seek to read into the record an order signed by the Court, which has been marked 3500-RKA-11.

THE COURT: Does either defendant wish to be heard as to whether the Court should sustain the claim of privilege or no?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Okay.

The Court does find that the assertion of privilege is appropriate and sustains the claim of privilege. An Immunity Order has been issued, and I will permit the Government to read the Immunity Order to the witness at this time.

MS. BENSING: Thank you, very much.

IN RE TESTIMONY OF TRIAL WITNESS, ORDER 24-mc-4869-DG:

On the motion of Breon Peace, the United States Attorney for the Eastern District of New York, by Assistant United States Attorney Kayla Bensing --

THE COURT: Just slow down a bit, Ms. Bensing, please.

MS. BENSING: Yes.

-- filed in this matter on December 13th, 2024; and it appears to the satisfaction of the Court:

That Robert Kandell, the Witness, has been called to testify or provide other information at the trial in United States versus Cherwitz, et al., criminal docket number 23-146-DG.

That in the judgment of the United States Attorney, the Witness is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination;

That in the judgment of the United States Attorney, the testimony or other information from the Witness may be necessary to the public interest; and

That the aforesaid motion filed herein has been made with the approval of Jennifer A.H. Hodge, Deputy Assistant Attorney General of the Criminal Division of the United States Department of Justice, pursuant to the authority vested in her

by Title 18, United States Code, Section 6003(b), and Title 28, Code of Federal Regulations, Section 0.175(a).

Now, therefore, it is ordered pursuant to Title 18, United States Code, Sections 6002 and 6003, that the Witness gives testimony or provide other information which he refuses to give or to provide on the basis of his privilege against self-incrimination as to all matters about which he may be questioned at the trial in the United States versus Cherwitz, et al., criminal docket number 23-146-DG, and in any further proceedings resulting therefrom or ancillary thereto.

It is further ordered that pursuant to Title 18, United States Code, Sections 6002 and 6003, no testimony or other information compelled under this Order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except in a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order.

It is further ordered that for the reasons stated in the Government's motion, the Government's motion and this Order shall be filed under seal, except that the Government may provide a copy of this Order to counsel for the trial defendants.

This Order shall become effective only if after the execution of this order the Witness refuses to testify or

provide other information on the basis of his privilege against self-incrimination.

And as I mentioned it's dated December 13th, 2024, in Brooklyn, New York, by the Court.

THE COURT: Could you just, I'm not sure if you did, put the exhibit number you were reading off of just for record clarity?

MS. BENSING: Yes. 3500-RKA-11.

THE COURT: Okay.

And I want to make sure that the witness understands that we will be bringing out a jury and that this Order means that you are ordered to testify.

Do you understand?

THE WITNESS: Yes, Judge.

THE COURT: Okay.

Is there anything that the Government thinks we need to do before we bring out the jury?

MS. BENSING: I don't think so, Your Honor. Thank you.

THE COURT: Let me ask the defendants the same question.

Is there anything else that the parties think we need to do before bringing out the jury?

MR. ROBOTTI: No, Your Honor.

THE COURT: Okay. I'm going to ask -- I'm sorry, I

didn't hear.

MS. BONJEAN: No, Your Honor.

THE COURT: I am going to ask the witness to step down. We need to actually check if the jury is all here.

MS. BENSING: Yes. And, Your Honor --

THE COURT: And then you will call the witness again.

MS. BENSING: Thank you.

THE COURT: And he will be sworn again.

MS. BENSING: Perfect.

THE COURT: So you may step down for the moment. Thank you.

(Witness steps down and exits the courtroom.)

MS. BONJEAN: Your Honor, if I can raise one issue before the witness comes in.

THE COURT: Yes.

MS. BONJEAN: I brought this motion before, but I'm just going to repeat it here.

The defense moves to bar any reference to the words "cult" or "brainwashing." I don't know if they're going to come out.

THE COURT: With this witness or you mean the next witness?

MS. BONJEAN: This witness, potentially. So, we maintain our objection the use of those words and those

concepts.

THE COURT: Okay.

As a blanket matter I would overrule your objection, but I don't know whether anything this person is going to be saying will touch on those terms or whether it would be relevant. I just need to hear it if it happens, but I appreciate you raising it.

Are you feeling better, Ms. Bonjean?

MS. BONJEAN: I'm getting there. I am just annoyingly coughing, so I apologize.

THE COURT: No, that's fine.

MS. COHEN: And, Your Honor --

THE COURT: Yes.

MS. COHEN: -- we would join in that.

But I should have said this a long time ago that our objections have been the same.

THE COURT: Yes.

MS. COHEN: I would just say for the record any objections that haven't been joined, we would join.

THE COURT: Okay. I think that --

MS. COHEN: I think we have --

THE COURT: Joined.

MS. COHEN: -- but just to cut down on some of the back and forth.

THE COURT: I typically have been asking both of you

for record clarity --

MS. COHEN: Yes.

THE COURT: -- whether you object.

MS. COHEN: And we appreciate that. Sometimes we have different grounds and that's fine. I just --

THE COURT: Yes.

MS. COHEN: I just wanted to put that on the record just in case there's any -- any confusion on the record. Thank you.

THE COURT: You should continue, though, to object if you want to object. I don't think you should rely on any sort of perspective --

MS. COHEN: Absolutely.

THE COURT: -- joining.

MS. COHEN: Absolutely. I just --

THE COURT: Yes.

MS. COHEN: Just in an abundance of caution.

THE COURT: Yes.

MS. COHEN: Thank you.

THE COURT: I think we are still waiting for a juror, so I am going to leave the bench. I don't think we have to all sit here in quiet. You can continue to do what you need to do and as soon as the juror arrives, we will come back down.

Thank you.

(Judge DIANE GUJARATI exited the courtroom.)

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Everyone may be seated for now until we bring out the jury.

(Pause.)

(Jury enters.)

THE COURT: Everyone may be seated. It's nice to see the jury. Good morning, and I hope everyone had a wonderful weekend.

And the Government may call its next witness.

MS. BENSING: Thank you.

The Government calls Robert Kandell.

(Witness enters.)

THE COURT: You can come up here, sir.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Sir, please step up. Remain standing and raise your right hand.

Do you solemnly swear or affirm that the answers and testimony you are about to give this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Thank you. Please be seated.

State your full name for the record spell your last name slowly. And speak into the microphone.

Thank you.

THE WITNESS: Robert Kandell, K-A-N-D-E-L-L.

THE COURT: You may proceed.

MS. BENSING: Thank you very much, Your Honor.

(Continued on the following page.)

**ROBERT KANDELL**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q Mr. Kandell, did you receive a subpoena to be here today?

A I did, yes.

Q Have you also received a grant of immunity for your testimony today?

A Yes.

Q What do you understand that to mean?

A That I cannot be prosecuted for anything that's said by myself or anything else in the court.

Q Are you familiar with an organization called OneTaste?

A Yes.

Q How are you familiar with OneTaste?

A I was a co-founder.

Q When did you first become involved with OneTaste?

A OneTaste had its start in 2002, a previous organization where I met Nicole. And I was involved until 2014.

Q Approximately how old were you when you first became involved with Nicole and OneTaste?

A 32.

Q And your reference to Nicole, is that to Nicole Daedone?

A Yes.
Q I'm going to ask that you look around the courtroom and let me know if you see Nicole Daedone.
A I do.
Q And I'd ask that you identify her by an article of clothing.
A She's wearing a dark sweater.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant Nicole Daedone.
THE COURT: Yes.
BY MS. BENSING:
Q Why did you leave OneTaste, Mr. Kandell?
A My belief system and OneTaste's diverged, and I wanted to do something else.
Q In what way did your belief system in OneTaste's diverge?
A I was no longer interested in the way we were doing sales, no longer interested in the lifestyle, and I wanted to live, quote, a more normal life.
Q And what do you mean by the way OneTaste was doing sales?
A It was sales focused.
Q In what way?
A We had a sales goal from morning to night. The focus was on sales rather than service. And I just didn't have the same viewpoint as the organization.

Q And what do you mean by a shift in your lifestyle?
A I wanted to be able to have my own time, not work all the hours we were doing, and just have freedom to, you know, choose to make my own choices without being responsible for everything.
Q Mr. Kandell, approximately when did you first meet Nicole Daedone?
A December 1999.
Q In what context?
A She came to a group at my house run by another organization.
Q What organization?
A It was called The Welcomed Consensus.
Q What is The Welcomed Consensus?
A They were another sexuality-based organization based in northern California.
Q What was your involvement in The Welcomed Consensus in 1999?
A I was a student.
Q And what was Nicole Daedone's involvement in The Welcomed Consensus at that time?
A She was a student.
Q What does it mean to be a student in The Welcomed Consensus?
A To participate, take classes. Nicole was living in a

communal house at that point -- no, I'm sorry, that's not correct. Just to take classes with the group.
Q What kind of classes?
A Sexuality, communication, relational.
Q How did you become involved with The Welcomed Consensus?
A I heard about it from another teacher I took another course from.
Q And who was that?
A His name was Erwan Davon.
Q And what, if any, relationship did Nicole Daedone have with that individual you just named?
MS. BONJEAN: Objection --
THE COURT: Sustained.
MS. BONJEAN: -- relevance.
BY MS. BENSING:
Q Who ran The Welcomed Consensus at that time, Mr. Kandell?
A There were five main members led by RJ Testerman.
Q Who was RJ Testerman?
A He was the lead of The Welcomed Consensus, a teacher.
Q And how did RJ Testerman run The Welcomed Consensus?
MS. BONJEAN: Objection, vague.
MR. ROBOTTI: Objection, relevance.
THE COURT: Sustained.
BY MS. BENSING:
Q Did you and Nicole draw ideas from The Welcomed Consensus

when you later formed OneTaste?
A Yes.
MR. ROBOTTI: Objection, leading.
MS. BONJEAN: Join.
THE COURT: Overruled.
BY MS. BENSING:
Q And I'm sorry, what was your answer?
A The answer was yes.
Q In what way?
A We used it as a basis of the foundation of our work and our own practice.
Q And what was the basis of the foundation that you drew from The Welcomed Consensus?
A It was a lot of technology and -- and different ideas about relationships and communication. And they had a practice called deliberate orgasm, which was similar to orgasmic meditation.
Q And what is deliberate orgasm?
A It's a partner practice of stroking a woman's genitals for a set period of time.
Q What was the set period of time with respect to deliberate orgasm?
A It was a little more random. It could be two minutes, it could be an hour.
Q And did that form the basis for orgasmic meditation?

A There were elements of it; the position and other ideas, but just the basis.
Q And you said that there were other concepts that you drew from The Welcomed Consensus outside of deliberate orgasm that you later folded into OneTaste, is that correct?
A Yes.
Q What were those?
A They had a -- viewpoints around communication. They had ideas around relationship. There was certain cause and effect, different -- just all of these different technology that was passed to The Welcomed Consensus that we -- we picked up.
Q And can you give us some examples.
A The Welcomed Consensus idea of call and response, which is the man calls or a man or woman calls and a woman responds. And so, a man would send out an intention, a woman would respond to it -- actually, I'm sorry. The female would call and the man would respond.
Q Okay.
A I'm sorry.
Q And what other kinds of concepts were drawn from The Welcomed Consensus?
A There was a lot about relationships. A lot about following a woman's desire. There was communication techniques, things -- something called withholds.

There was thousands of different viewpoints about how to improve your relationships in your life.

BY MS. BENSING:

Q Were tactics of pressure used at The Welcomed Consensus?
A Yes.
Q In what way?
A There was threat and actual physical violence.
Q In what way?
A There was pressure to respond. Some people, mostly women were hit by RJ Testerman.
Q How did your relationship with Nicole Daedone develop after you first met her?
A I met her at the group at my house. I was impressed by her and intrigued by her, and we became fast friends.
Q And what happened with respect to your relationship?
A We just sort of were on the same spot of where we were in the courses. I was very enthusiastic. I was married at the time. Nicole was an enthusiastic student that had been gone for a while. We took multiple classes together, spent a lot of time together. And she was just someone who was impressive.
Q Did there come a time where you and Nicole Daedone lived together?
A Yes.
Q Approximately when?

A That was September of 2001.
Q And how did that come about?
A We were having trouble relating with The Welcome Consensus. They were up in their home near the Oregon border. There was a party that myself and -- well, actually Carol and -- my ex-wife, and Nicole were not invited to. So we stayed -- all stayed home, and then decided to exit The Welcomed Consensus and live together.
Q And you just mentioned somebody named "Carol." Who was that?
A Carol Kandell is my ex-wife.
Q And at the time were you married?
A Yes.
Q Approximately when did you get a divorce?
A We were divorced in April of 2004.
Q You mentioned the concept of withholds being used at The Welcomed Consensus.
What is a withhold?
A Withhold is a withheld communication. The concept is that you have an idea, a viewpoint, a judgment around the person. You don't communicate that judgment, and then that creates distance between you and the other person.
Q And was that a concept that you and Nicole then later used at OneTaste?
A Yes.

Q So, what happened in September 2001 with respect to your and Nicole Daedone's involvement with The Welcome Consensus?
A After 9/11, we -- we decided to exit.
Q And so, what happened?
A Nicole, a woman named Morgan, myself, and a gentleman named Harvey, all moved to my house in San Francisco.
Q And did you start your own community there?
A Not specifically. We -- we started the concept of forming one, but we never got very far.
Q And what happened?
A We got into a disagreement. Nicole and Morgan moved in with a gentleman named Ray Vetterlein, and Carol and myself remained in our house in San Francisco.
Q Who was Ray Vetterlein?
A Ray Vetterlein was --
MS. BONJEAN: I'm going to object to the relevance.
MR. ROBOTTI: Join.
THE COURT: Overruled.
A Ray Vetterlein was an older gentleman. He had been involved with multiple organizations, one called More University.
More University was a predecessor of The Welcome Consensus. He had a community in a town called Brisbane, California, which is south of the city. And an old-school believer of all the beliefs of More and The Welcomed

Consensus.
Q And did More University go by another name?
A I don't know if it did. They had nicknames, but I think that's what they're officially known as.
Q What were the nicknames?
A They were called The Purple People.
Q And why is that?
A They had purple houses, purple chauffeurs and purple cars, and everything purple.
Q Directing your attention to 2002, what, if anything, happened with respect to your and Nicole's involvement together in 2002?
A We were -- we were in a disagreement in 2001. We became friends again later in that year. She was living at Ray's house in Brisbane. And 2002 is when she went to Hawaii to do what's called an audience with a gentleman named Victor Baranco.
Q Who is Victor Baranco?
A Victor Baranco was the head of More for several decades.
Q And what is More?
A More is the organization More University, Purple People.
Q Okay.
Why -- what, if anything, did Nicole Daedone tell you about her trip to Hawaii?
A She told me about the intensity of it. She told me some

details of it. She also said at the end of a six-hour period with him, she said that she wanted to take his seat when he died.

Q Okay. So let's take a step back.

What seat would she -- did she say that she wanted to take?

A More University was, you know, very large and expansive in the '70s and '80s and the '90s, and it was in sort of decline. Victor Baranco had serious cancer and was on health decline. And we came there to -- she decided at that point that she wanted to be the next leader of More University.

Q And what did that mean? What did it mean to be the leader of More University?

A I'm not sure what it would actually mean, but I took it to be that she would run --

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q What was More University at the time, what did it do?

A It ran several houses, four or five houses in the United States at that point, including Hawaii. And they were running courses, but very, very small and very -- you know, not very large.

Q And what kind of courses?

A I believe it was More sexuality courses, communication courses, relationship courses.

Q And when you say it ran houses, what do you mean?
A They had communal houses in Oakland, San Francisco, Hawaii, and I believe in Atlanta at that time.
Q And through what means was More University run?
MS. BONJEAN: Objection to form.
THE COURT: Sustained.
BY MS. BENSING:
Q Were you familiar with how More University was run at that time, Mr. Kandell?
A No, no.
Q Okay. And did you speak with Nicole Daedone about her experience in Hawaii regarding how it was run?
A I don't remember.
Q You testified already that she told you about the intensity of her experience in Hawaii.
What do you mean?
A It was six hours in front of Vic. Vic was a very intense individual. You could sit in his presence and feel him. He was just very impressive.
She said that she was -- difficult talking and asking for what she wanted for the first five-and-a-half hours, and the last half an hour was that she was able to say that she wanted to take his seat.
Q And did she say anything else regarding the intensity of her time there, apart from the six-hour meeting with Victor

Baranco?

A I don't -- no, I don't remember.

Q What happened when Nicole got back from Hawaii?

A She had the idea of us moving to Hawaii and, basically, taking over More University.

Q And did that happen?

A We did.

Q And so, what happened next?

A We rented out my house. We packed up our stuff. We went to Honolulu. We moved into the house and we started the process of investigating how to take over More University.

Q And describe that process.

A It was mostly sitting around eating and realizing that this wasn't a good choice.

Q Why?

A Because while the -- Vic said that we had a game and we could, the rest of the people were not very interested in us actually taking over. So, we met a lot of resistance.

Q What do you mean "had a game"?

A When Nicole said: I want your seat; Nicole told me that he, basically, said: Great. Now, we have a game.

Q And what did you and Nicole understand that to mean?

A That he knew all along that was the intention and that he was interested in us taking over More University.

Q You said that you met resistance.

What do you mean by that?
A The other top people that had been there for several decades were not interested in us taking over the organization. They didn't know us. They didn't like us. And it was not, to them, a good fit.
Q And so, what happened?
A We left after three weeks.
Q And where did you go?
A We went first to the city, and then we went back to California.
Q Did More University engage in deliberate orgasm?
A Yes.
Q In what way?
A It was the practice they taught and the practice that members did with each other.
Q And how, if at all, did deliberate orgasm, as practiced with More University, differ from what later became orgasmic meditation with OneTaste?
A Nicole saw that, one, doing deliberate orgasm was written from a man's perspective from the 1960's, was antiquated and, on some level, male domination of a woman.
She had the idea to rework it from a woman's perspective to turn it more into a practice, more akin to a meditation or to yoga, which led just to a much more open, free-er practice than that.

Q And when did that idea generate?
A Between 2003 and 2004. It kind of evolved over time. The name OMing came -- came in later 2004, but I believe that she was interested in redoing it from 2003.
Q So, after you guys returned from Hawaii, did there come a time where you started OneTaste?
A The name OneTaste is confusing. It is the name of the organization, the corporation we started in 2011.
At the time when we came back from California -- from Hawaii to California, we were looking for different names and different groups. We started one organization whose name just popped out of my head, sorry, that was less sexual and more mind-based.
Q And approximately when did you start that organization?
A We started that in November 2002.
Q And what do you mean more mind-based?
A I wasn't sexuality-based, it was based on different concepts around higher levels of communication and relationship.
Q And what do you mean by that?
A Just the way most people interact is mired with a lot of dishonesty and masks. And so, we wanted to create a practice of more honest and open communication.
Q What happened after you launched this interim practice?
A We had moved to Mill Valley at that point. We ran

several courses. One was called Theater of the Mind, and we taught it two or three times to different friends.
Q And then what happened?
A We realized that it was too head-based. It was too thick. It was too weighty. And then we shifted to going back to our roots around sexuality and communication and formed an organization called The Insight Institute.
Q And what was too thick and too weighty about it?
A People just -- Nicole's concepts were just so complex and so deep, and it was just very difficult for people in a workshop, especially new people, just to come up and follow her -- her lead. And so, we just found out that we were just teaching too intense and heavy concepts, and so we shifted.
Q Too intense and heavy in what way, can you give us an example?
A It's sort of like being in a, you know, really thick math class that you just can't understand the concepts. And so instead of actually trying to understand the concepts, you would just sort of phase out and stop thinking.
So, that was kind of the classes. They were so complex and -- and people would just not confront and not listen.
Q But you testified that this pertained to communication.
So, what kind of concept was so weighty that people couldn't understand it?

A It dealt with people's responsibility about communication. For one, just people being responsible for their communication. Just -- the ideas and the concepts, just people could not bring down to a ground level, practical level.

Q All right. You testified that you returned to a sexuality-based practice.

Did that lead to the origins of OneTaste?

A The first organization was called The Insight Institute. We formed that and taught classes in 2002. And then we merged with an organization called Beyond Education.

When that didn't work out, then we decided to open up The Center. And The Center, itself, was called OneTaste. So that was the first time we used that name.

Q And you just testified about something called The Center.

What is The Center?

A The Center was a building we leased at 1074 Folsom in San Francisco.

Q When did you sign the lease for the center approximately?

A July 2004.

Q How was OneTaste initially funded?

A I had sold my house in San Francisco and I was the initial investor.

Q Were you the only person who contributed money to OneTaste?

A A woman named Allyson Wyenn had put money into The Insight Institute. So, no I was the only person into the corporation that ran The Center, which at that time was called Caravan, Incorporated.
Q Caravan, Incorporated?
A Yes.
Q Approximately how much money did you invest into Caravan or OneTaste?
A $350,000.
Q And you said that that represented the proceeds of a sale of your house?
A Yes.
Q Did Nicole Daedone invest anything in OneTaste?
A No cash value.
Q What was the ownership distribution?
A Of Insight Institute was 40 percent myself, 40 percent Nicole, 20 percent a woman named Allyson Wyenn. Caravan Retreats was 50 percent myself, 50 percent Nicole.
Q Mr. Kandell, at this point in time what was your highest degree of education?
A I had a Master's Degree in biomedical engineering.
Q And prior to meeting Nicole Daedone, what did you do for employment?
A I was a computer programmer.
Q Did there come a time when you stopped working as a

computer programmer?
A Yes.
Q Approximately when?
A When The Center opened, August 2004.
Q And I think you testified that this is approximately around the time that you divorced your wife, is that correct?
A Yes.
Q Why did you and Nicole Daedone use the entity Caravan?
A Caravan refers to a Van Morrison song.
Q Not the name of Caravan, but why did you use the separate entity, separate from OneTaste?
A Oh, thank you.
We believed at Insight Institute -- well, we were advised by a lawyer, first and foremost, to separate workshops from the physical space. If something happened in the physical space, it could affect the other corporation. So, there was wisdom in separating the two entities.
Q And you testified that later you formally incorporated OneTaste?
A Yes.
Q Approximately when was that?
A Late 2010, early 2011.
Q You testified that somebody named Allyson Wyenn had a stake in the company.
Who was that?

A Allyson was a friend, a co-teacher, and she wanted to participate in the ownership of The Insight Institute.
Q So, how did it come to be that it was the three of you; you, Nicole Daedone and Allyson?
A I was dating Allyson at the time. We were fast friends.
Q Did there come a time when Allyson dropped out of the venture?
A Yes.
Q Approximately when?
A Mid 2008.
Q And so at that time, what was the ownership distribution?
A We returned Allyson's money and it was 50/50, Caravan and -- 50/50 Nicole and I for Caravan. We had dissolved The Insight Institute I think a few years earlier.
Q So, at this point it was 50/50, you and Nicole Daedone, into Caravan?
A Yes.
Q Did that -- prior to your leaving the company, did there come a time where that distribution allocation changed in any way?
A We had formed another entity called OneTaste Media in 2013, but Caravan Retreats and OneTaste, Incorporated were just 50/50. I don't believe we ever changed that ownership structure.
Q And with respect to the formation of OneTaste Media in

2013, who, if anybody, had an ownership stake in that entity?
A I don't remember the timing it actually happened. I believe it was 50/50 Nicole and I.
We were discussing other people getting some shares. I honestly can't remember if it happened before my tenure ended or after -- or if it ever happened.
Q And which people did you discuss having shares in OneTaste Media?
A Justine Dawson, I believe Rachel Cherwitz, Rachael Hemsi, I believe. I'm sorry, I can't remember anyone else.
MS. BENSING: If we can please pull up for the witness only what's been marked as Government Exhibit 550.
And, Your Honor, may I approach the witness with a binder of exhibits?
THE COURT: Yes, as long as the defense has the exhibits you're going to be putting in front of the witness.
MS. BENSING: Yes. And I'll just note for the record that these are all marked Government exhibits, which the defense has.
THE COURT: Okay.
BY MS. BENSING:
Q And, Mr. Kandell, I have on the screen in front of you Government Exhibit 550.
I am going -- this is also in Tab 2 of your binder, if you want to take a look at it.

And I'd ask that you please take a look at it and let me know if you recognize it.
A Yes.
Q What do you recognize it to be?
A Articles of Incorporation -- Articles of Incorporation for Caravan, Incorporated.
Q And is it a fair and accurate copy of those Articles of Incorporation?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 550 into evidence.
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 550 is admitted.
(Government's Exhibit 550 was received in evidence.)
MS. BENSING: And if we can, please, briefly publish this to the jury.
(Exhibit published.)
MS. BENSING: And if we could just zoom in on the top half. Okay.
BY MS. BENSING:
Q Were these Articles of Incorporation for Caravan filed in May of 2004?
A Yes.
MS. BENSING: And if we can just move to the bottom

with respect to who signed it.
Q Is that your signature, Mr. Kandell?
A Yes.
MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 544.
BY MS. BENSING:
Q And this is Tab 1 in your binder, Mr. Kandell, if you want to look at a paper copy.
Do you recognize what's in Government Exhibit 544?
A Yes.
Q What is it?
A Articles of Incorporation for OneTaste, Incorporated.
Q Is it a fair and accurate copy of that?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 544 into evidence.
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 544 is admitted.
(Government's Exhibit 544 was received in evidence.)
MS. BENSING: And if we can briefly publish this to the jury.
(Exhibit published.)
Q Were these Articles of Incorporation for OneTaste, Incorporated filed on December 23rd, 2010?

A Yes.
Q And, again, did you sign these?
A I did.
Q Why was OneTaste, Incorporated created at that time?
A The workshops were all part of Caravan, Incorporated. Actually, it was renamed Caravan Retreats, Incorporated, and we were worried about something happening at the residence that could take down the coursework or vice versa. So, we were advised to create a separate corporation.
Q And what do you mean that could take down Caravan?
A Someone falls at the restaurant -- at the residence and sues, then it could affect OneTaste, the workshops; or something happened at the workshops, it could take down the residence. So, a common practice is to create separate corporations and, basically, do a spin-off of the assets to OneTaste, Incorporated.
Q And here in late 2010 what residence are you talking about?
A 1080 Folsom.
Q Prior to 2010, through what entity were employees or contractors paid?
A Caravan Retreats, Incorporated.
Q And what about after OneTaste, Inc. was incorporated?
A Those who were part of OneTaste were paid via OneTaste, Incorporated.

Q Are you familiar with a location called The Warehouse?
A Yes.
Q What is that?
A That was a location at 1060 Folsom. And it was a space that we rented for living from 2006 to 2008.
Q So, approximately how long after you opened The Center did you open The Warehouse?
A Less than two years.
Q And where did you live prior to living in The Warehouse?
A We had communal houses in Brisbane.
Q And when you say "we," who are you talking about?
A There were about 20 or 30 people who lived in three houses in Brisbane.
Q And did that include yourself?
A Yes.
Q Did it include Nicole Daedone?
A Yes.
Q You said The Warehouse opened in 2006?
A Yes.
Q How did that come about?
A We heard that it was available, and it was -- people were moving out. So, we jumped on it and took -- we got the lease for it.
Q And was that down the street from The Center?
A It was.

Q How were you paying for rent at The Center?
A How were we paying?
Q Correct.
A We were making some money, but most of the money was funded through me.
Q Through you personally?
A Yes.
Q And how were you making money at that time?
A We were selling courses, workshops. We had a book store. We had a café. We had yoga classes. We had massage.
Q So, did you continue to put in additional money into OneTaste at this time?
A Yes.
Q Did Nicole Daedone?
A No.
Q How did you pay for things at the warehouse?
A We had -- I don't remember exactly where the money came from, but it was either -- it was probably from me, from my reserves.
Q And did Nicole Daedone contribute any money?
A No.
Q When you first moved into The Warehouse, approximately how many people lived there?
A Twenty.
Q Did Nicole Daedone live there?

A Briefly.
Q And what happened?
A She was there for maybe a month, and then moved in with Reese Jones.
Q Who is Reese Jones?
A Reese Jones was her boyfriend, an investor, a student, supporter of OneTaste.
Q And so, approximately when did she move out of the warehouse?
A July or August 2004 -- no, sorry, 2006.
Q Okay.
A Excuse me.

MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 672.

BY MS. BENSING:

Q And this is Tab 3 in your binder, Mr. Kandell.

Do you recognize this?

A Yes.
Q What is this?
A This is a floor plan of our beds at The Warehouse.
Q And is it a fair and accurate copy of the floor plan of the beds at The Warehouse?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 672.

THE COURT: Any objection?
MR. ROBOTTI: Objection on relevance.
MS. BONJEAN: Join. Also foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q Mr. Kandell, when you say that this is a copy of a plan for The Warehouse, what do you mean?
A This is the bed layout that we had for The Warehouse and how, you know, people slept.
Q And why were these bed layouts necessary?
A I don't remember the -- I think we just wanted to know where people were living and what was available.
Q Did people share beds at The Warehouse?
A Yes.
Q And how did those bed assignments come about?
A Some chosen, some assigned.
Q And who assigned beds?
A Nicole.
Q Nicole Daedone?
A Yes.
Q Does this bed chart accurately reflect the assignments as of June 15th of 2008?
A Yes.
Q And do you see yourself --
A I do.

Q -- as having a bed assignment?
A Yes.
Q And do you see an individual named Christina as having a bed assignment?
A Yes.
Q Who named Christina was living in The Warehouse in 2008?
A Christina Berkley.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 672 into evidence.
MR. ROBOTTI: Same objections.
MS. BONJEAN: Join.
THE COURT: Overruled. Government Exhibit 672 is admitted.
(Government's Exhibit 672 was received in evidence.)
MS. BENSING: And if we could, please, publish this to the jury.
(Exhibit published.)
BY MS. BENSING:
Q I am going to first direct your attention to the top left-hand side where it says "Russ Street."
MS. BENSING: And if we could -- thank you.
Q What is this delineation in this exhibit that says "Russ Street"?
A 1060 Folsom was The Warehouse, and then there was a building adjacent called Russ Street, which was actually

accessible through a big metal door. We took on that lease, as well, to expand capacity.
Q And there's an independent listed in bed 25 as Koser.
Who was that?
A Chris Kosley.
Q And there's an individual in bed 27 as Kal, who was that?
A Kal Holczler.
MS. BENSING: And then if we can please zoom in on the Loft and Warehouse area.
BY MS. BENSING:
Q What is this?
A This is the main Warehouse space.
Q And what is the -- what is the main Warehouse space?
A When you entered through 1060, you went through and this was the large space where most of the beds were held.
Q And what is the Loft area?
A We had built a loft on top of that. It was very tall ceilings, 20 to 30-foot ceilings, and we built a wooden loft above it.
Q And in Bed 21 there's somebody named Yia.
Who was Yia?
A Yia Vang?
Q And who was she?
A She was one of our staff.
Q As of 2008, she was a staff member?

A Yes.
Q In Bed 23 there's individuals listed as Rob and Justine.
Who is that?
A Myself and Justine Dawson.
Q And who is Justine Dawson?
A She was a staff member and my girlfriend.
Q And then in Bed 16, do you see the individuals listed as Will and Christina?
A Yes.
Q Is that the Christina Berkley you testified about?
A Yes.
Q In Bed 17, who is listed there?
A Nicole Halpern and George Lawton.
Q Who is Nicole Halpern?
A Nicole Halpern was a staff member -- staff member.
Q And what was her role -- what was her role on staff at that time?
A She was a sales lead until around 2008.
Q In Bed 10 there's an individual listed as Racheli.
Who is that?
A Rachel -- Rachel Cherwitz.
Q At that time did she go by the name Racheli?
A She did.
MS. BENSING: If we can zoom out and go to the Warehouse, WH, Upstairs.

BY MS. BENSING:
Q What is this?
A Upstairs of the Warehouse there was another space that we put beds in.
Q And do you see in Bed 5 Ken V?
A Yes.
Q Who was that?
A Ken Vanosky.
MS. BENSING: And if we can go to the area called Apartment.
Q What is that?
A There was an apartment over 1072 Folsom that we leased, as well.
Q You testified that Nicole Daedone gave bed assignments.
How would she give those?
A It wasn't -- it wasn't always. When people wanted research partners or she saw people that she recommended to research partner, she would recommend or assign them to sleep together.
Q What are research partners?
A Research partners was a concept that we had of how to explore yourself in your sexuality, your relationship styles, by being in a short-term or long-term relationship with another person.
Q Did that involve sexual activity?

A Yes.

MS. BENSING: We can take that down. Thank you.

BY MS. BENSING:

Q At this time when you were living in The Warehouse, who were the leaders of OneTaste?

A Nicole, myself, Yia, Justine, Rachel, Nicole Halpern, josh Boshnack, Beth Crittenden, Ken Vanosky.

Q And when you say "Yia," do you mean Yia Vang?

A Yes.

Q And when you say "Justine," do you mean Justine Dawson?

A Yes.

Q And when you say "Rachel," who do you mean?

A Rachel Cherwitz.

MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 858, which is Tab 7 of your binder, Mr. Kandell.

Q Do you recognize this?

A Yes.

Q And what is this?

A This is an organization chart.

Q Approximately what timeframe is this organizational chart?

A I would say 2007, 2008.

Q And it's an organizational chart of what organization?

A OneTaste.

Q Is it a fair and accurate organizational chart of OneTaste at approximately that time period?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 858 into evidence.
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 858 is admitted.
(Government's Exhibit 858 was received in evidence.)
(Exhibit published.)
MS. BENSING: And if we can publish this to the jury.
And I'd ask that you just zoom in on the top third. Okay.
BY MS. BENSING:
Q At this time, who ran OneTaste, Mr. Kandell?
A Nicole.
Q And what was your role?
A Chief operating officer.
Q And who reported to you?
A Pretty much most of the operation side. Pretty much everyone except non-sales.
Q And here there's -- Ken Vanosky was listed as the CFO.
Was that his role at the time?
A Yes.

Q And Rachael Hemsi is listed as director OTSF.
What is that?
A OneTaste San Francisco.
Q And who was Rachael Hemsi?
A She was a leader of the organization.
Q And who is listed as CTO?
A Chris Hubbard.
Q And who was that?
A He was a member of the organization who ran our technology.
MS. BENSING: And if we can zoom down on the bottom half.
(Exhibit published.)
BY MS. BENSING:
Q Directing your attention to the middle. What was Yia Vang's role at this time?
A She was manager of events.
Q And Nicole Halpern?
A Manager of enrollment.
Q And do you see somebody named Alisha Price?
A Yes.
Q And who is she?
A Manager of yoga, the yoga studio.
Q And did she have any other roles at this time?
A She was a teacher.

Q Directing your attention to the bottom right, which says Internet Radio.

Did an individual named Chris Kosley have a position there?

A Yes.

Q And what was his role?

A He was involved in our production of different podcasts called Internet Radio. And I believe he was also part of our media team building videos.

Q And I'd like to direct your attention to the very far left, the box that says Josh Boshnack and Christina Berkley.

What was Christina Berkley's role at this time?

A I don't remember.

Q And directing your attention to the very bottom rung for production.

Do you see Christina Berkley's name again?

A Yes.

Q And do you recall what role she had at this time?

A Yes. She was part of the production team.

Q Did there come a time where Christina Berkley also worked for Nicole Daedone?

A Yes.

Q In what capacity?

A She was what we called Nicole's handler, her personal assistant.

Q And what did being Nicole's handler involve?
A Picking up food, dry cleaning, driving her around. Basically, taking care of her needs.
Q And did she also take care of the needs of anybody else?
A She was taking care of needs of Reese Jones.
Q In what way?
A She was assigned as his handler as well.
Q And what did that mean?
MR. ROBOTTI: Objection, foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q Did Nicole Daedone tell you what it meant to be Reese Jones' handler?
A Yes.
Q And what did she say it meant?
A It meant to be -- take care of him, his needs, his food, his clothing, take care of his well-being. I think Christine -- Christina lived with him at the time and also was involved with him sexually.
Q In what way was she involved with him sexually?
MS. BONJEAN: Objection, foundation.
THE COURT: Sustained.
Q Did Nicole Daedone tell you what way she was involved with him sexually?
A I don't think so.

Q How do you know that she was involved with him sexually?
A Christina told me.
MS. BONJEAN: Move to strike.
MR. ROBOTTI: Objection.
THE COURT: Yes, sustained. The answer will be stricken.
Go ahead, Ms. Bensing. Next question.
BY MS. BENSING:
Q I'd like to direct your attention to the box that says "San Francisco."
Who was listed as the lead for San Francisco?
A Rachel Cherwitz.
Q Do you see Rachel Cherwitz in the courtroom today?
A Yes.
Q I would ask that you identify her by an article of clothing.
A Purple shirt and -- and dark jacket.
MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant, Rachel Cherwitz.
THE COURT: Yes.

(Continued on the following page.)

BY MS. BENSING: (Continuing.)

Q Mr. Kandell, I'd like to show you what's been marked --

MS. BENSING: We can take that down -- just for the witness, only, please.

Q -- as Government Exhibit 824, which is tab six of your binder.

Do you recognize this?

A Yes.

Q What is this?

A An organization chart.

Q Of which organization?

A OneTaste.

Q From approximately what year?

A 2007.

Q Is it a fair and accurate copy of an organizational chart from OneTaste in 2007?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 824.

THE COURT: Any objection?

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: Government Exhibit 824 is admitted.

MS. BENSING: And if we could please publish this to the jury.

(Government Exhibit 824, was received in evidence.)

(Exhibit published.)

MS. BENSING: And if we could please zoom in on the left-hand side.

Q What are the two bubbles that we're looking at in this organizational chart Mr. Kandell?

A I want to change --

Q You may need to tap your microphone so that the green button is on.

A Thank you. My apologies.

I wanted to split up the organization into visions, strategic and tactical. So the top bubble is vision and the bottom bubble is strategic.

Q And who ran the vision of OneTaste.

A Nicole did.

Q And what did that mean?

A She was the vision, the idea, and the progress forward.

Q Did you lead the strategic part?

A I did.

Q And what did that mean?

A At that point, I hired to develop different aspects going forward, kind of in the proactive way, rather than the responsive way.

Q And what do you mean by that?

A You know, organizations have to handle the day to day and

then strategic is you're thinking how to improve, how to optimize your current processes.

MS. BENSING: And if we could zoom in on tactical.

Q What was the tactical bubble?

A This was all handling the day-to-day needs of the organization.

Q And at the bottom, do you see a dividing line, SF and NY?

A Yes.

Q What does that mean?

A We had a New York office at this point.

Q And who ran the New York office?

A Rachel Cherwitz.

Q And that was as of what date?

A We went to New York in June or July of 2007, and she was running the organization once we got there.

Q Approximately how long had Rachel Cherwitz been at OneTaste at that point?

A She arrived in January 2007.

Q So this is approximately --

A Ten months later.

Q Thank you.

Looking again at tactical, do you see Christina Berkley's name?

A Yes.

Q And what was her role at that time?

A Looks like she ran the massage and the front desk.
Q Okay.
MS. BENSING: We can take that down. Thank you.
Q Mr. Kandell, you testified earlier when we were looking at the bed chart that you were in a relationship at some point with Justine Dawson; is that correct?
A Yes.
Q Can when did you enter into a relationship with Justine Dawson?
A October of 2007.
Q And for approximately how long did you date Justine Dawson?
A August 2008, 10 months.
Q What happened?
A Our relationship ended.
Q Why?
A I was directed to end my relationship by Nicole.
Q Nicole Daedone?
A Yes.
Q How did she direct you to end your relationship with Justine Dawson?
A She called me up and said I'd like you to end your relationship with Justine or I'm going to end it for you.
Q Why?
A She believed there was not working and detrimental to the

organization.
Q Detrimental to the organization in what way?
A That I wasn't taking care of Justine's needs, I wasn't taking the organizations needs, and there was other people who were upset by my relationship with Justine.
Q Who?
A Rachel Cherwitz at most.
Q And what did Nicole say to you with respect to Rachel Cherwitz being upset by your relationship with Justine Dawson?
A It was impacting negatively the organization and sales.
Q In what way?
A It was just -- her focus was on me and Justine rather than working and taking care of others.
Q So what happened?
A I ended the relationship with Justine.
MS. BENSING: I'd like to show the witness, only, what's been marked as Government Exhibit 3212 and 3212-R which is tab 56 in your binder, Mr. Kandell.
Q Do you recognize what's in Government Exhibit 3212?
A Yes.
Q And directing your attention to the tab behind that that says R.
Do you recognize what's in Government Exhibit 3212-R?
A Yes.
Q What is it?

A This is a transcript of what we called a darshan which was a group meeting led by Nicole.
Q And did you review this transcript prior to coming to court today?
A Yes.
Q And did you review the redacted version of this transcript at Government Exhibit 3212-R before coming to court today?
A Yes.
Q You testified that this is a transcript of a darshan. What is a darshan?
A Darshan is from other groups on a way of basically speaking, question and answer. It's a teaching process.
Q And who was doing the teaching?
A Nicole.
Q Were you present for this?
A I was.
Q And do you remember the portions of this transcript that are in 3212-R?
A I do.
Q And are they fair and accurate transcription of the darshan?
A Yes.
Q And did the darshan occur on July 10th, 2008?
A Yes.

Q Directing your attention to Page 4. So Government Exhibit 3212-R-004.
Who are the participants in that portion of the conversation?
A Nicole, Christina.
Q Nicole who?
A Daedone.
Q Christina who?
A Christina Berkeley.
Q And did those pertain to, at the a high level, Nicole provide Christina with advice?
A Yes.
MS. BENSING: And turning to the pages marked Government Exhibit 3212-R-11, 12, 13, and 14.
Q Who are the participants in that portion of the darshan?
A Myself, Nicole, Christina.
Q And again, Nicole Daedone and Christina Berkeley?
A Yes.
Q At a high level, did this pertain to Nicole giving advice to you and Christina Berkeley?
A Yes.
MS. BENSING: And turning to Government Exhibit 3212-R-016 and 017.
Q Who are the participants to this portion of Government Exhibit 3212-R?
A Nicole Daedone, myself, Joshua Boshnack, Judy Silber.

Q And again, do these pertain to advice that Nicole Daedone was providing to you?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3212-R.

MR. ROBOTTI: Your Honor, we object on hearsay and relevance grounds.

MS. BONJEAN: I would also join that objection. And there are some other statements about other individuals. But I join those objections, Judge.

THE COURT: Let me hear from the Government on the hearsay objection.

MS. BENSING: Yes, Your Honor. The Government is moving to admit this under 801(d)(2)(A) and the other portions for context to the extent that this even constitutes hearsay, as there are some statements of command and questions.

THE COURT: The objection is overruled. Government Exhibit 3212-R is admitted.

(Government Exhibit 3212-R, was received in evidence.)

MS. BENSING: I'd like to publish this to the jury, please.

(Exhibit published.)

MS. BENSING: Okay. I'd like to just zoom in on the top left.

Q Does this indicate what you just testified to with respect to the context in which this conversation occurred?
A Yes.
Q And what is the yoga studio?
A Yoga studio was a room in the back next to the center at 1072 Folsom.
No, I'm sorry. This referred to upstairs of 1074 Folsom.
Q Was there a yoga studio upstairs at 1074 Folsom?
A Yes.
Q And is that the address of the center?
A Yes.
Q Okay.
MS. BENSING: I'd like to turn to Page 3212-R-004.
Q And Mr. Kandell, who is speaking in the top portion of this exhibit?
A Nicole Daedone.
Q And the other portions I think as you testified to earlier is a transcript of Christina Berkeley?
A Yes.
Q And I'm going to ask you to read the portion that Nicole Daedone stated.
A From the beginning?
Q From the beginning.
A So what I wanted to do was have this be a little more human in the session today. There is a question usually that

each of us is struggling with or wrestling with where we know there's something that our soul wants to be and we're usually arguing against. For example, I just got off the phone with Alisha. We're pretty clear that Alisha's soul wants to be a leader. And her minds want to be a teenager. Her mind wants to rest in the breast of Ama and have Ama clean out her internal house for her and spend the day doing that. But her soul really wants to go forth and take care of other people, but that's so scary to her. There's this whole war going on inside of her that she's projecting out into world. She's trying to project it onto me. I want to quit, and I know you think I'm full of shit. No, go ahead and quit. Well, I know what you're thinking. But that argument is with her.

What I want to do is take those arguments and bring them back into the locus of our own bodies, not have it be on anyone else. So what is usually an argument where I'm saying so-and-so is making me do such and such, and I'm happy because it -- and I'm unhappy because of it, so-and-so is just speaking the other half of the argument for you. I thought we could just begin today in connecting the human by saying what your argument is.

Q Thank you. And I read Christina's portion, and I'll ask that you continue to read out Nicole Daedone's.

Christina: My argument is just having just gotten on a channel, on a certain level of energy, take on another thing

and recalibrate back into...
A What are you talking about? Are you programming mystical computers? We're human. What's your situation?
Q Can I maintain the level of work that I'm doing with you and awareness and clarity and have a relationship?
A I'm going to have you work on getting your argument more specific because that argument is, like, duh, of course. So what's the challenge? Because I can tell you how this story plays out at the end. I gave up relationships, or I gave up on work because...
Q I don't want to do either. The internal thing is noticing when the fog comes in and then figuring out what the fog is.
A The fog is here. I'm going to go on to the next person and have you work this. Just wrestle with it a little bit more.
Q Mr. Kandell, are you familiar with the term, fog, as used to at OneTaste?
A Yes.
Q And did that mean.
A It's when you're stunned, you're wrestling with something, when you're confused, perhaps you're in your fight-or-flight mode, yeah.
Q What does it mean to be in fight-or-flight mode?
A Different parts of your brain handle different

circumstances. The fight or flight is part of the triune brain. It's part of the brain when something scary comes up, you go out of cortex, out of your thinking out of your limbic system, into your fight or flight, which is autonomic.

MS. BENSING: I'd like to turn to Government Exhibit 3212-R-011.

Q And I think you testified earlier that in this portion, it's you, Nicole Daedone, and Christina Berkeley speaking; is that correct?

A Yes.

Q So I'll ask that you read the portions of yourself, and I'll read the portions of Nicole Daedone and Christina Berkeley.

A I'm powerless to create motion by myself because I'm dependent on others, specifically and you and Reese, to create motion on me. I'm dependent on you to create motion. The best example is the hotel. I have to wait for your action so I can do my action.

Q And let me pause there.

Who is Reese?

A Reese Jones.

Q And what is the hotel?

A The hotel is 1080 Folsom.

Q All right. And here it says, Nic.

Who is the speaker?

A Nicole Daedone.
Q And did she sometimes go by Nic?
A She did.
Q Nic: But that's true. The challenge is that you don't like it. And you don't understand that it's true here too. And so that's where you pull out. Like, you don't understand it's a feedback loop. So either you go off on your own and try to create it or when I'm needing to create with you, you pull out and say you're not important.
A And I'm pulling out because you told me I'm not important.
Q Yes.
A The link for me is that that was the relationship with my father and my mother. It was the same dynamic almost identical with money and growing up with the same issues.
Q Just so you know on this end I am 100 percent clear on how much I need you and how much my happiness is at the mercy of you being here.
A I acknowledge the same thing on my side.
Q Christina: I blame you for the disconnect and the fog because I feel like you have a strong disapproval and you've already decided and that pull back I'm constantly trying to find it within myself to just be there and I can't find the landing spot and I feel like it's because you moved it.
A I have a strong disapproval of what?

Q Of me being with Isaac.
A Of what specifically?
Q I'm going to pause you there.
Was there an Isaac involved with OneTaste at this time?
A Yes.
Q And who was that?
A He was another member of our residence. He worked at 1080 was Christina's boyfriend at the time.
Q Christina: That you feel the energy will go there or go down.
A Have you been here before or you had the same perception?
Q I blamed you for the disconnect the last time we disconnected, as well. I realized that you can feel within me my rightness and myself, so it's not about you doing anything. I walk into a room and you can just feel it. So it's me that needs to figure it out in me. And then you'll be there.
A You don't quite believe that yet, do you?
Q No.
And again, just clarifying, you were reading the portions of Nicole Daedone?
A Yes.
Q Okay. Please continue on the next page.
A And even if I did, shouldn't you be able to find it?
Q I'm looking. I don't think I'm as far off as last time I got off. I can taste it. It's almost there. It's really

subtle. It's not like things are falling apart.
A One thing about orgasm is that we all hate -- that we all hate is this one of those things we hare about the in/out game is either you're on or you're off, and we're clear that you're off. We're also not clear about is if it's my responsibility and fault or if it's yours.
Q And let me pause you there.
There was reference to the in/out game.
What is that?
A The way I describe I've always thought about OneTaste is the concept of circles. There was an inner circle, which was Nicole, then there was a second circle which was whoever was close and near her. Then concentric circles out to, say, 15, 20 levels, going all the way out to the public. The in/out game was that the idea that you could slip into the inner circle or move out in different circles based on your state of mind, your state of practice, and your importance to the organization.
Q And based on your own personal observations, how did Nicole Daedone use the in/out game at OneTaste?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to foundation and speculation.
MR. ROBOTTI: Vague.

THE COURT: Sustained.
Q Mr. Kandell, did you have an opportunity to observe how Nicole Daedone used the in/out game at OneTaste?
A Yes.
Q And did you have an opportunity to observe how she used it during this time period during the years that you were living at the warehouse?
A Yes.
Q How did she use the in/out game during that time period?
MS. BONJEAN: Same objection.
MR. ROBOTTI: Joined.
THE COURT: Overruled.
A There was a carrot and a stick effect. You know, you had the carrot to do more, to be involved, to go closer to the inner circle, and then there was the fear of being kicked out the inner circle to outer circles.
Q And how did she use that fear?
A To motive for your own self and also motive for your work within the organization.
Q And to what end, Mr. Kandell?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
Q When you're talking about using fear to motive people, motive them to do what?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection to the foundation, as well.

THE COURT: Sustained.

Q Mr. Kandell, you testified that she used the in/out game to motive people.

Motive them to do what, based on your own personal observations?

A There was her own practice. There was other own belief and where you wanted to go and where you wanted to get to, how hard you wanted to work and what you wanted to achieve that you had discussed with Nicole and she had encouraged for you to have it. That was part of it. And was what was you overall benefit to the organization, could you be a good salesperson, could you be a good teacher, could you be a good coach, could you be good, you know... So there was a mixed energy of it, both your own self-practice, and how to benefit the organization.

Q And which organization are you talking about?

A OneTaste.

Q Okay. Let's return to Government Exhibit 3212-R-012.

Christina: I do take responsibility. I think it's both. I do take responsibility and I know that I need to get clear and have my energy and attention and awareness focused where I need it to be focused.

A And this is your challenge here. And at very high price

you're learning this. You're an very expensive section of the store where to buy one thing could have you lose your whole income. You would do well well to be extremely precise. But one of the pieces that you have to learn which is similar to the piece to what Leif is having to learn, you can be so absolutely clear that your clarity overtakes my system. So even if I were unclear, I don't feel particularly unclear -- I mean I think everyone is clear when I'm unclear -- there's no mystery. I'm a Sicilian, so you know. You can have it be that even when I was in my drunken lack of clarity and you were so clear that your clarity permeated my system. Your clarity is not dependent on mine. You have that power in you. See, you have the power to be clear without me. You have the power to have you be clear and me be clear. Both.
We're none of those at this point. You're deeply fogged, most of the time. I can tell you that if you look at the blame, that will guide you to the source of your fog.
So things are were and then they're off, and I made them off. Why?
Q Because you disapproved.
A Why?
Q Because you don't think that I can do it, that the energy will just shift completely, and I won't be able to hold you.
A And I don't believe that why?
Q From past experience.

A I would say in the present, have you been holding me?
Q I feel like I have been trying to, but you haven't been letting me.
A This one is hard four, huh?
Does anyone get that one? Has anyone ever done that? Because I know that I could hold you no matter what you did. So somehow it's my fault that you aren't holding me.
Q Yes, I get it. There's the theoretical place that I totally understand and then there's inside here.
A So what do you not want to admit?
Q That I haven't been holding you.
A Why?
Q Because I've been preoccupied with anxiety.
A About what?
Q About not being ahold to able to hold you.
A Why?
Q Because it's hard.
A Was it hard last week?
Q No.
A Was it hard this week?
MS. BONJEAN: Objection. Misstates the transcript.
Q I'm sorry, does that actually say why is it hard this week?
A Why is it hard that week.
Q Because I have an extra thing that I am putting attention

on and so I have to compensate for that.
A Do you have enough money in the bank account to buy both?
Q I feel like I can buy both.
A See, this is the place where you go into delusion. The way to know whether or not you're doing something is to look at whether or not you're doing it. Anything else is fantasy. It's like you're the one of these women who walks in a course and tells me how powerful they are, I just don't know it. If you're that powerful, be that powerful. If you can do it, do it. But if you aren't doing it, but you aren't doing it. So you keep telling me you can do, it but you aren't doing it. Thing after thing after thing is fucked up, right. You know you aren't on, right? But you keep telling me you can be. I don't want to hear that, you can be. I just want you to be on.

I was thinking about how the game right now and how it's really intense. It's probably the highest concentration of intensity that it's been in a good long time, and so I can't watch a movie right now. I don't have the energetic bank account to do that. That's not saying that when the field goes down when all these things happen that I'll be able to. But I need to be realistic about what I'm doing now or everything I'm doing is going to be fucked up. So you need to do a pretty good internal inventory of what you're actually capable of and then make a decision and do that because

otherwise you're going to be doing everything poorly. And we just had this conversation. And this is the "if" that we're talking about.

Q And I'm sorry to pause you.

Does that read, And this is the "it" that we're talking about?

A And this is the "it" that we're talking about.

You're blaming me for the fact that you aren't serving me well is not good. I mean, any of us blaming. The teacher is blaming the students for not longer learning the material. That's not good. That's why total responsibility is. Whatever it takes I'm going to take care of you and getting clear on what your properties are. And I don't think that you're clear on what your properties are.

Q Mr. Kandell, at this point in time in mid 2008, what role did Christina Berkeley have with respect to Nicole Daedone?

MS. BONJEAN: Objection. Vague.

THE COURT: Overruled.

Q That means you can answer.

A Yes. I'm trying to remember.

Q Okay.

A I don't remember, specifically. I don't know if she was still Reese's handler at this point.

Q And there were multiple reference in what we just read to the word handling or handled.

What did that mean?

MS. BONJEAN: Objection. Speculation.

MS. BENSING: May I rephrase the question, Your Honor?

THE COURT: Yes. I'll sustain the objection. You can ask the next question.

MS. BENSING: Thank you.

Q Are you familiar with how the words handling or handled were used at OneTaste?

A Yes.

Q How were they used?

A They were specifically to take care of the well-being of the person you were handling. The driving them, food, emotional energic, sometimes sexually.

MS. BONJEAN: Your Honor, I'm sorry, I'm going to object. Handling wasn't used, as far as I can see. So I'm going to object to the, assumes facts not in evidence.

MS. BENSING: Your Honor, I simply asked him how these words were used at OneTaste.

THE COURT: Give me one moment, please. Yes, I think I'm going to overrule that. You may proceed.

MS. BENSING: Thank you. Can we please turn to the next page, 3212-R-016. I'm sorry two pages.

Q Okay. I'll now read Nicole Daedone and I'll ask that you read yourself.

And I think you've testified earlier --

THE COURT: Let me just ask that you both read more slowly.

MS. BENSING: Yes. Thank you.

Q And just for clarity of the record, I think you testified that the participants in this portion of the darshan were Nicole Daedone, yourself, Joshua Boshnack, and Judy Silber; is that correct?

A Yes.

Q Okay. I'll start.

Rob, I just had an idea. Do you want to tell Christina about how you were not permitted to have relationships?

A How do I phrase this? Allyson is the best example. I blame Nicole for stopping our relationship, that every time I did it, it would hurt my relationship to Nicole and my relationship to the business and I would get foggy. What I would do is constantly fight Nicole, rather than confront the fact that I didn't want to have a relationship with Allyson. The war was, it was her, Nicole's fault. She was stopping me from having the relationship that I wanted. I didn't want to confront not being in that codependent relationship with her. I wasn't willing to do the work to really investigate myself, my side of the equation.

Q How did you force me into letting you have a relationship with Justine? If I was blocking you, how did you force me

this time?
A How did I work you? I kept myself clear and I removed myself from them too. And I knew that at any point I would drop Justine. The relationship is secondary if the call came out the door. But that's not her, Nicole's fault. It's my choice because that's how I want to live my life. That's the person I want to be.
Q I want to pause you there, Mr. Kandell.
You testified already that there come a time where you did break up with Justine Dawson; is that correct?
A Yes.
Q Did you want to do that?
A No.
Q Why did you do it?
A Because I was asked -- I was told to.
Q And just to be clear, by whom?
A Nicole Daedone.
Q So why are you saying this in this portion of the transcript, it if that's not something that you wanted to do?
A Either -- I don't remember exactly, but either I changed my mind from this position or I was saying this just to get out of the conversation.
Q There are conversations here to Allyson.
Who is that?
A Allyson Wyatt.

Q That's the same individual you testified about earlier?
A Yes.
Q Okay. Returning to this.

Nicole: I would said that how he convinced me is that he had such a clear healthy relationship that there was no question. His relationship with Justine adds to my life. It doesn't take aware because he's clearer for it.

And I'll read Josh.

I would say there's one additional part of that equation, and that's that before one OneTaste began, Rob made an agreement with you to put OneTaste first.

Nicole: Well, I would stay there is an additional one, and that's that Rob made an agreement with himself to live a life of awakening and clarity.

Josh: And OneTaste being the assigned author of that.

Nicole: But see, if you raise phrase it the way you phrased it, then it sounds like Rob agreed to do whatever I told him, and that isn't an agreement that Rob made, actually.

A I had my life before OneTaste and I saw the person I was and I had relationship as the top priority. And then I wanted to live a life of -- I didn't know these words at the time -- but service and purpose as first. And then my relationships were better because of it, and it's very rocky.
Q Nicole: The last part I want to say about this, if you're doing something that's clear and in alignment with your

Case 1:23-cr-00146-DG-RML Document 437 Filed 08/22/25 Page 80 of 354 PageID #: 10306



orgasm, everyone follows. It's nuts. Weird things. Like we have done some really weird things that were the right thing to do and everyone backed it because it was just right. So it isn't a thing as either right or wrong. It's right or wrong in the context that you're in. But it might be wrong later. The same thing that was totally right for me before is totally wrong for me now for this moment because it tells me what to do. So then the real question is where are you out of alignment with the moment and where are you pretending that this moment isn't telling you what it's telling you and holding onto something, and you can know you're holding onto it when you find yourself saying, but I'm right. When you find yourself arguing with it, you know.

I want to pause here.
There was a reference to orgasm.
How was the term orgasm used at OneTaste?
A It was used for many many things. There was the physical practice orgasm meditation which led to orgasm. Orgasm not meaning climax, but orgasm being the energic energy in the body. It was also used as life force, you know, that thing that powered you. Some people even looked at it as a relationship to God, as orgasm as the connection to God.
Q And who did -- did Nicole teach that?
A Yes.
Q And what exactly did she teach as orgasm being the

connection to God?

A I think she meant it as just a connection to -- or the pathway to your spiritual enhancement your spiritual awareness, spiritual to the unknown.

Q And did she teach what that pathway was?

A Yes.

Q I'm going to keep reading.

Judy: How about when you're unconcern about certain about it?

Nicole: Then I think you're just uncertain about it. I think you don't have enough information about it.

Judy: But if you're justifying...

Nicole: If you're justifying or blaming, then you're not hearing what the moment has to tell you, and you're making someone else the reason for it. And we usually create another person that we're justifying against. It's this person's fault I can't do what I want to do. But what if you just took that person away, entirely? What would you telling yourself?

And does that end this portion of the exhibit, Mr. Kandell?

A Yes.

Q You testified earlier that Rachel Cherwitz joined the OneTaste community I believe in January 2007; is that correct?

A Yes.

Q You also testified earlier that Daedone made statements to you with respect to your relationship with Justine Dawson vis-Ã -vis Rachel Cherwitz; is that correct?

A Yes.
Q Did Daedone instruct to you gauge in a physical relationship with Rachel Cherwitz?
A Specifically, Rachel recommended that I become research partners with her.
Q Rachel Cherwitz did?
A Yes. No. Nicole Daedone recommended that I become research partners with Rachel Cherwitz.
Q What did she say about that?
A She said it would be good for both of you.
Q In what way?
A That it would bring more energy to my life and I could bring a grounding force to hers.
Q Approximately when that that happen?
A February 2007.
Q So approximately one month after Rachel Cherwitz joined the community?
A Yes.
Q And what, if anything, did Nicole Daedone say about why that would bring more energy to the system?
A Because Rachel Cherwitz is a bundle of energy.
Q When Rachel Cherwitz joined OneTaste, did you have an opportunity to observe her and Nicole Daedone's relationship?
A Yes.
Q And what was their relationship?

A They took to each other. They were very similar. They were both strong women, emotional, strong, dynamic. And Rachel was looking for a teacher and I think Nicole was looking for a top student.
Q And did Rachel become Nicole's top student?
A One of her top students, yes.
Q After this conversation with Nicole Daedone, did you engage in a relationship with Rachel Cherwitz?
A I did.
Q What kind of relationship?
A We were research partners which mean we shared a bed together in the warehouse and we practiced relationship.
Q Was it a physical sexual relationship?
A Yes.
Q What happened with respect to that relationship?
A We continued, we eventually moved to New York together, in mid 2007, we stayed research partners in running New York together for four months, and then I came back to San Francisco, and the research partnership ended.
Q And then what happened?
A I got involved with Justine Dawson.
Q And then what happened after Nicole Daedone instructed you to no longer be in a relationship with Justine Dawson?
MS. BONJEAN: Objection to foundation.
THE COURT: Overruled.

Q You can answer.
A I'm sorry, could you ask a different question.
Q What happened after Nicole Daedone instructed you to no longer be in a relationship with Justine Dawson?
A I was no longer in a relationship with Justine Dawson.
Q And did you enter into another relationship with Rachel Cherwitz at any time?
A Yes.
Q Approximately when?
A We were teaching together, we were colleagues, we OMed, we sexed together, and then I believe we got involved in more of a romantic relationship at that point.
Q At what point?
A It was close to the end of 2008.
Q You testified earlier that shortly after everyone moved into the warehouse, Nicole Daedone moved in with Reese Jones; is that correct?
A Yes.
Q Did you come to work with Reese Jones at OneTaste?
A Yes.
Q In what capacity?
A He was our -- became an investor. He was also an advisor, a mentor, just a incredible resource of information of how to expand the organization.
Q An investor in what way?

A He provided, at one point, both cash infusions to the business, but also mentorship spending a lot of time, took Nicole to New York, and introduced her, at one point, employed several members of the OneTaste under his company so they could do work through his company and benefit OneTaste, and also, just got involved with pretty much the day to day advisement of marketing and sales.
Q Approximately when did you first become familiar with Reese Jones?
A June of 2006.
Q In what context?
A He applied to be part of one of our workshops, and we were intrigued by him for some reason, and then we researched him.
Q Who's we?
A Nicole and I.
Q Nicole Daedone?
A Yes.
Q What kind of research did you conduct?
A Internet research on his name.
Q For what purpose?
A Just to see who was coming to the class. There was something about him that she recognized.
Q And what happened after you researched him?
A We found out he was --

MR. ROBOTTI: Objection to hearsay.

MS. BONJEAN: Objection. Join.

THE COURT: I'm going to sustained. You can ask the next question.

Q You testified that you researched Reese Jones. What, if any, further involvement did you have with Reese Jones after you and Nicole Daedone researched him?

A He skipped the first class and then he came to the -- one about a week or two weeks later.

Q And what happened at that class?

A He was a student in the class, he was quiet most of the time, but I did notice that him and Nicole were having a lot of interactions, non-comminative interactions.

Q And did you and Nicole discuss Reese Jones at this point in time?

A Yes.

Q What did she say to you about Reese Jones?

A She said he was very very interesting energic player and he was just very interesting to her.

Q And what, if any, did she tell you about his wealth?

MS. BONJEAN: Objection to the leading.

THE COURT: Overruled.

Q You can answer.

A I think we surmised from our internet research that he was a wealthy individual.

Q And what did Nicole Daedone say to you about that?
A I don't remember.

THE COURT: Ms. Bensing, within the next five to 10 minutes, I'd like to take a break, so you can tell me if now is a good time or you want to do another few minutes.

MS. BENSING: Now is as good a time as any, Your Honor.

THE COURT: Okay. So I'm going to ask the witness to step down. We're going to take a brief break.

THE WITNESS: Thank you.

(The witness steps down.)

THE COURT: Okay. We're going to come back at 20 after 11:00 which is slightly less than 20 minutes from now. Don't talk about the case, keep an open mind, and I'll see you at 20 after 11:00.

(Jury exits the courtroom.)

THE COURT: Okay. We'll be back at 20 after 11:00. Before I let you break, Ms. Bensing, approximately how much longer do you have, do you think?

MS. BENSING: I'm not entirely sure, but I -- we're still in the first half, I would say of his testimony.

THE COURT: Okay. See you at 11:20.

MS. BENSING: Thank you.

(A recess was taken.)

(Continued on the following page.)

(Continuing.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Everyone may be seated. We can get the witness back and the jury back.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

Ms. Bensing, you may resume your examination.

MS. BENSING: Thank you very much.

DIRECT EXAMINATION

BY MS. BENSING:

Q Mr. Kandell, before we broke I believe you were testifying about the summer of 2006; is that correct?

A Yes.

Q Did there come a time where you and Nicole Daedone designed a course for Reese Jones?

A Not specifically, no.

Q What happened after the second course that Reese Jones took?

A They started to date.

Q And what happened with respect to the relationship between Reese Jones and OneTaste?

A He got more involved, started spending more time with the center, he would show up at random times, so he was just around a lot more.

Q And approximately how long after attending courses did he and Nicole Daedone begin to date?
A Pretty immediate.
Q You testified already he became an investor of OneTaste. Approximately when did he make any kind of initial financial investment in OneTaste?
A I believe it was early 2007.
Q Are you familiar with the term scene?
A Yes.
Q Were scenes put on for Reese Jones?
A Yes.
Q What is a scene?
A Scene is an organized experience specifically designed for the person, for Reese. It involved usually -- I think it was borne of the BDSM society, and it enabled us to create a sensory experience for Reese.
Q And who created these scenes for Reese Jones?
A Nicole.
Q Did you participate?
A Yes.
Q Who else participated?
A Depending on the scene there were half a dozen in the first couple of years, dependent on the type of scene, usually a dozen or so people, mostly the close inner circle of OneTaste.

Q Did you and Nicole Daedone discuss why these things were put on for Reese Jones?
A Yes.
Q What did she say?
A He was providing for us so much we wanted to give back and keep him engaged and entertained.
Q When you say he was providing so much?
A His attention was very valuable in the beginning. He was offering a lot of advice. She also probably saw the possibility of his investing. He was an attractive person to keep entertained.
Q Did the scenes start prior to his financial investment in OneTaste?
A Yes.
Q So approximately when did scenes start being put on for Reese Jones?
A Late 2006.
Q You testified that one of the reasons scenes were put on, at least one of the reasons Nicole told you scenes were put on for Reese Jones, was to keep him interested. What do you mean by that?
A He was providing so much attention and for us. And also his attention was a million other places, he was a venture capitalist, he was an explorer, he liked doing research and taking workshops. So I think we believed that we had to keep

the attractiveness of our organization really high so he would remain engaged in with us.

Q In what ways, apart from scenes, did you keep the attractiveness of the organization really high?

A He was catered to. He was taken care of. He was a VIP. He got a lot of attention from people.

Q From who?

A Pretty much everyone was very found of Reese. He was a really fascinating man. You could talk to him. You could spend time with him.

Q I'd like to show the witness only what is marked Government Exhibit 3014, this is tab 55 in your binder, Mr. Kandell.

Do you recognize this exhibit?

A Yes.

Q What is it?

A This was the prep sheet for a scene we produced for Reese.

Q I ask that you flip through the entirety of the exhibit.

A Yes, this is our first one.

Q Are you familiar with this document?

A Yes, I wrote it.

Q You wrote this document?

A Yes. This was called The Seven Deadly Sins.

Q Before I ask you to testify about the document, at a high

level, is this a document regarding scenes for Reese Jones that you yourself wrote?
A Yes.
Q Is it a fair and accurate copy?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 3014 into evidence.
MS. BONJEAN: Objection, hearsay.
MR. ROBOTTI: Objection, specifically non-furtherance.
THE COURT: Sustained.
BY MS. BENSING:
Q Mr. Kandell, you testified that you were involved in creating scenes for Reese Jones. Were you involved in the creation of The Seven Deadly Sins scene?
A Yes.
Q At a high level, what did creating that scene entail?
A It was three-day experience. It involved 15, 20 members of our staff. We flew down to Los Angeles. We flew back up to San Francisco. It was a very esoteric scene, just to provide Reese with really high level, intense experience.
Q And did it include sexual services?
A Yes.
Q You said it involved members of staff. What staff?
A OneTaste staff.

Q You testified earlier regarding Christina Berkley acting as a handler for Reese Jones; is that correct?
A Yes.
Q Who else were handlers for Reese Jones, to your personal knowledge, Mr. Kandell?
MS. BONJEAN: Objection, foundation.
THE COURT: Overruled.
Q You can answer.
A Christina Berkley, Alicia Price, Yia Vang, Maddie Carl, Michelle Wright.
Q Is that it?
A That's what I remember at the moment.
Q Did you have conversations with Nicole Daedone with respect to these women being handlers for Reese Jones?
A I don't recall.
Q You don't remember any conversation with Nicole Daedone with respect to these women being handlers for Reese Jones?
A No, I do remember now. Yes, I do remember some.
Q Okay. What do you remember?
A Just the idea that Reese -- she needed help with Reese and wanted Reese to be taken care of between food and taken care of and company and energy. And so this was an opportunity for people to be close with Reese and close to Nicole.
Q What did she say this about this being an opportunity to

be close to Nicole?
A We talked about the circles, to be taking care of Reese was a way to get into those inner circles.
Q The inner circles of Nicole Daedone?
A The inner circles of the OneTaste environment.
Q Why, to your understanding, was taking care of Reese a way to get into the inner circles?
A One, it was a challenging job. Two, it was just such a benefit to Reese, Nicole and the organization.
Q In what way was it such a benefit to Reese, Nicole and the organization?
A Because Reese was taking care of us on so many levels, to take care of him was a way to continue him being involved in the organization.
Q Did you and Nicole Daedone discuss the provision of sexual services to Reese Jones?
A Yes.
Q What did she say about that?
A Keeping him sexually satisfied was an important part.
Q In what way?
A Because he had a very large appetite and the opportunity for other people to take care of him sexually was of benefit.
Q Throughout what time period were you aware that women were handling Reese Jones?
A 2016 to the end of my tenure.

Q Sorry, 2006?
A Sorry. 2006 to the end of my tenure.
Q 2006 through?
A July 2014.
Q I'd like to show the --
You mentioned a couple of names. Maddie Carl; is that correct?
A Yes.
Q Who is that?
A She was a member of our staff and a student.
Q At the time when she was handling Reese Jones, what was her role at rote?
A Part of our operations team, production.
Q You mentioned the name Michelle Wright?
A Yes.
Q Who was that?
A Another member of our staff and a student.
Q At the time that she was handling Reese Jones, what was her role?
A Probably sales at that point.
Q You mentioned Yia Vang?
A Yes.
Q At the time she was handling Reese Jones, what was her role?
A She was Nicole's executive assistant and other teaching

staff.
Q Approximately what years was that, or year?
A 2011 to 2012.
Q You mentioned Alicia Price?
A Yes.
Q At the time when she was handling Reese Jones, what was her role?
A She was a teacher and worked in the yoga studio and other things.
Q I'd like to show the witness only what has been marked as Government's Exhibit 1004, which is tab ten of your binder. Do you recognize Government's Exhibit 1004?
A Yes.
Q What is it?
A It's an email.
Q From who to who?
A From Nicole Daedone to me.
Q What about -- is there any other email contained within that exhibit?
A It looks just like the two of us.
Q Did you send her an email?
A I would send her updates. This looks like a response to one of my updates.
Q If you could look at the paper copy in front of you, it might be easier, in tab ten. Turning to the middle of the

first page and into the second page, is that an email that you wrote to Nicole?
A Yes.
Q Did she then respond?
A Yes.
Q Is this dated September 18, 2007?
A Yes.
Q Did you provide Nicole Daedone with updates regarding your interactions with Reese Jones?
A Yes.
Q Including in 2007?
A Yes.
Q Is this a fair and accurate copy of an email exchange in which you provided Nicole Daedone an update with respect to Reese Jones?
A Yes.
Q And her response to that as well as other business updates with respect to OneTaste?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government's Exhibit 1004 into evidence.

MR. ROBOTTI: Objection on hearsay grounds, not in furtherance.

MS. BONJEAN: Your Honor, also objection to the extent that portions are not relevant.

THE COURT: Give me one moment, please.

MS. BENSING: If can I respond when the Court --

THE COURT: Go ahead.

MS. BENSING: Your Honor, the portions by this witness are being admitted for context, and then the portion offered by the defendant is being offered pursuant to Federal Rule of Evidence 801(b)(2)(A.)

MR. ROBOTTI: Join on relevance.

THE COURT: Now I do need a minute. Thank you. Objection is overruled. Government 1004 is admitted.

(Government Exhibit 1004, was received in evidence.)

BY MS. BENSING:

Q If we can please publish 1004 to the jury. If we can zoom in on the bottom portion of the page, starting on 9/18/07 and the first paragraph, please. Mr. Kandell, is this an email that you sent on September 18, 2007 to Nicole Daedone?

A Yes.

Q What do you tell her in the first sentence?

A Mr. Jones arrived well and was greeted by a sexy witch who entertained him on the ride into NYC. A good time was had by all. I'll pick you up tonight at the airport. Please call me when you get off the plane, there is no where to stop, but no where to chill until you call.

Q We can pause there. You write with respect to Mr. Jones: Arriving well. Who are you referencing?
A Reese Jones.
Q Where was he arriving?
A The airport.
Q From what city?
A New York City.
Q Do you recall which airport?
A I don't.
Q You indicate that he was arriving in New York City, were you living in New York City at this time?
A Yes.
Q Did you also provide Nicole Daedone updates with respect to other aspects of your work at OneTaste in this email exchange?
A Yes.
Q When you write that Mr. Jones was greeted by a sexy witch who entertained him on the ride into NYC, what did you mean?
A I believe we got a car service with one of the members of our staff that rode back with him from the airport to the city.
Q And did that involve sexual services?
A Yes.
Q Do you remember which members of the staff greeted him?
A I believe Shara Ogin.

Q Who was that?
A She was a member of our New York crew.
Q That's another individual who provided sexual services to Reese Jones?
A Yes.
Q Was she working for OneTaste in New York at that time?
A Yes.
Q If we can please publish to the jury Nicole Daedone's response.
Does she generally respond to the full update that you provided to her in this email exchange?
A Yes.
Q I'd like to direct your attention to the final paragraph: Oh, and have Reese and Racheli invited the Greys to Colin Finlay's book opening in New York on Wednesday night? I think that would be a good bridge. Who is the reference to Racheli?
A Rachel Cherwitz.
Q Was she living in New York with you at that time?
A Yes.
Q We can take that down.
Mr. Kandell, what did Reese Jones end up providing to the company in exchange for these services?
MS. BONJEAN: Objection to the conclusory nature.
THE COURT: Sustained.
Q What did Reese Jones provide to the company following

receipt of these services?

MS. BONJEAN: Objection, foundation.

THE COURT: Sustained.

Q Mr. Kandell, you've already testified that Reese Jones invested in OneTaste. What kind of investment did he make?

A Equipment, cash, expert opinion and advice, time, introductions, housing in New York City, hotels and the like, and just was a general supporter of the entire ecosystem.

Q You testified already that his financial investment began in early 2007; is that correct?

A Yes.

Q For how many years or for how long did Reese Jones invest in OneTaste financially?

A I believe until 2011.

Q Do you know how much Reese Jones financially invested in OneTaste?

A Close to $800,000, cash wise.

Q You testified that he invested in terms of provision of equipment; is that correct?

A Yes.

Q What kind of equipment?

A Computer equipment.

Q And do you know approximately how much that was worth?

A At the time 50, $60,000.

Q Did you and Nicole Daedone discuss Reese Jones' financial

investments in OneTaste?
A Yes.
Q What did you discuss?
A It was just mandatory. It was important. We couldn't have done 1080 Folsom without his capital investments. And overall his attention and expert advice was crucial.
Q In this time period, 2007 to 2011, was OneTaste making a profit?
A No.
Q So how was OneTaste supporting its operations?
A We were in the red. Reese's cash investments were crucial to the success.
Q Were you, Nicole Daedone and Reese Jones on emails discussing these financial transactions?
A Yes.
Q Do you remember the specific dates?
A No.
Q I want to show you a series of emails to see if that refreshes your recollection. I'll start with Government's Exhibit 1007, tab 12 of your binder.
Let me know if this refreshes your recollection as to dates on which you, Reese Jones and Nicole Daedone were on emails regarding Reese Jones' investment in OneTaste?
A Yes.
Q And so, on what date were one of these emails?

A August 6, 2008.
Q At that time, approximately how much did Reese arrange for the transfer of funds into OneTaste?
A On that date $24,000.
Q Do you recall which bank account he put that money into?
A It's referring to the OneTaste Bank of America bank account.
MS. BONJEAN: Objection, reading from the document.
THE COURT: Sustained.
Q Just let me know if you can recall what bank account he put that into?
A It was an operating account we had at Bank of America.
Q Who is we?
A OneTaste.
Q Who did Reese Jones put on notice that he had transferred 24,000 into the OneTaste Bank of America account?
A Bryan Franklin, Rob Kandell, Nicole Daedone and Ken Vanosky.
MS. BONJEAN: I'm going to continue to object, to the extent he's reading from the document.
MS. BENSING: I can take down that the document.
THE COURT: Overruled.
BY MS. BENSING:
Q Who was Bryan Franklin?
A Initially a student and then became a leader in the

organization.
Q What way did he become a leader in the organization?
A He was a business consultant and was intrigued by what we were doing, and for a period of time he was our president.
Q You testified that this was a OneTaste Bank of America account, was that in OneTaste's name or Caravan's name in 2008?
A Technically Caravan Retreats was DBA OneTaste, so probably in OneTaste's name even though it was a Caravan Retreats Incorporated account.
Q I'd like to show you another email to see if it refreshes your recollection on a different date.
MS. BONJEAN: Your Honor --
THE COURT: Sustained. You need to ask a question first.
MS. BENSING: Understood.
BY MS. BENSING:
Q Mr. Kandell, do you recall that you, Reese Jones and Nicole Daedone emailed about cash infusions into OneTaste?
A I do not.
Q So let me show you another Government exhibit to see if that refreshes your recollection. I'd like to show you Government's Exhibit 1013, which is tab 14 of your binder. Does this refresh your recollection?
A Yes.

Q So, what is an additional date on which you Nicole Daedone and Reese Jones emailed regarding the provision of funds to OneTaste by Reese Jones?

A September 23, 2008.

Q How much did Reese Jones provide at that time?

A $15,000.

Q During this time frame, were you also providing business updates to Reese Jones?

A Yes.

Q What kind of business updates?

A Profit and loss statements, balance sheets, cash provisions, analysis of the business, discussion of what needed to be optimized and the like.

Q Did he provide business advise to you and Nicole Daedone?

A He did.

Q Is one of the instances in which you sought and received business advice from Reese Jones, this email exchange on September 23, 2008 and September 22, 2008?

A Yes.

Q Does that constitute the entirety of this exhibit, Mr. Kandell? And you can flip through the hard copy in front of you if you need to.

A This is a business discussion about cash needs and the state of the business.

Q As of September 2008?

A Yes.
Q Is it a fair and accurate copy?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government's Exhibit 1013 for non-hearsay purposes.
MR. ROBOTTI: Objection, hearsay.
MS. BONJEAN: Join.
THE COURT: Ms. Bensing, a response?
MS. BENSING: Not being admitted, not seeking to admit it for its truth, merely for notice to, among others, the defendant, Nicole Daedone.
MS. BONJEAN: Still objecting.
MR. ROBOTTI: Still on hearsay and relevance of notice.
MS. BONJEAN: Relevance of notice.
THE COURT: One moment, please. Overruled. Government Exhibit 1013 is admitted.
(Government Exhibit 1013, was received in evidence.)
BY MS. BENSING:
Q If we can please publish this to the jury. I'd like to turn to the second page, the middle message from Reese Jones to Rob Kandell, Nicole Daedone, Bryan Franklin, and Justine Dawson.
What is this?
A This is a request for a business plan from Reese Jones.

Q Can we please go up? Who responds?
A Bryan Franklin.
Q Does he copy you and Nicole Daedone?
A Yes.
Q At this time what was Bryan Franklin's role in OneTaste?
A He was our president.
Q What was your role?
A Chief operator officer.
Q And Daedone's role?
A CEO.
Q If we can go up to the bottom of the next page. On September 22, 2008, what does Reese Jones indicate he's doing in this exchange?
A Transferring $15,000 to the OneTaste account.
Q What was that money for?
A Operating expenses.
Q If we can scroll up, please, to the top level email. What does Reese Jones say to you and Nicole Daedone and Bryan Franklin in the top level email?
A Would you like me to read it?
Q Yes, please.
A Is my optimism that I expect very good results from very little cash? Or a cynical comment that I should not have loaned any money to OT because --
MS. BONJEAN: I'm going to object. He omitted a

word.

THE COURT: Read it again. It may be easier to read of the hard copy.

THE WITNESS: Can I pull it out of the binder?

THE COURT: Absolutely. Start again.

A Thank you.

Is my optimism that I expect very good results from very little cash? Or, a cynical comment that I should not have loaned any more money to OT because I should not be as optimistic about all our team's possibilities. Note that I also renegotiate today aspects of the 1074 lease arrangement urgency, taking care about half of the more money requested. Basically, I accommodated what was specifically requested and when is said I might. I remain optimistic in our team, practice and vision.

Q Okay. And we can take that down.

Mr. Kandell, at this point in time, how involved was Reese Jones in the operation of OneTaste?

A Directly.

Q Excuse me?

A Directly.

Q In what way?

A He was involved in all aspects of our growth, our vision, our direction.

Q Did you provide him an accounting of each of the loans

that he provided to OneTaste?

A I was able to provide the loans where there were cash infusions. There were other loans that he said he sent that I didn't have any accounting for because I did not have any receipts.

Q Let me rephrase the question. Did you provide Reese Jones an accounting of how the loan money was used with respect to the loans that he provided to OneTaste?

A Yes.

Q I'd like to show you what is marked as Government Exhibit 101, which is tab 13 of your binder. Do you recognize this?

A Yes.

Q What is it?

A Status update on the construction project for 1080.

Q Was the construction project at 1080, as you already testified to, something that Reese Jones' financial investment contributed to?

A Yes.

Q Is it a fair and accurate copy of the status update of the construction project at 1080?

A Yes.

Q Was that on September 2, 2008?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1010 into evidence.

MR. ROBOTTI: Objection on hearsay grounds.

MS. BONJEAN: Join.

MS. BENSING: Your Honor, it's being offered for the same purpose, of non-hearsay.

THE COURT: When you say same purpose, you mean?

MS. BENSING: To show the effect on Nicole Daedone who is copied on this email exchange, your Honor.

MR. ROBOTTI: Relevance.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1010 is admitted.

(Government Exhibit 1010, was received in evidence.)

BY MS. BENSING:

Q If we can please publish Government Exhibit 1010 to the jury.

Mr. Kandell, is this a copy of the status update that you were providing to Reese Jones on September 2, 2008?

A Yes.

Q Did you copy Nicole Daedone?

A Yes.

Q And that email address NDONE1@gmail.com, is that Nicole Daedone's email address?

A Yes.

Q I'd like to direct your attention to the section of the email that you sent that states: Capital.

Do you see the reference here to invested capital of about more than 1M to date plus operations?
A Yes.
Q What was that a reference to?
A My contribution and Reese's investment.
Q So the totality and you and Reese's contribution as of that date?
A Yes.
Q We can take that down, please.
I'd like to show you what has been marked as Government Exhibit 1020, which is tab 16 of your binder. Do you recognize this?
A Yes.
Q What is it?
A Another status report on the finances of the company.
Q Does Reese Jones respond?
A Yes.
Q Mr. Kandell, do you recall the exact dates of various loan contributions made by Reese Jones to OneTaste?
A I do not.
Q Is there something that might refresh your recollection?
A Spreadsheets.
Q I'd like ask that you look at the bottom portion of this exhibit and let me know if that refreshes your recollection?
A It does.

Q So what was Reese Jones' loan contribution to OneTaste in November of 2008?
A $47,000.
Q And December of 2008?
A $41,000.
Q And January 2009?
A $20,000.
Q And February 2009?
A $20,000.
Q And March 2009?
A $25,000.
Q So what was the total loan contribution amount as of between November 2008 and March 2009?
A $153,000.
Q What was OneTaste's financial state at this point in time?
A Challenged.
Q In what way?
A Cash flow issues, doing a lot with not a lot of capital, building out 1080, which was still in construction mode, expansion of New York and other things. So we were stretched.
Q How important were Reese Jones' cash infusions to OneTaste at this point in time?
A Crucial.
Q Did Reese Jones comment on the use of his funds that he

was putting into OneTaste?
A Yes.
Q In what way -- you can put that document down, thank you -- in what way?
A He was often -- it depended on the day but sometimes critical sometimes supportive.
Q In March 2009 -- in that entire time frame that we talked about, was Reese Jones still being handled by various women working for OneTaste?
A Yes.
MS. BONJEAN: Objection, foundation.
THE COURT: Overruled.
Q You can answer.
A Yes.
Q Do you know who was servicing him at that point in time?
A I believe it was Alicia Price.
Q I'd like to show you what is marked as Government Exhibit 805, which is tab four of your binder. Do you recognize this?
A Yes.
Q What is this?
A An agreement between IP Media and Nicole Daedone.
Q What is IP Media?
A It was Reese Jones' company.
Q What is the date of this contract?
A June 10, 2009.

Q What was the purpose of the contract in Government Exhibit 805? What was it for?
A It laid out the loan agreement between Reese and Nicole and OneTaste.
Q Is that between Reese using IP Media?
A Yes.
Q Are you familiar with an individual named Kelly Notaras?
A Yes.
Q Who is that?
A She was a ghostwriter that worked on Nicole's book, Slow Sex. And then also became a member of our staff.
Q Did she become a member of your staff before or after she worked as a ghostwriter for Slow Sex?
A After.
Q Who paid for Kelly Notaras' services?
A IP Media.
Q Reese Jones' company?
A Yes.
Q Mr. Kandell, returning to Government Exhibit 805. I'm going to direct your attention to the second page. Is there an addendum to this agreement?
A Yes.
Q Do you recall the purpose of the addendum?
A To conclude the loan.
Q What is the date of the addendum to the agreement between

IP Media and Nicole Daedone concluding the loan?

A November 21, 2012.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 805 into evidence.

THE COURT: Any objection?

MR. ROBOTTI: Objection on hearsay grounds.

MS. BONJEAN: I will join that.

MS. BENSING: Your Honor, it's a contract. It's not for the truth of its contents under Rule 801(c), but to establish that it was entered into.

THE COURT: Sustained.

BY MS. BENSING:

Q Mr. Kandell, did there come a time when OneTaste began paying Reese Jones back?

A Yes.

Q Approximately when?

A 2011.

Q Were you involved in the pay back of Reese Jones?

A Yes, I was responsible for it.

Q Why did OneTaste begin paying Reese Jones back?

A We wanted to. We started to make some money, we wanted to pay back the loan.

Q Did anything change with respect to Reese Jones' financial situation?

A He was also in more dire straits.

Q What do you mean?
A He was having problems, I believe -- actually, I don't quite know the details of it.
Q So was your understanding at the time that he was no longer able to make loan payments to OneTaste?
MR. ROBOTTI: Objection, hearsay, foundation.
MS. BONJEAN: Join.
THE COURT: Sustained.
BY MS. BENSING:
Q You testified that you began paying Reese Jones back, did Reese Jones ask for you to pay him back?
A Yes.
Q What was your understanding of why?
MR. ROBOTTI: Objection, hearsay, foundation.
MS. BONJEAN: Join.
MS. BENSING: Not for the truth, it's to the effect on this witness who paid him back.
THE COURT: Overruled.
Q You can answer.
A He needed the money. We wanted to pay back the loan.
Q You said in or around 2011 OneTaste began making a profit; is that correct?
A We started making some cash, so we had more cash than before.
Q Do you recall specific dates on which OneTaste made

payments back to Reese Jones?
A I do not.
Q Is there a document that would refresh your recollection?
A Spreadsheet.
Q I'd like to show you Government Exhibit 1046, which is tab 20 in your binder. Let me know if that refreshes your recollection on the date in which OneTaste paid back Reese Jones?
A Yes.
Q On what date?
A September 29, 2011.
Q Setting that document aside. In approximately how many installments did OneTaste pay back Reese Jones?
A Thirty to 40.
Q Why so many installments?
A I would give him any cash that we had available.
Q It was an on as-available basis?
A Yes.
Q What dictated that?
A I could project what the business needed and what cash we had in the bank and what cash was coming in, so I was able to forecast what we could spare.
Q At this period in time, in the fall of 2011, how was OneTaste making money?
A Courses, workshops, coaching programs.

Q When did the coaching programs start?
A We did a Bryan Franklin split program in 2009. And then we started our own coaching program in January of 2010.
Q What happened to Bryan Franklin?
A We terminated our relationship with him.
Q So you started -- OneTaste started its own coaching program in 2010?
A Yes.
Q Which coaching program was that?
A It was called CP1, coaching program one.
Q Approximately how many coaching programs did OneTaste have during your time at OneTaste after coaching program one?
A Seven -- sorry, eight.
Q Was that called CP1 through CP8?
A Yes.
Q By the way, was Nicole Daedone apprised of loan repayments to Reese Jones?
A Yes.
Q Why?
A It was important for her to be involved to know. And it was a boost to our collective happiness when we could pay him back.
Q Why?
A It was a burden, and we felt we wanted to pay back the loan. And it just felt good every time we could send him

money.

Q In what way was it a burden?

A He often complained about the loan. I think he -- I heard about him putting.

MS. BONJEAN: Objection to the hearsay.

THE COURT: Sustained.

Q Did you and Nicole Daedone discuss the pay back to Reese Jones of the loan?

A Yes.

Q What, if anything, did she say to you about it?

A Let's get him paid because he's complaining a lot about it.

Q Turning your attention to March of 2012. How, if at all, was Nicole Daedone involved in establishing the financial plan for OneTaste?

A Directly.

Q I'd like to show what you is marked Government Exhibit 1090, which is tab 21 of your binder. Do you recognize this?

A Yes.

Q What is it?

A Status report -- I'm sorry. Nicole sent us a vision of how money and where to spend it.

Q With respect to OneTaste?

A Yes.

Q Is this dated March 9, 2012?

A Yes.
Q Who did she send it to?
A Myself, Joanna Van Vleck, Justine Dawson.
Q I'm going to ask you to look around the courtroom. Do you recognize Joanna Van Vleck in the courtroom?
A I don't see her. She might be here.
Q Okay. I'm going to ask, do you recognize anybody else in the courtroom?
A Yes.
Q Who do you recognize?

MR. ROBOTTI: Objection to relevance.

MS. BONJEAN: Objection to relevance.

THE COURT: I'm going to meet the parties at sidebar.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: We're at the sidebar. The parties are here, as well as the two individual defendants. Ms. Bensing, I'll hear you out on the response to the objection.

MS. BENSING: Yes, your Honor. I believe that he will testify that certain other individuals, who have already come up in his testimony, are here in the courtroom including Yia Vang and Rachael Hemsi. I think his recognition of those individuals is directly relevant to his testimony.

THE COURT: Tell me how.

MS. BENSING: It demonstrates his knowledge of OneTaste and his knowledge of who we allege to be co-conspirators are in the courtroom.

THE COURT: I'm going to sustain the objection. You can move on.

MR. ROBOTTI: We note for the record, there is a constitutional right for people to be in the courtroom here. And asking witnesses to point them out is suggesting that they shouldn't be in the courtroom.

THE COURT: That doesn't logically follow. In any event, I have sustained the objection.

MS. BENSING: Understood.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; jury present.)

THE COURT: The objection is sustained. And, Ms. Bensing, you may ask your next question.

MS. BENSING: Thank you very much.

BY MS. BENSING:

Q Turning back to Government Exhibit 1090. I'm sorry if you testified to this already, who were the recipients of this email from Nicole Daedone?

A Myself, Joanna Van Vleck, Justine Dawson.

Q Is it a fair and accurate of an email sent on March 9, 2012 from Nicole Daedone to, among others, you?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1090 into evidence.

MR. ROBOTTI: Object on relevance grounds.

THE COURT: Ms. Bonjean?

MS. BONJEAN: I'll join the objection.

THE COURT: Overruled. Government Exhibit 1090 is admitted.

(Government Exhibit 1090, was received in evidence.)

BY MS. BENSING:

Q If we can please publish this to the jury. Mr. Kandell, is the subject line for this email: Vision?

A Yes.

Q And I'm going to ask that you read the first three lines,

please.
A Presently slated 47,500 revenue; expenses at 39,000; debt at 1,200K; 670 to Reese; 442 to Rob; 100 other.
Q Focusing on the 47,500 revenue, was that what Daedone was indicating OneTaste predicted revenue at that time?
A Yes.
Q Was that $47,500?
A Yes.
Q Turning to the line that says: Debt at 1, 200K. What did you understand that to mean?
A 1.2 million.
Q The 670, what did that number represent?
A What we owed Reese at that time.
Q $670 or something else?
A $670,000.
Q The 442 to Rob, what did that represent?
A The debt owed to me, $442,000.
Q And the 100 other, what was that?
A I don't remember.
Q I want to direct your attention further down the email to the paragraph beginning: So with revenue being 58,300 and expenses at 40K, we have an 18K monthly net.
Do you see that?
A Yes.

(Continued on next page.)

DIRECT EXAMINATION (Continues)
BY MS. BENSING:
Q And what did Nicole Daedone indicate with respect to how that net income would be used?
A She wrote 15,000 of that goes to debt and 3,000 goes to marketing and advertising. So with 20,000 Reese money from Caravan included going to debt, we look -- if we have no growth whatsoever -- to pay off debt in five years.
Q I am going to ask that you -- that we turn to the next page.
MS. BENSING: And just if we can blow up the first paragraph on the next page.
(Exhibit published.)
Q Mr. Kandell, do you see the reference here in the e-mail from Nicole Daedone: The other element that Jim Kwik has mentioned is key for numerous reasons?
A Yes.
Q Who was Jim Kwik?
A He was an author and a friend to OneTaste.
Q And what role, if any, did he have with OneTaste?
A Just a friend of the organization. Could have been an advisor, but not -- not paid, not on staff.
Q Okay.
MS. BENSING: We can take that down.
Q I'd like to show you what's been marked as Government

Exhibit 1105, which is Tab 22.

Do you recognize this?

A Yes.

Q What is it?

A E-mail from Nicole to me.

Q And at a high level, does it pertain to paying back Reese Jones?

A Yes.

Q And is it dated May 1st, 2012?

A Yes.

Q And is it a fair and accurate copy of an e-mail exchange between you and Nicole Daedone?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1105.

MR. ROBOTTI: Objection, cumulative.

MS. BONJEAN: Relevance and -- and under 403.

THE COURT: Overruled.

Government Exhibit 1105 is admitted.

(Government's Exhibit 1105 was received in evidence.)

MS. BENSING: And if we can please publish 1105 to the jury.

(Exhibit published.)

Q Mr. Kandell, on May 1st of 2012, did you write to Nicole

Daedone: I'd like to have at least 25K of this money to deal with paying back OneTaste Tiers 2 and 3 debt?
A Yes, I wrote that.
Q So my advice is to be straight with Reese and explain the situation, pledge up to 20K for any money we collect for CP5 beyond the initial 25K. Thoughts?
A Yes.
Q What is Tiers 2 and 3 debt?
A I don't remember specifically.
Q And what did Nicole Daedone say in response?
A She agreed.
Q In May of 2012 were women still handling Reese Jones?
A Yes.
Q And do you know who was handling him as of May of 2012?
A I believe Yia at that point.
Q I'd like to show you what's been marked as Government Exhibit 1125, which is Tab 23 of your binder.
Do you recognize this?
A Yes.
Q And is this an e-mail exchange between you and Nicole Daedone on July 11th, 2012 regarding paying off Reese Jones?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit --
Q Is it a fair and accurate copy, Mr. Kandell?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit to admit Government Exhibit 1125 into evidence.

MR. ROBOTTI: Objection; relevance, cumulative.

MS. BONJEAN: Same objections.

THE COURT: Overruled.

Government Exhibit 1125 is admitted.

(Government's Exhibit 1125 was received in evidence.)

MS. BENSING: And if we can please publish this to the jury.

(Exhibit published.)

BY MS. BENSING:

Q So, Mr. Kandell, as of July 11th of 2012, was OneTaste still paying back Reese Jones?

A Yes.

Q And approximately how much did you pay off on that date?

A $12,000.

Q Setting that aside for a minute, what was going on with the business of OneTaste in 2012, was it profitable?

A Yes.

Q When did it first become profitable?

A April or May 2012.

Q And what happened that caused it to be profitable?

A We started C -- Coaching Program Number 5, CP5.

Q And why was Coaching Program 5 more successful in terms of profitability?
A We had more people in CP5. It was an in-person experience compared to CP2, 3 and 4. We had a higher per average fee per students, and I think we had close to 70 people in that program.
Q In addition to making payments to Reese, in the summer of 2012 did there come a time when Reese Jones repeatedly asked the company to make additional payments to him?
A Yes.
Q And what happened?
A We did our best to accommodate, though there were times where I couldn't.

MS. BENSING: And I'd like to show the witness only what's been marked as Government Exhibit 1136.

BY MS. BENSING:
Q This is Tab 24 of your binder.

Do you recognize this?
A Yes.
Q What is it?
A An e-mail from Rachel Cherwitz to myself with Yia Vang cc'd.
Q And is there an e-mail exchange below that?
A Yes.
Q And is that between you and Reese Jones?

A Yes.
Q And do you then forward that to, among others, Rachel Cherwitz, and she responds?
A Yes.
Q And is this exchange dated between July 25th, 2012 and July 27th, 2012?
A Yes.
Q And does it pertain to payments being made to Reese Jones?
A Yes.
Q Is it a fair and accurate copy?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1136 into evidence.

MR. ROBOTTI: Your Honor, we object on relevance and cumulative grounds.

MS. BONJEAN: Join.

THE COURT: Give me one moment, please.

(Pause.)

THE COURT: Overruled.

Government Exhibit 1136 is admitted.

(Government's Exhibit 1136 was received in evidence.)

MS. BENSING: And can we, please, publish Government Exhibit 1136 to the jury?

(Exhibit published.)

MS. BENSING: And if we can go down to the bottom of the page, the e-mail starting on July 25th, 2012, at 3:37 p.m., and blow that up.

BY MS. BENSING:

Q Mr. Kandell, did you write to Reese Jones on that date: Hi Reese, I'm still working on our end-of-month expenses, looking like 3K on Friday. Next payment after that will be on August 5th?

A Yes.

Q And did that pertain to repayments of the loan from Reese Jones?

A Yes.

MS. BENSING: And if we can show the next e-mail up.

(Exhibit published.)

Q Did Mr. Jones respond: I am to the stage this morning where my credit cards have been maxed/shut off so no food, gas, phone or basic expenses and many items to fail August 1st without significant loan return?

A Yes.

Q And moving up to July 26th, 2012 at 9:37 a.m., do you respond: I'm sorry to hear of your financial troubles. Unfortunately, 3K today is all we can afford by the end of the month. If a large cash payment comes in, I will be able to pass that to you.

Is that what you wrote?
A Yes.
MS. BENSING: And if we can go up to the e-mail that you sent on July 26th, 2012 at 10:48 a.m.
BY MS. BENSING:
Q Did you write "FYI to you guys only, games Reese is playing?
A Yes.
Q Who did you write that to?
A Yia -- I suspect Yia and Rachel.
Q Well, we can go up and just look at the e-mail exchange.
Who did you write that to?
A Yia Vang and Rachel Cherwitz.
Q And did Rachel Cherwitz respond?
A Yes.
Q What did she say?
A She said: Lol. Ok. Good to know.
Q And below that?
A Same old Reese. Let's get him what we can this month and Yia and I will work our witchy magic to calm him the fuck down.
Q Okay. Mr. Kandell, did you make another payment to Reese Jones on July 31st, 2012?
A I don't recall.
Q Is there something that would refresh your recollection?

A An e-mail or a spreadsheet.
Q I'd like to show you what's been marked as Government Exhibit 1138, which is Tab 26 of your binder.
And let me know if that refreshes your recollection.
A Yes.
Q And approximately how much did OneTaste make to Reese Jones on that day?
A 2400.
Q And who did you inform about making that payment?
A Rachel Cherwitz.
Q You can set that down.
Why did you tell Rachel Cherwitz about these loan repayments?
A She was the leader of the business, head of sales, and handling Reese.
Q So, at this point in time, she was head of sales?
A Yes.
Q Approximately when did she become head of sales?
A I don't remember specifically. I believe around mid 2009.
Q I'd like to show you Government Exhibit 1141, which is Tab 72 of your binder.
Do you recognize this?
THE COURT: 1141, Ms. Bonjean.
MS. BONJEAN: I don't think I have that one, but

I'll find it.

THE COURT: Let's give her a minute.

MS. BENSING: Of course.

MS. BONJEAN: I can look at it here, it's fine, Your Honor.

THE COURT: Okay.

Go ahead, Ms. Bensing.

BY MS. BENSING:

Q Do you recognize this, Government Exhibit 1141?

A Yes.

Q And what is it?

A E-mail exchange between Rachel, myself and Yia Vang; Rachel Cherwitz, myself and Yia Vang.

Q And are you forwarding another e-mail exchange between yourself and Reese Jones?

A Yes.

Q Is this dated August -- July 30th, 2012 and August 1st, 2012?

A Yes.

Q And it pertains to the repayment of loans to Reese Jones?

A Yes.

Q Is it a fair and accurate copy?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1141 into evidence.

MR. ROBOTTI: Same objections, Your Honor, relevance and cumulative.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1141 is admitted.

(Government's Exhibit 1141 was received in evidence.)

MS. BENSING: And if we can, please, publish Government Exhibit 1141 to the jury.

(Exhibit published.)

MS. BENSING: Okay. If we can please blow up the bottom e-mail from Reese Jones to Robert Kandell.

BY MS. BENSING:

Q So, Mr. Kandell, did Reese Jones reach out to you again on July 30th, 2012 asking how things were progressing with the loan repayment and indicating that he needed money?
A Yes.
Q And did you then forward that to Rachel Cherwitz?
A Yes.
Q And so, if we can go up to the e-mail dated July -- sorry, August 1st, 2012 at 2:20 p.m.
A Yes.
Q I'm just going to ask you please read out what you wrote to Rachel Cherwitz and Yia Vang.
A FYI, what Reese is basically asking us is to not pay our

bills in August and then give the money to him. This goes against my training, but am willing to do so for some. It won't be a lot of extra money. Love some viewpoints from the fourth dimension.

Q What is the fourth dimension, Mr. Kandell?

A It's the dimension outside the third dimension, call it the energetic higher -- higher realms.

Q And was that a phrase used at OneTaste?

A Yes.

Q In what capacity?

A It was just another way to look at the world that's not the 3-D physical world and more the energetic spiritual world.

Q And how did Rachel Cherwitz respond?

MS. BENSING: If we could blow up the top e-mail, please.

A Let's not do anything to put ourselves in danger. And if we can give some extra, let's do it. I will work on getting us some paid-in-full for CP. Don't let him bully you, it's fine.

Q Mr. Kandell, the reference to "paid-in-full for CP," what did you understand that to mean?

A You could pay your full amount or you could do a payment plan for the program.

Q And so "CP" is a reference to the Coaching Program?

A Yes.

Q And were the repayments to Reese Jones tied to how much OneTaste was getting in Coaching Program income?
A Yes.
Q And who was responsible for that?
A Who was responsible for getting the payments?
Q Correct.
A The entire team.
Q And who led the sales team?
A Rachel Cherwitz.
Q Did Reese Jones reach out to you again about payments later in August of 2012?
A I don't remember.
Q I'm going to show you what's been marked as Government Exhibit 1159, which is Tab 73 of your binder, and ask if that refreshes your recollection?
A Yes.
Q So, did Reese Jones reach out to you again about loan repayment in the end of August 2012?
A Yes.
Q And just looking at Government Exhibit 1159, what is this? Do you recognize it?
A A similar e-mail request and forward to Yia and Rachel.
Q And is this dated August 25th and August 26th, 2012?
A Yes.
Q And does Rachel Cherwitz respond?

A Yes.
Q Is it a fair and accurate copy of that e-mail exchange?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1159 into evidence.

MR. ROBOTTI: Object on relevance, cumulative.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1159 is admitted.

(Government's Exhibit 1159 was received in evidence.)

Q And, Mr. Kandell --

MS. BENSING: Sorry. If we can just publish this to the jury.

(Exhibit published.)

BY MS. BENSING:

Q Mr. Kandell, on August 25th, 2012, did Reese Jones request additional money from OneTaste?
A Yes.

MS. BENSING: And if you we just publish your response on August 25th, 2012 at 10:42 p.m.

Q Did you forward this to Rachel Cherwitz and Yia Vang?
A Yes.
Q And what did you say when forwarding it?
A FYI, not going to send to Jo since it seems to create

charge. Nothing to do but make money.
Q And the reference to "Jo," who is that?
A Joanna Van Vleck.
Q And when you say "nothing to do but make money," what do you mean?
A The more money we made, the faster we could pay him off.
MS. BENSING: And if we can please publish Rachel Cherwitz's response to you. The whole response, sorry.
(Exhibit published.)
BY MS. BENSING:
Q Does Rachel Cherwitz respond: All right. We'll see what else comes in this week. I've set my sights on three CPs paid in full?
A Yes.
Q And then does she say: FYI, you cannot write things like "I'm not sure of the next transfer, as I have to deal with travel and CP expenses. I will keep you informed of any extra money we can send." That can trigger responses like the one below. He does not need to know what else we are spending money on. Just tell him exactly what he needs to know transfer wise. Nothing more, nothing less. Make sense?
Is that what she writes?
A Yes.
Q And does she then write: We will continue to pay what we can as we can, it's going to be all right?

A Yes.
Q Do you know why she was writing it's going to be all right?
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MS. BENSING:
Q Is it fair to say, Mr. Kandell, that Reese Jones was putting pressure on OneTaste at this time?
A Yes.
Q Did you make another payment to Reese Jones on September 10th, 2012?
A I don't remember.
Q Is there something that would refresh your recollection?
A An e-mail.
MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 1164, which is Tab 27 of your binder.
Q And let me know if this refreshes your recollection about another payment made to Reese Jones by OneTaste on September 10th of 2012.
A I'm sorry. Could you give me the tab number again?
Q Tab 27, Government Exhibit 1164.
A Yes, it looks familiar.
Q And if you're looking at the screen, if we can just scroll down, please.

Okay. And stopping there, does this refresh your recollection about another payment made to Reese Jones in or around September 10th, 2012?
A Yes.
Q And approximately how much was paid back to Reese Jones at that time?
A $12,000.
Q And sticking with Government Exhibit 1164, do you recognize this?
A Yes.
Q And what do you recognize it to be?
A E-mail between myself, Nicole and Reese Jones.
Q And does it pertain to OneTaste repayment of Reese Jones' loan?
A Yes.
Q Is it a fair and accurate copy of an e-mail exchange between yourself, Reese Jones and Nicole Daedone on September 10th, 2012?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1164 into evidence.

MR. ROBOTTI: Objection to relevance, cumulative.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1164 is admitted.

(Government's Exhibit 1164 was received in evidence.)

MS. BENSING: And if we can, please, publish Government Exhibit 1164 to the jury.

(Exhibit published.)

MS. BENSING: And if we can just scroll down to the September 10th, 2012 at 8:29 a.m. e-mail.

BY MS. BENSING:

Q Do you indicate to Reese Jones that you can put money into his -- into the IP Media account?

A Yes.

Q Okay. And then scrolling up, does Nicole Daedone then respond?

A Yes.

Q And can you please read out to the jury Nicole Daedone's response on September 10th, 2012?

A Reese and Rob, it is my understanding that we will have a minimum of 60K to Reese by Thursday. That said, we cannot continue to put OneTaste in the red for these emergencies, less we harm the system that is covering all of us. For that reason, for the month of October, let's aim to get OneTaste out of the red and pay Reese 20K for October, unless it's unusually profitable month.

To be clear, our priority from here on out, following helping Reese with his recent emergency, is to get

OneTaste out of the immediate red prior to making any more payments on the loan to Reese so that OneTaste remains sustainable.

Q Mr. Kandell, are you familiar with the term "the system" as used at OneTaste?

A Yes.

Q And what is "the system" as used at OneTaste?

A System refers to how the OneTaste ecosystem worked.

Q And what do you mean by that?

A There were just certain culture aspects of our group communications, the way we did things, the way we understood things, how we communicated.

MS. BENSING: We can take that document down.

Q Mr. Kandell, I think you testified earlier regarding your efforts to account for how much OneTaste owed Reese Jones, is that correct?

A Yes.

Q And were you able to account for an exact amount?

A No.

Q Why not?

A I made requests to Reese for receipts and he claimed we owed him 2 million, $3 million. All I had was the money that was transferred to our bank accounts as definitive receipts.

So, I asked for receipts, but never received them. So I was never able to understand the exact amount that we

owed him.
Q And did you discuss this with Nicole Daedone?
A I did.
Q And did you and Nicole Daedone at some point determine how much money total you were going to pay back Reese Jones?
A We did.
Q And what did you determine?
A We calculated the amounts that we'd already paid. We received a loan from another source, and that money went to Reese to complete in November 2012.
Q Okay. And so that process happened in November of 2012?
A Yes.
Q And prior to that accounting in November of 2012, in September and October of 2012 did Reese Jones continue to make requests for repayment from OneTaste?
A Yes.
Q And did you continue to discuss those requests with Nicole Daedone when he did?
A I don't remember for sure.
Q I'd like to show you -- let me ask you this:
As of October 29th, 2012, how much money was still outstanding on the Reese Jones loan?
A I don't remember.
Q Is there something that would refresh your recollection?
A An e-mail.

Q I'd like to show you what's been marked as Government Exhibit 1273-R, which is Tab 51-R of your binder.

THE COURT: That's not the number that's lining up.

Did you mean to say 15 or 1973?

MS. BENSING: Yes, 1973. I apologize, 1973-R, which is Tab 51 of your binder, Mr. Kandell.

THE COURT: It would be behind 1973, correct?

MS. BENSING: Yes.

THE COURT: There are two documents in that tab.

MS. BENSING: Exactly. It's the one behind the tab that says R.

THE COURT: Go ahead, Ms. Bensing.

BY MS. BENSING:

Q So, Mr. Kandell, does this refresh your recollection as of October 29th, 2012, how much money was still outstanding on the loan to Reese Jones?

A Yes.

Q And approximately how much was still outstanding?

A According to him, at least a quarter-million dollars.

Q And do you recall your own accounting of that --

A Yes.

Q -- at that time?

And what was your own accounting?

A 260 -- $267,000.

Q Approximately?

A Approximately.
Q And do you recall as of the date of October 29th, 2012, approximately how much OneTaste had paid already to Reese Jones?
A According to this graph, 733 --
MS. BONJEAN: I'm going to object to reading from the --
THE COURT: Sustained.
Q And the question --
MS. BENSING: Excuse me, Your Honor.
BY MS. BENSING:
Q The question is just do you recall your own accounting?
A No.
Q Is there something that would refresh your recollection?
A E-mail.
Q Okay. And so take a look at it and let me know if that refreshes your recollection.
A 733,000-and-change.
Q You testified --
MS. BENSING: You can take that down. Thank you.
Q You testified just a minute ago that in or around November 2012, you and Nicole Daedone finalized an accounting of what you owed to Reese Jones.
Is that correct?
A We paid off the debt with a -- one lump sum.

Q And I think you testified that one of the ways you paid off that debt was by taking out additional debt, is that correct?
A Yes.
Q What do you mean by that?
A We got a loan from -- on another -- someone, not an investor, but someone who was willing to loan us money.
Q And who did you get that loan from?
A She was the mother of one of our leaders.
Q Who?
A Her name was Ippolita. I can't remember her last name.
Q Is there something that might refresh your recollection?
A An e-mail.
Q Well, I'd like to show you what's been marked as Government Exhibit 4051, which is Tab 60 of your binder.

MS. BONJEAN: I didn't hear that. Can you repeat that?

MS. BENSING: I'm sorry.

THE COURT: 4051. Tab 60, if you have a binder.

MS. BENSING: And if you can scroll down and highlight the paragraph, "Whereas, retiring shareholder."

BY MS. BENSING:
Q Let me know if that refreshes your recollection as to the name of that individual.
A Yes. Ippolita Rostagno.

Q Sorry. How do you spell the last name?
A R-O-S-T-A-G-N-O.
Q And you said she was the mother of a OneTaste leader?
A Yes.
Q Who was she the mother of?
A Maya Gilbert.
Q Approximately when did you take out that loan from Maya Gilbert's mother, Mr. Kandell?
A October 1st, 2013.
Q And for how much?
A $250,000.
Q Did you discuss this with Nicole Daedone?
A Yes.
Q Why did you take out that loan?
A To pay off Reese.
Q And why get into more debt to pay off debt to Reese Jones?
A We thought we could handle the new debt with specific terms easier. Reese needed the money, and we wanted just to complete the transaction.
Q And at this time, in the fall of 2012, was Reese Jones still being serviced by women --
A Yes.
Q -- from OneTaste?
A Yes.

Q Do you recall who his handler was in the fall of 2012?
A Maddie Carl, Michelle Wright.
Q Did Reese Jones continue to ask for money into 2013?
A Yes.
Q What about in April of 2013?
A Yes.
Q In 2013, including in April of 2013, describe how OneTaste was doing financially to the jury.
A We were doing well. We were making money. We had several programs running concurrently. We had several cities that were becoming successful. It was -- we had cash.
Q And was there a Coaching Program going on at that time?
A Yes.
Q Which Coaching Program?
A Depends on what month.
Q Okay. Which Coaching Programs?
A CP5 went from September of 2012 to June of 2013.
CP6 started in New York in January of 2013 and went to October of 2013.
Q And what, if any, business impact did CP6 have at OneTaste?
A It was mixed success.
Q What do you mean?
A It wasn't as well sold and it was a bigger challenge than CP5.

Q A bigger challenge in what way?
A We were dealing with New Yorkers.
Q So, CP6 was held in New York?
A Yes.
Q I'd like to show you what's been marked as Government Exhibit 1263, which is Tab 33 of your binder.
Do you recognize this?
A Yes.
Q What is this?
A It's an e-mail between Nicole and myself.
Q And are you forwarding an exchange between yourself and Reese Jones?
A Yes.
Q And are these dated between March 2013 and June 6th, 2013?
A Can you give me those dates again?
Q March 19th, 2013 and June 6th, 2013.
A Yes.
Q And does this pertain to repayment of the loan to Reese Jones?
A Yes.
Q And does the top level exchange pertain to your discussion of that with Nicole Daedone?
A Yes.
Q Is it a fair and accurate copy of those e-mail exchanges?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1263 into evidence.

MS. BONJEAN: Can I have one second, Your Honor?

THE COURT: Yes.

Do you have it?

MR. ROBOTTI: We'll object on relevance and cumulative.

MS. BONJEAN: We'll join.

THE COURT: Overruled.

Government Exhibit 1263 is admitted.

(Government's Exhibit 1263 was received in evidence.)

MS. BENSING: And if we can publish this to the jury, please.

(Exhibit published.)

MS. BENSING: And I'd like to just blow up halfway through the first page on May 31st, 2013 at 3:10 p.m., "Reese Jones wrote."

BY MS. BENSING:

Q So, did Mr. Jones write to you on that date: At a very basic level, I need some cash flow help at this time as you/Nicole/business have needed some financial help in past times?

A Yes.

Q And just to be clear, was May of 2013 after you and Nicole Daedone had reached an agreement with Reese Jones settling the amount of the debt?
A Yes.
Q And I'd like to scroll up to your e-mail dated June 5th, 2013. And I'd ask that you read out what you wrote.
And by the way, who is this e-mail to on July 5th, 2013?
A Nicole Daedone.
Q And what did you write?
A We are at a fundamental disagreement with the money. According to this view, he's still asking for interest from a loan, which is 258,000. The PDF attached is an amortization schedule that comes up with that number.
From our vantage point, the 1 million included interest, and when we paid him off early, November 2012, that he signed that this contract and other agreements are canceled by agreements [sic].
I feel personally that we paid this debt off and went out of our way to do so last year, but he keeps knocking. We paid him 5,000 about four or five weeks ago on top of the previous payments.
I want to push back hard citing the contract that he signed that the agreement is over and that the intent of getting the loans to help him out was that. But before I do,

I want to make sure we are in agreement.

Sorry to bother you with this, but it's a good time to be in agreement.

Q And how does Nicole Daedone respond?

A Not hard, but straight.

Q Okay.

MS. BENSING: We can take this down.

Q At this point in time in the summer of 2013, was Reese Jones still being handled by women at OneTaste?

A I don't know.

Q Mr. Kandell, you testified earlier that there came a time when Nicole Daedone moved in with Reese Jones. Is that correct?

A Yes.

Q To what location?

A His house in Russian Hill, San Francisco.

Q And are you familiar any other properties owned or operated by Reese Jones?

A He had a house in Tahoe. He rented a house in Stinson Beach.

Q And with respect to the house in Stinson Beach, were any events held there?

A Yes.

Q What kind of events?

A We had meetings, group meetings. We hosted VIPs. And

part of the Bryan Franklin Program we hosted at the house.
Q And when you say "we hosted VIPs," who are you talking about?
A People of interest who would come by and be -- you know, work with us or some kind of joint venture, we would bring them to Stinson.
Q And who would bring them to Stinson, specifically?
A Nicole and Joanna, I believe, would invite them to Stinson, maybe Reese as well.
Q Did there come a time where you attended a demonstration of Orgasm at Stinson Beach?
A I did.
Q Approximately when?
A Mid 2009.
Q And do you recall exactly when that was?
A No.
Q What was that event?
MS. BONJEAN: Objection on vagueness grounds.
THE COURT: Overruled.
Q What was the event that you attended, Mr. Kandell?
A I'm just rethinking the date because the writer of the New York Times was there, I believe.
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A I think it was closer to the end of 2008. The writer of

the New York Times, other persons of interest we invited. We were hanging out with a Buddhist monk at that point, he got invited. And other various members of the team.

Q And what was -- did you participate in that demo?

A I held the operations aspect of it.

Q And what does that mean?

A Music, setup, lights. Just general support.

Q Who else participated in the demo?

A Joshua Boshnack, Nicole Daedone, Reese Jones, Rachel Cherwitz.

Q And what was Nicole Daedone's role?

A She was the strokee.

(Continued on the following page.)

BY MS. BENSING: (Continuing.)
Q And what was Josh Boshnack's role?
A He was the stroker.
Q And what was Rachel Cherwitz's role?
A She was kind of holding the room, maybe like an MC.
Q And what was Reese Jones's role?
A He was a supporter.
Q Do you recall who attended that demo?
A Beyond the writer of the New York Times, I don't.
Q I'd like to show you a series of photographs that are already in evidence.

MS. BENSING: So we can start with Government Exhibit 4793, which is already in evidence.

THE COURT: Just for planning purposes, Ms. Bensing, we're getting close to 1:00 o'clock. I'd like to start stop at 1:00 to have the lunch break for the jury.

MS. BENSING: Yes. I have three exhibits I'd like to show him and then --

THE COURT: Yes. Go ahead.

Q So Government's Exhibit 4793, which is already in evidence, do you recognize the person depicted there?
A That's Brian Franklin.
Q And who is behind Brian Franklin?
A Rachel Cherwitz.
Q I'd like to show you Government Exhibit 4795, which is

already in evidence.

Do you recognize this person?

A Reese Jones.

Q And I'd like to show you Government Exhibit 4796, which is already in evidence.

Do you recognize this person?

A Yes. Her name is Marta. I can't remember her last name.

Q And who is Marta?

A Marta Paras, I think, P-A-R-A-S. She was Reese Jones' business partner.

Q And do you recall whether these people were present for the Stinson Beach demo?

A Yes.

MS. BENSING: Your Honor, now would be a good breaking point.

THE COURT: Okay. I'm going to ask the witness to step down for the lunch break.

(The witness steps down.)

THE COURT: Okay. We'll break until five minutes to 2:00. Enjoy your lunch, don't talk about the case, don't let anyone talk to you about the case, keep an open mind, and I'll see you at five minutes to 2:00.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated.

Ms. Bensing, what is your estimate now of how much longer you

have on direct examination?

MS. BENSING: We're in the back half, Your Honor. Maybe a couple of more hours. Maybe less.

THE COURT: Okay. See everyone at five to 2:00.

(A luncheon recess was taken.)

(Continued on the following page.)

A F T E R N O O N S E S S I O N

(In open court; Jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: We can bring out the jury now.

MS. BENSING: Should we get the witness, Your Honor?

THE COURT: Yes, you can get the witness, as well. You can just come back up here, sir.

(The witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Okay. Everyone may be seated. I hope everyone had a good lunch. Ms. Bensing, you may resume your examination.

MS. BENSING: Thank you. And Mr. Kandell, just to remind you that you're still under oath, okay.

THE WITNESS: Thank you.

DIRECT EXAMINATION (Continued)

BY MS. BENSING:

Q You testified this morning about a location called Brisbane. What is that a reference to?

A Brisbane, California, a city south of San Francisco.

Q And you testified with respect to the Stinson Beach demo, that a New York Times reporter was there. Why was a New York times reporter there, to your knowledge?

A She was writing an article about OneTaste.
Q When you first became involved in OneTaste and OneTaste developed in their early years, what did you and Nicole Daedone was the purpose of OneTaste?
MS. BONJEAN: Objection to the form.
THE COURT: Sustained.
Q You said that you cofounded OneTaste, correct?
A Yes.
Q What was the purpose of OneTaste?
A We wanted to bring orgasm into the world conversation. We wanted to redefine different ways of relating between people.
Q And I think you testified earlier that Daedone taught about spirituality; is that correct?
A Yes.
Q What, if anything, did Daedone teach --
MS. BONJEAN: Objection.
THE COURT: I think she's not finished yet.
MS. BENSING: Withdrawn.
Q What, if anything, did you hear Daedone say regarding a connection between spirituality and sexually servicing Reese Jones?
MS. BONJEAN: I'm going to object to the foundation. I'm sorry, late objection.
THE COURT: Overruled.

A The pursuit of orgasm, the pursuit of personal empowerment was our approach to find our connection to God, or whatever work was appropriate for the person, higher power, inner master, whatever. The opportunity to put yourself in challenging situations, the opportunity to be of service to others, was a big part of the early years in terms of it being a service organization. We believed that Reese was key to our expansion and our growth, and like I said many times, he put a lot into the organization and helped us, and there was -- you know, we wanted to take care of him, as well. And he was our friend and he was our mentor, so it was a two-way street.
Q Are you familiar with the term game masters, as used as OneTaste?
A Game masters?
Q Yes.
A Yes.
Q And what did that mean?
A We looked at many things through the viewpoint or the concept of a game. You know, specifically, the book was called *Finite and Infinite Games* by James Carse, and one of the games -- one of the roles in the game would be the game master. There was an opportunity to create a game for yourself, at a minimum, but several others.
Q And who were the game masters at OneTaste, Mr. Kandell?
A Depended on the timeframe and when and where. Nicole was

certainly a game master, Chris Hubbard was a game master, Yia, Rachel Cherwitz, Rachael Hemsi, myself, with different circumstances, teaches, created games for students, depending on the course. Could have been any teacher at any time during OneTaste.
Q And were games used as a means of employing people?
A No.
Q Were games used as a means of directing labor?
MS. BONJEAN: I'm going object to the vagueness of that, and foundation.
MR. ROBOTTI: Join.
THE COURT: Overruled.
A I would not equate that, no.
Q Was manipulation used as a means of directing labor?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection to leading.
MS. BONJEAN: And vague.
THE COURT: Overruled.
MS. BONJEAN: Vagueness.
THE COURT: Overruled.
A Could you repeat the question.
Q Was manipulation used at OneTaste as a means of directing labor?
A Yes.
Q By whom?

A By all the leaders in one shape or form, my included, Nicole, Rachel Cherwitz, Rachael Hemsi, Yia Vang, Joanna Van Vleck, myself.
Q How was manipulation used as a means of directing labor at OneTaste?
A Manipulation has a negative connotation. I think manipulation is directing someone towards the higher goal, sometimes past their own perceived self-abilities and self-limitations.
Q And so how was that used at OneTaste?
A We would direct people past their comfort zonings into situations, either through sales or through connection with other or courses to further the goal of the organization.
Q And you testified that that included yourself and Nicole Daedone, correct?
A Yes.
Q And what way did you and Nicole Daedone do this?
A We would see where people were, you know, we perceived playing small or not at their full potential, and we would use various techniques to inspire, manipulate, cajole, into moving them into a different direction.
Q What techniques?
A Threats, fear of losing position, fear of losing social status, taking away, you know, you were in the inner circle on Tuesday and you were in the fifth circle by Thursday, you

could be moved to a different city, you could be promised to teach something, and then that would be taken away.

Q You testified that other OneTaste leaders were involved in manipulation; is that correct?

A Yes.

Q Was Rachel Cherwitz?

A Yes.

Q In what way?

A Rachel was in charge of sales, was particularly challenging, so she would basically do whatever it took to make our sales goals. She would use any tool she had, any knowledge of the person to push them in the direction of increasing sales and attention and dedication to the organization.

Q And what do you mean, she would do whatever it took?

A She would use any technique, she would love bomb, she would promise something, she would bring up their faults, she would embarrass them in front of a group.

Q Who did you, Rachel Cherwitz and Nicole Daedone do this to?

MS. BONJEAN: Objection to, assumes facts not in evidence. The prior question.

THE COURT: Sustained.

Q Well, Mr. Kandell, you testified you and Nicole Daedone manipulated people to get them to provide labor; is that

correct?
A Yes.
Q Which people?
A Pretty much anyone on staff that we could get to do something we wanted them to do.
Q And what about Rachel Cherwitz?
A Yes.
Q Who?
A Members of the staff team, members of the New York staff team, member of any member of the staff team, we had. You know, meetings every day. You could be called out for not being attentive. We had group text threads with 20, 25 people that were going constantly where you could be called out for not responding. It was a very intense very tight situation.
Q You testified that you manipulated people alongside Nicole Daedone and Rachel Cherwitz to obtain labor. What kind of labor?
A I was in charge of operations. So having people work harder, work longer hours, perhaps beyond their own believed self-limits.
Q And what about the provision of sexual labor?
A I don't understand the question.
Q Did you manipulate people to provide sexual labor?
A It wasn't really my department.
Q Whose department was it?

A That was Rachel and Nicole's.
Q You testified about a term, love bombing.
What is that?
A Love bombing is when you see someone come new and you believe there was a possibility of being benefit to the business, so a lot of people would pay a lot of attention --
MS. BONJEAN: I object to the question and.
THE COURT: A foundational objection?
MS. BONJEAN: Yes.
THE COURT: Sustained.
Q Mr. Kandell, you testified that one means by which Rachel Cherwitz manipulated people was love bombing; is that correct?
A Yes.
Q And when you used that term, love bombing, what you do you mean?
A Love bombing refers to putting a lot of attention from members of the opposite sex to have that person feel special, feel loved, feel something they may never have felt before. It could be promise of sex or attention or OMing, and so you would just put a lot of tension on someone when they first came in order to, you know, further the business or perhaps get a sale.
Q And how was that used in the manipulation of people to provide labor?
A I don't think love bombing was used much in the promotion

of labor. It was mostly for the promotion of sales.
Q Got it. You testified that one means of using manipulation for the promotion of labor was use of threats. What did you mean by that?
A We believed that, you know, your power, your path to God was through your orgasm, was through your practice, through your attention and loyalty to the organization. You could fear losing that. You could fear losing that social status. It was kind of, like, a high school clique situation gone bad, and you could lose, you know, being closer to the cool kids, you could be outcasted, you could lose position. There was just a -- there was a lot of social pressure to do what the organization wanted you to do.
Q What was the purpose of your using these techniques, Mr. Kandell?
A I had some significant challenges around the operational end of the business with providing courses and moving equipment and being back of house, and so I would push people past their perceived limits in terms of providing the foundational support for the business.
Q And when you say, push them past their perceived limits, what do you mean?
A We would work, you know, sometimes 10, 12 hours a day, we would start at 7:00 o'clock in the morning. We would go until 8:00, 9:00 at night. We would set up for the next day. We

were just exhausted beyond belief.
Q Are you familiar with the term, stroking?
A Yes.
Q How was that used at OneTaste?
A Stroking was used on -- for various different things. There's obviously the physical practice of orgasmic meditation which was specifically stroking. Then you could verbally stroke someone.
Q What is verbal stroking?
A Verbal stroking was, as OMing, where you apply different forms of pressure to increase the sensation between the two people. You could use different communication techniques, variance of tenor and cadence, intonation of the voice, intention behind the words, to increase sensation, push people into a different direction.
Q Did you observe Nicole Daedone stroke people --
A Yes.
Q -- in terms of the verbal stroking meaning?
A Yes.
Q In what way?
A She did it both individually or in house meetings or in courses.
Q To what end?
A To move --
MS. BONJEAN: Objection to the speculation.

THE COURT: Yes. Sustained.
Q Did you observe why Nicole Daedone was verbally stroking people?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
THE COURT: Yeah. Sustained.
Q Did you observe in what context Nicole Daedone was verbally stroking people?
A Like I said, it was ear either in a one-or-one or two-on-one experience that I was involved with. It could be in a team meeting to have people be more involved. I think we read the example of that in the darshan that I read out loud, that was an example of verbal stroking. It could be in a class or a workshop.
Q Are you -- and did you observe Rachel Cherwitz verbally stroke people?
A Yes.
Q In what context?
A Similar situations, team meetings, workshop, one on one.
Q So including with respect to employees?
A Yes.
Q And including with respect to volunteers?
A Yes.
Q And including with respect to independent contractors?
A Yes.

Q Are you familiar with the phrase, OTR?
A Yes.
Q What does that mean?
A Off the rails.
Q What does that mean?
A Off the rails was code for you're off in your game, you're not doing what you said you would do, are you not following the group's intention, you're individuating making decisions, originating other things that were not in the group direction.
Q Who used the term OTR for the leadership team that you can recall?
A Pretty much every leader used it at some shape or form. It was one of Joanna Van Vleck's favorite phrases, Rachel's favorite phrases, Rachael Hemsi, myself, Yia Vang, Justine Dawson. Any of the leader team would use OTR to describe someone who was heading in a different direction than the group.
Q And was that used as a mean of obtaining labor?
A It was meant to pull people back into the fold which could mean labor, yes.
Q Are you familiar with the term gaslighting?
A Yes.
Q How, if at all, was that used at OneTaste?
MS. BONJEAN: I'm going to object to the foundation.

THE COURT: Sustained.
Q Was that used at OneTaste?
A Yes.
Q In what way?
A Gaslighting is a relatively new terms based on a movie, and the idea was someone would --
MS. BONJEAN: I'm just going to object to the --
THE COURT: Sustained.
Q Did you observe Nicole Daedone gaslight individuals at OneTaste?
A Yes.
Q How?
MS. BONJEAN: Still going to object to the foundation.
THE COURT: Sustained.
Q Did you observe her gaslight employees at OneTaste?
MS. BONJEAN: Same objection.
THE COURT: Same. Sustained.
Q Are you familiar with the phrase white rabbit?
A Yes.
Q Was that phrase used at OneTaste?
A Yes.
Q What did that mean?
A White rabbit from *Alice in the Wonderland* is the person that led someone down the rabbit hole on the adventure.

Q Are you familiar with the phrase or the word virus?
A Yes.
Q Did you hear that used at OneTaste?
A Yes.
Q By whom?
A Virus was often used by Rachel Cherwitz, mostly, I think. Yeah, Rachel.
Q When did you hear Rachel Cherwitz use virus?
A She would use that to describe someone who was, quote, infecting the rest of the group with the lack of cohesion with the rest of the group.
Q Can you give us an example?
A It was often someone at sales meetings, someone who wasn't -- who was distracted, who was fighting the system. Like I said, New York was especially troubling. So the New York team, there was a lot of challenges for them with individualization, and so if someone was going against the group, they were often called a virus.
Q By whom?
A Rachel Cherwitz.
Q And who were the individuals on the New York team that you're talking about?
A I don't recall, specifically.
Q Well, can you recall any members of the New York team?
A Yes.

Q And so who? Who do you recall?

MS. BONJEAN: Objection to the foundation of the question.

THE COURT: I think the question he was clear. But I'll ask you to rephrase it, in any event.

MS. BENSING: Sure.

Q You testified that there were challenges with respect to the New York team for whom Rachel Cherwitz used the term virus.

Who were the members of the New York team at approximately the time that Rachel Cherwitz was using the term virus?

A Margaret Pixley, Becky Uma, Ruwan. I'm sorry, I can see their faces, but not their names.

MS. BENSING: I'd like to show the witness, only, please what's been marked as Government Exhibit 7 -- 4789.

Q Do you recognize this?

A Yes.

Q What is it?

A It's a picture.

Q Of who?

A Reese Jones and Rachel Cherwitz.

Q I'd like to show you Government Exhibit 4790.

Do you recognize this?

A Yes.

Q Who is it?

A Reese Jones and Nicole Daedone.

Q Are these fair and accurate copies of pictures of Rachel Cherwitz, Reese Jones, and Nicole Daedone.

A Yes.

MS. BENSING: Your Honor, the Government moves to admit 4789 and 4090 into evidence.

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibits 4789 and 4090 are admitted.

(Government Exhibits 4789 and 4090, were received in evidence.)

MS. BENSING: And if we could please publish both of them.

(Exhibit published.)

MS. BENSING: Thank you. We can take those down.

Q Mr. Kandell, I want to shift gears and ask you about the development of OneTaste community standards.
Did there come a time where OneTaste developed community standards?

A Yes.

Q Approximately when?

A We had the ethics committee in response to the New York Times article coming out written, first version written by myself and Justine Dawson in February of 2009. We had a house

manual for 1080. I don't remember when the first version came out. Probably soon after that. Those are the two that come to mind.

Q Did you discuss with Daedone the concept of community standards as early as 2007?

A It's possible. I don't remember.

Q Is there something that might refresh your recollection?

A A document or e-mail, I assume.

Q I'd ask you to look at Government Exhibit 1006, which is tab 11 of your binder.

MR. ROBOTTI: Judge, I'm not sure we have that on the defense side.

THE COURT: You need to have it.

MS. BENSING: Yes. Government Exhibit 1006, it's a marked Government Exhibit.

THE COURT: Do you have an extra copy, Ms. Bensing? Or as many as they need?

MS. BONJEAN: I'm sorry, Your Honor we'll have to pull it up if it was produced.

THE COURT: I'll give you a minute.

Did you guys have it now, everybody?

MR. ROBOTTI: We do, Your Honor.

THE COURT: I'll give you time. It's a bit small print and a bit lengthy.

Q Mr. Kandell, does this refresh your recollection with

respect to whether or not you and Nicole Daedone discussed the concept of business and community standards as early as 2007?
A Yes.
Q And what did and you Nicole Daedone discuss at that time?
A It looks like --
Q There's no need to read. I'm going to ask you not to read from the document.
But you can testify to whatever refreshed your recollection with respect to those discussions, okay.
A Looks like a discussion we had about separating the business heads from heads of community.
Q And why was that a topic of discussion in 2007 between and you Nicole Daedone?
A We had grown enough in terms of both the business and community, at this point, the warehouse was open, and so there was just a very convoluted sense of who to go to if you had a problem, who you dealt with if you had a fight or an argument. So the idea looks like the idea of someone being in charge of community and building standards so people knew how to live inside the community and not dictated by business.
Q And with respect to the time period that you were involved in OneTaste, did the business ever successfully siphon off the community and the business?
A From my perspective, no, it was always convoluted.
Q You testified, though, a minute ago that ethics standards

were put in place; is that correct?
A Yes.
Q Approximately when?
A March 2009.
Q And what prompted that?
A The arrival of New York Times article.
Q And did you discuss these standards with Nicole Daedone prior to the arrival of the New York Times article?
A Yes.
Q And what did she indicate with respect to the standards at that time?
A She thought it was important. We had some models, a place called Spirit Rock which is a meditation community no Northern California. So we wanted to implement really specific rules of interactions between students and teachers.
Q And why was the New York Times article the impetus for the implementation of these standards?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
Q Well, you just testified, Mr. Kandell, that it was the arrival of the New York Times article that led to the implementation of these standards, correct?
A Yes.
Q Why?

MS. BONJEAN: Objection to the prior. We maintain our objections on this.

THE COURT: Sustained.

MR. ROBOTTI: Joined.

Q Mr. Kandell, did you discuss the arrival of the New York Times article with Nicole Daedone with respect to the implementation of these standards?

A Yes.

Q And what did she say with respect to the New York Times article on the implementation of these standards?

MR. ROBOTTI: Objection.

MS. BONJEAN: Again, objection, both on hearsay, but also the 403 grounds.

THE COURT: Overruled.

Q You can answer.

A It was Nicole's idea to implements the ethics standards to raise the level of service of our business.

Q And why was that linked to the New York Times article?

A We believed there would be more tension, more sales, more scrutiny of the company.

Q Approximately, when did the New York tiles article come out?

A March 2009.

Q Did you have a discussion in March of 2009 with Nicole Daedone regarding a student-teacher ethics proposal?

A Yes.
Q And did you discuss prostitution with Nicole Daedone at that time?
A I don't remember at that time.
Q Is there something that might refresh your recollection?
A An e-mail.
Q I'd like to ask you to look at Government Exhibit 1021, which is tab 17 of your binder.
Does that refresh your recollection?
A Yes.
Q What, if anything, did and you Nicole Daedone discuss in March of 2009 regarding prostitution?
A My understanding is that, viewed from the outside, volunteers OMing with students in classes or teachers or assistants having any sexual contact with students could be perceived as prostitution.
Q And did you consider this question as one of the business leaders of OneTaste at the time?
A I did.
Q And what, if anything, did the business do in response to that concern?
A We created the ethics committee and the ethics document.
Q And did volunteers and students and employees continue to OM after that?
A No. Well, yes, but under very strict and regulated

timelines and timeframes.
Q And what do you mean by that?
A For example, a teacher would not have a OM with a student until one month after the course, they couldn't have a sexual or romantic relationship until three months after a course, if you volunteered and helped as back of house, you were under the same ethic guidelines.
Q And were there exceptions to that?
A We built an ethics committee to allow people to ask for exceptions to those rules.
Q And did you ask for exemption exceptions to those rules, Mr. Kandell?
A I did, once or twice.
Q And were those granted?
A They were.
Q I think you testified earlier that as of March of 2009, Daedone was directing employees to sexually service Reese Jones, correct?
A Yes.
Q And did this policy apply to that?
A No, because Reese Jones was no longer a student of any of our workshops.
Q So there was no policy in place for that kind of sexual services, correct?
A Not to my knowledge.

Q Did a New York Times article, in fact, come out in March of 2009?
A It did.
Q Did that have an impact on OneTaste's business?
A It did.
Q What was that impact?
A We became well-known or we became known. There were many many blogs and articles written about us. It led to more media. It led directly to a publishing deal for Nicole's book and I'm sure other tangential benefits.
Q Did you discuss that New York Times article with Nicole Daedone?
A Yes.
Q What did she say about it?
MS. BONJEAN: I'm going to object, Your Honor.
MR. ROBOTTI: Object.
THE COURT: Overruled.
MS. BONJEAN: We maintain the objections from --
THE COURT: I didn't hear you, Mr. Robotti.
MR. ROBOTTI: We also object based on the previous discussion.
THE COURT: Yes. Overruled.
Q What did you discuss about it? Or I'm sorry, I think I asked, what did she say about it?
A I don't remember specifically. We were excited by it.

We thought it was a good thing. The article itself when it came out was kind of mixed. It said some negative things about Nicole that hurt her feelings. But it was, you know -- I always thought it was a balanced article in terms of pros and cons. I think we were looking for a super positive article, and it came out more mixed.

Q So you testified that there were certain negative things in the article that hurt Nicole's feelings; is that correct?

A Yes.

Q And that's -- you know, that's from discussions you had with Nicole Daedone?

A Yes.

(Continued on the following page.)

(Continuing.)

BY MS. BENSING:

Q What were the negative things?

MS. BONJEAN: Objection, to the extent it calls for hearsay.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

MS. BENSING: And your Honor, this is not being offered for the truth but the affect on Ms. Daedone.

THE COURT: Sustained to the form of the question.

MR. ROBOTTI: Objection to 403.

MS. BONJEAN: And also objection, the purpose of the question has been satisfied.

THE COURT: Sustain the objection to that question as framed.

BY MS. BENSING:

Q You testified that there were certain negative aspects of the New York Times article, correct?

A Yes.

Q You discussed those negative aspects with Nicole Daedone, correct?

A Yes.

Q And fair to say she was then aware of the negative aspects in the article, correct?

A Yes.

Q What were some of the negative aspects of the article?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

MS. BENSING: May I lead?

MS. BONJEAN: No objection, your Honor, this is --

THE COURT: Sustained. You can ask another question.

BY MS. BENSING:

Q You testified earlier that you and Nicole Daedone manipulated people at OneTaste, correct?

A Yes.

Q And were there allegations of that nature --

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

MS. BONJEAN: Move to strike.

THE COURT: The question? There is no answer. You can ask your next question.

BY MS. BENSING:

Q Mr. Kandell, what specifically did she say hurt her feelings?

MR. ROBOTTI: Objection.

MS. BONJEAN: Same objection.

THE COURT: Overruled.

A There was something about the word diva that I don't think she liked.
Q Do you recall anything else?
A I do not.
Q I want to direct your attention to 2011. At that time, did OneTaste engage the services of Reputation.com?
MS. BONJEAN: Objection. Your Honor, we don't have a rule, can we get a ruling?
THE COURT: Overruled.
A We did engage in Reputation.com. I'm not exactly sure of the year.
Q Is there something that might refresh your recollection?
A An email or bill or something of that ilk.
Q I'd like to show you what is marked Government Exhibit 1034, which is tab 19.
A Yes, this refers (sic) my memory of the time frame.
Q Was Nicole Daedone involved in the retention of Reputation.com's services?
A Yes.
Q And was Reese Jones involved in the retention of Reputation.com's services?
A Yes.
Q And were you involved?
A Yes.
Q Did OneTaste engage the services of Reputation.com?

A Yes.
Q Who paid for that?
A The business.
Q What was Reese Jones' involvement?
A It was his idea. And it's possible he loaned us money to do it, based on the time frame.
Q And for what reason did OneTaste engage the services of Reputation.com?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained as to foundation. Sustained.
BY MS. BENSING:
Q Did you discuss with Nicole Daedone engaging the services of Reputation.com?
A Yes.
Q What did she say about it?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to the extent it calls for, for the reasons we argued.
THE COURT: Overruled.
The question is?
MS. BENSING: What did Nicole Daedone tell you -- what did you discuss with Nicole Daedone regarding --
THE COURT: The last question: What did she say about it, I will overrule the objection to that question.

MS. BENSING: Thank you.
A She believed it was a good idea, that we should engage in their services.
Q For what reason did she say that?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MS. BENSING:
Q Did she tell you why she believed it was a good idea?
A Yes.
Q Why did she believe it was a good idea?
MR. ROBOTTI: Objection.
THE COURT: Sustained as to form.
BY MS. BENSING:
Q What did she tell you about why she thought it was a good idea?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A It would improve how we ended up in the Google searches under OneTaste.
BY MS. BENSING:
Q Did she discuss with you what was wrong with the Google searches with respect to OneTaste?
THE COURT: Sustained.

MS. BONJEAN: Objection.

BY MS. BENSING:

Q What did she tell you about why she thought it would improve the Google searches with respect to OneTaste?

MR. ROBOTTI: Objection.

THE COURT: Overruled.

A Often you type in OneTaste, and you know how Google comes up with four or five recommendations, the word cult was the second word or --

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Overruled.

A Second or third word when she typed in OneTaste as the prompt.

BY MS. BENSING:

Q I want to show you what is marked as Government Exhibit 1265-R, which is in tab 34-R of your binder. Do you recognize Government Exhibit 1265-R?

A It looks like a text message thread.

Q I'm going to direct your attention to Government Exhibit 1265. Are you a participant on this thread, Mr. Kandell?

THE COURT: You're asking him now 1265 as opposed to 1265-R?

MS. BENSING: Exactly, your Honor.

A This is D, sorry.

THE COURT: Where is that?
MS. BENSING: At tab 34, your Honor.
THE COURT: Thank you.
BY MS. BENSING:
Q Are you a participant on that thread, Mr. Kandell?
A Yes.
Q Do you recognize this conversation?
A Yes.
Q Is it a text message conversation from in or around June 13, 2013?
A Yes.
Q Returning to Government Exhibit 1265-R, is this a partially redacted version of Government Exhibit 1265, which you just testified about?
A Yes.
Q And who else are participants on this text thread?
A Rachel Cherwitz, Joanna Van Vleck, Yia Vang, Adam Jacobwitz, a London based number.
Q Do you know who was using that London based number?
A I do not.
Q Who is Adam Jacobwitz?
A He was our counsel, in-house counsel, for a period of time.
Q In Government Exhibit 1265-R, are there discussions regarding a complaint about an OM experience in New York?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection to the --

THE COURT: Sustained.

BY MS. BENSING:

Q As a general matter, what is Government Exhibit 1265 --

MR. ROBOTTI: Objection, 401, 403, hearsay.

MS. BONJEAN: Objection, hearsay.

MS. BENSING: May I respond?

THE COURT: Can I ask, if the two defense counsel, I'll hear you both, but you cannot talk over each other. But I think I heard both of you now.

You may respond.

MS. BENSING: The Government is not seeking to admit those portions of 1265-R for their truth but rather Rachel Cherwitz's statements, your Honor, the effect on Rachel Cherwitz and Rachel Cherwitz's --

THE COURT: On this foundation I'm going to sustain the objection on relevance grounds.

MS. BENSING: I haven't offered to move it yet, your Honor, I asked the witness if he recognized it.

THE COURT: Go ahead.

BY MS. BENSING:

Q What do you recognize it to be?

A The text message thread between the people I mentioned.

Q At a high level, what does the text message thread

pertain to?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY THE COURT:

Q Is Rachel Cherwitz a participant on this text message thread?

A She is.

Q I'm going to ask, you are you familiar with the term beast at OneTaste?

A Yes.

Q How is that term used?

A Beast was to talk about that part of you, the angry, explosive, out of control, animal part that all of us have, or theoretically all of us have, that we keep locked away.

Q And on June 13, 2013, did Rachel Cherwitz discuss beasts?

MR. ROBOTTI: Objection, misstates.

THE COURT: Overruled.

A Yes.

Q What did she say?

A Can I just, say one day.

MR. ROBOTTI: Objection to reading.

THE COURT: Yes, he can't read from the document but he can answer your question.

Q Is there something that would -- do you recall what

exactly she said on that day?
A No.
Q Is there something that would refresh your recollection?
A Reading the document in front of me.
Q So I'm going to ask that you look at Government Exhibit 1265-R. Let me know if that refreshes your recollection about what Rachel Cherwitz said?
A Only by reading what is in front of the screen. I have no specific memory of this text message thread.
Q Okay. You can set that down.
As a general matter, what did Rachel Cherwitz discuss with respect to beasts?
A We all believed that the beast should be seen, acknowledged and understood.
Q What does that mean?
A By hiding this part of ourselves, it is goes to what is called their shadow. The shadow is the part of our systems that are unseen. And if left unconnected to, it can do things undeliberately and unconsciously.
Q And so can you put that in more concrete terms?
A Parts you don't pay attention to can show up in a moment of anger or frustration. And if you don't connect to, quote, "the beast", then the beast can come out in ways that you don't want it to come out.
Q And did Rachel Cherwitz discuss letting beasts roam free?

A Yes.
Q What did that mean?
A That meant that we spent the time to understand our own beasts so we could become more connected to them, to have a more conscious relationship with them.
Q Mr. Kandell, I think you testified earlier that at some point in your tenure at OneTaste, OneTaste opened branches in other cities, correct?
A Yes.
Q Which cities?
A New York was first, then Austin, London, New York, Los Angeles, Philadelphia, Las Vegas.
Q Were you familiar with any in Colorado?
A Boulder, excuse me.
Q Did there come a time where certain of those cities closed down while you were at OneTaste?
A Yes.
Q Approximately when was that?
A Later, late 2013, maybe 2014.
Q Without getting into the details, did those closures happen because of an allegation of misconduct in Austin?
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to the leading.
THE COURT: Sustained.
Q Well, why did those cities close down, Mr. Kandell?

A Well, specifically they didn't close down, we released them from us running those cities.
Q And why did that happen?
A Several things. One was we wanted to focus on the core business. Austin was a challenging city in terms of management and personnel. And it was very hard to build our core business of the larger scale programs when we were also responsible of the minutia of running the cities.
Q What about with respect to Boulder?
A Boulder we worked out of something called the Integral Center. And the members of the Integral Center rejected us teaching and having our classes and sessions there.
Q You testified earlier that the company started making a profit in approximately 2012. Do I have that right?
A Yes.
Q Did there come a time when the company's business model changed?
A Yes.
Q When was that?
A March 2012.
Q And what happened in March 2012?
A Nicole and Ken Blackman took a walk on the beach and came back and decided to move it from a service-based organization to a sales-based organization.
Q What do you mean by service based versus sales based?

A The intention of the company. The intention up to that point was of being one of service to the world, to bringing this technology to them, to make the world a better place. And unfortunately, that led us to eight years in the red and the debt we discussed previously.
And so turning it into a service organization -- a sales organization, was changing the focus to increase our sales.
Q And when you say bringing this technology, what technology are you talking about?
A The OM technology, the language of the courses, all the work we've done to building the courses.
Q By OM technology, do you much mean the practice of orgasmic meditation?
A Yes.
Q What role did you have in March of 2012?
A I was still Chief Operating Officer.
Q After the company's business model changed, did you become familiar with the concept of sales goals?
A Yes.
Q What are those?
A We set a specific goal per day of how much sales we made for that day cash in.
Q When you say we set it, who set them?
A Nicole Daedone.
Q Who implemented them?

A Rachel Cherwitz.
Q And at that time -- and throughout the entire time that you were with OneTaste, was Nicole Daedone running the company?
A Yes.
Q And at that time in 2012, what was Rachel Cherwitz's role?
A Head of sales.
Q Did that remain the case until you left OneTaste?
A Yes.
Q Based on your own personal observations, how did Rachel Cherwitz approach her role as head of sales?
A Passionately, all in, 100 percent.
Q You testified earlier regarding language that she would sometimes use with her staff; is that correct?
A Sometimes she would use that language, yes.
Q In what manner did she treat her staff?
MR. ROBOTTI: Objection.
Q Based on your own personal observations?
MR. ROBOTTI: Vague.
THE COURT: Sustained.
Q Did Rachel Cherwitz use shaming techniques with her staff based on your own personal observations?
MS. BONJEAN: Objection to the leading and --
MR. ROBOTTI: Vagueness.

MS. BONJEAN: -- foundation.
THE COURT: Sustained.
Q Mr. Kandell, in 2012, 2013 and until you left in 2014, did you have opportunity to observe Rachel Cherwitz interact with her staff?
A Yes.
Q In that time period, in what manner did she interact with her staff?
A She was everything. She was a passionate, inspiring leader. We've talked a lot about the negative terms, but she was also and incredibly dedicated, worked with people, were patient with people, wanted them to succeed, wanted the organization to succeed. At the best of times that's what came across. In the worst of times, she got annoyed because people weren't doing what they were doing or they were lazy or they were argumentative. And so the whole spectrum of what a sales manager has to deal with.
Q Did you observe Rachel Cherwitz direct individuals on her staff to engage in sexual acts?
A Yes.
Q In what incident instances?
A I have a memory directing two members of the staff go and have sexual relations because there was energy between them, negative energy between them.
Q Which members of the staff?

A If memory serves, it was Becky Uman and Ruwan.
Q Approximately when?
A Mid to late 2013.
Q Are there other instances in which she directed employees to engage in sexual acts?
A That's the one I can remember.
Q During the course of your time at OneTaste, did have you an opportunity to observe Nicole Daedone and Rachel Cherwitz's relationship?
A Yes.
Q What was that relationship like in the service phase of OneTaste that you've testified about?
A She was really inspired by Rachel, Nicole was inspired by Rachel and enjoyed, they had a deep friendship and deep mentorship. She can get annoyed with Rachel in terms of any business owner, but overall very positive, nurturing relationship.
Q What about with respect to when the company transitioned to a sales-base model?
A I think it was more of the same, probably higher stakes, more energy. Rachel was in an incredibly difficult position and she put everything she had, she worked harder than any of us, for sure. And I think Nicole put a lot of pressure on her to make those sales calls, especially as they got higher.
Q Was Nicole Daedone personally involved in the sales goals

set during the entirety of this later time period between March 2012 and until your departure in 2014?
A Yes.
Q Directing your attention to March 19, 2014, did you and Nicole Daedone have a conversation with regarding Rachel Cherwitz's involvement in sales on that date?
A I don't remember.
Q Is there anything that might refresh your recollection?
A Email.
Q I'd like to show you what is marked as Government Exhibit 1467-R, which is tab 47 in your binder. I'm going to ask that you first look at 1467-R. Does this refresh your recollection?
A Yes.
Q And just taking a step back and looking at Government Exhibit 1467-R, do you recognize this?
A Yes.
Q What is this?
A Text conversation between several people in the business.
Q Including yourself?
A Yes.
Q The portions in 1467-R that are not redacted, is this a fair and accurate copy of the text message conversation that you were a part of on March 19, 2014?
A Yes.

Q Who are the other participants in this conversation?

A Nicole Daedone, Rachael Hemsi, Joanna Van Vleck, Kenan Wang, Marcus Rathnathicam, Yia Vang, Kim Howerton, Rachael Hemsi.

Q I think you testified about most of those names, but who is Marcus Rathnathicam?

A A member of our staff.

Q Who is Kenan Wang?

A A member of our staff.

Q Is this a conversation generally pertaining to sales and the way sales were run at OneTaste?

A Yes.

Q Is that correct for the entirety of this conversation; that is physical here in 1467-R?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1467-R.

MR. ROBOTTI: We object on relevance, hearsay, and it's also not clear the witness is on most of this.

MS. BONJEAN: Additionally, your Honor, we object to the portion that actually includes Mr. Kandell, which is on page two.

MS. BENSING: May I respond, your Honor?

THE COURT: Yes.

MS. BENSING: The witness has already testified that

he was a participant to this text message conversation. With respect to hearsay, obviously this contains statements of a party opponent. The Government is admitting those statements for the truth.

The remainder of the statements, the Government is seeking to admit only for context.

MS. BONJEAN: We maintain our objections. Also on --

THE COURT: Sustained.

BY MS. BENSING:

Q Mr. Kandell, does this refresh your recollection regarding statements that Nicole Daedone made about Rachel Cherwitz's role in March of 2014?

A Yes.

Q Did she indicate at that time that she runs Rachel and Rachel runs the team?

A Yes.

Q What does that mean?

A Nicole was the boss and Rachel was a manager of sales, so as an organization, that's the reporting structure.

Q What, if anything, did she say at that time about who the top salespeople at OneTaste were?

A Probably her and Rachel.

Q If you need to review the document to refresh your recollection, you can take your time.

A Rachel, Eli and Rachael Hemsi.
Q Are you familiar with the term hunter?
A Yes.
Q How, if at all, was that term used at off OneTaste?
A To described our salespeople and our sales lead generators.
Q In March of 2014, did Nicole Daedone describe that the two biggest hunters were Rach and herself?
A Yes.
Q Who is Rach?
A Rachel Cherwitz.
Q Mr. Kandell, did implementation of sales goals in or around March of 2012 have an impact on employees, based on your own personal observations?
A Yes.
Q In what way?
A It inspired us, it moved it, it got us excited in the positive; and in the negative it stressed us out.
Q What, if any, involvement did you have in setting sales goals?
A None.
Q Would you -- did you report to Rachel Cherwitz or Nicole Daedone the business' cash flow needs throughout this time period?
A I did.

Q Did you come to learn what impact that had on setting sales goals?
A Yes.
Q What impact did that have?
A The cash needed to dictate or educate the sales leads on what the sales goals should be.
Q You've testified already about the coaching program. What, if any, other courses did OneTaste develop while you were at OneTaste?
A We had an Introduction To OM, a one-day course. We had two-day courses like Ten Women Want You To Know. We had communication courses. We had men's retreats or men eight-week courses. We had online virtual courses. We had the Coaching Program. We had the Mastery Course, which was multi-month, expensive course about sexuality. We had Man Woman courses. Probably a dozen others I can't remember at the moment.
Q I want to ask you about how employees were paid at OneTaste. In your role as I think you said COO, were you one of the individuals responsible for payroll?
A I was responsible.
Q And in the earlier years at OneTaste when you were living at Warehouse, which I think you said was approximately 2007 to 2008; is that correct?
A We moved into the Warehouse mid 2006 and left at the end

of 2008.
Q How were employees paid during this time period?
A Mostly as independent contractors. I think there might have been a period of time they were paid as W2.
Q I think you testified earlier that with respect to at least some people, Reese Jones paid them?
A Yes.
Q Did there come a time when that changed?
A Yes.
Q What happened?
A There were periods of time where we were doing the W2 proper contracts and paying. At other points we would fire everyone as W2s and pull them out as independent contractors, then back to W2s again.
Q Why all the changes?
A Based on the cash flow that we had, the expense of employees and other factors.
Q Did the company also rely on volunteers?
A We did.
Q In what way?
A Volunteers were just the back bone of the organization. They would come for a couple hours to support a course, to help out on in the book store, the cafe. They just wanted to be in the environment, so they would come watch the courses from the back. Some people would volunteer all weekend.

Q You testified with respect to that March 2012 shift in the OneTaste business model. How were OneTaste employees being paid prior to that shift?
A As W2 employees.
Q And what happened after that shift?
A We fired or we terminated all the W2 employees, and just took on several people as independent contractors, and most of it was based on sales commissions.
Q Are you familiar with work/trade arrangements at OneTaste?
A Yes.
Q What were those?
A You could take a course and trade it for physical labor or sales commissions.
Q Were those arrangements reported to the IRS in any way?
A They were not.
Q What about State Department of Labor?
MR. ROBOTTI: Objection, relevance.
THE COURT: Response?
MS. BENSING: Your Honor, this is directly relevant to the management of payroll, which goes to the labor and services in this case.
MR. ROBOTTI: 403, your Honor.
MS. BONJEAN: And 404(b).
THE COURT: Overruled.

BY MS. BENSING:

Q Did you report these work/trade arrangements to the IRS?

A We did not.

Q What about State Department of Labor?

A We did not.

Q I'd like to show the witness only what is marked as Government Exhibit 826, which is tab 77 of your binder.

A I think this is just 76 in here -- sorry, I got it. Thank you.

Q Do you recognize this?

A Yes.

Q I'm going to ask, there are two pages, so turn to the second page. Do you recognize this?

A Yes.

Q What are these?

A Organizational charts.

Q Of what?

A OneTaste Incorporated and 1080 Folsom Caravan Retreats.

Q Approximately what year?

A March 2011.

Q Is this a fair and accurate copy of that OneTaste organizational chart in March of 2011?

A Yes.

MS. BENSING: Your Honor, we move to admit Government Exhibit 826.

MS. BONJEAN: No objection.

MR. ROBOTTI: No objection.

THE COURT: 826 is admitted.

(Government Exhibit 826, was received in evidence.)

MS. BENSING: If we can publish this to the jury.

BY MS. BENSING:

Q Mr. Kandell, I'm going to ask that you walk the jury through the top half of the chart.

A Nicole is CEO, Yia as her executive assistant, myself as head of operations, Justine Dawson as head of curriculum, Alicia Price as head of sales, Joanna Van Vleck as head of marketing and development, Kelly Notaras as head of content.

Q And that's the individual you testified was Nicole Daedone's ghostwriter earlier?

A Yes.

Q There are at least two individuals on page one that are designated by the color yellow. What does that mean?

A Volunteer.

Q But they are on OneTaste's organizational chart?

A Yes.

Q There are several individuals who are designated as work/trade --

A Yes.

Q -- in green; is that correct?

A Yes.

Q Who are the individuals who were designated as work/trade?
A Keith Paolino, Maddie Carl, Audrey Wright, Michelle Wright.
Q If you can turn to the second page, please. What does this second page depict?
A The 1080 Folsom organizational chart.
Q Who is at the top of that chart?
A Nicole and myself.
Q And below you two?
A Rachael Hemsi.
Q Again, are there some people who are designated as work/trade and some as volunteers on this organizational chart?
A Yes.
Q We can take that down.
Mr. Kandell, are you familiar with the process of obtaining commissions at OneTaste?
A Yes.
Q Who handled commissions?
A I handled the payments, the organization of the commissions.
Q How did -- what was at model at OneTaste when you were handling commissions?
A You were paid a percentage of the gross income of the sale.

Q I think you testified earlier that there were periods where individuals were paid only by commission; is that correct?
A Yes.
Q I want to show you what is marked as Government Exhibit 1331-R-B, which is in tab 36 of your binder-- 1331-B-R. Do you recognize this?
A Yes.
Q What is this?
A Text message thread.
Q Is this a text message thread dated October 16, 2013?
A Yes.
Q Who are the participants to this text message thread?
A In this redacted version?
Q Yes, in this Government Exhibit 1331-B-R.
A Rachel Cherwitz, Yia Vang, the same London number, myself, Ken Blackman, Yia Vang.
Q I think you testified earlier regarding at least one demonstration. Are you familiar with the term demo as used at OneTaste?
A Yes.
Q What is a demo?
A It was a demonstration of orgasmic meditation that we did at an individual class or part of the introduction to OM.
Q In or around October 16, 2013, did you have a discussion

with Rachel Cherwitz and the other individuals listed in this exhibit regarding a demo in New York City?

A Yes.

Q Is that what is discussed in the entirety of what is visible here in 1331-B-R?

A Yes.

Q Is it a fair and accurate copy of discussions regarding that demo as of that date?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1331-B-R.

MR. ROBOTTI: We object on hearsay and relevance.

MS. BONJEAN: Join.

THE COURT: Do you want to respond on relevance, Ms. Bensing?

MS. BENSING: Yes, your Honor. There have been numerous witnesses who have testified about demo in New York City in October of 2013, and this is a discussion of that, your Honor, and so I think it's directly relevant to other witness's testimony.

In addition, with respect to hearsay, the Government is seeking to admit Rachel Cherwitz's party opponent statements. And the remainder of the statements are not admitted for the truth, but solely on the effect on Rachel Cherwitz and context.

THE COURT: Overruled.

Exhibit 1331-B-R is admitted.

(Government Exhibit 1331-B-R, was received in evidence.)

MS. BENSING: Thank you.

BY MS. BENSING:

Q If we can publish this to the jury. If we can zoom in on the top.

Mr. Kandell, does Rachel Cherwitz write: Hey guys, can we talk about NYC demo? I was thinking Pix and Eli. I want all those girls on the table.

A Yes.

Q Who is Pix?

A Margaret Pixley.

Q Who is Eli?

A Eli Block.

Q And going down to the next portion below the redaction. We can blow that up.

Does Rachel Cherwitz then state: Chelsea good. I want those three to start rotating. How is Summer's orgasm as well?

A Yes.

Q How do you respond, Mr. Kandell?

A I don't think I've ever stroked her. It always seems quiet.

(Continued on next page.)

DIRECT EXAMINATION (Continues)
BY MS. BENSING:
Q And then does an individual named Ken Blackman respond?
A Yes.
Q What role did Ken Blackman have at OneTaste at that time?
A He was a teacher and termed the Master Stroker.
MS. BENSING: And I'd like to blow up the portion of the conversation beginning at 13:52:16 where Rachel Cherwitz is speaking.
Q Is there discussion then between Rachel Cherwitz and Ken Blackman regarding Orgasm?
A Yes.
Q And what does this pertain to, Mr. Kandell?
A They're talking about the ability to transmit the orgasm.
Q In what context?
A In the demo.
Q And why was the ability to transmit orgasm important in a demo?
A We wanted the participants to be able to feel the energy of the orgasm sitting in their seats.
Q And were demos used as a means of sales?
A Yes.
Q In what way?
A Sales and or -- sales and demonstration of what was possible.

Q And so sorry. In what way were they used as a means of sales?
A People saw what could be possible. They felt what was possible, and then they were inspired that they could do it.
Q And how did that pertain to sales?
A Then they would take a course.
MS. BENSING: We can take that down. Thank you.
BY MS. BENSING:
Q I'd like to show you what's been marked as Government Exhibit 1331-A-R. So it's the tab right before that.
Do you recognize this?
A Yes.
Q And what is this?
A Text message between several members of the staff.
Q And is this a different portion of the same text conversation that we were just looking at?
A Yes.
Q And is it a fair and accurate copy of this other portion of the same text message exchange that you just testified about?
A Yes.
Q So, the exchange on October 16th, 2013?
A Yes.
Q And involving substantially the same participants?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1331-A-R.

MR. ROBOTTI: We object on the same grounds, Your Honor; hearsay, relevance.

MS. BONJEAN: Join.

THE COURT: Overruled.

Government Exhibit 1331-A-R is admitted.

(Government's Exhibit 1331-A-R was received in evidence.)

MS. BENSING: Thank you. And if we could, please, publish this to the jury.

(Exhibit published.)

MS. BENSING: And starting at the very top, if we can please blow up the very top.

BY MS. BENSING:

Q Does Rachel Cherwitz write: Who are all of our salespeople on staff? I wold up this morning thing that everyone needs their next level of training?

A Yes.

MS. BENSING: And then if we can please go down to the portion beginning at 8:42:56.

Q Does Rachel then write the same thing?

A Yes -- well, no. She says: So who would we say are our salespeople?

Q I'm sorry. Do you have in front of you 13 --

A Oh, I see. There's several at 56.
Q Yes. So just looking at the top. Does Rachel Cherwitz again say --
A Yes.
Q -- who are all of our salespeople on staff? I wold up this morning thing that everyone needs their next level of training?
A Yes.
Q And then does she write: I want to start doing training like Rachel does for BoH?
A Yes.
Q What is BoH?
A Back of house.
Q Later at 8:42:56 does Cherwitz write: So who would we say are salespeople?
A Yes.
Q And does Yia Vang identify the salespeople?
A She does.
Q And does that include someone named Lianna?
A Yes.
Q Who is Lianna?
A Lianna Lifson.
Q Who is that?
A She was a member of our staff.
Q And does it identify somebody named Becky?

A Yes.
Q Who is that?
A Becky Uma.
Q And who is that?
A A member of our staff.
Q And does it identify somebody named Michelle?
A Yes.
Q Who is that?
A Michelle Wright.
Q And who is she?
A A member of our staff.
Q And does Justine then respond: You mean anyone who has potential?
And does Rachel then respond: No, anyone who is currently what we would consider salespeople?
A Yes.
Q And does Yia then write: These are our legal salespeople?
A Yes.
Q Do you then write: I think staff only, everyone else LG?
A Yes.
Q What do you mean by that?
A Lead generator.
Q And what is the difference between legal salespeople and lead generator?

A Lead generators are ones who go out and meet people at events and then bring them to salespeople for the sale.
Q Does Cherwitz then respond: People we actually pay to do sales?
A Yes.
Q And what did you understand that to mean?
A The sale -- the sales team.
Q And were there other individuals working at this time who were not paid to do sales?
A It seems that way. I don't know.
MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 1332-R, which is in Tab 37 of your binder.
BY MS. BENSING:
Q Mr. Kandell, do you recognize what's in 1332-R?
A Text message thread.
Q And is this from the day after the one we were just looking at, October 17th, 2013?
A Yes.
Q Who are the participants on this text message thread?
A Joanna Van Vleck, Rachel Cherwitz, myself, Ken Blackman, the London number, Yia Vang.
Q And is there additional discussion in this text message thread regarding OneTaste personnel and staffing decisions?
A Yes.

Q Including with respect to salespeople?
A Yes.
Q And does that constitute the entirety of the visible portions of 1332-R?
A Yes.
Q Is it a fair and accurate copy of text message correspondence between those individuals on October 17th, 2013 in which you were a participants?
A Yes.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 1332-R.

MR. ROBOTTI: Your Honor, we object to the irrelevant business banter and on hearsay grounds.

THE COURT: Sorry, I just didn't the end of that.

MR. ROBOTTI: The irrelevant business banter.

THE COURT: I heard that part, I thought you said something else.

MR. ROBOTTI: Oh, hearsay.

MS. BONJEAN: Join.

THE COURT: Give me one moment.

(Pause.)

THE COURT: Overruled.

Government Exhibit 1332-R is admitted.

(Government's Exhibit 1332-R was received in evidence.)

MS. BENSING: Thank you. And if we could, please, publish this to the jury.

(Exhibit published.)

BY MS. BENSING:

Q And, Mr. Kandell, I want to read this one out. So I'm just going to ask that you read the portions in which you are a participant, and I will read the remainder of the portions.

Okay?

A Yes.

Q Joanna Van Vleck: It's time to make some major changes. We've all been feeling it. Instead of moving people around, I would like to clear out the system. We are bloated and can't get moving to the speed we need to. Here is what I suggest, we cut the following people: Summer, Casey, Erica, Chelsea, Becky, Ruwan, Peter, Hamza. We take these people to part-time: Leah, Audrey, Billy, Michelle, Maya, Kim, Sasha, Keith. This would need to happen tomorrow.

Rachel Cherwitz: I'm in.

Rachel Cherwitz: I'm also going into the meeting now with Jennifer, so I will be offline for about 90 minutes.

A I disagree on many levels. It feels like panic.

Q Rachel Cherwitz: No one is panicking, Rob. We are waterlogged.

Joanna Van Vleck: It's about the energetics of it.

Joanna Van Vleck: We aren't juicing most of our

people and we can't get traction as a whole because we are heavy.

A I think we're stuck at the top, not at the bottom.

Q Rachel Cherwitz: Hey, Rob, listen to what Jo is saying, please.

A Okay.

Q Joanna Van Vleck: I agree. The top needs to speed up as well, myself included. And we are carrying too much.

Yia: I agree that we need to tighten up and system feel bloated. And we just hired all these people legally. And the issue is with not juicing them. There is a sweet spot between the two on how we do things and what's actually necessary.

Rachel Cherwitz: We would all do well to actually listen to each other when someone sees something. Joanna isn't just pulling this out of her ass.

Rachel Cherwitz: And FYI, Becky just informed us she is sick and contagious and will not be working today.

Joanna Van Vleck: We've been in this location before. Each time the system has slowed down and we've cut and things have gone to the next level. We are here again.

Ken Blackman: Some of the people you're pulling, there's stuff only they can do. Dropping them means dropping their projects. Hamza is one example. That's not necessarily bad, it's just there's stuff on our list that won't get done.

Maybe they won't need to be. But we can actually play it out and see what the effect will be and then decide if we want that.

A We also cut and do things illegally.

Q So let me pause there.

What did you mean by that?

A There's hired people as W-2 employees, if you fire them without cause or without documentation, even if they're an at-will employee, it can lead to backlash issues and attention from state agencies.

Q Do you then write: Our growth is based on very risky practices?

A Yes.

Q And what did you mean by that?

A Our growth is based on our sales practice and the courses that we teach, and the best way to protect the system was to fly under the radar of all these government agencies, specifically the ones for unemployment.

Q And so what risky practices were you referencing?

A I think our sales techniques, the way we paid people, the way we switched around 1099s and W-2s. Just how we consulted business as an organization.

Q And so what are some examples?

A We would hire people as independent contractors and then treat them like employees. There's a specific IRS checklist

that needed to be followed that we were not following.
Q And when you say you hired contract employees and treated them like W-2 employees, what did -- what do you mean?
A There are certain rules for how you treat independent contractors; direction, times of when they do their business, how they serve, what roles they play, and we were ignoring basically all the rules.
MS. BENSING: I'd like to go to the next page, please. And beginning at 9:46:32, can you blow that up?
(Exhibit published.)
BY MS. BENSING:
Q And I think you testified this individual Yia, is that Yia Vang?
A Yes.
Q Does Yia Vang then respond: I think we've gotten scarce and fearful of the 3-D legal stuff and it's outweighing what the purpose of what we actually do is. People are starting to use money as a way to threaten the flow of the orgasm. There's more in my head, but it's not coming clear just yet, along this line.
Does Joanna Van Vleck then respond: Agreed. This is about getting Orgasm flowing at the speed we need to move to the next level?
A Yes.
Q Mr. Kandell, what was Joanna Van Vleck's role at OneTaste

at this point in time?
A I believe she was president.
Q And what about Yia Vang?
A Yia Vang was Nicole's executive assistant, and also teacher and member -- member of the executive team.
MS. BENSING: I'd like to turn to the third page and publish the portion to the jury beginning at 19:34:34.
BY MS. BENSING:
Q What do you write, Mr. Kandell?
A FYI, if Keith tries to collect unemployment, it will be a problem since he was an IC for a long time.
Q And did Justine ask you: What kind of problem?
A Yes.
Q And what did you say?
A It could trigger some interest and it could lead to investigation. Don't know if he will, but it would be a rough spot if he does.
Q And does Rachel Cherwitz respond: Oh, my.
And then Joanna Van Vleck responds: About a list to cut from salary?
A Yes.
Q Is there also discussion below this regarding an individual named Becky being on probation?
A Yes.
Q And who is that a reference to?

A Becky Uma.

MS. BENSING: Okay. We can take that down. Thank you.

BY MS. BENSING:

Q Mr. Kandell, I want to talk about the tracking of expenses at OneTaste.

Were you involved in the tracking of expenses at OneTaste in your role as COO?

A Yes.

Q Who paid for Nicole Daedone's expenses?

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q In your role as COO, did you have an opportunity to observe who paid for Nicole Daedone's expenses?

MS. BONJEAN: Objection to the vagueness.

THE COURT: Sustained.

Q Mr. Kandell, in your role as COO, what, if anything, did you do to track expenses at OneTaste?

A At that point I was handling CFO responsibilities as well, and so myself and the Director of Finance, a gentleman named Aram, at this point we would track expenses. We would look at the books. We would look at the credit card usage.

Q And this is OneTaste's credit card and OneTaste's books, correct?

A Yes.

Q Did Nicole use, did Nicole Daedone use OneTaste's credit card for her own personal expenses?
A At times.
Q I want to ask you about an individual named Beverly Daedone.
Are you familiar with this person?
A Yes.
Q Who is that?
A Nicole's mother.
Q Did she make a salary at OneTaste?
A I believe we put her on salary at some point.
Q Do you recall when she was put on salary?
A I don't remember specifically.
Q Did she perform work for OneTaste?
A She -- not -- not directly, but she definitely supported Nicole.
Q Supported Nicole the way a mother would to a daughter?
A And beyond.
Q And what is the beyond?
A She would help her with business ideas and concepts, be a sounding board. So, on some level a consultant or advisor.
Q So a consultant or advisor personally to Nicole Daedone?
A Yes.
Q And what kinds of business decisions was she involved in, Mr. Kandell?

A I wasn't privy to those conversations.
Q So, as the COO of the company, you have no idea what Beverly Daedone did at the company?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection to leading.
MS. BONJEAN: Asked and answered.
THE COURT: Sorry, say again, Ms. Bonjean. I didn't hear the end.
MS. BONJEAN: I said objection to the leading and asked and answered.
THE COURT: Overruled. That means you can answer.
A I was not aware of the specific conversations between Nicole and Beverly.
BY MS. BENSING:
Q Did OneTaste ever come to have affiliates?
A Yes.
Q What is an affiliate?
A Affiliate is an organization that pays or has an agreement with a company to use various parts of the company, usually their name, their resources, things like the OM classes.
So, we had affiliates and we transitioned from cities that we ran to them becoming affiliates.
Q And approximately when did that transition happen?
A 2013.

Q And what were the affiliates that you were aware of?
A We started off with Austin. We then migrated Boulder, Las Vegas, Philadelphia. Those are the ones I remember from my tenure.
THE COURT: Ms. Bensing, in five minutes I am going to want to take a break.
MS. BENSING: Yes, Your Honor.
Q Mr. Kandell, you testified earlier that you left OneTaste in approximately 2014.
Is that correct?
A July of 2014.
Q How did that come about?
A I decided in July of 2013 that I wanted to change direction in my life.
Q And so why did it take you a year to leave?
A Several things.
One was the company wasn't ready for me to be gone. There was too much depending. There was too much in my head. People weren't trained.
And the second, that the company didn't have the funds for my buyout that I wanted.
Q Approximately what -- or what day did you resign, do you recall?
A Around July 14th, 15th, 2014.
Q Is there something that would refresh your recollection?

A Yes, an e-mail or text message thread.
Q I'm going to show you what's been marked as Government Exhibit 1589, which is Tab 49 of your binder.
And just review that and let me know if that refreshes your recollection as to the date that you left.
(Pause.)
A Yes.
Q What day did you leave?
A July 30th, 2014.
Q Sorry, is that July 31st?
A Well, it says I resigned as of last night, so....
Q Got it.
Did you enter into a Stock Redemption Agreement with OneTaste and Nicole Daedone when you left?
A Yes.
Q And what is that?
A It's the selling of my shares of the organization.
Q And what were the terms of the Stock Redemption Agreement?
A I was paid cash on a payment plan for my shares.
Q And approximately how much did you get for your shares?
A 1.3 million.
Q And that was the 50 percent of the shares that you owned in OneTaste, is that correct?
A OneTaste, Incorporated; Caravan Retreats, Incorporated;

and OneTaste Media.
Q That was for all of them?
A Yes.
Q Did you also receive a severance payment and a bonus when you left?
A I did.
Q And what was that, approximately?
A $386,000.
Q Do you remember that exactly?
A (No response.)
Q It was approximately around that amount?
A Yes.
Q Did you, in fact, receive the full amount of those payments in the ensuing years --
A I did.
Q -- after you left OneTaste?
A I did.
Q Did you later enter into another agreement with OneTaste and Nicole Daedone with respect to paying an additional sum to you?
A Yes.
Q And what was that?
A The agreement had stated -- the severance agreement had agreed that they would pay my 2014 taxes, and we had neglected to account for that. So once I read, reread the agreements,

we found the mistake and agreed to pay that off.
Q And how much was that for, approximately?
A $75,000.
Q What was revenue like at the time that you resigned from OneTaste, was the company profitable?
A Yes. 2014 I think the number was close to 4.1, 4.2 million top line. I don't know what the bottom line was at that point.
Q Mr. Kandell, who was on the leadership team when you left OneTaste?
A Myself, Justine Dawson, Ken Blackman, Joanna Van Vleck, Yia Vang, Rachael Hemsi, Rachel Cherwitz, I believe Eli Block, I believe Marcus Ratnathicam.
Q If you know, after you resigned who owned your shares in the company?
A I don't know.
Q Well, who did you turn your shares over to when you left the company?
A Technically, the -- the shares were rebought by the company. So, basically, it was a purchase agreement with me and the company.
Q Okay.
MS. BENSING: Your Honor, I just have a little bit left, but --
THE COURT: I think we should take a break. It's --

let me ask the witness to step down.

(Witness steps down and exits the courtroom.)

THE COURT: Okay. We are going to take a break until 5 minutes to 4:00.

Don't talk about the case. Keep an open mind. I'll see you in 15 minutes.

(Jury exits.)

THE COURT: Okay. I will see you at 5 minutes to 4:00.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: All right. We can bring back the witness and the jury.

(Witness entered and resumed the stand.)

(Jury enters.)

THE COURT: Everyone may be seated. And, Ms. Bensing, you may resume your examination.

MS. BENSING: Thank you very much.

I'd like to pull up what's in evidence as Government Exhibit 208.

(Exhibit published.)

BY MS. BENSING:

Q Do you recognize this person, Mr. Kandell?

A Yes.
Q Who is this?
A Christina Berkley.
Q Did you have a sexual relationship with Christina Berkley while she was at OneTaste?
A I did.
Q Was that outside of the OM practice?
A Yes.
Q And did that include the OM practice?
A Yes.
Q And were you her superior at OneTaste at the time?
A Yes.

MS. BENSING: I'd like to pull up Government Exhibit 408.

(Exhibit published.)

Q Do you recognize this person?
A Michelle Wright.
Q Did you work with her at OneTaste?
A Yes.
Q Did you have a sexual relationship with her while she was at OneTaste?
A Yes.
Q Including outside of the OM practice?
A Yes.
Q Were you her superior at OneTaste?

A Yes.

MS. BENSING: I'd like to pull up Government Exhibit 297.

(Exhibit published.)

BY MS. BENSING:

Q Do you recognize this person?

A Yes.

Q Who he is this?

A Dana Gill.

Q Did you work with her at OneTaste?

A No.

Q How do you know her?

A She was a member of the community.

Q At OneTaste?

A Yes.

Q Did you have a sexual relationship with her while she was a member of the community at OneTaste?

A Yes.

Q Including outside of the OM practice?

A Yes.

Q And including the OM practice?

A Yes.

Q And what role did you have at OneTaste when you had a sexual relationship with her?

A Chief operating officer.

MS. BENSING: I'd like to pull up Government Exhibit 260.

(Exhibit published.)

BY MS. BENSING:

Q Who is this?

A Lianna Lifson.

Q Who is that?

A A member of OneTaste and staff member.

Q Did you have a sexual relationship with Lianna Lifson?

A Yes.

Q Including outside of the OM practice?

A Yes.

Q And including the OM practice?

A Yes.

Q And at the time were you her superior at OneTaste?

A Yes.

MS. BENSING: I'd like to pull up Government Exhibit 382.

(Exhibit published.)

Q Did you recognize this person?

A Yes.

Q Who is this?

A Becky Uma.

Q And how do you know her?

A She's a member of the community.

Q At OneTaste?
A Yes.
Q Was she also employed by OneTaste?
A Yes.
Q Did you have a sexual relationship with her?
A Yes.
Q Including outside of the OM practice?
A Yes.
Q And including the OM practice?
A Yes.
Q And were you her superior at OneTaste at the time?
A Yes.

MS. BENSING: I'd like to pull up Government Exhibit 265.

(Exhibit published.)

BY MS. BENSING:

Q Do you recognize this person?
A Yes.
Q Who is this?
A Margaret Pixley.
Q Who is that?
A A member of the community and a staff member.
Q At OneTaste?
A Yes.
Q Did you have a sexual relationship with her?

A No.
Q Did you engage in the practice of orgasmic meditation with her?
A I don't believe so.
MS. BENSING: I'd like --
Q Do you recall one way or the other?
A I don't believe so. I would say no.
MS. BENSING: I'd like to pull up Government Exhibit 228.
(Exhibit published.)
BY MS. BENSING:
Q Do you recognize this person?
A Yes.
Q Who is this?
A Brooke Scheffer.
Q And who is that?
A She was a student and eventual owner of OneTaste New York.
Q And did you have a sexual relationship with her?
A Not outside the OM practice, during OneTaste.
Q Did you after you left OneTaste?
A Yes.
Q And when -- did you engage in orgasmic meditation with her while she was at OneTaste?
A Yes.

Q And at that point in time were you her superior at OneTaste?
A No.
Q Is that because she was a community member?
A Yes.
Q And what was your role at the time?
A In the community?
Q At OneTaste.
A Oh, chief operating officer.

MS. BENSING: I have no further questions.

THE COURT: Mr. Robotti, any cross-examination?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Okay, go ahead.

CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon, Mr. Kandell.
A Hello.
Q So, Mr. Kandell, you were a co-founder of OneTaste, is that correct?
A Yes.
Q And you started it with Nicole Daedone, is that right?
A Yes.
Q And that was at about 2004?
A OneTaste -- yes.
Q And you left in 2014, correct?

A Yes.
Q So you were there for about ten years in total?
A Yes.
Q And fair to say you wore many hats at OneTaste?
A Yes.
Q Among your titles, you were a major shareholder, correct?
A Yes.
Q Chief financial officer?
A Yes.
Q Chief operations officer?
A Yes.
Q And so it's fair to say you were one of the top leaders of the company, correct?
A Yes.
Q Now, you're testifying pursuant to an Order of Immunity today, is that right?
A Yes.
Q And the Government obtained that Order?
A Yes.
Q And the purpose of that Order is to permit the Government to call you to testify at this trial, correct?
A Yes.
Q And the Government has agreed not to use any of your testimony today against you, is that right?
A Yes.

Q And the Government also separately agreed not to use any statements you made at meetings with the Government against you, correct?
A Yes.
Q Now, in connection with the Government's grant of immunity, you did not admit to committing any crime, is that correct?
A That is correct.
Q And, in fact, you deny committing any crime, correct?
A Yes.
Q And you maintain your innocence, correct?
A Yes.
Q So, you are not here today to testify that you committed a crime while you were on the OneTaste, correct?
A Yes.
Q You are not here today to testify that you committed a crime with Rachel Cherwitz, correct?
A Yes.
Q And you are not here today to testify that you committed a crime with Nicole Daedone, correct?
A Yes.
Q You are, obviously, not on trial here today, correct?
A That is correct.

(Continued on the following page.)

BY MR. ROBOTTI: (Continuing.)
Q And because you have not been charged with any crime, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, on December 19th, 2024, in explaining how OneTaste works to the Government, you used an analogy to CrossFit. Do you recall that?
A I do.
Q And in general, you found it useful to use CrossFit as a comparison to explain OneTaste, correct?
A Yes.
Q And you've taken CrossFit yourself, correct?
A I did.
Q So CrossFit is a fitness class you take when you want to get into great shape, correct?
A Yes.
MS. BENSING: Objection. Relevance.
A Yes.
Q And there's a trainer or instructor with you in class?
A Yes.
Q And the trainers push you to your physical limits; is that right?
A Yes.

Q And that's how you grow your muscles?
A Yes.
Q And sometimes they're very tough on you and yell at you; is that correct?
A Yes.
Q And that helps you push yourself to get into great shape, right?
A Yes.
Q And you're making the choice to show up every day to be pushed; is that correct?
A That is correct.
Q And if you don't want to get pushed, you can leave, right?
A Yes.
Q But then you've made the choice not to get stronger through CrossFit; is that correct?
A Yes.
Q So OneTaste provided courses to help people get in sexual or spiritual shape; is that right?
A Yes.
Q And that's what the OM practice was designed to do, correct?
A Yes.
Q And that practice involved pushing people beyond their comfort zone, correct?

A Included pushing people past their comfort zone, yes.
Q And OneTaste was open about that fact, so people were advised of it going in, right?
A Once they got past the first course, yes. I'm not sure if that happened before the initial courses.
Q And as we'll get to later, they were consent forms laying out the nature of the course, correct?
A Yes.
Q And OneTaste pushed boundaries by trying to encourage people to have different sexual experiences than they were used to; is that right?
A Yes.
Q And oftentimes, that meant trying OM, the OM practice with a variety of partners, correct?
A Yes.
Q And sleeping next to someone different than you're used to?
A Yes.
Q And trying a sexual relationship with someone you weren't attracted to, right?
A Yes.
Q Or trying a sexual practice you had an aversion to?
A Yes.
Q And the idea was to challenge preconceived notions, correct?

A Yes.
Q And OneTaste programs also tried to encourage people to speak about sex differently, right?
A Yes.
Q And to discuss their desires differently, correct?
A Yes, sir.
Q And the idea was that by going beyond your boundaries, you believed that could lead to growth?
A Yes.
Q And you had experienced that the type of growth yourself, correct?
A Yes.
Q And while you were there, you woke up every day and chose to be apart of OneTaste, correct?
A That is correct.
Q Now, on direct, you said that some people on the internet called OneTaste a cult.
Do you remember that?
A I do.
Q And you have your own subjective definition of that term, right?
A I do.
Q And, in fact, you viewed the term cult to be more of a subculture; is that right?
MS. BENSING: Objection.

THE COURT: Overruled.
A I believe the word cult comes from the word culture, and it is the definition of a subculture and not a negative connotation.
Q And in your view, many other legitimate organizations and companies could be considered cults, right?
A Absolutely.
Q And you view CrossFit as a cult, for example?
A Definitely.
Q And when you say CrossFit is a cult, you don't think of that as a bad thing, right?
A Yes.
Q By cult, you mean an organization with its own subculture right?
A Yes.
Q And that speaks with a common lingo, correct?
A Yes.
Q Has a defined leadership, correct?
A Yes.
Q A hierarchy within the organization?
A Yes.
Q And it's own rules and regulations, right?
A Yes.
Q And as you said, you don't think that has to be a negative thing, right?

A Correct.
Q And, in fact, it can help people achieve positive things this in their life, right?
A Yes.
Q Just like CrossFit does, right? Is that correct?
A Yes.
Q And in terms of other organizations, for instance, you think Bikram yoga qualifies as a cult?
A Yes.
Q Veganism?
A Yes.
Q Pickle ball?
A Yes.
Q The Catholic church?
A Definitely.
Q And you also think of OneTaste as a cult in this positive sense, right?
A Yes.
Q Do you recall speaking about the benefits of the OM practice to a group of students during CP6 in 2013?
A Not specifically.
Q Well, at that time period around 2013, do you recall that you felt that before OneTaste, you were a nice guy who wasn't connected to his true feelings?
A Yes.

Q And that you had built up walls or layers preventing you from getting access to your true feelings?
A Yes.
Q And you felt that the practice had helped you shatter those walls and get access to your true self?
A Yes.
Q And you felt that the work you had done had helped you become a powerful person who affects lives?
A Yes.
Q And that as a result of that work, you genuinely liked yourself at that point?
A Yes.
Q And you believed you had taught others to do the same, correct?
A Yes.
Q And that you had affected their lives for the better, right?
A Yes.
Q And you believe the work at OneTaste was not easy, right, but it was worth it?
A Yes.
Q In your experience, the positive aspects of OneTaste significantly outweighed the negative aspects; is that correct?
A Yes.

Q In your experience, you believed that the vast majority of OneTaste customers found the practice beneficial?
MS. BENSING: Objection.
THE COURT: Sustained.
Q In your experience, did you have complaints from the vast majorities of customers at OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
Q In your experience, could you cherrypick a handful of people who had bad experiences over years?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Is it fair to say that anyone who had a bad experience could walk out the door and not come back?
A Yes.
Q And that applies for both students and employees, correct?
A Yes.
Q All right. So I'd like to back up and talk a little bit about how OneTaste got started. I know you've testified to this on direct, as well.
But is it fair to say that OneTaste was a startup company?
A Yes.
Q And a startup company is a new company founded upon an idea or product, correct?

A Yes.
Q And that's usually with limited funding?
A Yes.
Q But with a goal to work very hard and make sure the company is successful, correct?
A Yes.
Q Maybe even change the world?
A Yes.
Q And that's what you and Nicole set out to do back in 2004, correct?
A Yes.
Q You had a vision for a company and you threw yourself into it?
A Yes.
Q And there were stories of lots of famous startup companies to motive you, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q And your journey on this startup path really began at Burning Man, correct?
A Yes.
Q And you were leading what you thought was a vanilla life in San Francisco in 1998, correct?
A Yes.
Q You had a wife?

A I did.
Q You were well educated?
A Yes.
Q You had a degree in biomedical and electrical engineering from the University of Southern California?
A Yes.
Q A graduate degree from Drexel?
A Yes.
Q And you were working 70 to 80 hours per week at a corporate job, correct?
A During some of that time, yes.
Q And you were basically helping stock traders keep their computer platform working?
A Yes.
Q And fair to say you didn't like it?
A There were pros and cons.
Q So in 1998, you and your wife changed things up and you went to the Burning Man festival in the desert; is that correct?
A Yes.
Q And that was an eye-opening experience for you, right?
A Yes.
Q You had an honest conversation with your wife at Burning Man, correct?
MS. BENSING: Objection.

THE COURT: Overruled.
A Yes.
Q You both wanted more out of your sexual relationship than you were having, correct?
A Yes.
Q And you and your wife decided you wanted to explore different sexual experiences?
A Yes.
Q And you did that together for a few years afterwards, correct?
A Yes.
Q But you ultimately decided to go your separate ways in August 2003?
A Yes.
Q And you ended up meeting Nicole Daedone at a party at your house; is that correct?
A It was a group held by the Welcome Consensus in 1999.
Q And you said that was in December 1999, right?
A Yes.
Q And you were about 29 and Nicole was about 31?
A Yes.
Q And fair to say you two became fast friends, right?
A Yes.
Q And you ended up forming a close bond very quickly which became the foundation of your work together?

A Yes.
Q And what drew you to Nicole was her quick wit and intelligence?
A Yes.
Q And her insight into people, correct?
A Yes.
Q As you mentioned, you both participated in this organization, the Welcome Consensus; is that correct?
A Yes.
Q And that was an organization that taught courses and explored sexuality; is that right?
A Yes.
Q And you were involved in that organization until about 2001?
A Yes.
Q And then you and Nicole participated in it in and took classes within the organization known as More House; is that right?
A Yes.
Q And you were involved in that until December of 2001?
A No. We went to Hawaii in July of 2002 and participated with them until the end of the month, and then we would drop into various -- other things, but nothing significant past 2002.
Q And at Welcome Consensus, you and Nicole learned a

practice called deliberate orgasm?
A Yes.
Q And you practiced deliberate orgasm while you were at More House, correct?
A Yes.
Q And that practice is known as Doing?
A Yes.
Q And Doing was taught from a perspective of a man; is that right?
A Yes.
Q And Nicole had the idea to teach orgasmic meditation from the perspective of a woman; is that correct?
A Yes.
Q And is it fair to say it was primarily Nicole who reworked the practice, the Doing practice?
A I think she was the lead. But she definitely solicited ideas from many people.
Q Okay. And did that practice ultimately become known as OMing?
A Yes.
Q And Nicole incorporated other philosophies into that practice, including Buddhist principles?
A Yes.
Q And from your perspective, OM is meant to be more of a spiritual practice than a sexual practice, correct?

A Depends on the person. So for some, definitely, for some, no, it's mostly sexual.
Q And for you, you viewed it as more of a meditative practice; is that fair?
A I was kind of in the middle, towards the spiritual.
Q And the idea is, at least for some people, to meditate on the connection between two people?
A The idea was to use the meditative practice to feel and be aware of the connection between the two people.
Q Now, in 2003, you and Nicole were living in Brisbane, California, correct?
A Yes.
Q And you were housemates at that time, right?
A Yes.
Q And during these early years, you OMed together?
A It was called Doing at that point.
Q Okay. And did you also have a sexual relationship?
A Yes.
Q And around this time, you and Nicole decided to form an organization known as Insight Institute; is that correct?
A Yes.
Q And you taught workshops through the Insight Institute about communication and man/woman dynamics?
A Yes.
Q All right.

MR. ROBOTTI: I'd like it pull up what's been marked for identification as Defendant's Exhibit 4A1. This is just for the witness.

Q Do you see that on your screen, sir?

A I do.

Q Okay. And do you recognize, in Defense Exhibit 4A1, the top photograph, as you and Nicole Daedone?

A Yes.

Q And is this during the early time period at Insight Institute?

A Yes.

Q And then looking at the bottom photograph, do you recognize that as one of your early workshops at the Insight Institute?

A That was the first workshop.

Q And do you see yourself and Nicole Daedone in that photograph?

A Yes.

MR. ROBOTTI: Your Honor, the defense moves Defense Exhibit 4A1 into evidence.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 4A1 is admitted.

(Defense Exhibit 4A1, was received in evidence.)

MR. ROBOTTI: And can we publish to the jury.

(Exhibit published.)

Q And just again, for the jury, here, the top photograph is you and Nicole Daedone.
Is that teaching at the Insight Institute?
A Yes.
Q And the bottom is you during -- and you Nicole during the first workshop.
And can you identify yourself by touching on the screen there.
A (Witness complies.)
Q There's a blue dot on the third person from the left in the back, correct?
A Yes.
Q And is Nicole Daedone standing right next to you?
A Yes.
Q All right.
MR. ROBOTTI: We can take that down.
Q Now, you also had a website for Insight Institute?
A We did.
Q And so even early on, you all were trying to get the word out about what you were doing?
A Correct.
Q Now, around this time, Nicole had the idea to open a center; is that correct?
A Yes.
Q And the concept was an urban retreat center where people could come together to focus on their physical and mental

health?
A Yes.
Q You were a big fan of this idea?
A When she first came up with it, I didn't even know about it. She sort of came up with it, and once she reminded me of the concept, I was a fan of it.
Q And it ultimately inspired to you ditch your day job, right?
A Eventually.
Q And pretty quickly, Nicole found a two-story building in the south of the Market area -- or the South Market area of San Francisco, correct?
A Like the next day.
Q Okay. And you all signed the lease for 1074 Folsom Street in San Francisco in April of 2003?
A April or May of 2004.
Q Okay. And that's when you formed a company Caravan Retreats; is that correct?
A It was originally called Caravan Incorporated. It was later renamed Caravan Retreats.
Q And that did business as OneTaste?
A DBA OneTaste.
Q And the plan was to sell Insight Institute courses as part of this multiuse center, right?
A Yes.

Q And OneTaste, the name is a reference to a Buddhist poem, correct?
A Yes.
Q And the poem is, just as the great ocean has OneTaste, the taste of salt, so too does liberation, and the taste of truth, correct?
A Yes.
Q And the basic idea is that truth can lead to spiritual awakening or a spiritual truth?
A Yes.
Q Now, you and Nicole each owned 40 percent -- at that time, it was Caravan, correct?
A We owned 40 percent of what was Insight Institute, each, and then Allyson Wyenn 20 percent, and I believe Caravan was 50/50.
Q Okay. And as you testified on direct examination, you invested about $350,000?
A Yes.
Q And that was of a total of about $500,000 you had obtained from the sale of your house, correct?
A Yes.
Q So you invested about 70 percent of your assets in the company?
A Yes.
Q And to be clear, you all had no idea what you were going

to do with the center at the time, right?
A We had an idea.
Q Did you have a business plan to make money at that point?
A No.
Q But when you had was more of a group of like-minded people who had this concept, correct?
A Correct. We were enthusiastic, if not educated.
Q And it was an idea to focus on the practice of OM to help make people's lives better, correct?
A The center itself had multiple uses. Insight Institute was just, at that point, just one portion of it.
Q Okay. Is it fair to say that you and Nicole kind of dove into this headfirst and said we'll figure out how to make it work?
A Yes.
Q So this is a true startup company, right?
A Yes.
Q And for the next 12 months or so, you started brainstorming and planning how this was going to work, right?
A Yes.
Q And there's was kind of a certain amount of if-you-build-it-they-will-come mentality?
A Yes.
Q So the center was a 4,000-square foot building, correct?
A Yes.

Q And as you mentioned it held several different types of events?
A Yes.
Q Some of those activities were a book store, a cafe, a yoga studio, meditation, massage class, live events, private events?
A Yes.
Q Did I miss anything?
A And the Insight Institute classes.
Q OMing was still a new idea at the time, correct?
A Yes.
Q And as you mentioned, OM was practiced at the center?
A Yes.
Q And is it fair to say that you and Nicole tried just about everything to generate interest?
A Yes.
Q You would advertise, correct?
A Yes.
Q Throw parties and free or low-cost events?
A Yes.
Q And you'd show up every day at 8:00a.m. and do yoga in the hopes that people would come join you?
A Yes.
Q And eventually, people did start to come to the center, right?

A Yes.
Q And it started to grow.
MR. ROBOTTI: I'd like to show you a stack of photos here, and I think it's going to be easier for me to hand them up to you.
Your Honor, may I approach?
THE COURT: Yes. Are these in evidence or no?
MR. ROBOTTI: Not yet, Your Honor.
THE COURT: Okay.
Q All right. Could you just take a look through those photographs.
THE COURT: Would you just tell me the numbers.
MR. ROBOTTI: Apologies, Your Honor. I've shown the witness D84A4, DX4A2, DX4A5, DX4A6. That's it.
THE COURT: Thank you.
MR. ROBOTTI: And if we could pull up DX4A4 on the screen.
Q Okay. So do you recognize that as the inside of the center?
A I do.
Q Okay.
MR. ROBOTTI: Can we pull up DX4A2.
Q And do you recognize that as the outside of the center and various photographs of people at the center?
A I do.

MS. BENSING: And Your Honor, I'm just going to note that I don't have any objection to the admission of any of these, to the extent that that speeds things along.

MR. ROBOTTI: All right. So well that'll things along, Your Honor. We move to admit DX4A4, DX4A2, DX4A5, and DX4A6.

THE COURT: Okay. Defense Exhibits D84A4, DX4A2, DX4A5, DX4A6 are admitted.

(Defense Exhibits D84A4, DX4A2, DX4A5, and DX4A6, were received in evidence.)

MR. ROBOTTI: If we could publish to the jury. And can we just go back to 4A4.

Q So Mr. Kandell, is this the inside of the center?
A It is.
Q And going to 4A2.
And can you just walk us through those photographs, starting in the top left corner and going clockwise?
A It was a photo shoot for our first brochure outside the center, top left. Top right was our opening party. That's myself, Nicole Daedone and Allyson Wyenn. The group of people in lower right were the original crew that started the center, and the bottom left is DJ Gray, who supported our center.
Q Okay. And can we go to 4A5.
And what are these two photographs?
A Picture to the left is looking at the front of the

center, about halfway through, the picture to the right is you walk through the front door and see -- that was the first thing you saw.

Q And 4A-6.

A That was our yoga studio upstairs.

Q All right.

MR. ROBOTTI: And we can take that down.

Q So is it fair to say it was a big financial risk for you to put 70 percent of your assets into this center?

A Yes.

Q But you took that risk because you viewed Nicole as a visionary, right?

A I did.

Q And you believed the OM method could, in your words, free people from their self-imposed bondage around their sexuality?

A Yes.

Q And you believed OneTaste would become a successful startup through this practice, correct?

A Yes.

Q So would it be fair to say that the first few years of the business were tough?

A Yes.

Q And you were a new company trying to figure out its product and how to make money, correct?

A Yes.

Q And you were in the red pretty much every month?
A Yes.
Q Meaning, that you were losing money, right?
A Yes.
Q So to make money at the center, you all tried a variety of things, correct?
A We did.
Q You held courses, focused on communications, and relationships?
A We did.
Q Sold books and coffee?
A We did.
Q Rented out the venue for events?
A Yes.
Q But for the first few years, you all were not having a ton of luck bringing in customers, right?
A We had some, but not enough to get into the black.
Q But at that point, you didn't view this as about the money, right?
A The money was a concern, but it was about the purpose.
Q And the focus at the time was OM, that was that the mission, right?
A OM was in the background as very important. But we were also running a complicated center at the same time. So my attention was mixed and in both succeeding.

Q And even though the center wasn't really making money, you did have some success in building the community; is that fair?
A Yes.
Q Now, certain people who were focused on the OM practice decided to live together in the early days of OneTaste; is that right?
A Yes.
Q And before people -- 2006, people lived in three communal houses around Brisbane, California?
A Yes.
Q And in 2006, you rented a location at 1060 Folsom Street; is that right?
A Yes.
Q That was just down the street from the center?
A Yes.
Q And this is the building known as the warehouse, correct?
A Yes.
Q And you lived there for about two and a half years from June 2006 until December of 2008, correct?
A Yes.
Q And it averaged about 40 people living there during that time?
A Yes.
Q All right. I'd like to show you what is in evidence as

Defense Exhibit 4F. And this can go for the jury, as well. Now, is this a view from the loft of the warehouse?
A Yes.
Q And you can see on either side there's beds separated by curtains; is that correct?
A Yes.
Q And we saw earlier today in that diagram the Government showed you, there are also several rooms beside this one big room, right?
A Yes.
Q So it wasn't 40 people living in this space at once, right?
A Correct.
Q Now, in 2008, OneTaste rented a 45-room residential building, correct?
A Yes.
Q And that was at 1080 Folsom Street?
A Yes.
Q And this was a rundown building that needed a lot work, correct?
A Yes.
Q And you were the one who spearhead the rehab of that space?
A I did.
Q And you did that by scraping together money and

volunteers, correct?
A Yes.
Q And over time you were able to turn this into a pretty good place to live, right?
A Yes.
Q And by December 2008, OneTaste opened the residence at 1080?
A Yes.
Q At that time, OneTaste closed the warehouse, correct?
A Yes.
Q And some people from the warehouse, but not most people, moved over to 1080; is that right?
A A few people from the warehouse moved over, 13 of the 40 or 50 that were there.
Q And you were involved in managing 1080 throughout your time at OneTaste, correct?
A I was.
Q And generally, there was 30 to 60 people living there at a given time, right?
A Yes.
Q The 1080 was open for about six years until 2014, correct?
A Yes.
Q And you lived there on and off during that time period?
A Yes.

Q Both the warehouse and 1080 were communal homes?
A Yes.
Q And so that's basically like a college dorm, right?
A Yes.
Q And there were a lot of advantaging to living together like that?
A There was.
Q So like New York City, for instance, San Francisco was very expensive?
A Yes.
Q Living together allowed to save on present rent?
A Yes.
Q It allowed to pool resources for things likes food, electricity, heat, Wi-Fi, all those amenities?
A Yes.
Q Rent was also comparatively cheap compared to the rest of San Francisco?
A Yes.
Q And rent generally ranged from about 500 per month to about 1600 per month, correct?
A Yes.
Q But mostly, the rent was on the lower end of that scale?
A Yes. Just two rooms were higher than a thousand or two or three rooms.
Q There was also a communal kitchen for the house, correct?

A Yes.
Q And there was a meal plan that allowed people to buy into to get lunch or dinner every day?
A Yes.
Q Fair to say that everyone was asked to pitch in on chores?
A Yes.
Q And to contribute to the house in terms of cooking and cleaning?
A Yes.
Q There were also other advantages aside from just saving money, right?
A Yes.
Q So you would view this place as a lot of fun to live, right?
A Most of the time.
Q You've described it as a beautiful, incredible, intense experience, right?
A Yes.
Q Truly one of the greatest experiences of my life?
A Yes.
Q And you were so grateful you got to live in the riches of it because it was a magical experience?
A Yes.
Q And for you, part of what made this such an amazing

experience was the sense of community, right?
A Yes.
Q Most people there were also focused on bettering their lives through the OM practice, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Is it fair to say that the OM practice was the focus of the communal living then?
A Yes.
Q You got to connect with other people interested in that practice?
A Yes.
Q And you had sexual experiences with many other people there, right?
A Yes.
Q Just like a college dorm, there was a lot of drama, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes.
Q There were relationships issues, personal conflict, jealousy?
A Yes.
Q And you yourself spent a lot of time helping people sort

that out, right?
A Yes.
Q And part of the, you know, fun of living there was dealing with the drama?
A Yes.
Q That was, itself, what was made this part of the community, correct?
A Yes.
Q Aside from the drama, you would say there was a lot of laughing, parties, meditation, yoga, OMing, all sort of fun activities?
A Yes.
Q All right. I'd like to show you what's in evidence as Defense Exhibit 3DC and 3DA. Let's start with 3DC. So 3DC, what do you see there?
A 1080 Folsom.
Q And is that the top two floors of this yellowish building?
A Yes.
Q And below, there's a cafe there, correct?
A Yes.
MR. ROBOTTI: And can we look at 3DA.
Q And is this the interior of 1080?
A Yes.
Q And is this a communal dinner at the residence?

A Yes.
Q And these types of dinners happened often, correct?
A Nightly.
Q All right.
MR. ROBOTTI: I'd now like to show you what had been marked for identification as Defense Exhibit 4CR and then 4CS.
Q All right. And 4CR, do you recognize yourself in this photograph?
A I do.

(Continued on the following page.)

(Continuing.)

BY MR. ROBOTTI:

Q Is this a game with other 1080 residents?

A Yes.

Q And turning to 4CS. Do you recognize this as the kitchen at 1080?

A Yes.

Q Do you recognize the person in the photo?

A Yes.

Q Who is that?

A Johnny Tumelty.

MR. ROBOTTI: The defense moves to admit Defense Exhibit 4CR and 4CS.

MS. BENSING: The Government objects to 4C on relevance grounds. No objection to 4CS.

THE COURT: 4CS is admitted. And the objection of 4CR is sustained.

(Defense Exhibit 4CS, was received in evidence.)

BY MR. ROBOTTI:

Q If we can publish 4CS. Is this the interior of the kitchen at 1080?

A Yes.

Q Next I'd like to show you Defense Exhibit 1BG. If we can scroll down so the witness can review it.

THE COURT: Can you read that?

THE WITNESS: If you can make it big again and scroll that's great.

I remember what this is.

MR. ROBOTTI: I can walk over a copy.

THE COURT: I think it was too small initially, but you might as well give him one.

BY MR. ROBOTTI:

Q Mr. Kandell, do you recognize this as the house rules for 1080 Folsom?

A Yes.

Q Is this from the time period of about 2011 or 2012?

A That seems right.

Q And at this time you over saw 1080, correct?

A Yes.

Q And you were familiar with these rules in that capacity; is that correct?

A Yes.

MR. ROBOTTI: The defense moves Defense Exhibit 1BG into evidence.

THE COURT: I'm looking for it, do I have this somewhere?

MR. ROBOTTI: You should, but I can also hand up a copy.

THE COURT: Can you tell me where I have it? I have a big binder and a smaller binder, I don't think it's in

either one of these.

MR. ROBOTTI: It should be in the One Series, your Honor. I'll hand up a copy.

THE COURT: I don't think I have it. Thank you. You just offered this?

MR. ROBOTTI: Yes, your Honor.

THE COURT: Give me a moment.

MS. BENSING: The objection is as to the establishment of the time period in which this was used.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Mr. Kandell, do you recognize the name Maddie Carl?

A I do.

Q Do you recall what time period she lived at 1080 Folsom?

A Maddie came in late 2010, and she was doing work/trade according to those org charts we looked at, so I would bet it's mid 2011.

Q And Maddie was involved in the day-to-day operation of 1080 Folsom?

A Yes.

Q And Maddie Carl is listed as a point of contact on this document, correct?

A Yes.

MR. ROBOTTI: The defense renews its offer of Defense Exhibit 1BG.

MS. BENSING: No objection.
THE COURT: It's a two-page document.
MR. ROBOTTI: It is.
THE COURT: Defense Exhibit 1BG is admitted.
(Defense Exhibit 1BG, was received in evidence.)
MR. ROBOTTI: Thank you.
BY MR. ROBOTTI:
Q And if we may publish this to the jury.
I want to walk through a couple of portions that are highlighted on your copy. Looking under house rules in the first sentence there, is it correct that 1080 Folsom was an alcohol, smoke and drug-free building?
A Yes.
Q Then going down to communication. Fair to say there was a Google group called 1080 Google group for the residents?
A Yes.
Q And under that same heading, communications, the last sentence there was a mandatory monthly house meeting; is that correct?
A Yes.
Q Down under guests, it says, guests may stay, the last sentence: Guests may stay up to a maximum of up to eight days?
A Yes.
Q So outside guests were permitted at 1080, correct?

A Yes.
Q Outside guests did come and stay at 1080, correct?
A Yes.
Q Then under Internet and WiFi there was WiFi provided by 1080; is that correct?
A Yes.
Q Then turning to the next page, under meals. Here it describes the monthly food plan for lunch and dinner served five days a week that people could buy into correct?
A Yes.
Q If we could pull up the last section highlighted here, orgasmic meditation. Here the house rules explicitly state that orgasmic meditation is available at 1080, correct?
A Yes.
Q There was group practice twice every day, correct?
A Yes.
Q And most people who live there had participated, correct?
A Fifty, 60 percent.
Q But not everyone participated?
A Correct.
Q But it was certainly no secret, the practice of orgasmic meditation was a part of living at 1080, correct?
A Yes.
Q It's right there in the house rules, right?
A Yes.

Q For the court reporter we need a yes or no.
I'd like to show you next what is in evidence as Government Exhibit 3500-RW-12. Aside from 1080, there were other people who practiced OM who wanted to live together, correct?
A Yes.
Q There were a few locations like 1080 that were actually operated by OneTaste, correct?
A Yes.
Q But there were other locations that were just organized by community members who practiced OM?
A Yes.
Q Looking at this document in front of you, OneTaste put together an OM residential handbook, correct?
A Yes.
Q These were general guidelines for living in an OM house; is that right?
A Correct.
Q This guide had a set of ground rules for how the houses were supposed to operate, correct?
A Yes.
Q All right. So I want to go through some the categories here. On the very top, there is rules of play. If you can highlight that. That sets out general ground rules, correct?
A Yes.
Q Then below that there is staying connected. This section

encourages the members of the OM house to stay connected to with each other, correct?
A Yes.
Q Then below that there is use of safe words. This section sets out the green, yellow, red scale; is that correct?
A Yes.
Q We'll talk more about that in a bit. Are you familiar with that scale from your time at OneTaste?
A Yes.
Q That's something borrowed from the BDSM community, correct?
A Yes.
Q If you can turn to page two of this document. At the bottom there, under residential practice, it sets forth various expectations for living in an OM house, correct?
A Yes.
Q One of those expectations is a daily OM practice, correct?
A Yes.
Q There is also under movement it's recommended that people participate in Bikram yoga; is that right?
A Yes.
Q If we can turn over to page three. Just highlight the top three sections there.
There is also a discussion of participating in regular fear

inventory, correct?
A Yes.
Q And journaling?
A Yes.
Q And attending TurnON events, correct?
A Yes.
Q So all of this is set forth right in the house rules, correct?
A Yes.
Q Just turning lastly to page four. Under safer sex STI it is recommended that OM house residents engage in safe sex practices, correct?
A Yes.
Q We can take this document down.
So regarding the fear inventory. That's something that is based on 12-Step programs, correct?
A Yes.
Q There is a daily practice of fear inventory in such programs, or regular practice?
A 12-Step programs are all different; some have daily practices, some don't.
Q The idea borrowed from those practices is that you write down your fears so you get to know them, correct?
A Yes.
Q The idea you is dig into your fears by naming them,

right?
A Yes.
Q And you write the inventory, then you say it out loud to someone else, correct?
A Yes.
Q Then you rip it up?
A Yes.
Q So renting 1080 was a source of income for OneTaste?
A Yes.
Q That helped sustain OneTaste in the early years?
A Yes.
Q Even with that income, is it fair to say that OneTaste was still struggling?
A Yes.
Q You and Nicole almost walked away from the business entirely in 2008, correct?
A Yes.
Q But instead of doing that, you all decided to recommit and try to take it to the next level; is that right?
A Yes.
Q You talked a little bit about this on direct examination, but in 2007 you realized that OneTaste needed to have a clearer distinction between its community and its business; is that right?
A Yes.

Q So for example, do you recall an email you sent on November 7, 2007 discussing this topic?
A Not specifically.
Q I'm going to show the witness Defense Exhibit 4H. If you want to take a moment and read over that.
A I remember it now.
Q Putting aside the document. Is it fair to say that at that time you expressed your opinion about the need to --
MS. BENSING: Objection, calls for hearsay.
THE COURT: I have to hear the question first. You can continue the question.
BY MR. ROBOTTI:
Q Fair to say that you expressed your views at that time that you needed to separate the community of people who practiced OM from the OneTaste business?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Did you hold the view at the time that you needed to have that separation?
A Yes.
Q At that time you had a tight-knit community of about a hundred people?
A Yes.
Q Is it fair to say you realized to grow the business you

needed more of a structure for the people who were interested in the practice?
A Yes.
Q And at this time, in 2007, your view is that you needed to take concrete of steps forward to separating the community and the business?
A Yes.
Q In your view you had kind of a Land of Misfit Toys on one side and the people who wanted to focus on the business on the other side?
A That is something I would say, yes.
Q And you viewed the distinction between party throwers and party goers, right?
A Yes.
Q Party throwers were the ones who wanted to help the business grow, correct? And party goers were the ones who just wanted to be there for the community and the parties, correct?
A Yes.
Q But you were trying to identify people that would help take OneTaste to the next level, right?
A Yes.
Q Fair to say there were certain people in the OneTaste community who simply did not want to work that hard?
A Yes.

Q And that was something that OneTaste struggled with throughout your time there, correct?
A If they were a member of the staff, yes. If not, then they were hopefully paying customers.
Q So with members of the staff, OneTaste often had an issue of people not wanting to --
MS. BENSING: Objection as to which people.
THE COURT: Yes. Sustained.
BY MR. ROBOTTI:
Q During your time there, you viewed it as an issue that some people did not want to work that hard?
A Yes.
Q So you did put in place this separation between the business and the community, correct?
A Yes.
Q And as you said on direct examination, it still remained a little bit blurry throughout you're time there, right?
A Yes.
Q But it was a structure that you tried to put in place?
A Yes.
Q Fair to say that the company did become more structured over time?
A Yes.
Q And that was part of a startup, growing up at a company, correct?

A Yes.

Q By 2006 you and Nicole had met Reese Jones?

A Yes.

Q And at the time, you needed seed money beyond the initial investment that you put in from the sale of your house, right?

A Yes.

Q And Mr. Jones offered to help out, correct?

A He did.

Q Mr. Jones was a wealthy person at the time?

A Yes.

Q To your knowledge he was a millionaire who had started various networking companies?

A Yes.

Q It was your understanding that Mr. Jones invested in various startup companies not just OneTaste, correct?

A Yes.

Q Mr. Jones had come to some OneTaste courses, correct?

A Yes.

Q He had a relationship with Nicole Daedone?

A He did.

Q And he agreed ultimately to help out the company, correct?

A Yes.

Q And that was not just with money, but as you testified on direct examination, as a mentor and as someone who could give

advice?
A Yes.
Q Over time that investment accumulated in terms of money to about $800,000, right?
A That's my memory.
Q Between 2006 and 2011, correct?
A Yes.
Q On top of the cash, Mr. Jones also contributed to purchasing equipment, correct?
A Yes.
Q And he also paid some OneTaste personnel directly such as to produce media, correct?
A Yes.
Q There was the financing that helped keep OneTaste afloat during these early years, right?
A Yes.
Q But by 2012 the company had fully paid back what was, in your view, was the total amount owed, correct?
A Yes.
Q By 2009 there was a lot of interest in OneTaste?
A Yes.
Q And OneTaste needed to figure out how to translate that interest into revenue, correct?
A Yes.
Q And you had a lot of responsibilities on your plate at

this time?
A Yes.
Q So you were COO, Chief Operating Operator, and CFO, Chief Financial Officer?
A Yes.
Q You were managing each OneTaste location, right?
A Yes.
Q You were thinking about opening a location in New York at the time?
A We had gone to New York in 2007, so by 2009 in New York was established.
Q You were also teaching courses for the company?
A I was.
Q You were handling course enrollment and also collecting payments, correct?
A Yes.
Q So fair to say you were working hard on about every aspect of the business?
A Yes.
Q Now, by 2008 you were also working on co-producing a six- to eight-month program with Bryan Franklin, right?
A Yes.
Q And Bryan Franklin, as I believe you testified on direct, he was an outside consultant initially, right?
A He was a student first, then he became interested in what

we were doing, then he offered to co-create a one-year coaching program, or ten-month coaching program -- sorry, one year, a one-year coaching program.

Q And this coaching program ultimately had a big impact on OneTaste business model, correct?

A Yes.

Q And the idea was that he was going to teach coaching, how to be a coach in the program, and Nicole would teach spirituality, correct?

A That's a small part of what she was teaching, but yes. It was much more complex than spirituality.

Q But the idea was Mr. Franklin would teach a portion of the program and Ms. Daedone would teach another?

A Yes.

Q Based on its experience with the Bryan Franklin program, the following year OneTaste came up with the idea that it would do its own coaching program?

A Yes.

Q So by 2010 this coaching program became a main product of OneTaste going forward?

A The highest revenue producer of the business, yes.

Q So the first coaching program was CP1 in 2010?

A Yes.

Q Then they were named subsequently after that, CP1, two, three, four, correct?

A Yes.
Q The content of the coaching program evolved over time?
A Yes.
Q And you were instrumental in developing the coaching program, right?
A Yes, I was a part of it.
Q Generally speaking, all of the coaching programs had three parts: Coaching techniques, how to teach OM, and how to be a better person?
A I would call Nicole's portion how to be more connected to self, I don't know a better person but an evolved person.
Q Aside from the coaching program, OneTaste also developed other courses too?
A Yes.
Q Including the Taboo and Mastery courses?
A Yes.
Q And those were more advanced courses that were designed to push people's boundaries even further than the general coaching program?
A Yes.
Q So the shift in the business was basically OneTaste deciding to be an educational institution, correct?
A Yes.
Q And it would charge money in exchange for courses, right?
A Yes.

Q And the goal for the students taking the courses, they would become certified OM coaches, correct?
A In the coaching program that was an option, yes.
Q So that ultimately they would be able to teach OMing to other people for a fee, right?
A Yes.
Q So the first couple of years of the coaching program, that was 2009 to 2011, the company was still continuing to lose money, right?
A First year of the Bryan Franklin program was 2008, 2009; first coaching program was 2010.
Q The company didn't start making money until 2012, correct?
A Yes.
Q In 2012 what changed was leading up to CP5, the company started focusing on sales; is that right?
A Yes.
Q Participants in the coaching program received an orientation packet from OneTaste?
A Yes.
Q I'd like to show you what has been marked for identification as Defense Exhibit 4L. Do you recognize this as an orientation packet from CP5? We can scroll through.
A Yes.
Q And CP5 was in September of 2012, correct?

A Correct.
Q You were involved in organizing CP5?
A I was.
Q You were involved in putting together the orientation package curriculum?
A Yes.

MR. ROBOTTI: The defense moves to admit Defense Exhibit 4L.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 4L is admitted.

(Defense Exhibit 4L, was received in evidence.)

BY MR. ROBOTTI:

Q So looking at the top, the program features here -- fair to say that there were extensive program features for this program, yes?
A Yes.
Q The program included ten three-day weekends?
A Yes.
Q Also a monthly meeting on business development?
A Yes.
Q A weekly OM training and coaching practice labs?
A Yes.
Q Meeting with a master coach?
A Yes.
Q Peer coaching, homework, and daily OM practice and

journaling, right?
A Yes.
Q If we can go to the program prerequisites. We don't need to go through all these in detail, but there were requirements before entering the program, correct?
A Yes.
Q One of these is you had to take a preliminary Build Your OM Practice class, correct?
A Yes.
Q You had to establish your own daily OM practice?
A Yes.
Q And there was also required reading and attendance, correct?
A Yes.
Q If we can turn to page five of this document. If you can zoom in on the certification requirements. These were all the requirements that someone had to meet to be able to become a certified coach, correct?
A Yes.
Q So you had to attend the emergence, correct?
A Yes.
Q Among other things, you had to pass a written exam?
A Yes.
Q You also had to do a certain number of hours in order to become a certified coach?

A Yes.
Q We can take this document down.
So was the focus on sales that helped CP5 become profitable, correct?
A Correct.
Q And around that time in 2012, OneTaste developed the sales team with daily sales goals, right?
A Yes.
Q And the goal here was to sell courses, correct?
A Yes.
Q And this is when the company really started to take off?
A Yes.
Q You were working very hard during these years to help make the company successful?
A Yes.
Q You were working perhaps 70, 80 hours per week?
A Yes.
Q Many other people were working very hard at the company at this time too?
A Yes.
Q And your understanding is this was typical of startup culture, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes.

BY MR. ROBOTTI:
Q You need to work very hard in these early years to help make the companies successful?
A Yes.
Q OneTaste had a policies and procedures that governed coaching program, correct?
A We did.
Q I believe you testified on direct examination that those started early on in the company's history?
A Yes.
Q As the company got more interest and grew, you tried to improve the company's structure, correct?
A Yes.
Q That involved putting in place ethical rules, right?
A Yes.
Q Making sure the company was not running afoul of prostitution laws, correct?
A Yes.
Q You considered these issues and you took responsible steps to make sure you addressed them, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q You considered these issues and you took steps to make sure you addressed them?

A Yes.
Q And during that time period you were also asking the advice of outside professionals about how to do this?
A Yes.
Q Do you recall on March 8, 2009 the management of OneTaste discussing putting in place an ethics policy?
A I do.
Q That discussion included you and Rachel Cherwitz and Nicole Daedone and other people at OneTaste, correct?
A Yes.
Q Do you recall that the ethics policy you were seeking to put in place related to when and how teachers and employees could engage in OMs and sexual relations with students?
A Yes.
Q And generally, the idea was to put in place waiting periods after classes and events before any OneTaste personnel could have an OMing relationship?
A Correct.
Q Or have a sexual relationship, right?
A Yes.
Q And was your understanding at the time that Ms. Cherwitz recommended a stricter policy than had been proposed?
MS. BENSING: Objection, called for hearsay.
THE COURT: Sustained.
MR. ROBOTTI: 803(3).

THE COURT: Sustained.

BY MR. ROBOTTI:

Q This ethics policy went into effect?

A It did.

Q It remained in place during your time at OneTaste, correct?

A It did.

Q This was modeled on ethics policies that had been borrowed from other organizations, correct?

A Yes.

Q I'd like to show you what has been marked for identification as Defense Exhibit 1X. Do you recognize this as the OneTaste Coach Association Code of Conduct?

A Yes.

Q Is this from April of 2011?

A Yes.

Q In your capacity as COO and CFO were you involved in the creation of this Code of Conduct?

A I did the initial one, I believe this was updated and written by others, but I did the original draft.

Q You were familiar with this Code of Conduct based on your position at OneTaste?

A Yes.

MR. ROBOTTI: Your Honor, the defense offers Defense Exhibit 1X.

MS. BENSING: Your Honor, the Government objects to this version coming in based on the testimony that he's given.

THE COURT: Is this a different version than the version you've seen before? I'm not sure I'm following what your objection is of the version.

MS. BENSING: Just with respect to his testimony as to recognizing this document, your Honor.

MR. ROBOTTI: He testified he recognized it in his role.

THE COURT: Sustained on the current foundation.

BY MR. ROBOTTI:

Q Mr. Kandell, do you recognize this document?

A I do.

Q You're familiar with it based on your role as OneTaste?

A I do.

Q You recognize that this is the Code of Conduct from April 2011?

A Yes.

Q Is this a fair and accurate representation of that Code of Conduct?

A Yes.

MR. ROBOTTI: We renew our request to admit Defense Exhibit 1X.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 1X is admitted.

(Defense Exhibit 1X, was received in evidence.)

BY MR. ROBOTTI:

Q If we can publish for the jury. I would like to blow up the third paragraph there, beginning acknowledging. Mr. Kandell, if you can read that?

A Acknowledging the sensitivity of client/teacher relating, OneTaste coaches and trainers agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a client. Because several coaches and trainers in organizations have developed relationships with former clients, we acknowledge that such a healthy relationship can be possible but that great care and sensitivity are needed. In such cases, the coach/trainer and the client can consult with the ethics committee to determine the healthiest approach.

(Continued on next page.)

(Continuing.)

MR. ROBOTTI: All right. And we can put aside that document.

And I'd like to next show you what's been marked as Defense Exhibit 1-AB for identification.

CROSS-EXAMINATION (Continues)

BY MR. ROBOTTI:

Q All right. Do you recognize this as a later version of the Code of Conduct?

A Yes.

Q And you're familiar with this version based on your role at OneTaste?

A Yes.

Q And you recognize this as a fair and accurate depiction of the OneTaste Code of Conduct from February of 2014?

A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 1-AB.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 1-AB is admitted.

(Defense Exhibit 1-AB was received in evidence.)

(Exhibit published.)

Q All right. So looking at this document, this is the Code of Conduct for all teachers, coaches, leaders and support staff. Is that correct?

A Yes.
Q And if you can just look at the third paragraph here.
MR. ROBOTTI: And if we can just blow that up.
Q Could you read the first just three sentences there?
A Our work is intended for adults, and we mean emotional, spiritual, as well as physical. This means that you are willing to take responsibility in your experiences within OneTaste. That means you overtly agree to play using green, yellow, red rules.
Q And the following sentence there is: These rules are explained in all of our classes and programs, correct?
A Yes.
Q And then the last sentence of this paragraph says: OneTaste teachers and staff are well-acquainted with red, yellow, green, and agree to respect them in student interactions.
Correct?
A Yes.
Q All right. And I would like to turn to page 3 of this document.
MR. ROBOTTI: I'm sorry. If we can back up one page and just blow up Ethics Committee Petitions. It's down near the bottom.
BY MR. ROBOTTI:
Q Now, Mr. Kandell, does this document, this paragraph

describe the process for submitting a request to the Ethics Committee for exemptions from this policy?
A Yes.
Q All right.
MR. ROBOTTI: And if we could go to page 3.
Q On page 3 we have --
MR. ROBOTTI: We can just highlight beginning "OM Guidelines" to the end.
Q All right. And does this set forth the ethics policy for OM guidelines?
A Yes.
Q And then below that in the document there's the ethics policy for makeout guidelines?
A Yes.
Q And then turning to the next page. And the next page sets forth --
MR. ROBOTTI: If we can just pull up the next page.
(Exhibit published.)
Q And the next page sets forth the consequences for violations of the Code, correct?
A Yes.
Q Now --
MR. ROBOTTI: And we can put this document aside.
BY MR. ROBOTTI:
Q Now, people often did send in these ethics requests to

the Committee, correct?
A I don't know how often or not.
Q People did send in requests?
A Yes.
Q Including yourself?
A Yes.
Q And those requests for exemptions would be granted sometimes or most times?
A I don't know the frequency. Sometimes.
Q But to your knowledge, they were denied at some points?
A Yes.
Q All right. So let's talk a little bit about the corporate structure of the company as it grew.
So as the company grew, is it fair to say your responsibilities also grew?
A Yes.
Q And by 2011 you had taken on additional responsibilities from what you'd had previously?
A Yes.
Q So, on top of your CFO and COO tasks, you were co-director of the overall business?
A Yes.
Q You handled the finances and the bookkeeping, including payroll?
A I was responsible for the bookkeeper and responsible for

payroll running successfully.
Q So, you oversaw that?
A Yes.
Q You handled reporting to investors?
A Yes.
Q You handled collections for the Coaching Program, refunds, and payment plans?
A Yes.
Q And you had sole signing authority for the bank accounts?
A What year? 2011?
Q 2011.
A Yes.
Q Did that change at some point?
A Yes.
Q What year was that?
A 2012.
Q All right. Now I'd like to show you what's in evidence as Government Exhibit 826.
(Exhibit published.)
MR. ROBOTTI: And if we could blow that up.
Q Now, is this the organizational chart that you looked at with the Government on direct examination?
A It is.
Q All right. So, at the time Nicole was CEO, correct?
A Yes.

Q You were directly under her managing Operations?
A Yes.
Q And can you identify where Rachel Cherwitz is?
A She's in the Enrollment team.
Q Okay. So she's several levels below you and Nicole at this point?
A Yes.
Q And as part of the Enrollment Department, she's signing up customer for courses, correct?
A Yes.
MR. ROBOTTI: Now, can we blow up the legend here?
Q All right. So this lists several different types of employees or volunteers at the company -- let me withdraw that.
This lists several different type of payment arrangements, correct?
A Yes.
Q So there's paid staff, right?
A Yes.
Q And those are people who are paid by OneTaste for their jobs, rights?
A Yes.
Q And there's also people who are listed as volunteers, correct?
A Yes.

Q Now, OneTaste offered a volunteer position because there were people who wanted to volunteer with the company, correct?
A Yes.
Q And that was even though the company was still growing and could not pay them, correct?
A Correct.
Q And the volunteer spot, from your perspective, could be a lot of fun, right?
MS. BENSING: Objection.
THE COURT: I didn't hear the last word, could be a lot of?
MR. ROBOTTI: Fun.
THE COURT: Overruled.
A Yes, it could be a lot of fun.
Q You got to -- as a volunteer you would get to meet support staff and watch the course?
MS. BENSING: Objection as to which volunteer, when, what time period.
THE COURT: Yes; sustained. Sustained.
BY MR. ROBOTTI:
Q As part of the volunteer role, right, your understanding was that volunteers would get to meet the staff and watch courses?
MS. BENSING: Same objection.
THE COURT: Sustained.

Q Was there a typical volunteer role at OneTaste?
A There were several categories.
Q And did volunteers typically have the opportunity during this time period, 2011, to view courses?
A Yes. They could volunteer as a back-of-house and they could sit in the back of the course for free and watch and -- and support.
Q And they could interact with people attending the course, correct?
A Yes.
Q And this volunteer position could lead to a permanent position at OneTaste, correct?
A Yes.
Q And volunteer positions were offered to people in all sorts of different financial positions, correct?
A Yes.
Q And, in fact, some of the volunteers were independently wealthy, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Do you recall certain volunteers who had their own financial means taking the positions despite that?
MS. BENSING: Objection.
THE COURT: Sustained.
Q During this time period of 2011, do you recall -- were

you aware of certain volunteers' financial resources?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q All right. The company also offered work trade, correct?

A Yes.

Q And just stepping out of this legend here.

There were several people on this organizational chart who were in the work trade arrangement, correct?

A Yes.

Q That included Amy Jones, Maddie Fuller and Michelle right?

A Maddie Carl.

Q Oh, excuse me, Maddie Carl.

A And Audrey Wright, yes.

Q And work trade was generally for people living at 1080, correct?

A Yes.

Q And the agreement for work trade was that instead of paying for something, like rent or a course, you could pay with time?

A Yes.

Q So, for example, if you wanted to take a course for free, you could devote six hours to sweeping the floors at 1080, correct?

A Yes.
Q Or if you wanted a free room at 1080, you could do like 10 cooking shifts per month, right?
A Yes.
Q And that was offered to people who said they wanted to be involved in OneTaste, but couldn't pay the full fees, correct?
A Yes.

(Continued on the following page.)

BY MR. ROBOTTI: (Continuing.)
Q And that could also lead to a paid position, right?
A Yes, sir.
Q And the terms of the work trade agreement were explained to people upfront, correct?
A Yes.
Q And if someone changed their mind or wanted to volunteer or do work trade, they could leave, correct?
MS. BENSING: Objection. Calls for speculation.
THE COURT: Sustained.
Q Now, is it fair to say there was no obligation to volunteer or do work trade --
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, the payment structure for employees fell under your jurisdiction; is that correct?
A Yes.
Q And it changed and evolved during your time at OneTaste, right?
A Yes.
Q And as you talked about a bit on direct examination, there were some growing pains, correct?
A Yes.
Q And in your view certain, mistakes were made regarding the payment structure, right?

A Yes.
Q So for example, the company changed back and forth from W-2 employees to independent contractors a few times?
A Yes.
Q And in your view, under the IRS guidelines, that -- the independent contractor should have been treated as W-2 employees, correct?
A Yes.
Q And this raised concerns for you about tax issues, correct?
A Yes.
Q And the problem that was driving those changes was OneTaste cash flow issues, correct?
A Yes.
Q Now, as the company continued to grow over time, you continued to consult with additional outside professionals, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes, I did.
Q And those resources became more available to you as the company got more resources?
A Yes.
Q And you consulted with them about how to try to do things the correct way, right?

Case 1:23-cr-00146-DG-RML Document 437 Filed 08/22/25 Page 310 of 354 PageID #: 10536



A Yes.
Q All right. So I'd like to talk a little bit more about consent at OneTaste.
So in your view, even in the early years, consent was very important at the company?
A Yes.
Q From the very beginning, the company had consent forms, correct?
A Yes.
Q You were involved in drafting the consent forms?
A Yes.
Q And while the wording of these forms might have changed over time, the general substance was the same, correct?
A Yes.
Q And if a person wanted to participate in a OneTaste program, they had to sign a consent form, correct?
A Yes.
Q The company was strict about this?
A Yes.
Q And, in fact, before you left in 2014, you were involved in digitizing boxes and boxes of hard copy consent forms?
A I was.
Q I'd like to show you what's been marked for identification as Defense Exhibit 1AN.
Now, do you recognize this as a general release form for all

OneTaste programs at the Urban Retreat Center?
A Yes.
MR. ROBOTTI: If we can scroll down to the bottom. There's a very small -- the bottom there.
Q Do you recognize the date of this document?
A Yes. October 2006.
Q And you recognize this form your work at OneTaste, as well as the fact that you drafted it, correct?
A Yes.
Q Is this a fair and accurate depiction of the consent form back in October of 2006?
A Yes.
MR. ROBOTTI: The defense moves to admit Defense Exhibit 1AN, Your Honor.
MS. BENSING: Your Honor, the Government objects on relevance grounds for lack of testimony with respect to this program.
THE COURT: The form I have is a blank as to the course.
Is that what everybody is using?
MR. ROBOTTI: He testified this is the standard form used for all courses during this time period.
MS. BENSING: Yes, Your Honor. Again, during this time period with respect to lack of testimony about these courses, the Government objects on relevance grounds.

MR. ROBOTTI: I could ask another question, Your Honor.

THE COURT: Sustained.

You can ask another question.

Q So you spoke earlier about the Insight Institute?

A Yes.

Q And these were courses that were held by the Insight Institute at the Urban Retreat Center, correct?

A Yes.

Q And this form was one of the foundational forms that was used to create the consent forms throughout the rest of your time at OneTaste, correct?

A Yes.

MR. ROBOTTI: Your Honor, based on that foundation, we renew our offer to admit.

MS. BENSING: The Government maintains its objections on relevance grounds.

THE COURT: Overruled. Government -- excuse me, Defense Exhibit 1AN is admitted.

(Defense Exhibit 1AN, was received in evidence.)

Q All right.

MR. ROBOTTI: And if we could just pull up the assumption of risk portion.

Q Now, we won't go through all of these, but just to go over a couple, the first point is that the content of the

course is controversial, correct?
A Yes.
Q And if you go to the fourth bullet point, the last sentence says, I alone will decide and accept responsibility for how and for what purpose I apply the content of this course, correct?
A Yes.
Q And the next bullet point below that says, That I may not agree were all of the content of the course and accept that possibility?
A Yes.
Q And skipping down, one, two, three, four bullet points, starting, That I may choose not to participate in any activity offered in the course, however, if I do decide to participate, I do so of my own knowing and free will, correct?
A Yes.
Q And next one is that I have assessed my own emotional, mental, and physical well-being, and I've concluded that I wish to and able to participate in the course, correct?
A Yes.
Q Okay.
MR. ROBOTTI: You can take that one down, and I'd like to look at Defense Exhibit 1AK, for identification.
Q All right. So this -- do you recognize this as being a release of liability form from about the 2010 time period?

A Based on the logo and the font, yes.
Q So you recognize the OneTaste logo as one that was used in about 2010, correct?
A Yes.
Q And this is a later version of the form we just looked at, correct?
A Yes.
Q And a general release form for all OneTaste programs during this time period, correct?
A Yes.
Q And this is a fair and accurate representation?
A Yes.
MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 1AK.
MS. BENSING: No objection.
THE COURT: Defense Exhibit 1AK is admitted.
(Defense Exhibit 1AK, was received in evidence.)
MR. ROBOTTI: And if we could just blow up the assumption of risks to look at them in general.
Q Are these very similar to the disclosures that we just look at?
A Yes.
THE COURT: Mr. Robotti, just to let you know, in about five minutes, we'll stop.
MR. ROBOTTI: Yes, Your Honor. I actually think

this is the right place to stop. I can go --

THE COURT: I wasn't giving you an option.

MR. ROBOTTI: I can do five more minutes, no problem.

THE COURT: Do you have more questions?

MR. ROBOTTI: Of course.

THE COURT: Okay. Let's go for another few minutes.

MR. ROBOTTI: No problem.

BY MR. ROBOTTI: :

Q All right. So as we've discussed, you were a coach at OneTaste, correct?

A Yes.

Q And if you asked a student to do something, it was because you believed it would help them grow?

A Yes.

Q And if the student didn't want to do it, they didn't have to, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q When you were a coach, in your practice, if a student didn't want to do something, they didn't have to, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Was it always an option for the students you taught to drop out of the program?

MS. BENSING: Objection.
THE COURT: Sustained.
Q You taught numerous different courses while you were at OneTaste, correct?
A I did.
Q You taught the CP programs, correct?
A I did.
Q You were involved, for instance, in CP1 through CP5, correct?
A CP7.
Q CP1 through CP7.
And those courses took place over the course of what years?
A 2010 to end of my tenure in 2014.
Q Now, during that time period, did a student ever tell you they didn't want to do something?
MS. BENSING: Objection.
THE COURT: Sustained.
Q During these programs, OneTaste had safe words, correct?
A Yes.
Q We talked, again, about the red, yellow, green scale?
A Yes.
Q That's pulled from the BDSM community, right?
A Yes.
Q And if someone said red, that meant stop, correct?
A Yes.

Q And if someone said red, that was a way to communicate they were no longer giving their consent, correct?
A Yes.
Q These safe words went back to the very beginning of OneTaste?
A Yes.
Q And OneTaste programs were designed for people to have some very heavy experiences and play some serious games, correct?
A Yes.
Q And the company would look to people to know their own boundaries, correct?
A Yes.
Q And they gave them the tools to express those boundaries through the red, yellow, green scale, correct?
A Yes.
Q And the company relied on the students to use that scale, correct?
A Yes.
Q OneTaste also had the concept of safeporting, correct?
A Yes.
Q And that basically meant checking in with someone in OM to ensure that there was still consent, correct?
A Yes.
Q And that was a concept that was also taught during the

coaching program, correct?
A Yes.
Q And more generally, as part of the OM practice?
A Yes.

(Continued on the following page.)

(Continuing.)

BY MR. ROBOTTI:

Q And OneTaste had a refund policy, correct?

A We did.

Q And if people dropped out of courses they could get a refund through that policy, correct?

A They could.

Q And some customers did chose to do that, right?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance as to which customers, when.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q There was a policy that allowed customers to get refunds, correct?

A There was.

THE COURT: I'll let you stop, now if you want.

MR. ROBOTTI: Perfect place, Judge.

THE COURT: I'll let the witness step down for today. We'll resume tomorrow.

(Whereupon, the witness steps down.)

THE COURT: Mr. Robotti, you're welcome to sit down too.

We'll stop for today we'll resume tomorrow at the usual time, come at 9:15 and we'll start at 9:30.

I appreciate everybody's attentiveness today as always. We're going to have an evening break now so let me remind you of what I've been reminding you of throughout this trial.

Over this evening break don't discuss the case with anyone, including with your fellow jurors. If anyone approaches you and tries to discuss the case with you, please let me know about it immediately through Mr. D'Agostino. Don't read, watch, listen to any news or other media reports of the trial. Don't conduct any independent research about the case or about the matters in the case or the individuals involved in the case. Don't talk to the parties the witnesses, or the attorneys about anything.

Keep an open mind and have a lovely evening. We'll see you tomorrow.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated.

I want to go over a few things.

Mr. Robotti, do you want to give me an estimate roughly of how much longer you think you have?

MR. ROBOTTI: I think I'm halfway through, but I have more ground to cover.

THE COURT: Ms. Bonjean, I assume some cross-examination as well?

MS. BONJEAN: A short bit, but things can change. That's my present plan.

THE COURT: I want to turn to the Government's motion to permit expert testimony of Dr. Raghavan. That motion is at ECF No. 385. The Government also filed a letter in support of the motion, which is at ECF No. 390. And defendant's filed a letter in opposition, which is at ECF No. 392.

As the parties are aware, well before trial I provisionally granted the defendants' motion to exclude the Government's proffered expert witness, Dr. Raghavan. The Government has renewed its request to be permitted to call Dr. Raghavan to provide expert testimony on coercive control.

The Court cannot conclude that the proffered testimony would help the jury to understand the evidence for it to determine a fact in issue. Although this case has certain similarities to cases in which experts have been permitted to testify on coercive control and similar topics, there are unique as aspects to this case that make those cases not sufficiently analogous. The Government's motion at ECF No. 385 is denied.

Turning to the filing at ECF No. 394, which relates to potential testimony of an upcoming witness. The parties have set forth their respective positions. I will rule on any specific objections if and when made. That filing seemed to be sort of anticipating testimony, and I think very candidly so, saying it wasn't clear whether that testimony would in fact be elicited.

So to the extent that there are objections, the Court will rule on them. It sounds like some of the testimony that is anticipated by the defense may actually not even be what the Government is intending to elicit, but we'll see how that plays out.

I want to remind everyone, because we are moving along in this trial, that I'm going to want a compilation of all the exhibits that have gone into evidence. I wish you all luck on figuring out this numbering system. I want it in an order that makes some sense, so everybody can look at it and make sure everybody is in agreement on what went in.

I think that's all that I have to cover for now.

I have received, of course, your submissions on jury instructions that you filed over the long weekend, and we'll talk more about some of that.

Is there anything we need to take up? If not, we'll see each other in the morning.

MS. FARRELL: The Government has two issues. One potentially we can table to the morning.

But with respect to the testimony that was just elicited, the Government has concerns that we either crossed into or very close to the assertion of an advice of counsel defense.

There were two portions of Mr. Kandell's testimony in which Mr. Robotti elicited, he didn't use the word lawyers, but he discussed the fact that they were evaluating the legality of

whether the company was engaged in prostitution. And then also about how his resources became more available, the company was consulting with outside professionals to do things in the correct way.

And the Government would just point out, that to the extent there is an advice of counsel defense or quasi advise of counsel of counsel defense, there are, like, very strict provisions in the law of how that goes about, including waiver of privilege and production to the Government of all the materials relating to those topics.

THE COURT: I didn't understand him to be going there. But I appreciate that you are raising it, because you are in fact correct.

MR. ROBOTTI: Just if I may be briefly heard. We weren't intending to go down this road, but the Government opened the door to this by asking about the prostitution issue and asking about whether they had taken steps to address the concerns that prostitution was illegal. I think it is fair rebuttal testimony to explain that they did so as part of a responsible effort by consulting outside professionals. That's all that we're going to argue about, or to, elicit in this regard.

THE COURT: You're not intending to be eliciting any legal advice, I take it.

MR. ROBOTTI: We are not. We wanted to the facts to

be out there that this was a considered decision in response to the testimony the Government elicited.

MS. FARRELL: Thank you, your Honor. If that's all it is --

THE COURT: I think he was done with that line of questioning.

Is that correct?

MR. ROBOTTI: I am.

THE COURT: Ms. Bonjean, I take it you're not going to go back there?

MS. BONJEAN: No.

THE COURT: Okay. I didn't think that's where they were going; I appreciate everybody addressing this.

MS. FARRELL: Our other issue we wanted to raise is, we anticipate one of the upcoming witnesses shortly will be an accounting analyst, essentially, from the FBI who will testify and put into evidence summary charts regarding certain financial aspects of the case. We basically want to address the issue before it's in front of the jury.

There are voluminous -- we discussed this last week -- there are voluminous financial records that underpin the summary charts. We understand the defense has some objections, we're going to resolve one of the objections by changing the language in one of the summary charts. But basically we just, we want to discuss with the Court and understand ahead of time

the fact that we're going to be able to put these exhibits up in front of -- I guess, really frankly, we're requesting a ruling in advance. Because there is nothing that is going to be different about what this witness testifies to. We're prepared to have it go through the underlying records and pull out one page of thousands of bank records.

THE COURT: Are these the charts I've seen or not seen already?

MS. FARRELL: I believe you've seen them already.

THE COURT: These are the expenses? Or what are the charts?

MS. FARRELL: They are expenses. They are wage -- they are a compilation of wage information regarding the victims, and wage information regarding the defendants.

THE COURT: What is the objection to -- is it a specific exhibit?

MS. BONJEAN: Yes, your Honor, two things. It's part A and part B.

I know the Court generally ruled on the relevance of financial information, but we do have a more specific objection that has not been teed up for the Court that I'm happy to put in a letter.

THE COURT: Can you tell me what it is now?

MS. BONJEAN: Generally speaking, our position is that there are statements within -- first of all, there are

thousands and thousands and thousands of pages of financial records. For example, there are years worth of credit card statements for Ms. Daedone.

While I do understand that the Government wants to put in evidence regarding some financial, what they perceive, is a financial benefit to her. How she spent her money, I think, particularly since if you look at summary charts, they are cherry-picking certain things that they want to use.

(Continued on next page.)

(Continuing.)

THE COURT: I don't know because all I have is the chart. So they haven't given me the thousands of pages, I don't think.

So when you say cherry-picking, have you talked to the Government about what your concern is about what is --

MS. BONJEAN: I have.

THE COURT: Okay.

MS. BONJEAN: I have. And so, I have a relevance objection to some of these -- some of the materials, apart from, like, the letter we wrote. Because we are talking about -- the letter was more categories of financial materials.

THE COURT: Yes.

MS. BONJEAN: And there are some specific -- there are some specifics in here that I think, at the bare minimum, deserve a Rule 403 analysis.

And then as to the charts, like I think they're improper under Rule 1006 because they're not really summaries from our perspective.

For instance, there doesn't need to be a chart that she sold the company for $12 million. You can show one document. That is a not summary. And it's being used in an argumentative fashion.

THE COURT: If I remember that particular one, it's

showing where the money went, right, or where it came from, I guess?

MS. FARRELL: Correct.

MS. BONJEAN: No. Well, I don't think so actually.

THE COURT: Maybe I'm not thinking of the right document then.

MS. BONJEAN: I mean I guess -- yes, who paid for it?

THE COURT: Yes.

MS. BONJEAN: Correct.

But, again, this is all in one document, I think, my understanding is, or maybe two documents.

So, again, my understanding of Rule 1006 is that it's meant to summarize voluminous financial records not meant to pull out little bits of your financial records to -- to make a splash or to be argumentative. And I think that it is being used improperly here.

I think that also, again, going back to not just the summary charts, themselves. I did have an objection. We worked out one piece of it. And I think we can work out other pieces of it, but again the underlying issue is my position that how Ms. Daedone specifically spent some of her money doesn't add much to the equation in terms of financial benefit. This isn't a fraud case. Like, they don't have to prove lavish lifestyle and, you know, the motive is

irrelevant, frankly. And most of these payments were after she received, you know, the -- the payments she received for selling the company.

So once she gets the money, I don't really see how she spends it. For instance, they want to put in that she, you know, had plastic surgery. These types of things --

THE COURT: Where is that on these forms? I didn't -- I guess we're talking a bit in a vacuum here.

Which is, which is the chart that you're having the most issue with?

MS. FARRELL: One moment, we can get that.

THE COURT: Okay.

MS. BONJEAN: The chart that details sort of what she spent her money on.

THE COURT: There was one that had a bunch of stores on it, and that's not what --

MS. BONJEAN: Yes --

THE COURT: -- you're talking about is it?

MS. BONJEAN: Well, it is, because if you keep scrolling there's --

THE COURT: Well, I'm not scrolling because it was a hard copy.

MS. BONJEAN: Oh.

THE COURT: Maybe it's not the same document.

MS. BONJEAN: I thought it was three pages. There

is the retail spending, which I do object to.

THE COURT: Maybe you can just hand it up, if you don't mind. I want to see exactly what you're talking about. Thank you.

(Pause.)

THE COURT: Because I think what we're talking about is the one that's marked 865.

MS. BONJEAN: Okay.

THE COURT: That's three pages and it's got stores on the first page; sort of salons, et cetera, on the second page. Furniture, club membership and then procedures. Okay. Now I see what you're talking about. Okay.

MS. BONJEAN: So, I think our position is that whatever probative value there is of what she spent the money she received from OneTaste on is minimal.

I understand why they want to show that she received money from OneTaste. I think that is evidence. I think they see that as a financial benefit. They want to show that OneTaste provided some financial benefit to her and I understand that logic. I mean we still maintain our objections --

THE COURT: Right.

MS. BONJEAN: -- based on he --

THE COURT: No, I understand that part.

MS. BONJEAN: But the specific, you know, pulled out

of four years of bank statements of what she spent that money on I think is designed for some other purpose, other than --

THE COURT: Well, it is telling that it's labeled "select purchases."

MS. BONJEAN: Right. I understand, but again, like this is from our perspective --

THE COURT: I'm agreeing with you. I'm agreeing with you, Ms. Bonjean.

MS. BONJEAN: Yes, okay. I can't take a hint.

THE COURT: Yes. Let me hear from the Government on this particular one. The others are a bit of different category.

MS. FARRELL: Sure.

So just factually, these -- these expenses predate the sale of the company. So, it's not that she's using the proceeds from the sale to buy this stuff, it's what she's using her salary coming from OneTaste to spend her money on.

And, look, this is a forced labor conspiracy. The whole theory is that there -- you know, there's some kind of benefit or gain from forcing the "un" or underpaid laborer of these, you know, women who have now testified in this trial. And -- and we think we're entitled to show the jury what the fruits of that labor entailed, including everything set forth in this chart, Government Exhibit 865.

And it's not -- it's not just for -- to make a

splash, as Ms. Bonjean says, but a lot of this is directly relevant or corroborative to pre-existing testimony. And so, obviously --

THE COURT: I think, Ms. Bonjean, if I'm hearing her correctly, her argument is not that it may not be admissible, although she disagrees, but her argument is that it's selective and so it's not a summary chart.

Is that your argument?

MS. BONJEAN: Yes.

MS. FARRELL: Well -- oh, I'm sorry.

So, these -- these come from three years' worth of bank records. And so one way of doing this is putting in, you know, hundreds of pages of bank records and having the analyst go through and individually highlight.

The whole -- I think the whole function of the summary chart provision in the Federal Rules of Evidence is to allow the Government, or whichever party, to -- to summarize voluminous information in --

THE COURT: But Ms. Bonjean, I think, is saying is that this is not a summary of voluminous information. This is taking certain information from that voluminous stack and putting it on a chart, which is not summarizing the entirety of the records.

Is that, in essence, what you're arguing?

MS. BONJEAN: Yes, Your Honor.

And I would say that differentiates it from the other charts that they have provided regarding salary and wages, which I think are incomplete on some level, but that's kind of a different issue. That goes to weight and, perhaps, some part of cross-examination.

But to have a chart where this is the salary that Ms. Daedone made over these years, that summarizes her salary for those years. That seems more like fair game. This is -- this is a different animal.

MS. FARRELL: So, respectfully, Your Honor, I don't think the relevant rule, 1006, suggests that you have to summarize everything that is in the relevant documents.

There's nothing -- it's very clear, and the witness will testify what exactly from the voluminous materials he's summarizing here. And so, I don't think there's anything in the rule — and, obviously, we can search the caselaw for this — suggesting that you have to summarize all the information and voluminous materials.

Here, this document is very clear specifically what is being summarized from these thousands of pages of bank records. And, of course --

THE COURT: Well, tell me what is clear about it. It says it's "select purchases."

MS. FARRELL: Right. It says it's select, select retail, salon, design, club membership, procedures. The

witness will testify how he isolated these particular expenses and these particular categories.

THE COURT: Well, tell me what would he say about that, just what's the general proffer on that?

MS. FARRELL: That he reviewed the bank records and that they, you know, they -- he searched for specific expenses in these different categories, which go to personal benefit to Ms. Daedone, and -- and summarized them in this chart.

THE COURT: Well, would, for instance, on the part that says procedures, would he say: This is all plastic procedure -- excuse me, plastic surgeon expenses?

MS. FARRELL: That were in these specific bank records.

THE COURT: That these were the only ones?

MS. FARRELL: That he could identify based on what is in the bank records.

MS. BONJEAN: Your Honor --

THE COURT: And if you want to try to find some caselaw to suggest that this is proper under Rule 1006, I'll look at it, but I'm not yet convinced.

MS. FARRELL: The -- I'm sorry.

The alternative would be putting in all of these bank records and having him --

THE COURT: No, that's not the only alternative.

I think the issue is not with respect to the

testimony, he could testify about what he did and what he, you know, sees in the documents, but I think the issue that Ms. Bonjean is having with this is that it's, essentially, cherry-picking.

I don't know if that's exactly the right word, but it's not really summarizing a large body of material. It is picking out certain things you want highlight, which, again, if you want to convince me that that is proper under 1006.

MS. BONJEAN: Well, I would point out, Your Honor, that actually -- and this is an Eighth Circuit case, but only because I briefed this issue before, that I happen to have an Eighth Circuit case, but I'm sure there's other authority, that Courts acknowledge that these devices may be inappropriate because they're too influential and -- that these devices, these aids are really meant to summarize complex testimony and also that they can be inappropriate devices because they become too influential or more akin to an argument.

So I don't know, I'm happy to do some more research in this particular Circuit, but Rule 1-0 -- at least the authority interpreting 1006 does address this issue that I'm raising to the Court.

MS. FARRELL: So, if I may, Your Honor.

THE COURT: Yes.

MS. FARRELL: I mean if you look just, for example,

at the first page of Government Exhibit 865, there are a total of 168 transactions that are detailed in this page alone.

See at the bottom where it says "Totals," "Counts of payments"?

THE COURT: Yes.

MS. FARRELL: And so, I mean truly just focusing on, for efficiency's sake, it would not be inappropriate for a witness to get up and say: I've reviewed the bank records and let me go through, let me march you through payment by payment of all the payments that she's made.

If we went through a hundred-and-sixty -- and this is just one column, if we went through 168 individual payments, this witness would literally be on the stand for -- and we did this for this whole thing -- for hours.

THE COURT: Okay. Let me just stop you for a moment because it's not clear to me, whether -- again, you're saying selected resale.

So, what is the entire universe is what you've selected, out of what? And what's been left out?

MS. FARRELL: All the bank records out of this time period.

MS. BONJEAN: Three-and-a-half years of credit card statements.

And, again, our position is none of this really matters. I think the Court's doing a 403 analysis. The fact

that she got a salary is what matters, not what she spent her salary on.

And because, again, this isn't -- you know, this is -- the issue here is whether or not she knowingly financially benefited from OneTaste obtaining labor and services. This is 1789(b), it's not 1789(a) to start. It's really about OneTaste that she financially --

(Continued on the following page.)

(Continuing.)

THE COURT: 1589, right?

MS. BONJEAN: What did I say? Oh, 17. Sorry. 1589.

There's no financial piece in 1589A, so we're really talking about 1589B, and whether she financially benefited from OneTaste, not --

THE COURT: Well, I think the Government would probably argue that it's relevant to A, as well --

MS. BENSING: Yes.

THE COURT: -- but for different reasons.

MS. BONJEAN: It's not an element is what I'm saying. The financial piece is not an element. Maybe, I guess, motive or something like that. But I would point out that I think the closer call is 1589B, and that's really about whether she's benefiting from OneTaste, the organization, which is about the salary. What she then did with that money, I'm not saying it's not wholly irrelevant, I'm saying it's of minimal probative value.

THE COURT: What is the part that you think would run afoul of 403 or you'd would want me to consider in the 403 analysis?

MS. BONJEAN: They're trying to engender contempt and show --

THE COURT: But is there something on the chart? Is

it the plastic surgery?

MS. BONJEAN: It's the plastic surgery. Frankly, that is the biggest problem for me. It's the plastic surgery for me that is the most problematic. Frankly, spending $730 at Victoria Secret over three and a half years, to me, is a not a particularly prejudicial thing. But I do think that the plastic surgery, I really do not understand what can be of such probative value, and there's a very large potential value of prejudice, and it doesn't get to the heart of the case, in my view.

THE COURT: I'll hear from the Government on that specific complaint.

MS. FARRELL: Certainly, Your Honor. So all of these happened between 2014 and 2016. So before the sale of the company. And so two things. Like, the -- you know, the money that's used to pay for these very expensive procedures is money that's coming from her salary at OneTaste. The other thing is it's corroborative of, you'll see in the binder we gave you, there are text messages about this, about, like, getting plastic surgery with other members of the like, top, OneTaste leadership group. And so it's also corroborative of other --

THE COURT: But tell me the relevance of that.

MS. FARRELL: It's what she's using the money that is gained through the forced labor conspiracy to do. And it's

to benefit her personally. I mean, there's -- frankly, I can't think of something more personally beneficial than procedures that enhance your own physical appearance.

MS. BONJEAN: Your Honor, they haven't actually shown that it came from OneTaste, also, I would point out. They have her credit card statements, but you know, we don't know if she got it from, you know, got resources from other places. They haven't traced it. So it is actually even further removed, because it's not -- I know that, you know I'm not suggesting they have to trace it. But if they're going to say their argument for it is that it comes directly from the forced labor conspiracy, then they should -- then they should have a good-faith basis for saying that, and I don't think we have records that actually trace this back to that, to her salary which is, again, we're talking about her salary. I mean, she -- they're putting in evidence of her salary.

MS. FARRELL: Well, I think we have the credit card statements and then we have the statement the bank account used to pay the credit card statements and those are capitalized by the salary payments. So I think it -- I believe this witness will testify it's not super complex financial tracing. But there is an A-to-C element of it that is drawn out through the bank record.

I think what I would say -- we understand the objections. We'll continue to talk to the defense about it.

THE COURT: And maybe there is a way to sanitize it, to some degree.

MS. BONJEAN: Yes.

THE COURT: So maybe you can talk to each other about that.

MS. BONJEAN: I'm happy to continue the conversation.

THE COURT: Okay.

MS. FARRELL: I think our view is that sanitizing it wouldn't be appropriate given that what we're setting out to do with this exhibit or with this testimony is to show precisely what the money that was, again, as we -- our whole theory of the case is the money that was gained through the forced labor conspiracy, what it was, in fact, used for what, benefits, specifically, to this defendant they were used for, and in our view, it wouldn't be appropriate to sanitize it.

THE COURT: Okay. I'm hearing you.

MS. FARRELL: Potentially, what we could offer up -- I hesitate to negotiate against myself -- but I think we could use these as demonstratives. We could have the testimony, have the witness there referring to this live in the moment, and then have it just be a pure demonstrative, as opposed to an admitted exhibit. That's a potential --

MS. BONJEAN: They could also ask six questions of an agent and get it in that way.

THE COURT: Are you planning on going through each line with the agent, each of these expenses?

MS. BENSING: Yes. We are not planning on going through each line of the underlying bank records, but to use -- look, I don't think we're going to say, were there $742 spent at Victoria Secret, but more broadly that there was 46,000 spent on retail during this period.

THE COURT: But that's different then, right? That is very different than having the breakdown.

MS. FARRELL: Well, I think we can anticipate -- maybe I'm wrong about this -- but I think we can anticipate the defense crossing the witness on his -- the work of how he got here, and this establishes at a high level how he got there.

MS. BONJEAN: If I have to, of course. I mean, of course I'm going to do that. They're the one -- they're opening the door to that, though, by picking out through three and a half years of statements, things that make it look like Ms. Daedone was living a lavish lifestyle, which I disagree with. But that's what they're trying to present and, of course, I'm going to go back then and cross-examine on what he didn't include in the chart. That's fair game, obviously.

MS. FARRELL: From our view, too, there's an evidentiary value to the comparison of what Ms.-- the money Ms. Daedone had access to and what she was spending it on

versus what the testimony we've heard from the witness who were providing the labor for the company. So that's also an element of this which we think is appropriate, given the charges here, and the testimony that's come out thus far.

THE COURT: Okay. I think we've discussed that one. We can continue to discuss with each other. If there's law you want to put in front of me, I don't know that you are going to want to spend your time doing this tonight. But this is coming in tomorrow potentially or no?

MS. FARRELL: Tomorrow or I was about to say Wednesday but today is Tuesday. Thursday.

THE COURT: Okay. Can we talk then about the other chart, 863, because I think that's the one that I started to reference earlier about the money from the sale.

MS. BONJEAN: Oh, yes, Your Honor. I mean, again, I have, you know, I have an objection to that simply because I think there's about three documents that could be used. They don't need a visual aid. Again, these visual aids aren't just for so you can, you know, make an impact on the jury. That's not what they're intended for according to Rule 1006.

THE COURT: But is this -- let me ask, Ms. Farrell, is this, 863, a document that you would be offering under 1006?

MS. FARRELL: Yes. And the reason is, Your Honor, it's not simply the sale contract that's relevant, but the

fact that she, in fact, got the money from the sale. Those are two separate issues. The fact that you have a signed contract or a series of schedules relating to a contract is not proving the fact that she, in fact, got the money.

(Continued on the following page.)

(Continuing.)

THE COURT: Right, but I think the issue Ms. Bonjean is raising is testimony versus a chart like this.

MS. BONJEAN: They cite three exhibits on the bottom. Why do you need a visual chart? This is not summarizing complex financial records. That's my position. I think that's not what Rule 1006 was intended for. We can look at more authority around it, but that is my position.

THE COURT: Okay.

MS. FARRELL: The exhibit cited, some of these are very lengthy bank records, we could probably snip out what is relevant but we'll have to mark some new exhibits and send those around.

Our preference would obviously would be to use this; but our bigger concern is just getting this in this an efficient fashion. That's why we're raising it with the Court and defense now, so we're now mid-trial in front of the jury having these fights.

THE COURT: There is another category of information that Mr. D'Agostino handed me a document that somebody handed up this morning, that has a column for defense objections then there is nothing in the column. So what is that, and what would you like me to do with that?

MS. BENSING: Yes, your Honor. We wanted to put this on the record as well tonight.

So there is a series of Government exhibits that we intend to offer through an FBI summary witness. I think we flagged this for the Court. These are the some the documents to which the parties reached an authenticity stipulation, which we read into the record last week. With respect to the summary witness, he's not going to be able to provide additional context or relevance testimony. He's a summary agent for whom the Government will offer these exhibits into evidence to publish them, as is often the case with defendant and co-conspirator statements, your Honor. And so for efficiency sake, to try to understand what the objections or responses would be in advance given that there won't be additional foundation laid throughout this witness, we created a chart and we sent it to the defense. I understand that they are in the process of providing their objections. But we wanted to the Court to go ahead and have it so it is teed up for the Court. Obviously the Court will need the defense objections as well. But we just wanted to get ahead of this given that it is a significant volume and we anticipate putting this witness on this week.

THE COURT: So the categories, though, are statements of the defendants or what the Government is asserting are co-conspirator statements; is that right?

MS. BENSING: Yes, exactly.

And we've outlined the hearsay exception or non-hearsay bases,

the relevance proffer that the Government has made, the participants to the conversation identifying where a defendant is a party to the conversation, which is the vast majority, your Honor. And then as the Court noted, there is a space for defense objections. We also noted where we intend to offer the entirety of the exhibit or just a redacted sub-portion.

THE COURT: Okay.

MS. BONJEAN: We got the chart yesterday. And it is a lot of material.

THE COURT: I know. I could tell from just a quick look at it this morning.

MS. FARRELL: Respectfully, that's not accurate. We sent a chart of all these exhibits over in connection with the authenticity stipulation, which was I think over a week ago now at this point. Then we sent the chart on Sunday, the updated chart, but the content of what is contained in there are the same exhibits that we had flagged with respect to the authenticity stipulation.

MS. BONJEAN: We received redacted versions yesterday. And it's a whole different analysis depending -- because some our objections are about what is in there and how long it is and why do you need it all. Then yesterday we got redacted versions. So yes, we had the material. If you want to go back to that, we had some of this material since November, but until we know what they are actually trying to

submit, it puts us in a difficult position to figure out if we really have relevance objections, or how broad they are, or the scope. These are lengthy, lengthy text exchanges. We're doing it and but it's a project. It's not easy.

THE COURT: Okay. And these are the texts that were produced by OneTaste; is that correct?

MS. BENSING: Correct. Just for the record, they were produced in redacted fashion on Sunday. And as we said, this is the same subset that the parties have been discussing with respect to the authenticity stipulation.

THE COURT: But Ms. Bonjean's point is well taken, that until she sees exactly what it is you want to put in, she can't really formulate exactly what her position is on that.

MS. BENSING: So the defendants have had this since Sunday. The Government is wanting to tee this all up. We expect this witness to testify later on in the week. We are trying to make every effort to make this as seemless as we possibly can. And we have narrowed this substantially from the set of Government exhibits that we initially marked.

THE COURT: Okay. And do I have the narrowed set and redacted version?

MS. BENSING: Yes. We've given you and the defense a copy of the narrowed set with the --

THE COURT: When did you give that to me and in what form?

MS. BENSING: We passed a binder up to the Court I believe this morning. And we can also make electronic copies available, I think the Court has them.

THE COURT: I know which binder you're talking about now. When do you think the witness will testify?

MS. BENSING: He may be the last witness, so perhaps Thursday or Friday.

THE COURT: Who else do you have? What is the lineup? We're going to finish with this witness tomorrow?

MS. BENSING: Yes. I anticipate --

THE COURT: Then another person that falls into the category of victim witness, correct, that you mentioned before?

MS. BENSING: Yes, but it may be that we call an individual Ken Blackman tomorrow. And then there is another individual who he would categorize as a victim witness. Then there is this financial witness who we talked about. Then the FBI summary witness. There may be one additional witness that we're still determining, but that's essentially the lineup.

THE COURT: So two that fall under the victim category or one?

MS. BENSING: Two.

THE COURT: So you added one.

MS. BENSING: No, we've given the defendants notice about her.

THE COURT: Okay. Is there anything else we need to take up right now?

MS. BENSING: I don't believe so, your Honor.

THE COURT: Ms. Cohen or Mr. Robotti or Ms. Bonjean?

MS. COHEN: No, your Honor.

MS. BONJEAN: No, your Honor.

MR. ROBOTTI: No, your Honor.

THE COURT: I'll see you tomorrow at 9:30.

(Proceedings adjourned at 6:05 p.m. to resume on May 28, 2025 at 9:30 a.m.)

ooo0ooo

# I N D E X


| WITNESS | PAGE |
|---|---|
| **ROBERT KANDELL** | |
| DIRECT EXAMINATION BY MS. BENSING | |
| (Jury Not Present) | 3225 |
| **ROBERT KANDELL** | |
| DIRECT EXAMINATION BY MS. BENSING | 3236 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 3456 |
| | 3556 |

# E X H I B I T S



| Exhibit | Page |
| --- | --- |
| Government's Exhibit 550 | 3257 |
| Government's Exhibit 544 | 3258 |
| Government's Exhibit 672 | 3264 |
| Government's Exhibit 858 | 3269 |
| Government Exhibit 3212-R | 3281 |
| Government Exhibit 1004 | 3318 |
| Government Exhibit 1013 | 3326 |
| Government Exhibit 1010 | 3330 |
| Government Exhibit 1090 | 3342 |
| Government's Exhibit 1105 | 3345 |
| Government's Exhibit 1125 | 3347 |

# E X H I B I T S

| Exhibit | Page |
|---|---|
| Government's Exhibit 1136 | 3349 |
| Government's Exhibit 1141 | 3354 |
| Government's Exhibit 1159 | 3357 |
| Government's Exhibit 1164 | 3361 |
| Government's Exhibit 1263 | 3370 |
| Government Exhibits 4789 and 4090 | 3393 |
| Government Exhibit 826 | 3426 |
| Government Exhibit 1331-B-R | 3430 |
| Government's Exhibit 1331-A-R | 3433 |
| Government's Exhibit 1332-R | 3437 |
| Defense Exhibit 4A1 | 3473 |

**E X H I B I T S**


| Exhibit | Page |
| --- | --- |
| Defense Exhibits D84A4, DX4A2, DX4A5, and DX4A6 | 3480 |
| Defense Exhibit 4CS | 3491 |
| Defense Exhibit 1BG | 3494 |
| Defense Exhibit 4L | 3509 |
| Defense Exhibit 1X | 3516 |
| Defense Exhibit 1-AB | 3517 |
| Defense Exhibit 1AN | 3531 |
| Defense Exhibit 1AK | 3533 |