UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :
May 7, 2025
Defendant. : 9:00 a.m.
\- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 9:32 a.m., in open court, outside the presence of the jury, to wit:)

THE COURT: Call the case.

THE COURTROOM DEPUTY: *United States of America v. Rachel Cherwitz and Nicole Daedone*.

Is the government ready?

MS. FARRELL: Yes, Your Honor. Good morning.

Kaitlin Farrell, Kayla Bensing, Sean Fern, and Nina Gupta for the United States. We are joined by paralegal specialists Marlane Bosler and Liam McNett, and Special Agent Tricia Quintero of the FBI.

THE COURT: Good morning, everyone.

THE COURTROOM DEPUTY: Is defendant Cherwitz ready?

MS. COHEN: Yes, Your Honor.

Celia Cohen, Michael Robotti, and Kelly Lin on behalf of Ms. Cherwitz.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning.

THE COURTROOM DEPUTY: Is Ms. Daedone ready?

MS. BONJEAN: Yes. Jennifer Bonjean, B-o-n-j-e-a-n, and Kelsey Killion, on behalf of Ms. Daedone, who is also present.

THE COURT: All right. So my deputy has shown to the parties two notes from jurors. The first one, which we've marked Court Exhibit 3, is from juror number 1. It was given

to my deputy yesterday after we let the jury go for the evening.

The second one, which we've marked Court Exhibit 4, was given to my deputy this morning. And that one is from juror 2.

(Court Exhibits 3 and 4, so marked.)

THE COURT: So let me give you a moment or two to look at this.

MS. FARRELL: Ms. Bensing is e-mailing photos of these to everyone so we all have a copy in front of us.

THE COURT: Sure. And maybe the parties want to talk to each other, too.

(Short pause.)

THE COURT: Okay. And we're starting later than I wanted to, but we didn't get the last juror to show up until 9:30, so I will remind them to come earlier.

So why don't I hear from the parties on -- let's start with the first one, which is Court Exhibit 3, from juror number 1. And I will hear from whoever wishes to be heard first.

Government. Why don't you go, and then we'll move to the defense.

MS. BENSING: Sure.

The government agrees to dismiss juror number 1. I think Ms. Bonjean intends to move for a mistrial. The

government, obviously, vehemently opposes that.

THE COURT: Okay. Let me hear from counsel for Ms. Cherwitz first, and then counsel for Ms. Daedone.

MS. COHEN: Your Honor, we are going to join. Ms. Bonjean is going to argue for this.

THE COURT: Okay. Go ahead, Ms. Bonjean.

MS. BONJEAN: Yes, Your Honor.

For the record, and I know that the letter will be made part of the record, but this juror number 1 has disclosed for the first time that his wife had experienced some type of sexual abuse or assault. That was a direct question that was posed to him during jury selection. It was a question that was important to the defense. Obviously, he did not disclose it.

I think that it -- we moved long ago for a questionnaire in this case, for this precise kind of reason, that people may not be forthcoming in a courtroom, where they might be on a questionnaire. That request was denied.

But here now we have a scenario where a juror is disclosing belatedly that he has a close family member, as in his wife, who suffered some type of sexual abuse for assault. He said he never disclosed that. He can think of no reason why he could not be fair. He was asked a number of probing questions, and now he provides a note saying I can't have a clean mind in deciding the outcome of this case. He does not

see how he could side with anyone other than the government. And so he needs to recuse himself.

So the reason we are -- we understand and appreciate that the government agrees that this witness -- this juror needs to be replaced. But what is relevant here is that it appears as if he would have been struck for cause, and that changed the whole dynamic of the selection process.

Obviously, peremptories are in short supply. We make our judgment call based on the whole picture. And juror number 1 was a juror that we had limited information about. We were misled, frankly, and would have moved for cause, if we had this information. Likely, based on the jury selection, would have been granted, our motion for cause.

So we have a scenario where this entire process has been influenced by a misrepresentation, and we don't know how we would have exercised our peremptories and how this jury would have been formulated, had we not had a juror who essentially misled us and now is saying he will -- he could only side with the government. And this is not information, obviously, he just came to come in possession of. He was on notice of what the case was about on the sexuality front.

So we are moving for a mistrial based on that. And I don't know what Ms. Cherwitz' counsel wants to add, but that's on behalf Ms. Daedone and Ms. Cherwitz.

MS. COHEN: Yes. We would join in everything that

Ms. Bonjean said.

THE COURT: I'll hear from the government.

MS. BENSING: Yes, Your Honor.

The government opposes. The defendant's right here is to a fair jury. We have six alternates for a reason. The juror was posed these questions during the voir dire. The juror disclosed what he disclosed. We are now in a position where the juror is indicating he can't be fair and impartial. The juror should be removed, and we should go to the first alternate, Your Honor.

THE COURT: Well, there's no question that the juror should be excused from this case. And I think everybody agrees with that; is that correct?

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes.

THE COURT: Okay. As much as I don't like to keep a jury waiting, we are going to take a 15-minute break, and I am going to encourage the parties to -- I know that's not a very long period of time, but to provide the Court with any relevant case law.

We'll come back at 10:00.

And let me just -- before we do that, before we do that, does anyone want to be heard on the second request? I don't think there's really too much that needs to be done. It doesn't appear to be a real request. But it's just sort of

informational, and I think -- I will hear the parties out on that.

MS. BONJEAN: Judge, I do think it requires additional inquiry. I mean, if she's having physical symptoms -- I don't know what that means. I am having heart palpitations. Again, I would also point out none of this was -- none of this was disclosed during the jury selection process, and I think there were questions that certainly would have elicited this type of information naturally.

THE COURT: Maybe or maybe not, right? I mean, this is -- this, I'm not sure it's -- that we can say it is that clear.

MS. BONJEAN: I agree it is not that clear.

THE COURT: Okay. One option is for the Court just to, you know, remind people that jury service -- you know, everybody appreciates jurors serving, and we understand that it is a time commitment, and that kind of thing. You know, I don't think she's really asking for anything here. And I'm not sure this really triggers too much.

But, again, I'll hear more from anyone who wants to hear.

MS. BONJEAN: Sorry, Your Honor. Before you move on, I want to also point out, as to juror 1, I do think we need to -- once he's dismissed, we need to probe whether he has said anything to the other jurors. That -- I mean, he has

indicated that he cannot be fair, that he couldn't side with anyone other than the government. I think we need to confirm that --

THE COURT: I think we have no basis to think that he has done that, especially because he was instructed yesterday, along with every other juror, not to talk to each other. I don't think that there's anything from which we can assume -- I think he did what he was supposed to do, which was to write a note and get it to me.

MS. BONJEAN: Respectfully, he was instructed on a lot of things that he didn't follow, including revealing whether his wife or anyone he knew was a victim of sexual abuse herself.

THE COURT: That's a different issue, though.

MS. BONJEAN: He still was not forthcoming.

THE COURT: Okay. Let's take the -- is anyone asking for anything with respect to juror number 2? You can also think about that, if you want, for the next few minutes.

MS. BONJEAN: We are asking for further inquiry.

MS. COHEN: Yes, we are as well.

THE COURT: What would be the inquiry you are asking for?

MS. BONJEAN: An inquiry into her ability to serve and whether her physical condition is impacted in such a way that she can't. And I know the Court doesn't want to

necessarily go down that rabbit hole, but I think there's been an issue raised and it needs to be addressed, and it cannot be ignored. That's our position.

MS. COHEN: As well, Your Honor, she's obviously distraught over her son's suicide, and that could affect her ability to serve. And we ask not specifically that question, but the question about whether you have had someone that -- you know, we asked sexual assault, sexual issues. We asked about whether they knew if someone had been convicted of a crime or anything like that.

THE COURT: All right. This reflects -- as I read this note, it reflects that the suicide was in January of 2023. Do you read it the same way?

MS. COHEN: Yes. But she --

THE COURT: So what question called for that?

MS. COHEN: That's what I'm saying. There wasn't a question, but it did -- the judge did ask over and over again is there anything else that would prevent you from serving here, and she did not answer that there was anything, and, clearly, this is having an impact on her. So I think at the very least it requires some further inquiry.

MS. BONJEAN: There were two questions, Your Honor, he asked, actually. He asked about -- he was asked about people's either physical condition or some type of disability or anything along those lines where they couldn't serve.

Numerous people -- not numerous, but at least two or three people were struck because of social anxiety disorders, panic disorders, emotional type -- the inability to sit. Three women sat -- came to sidebar and said, I have so much anxiety, I really can't even be here. I am under distress sitting here listening to this jury selection process.

They were struck. This woman said nothing. So I do think, you know, at least three people, two or three knew that the question that was asked about their physical ability to sit included a mental capacity to do so. So that's one.

Secondly, I believe the judge asked more than once about is there anything that would prevent you from being fair and impartial. And I would agree, the note isn't saying she can't be fair and impartial.

THE COURT: It's definitely not saying that.

MS. BONJEAN: It's not saying that.

But I do think in light of the fact that she's sending it out, that we, again, our position is she needs to be asked further about her physical condition, the ability to sit, as well as whether this will impact her ability to be fair and impartial. That's what we are requesting specifically.

THE COURT: Government?

MS. FARRELL: Your Honor, we would just note, it doesn't seem from the note that the juror was in any way

dishonest during voir dire.

THE COURT: Yes, I agree.

MS. FARRELL: And if there's limited --

THE COURT: I don't think the defense is suggesting she was dishonest.

MS. COHEN: No.

MS. FARRELL: I think there's a suggestion that there were questions asked about people's health and ability to serve that she did not respond to. But, obviously, we're in a different situation today than we were yesterday --

THE COURT: Yes.

MS. FARRELL: -- mostly they have now heard opening statements.

THE COURT: Well, they have also now learned that they were on the jury that's going to be sitting for approximately six weeks.

MS. FARRELL: That's true.

THE COURT: So there are many things that are different between when they were being asked questions then and now.

MS. FARRELL: Correct.

THE COURT: Okay. Again, I don't want to take too much time, but I think these are important issues to give the parties a little bit of time. So, again, now we will meet at 5 after 10:00, and we'll come back on these two issues.

I am not going to take up, given the timing, the motion in limine that was filed last night, but I have reviewed it, and I do have questions for the parties. We can do that either a portion of the lunch break or at the end of the day. As I understand it, the witness or witnesses you were going to call today do not implicate that issue; is that correct?

MS. FARRELL: That's correct, Your Honor. And we can table that until later in the trial.

THE COURT: I think that's -- in the interest of efficiency and not keeping a jury waiting, we should do that. But five after 10:00, we will be back. And any additional law or argument you want to give me, we will do briefly then. But, of course, I am also familiar with these issue so I don't think we will need to spend too much time.

Thank you.

(Recess taken.)

THE COURT: Okay. We're back on the record. Everybody that was here before that needs to be here, including the two defendants, are present again.

I don't think we need to take much time, but I will hear from anyone who wants to be heard. Let's start with the juror number 1 issue.

MS. BENSING: Your Honor -- oh. I don't know if the defendants want to start.

THE COURT: Go ahead, government.

MS. BENSING: Okay. Thank you.

We have done a little bit of additional inquiry in the 15 minutes that we had, and we understand that, first, I don't think that there is deliberate concealment of information here. The juror very candidly, after the opening statements, disclosed this and brought it to the Court's attention before any evidence has actually been heard in the case.

THE COURT: And I will tell you, it was very close in time to when the jurors were excused for the evening that he gave my deputy the note.

MS. BENSING: Thank you, Your Honor.

And, in addition, under *McDonough*, which seems to be the governing case here, and that's just 464 U.S. 548, I think the right that is at issue is the right to an impartial jury, and, here, we have six alternates for a reason. It comes out all the time during jury -- after the jury's picked that a juror didn't disclose that they had a conflict or something of that nature, and we just move on to the next alternate. So that's what the government thinks is appropriate here.

THE COURT: I will hear anything further from the defense. I think you've made your argument pretty clear, but if there's anything else you would like to raise.

MS. BONJEAN: Yes, Your Honor. We did have an

opportunity to look at the authority.

Do you mind if I sit?

THE COURT: That's fine.

MS. BONJEAN: As a preliminary matter, I went back and looked at the transcript from our jury selection conference with the magistrate, and I just want the record to be clear that we moved for the questionnaire for this exact reason. I placed my concern that for this sensitive matter, this topic, that there was likely going to be a scenario, a high likelihood that the defendants will be denied the information that they need, that they require to make appropriate cause challenges and meaningful peremptory challenges. Those were my exact words at the time. Our motion for a questionnaire was denied. So I want to give that backdrop.

I understand that the Court has discretion to allow questionnaires, but this was precisely the scenario that I had addressed was a concern.

The question that was asked of all the jurors -- and I would also point out that we objected to this process in and of itself, but the question that was asked by the Court, the magistrate judge, is whether or not any -- have you, any of your family members, or your close friends ever been the victim -- ever been subjected to sexual harassment, sexual abuse of any other kind, or any other kind of sexual

misconduct. Sorry. That was a little choppy. But essentially was asked that question.

He was also asked the question about his connections to law enforcement. He answered those questions --

THE COURT: This doesn't implicate a connection to law enforcement, this letter or note.

MS. BONJEAN: No, but what I'm suggesting is he did answer that question. He raised his hand and said, I -- my --

THE COURT: I see. You're saying that he answered a question, but didn't answer this question.

MS. BONJEAN: Yes.

THE COURT: Okay.

MS. BONJEAN: He understood what the process was. And he withheld the information about having a wife who had been sexually abused or sexually assaulted. Unclear at this point.

So it is our position that this was juror misconduct. He was not forthcoming, he was not -- he did not do what was expected of him and what he was told. The judge made it very clear that it is important that you tell the truth and give us the information, not to embarrass you, but because the parties need the information to do their job. He did not do that.

So by failing to disclose that information, what ended up occurring from our position is that we would have

moved for a cause application, and it clearly would have been granted in light of his remarks. There was nothing in opening statements that he wasn't at least, you know, brought to his attention during jury selection about --

THE COURT: Well, I'm not sure that that's really accurate in terms of, you know, he heard what this case in more detail is expected to be about.

MS. BONJEAN: Okay. Well, then that's still the Court's fault, frankly, because we asked for more -- we wanted context, and we wanted more information for this jury selection process. And I am going --

THE COURT: What exactly are you faulting the Court for?

MS. BONJEAN: The Court's jury selection process, which I indicated early on we had an objection to. It was not -- it did not scratch the surface of what needed to happen to appropriately probe the thoughts and positions of potential jurors in a case that is so unique like this. And I think we are seeing the consequences of that.

THE COURT: I'm not sure that this is as you're describing it, but I hear you. Is there anything additional? Do you have some case law on the issue of the peremptories that you're talking about?

MS. BONJEAN: Well, Your Honor, I think it is just under *McDonough Power Equipment v. Greenwood*, which is a

United States Supreme Court case, 464 U.S. 548, that addresses juror misconduct. And, yes, it's in the context of a post trial motion, but to obtain a new trial in such a situation a party must demonstrate that the juror failed to answer honestly a material question on voir dire, and then show that the correct response would have provided a valid basis for a challenge for cause. We believe we've satisfied both prongs.

THE COURT: That's a juror that ended up sitting throughout trial; is that correct? You said it was a pest trial motion.

MS. BONJEAN: Yes. It was a post trial motion.

THE COURT: Right.

MS. BONJEAN: Correct.

THE COURT: Okay. I know. You were saying that's not what we have here, but I understand why you are raising that case.

Okay. Go ahead.

MS. BONJEAN: And, separately, Your Honor, I think we'll probably put something in writing, and so we don't need to take up too much time, and I know I see where the Court is headed on this, but I just want the record to be clear, that we believe that this is an error of a structural nature. It's very hard to quantify in light of the fact that we don't know how we would have exercised our peremptory strikes, and it's hard to quantify, and it changes the entire structure of the

trial.

I understand that there are -- I understand that there are alternates, we have alternates. But where you have juror misconduct, which we believe is what occurred here, it's not simply, you know, a circumstance where something unforeseeable played out.

So I have made the record. We'll probably follow up with a written letter.

THE COURT: Okay. What exactly are you asking for at this time?

MS. BONJEAN: A mistrial. We are asking for a mistrial because the entire process of my client being able to choose a jury of her peers, and, again, within the confines of the laws and the rules, have been compromised and tainted by a juror who misled, misrepresented, and changed the course of the jury selection process.

THE COURT: Okay. So your request to the Court is for a mistrial.

Ms. Cohen?

MS. COHEN: We would join, Your Honor. I will just add to that, you know, obviously, Ms. Bonjean cited that case, the Supreme Court case. There's lots of cases, obviously, saying the same thing. If you lie during voir dire, you didn't give honest answers. This juror certainly would have been struck for cause, and if given the correct response, and,

therefore, that test of whether there should be under the law a new trial, in this case a mistrial, has been met.

Now, I understand that's after the trial has occurred. But, you know, I think the due process is the same. No matter what time it is, it is still the same issue that the entire pool has been affected.

THE COURT: Okay. I understand the defense position. The defendants, both defendants, are moving for a mistrial.

Government, your position is?

MS. BENSING: The government opposes, for the reasons stated, and, in particular, the right here is the right to a fair and impartial jury, which the defendants will get.

THE COURT: Okay. The motion for mistrial is denied. It is appropriate, though, to excuse and replace juror 1.

Nobody has an objection to excusing and replacing juror number 1, understanding that you've moved for a mistrial and that's been denied. Is that correct?

MS. COHEN: That's correct, Your Honor.

MS. BONJEAN: That's correct, Your Honor. We would maintain our request that he be questioned, and also for the Court to make a find being his misconduct.

THE COURT: Does the government wish to be heard on

that request?

MS. BENSING: We have no objection to the removal of juror 1, as we indicated at the top.

I don't think that there's a necessity for a finding of deliberateness. And I'm not sure what the other request was, Your Honor.

THE COURT: The request was for an examination of the juror.

MS. BENSING: Well, if the purpose of the examination of the juror is to assess whether or not this was deliberate or not, I don't think that that's necessary, Your Honor.

THE COURT: Okay. The request for examination of the juror is denied, and the Court does not make a finding of misconduct on the record here.

What is important is that the defendant -- both defendants get a fair trial. And we have alternates for a reason here, and we will be -- I will excuse juror number 1. That juror will be replaced by juror number 13, which is the fist alternate.

Do the parties have a preference as to whether number 13 moves down to the first seat so we're not looking at an empty seat? Does anyone have an issue with that?

MS. BONJEAN: I don't have an opinion on that particular issue, but I thought maybe that would be better.

Just --

THE COURT: Sorry. Which would be better?

MS. BONJEAN: That he move down.

THE COURT: And let me hear from Ms. Cohen?

MS. COHEN: Yes. I agree, Your Honor.

THE COURT: Government?

MS. BENSING: We take no position, Your Honor.

MS. BONJEAN: One other thing, Your Honor, I just want to make sure the record is clear. I'm not trying to harp on this.

Our other basis for asking that the juror be questioned wasn't just for finding of deliberateness or misconduct, but also as it relates to whether or not he communicated his views to the rest of the jury. And so I just want to remove for that, and I will leave it at that.

THE COURT: Okay. There is no indication that that has happened. And, in fact, the fact that he followed the rule so promptly and wrote a note to my deputy to give to me suggests that he did not do anything other than what he had just been instructed to do, which is to raise issues with the Court. All of the other jurors, of course, were also told that if anyone tries to discuss the case with them, to raise it. They were told not to even discuss the case among themselves until deliberations.

So I understand your argument, and don't think

there's any basis to assume, infer, or to inquire further about his -- whether he has spoken to any other juror.

MS. COHEN: Excuse me, Your Honor.

And I assume there will be some kind of -- when the jury does come out, that it is not to make any assumptions about the fact that someone is gone.

THE COURT: That's what I wanted to ask the parties about as well. But let's do that after we talk about the second note from today.

You know, I appreciate that the juror, this is juror number 2 now, raised, you know, an e-mail with us about how she's feeling. But there's nothing in here that suggests that she's not able to listen or pay attention or consider what comes before her. So I am not inclined to take any action on this note at this time.

If she were to raise another note, if it would be something that really more clearly triggers a concern here, I think we could address it then. But this -- there's no -- I think the government raised earlier, too, there's no suggestion that this juror was not honest about anything. This juror knows how to write a note, and knows how to convey what she wants to convey. And so I think unless this note -- unless there is a note that is more specific, more direct, or really indicates that there's some inability to pay attention, focus, listen, hear, et cetera, I don't think there's really

any action that needs to be taken. But I will hear -- I heard the parties earlier, I will hear the parties now, briefly, if you would like to be heard.

MS. COHEN: Yes.

Your Honor, I mean, this is juror number 2, correct?

THE COURT: Juror 2. Yes.

MS. COHEN: I mean, she's a main juror. She's going to be -- it's not an alternate. She's going to be sitting here for six weeks. You know, it concerns, again, because the question was asked over and over and over again, including people's health, is there anything else that would prevent you from sitting here. It does concern -- I'm not saying she has to be even gone, I just want to make sure that she -- that there's no further issues.

MS. BONJEAN: Thank you, Your Honor.

Respectfully, I think the note does indicate that she needs -- there's reasons to believe she cannot do her job.

THE COURT: What part of the note? Because she's essentially grieving, and with Mother's Day coming up, she's thinking about her son who took his own life. What beyond that makes you think that she cannot fairly and impartially hear this case?

MS. BONJEAN: The fact that she says I'm having heart palpitations and provides her psychiatrist's phone number. I think those are two indicators that she is

struggling. In fact, I think she says the word I --

THE COURT: She says she's struggling.

MS. BONJEAN: She says she's struggling.

So I understand that the Court disagrees, but I am making the record, I think the record -- I think the letter says very clearly, very clearly, in as plain language as you can, that she cannot or at least needs to be determined whether she can physical -- psychologically and mentally sit through this trial.

I don't -- I think it is also just jurors are expected to be here and do their civic duty. They are not expected to torture themselves. And so I think it requires further inquiry. The Court disagrees. I respect the ruling.

THE COURT: She diligently came in. She hasn't said she's not able to physically get here, et cetera.

I will hear from Ms. Cohen, if you would like to be heard.

MS. COHEN: No, Your Honor. I just -- look. I think just the fact that she brought -- she wrote this letter says a lot. I'm not saying necessarily that she should not be able to -- that we should dismiss her. And I understand Your Honor's concern about questioning and sort of allowing people to get out. But just a simple inquiry as to we received your letter, is there anything you wanted to add, and make sure she can sit, you know.

THE COURT: We are also on barely day one, you know, day two. But we haven't had any testimony yet.

And jurors, it may be sinking in on them that this is a long -- potentially long trial, and that they were, in fact, selected. And, you know, if we give it a day, things sometimes really tend to settle in, people get into the routine.

She has not refused to come. This letter doesn't suggest that there's -- you know, it really doesn't suggest that she's not paying attention or can't pay attention. And I have every reason to believe that someone who would write this type of letter will, in fact, write another one if there is an issue that really does prevent her from doing what she's supposed to do, which I made very clear what everybody's job was yesterday when I instructed the jury.

So I understand you're making your record. If there's anything else, I will hear you on that now, but I am not inclined to address this further, this particular note.

Anything further?

MS. BENSING: The government agrees with the Court, Your Honor.

MS. COHEN: Your Honor, one moment.

THE COURT: Sure. Take your time.

(Short pause.)

MS. COHEN: Okay. Nothing further, Your Honor.

THE COURT: Okay. And I would also note that the fact that she wrote a note suggests that she was listening and carefully paying attention and following instructions. So I think that is another reason why this does not require action at this time, but, again, the Court will take serious and prompt action on any future jury notes. But I do think we are getting notes now because it is the beginning of the trial, not uncommon, and I think we can just take them as they come.

So let's go back to the issue with juror number 1, which is I think, Ms. Cohen, you wanted some instruction to be given or some reminder to be given, and I will take the parties' suggestions. Ideally -- you can talk to each other for a minute, and, collectively, let me know what you propose for the Court to tell the jury when they come back in.

My thought, but I will listen to the parties on this, is that we don't need to bring the juror number 1 who's getting excused back in. I have excused him. I have let the parties know that. And we can send him back down to the jury room where he can serve on another jury potentially.

But we will bring everybody else back in. We can probably also, and, again, I will hear the parties on this, but tell juror number 13 that juror number 13 will be sitting in the fist seat, and then give some further instruction, which I will hear you out on.

But let me give you a minute to talk to each other.

(Short pause.)

MS. BENSING: Your Honor?

THE COURT: Yes.

MS. BENSING: I think we all agree that the Court can make some sort of record along the lines of juror number 1 had to be excused. Juror number 13 will be sitting in juror number 1's seat. You are not to speculate about why this is the case. We are going to proceed.

THE COURT: Okay. Let me just read essentially what you just said. I want to make sure everybody is on the same page.

They will come in. I will tell them juror number 1 had to be excused. Juror number 13 will -- tell me, Ms. Bensing, what exactly?

MS. BENSING: Will take the seat of juror number 1.

THE COURT: Take the seat of juror number 1. You are not to speculate as to why this is the case.

Does that work for everybody?

MS. COHEN: We agree, Your Honor.

MS. BONJEAN: That's fine, Your Honor. I guess maybe juror number 13 should -- I assume he'll understand he's now a juror rather than an alternate.

THE COURT: I think that's probably obvious, right? I have also told all the alternates they have to pay as close attention as everybody else. I don't think there's anything

necessary, if you want me to --

MS. BONJEAN: I just -- I was just pointing out that, just moving down to the seat, he may not realize he's now a juror. If you think it is clear, I will defer to you. I don't know what to think anymore of this jury, actually.

MS. BENSING: The Court could also perhaps just say, in an abundance of caution, that everybody should be paying attention and listening to the evidence with care, as the Court has already --

THE COURT: I just said that yesterday. I am not sure that's really required again, nor is it harmful, if the parties want me to say that? I really don't think it serves all that much extra purpose. I think we just tell him that he will take the -- maybe I say take the place of juror number 1? Does that work better?

MS. BONJEAN: Sure.

MS. COHEN: That's fine, Your Honor.

MS. BENSING: That's fine, Your Honor.

THE COURT: Okay. I think it might also be worthwhile just to tell the jurors that we understand that juror service -- well, let me hear you out on this. Jury service, you know, requires a commitment of time, and appreciate it. That was all said, I think, during jury selection. Maybe it is not necessary. But I will hear the parties out if you think there's anything more. Or let's get

this change done and move on to the witnesses.

MS. BENSING: We defer to the Court.

MS. COHEN: Yes, Your Honor, I believe you did say that. I don't think it ever hurts, so I'm fine with it.

MS. BONJEAN: I don't have a strong opinion. I think I said it in my opening statement, too, so I don't --

THE COURT: I'll leave it alone.

MS. BONJEAN: Yeah.

THE COURT: I think I'll leave it alone. I think we just need to get to the witnesses now.

One moment, please.

(Short pause.)

THE COURT: I will, though, remind them that they need to show up on tie. I mean, today we are delaying them, but for good reason, but I don't want them to be delaying all of you. So I will remind them they have to be here by 9:15, and not all of them were. I don't know which ones were or not, but they were not all.

Okay. So, again, my deputy will inform 1 that he's been excused and should go back downstairs, and 13, that 13 is going to be in the seat of 1. And they will come out, I will say briefly what the parties all agree, and we will then have the government call its first witness.

Is there anything else we need to take up before I do that?

MS. BENSING: No, Your Honor.

THE COURT: Ms. Cohen?

MS. COHEN: No, Your Honor.

MS. BONJEAN: No, Your Honor.

I know -- I just want to flag for the Court that I don't know how far we will get into the direct. We do have some objections to exhibits. So I know the Court -- I don't know -- I am going to object. So I am just letting the Court now.

THE COURT: Do you want to tell me now? Are they sort of foundational objections, or something else?

MS. BONJEAN: There's a number of foundational objections, and, yes, it has to do with e-mails and material that we believe has foundational problems, as well as hearsay problems, et cetera.

MS. COHEN: Sorry, Your Honor. I had forgotten there was another issue in addition to the objections --

THE COURT: Yes. Okay.

MS. COHEN: -- which we had advised the government about.

I just want to raise one other issue. And this was fronted in, actually, the government's opening statement, about, and for the first time I've heard there was something that the first witness is going to testify about, that the government suggests was asexual assault, in the opening

statement.

We do not, number one, the description, as they said in the opening, they never gave any notice of 403(b) evidence of prior -- of other acts. That's number one. We do not, certainly -- the incident, I think what they are talking about, is not at all -- I don't even say how they would say it is sexual assault. But in any event, the incident is also not relevant, it's not tied to labor. It had to do with on OM demonstration. And our view is that not only was it not identified as 404(b), but it's irrelevant and its prejudicial value far outweighs any relevancy under 403.

THE COURT: Is this something that's going to come up before the first morning break, or can we move on and take it up then? Because I really do want to get this testimony started.

MS. FARRELL: It is not, although it is not 404(b) it is direct evidence of the --

THE COURT: No, no, I know that you have a different position, I assume.

MS. FARRELL: It comes up later in the direct. So we can table it for now.

THE COURT: All right. Let's do that then.

Anything else?

MS. FARRELL: May I just ask when Your Honor intends to take a break so I can pace myself accordingly?

THE COURT: Yeah, I mean, we're a bit off schedule, but I would probably take a break around -- well, it depends. Do the parties prefer to take a break, or to just have an earlier lunch? I don't have a preference today.

MS. FARRELL: I think given that the witness is very pregnant, we will need to take a break.

THE COURT: Okay. Maybe about an hour after we start.

MS. FARRELL: Understood. Thank you.

THE COURT: So we will bring in the jury.

And, Mr. D'Agostino, you will inform juror number 1 that he's been excused from this case and needs to go downstairs to the second floor jury room.

And you will inform number 13 that he is taking the place of juror 1, and so he can sit in that first seat.

THE COURTROOM DEPUTY: Yes, Judge.

THE COURT: Okay? Thank you.

MS. FARRELL: And, Your Honor, may I go get set up while he's --

THE COURT: Yes.

MS. BENSING: And, Your Honor, one quick thing, which we do not need to hold up. It's very quick.

THE COURT: Okay.

MS. BENSING: I just wanted to make sure the Court is okay with the placement. I think this is where we had it

at my last trial before Your Honor, but I just wanted to --

THE COURT: Is the question, can I see it?

MS. BENSING: Can you see it, are you okay with it there --

THE COURT: I can see it --

MS. BENSING: Okay.

THE COURT: -- as long as it is not obstructing jurors' view, witnesses' view, defense counsel view, defendant's view, which I don't think it is.

And I'm also happy to move if I need to look at something and can't see it. But I think that's a good place for it.

MS. BENSING: Thank you.

THE COURT: And we're not going to bring the witness in until after I get the jury and we explain what we discussed.

MS. FARRELL: Yes.

(Short pause.)

MS. BONJEAN: These are my paralegals.

THE COURT: That's fine. I just want anyone who is in the well to be sitting at tables. If we need more chairs, we can get you more chairs.

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

Good morning to the jury.

THE JURY: Good morning.

THE COURT: I want to let the jury know that juror number 1 had to be excused, and juror number 13 will take the place of juror number 1. You are not to speculate as to why this is the case.

I also just wanted to mention that we did keep you waiting this morning, and I apologize that. There are sometimes reasons I have to meet with the parties, the lawyers, or others, without having the jury here, but I do take very seriously everybody's time, and I don't like to keep people waiting. So I apologize for that.

I also want to just remind all of the jurors to do your best to get here by 9:15. You know, it is just important that we do try to start on time, and I know full well that New York commuting can be very difficult, subways, trains, busses, cars, there are sometimes unavoidable delays. But if you could just do whatever it is you can do to get here on time. And we will do our best to start on time. And I thank you all.

And with, that, the government may all its witness.

MS. FARRELL: Thank you, Your Honor.

The government calls Rebecca Halpern.

(Witness enters courtroom.)

THE COURTROOM DEPUTY: Please stand up, remain standing, and raise your right hand.

(Witness duly sworn.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell it slowly, and speak into the microphone. Thank you.

THE WITNESS: My name is Rebecca Halpern. R-e-b-e-c-c-a, H-a-l-p-e-r-n.

MS. FARRELL: Thank you, Ms. Halpern.

And please just make sure to speak directly into the microphone, as we begin this morning.

Your Honor, before we begin, in the interest of efficiency, the parties have reached a stipulation as to the admission of certain documents. I would just like to read them out, and we'll move for their admission right now.

THE COURT: Go ahead.

MS. FARRELL: These are government exhibit numbers.

THE COURT: Just do it slowly, please, for me.

MS. FARRELL: Of course.

3120, 306, 309, 201, 211, 290, 242, 302, 281, 221, 292, 284, 3234, 3224, 12, 3768, 207, 260, 254, 382, 388, 228, 265, 269, 208, I have about five more, 374, 408, 261, 404, 3766, and, lastly, 3500, so 3500-RW-12.

THE COURT: Okay. Give me one moment because I think that defense might need a moment to review those numbers.

MS. COHEN: One moment, Your Honor.

THE COURT: Yes. Take your time.

(Short pause.)

MS. COHEN: Your Honor, we have no objection.

THE COURT: Ms. Bonjean, any objection?

MS. BONJEAN: No objection.

THE COURT: Okay. Are you offering each --

MS. FARRELL: Yes, Your Honor.

So the government moves all of those exhibits I just listed into evidence.

THE COURT: Okay. And although it is a bit cumbersome, for record clarity I will repeat the numbers. They are all admitted, and they are as follows. And everyone please pay attention to make sure that this is what -- I'm repeating what Ms. Farrell had just said.

Following exhibits are admitted: 3120. 306. 309. 201. 211. 290. 242. 302. 281. 221. 292. 284. 3234. 3224. 12. 3768. 207. 260. 254. 382. 388. 228. 265. 269. 208. 374. 408. 261. 404. 3766, and 3500-RW-12.

Are those the exhibits?

MS. FARRELL: Yes, Your Honor.

THE COURT: Okay. They are all the admitted.

(Government Exhibits 3120, 306, 309, 201, 211, 290, 242, 302, 281, 221, 292, 284, 3234, 3224, 12, 3768, 207, 260, 254, 382, 388, 228, 265, 269, 208, 374, 408, 261, 404, 3766, and 3500-RW-12 received in evidence.)

MS. FARRELL: Thank you.

REBECCA HALPERN,

called as a witness herein by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. FARRELL:

Q Ms. Halpern, can you please introduce yourself to the jury.
A Hello. I'm Rebecca Halpern. I usually go by Becky.
Q Do you know an individual named Nicole Daedone?
A I do.
Q Who is Nicole Daedone to you?
A I used to work for the company called OneTaste, and at the time she was the founder of the company.
Q Besides being the founder of the company did she have other roles?
A Yes.
Q Can you briefly describe them.
A She obviously founded the company and acted as the president, CEO, leader of the company. Was kind of at the top of the pyramid as far as the leadership.
Q Do you see Nicole Daedone here today?
A I do.
Q Can you please point her out, and, for the record, state an article of clothing that she's wearing.

A Sure.

That's Nicole Daedone standing. She's wearing a tan scarf.

MS. FARRELL: And, Your Honor, may the record reflect that the witness properly identified the defendant, Nicole Daedone.

MS. BONJEAN: So stipulated.

THE COURT: Yes.

Q Has Nicole Daedone harmed you in any way?

A Yes. I would say so.

Q At a high level, how did Nicole Daedone harm you?

MS. BONJEAN: I am going to object, Your Honor.

THE COURT: Basis? One word or two.

MS. BONJEAN: To the foundation of that question.

THE COURT: Overruled.

Q You may answer, Ms. Halpern.

At a high level, how did Nicole Daedone harm you?

A It's a big question to answer, but --

MS. BONJEAN: I'm going to object to the answer on relevancy grounds to the scope of that question.

THE COURT: Overruled.

A I experienced a large amount of harm during my time at OneTaste, both as a participant volunteer and as an employee of the company, and all of the ideas and all of the leadership came from Nicole, is my understanding.

MS. BONJEAN: Objection.
Q Do you know an individual --
THE COURT: Sorry. If you could just speak into the microphone.
MS. BONJEAN: Yes.
I am going to object to the speculation, "it was my understanding." So I am going to object on those grounds as well. Move to strike that last part.
THE COURT: Overruled.
Q Do you know an individual named Rachel Cherwitz?
A I do.
Q Who is Rachel Cherwitz to you?
A She was my direct manager at OneTaste.
Q Do you see her here in the courtroom today?
A I do.
Q Can you please point her out?
A Yes. She's standing over there, wearing glasses.
MS. FARRELL: And, Your Honor, may the record reflect that the witness properly identified the defendant Rachel Cherwitz.
THE COURT: Yes.
Q Has Rachel Cherwitz every harmed you?
A Yes.
Q And at a high level --
MS. COHEN: Objection, Your Honor. Same objection.

THE COURT: Overruled.
Q At a high level, how did Rachel Cherwitz harm you?
A I worked directly with Rachel for quite some time and experienced a lot of emotional abuse, sexual abuse, you name it.
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: Same objection. Relevancy.
THE COURT: Overruled.
Q So earlier you mentioned that you worked for a company called OneTaste. What is OneTaste to you?
A OneTaste was -- I'm going say "was" because I don't really know what they are today. But when I was there, was a company that taught courses on relationships and sexuality. There was a central practice that they taught called orgasmic meditation that is commonly referred to as OM.
Q Can you explain to the jury what orgasmic meditation or OM was when you were at OneTaste?
A Sure.
So it's a little bit confusing because the word "orgasm" in the jargon of OneTaste is pretty different from how we normally understand it. It doesn't mean climax, per se. It's kind of like it means a person's life force, like someone's energy.
So in an OM, in an orgasmic meditation session, it's

about a 15-minute practice, and it is sexual in nature. There are two people, it's usually a man and woman, could be two women. There's a stroker and a strokee. The person who's being touched is the strokee. And the stroker will stimulate her clitoris, which is the most sensitive part of a woman's anatomy, for about that 15 minutes, and then afterwards they share something that they felt during that meditation.

Q So how did OMing fit into the overall structure of the company OneTaste?

A It was used as a metaphor for almost everything. So there are -- in conversation it would be used like, oh, can you give me a frame of what just happened, which is terminology that's used within orgasmic meditation, you know, talking about someone's orgasm or life force, talking about someone being turned on. All of these things were in common usage.

Q You've already testified you were involved in OneTaste. In what capacities were you involved with the company?

A I started out as a participant and a community member, just kind of coming in, you know, for my first time and taking introductory level courses, and then, you know, and not too long after that, I became employed by the company on the sales team.

Q And approximately what was the span of time in years that you were involved in OneTaste?

A So I believe that I started -- like I was introduced to OneTaste about late 2010, early 2011. I was a participant for a few months, then I took a break, was not involved for approximately a year, and then that's when everything kind of ramped up for me. So I was there from late 2011 as a participant, became an employee of the company I think summer of 2012.

THE COURT: Can I just stop you for one minute, just to ask you to ever so slightly move the microphone away from you. We're just getting a bit of feedback.

(Short pause; technical difficulties addressed.)

(Continued on the next page.)

(Continuing)

THE WITNESS: Oh, sure.

THE COURT: Thank you so much.

THE WITNESS: Is this better?

THE COURT: Yes.

Can everyone hear still? It was very muffled for a moment there.

Okay. I'm sorry to interrupt. Go ahead.

MS. FARRELL: Thank you, Judge.

BY MS. FARRELL:

Q And sorry, just to get you back to where you were, you had started saying you were involved in late 2011. And then you got more involved when?

A I became an employee of the company in summer of 2012.

Q And approximately when did you leave or disassociate with OneTaste?

A In the spring of 2014.

Q And approximately how old were you during that time, 2010 to 2014?

A I was in my early twenties. I believe it was from around age 23 to 27.

Q And were you in the same city the whole time?

A No. I moved back and forth from New York to San Francisco several times.

Q Okay. So you've already described what OMing, orgasmic

meditation, this genital stroking practice was, but can you explain to us more broadly what type of business OneTaste was?
A Yes.
So --
MS. BONJEAN: I'm going to object, Your Honor. There's been no foundation that this witness can testify to these things.
THE COURT: Repeat the question, please.
MS. FARRELL: Sure.
I asked her to testify about what type of business OneTaste was.
Q Based on your experience.
THE COURT: Overruled.
A Yeah, so I worked for the company. I was -- I'm sorry, what was your question? Can you repeat?
Q Sure.
Just can you tell us about the business of OneTaste, based on your personal experience?
A Sure.
So it was a company that sold courses in relationships and sexuality. They also sold coaching in the style of OneTaste, life coaching. And so, there were courses in how to do orgasmic meditation and other sexual practices. There were -- and the courses were also largely based in a lot of psychological concepts, so kind of finding one's self and

-- so there was a lot of overlap between the sexuality practices and sort of digging deep into people's trauma, history, life, psychology. And that's what the courses were centered around.

Q You mentioned it covered topics of other sexual practices besides the OMing genital stroking practice that you've described. What were the other sexual practices that were taught at OneTaste?

A In sort of more upper-level classes, there was a practice, for example, called male OM, which is --

Q Which is what?

A Which is sort of just the reverse of orgasmic meditation. Instead, you would being stroking a man.

Q Stroking what, exactly?

A Stroking his penis. And the same idea. It could be two men, it could be a man and a woman. Everything else is the same.

Q Besides the male penis-stroking courses that you could take, were there other sexual classes or services provided by OneTaste?

A Yes.

You know, for example, in what was called the Mastery course, there were segments on, like, anal play and S&M, bondage and domination and sadomasochism, all -- it kind of was a wide range.

Q And were these classes conceptual or were they hands-on?
A They were hands-on.
Q During the time you were involved with OneTaste, did you provide any labor for the company?
A Yes.
Q What sort of labor did you provide?
A It was a pretty wide range. My title was that I was on the sales team, but I did -- you know, I did activities related to sales. So, you know, finding leads to sell to, going out to events to talk to new people to tell them about OneTaste.
And then also, things that were nonsales related. So production for courses, which just means when we held courses, there would be a lot of things involved. So, like, moving of chairs, and food and tea and all those things, setting up for the space to hold classes for people.
And additionally, you know, there were lots of little bits of work related to kind of taking care of the people in the company who were higher up than me. So, like, getting people coffee, getting people, you know, snacks and making their beds. And it was, like, a huge range of what I did there.
Q So we just talked about labor. Now I'd like to turn to services.
During the time you were involved in OneTaste, did

you provide any services for the company?
A Yes.
Q And what sort of services did you provide?
A Similar to the things that I had just described, but also just kind of always being out in the world as a representation of the company. So, wearing orgasmic meditation t-shirts. And the expectation was to kind of talk to anyone that you see and tell them about and proselytize really for the company.

And also, there were -- you know, I engaged in the practice of orgasmic meditation with community members and potential clients, so that was a service of the company as well.

MS. BONJEAN: I'm going to object, Judge, Your Honor, on the grounds that this is -- and I don't know, I -- it deserves a sidebar, but this is an ultimate issue for the jury to decide.

THE COURT: Excuse me. Excuse me. No speaking objections. One or two words if I need it.

Repeat the question.

MS. FARRELL: "What services did you provide?"

THE COURT: Overruled.

Q So you had just described how some of the services you provided were OMing with community members; is that correct?
A Correct.
Q Can you describe what you mean by that?

A Sure.

So there is this kind of important distinction between who worked for the company and who was a community member just taking classes. That line got blurry sometimes. But when I was employed by the company, there would be, you know, new people coming into the community who didn't know what OM was or maybe they had taken a couple of classes. And it was -- it was the expectation that I would be open to OMing with anybody kind of off the street, whoever they were, to -- you know, as a part of getting them interested in it, learning how to do the practice.

Q And specifically, who set that expectation with you?

A I would say kind of everybody, but my -- you know, my direct supervisor was Rachel, so most of the direct -- you know, directives came from her.

Q And when you say it was the expectation, a directive from Rachel Cherwitz that you would OM with community members, what does that actually mean? What would you physically be doing?

A So I can think of one example that just like really, you know, rings in my head. There was -- there was a community member coming in who was, you know, like an older man, somebody that I wouldn't necessarily -- you know, I definitely wouldn't ordinarily engage in sexual activity with. But the idea was that OMing was separate from sex and so we all had this idea that it was something different.

And so, I -- he was this new lead in that he had potential to buy lots of things from the company. I think he probably was known to have money. And so I OM'd with him privately in a separate room, prior to a larger OM circle that happened with more people prior to what was called a TurnON event, the intro event.

Q Okay. I have some follow-up questions.

When you said there was an idea that OMing was separate from sex, who was the proponent of that idea, if anyone?

A I mean, all of the -- all of the kind of tenets of orgasmic meditation and all, everything around that came largely from Nicole. And, you know, she gave courses and would speak publicly about, you know, the difference between OM and sex. And that was just a very widely known kind of -- widely accepted viewpoint. And, you know, everybody else who worked for the company, it was the same, the same thing.

Q And then when you say you OM'd privately with this older man before an event, who, if anyone, told you to do that?

A I remember Rachel Cherwitz saying, you know, okay, here's this guy, here's his name. I had never met him before, but he's going to be coming in. You know, why don't you OM with him. Like, we'll give you this room, here's the setup.

Q And when you say you OM'd privately with him, just very -- at a very specific level, what physically were you

doing with him?
A So we were in a room that was -- we had rented a space for courses that we were -- you know, it was to be used for a while and there was a separate room with, like, pillows. And so because he had never done the practice before, I was kind of walking him through it and showing him how it worked. So, like, you know, we laid out the, you know, cushions and a blanket and things.
And then I -- this is what a typical OM is. I undress from the waist down and I get into a position with my legs spread. And then he's sitting next to me and then he strokes me in a specific way for about 15 minutes.
Q And where is he stroking you?
A On my clitoris.
Q And is that in your vaginal area?
A Yes.
Q So we just discussed the labor and the services that you testified about.
Did you make any payments to OneTaste during your time involved with the company?
A Yes.
Q And approximately how much, if you know, total did you pay to OneTaste?
A I would estimate it was between -- it's probably in the range of 15 or $20,000.

Q And what were those payments for?
A For courses that I took.
Q And then did OneTaste ever pay you?
A Yes.
Q And what did OneTaste pay you for?
A For my -- for being employed on the sales team.
Q And we'll get into the details later, but do you recall how much your salary was?
A I believe it was in the range of like around $2,000 a month.
Q And was that for the entire period of your time at OneTaste?
A Yes.
Q Or was it only when you were employed there?
A Only when I was employed there.
Q We'll get into the details later, so I'm really just asking this at a high level, but did you experience any financial harm in connection with your time at OneTaste?
A Yes.
Q And how would you describe the level of financial harm you experienced?
A I came in with very little in savings and I left with absolutely nothing. It was as though I hadn't worked at all for that time.
Q Did you observe others experiencing similar financial

harm at OneTaste?
A Yes.
I experienced -- I mean, I saw others experience much worse, eventually.
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: Foundation.
THE COURT: Sustained.
Q So, we'll get into the details later. Again, this is at a high level.
THE COURT: Let me strike that answer because I think it was given before the objection.
Go ahead.
MS. FARRELL: Thank you, Your Honor.
Q We'll get into the details later, but at a high level, did you experience any psychological harm during your time at OneTaste?
A Yes.
Q And how would you describe the level of psychological harm that you experienced?
A It's pretty extreme, I would say. It's really hard to be in this room right now, for example. I -- it's something that I still deal with on a daily basis. You know, I've been in therapy and working through what I experienced there. But there was -- there was a lot of trauma and I experienced, you

know, a lot of lasting effects in -- you know, in my sex life and in my personal relationships.
Q So you've just described psychological harm that you've experienced since after your time at OneTaste.
I want to focus on --
A Sure.
Q -- what, if any, psychological harm you experienced while you were there.
Did you experience any psychological harm while you were at OneTaste?
A Yes.
There was -- public humiliation was a really big, you know, tactic that was used to keep the staff and the people, you know, in line. And so I -- you know, I would get yelled at and screamed at and publicly humiliated on an almost daily basis. And, you know, I remember it was really most days that I would be sort of crying in a bathroom, you know, scared and not --
Q And specifically --
THE COURT: You're going to have to let the witness answer the question.
MS. FARRELL: Thank you, Your Honor.
Q And specifically who was berating you in this way?
A Usually it was Rachel Cherwitz. Sometimes it was others. But it was usually kind of coming from her.

Q And so besides psychological harm -- again, I'm asking you about the harm that you experienced while you were at OneTaste as opposed to after you left.

Besides psychological harm, was there other harm you experienced while you were there?

A Yes.

Q What was that?

A There was sexual harm for sure.

Q How, if at all, did the psychological and sexual harm that you experienced while you were at OneTaste affect your subsequent provision of labor or services to the company?

MS. BONJEAN: Objection.

THE COURT: Basis?

Is it a foundational basis or something else?

MS. BONJEAN: Yeah, it's foundation.

THE COURT: You're going to have to lay a foundation if you want to proceed down this road.

I will sustain that objection.

Q So, Ms. Halpern, you've just testified that at the time you were at OneTaste, you experienced psychological harm; is that correct?

A Yes.

Q And you also experienced sexual harm; is that correct?

A Yes.

Q Did you provide labor and services to OneTaste at the

time that you were experiencing those things you just described?
A Yes.
Q How, if at all, did those experiences you just described impact your providing that labor and services?
MS. BONJEAN: Same objection.
THE COURT: Overruled.
A The -- they're so linked. The sexual harm, the emotional harm and the labor and services that I provided, it's almost one and the same in how I remember it. There was an overall expectation that I be a "yes" to everything, which means that I -- you know, the expectation was for me to say yes to, you know, OMing with anybody and going to any class at any time and, you know, getting up when I'm told to get up. Like, there were just -- my entire life was very -- there was an expectation for me to be working at all times. And so what that meant was to be so-called turned on at all times. And if I wasn't turned on --
MS. COHEN: Your Honor, I'm sorry, objection.
THE COURT: Basis?
MS. BONJEAN: It's nonresponsive, Your Honor.
THE COURT: Excuse me. I'm going to listen to Ms. Cohen first and then I'll hear from you.
Basis?
MS. COHEN: As to whose expectations?

THE COURT: Yes. Sustained on that ground.

MS. FARRELL: If I may ask a follow-up question, Your Honor?

THE COURT: You may ask a different question because I sustained the objection.

Q You've just described expectations that you felt. Who, if anyone, places expectations on you?

A It was largely from Rachel Cherwitz and other members of the leadership team.

Q Did that include Nicole Daedone?

A I didn't receive direct orders per se from Nicole Daedone as often. It was usually Rachel Cherwitz.

Q What was the relationship, based on your observation, between Rachel Cherwitz and Nicole Daedone in the structure of OneTaste?

A They were really a pair and a unit. It was, you know, Nicole at the very top and then Rachel being sort of her right-hand woman. So, you know, there was -- and then there was, you know, the rest of the leadership team kind of immediately after that. But they worked as a close pair.

Q All right. So I would like to take a step back and just start at the beginning.

First, where did you grow up?

A I grew up in Westchester County, just north of here.

Q And in addition to Becky Halpern, have you ever been

known by any other names?
A Yes.
I was -- I used my maiden name legally prior to this, Rebecca Weiner.
And then I also used a nickname while I was at OneTaste, Becky Uma.
Q How far did you go in school?
A I have a master's degree.
Q And what is your master's in?
A In social work.
Q What did you study when you were an undergraduate?
A I studied American studies.
Q And what did you do after you graduated college?
A Right after I graduated, I got really interested in yoga and meditation, which is all kind of in keeping with these themes, so I -- I lived and worked in a yoga community for a while after college.
Q When did you -- approximately when did you first learn about OneTaste?
A I believe it was around late 2010, early 2011.
Q And how old were you then, approximately?
A I was 23.
Q And at that time, where were you living?
A I was living in San Francisco.
Q And how were you supporting yourself?

A I had a job at a front desk at a gym.
Q And how did you first hear about OneTaste?
A I was on OKCupid, which was big at the time for finding dates and also friends, and someone that I didn't know messaged me. And I was intrigued by their profile because it said something about orgasmic meditation. And I said: Oh, that sounds weird. What is that? And then I wasn't really into the person, but I just was into this idea and felt curious, and so we went to an introductory TurnON event together.
Q And what was the introductory TurnON event? If you could describe it, please.
A Sure.
So this is like the very base level of -- it's not technically a course, but it's like the first thing that you experience when you are coming into OneTaste. So, it's an evening. There are a bunch of people in a space. There are two people up at the front leading the event and they're, like, on high chairs. And it's always the same pattern. You know, they're -- people are introducing themselves and then they play these games, largely psychological-based games, kind of getting to the root of what's bringing someone there.
There was a -- for example, I think this helps you understand. Like, there was a game called Hot Seat where, you know, someone would come up from the audience and they'd be in

the Hot Seat. And then they would be basically interviewed by one of the people leading the event and that person would be asking really personal questions about their life, their sex life, et cetera.
Q And for this first TurnON event that you attended, who were the leaders, if you remember?
A I don't know if I recall who the leaders were of the TurnON event. I recall who was there generally.
Q And who do you remember being there?
A I remember Robert Kandell was there. I don't think Rachel Cherwitz was there. I don't think Nicole Daedone was there. I believe possibly Drea Marz was there, Justine Dawson. A lot of people that I would come to know later.
Q Okay. And we'll get to them in a moment.
What was your initial reaction to this TurnON event?
A It felt really strange and unusual and also really intriguing. It was -- you know, you just -- you don't typically go around and have -- and hear people talking about sex openly very much in public. And so I sort of felt like wow, you know, they're talking so candidly, this is kind of -- it felt refreshing in a way.
Q And if you remember, how much did it cost to attend that first event?
A I think it was -- I think it was like $10.

Q And after that first TurnON event, did you sign up for another OneTaste course?
A I did.
Q And do you recall what the next course was that you took?
A Yeah. I took a How to OM class, also known as OM1.
Q And do you remember approximately when you took that class after this first one?
A Yeah. That was also in San Francisco. It was pretty soon after. I think it was within maybe a few weeks or a month of that first TurnON event.
Q And how much did that course cost, the second one?
A That one was, I want to say, like $150. Something close to that.
Q And if you remember, who taught that course?
A It was Robert Kandell and Lianna Lifson who taught that.
Q Are you sure about that?
THE COURT: Sustained.
Q It's been a while; is that correct?
A I think so, but I'm not 100 percent sure.
Q Regardless of who the instructors were, can you describe what happened during the How to OM course?
A Sure.
So there is a -- it's sort of broken up into pieces. The first part is largely, you know, talking about what is orgasmic meditation, how do you physically do it, how do you

ask for an OM, how do you say yes or no to an OM, all of those basics.

And then the second portion, there's a demonstration of the practice of OM. And then the participant or -- was there a demo? Yes. And then the participants are then OMing themselves. So they would, you know, choose a partner within the class. Sometimes people come with a partner already chosen, but often, usually it's just like, hey, do you want to OM? And then the participants would do that.

Q And what do you mean by a demo?

A There would be a demonstration of OM by people who already worked for the company and were familiar with this practice. So the teachers of the course would often perform the demonstration.

Q And can you just describe for us physically how that's laid out --

A Sure.

Q -- in a How to OM course?

A Sure.

So in my particular How to OM course, it was a much smaller venue than it would become later on in my time there. So it was just in a room on the floor, setting up the pillows and blankets. Same idea that I described earlier. The stroker would stroke and we would watch that happening live right in front of us. Later on, it was typically up on a

table, raised up so the audience could see better.

Q And so just to be clear, what is going on with the strokee at the time?

A So she is undressed from the waist down and her legs are open and the -- and she's being stroked on her genitals.

Q And if you can remember from that first How to OM course that you took, where are her genitals positioned with respect to the audience?

A In my course, since it was smaller, we were all just kind of sitting on the floor cross-legged and so they would be sort of sideways and we were in a semicircle around them with full access to being able to see everything.

Q And what did you think of the course?

A It was definitely strange. I mean, it's not an everyday occurrence. I remember feeling like whoa, this is really wild. And it was -- you know, it was exciting to see that in real life, but it was also very intimidating and odd and I felt -- I remember feeling shaken up.

Q In connection with this course, did OneTaste provide you with a handbook on How to OM?

A Yes.

MS. FARRELL: So I'd like, if we could -- this is already in evidence. I'm going to pull up Government -- or I ask the Court's deputy to please pull up Government Exhibit -- and the paralegal -- Government Exhibit 3120, please.

THE COURT: Okay. And I take it that Defense Counsel has all of these exhibits, correct?

MS. COHEN: Correct, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes.

MS. FARRELL: And, Your Honor, this is one of the exhibits that's already been moved into evidence.

THE COURT: Yes.

(Exhibit published.)

Q Do you recognize this document, Ms. Halpern?

A I do.

Q What is it?

A This is the How to OM pamphlet.

Q What is this?

A It's just a written-down packet of information about what is orgasmic meditation, how is it done. There are pictures of what it looks like, you know, tips about what you're going to need to -- what materials you're going to need to have with you, et cetera.

THE COURT: Let me just stop for one moment just to find out whether you're intending to use the small screens, the big screens, both.

MS. FARRELL: I have no preference. I can see it here. I think maybe we could do both and that way the jurors can choose.

THE COURT: Because I'm not sure people are going to be able to read anything on that big screen.

MS. FARRELL: Understood, Your Honor.

Why don't we leave it up for now. I think we will be zooming in.

THE COURT: Okay.

MS. FARRELL: And then the jurors can choose what their preferred method of looking at it is.

THE COURT: Okay. Go ahead.

MS. FARRELL: Thank you, Your Honor.

So why don't we start by going to page 3, please, Mr. McNett.

Q And if you could just read the top of this page, Ms. Halpern, please?

A "Things to know about OM."

MS. FARRELL: And then if we could zoom in on No. 4, please.

Q And if you could read that for us, Ms. Halpern.

THE COURT: You're asking her to read out loud?

MS. FARRELL: Yes.

THE COURT: Okay.

A "OM is a sexual practice, but it is not sex."

MS. FARRELL: And then if we could highlight -- blow up and highlight No. 9, please, Mr. McNett.

Q And, Ms. Halpern, if you could please read this one out

loud.

A "You don't have to be in the mood. Some of the best OMs start when one or both of you really don't want to do it."

MS. FARRELL: And then if we could next look at No. 13, please, Mr. McNett.

Q And, Ms. Halpern, if you could read that aloud.

A "OM helps spot a woman's genitals and awaken her sex."

MS. FARRELL: And next, if we could please blow up No. 14, Mr. McNett.

Q And, Ms. Halpern, if you could read that aloud please.

A "Sometimes when she says she doesn't want to OM, she wants you to talk her into it in a friendly way. Think humor and curiosity."

Q So, do you recall these, among other sort of tenets, about OMing?

A I do.

Q And with respect to the ones about not needing to be in the mood or sometimes the woman won't want to OM, what do you recall being taught about that?

A That was a pretty central idea. It was really frowned upon to not be in the mood or to suggest that you might say no to an OM. And that was -- you know, that sort of -- they went wide with it. We went wide with it. It was like you need to -- it was sort of what I was trying to explain earlier about needing to be a yes to everything. You need to be a yes

to an OM all the time, you need to be a yes to sex, you need to --

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: Foundation.

THE COURT: Ms. Bonjean, do you have a different objection?

MS. BONJEAN: No. It is foundation.

THE COURT: I'm overruling the foundation objection.

MS. COHEN: Your Honor, as to what -- sorry, as to what others, I -- now I'm forgetting the exact term, but that's what got me.

THE COURT: Okay. That is sustained.

MS. FARRELL: Thank you, Your Honor.

BY MS. FARRELL:

Q When you referred to something being the teaching or the practice and you're saying "they," who specifically are you referring to?

A Everybody who worked for the company who was above me.

Q And so at this time, is this when you're receiving this steps to OM or How to OM pamphlet, did that include the Defendants?

A Yes.

Q Had you met them yet, as far as you remember?

A I'm not sure, but I don't know if I met them quite yet.

Q And then did you later come to form an understanding of where they fell in the hierarchy of directions from the company?
A Yes.
MS. FARRELL: If we could next go to page 5 of the PDF, please, Mr. McNett.
If we could scroll down. And if you could zoom in on the photograph.
Q Ms. Halpern, what is this a picture of?
A That's depicting the beginning of an OM.
MS. FARRELL: And, Mr. McNett, if we could go to the next page, please.
Q Ms. Halpern --
MS. FARRELL: And if you could zoom in on the photograph, please.
Q If you know, Ms. Halpern, what is this a photograph or a picture of?
A That's a picture of a woman's vulva and genital area.
Q And if you could please describe, according to the practice of OM, where is the area that a stroker is supposed to stroke the woman?
A So the stroker will have the tip of his thumb resting at the introitus, which is the entry to the vaginal canal, and then he or she will be stroking with the other hand, using the index finger on the clitoris.

Q And, Ms. Halpern, if you touch your screen, you might be able to circle the areas you're describing. If you could try.

So you've just made a blue mark in the middle of the screen. What is that pointing to?

A That's the clitoris.

Q And then you mentioned the introitus earlier. If you could please circle that.

A It's not doing a great job, but up here.

Q And for the record, that's slightly below the mark you made for the clitoris; is that correct?

A Correct.

Q And remind us what happens in that spot?

A That's where the stroker rests their thumb.

MS. FARRELL: If we could please move to page 8, Mr. McNett.

If we could please zoom in.

Q Well, first of all, what is the title of this page, Ms. Halpern?

A Steps to OM.

MS. FARRELL: If we could go down to No. 3, please.

If you could blow that up, please, Mr. McNett.

Q And Ms. Halpern, if you could read the heading in the first sentence out loud.

A "Positioning: The woman removes only her pants."

MS. FARRELL: And then if we could please highlight

or zoom in on No. 5, Mr. McNett.

Q And, Ms. Halpern, if you could read this aloud, please.

A "Safe port: The stroker deliberately speaks his actions before taking them. For example: I'm going to touch your thighs now. Is that okay? And waits for her response. This allows the woman to fully relax and feel. Safe porting takes place throughout the OM when he needs to make a change or unexpected movement."

Q So can you explain to the jury your understanding of the concept of safe porting?

A It's saying what you're going to do before you do it. So, I'm going to put my hands on your thighs now, I'm going to put my finger on your clitoris now. And the idea is, you know, as it states here, to ideally have the woman feel more at ease.

Q And how, if at all, does the concept of safe porting relate to consent?

A In the -- this is tricky because you are -- when you're in an OM, there are many points where the stroker says, you know, I'm going to do this, is that okay, and the strokee can say yes or no. So, you know, if I'm not ready, for example, and I need to my move my position, I can say no, no, hold on one second. So that is, you know, consenting to that touch.

In an ideal world, you know, that would be consent for everything.

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection.

THE COURT: Yes. Sustained.

I will strike that. Well, it wasn't even an answer to a question. I think it was just an additional comment, but I will strike it.

Q In your personal experience, were you ever involved in an OM where some action was taken with respect to your genitals where there was not safe porting ahead of time?

A No, I don't think so.

MS. FARRELL: Okay. So we can take down this exhibit, please.

Q So after you took this How to OM course, did your involvement as a participant or a student of OneTaste continue?

A Yes.

Q And can you describe how it continued?

A So after that initial How to OM course, I became much more involved in volunteering with the company, so just kind of coming and helping out with courses. This was in New York, so I would help with production and help the two leaders of the New York team.

Q Okay. So when we last -- or when you started to tell us about the How to OM course, you told us you were living in San Francisco; is that correct?

A Yes.
Q So at what point did you move from San Francisco to New York?
A There was -- right, so there was a period of time where I was living -- I'm sorry, where I was volunteering and spending time at 1080 Folsom Street, which is the San Francisco location.

And then I took a break for a while, was not involved.

And then once I became -- once I moved back to New York, that's when I became involved in the volunteering there.
Q And when you were volunteering, did you meet the various individuals who were at the top of the company?
A Yes.

MS. FARRELL: Your Honor, it's 11:30. Do you want me to keep going or would you like --

THE COURT: Is it breaking time in terms of --

MS. FARRELL: It's a good time for me, for the outline.

THE COURT: Okay. Because we got started a bit late, we're going to take just a ten-minute break. And then we'll come back and maybe we'll do the lunch break slightly later than normally we would be doing it. So, we will recess for ten minutes.

I would just remind the jurors to keep an open mind, don't discuss the case with anyone, don't allow anyone to discuss the case with you. And we will reconvene in ten minutes.

MS. FARRELL: Thank you, Your Honor.

(Jury exits.)

THE COURT: Okay. We will adjourn for ten minutes.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

You may be seated.

THE COURT: Before we bring back in the jury, there was another jury note, which I have marked Court Exhibit 5. It's been shown to the parties.

MS. BENSING: Your Honor, should we remove the witness?

THE COURT: I'm not sure it matters, but yes, go ahead. Why doesn't she wait in the witness room. This will be very quick.

(Witness exits the courtroom.)

THE COURT: Okay. I mean, in essence, it's a juror who has a medical appointment but will reschedule it and just wondered whether there would be a day where he would not have to appear. We can deal with this towards the end of the day, but my inclination is to tell him that we will not be sitting

on May 16th.

Ms. Bonjean, that's still the case that you're unavailable May 16th, I take it?

MS. BONJEAN: Yes, Your Honor.

THE COURT: Okay. So do the parties agree that we don't need to deal with this now, but at the end of the day we can tell all of the jurors that court will not be sitting on May 16th?

Does the Government agree?

MS. BENSING: Yes, Your Honor.

MS. COHEN: Yes, Your Honor.

MS. BONJEAN: Yes, Your Honor.

THE COURT: Okay. And I don't think we need to deal with this now. I think we can do that at the end of the day.

MS. COHEN: Can we raise one issue, Your Honor, regarding this witness's testimony?

We want to point out our objection to the fact --

THE COURT: No. I'm going to bring the witness back. We're not going to discuss the testimony right now.

Go ahead. You can bring the witness back.

MS. BONJEAN: Your Honor, we have a record to make about our objections.

THE COURT: You've made your objection.

I'm going to bring the witness back now and we are going to continue.

MS. BONJEAN: Your Honor, I think it's --

THE COURT: Excuse me. The witness is coming back.

(Witness resumes the stand.)

THE COURT: You may continue your examination.

We are back on the record and everybody is here, including the Defendants.

MS. FARRELL: We need the jury, Your Honor.

THE COURT: I'm sorry. I'm sorry. Yes, of course, we do. We do. We certainly do.

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Farrell, you may continue with the witness.

MS. FARRELL: Thank you, Your Honor.

BY MS. FARRELL:

Q Ms. Halpern, when we left off, you had just testified that you became familiar with the leadership at OneTaste; is that correct?

A Yes.

Q So I would like to go through some individuals with you.

MS. FARRELL: And Your Honor, may I ask for permission for our paralegal, Ms. Bosler, to approach the board there and put some of these photos up as this witness testifies?

THE COURT: As long as they are admitted into evidence at the time she puts them up, yes.

MS. FARRELL: These are all already admitted pursuant to our discussion this morning, Your Honor.

THE COURT: Then yes.

MS. FARRELL: Thank you.

Ms. Halpern, I would like to show you what has been marked and admitted as Government Exhibit 306.

And we could -- if we could -- sorry.

(Exhibit published.)

MS. FARRELL: Oh, there we go. Thank you.

Q Do you recognize this person?

A Yes.

Q Who is this?

A That's Nicole Daedone.

Q And I think you already testified to this, but for the record, what was her role at OneTaste at the time you moved to New York City, which you had just told us right before the break?

A The founder and president of OneTaste.

MS. FARRELL: And if you could put that up. Thank you.

I'd next like to show you what has been marked and admitted as Government Exhibit 309.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q Who is this?
A That's Rachel Cherwitz.
Q And at the time you moved to New York City, what was her role at OneTaste?
A Director of sales.
MS. FARRELL: I'd next like to show you Government Exhibit 221.
(Exhibit published.)
Q Do you recognize this person?
A Yes.
Q Who is this?
A That's Robert Kandell.
Q And who is Robert Kandell?
A He was the -- I believe the chief financial officer of the company and cofounder.
Q And earlier I think you had mentioned his name with respect to some of the classes you went to in San Francisco; is that correct?
A Yes.
Q And so what was his role in some of these classes?
A He was definitely there on the night that I took the TurnON event. He had spoke to me afterwards and I believe that he was one of the teachers in my How to OM course.
Q And what was his role at OneTaste at the time you moved from San Francisco to New York City?

A He was the cofounder, so he had a lot of roles, but he handled a lot of the financial aspects of the company.

MS. FARRELL: I'd next like to show you Government Exhibit 201, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q Who is it?

A That's Joanna Van Vleck.

Q What was her role at OneTaste at the time you moved to New York City?

A She was -- I believe her title was CEO, which was different from president.

Q As CEO, was she somebody at the top of the company as well?

A Yes.

MS. FARRELL: I'd next like to show you Government Exhibit 211, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yes.

Q What's her name?

A Justine Dawson.

Q And what was her role at OneTaste at the time that you moved to New York City?

A She was also on the top leadership team in the C suite. I'm not entirely sure what the title was.

MS. FARRELL: Next I'd like to show you what has been marked and admitted as Government Exhibit 290.

(Exhibit published.)

Q Do you recognize this person?

A Yia Vang.

Q And what was her role at OneTaste?

A Similar to Justine, also in the leadership.

She was very much connected to Nicole.

MS. BONJEAN: Objection.

THE COURT: Overruled.

Q You can continue.

You say she was very much connected to Nicole as part of her job at OneTaste. Can you explain that?

A Yeah.

It's a little bit hard to describe, but she was -- Yia often acted as kind of a liaison. So, telling the rest of the leadership team or telling the rest of the employees, you know, what Nicole had said or what she wanted.

MS. FARRELL: I'd next like to show you Government Exhibit 242, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yes. That's Eli block.

Q And what was his role at OneTaste when you were there?
A He was, like, in a kind of middle management position.
MS. FARRELL: I'd next like to show you what has been marked as Government Exhibit 302 and is in evidence.
(Exhibit published.)
Q Do you recognize this person?
A Yes.
Q Who is it?
A I knew this was going to happen. My brain just gets tried. It will come to me in a second.
Q But do you recognize the picture as somebody you know?
A I do, yeah.
This happens to me when I get nervous.
Q Irrespective of her name, what was her role at OneTaste at the time you were there?
A When I was there, she was not in leadership. She was at a sort of similar level to me, an employee.
Q I'd next like to show you what has been marked and in -- and if the name comes back to you, just let us know.
A Yeah, it will.
MS. FARRELL: I'd next like to show you what's marked and in evidence as Government Exhibit 281.
(Exhibit published.)
Q Do you recognize this person?
A Yes.

Q What is her name?
A That's Rachael Hemsi.
Q And what was her role at OneTaste at the time you were there?
A She was also in that kind of middle position. Leadership, but not leadership team, to my understanding.

MS. FARRELL: I'd next like to show you what has been marked and is in evidence as Government Exhibit 292.

(Exhibit published.)

Q Do you recognize this person?
A Yes.
Q And who is this?
A That's Audrey -- the last name is blank for me.

MS. FARRELL: Okay. So, Marlane, if we could just put her picture up, not the name.

Q And irrespective of her last name, what was this person's role at OneTaste at the time you were there?
A When I was there, she was similar to me, an employee.

(Continued on the next page.)

BY MS. FARRELL:
Q And last but not least if I can please show you Government Exhibit 290 -- sorry 284, which is in evidence. Do you know who this person is?
A Yes.
Q Who is it?
A That's Reese, the last name is escaping me. And he was, I believe, Nicole's former partner and an adviser to Nicole.
Q When you say former partner, do you mean in a business sense, romantic sense, something else?
A I believe both. I think they were romantically involved prior to when I got there, then they became involved in a more business sense.
Q Before the break you testified that you moved from San Francisco to New York and continued your involvement in OneTaste once you arrived in New York; is that accurate?
A Yes.
Q When you arrived in New York, did you continue to take OneTaste courses?
A Yes.
Q As part of the initial courses that you were taking at OneTaste, what if any, discussion was there about participants' past traumas?
A There was quite a bit. People's back story and history

really factored in quite a lot. As part of the -- that was the bulk of what was talked about in the courses. Like, yes, there was some instruction about OM and things like that, but there was a lot of the -- whoever is leading the course kind of taking sometime with individual participants and talking them through whatever traumas they might have been through, whatever history kind of brought them there.

Q When we're talking about trauma, can you give an example so we understand what you mean?

A Sure. I remember people bringing up losses and griefs.

MS. COHEN: Objection, your Honor.

THE COURT: Sustained.

BY MS. FARRELL:

Q So these traumas that people would discuss during the OneTaste courses, was this discussed in a confidential setting?

A No.

Q What do you mean?

MS. COHEN: Objection, your Honor, as to --

THE COURT: Overruled.

A It was discussed in a public setting in front of the other members of the class.

Q Did you observe what, if anything, OneTaste employees did with the traumatic information that people were sharing during the courses?

MS. BONJEAN: Objection to the foundation, all of the employees.

THE COURT: She's asking about identifications. Overruled.

MS. FARRELL: Would you like me to repeat the question?

MS. BONJEAN: Standing objection as to foundation.

THE COURT: Standing as to what? Every question that is going to be asked? We'll move on.

That objection was overruled. Go ahead.

MS. FARRELL: Thank you, your Honor.

BY MS. FARRELL:

Q What, if anything, was your observation about what OneTaste employees did with the traumatic information that people were sharing during these courses?

A It was widely shared among the employees. We would have meetings of the sales team or various other teams where we would talk about whatever needs or new community members were coming in and what their back story was, what they've been through, what their financial situation was, all the details of what we gathered about them.

Q To be clear, the answer you just gave is based on your time when you were later an employee at OneTaste?

A Correct.

Q In the early days when you were just a community member

or a student, were you aware that the OneTaste employees were keeping track of and discussing the traumas that were being shared?
A No, I wasn't.
Q Any of the -- as far as you know and based on your personal understanding and observations, are any of the folks that we just went through who are on the board up there licensed psychologists?
A No.
Q Social workers?
A No.
Q Clergy members?
A No.
Q Licensed medical doctors?
A No.
Q Prior to getting involved in OneTaste, had you personally experienced trauma in your background?
A Yes.
Q Can you explain to the jury what happened in your background?
A Sure. So I think coming in what was known about me, I had some loss in my life. I lost two brothers when I was a young kid, in separate incidents. They both passed away. And coming in to OneTaste I also experienced some degree of sexual trauma in the form of like date rape and unwanted

sexual experiences.
Q How old were you when you lost your brothers?
A I was about -- I was a baby when I lost my older brother. I was about eight years old when I lost my younger brother.
Q Did you share this information about yourself in the context of OneTaste courses?
A I believe so.
Q To your knowledge, did any of the people in the photographs that we just reviewed -- I'll withdraw that question.
To your recollection, had you shared this information about yourself with any of the individuals that we reviewed in the photographs earlier?
A Yes.
Q And who specifically?
A I believe probably it would have been by almost everybody, but I was in courses talking --
MS. COHEN: Objection, your Honor, as to everybody.
THE COURT: Sustained.
Q Okay. Who specifically did you tell?
A Rachel Cherwitz, Robert Kandell, Eli Block, and to some degree Justine Dawson as well.
Q Earlier you testified that you have an understanding

that this information was shared among OneTaste employees based on your personal experience; is that correct?
A Yes.
Q Based on your personal experience, what was the purpose of sharing past traumatic information about OneTaste course participants among OneTaste employees?
A The conversations that happened within the sales team, in my opinion, were often pretty crass. It was a lot of, well, you know this person has --
MS. COHEN: Objection, your Honor.
THE COURT: Basis?
MS. COHEN: Hearsay and foundation.
THE COURT: Sustained on the foundation basis.
Ask your next question.
BY MS. FARRELL:
Q We'll come back to that in a moment, Ms. Halpern.
But with respect to your own personal trauma that you had shared in early OneTaste courses, how did that past impact, if at all, your desire to be involved in OneTaste?
A I think I was kind of the perfect mark. Like, that word "mark" was used quite a bit to describe people who were easy to sell to. It comes from like con-artist language.
MS. COHEN: Objection, your Honor.
THE COURT: Overruled.
A And so I was just, I was like perfectly suited because

I was very young and very idealistic, really open to the idea of meditation, really open to the idea of sexuality being talked about openly. And I just, like, I remember sort of at my initial turn on, just having every single person who I would later to know to work for the company come and talk to me.

MS. COHEN: Objection, your Honor, again foundation.

THE COURT: Sustained.

MS. FARRELL: So am I correct, your Honor, the sustain is to the answer not to the question?

THE COURT: Repeat the question.

MS. FARRELL: Sure. How did your personal traumatic personal experiences affect your desire to be in OneTaste?

THE COURT: Yes, that question is fine.

MS. FARRELL: Thank you, your Honor.

Q If we can focus on the question and see if you can answer that.

A Yes. I was --

MS. FARRELL: For the record, your Honor, am I correct only the last portion of that, that was excised?

THE COURT: Yes.

BY MS. FARRELL:

Q Go ahead, Ms. Halpern. Apologies for interrupting you.

A That makes sense. I was very primed for it because I was, I was really, really lonely. I really wanted community, and OneTaste offered that in such a clear way. There was this built-in community that I could come into. And I was, I was lonely as a kid, like not growing up with siblings. And it just, I was already -- I was sexually confused enough that this really, it kind of fit all of the pieces for me.
Q And your earlier testimony that in your view you were the perfect mark, is that based on your later involvement as being a member of the sales team and understanding how the sales team operated?
A Yes.
Q Okay. When you first moved to New York City, remind us approximately what time period we're in here?
A This is I think 2011 we're talking.
Q So you moved from San Francisco to New York?
A Uh-huh.
Q Did you enroll in any OneTaste courses in New York?
A Yes.
Q Do you recall the first course you attended after moving to New York?
A Yes.
Q What was it?
A I took a second how to OM class because it was taught

by different people. And it was suggested to me that it would be a good idea to do it twice.
Q Who was teaching the second how to OM class that was taking place in New York City?
A I remember Justine Dawson being involved. I think she was one of the teachers. I know Rachel Cherwitz was there, but I'm not certain if she was teaching the class.
Q Do you recall when you first met Nicole Daedone?
A I believe it was around this time.
Q It sounds like you don't have a clear memory who the teachers were in the first class.
A Not exactly.
Q The second how to OM course, was it similar to the first one you already described?
A It was. It was more polished.
Q In what way?
A It was in a larger space. There were more students. And the demonstration that I was describing earlier was up on an elevated table.
Q At the time you took this second how to OM course, did you have a job?
A Yes.
Q What were you doing?
A I was working for my dad's company in the theater business in New York.

Q How would you describe your financial condition at the time?
A I was making a liveable salary for an early 20-something, but I didn't have much.
Q Following this how to OM course, did you later purchase additional OneTaste courses?
A Yes.
Q If you can remember, can you list off some of the additional courses you took?
A Sure. I took the OM two course, which was the continuation of OM one to OM two. I took the coaching program, which was the bigger more expensive longer course. I took mastery. I believe there was an OM three that I took. There were quite a lot.
Q I'd like to focus on the coaching program that you just testified about. What was the coaching program?
A The coaching program is the biggest offering that OneTaste had at the time. And so you take this -- there are immersion classes over one weekend a month for several months in a row. And the goal of the course is to, at the end, you become a OneTaste coach, so like a life coach in the OneTaste style. So in the course you're taught about how to teach other people and how to coach people one on one.
Q And coach them on what?

A Kind of general life coaching. So, like what I would call of therapy adjacent. Talking to them about their life, what they've been through, and their traumas, their worries, their fears, all those sorts of things, and helping them through that. Often having to do with their sex life and their relationships. Then also like the specific OM coaching portion of just teaching them more about the details of how to OM or to how to get better at OM.

Q How did it come to be that you signed up for this coaching program?

A It was a lot of talk about the coaching program, it was a lot of excitement that it was coming up. The next coaching program that was about to happen was, so they call it CP5, coaching program five.

MS. COHEN: Objection, your Honor, as to they.

THE COURT: Do you want to clarify?

Q When you say "they," who are you talking about?

A The people who worked for OneTaste at the time that I was interacting with.

Q Did that include Rachel Cherwitz or Nicole Daedone?

A Yes, it included Rachel Cherwitz.

Q Okay. So when you say they were telling you, does this include Rachel Cherwitz?

A Yes.

Q And if you could be more precise, if you remember about

who you told you these things that would be helpful.
A Sure.
Q So you just testified that there was a lot of excitement about the upcoming CP5. Did you sign up for that?
A I did.
Q How did that -- how did you specifically signing up for that program happen?
A I remember Rachel -- we had started to get to know each other more. And so she texted me and asked to go to coffee. And I, I knew that she was the director of sales and there was likely a sales element to the conversation, but I was thinking of it like, you know, friends going out to coffee as well.
And we had a long conversation about if I want to do the coaching program, and I did. I was really concerned about not being able to afford it, it was extremely expensive. So we had a conversation about what could be done to make this happen.
Q What could be done to make this happen, according to Rachel Cherwitz?
A It was basically, like I remember saying, I can't, this course is like ten or $12,000, I don't have that, not even close to that. I don't have anything in savings, I'm just paycheck to paycheck at this point. And she said, like,

that's okay, we'll figure it out. There is always a way to make it happen. You could put it on a credit card, if you want to, you could ask your family for money. We could put you on a payment plan.

And I left the conversation -- I signed up for the coaching program and I left the conversation not knowing exactly how I was going to pay for it because that part of it was, we'll discuss it with Rob, Robert Kandell.

Q Could you afford a nine or 10,000 or $12,000 course at the time?

A No.

Q But you did sign up; is that right?

A I did.

Q Why?

A I really started to believe that, like, this is hard to explain, but there is this idea in OneTaste of the third dimension and the fourth dimension. The third dimension being the real world, reality. And the fourth dimension being sort of like thoughts and hopes, and all of the amorphous, not reality stuff. And it was like, we'll deal with the --

MS. COHEN: Objection, your Honor.

THE COURT: Basis?

MS. COHEN: Foundation and hearsay.

THE COURT: Sustained. Not hearsay, sustained on

foundation.

BY MS. FARRELL:

Q My question was why did you sign up for the course. You started explaining this concept of third dimensional versus fourth dimensional. Was that a precept that was taught at OneTaste?

A Yes.

Q Including by the defendants Rachel Cherwitz and Nicole Daedone?

MS. COHEN: Objection. Leading.

THE COURT: Sustained.

BY MS. FARRELL:

Q Including by who, Ms. Halpern?

A Including Rachel Cherwitz and Nicole Daedone.

MS. BONJEAN: I'm going to object on foundation as well.

THE COURT: Overruled.

BY MS. FARRELL:

Q Can you explain the concept of third dimension versus fourth dimension as it was understood at OneTaste and taught by the defendants?

A So the third dimension, being what you can see and know in reality. The fourth dimension being everything that's like outside of that. And you could call it like spirituality, you could call it emotions. It's a little

hard to describe.

But basically the idea was, like, I sign up for the coaching program; yes, there is this problem of the money in the third dimension and we'll figure that out later. But fourth dimensionally, like, in this more abstract way, you're ready for it, you want it. Like I remember Rachel saying, I know you want to do this, let's just do this and we'll make it happen.

Q And so the original question then was, why did you sign up for the coaching program given your money constraints?

A I very much wanted to, I was very open about that. I kept saying, like, I want to do this. If I had the money, I would easily sign up. It took a long time for me to get to the place to willing to sign up. I was really concerned how to pay for it.

Q Did you leave that coffee with a plan for how to pay for the course?

A No.

Q Did you share with -- following this coffee, did you share with Rachel Cherwitz in writing your concerns about paying for the course?

A Yes, I did.

Q Do you recall how you conveyed those concerns in writing?

A I remember a bunch of emails going back and forth.

MS. FARRELL: Your Honor, this is not in evidence. I'd like to show only the witness please and the parties and the judge, Government Exhibit 3501-3. If we could zoom in on the email so everyone can read it.

BY MS. FARRELL:

Q Ms. Halpern, do you recognize this email?

A Yes.

Q What is it?

A It's an email chain between myself and Rachel Cherwitz and Robert Kendall.

Q Is this a true and accurate copy of an email chain between you, Rachel Cherwitz, and Robert Kandell June 28, 2012?

A Yes.

Q Is this an email discussing your financial concerns that you just testified about?

A Yes.

MS. FARRELL: Your Honor, I'd like to move admit Government Exhibit 3501-3 into evidence.

MS. BONJEAN: We object on hearsay grounds.

MS. FARRELL: We're putting this in for the purpose of, as Ms. Halpern testified, the notice that it's providing to Ms. Cherwitz and for Ms. Cherwitz's statements.

THE COURT: Overruled.

Government Exhibit 3501-3 is admitted.

(Government Exhibit 3501-3, was received in evidence.)

MS. FARRELL: Thank you.

BY MS. FARRELL:

Q Mr. McNett, if you can scroll to the bottom of the email chain, and zoom in on the first chronological email there.

Ms. Halpern, do you recognize this email?

A Yes.

Q Who is it from?

A From Rob Kandell.

Q I'm not going to have you read the whole thing, but what is the origin of this email? Why is he emailing you?

A This is my confirmation email for having enrolled in the coaching program in CP5.

Q If we can scroll up, Mr. McNett, and zoom in at Ms. Halpern's response.

What do you write in response?

A I said: Hey, Rob. Received the application. I'll start filling it out tomorrow. I'm terrified/ecstatic. Thanks so much.

Q And were you terrified/ecstatic about starting CP5?

A Yes, that's accurate.

Q Why?

A I was ecstatic because I was so excited about this new,

weird venture I was plunging into. And I was terrified because I still had no idea how I was going to come up with that amount of money. And also for just the content of the course itself, because I knew it was going to be very intense.
Q If we can scroll up to his response to your email. This is Mr. Kandell responding to you; is that correct?
A Yes.
Q Can you read the second paragraph, please?
A He says: Let me know the best way for us to collect your weekly payment. We can do a recurring payment here if that's easiest, or give a bank account if you want to make deposits.
Q If we could go up, Mr. McNett, to the next email, please.
Ms. Halpern did you respond to him?
A Yes.
Q If we can start by the first paragraph?
A I said: Here's where I'm at, Rob. Last night when Rachel emailed me, I saw those numbers it flipped a switch in me. The conversation I had with her when I said I wanted to do the program did not involve any talk about how the payments would breakdown. I asked her and all she would say is that she would talk to you.
Q If I can ask you to slow down for the reporter. Thank

you.
A I was thrown so hard when I saw the expectation of over $200 a week. Wildly naive, though, it might have been, I was expecting more than 250 per month. There is no way I'll be able to adhere to that aggressive of a financial plan. I will not take out a loan and I will not borrow it, those are very real boundaries. I know you heard this sob story before. And I know that I'm "stepping into the fear that masks my desire." I know every line, but that doesn't make me any more able to pay.
Q In this paragraph you reference an expectation that you might have to pay per month rather than per week, what was that understanding based on?
A It was not based on any understanding. It was me making an estimate of what I thought might be possible.
Q Walking out of the coffee with Rachel Cherwitz that you described earlier where you signed up for CP5, did you have an expectation that you would be billed weekly for the CP5 cost?
A No, I had no expectation of what the payment would look like.
Q At the bottom you say: I know I'm "stepping into the fear that masks my desire." What is that in reference to?
A That's OneTaste jargon, OneTaste language. So there is a lot in the teachings of OneTaste, there is a lot of talk

about fear and desire being opposing, opposites. And what I'm trying to say here is that I know that like people who are employed by OneTaste who I'm having these discussions with, so like Rob and Rachel, would say you are you're afraid but that's not the important part, you also have desire, you also want to do this. So the fear is less important than the desire.

Q The next thing you say: I know every line. What is that in reference to?

A What I'm trying to express is, like, I know what you're going to say to me I know that -- it felt like, I know you're going to roll your eyes. This is where I'm coming from, but I still can't.

Q If you could please read the next paragraph.

A I said: So there needs to be some discussion. I will take responsibility for my decision to put down a deposit. Yes, borne out of intense desire as well as intense vulnerability; but I feel panicked, mislead and manipulated.

Q Next paragraph.

A I'm asking for one of you to get down to my level for a moment. I would like to have a serious discussion about my options. I did some research and I want to talk about the OM training program as an alternative to CP5. I'd like to talk about the possibility of putting my deposit toward that program. I want to give you my money, I want to learn from

you and none of that will happen if I'm in this heightened state of defensiveness and discomfort.

Q And read the final paragraph.

A I want to learn and grow through OneTaste so bad, but I need to do it at my own pace. Please meet me there.

Q If we can scroll up, Mr. McNett, to the next email.

Does Mr. Kandell respond to you?

A Yes.

Q Who is copied on this email?

A Rachel Cherwitz.

Q Can you please read Mr. Kandell's response to you?

A He says: Hi, Becky. I think it would be best if we had a conference call between you, myself and Rachel to come up with a plan that works for all of us. What is your schedule today and tomorrow?

Q To your recollection, did you speak with Mr. Kandell and Ms. Cherwitz about this payment issue that you raised?

A I did.

Q Did the three of you come up with a payment plan?

A Yes.

Q Was that documented by Mr. Kandell or Ms. Cherwitz in an email?

A Yes.

MS. FARRELL: I'd like to show, this is not in evidence, your Honor, I'd like to show the witness and the

parties and the judge only please, Government Exhibit 3501-10.

BY MS. FARRELL:

Q Ms. Halpern, do you recognize this document?

A Yes.

Q What is it?

A This is Rob Kandell sending me a screenshot of an Excel that lists out what my payment plant would be.

Q What is the date of the email?

A It is July 9, 2012.

Q Is this a true and accurate copy of the email between that Mr. Kandell sent to you on that day?

A Yes.

MS. FARRELL: I move to admit Government Exhibit 3501-10.

MS. COHEN: Same objection as to hearsay.

MS. BONJEAN: Join.

THE COURT: Sustained.

MS. FARRELL: We ask it to be admitted subject to connection with respect to Mr. Kandell.

THE COURT: How much more time do you have with this witness?

MS. FARRELL: Several hours.

THE COURT: We're going to come back to this issue. I'm going to ask you move on to something else. I

don't want to take the jury's time while we meet on this issue, but we'll take this up later.

MS. FARRELL: Understood, your Honor.

BY MS. FARRELL:

Q Putting aside the email, Ms. Halpern, did you and Mr. Kandell come up with a payment plan?

A Yes.

Q You can use the document to refresh yourself even though it's not in evidence. What was the resolution of the payment plan?

A I was going to be paying approximately $530 per month.

Q To whom?

A To OneTaste.

Q For what?

A For the coaching program.

Q As a result of this agreement, how if at all were you indebted to OneTaste?

A So, yes, this was the beginning of me being indebted to OneTaste. I was now starting to try and payoff this coaching program.

Q How much total for this coaching program approximately were you indebted to OneTaste at this point?

A Approximately $12,000.

Q Did you work that debt off?

A I don't think I ever did entirely.

Q Did you attempt to?
A I tried.
Q How did you attempt to work it off?
A When I, I became employed by the company pretty soon close to this time. And so that was part of the discussions that I had with Rachel Cherwitz, Rob Kandell and others. I can work for the company and then I can take a portion of my paycheck and that will be taken out to cover the debt for the course.
Q Where was CP5 taking place?
A In San Francisco.
Q Were you living in San Francisco at the time?
A No.
Q At the time you signed up for CP5, in connection with that coffee that you described, were you aware that CP5 was taking place in San Francisco?
A I was.
Q Did there come a time when you requested to change from CP5 to a different coaching program?
A Yes.
Q Why did you make that request?
A Because I was living in New York and the course was happening in San Francisco. And the people running the program, like OneTaste employees Rachel others, said it's going to be okay, it's going to be very immersive, your

experience in CP5. I did one of the immersions and I knew immediately I made a mistake; and that was not the case, so I needed to be in-person.

Q What do you mean immersions? Were you in-person?

A I was not. I was essentially zooming in, there wasn't zoom at the time, but I was on video link.

Q Remind us what year was this?

A 2012.

Q So when you say there wasn't zoom at the time, what do you mean?

A It was just, I was on -- I was watching a livestream of the immersion, which is the weekend that we would, that the people enrolled in the class would go and experience this class.

Q Were your expectations met with respect to how the course was online?

A No.

Q So what request, if any, did you make?

A I requested to be moved to the next coaching program, CP6.

Q To whom did you make that request?

A I believe I asked Rachel.

MS. FARRELL: I'd like to show the witness only and the parties and the Court Government Exhibit 3501-30.

Q Ms. Halpern, do you recognize this document?

A Yes.
Q What is it?
A This is an email between myself and Rachel Cherwitz about my requesting moving to the next coaching program.
Q Putting aside this email for a moment. In your conversations with Rachel Cherwitz requesting this transition from CP5 to another course, what if any notice did you provide to her about your financial situation?
A I stated right away that I don't have the money to -- I don't have any money left. I'm in the red at this point to OneTaste.
Q Is that something you conveyed to her and provided notice of to her via email?
A Yes.
Q So looking back to the Government Exhibit 3501-30, I believe you testified this is an email between you and Rachel Cherwitz. What is the date?
A It is November 6, 2012.
Q Is this email a true and accurate copy of an email between you and the defendant Rachel Cherwitz?
A Yes.
Q Regarding your financial situation at the time you're making this request?
A Yes.
MS. FARRELL: Your Honor, I move to admit

Government Exhibit 3501-30.

MS. COHEN: Your Honor, objection. Hearsay, at least on the second part.

MS. BONJEAN: Join.

THE COURT: When you say the second part?

MS. COHEN: I'm sorry, the top part.

THE COURT: There appears to be three different parts, at least, maybe more than that.

MS. COHEN: Not with the defendant but the other emails are hearsay. The witness's own email.

THE COURT: Let me be clear. Tell me a page number or portion of page. They are not numbered actually.

MS. FARRELL: Would you like a paper copy?

MS. COHEN: That would be great.

THE COURT: Do you mean something authored by the witness?

MS. COHEN: Yes.

THE COURT: That's what you're objecting to.

Response?

MS. FARRELL: Your Honor, I believe I laid the foundation. We're putting this in for the purpose of the notice it provided to the defendant. The witness here can testify live about the conversation.

THE COURT: Are you putting in the portions that are not -- that are authored by the witness? Are you

putting them in for completeness and context to the other portions, or is that not --

MS. FARRELL: Yes, that's also part of it. There are 801(d)(2) statements. And then there are separately statements for context, notice, et cetera.

THE COURT: Are you also offering anything subject to connection with respect to these documents?

MS. FARRELL: I don't believe I need to with respect to these documents given the parties involved in the discussion, your Honor.

THE COURT: Go ahead, Ms. Bonjean.

MS. BONJEAN: No objection for a non-hearsay purpose as to the statements of the non-defendant.

THE COURT: Is there a remaining objection or not? I'm sorry we're talking bit cryptically because the document is not in evidence yet.

MS. BONJEAN: No objection for a non-hearsay purpose.

THE COURT: Is that the same, Ms. Cohen?

MS. COHEN: Yes, your Honor.

THE COURT: Government, is that your understanding?

MS. FARRELL: That's my understanding. So we move to admit the document.

THE COURT: Government Exhibit 3501-30 is

admitted.

(Government Exhibit 3501-30, was received in evidence.)

THE COURT: We'll figure out a better way to do this going forward. Go ahead.

BY MS. FARRELL:

Q Ms. Halpern, just in the interest of time, I'm not going to go line by line through this email, can you briefly summarize the exchange you're having with Ms. Cherwitz here and what comes of it?

A Sure. I'm telling Rachel Cherwitz that I don't want to be in coaching program five any more, I want to move to the next one, CP6, because I want to be there in-person and it didn't make sense for me to be enrolled in CP5 because I wasn't in that city.

Q Mr. McNett, if you can go all the way to the bottom, the first chronological email.

And Ms. Halpern, let's just quickly look at the chain. Does it start with an email from you to Rachel asking to move?

A Yes.

Q And then if we can go up, does she respond to you?

A Yes.

Q If we can scroll up again, do you respond to her?

A Yes.

Q Are you answering her question that she earlier asked of why you want to switch?
A Yes.
Q And if we can scroll up again. If you can please zoom in on this, Mr. McNett.
Can you read Ms. Cherwitz's response to you?
A She says: Hi, Becky. I'm happy to move you to CP6 and you'll move to monthly payments. I'll need another $1,000 deposit to secure your spot, that's what we've done with people when they switch over. It's like reenrolling. Let me know when you can pay that and we'll make the switch.
Q Mr. McNett, go to the next.
Did you respond to her?
A Yes.
Q If you can read the response?
A I said: Rachel, thank you. I appreciate it a lot. The only thing is that I do not have $1,000. I have given OneTaste everything I had in my savings. This is why I requested to transfer the payment I already made towards CP5, excluding month one which I will pay for again, over to CP6.
MS. FARRELL: Mr. D'Agostino, is there any way to move the focus of this so it's not off the screen? I don't know if it's possible. We can deal with it at lunch, but I noticed it's not fully on the screen.

THE COURT: You can go on for now. We'll fix that for you.

BY MS. FARRELL:

Q At the time you're having this email exchange with Ms. Cherwitz in 2012, what was your financial condition?

A As I said in the email, I didn't have anything left in savings.

Q At this point were you still working for your father's Broadway marketing business or were you now an employee of OneTaste?

A I believe that I was about to start working for OneTaste but I hadn't been employed yet.

Q In this email chain did Ms. Cherwitz respond to your statement that you've given OneTaste everything you had in your saving?

A No.

MS. FARRELL: If we could please take a look at Government Exhibit 3501-5, only for the witness and the parties.

THE COURT: It's about a quarter to one now. So I think we should take a lunch break now or within the next five, ten minutes. Ms. Farrell, what is your preference.

MS. FARRELL: If I may address this document because it's directly relevant to what we're talking about now, then we'll break. Is that okay?

THE COURT: Go ahead.

MS. FARRELL: Thank you, your Honor.

I think we need a break because we need your deputy --

THE COURT: One minute.

(Brief pause.)

MS. FARRELL: Thank you, Mr. D'Agostino.

Q We're looking at Government Exhibit 3501-5. Mr. McNett, if you can scroll down -- sorry, back up.

Do you recognize this document, Ms. Halpern?

A Yes.

Q What is it?

A This is an email between me, Rachel Cherwitz and Rob Kandell.

Q Does this email pick back up on the conversation we just looked at in the prior exhibit?

A Yes.

Q Do you recognize this document?

A I do.

Q Is it a true and accurate copy of an email between you and Rachel and Mr. Kandell?

A Yes.

MS. FARRELL: We move to admit Government Exhibit 3501-5.

MS. COHEN: I object to this. I don't see where

the -- I think the top or the part that is bolded is not with this witness.

MS. FARRELL: Can you scroll down, Mr. McNett?

THE COURT: It looks like it is.

MS. COHEN: The bottom.

MS. FARRELL: I can give you a paper copy, if it's easier.

MS. COHEN: I believe it includes a part that this witness is not on. I object to that part.

THE COURT: I'm not seeing that.

MS. FARRELL: Let me take a step back.

Q Ms. Halpern, did you provide emails to the Government in connection with its investigation in this case?

A Yes.

Q Is this one of the emails you provided the Government?

A Yes.

Q Fair to say this is an email that you were on?

A Yes.

THE COURT: Let me make sure I'm understanding what Ms. Cohen is looking at. Are we all looking at the same thing, which is Government Exhibit 3501-5? There are references to the name and an initial.

I'm not seeing the issue you're raising, Ms. Cohen. Maybe you can direct me where on the paper.

MS. COHEN: On the top. It's from a witness not

in this courtroom right now to Ms. Cherwitz. I do not see this witness on that aspect of the chain.

THE COURT: You're talking about just the top third of that first page, correct?

MS. COHEN: Yes, your Honor. I think, the top, I think there is two messages -- yes, the top two messages.

THE COURT: Okay. But everything else you don't have an objection to?

MS. COHEN: Correct.

THE COURT: Ms. Bonjean, any objection?

MS. BONJEAN: I think the other exhibit encompassed the bottom part, the new messages that we're objecting to based on the front two.

THE COURT: Let me hear from the Government on that.

MS. FARRELL: Our understanding, based on Ms. Halpern's testimony, is that this email came from her. And so even though it doesn't show her as being BCC'd, that she necessarily got the email because she was the person who provided this email to the Government.

But we have no objection to frankly redacting the top part, if that's the issue.

MS. COHEN: That's fine, your Honor.

THE COURT: Ms. Bonjean, do you have any objection to the remainder, I guess it's two entries?

MS. COHEN: Your Honor, sorry, I just want to clarify. As to the one from this witness, I would object on the same hearsay grounds, assuming. But it's for the same purpose, a non-hearsay, I will not object; but as to the other, yes.

THE COURT: Ms. Bonjean?

MS. BONJEAN: That's joined in that objection.

THE COURT: Government, why don't you proffer your reason for the portions that are not objected to on non-hearsay grounds. Then tell me what you want to do with the top portion, either you still want to offer it or redact it out.

MS. FARRELL: So we would proffer the same bases we have for the prior two similar emails. I'm happy to spell that out.

THE COURT: Please do.

MS. FARRELL: 801(d)(2) statements by the defendant. And then context and/or notice by the other party in the email.

With respect to the top one, our expectation is that too comes in under 802 -- 801(d)(2). But if your Honor is inclined to sustain the objection, then we would respectfully request that we be permitted to redact it.

THE COURT: The testimony is that this witness provided that to you?

MS. FARRELL: Correct.

THE COURT: Had received this email; is that correct?

MS. FARRELL: Yes.

THE COURT: On the basis of that testimony, do you still maintain the objection to the top portion given that foundation?

MS. COHEN: Yes, your Honor. I don't think that the authenticity or the foundation has been laid with respect to that aspect. I don't understand how the witness could have gotten it if the witness is not copied on it.

THE COURT: I will admit the portion that is not objected to.

And does the Government want to lay any additional foundation before I rule on the objection with respect to the top or not?

MS. FARRELL: If I can have one moment, your Honor?

THE COURT: Yes.

MS. BONJEAN: We join the authenticity objection as well.

THE COURT: I understood you were both objecting on the same grounds to the top portion.

MS. FARRELL: Given that we're about to take a break, I would my request for now is that you admit it

subject to redaction of the top. Then I'll revisit it after the break after I had a chance to speak with defense counsel.

THE COURT: Any objection to that?

MS. COHEN: No objection, your Honor.

MS. BONJEAN: No objection.

THE COURT: Okay. Government Exhibit 3501-5 is admitted.

It will be though redacted. Let me be clear what we're redacting here. What is the Government suggesting redaction? Tell me where on the page you are?

MS. FARRELL: At the very top --

THE COURT: Until when?

MS. FARRELL: Until where it says: On Nov 6 - 2012 1:19 p.m.

THE COURT: So the last line redacted would be: Sent from my iPhone. Correct?

MS. FARRELL: No, your Honor. Higher up than that. May we just take this up after the break?

THE COURT: Yes. Why don't you -- let's just take a break.

MS. FARRELL: That's what I mean.

THE COURT: I'm not going to admit it subject to anything right now. I think the parties should talk to each other and when we come back you can offer it again in

whatever form you want to. But I'm also going to ask the parties to talk about other exhibits that are coming so we can do this more efficiently.

We are going to take a break for lunch. It's ten to one now. I'm going to ask the jurors to come back at a quarter to two, so 55 minutes from now.

I'll ask the parties to stay. The witness can step down, though.

(Jury exits the courtroom.)

(Whereupon, the witness steps down.)

THE COURT: Everyone may be seated. I won't keep you long, I think you should have a break.

But we did say we would come back to Government Exhibit 3501-10 and this issue as well. Do you want to talk to each other first, though, and we could come back earlier after lunch? Or do you want to be heard now briefly on this?

MS. FARRELL: My understanding with respect to dash ten is that there is an objection.

THE COURT: This is the payment schedule, correct?

MS. FARRELL: Yes. I'm happy to proffer here our bases.

THE COURT: You asked for it subject to connection, I believe.

MS. FARRELL: Although, upon reflection I don't think we do need to do it subject to connection. I'll explain why.

In my mind when we were discussing, we do intend to prove that Mr. Kandell is a co-conspirator. But there is also the separate provision about, it's 801(d)(2)(D), which is about made by a party's agent or employee. Our argument is that both with respect to this document and future documents, communications made by an agent of OneTaste given Ms. Daedone's role as the leader of the company are admissible under 801(d)(2)(D).

Separately, we believe we will be able to prove an additional basis under (d)(2)(E) as a co-conspirator statement.

THE COURT: I had said in one of the conferences we had on motions in limine that I was likely to permit evidence to come in subject to connection on the issue of co-conspirator statements, that remains the case. That's frankly typical. You have to start somewhere with putting in evidence.

You can be heard on this now if you wish to be heard on this, but I'm inclined to allow subject to, the evidence subject to connection.

MS. COHEN: Yes, your Honor. On the co-conspirator, I understand that. We would argue that this is not furtherance of the conspiracy, that's one, particularly because this relates to a course not to labor.

Two, under 802(d)(2)(E), as with respect to Ms. Cherwitz, Mr. Kandell was not her boss --

THE COURT: But that one is the conspiracy provision. I think you're thinking of something else correct, if you said E.

MS. COHEN: Not her agent is what we meant to say, your Honor.

THE COURT: Anyone else wish to be heard?

MS. BONJEAN: Your Honor, I think I would like a

lunch break to give some thought to this whole concept of agency.

THE COURT: This was something that was teed up in motions in limine, but of course now that you have specifics I think it makes sense to do that as well.

On the co-conspirator statement front, I am going to allow evidence to come in subject to connection. And of course, the parties will be able to make their arguments if they think the Government has not sufficiently met the *Bourjaily* prong.

MS. FARRELL: With respect to the second objection, about whether or not Ms. Halpern received the top email. So I believe we laid the foundation that she provided these documents to the Government and, therefore, is on the top email regardless of if you can read her email at the top. The other thing I would --

THE COURT: But you simply kind of suggesting that there is a bases is not going to cut it. Right. The witness has to lay -- if that's the case, then you'll have to elicit that.

MS. FARRELL: Understood. I wanted to point both the Court and the defense to the last page of this document and the other emails that Ms. Halpern provided. It contains the metadata. And on the bottom third of the metadata you can see there is a from Robert Kandell at the time 22:37:13,

which matches up with the email at the front.

THE COURT: Yes.

MS. FARRELL: It shows that Ms. Uma is copied on it. And that it's to Rachel Cherwitz. I wanted to point that out in case there were any concerns.

MS. BONJEAN: We'll look at that. It's in an unusual format.

THE COURT: And in minuscule print.

I think you should just talk to -- I'm looking at the Government now -- talk to defense counsel. If there are any other exhibits along these lines, if they are all the same sort of categories, they will either object or not object but they should know what is coming.

MS. FARRELL: If we may preview for your Honor what is coming, because we had these discussions. There are essentially three categories of documents or materials that we understand the defense is objecting to with respect to this witness.

The first is emails either with the defendants or with someone we allege and intend to prove as a co-conspirator or an agent of OneTaste. Then there are text messages of the same variety. Then the third is there are two videos that the Government intends to put in, courses that the defendant attended --

THE COURT: Not the defendant.

MS. FARRELL: Sorry. Well, the defendant did attend.

THE COURT: There are two defendants.

MS. FARRELL: Both defendants attended. My apologies. That the witness attended in which the defendants spoke or presented at. And so we intend to put those videos in of the defendants.

THE COURT: As defendant statements.

MS. FARRELL: One is defendant statements, and one is both defendant statements and to show what happened at this event. So just wanted to preview that for, your Honor.

I believe we provided copies of that in connection with the motions in limine. But didn't want to surprise you. We've already discussed those. I understand there is not agreement. I wanted to preview that.

THE COURT: And the objection is what?

MS. COHEN: I'll speak on the one involving Ms. Cherwitz. With respect to her, we would argue that the video is irrelevant. It is not about -- it is about a course and what specific exercise is going to be at the course. And what individuals should do, and speaking to a large audience. There is no specific relation to labor, which is the charge.

THE COURT: So it's irrelevant.

MS. COHEN: Yes, irrelevant.

THE COURT: Ms. Bonjean, do you want to be heard on this? Ms. Cohen is suggesting a relevance objection to the video.

MS. BONJEAN: We join that objection and to the other video as well.

THE COURT: Tell me about these videos. Are they explicit or graphic, anything along those lines?

MS. FARRELL: It's two separate ones. The first is a speech by Ms. Daedone in which she's discussing a concept of basically, it's more complicated than this, but essentially you can't be raped if you just turn yourself on and --

THE COURT: I know which exhibit you're talking about. And the other one?

MS. FARRELL: The second one is called the beast exercise, in which people are screaming at each other and hitting each other. It's an exercise led by Ms. Cherwitz. And Ms. Halpern was there and is featured, we can see her in the video.

THE COURT: And I'd like you to proffer the relevance.

MS. FARRELL: I think, as your Honor understands, our theory of the case is that the defendants put some the testifying witnesses, our victims, in psychological distress and also taught them concepts that taught them basically to

consent to everything and to be willing to engage in certain sexual activities that even at the time they would have viewed as something they wouldn't consent to, but they did so because they were taught this was a philosophy or a religious practice that was good for them, and if they continued to do it they would reach enlightenment. This all goes to the psychological aspect of how the labor is forced. So this is a first hand account from the defendant's own words showing a flavor or an example of those sorts of teachings.

And then obviously we'll ask the victim the follow-up. We'll lay the foundation then ask the follow-up questions of how, if at all, did these teachings affect your decision to work for the company to provide labor to provide services. So it's direct, in our view, directly relevant to the elements of the charged crime.

(Continued on next page.)

(Continuing in open court; no jury present.)

THE COURT: Okay. I have the arguments.

Are there any other exhibits that you want to flag for me before we take the break?

MS. FARRELL: Everything else is just categorically e-mails or text of the nature we already discussed.

THE COURT: Okay. And on the text, I'm sure it's in this binder you gave me, but is there the metadata or something equivalent to what you were showing me?

MS. FARRELL: So these are texts that we got from the witness herself.

THE COURT: Okay.

MS. FARRELL: We have separately raised issues with Your Honor about texts that were produced by OneTaste.

THE COURT: Oh, I know. We are going to take that up later in the day.

MS. FARRELL: Her texts do not implicate that issue.

THE COURT: Okay.

MS. FARRELL: These are materials from her.

THE COURT: Okay.

MS. FARRELL: Thank you.

THE COURT: Everyone, the jury is going to come back, with any luck, at 1:45, and we will all be back in the courtroom then.

And I think where we left off on 3501-10 is that you

need to then re-offer it --

MS. FARRELL: Yes. Thank you, Your Honor.

THE COURT: -- because I think we had tabled that. And the other 3501 -- what is the other one you have. 3501-5 is the one you are going to talk and tell me what you want to offer or not offer.

MS. FARRELL: Yes.

THE COURT: Redacted or not redacted.

MS. FARRELL: And, I'm sorry, what time do you want us back? I missed it.

THE COURT: 1:45.

MS. FARRELL: Thank you.

THE COURT: I think as a practical matter is usually takes the jury a few minutes.

Okay. Enjoy your lunch. We are adjourned.

(Recess taken.)

A F T E R N O O N  S E S S I O N

(Proceedings continue in open court; no jury present.)

THE COURT: Everyone may be seated.

Before we bring in the jury, I just want to mention something.

We don't have as many people in the courtroom now as we typically have, but it has come to my attention that there are members of the public in the courtroom that have been asking other members of the courtroom -- excuse me, of the public, who they are, what they're doing here, what side they're on, et cetera.

So the beauty of the system that we have here is that the public is always welcome in the courtroom. Nobody's excluded. And the public should just understand that no one has to identify themselves in order to be in this courtroom.

So to the extent that the parties, you know, want to convey that message to other folks, they are welcome to, or I can repeat it.

I also don't want a lot of movement and noise in the gallery. You know, these are very serious proceedings that happen in federal court, and people need to be respectful. And I am keeping a close eye. I have a very good vantage

point from up here as to what is happening.

But, again, nobody is required to give their name, their affiliation, or what they are doing here, if they're not in the well.

I just wanted to make the parties aware that that's been going on, and that that is the Court's view on it.

Okay. We can bring the jury in.

MS. BONJEAN: Judge, we have the objections on the video.

THE COURT: Is that going to be before the next break?

MS. FARRELL: That's coming up promptly.

THE COURT: Let's do that then.

Okay. Why don't you tell me exactly, again, what the exhibits are and --

MS. FARRELL: Yes. May I go to the podium where my materials are?

THE COURT: Sure.

MS. FARRELL: So, Your Honor, the exhibit numbers are Government Exhibit 3879 and Government Exhibit 3875. As I discussed before the break, one is both of these are presentations that happened at the coaching program that Ms. Halpern testified and will continue to testify she was present at. One is a presentation given by Nicole Daedone about -- surrounding the issues of sexual assault and consent

that the government proffers here, and I think we'll establish at trial goes directly to the elements of the crime with respect to psychological pressure to engage in certain types of labor, including sexual labor, straight from the defendant's mouth.

And the other one is something called the "letting your beast out" exercise in which people are yelling at each other and punching each other. And the proffered basis is the same. It goes to show sort of the physical and psychological coercion and some of the processes involved in that.

THE COURT: Okay. And both defendants have raised relevance objections to both of these exhibits; is that correct?

MS. COHEN: Correct, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Yes.

THE COURT: I know that you tend to do things together, but I am going to make sure we are very clear that each defendant is being heard on issues like this.

So those objections will be overruled. I do think that it is -- you will be making the objection when they are admitted. But I will be admitting those.

MS. BONJEAN: Your Honor, that's fine. I just wanted to make it clear for the record, this was raised in our motions in limine.

THE COURT: Yes.

MS. BONJEAN: I would point out, it is not just a relevance objection, but also under the doctrine of completeness, they want to use a couple of clips that, frankly, are taken out of context. I understand that the government --

THE COURT: Okay. Do you have the other clips and have you talked to the government about what you think would need to be complete?

MS. BONJEAN: Yes. I was getting there.

She is going to put in the whole video, which is an hour long discussion, I believe the government intends to do that. But they are only playing a couple of clips that are completely out of context for the purpose of this witness, which, again, I am objecting to, the way it is being presented, under the doctrine of completeness, and pursuant to 403 because I think the way it is being presented is highly prejudicial probative effect, which means virtually nothing since we are talking about what the government is saying is the effect of this on the listener somehow has something to do with the effect of Ms. Daedone's views and sort of pontificating about these issues, affected her own mental, I guess, assessment of why she did what she did.

I would also just point out for the record that this CP6 class in which this presentation was given was in August

of 2013. Ms. Uma or Ms. Halpern left in February of 2014. She was with OneTaste, if you want to call it that, for years before that.

So, again, I think this goes to just the relevance of this, I think it's highly prejudicial, and I don't think the effect on Ms. Weiner -- what probative value it has is minimal as compared to the prejudicial effect, and those are the bases for my objections. In addition to what we raised in our motion in limine, which is essentially an attempt to criminalize beliefs and thoughts and teachings and philosophies that have been espoused by Ms. Daedone.

THE COURT: Does the government wish to respond?

MS. FARRELL: Certainly, Your Honor.

So as Ms. Bonjean said, we actually do intend to offer the full videos as to both exhibits. I don't intend to play both videos through. Frankly, in the interest of efficiency, it's not -- we would be -- we believe the entire speech is supportive of our case, and so it will be in evidence if Ms. Bonjean or Ms. Cohen wants to play longer clips on cross. We obviously will have no objection to that. But in the interest of efficiency, and particularly just speaking frankly with the witness who's as pregnant as she is, I am just trying to keep it moving, and I don't think there's any issue with playing clips of an exhibit that's in evidence.

THE COURT: Yes. I am going to overrule the

objection, again, to those two videos. I don't find that the prejudicial effect of these is -- I don't find that the probative value, I should say, would be substantially outweighed by the danger of prejudice here. I don't find that they -- I do find that they are relevant.

This completeness issue, I think, is solved by the fact that these will be put into evidence in their entirety, and the defense certainly has the right to cross-examine and can at that point address a lot of the issues that you are raising in connection with your objection.

So I am overruling the objection. I find that the evidence is relevant and admissible and does not run afoul of rule 403.

So why don't you bring the witness back in. I think you need to offer -- did you deal with the two exhibits we talked about? The 3501-10, which I think you just need to re-offer, and 3501-5. You were going to let me know whether you want to redact it or how you want to offer it.

MS. FARRELL: So I understand that with respect -- and Ms. Cohen will correct me if I'm wrong. I understand there is a general objection to authenticity to a number of items in this case, including this batch of e-mails. My understanding is with respect to this particular e-mail, they don't have a real problem, but that they intend to assert an objection more for the purposes of categorically having an

objection. I'm sorry if I misstated that.

MS. COHEN: That's right, Your Honor.

Specifically, I had to look at the metadata with Ms. Farrell, and she pointed me to it. I see that it is in metadata. Obviously, it's hard to understand that a "to" wouldn't be -- a person's e-mail address isn't there.

So, you know, I'd say we still object to authenticity, but I'd like to move this along, and we will allow that to come in.

I do want to raise what I raised this morning, though, regarding the claim of sexual assault that was raised in the opening, briefly, Your Honor.

I did -- as I said, there wasn't evidence of 404(b). The government did point me to the motion in limine. You know, I didn't see it -- when I looked at it, I see their 404(b). I don't really see exactly where it specifically talks about that incident.

THE COURT: Is this coming up with this witness?

MS. COHEN: Yes.

MS. FARRELL: It is.

MS. COHEN: Yes.

THE COURT: Okay.

MS. COHEN: And our argument, overall, is any probative value is substantially outweighed by the prejudicial effect.

I mean, this is a claim that Ms. Cherwitz sexually assaulted her. This was an OM demonstration. I heard the witness say, you know, everything was -- no touch was had until she said yes. This -- the way it is being characterized is prejudicial.

THE COURT: But the witness isn't going to characterizing, presumably, the witness is going to be talking about facts, observations, or experiences; is that correct?

MS. FARRELL: That is correct.

THE COURT: Okay. I don't see an issue then. I don't think the witness is going to be characterizing. Is the witness going to be using the term "sexual assault"?

MS. FARRELL: I don't know, Your Honor. I don't know. I don't -- I think she considers it to have been -- I think she believes she was sexual assaulted.

THE COURT: Go ahead.

MS. FARRELL: Sorry, Your Honor.

I believe -- I think she was and believes that she was sexual assaulted. I don't know if she's going to use those words.

THE COURT: Well, are you going to be asking a question that's going to be calling for those words, or not? This is your witness.

MS. FARRELL: I am going to ask her to tell me what happened, and she's going to describe factually what happened.

THE COURT: I think you need to ask your question in a way that elicits the facts.

MS. FARRELL: That is absolutely my plan, Your Honor.

THE COURT: Okay.

MS. COHEN: I will say, Your Honor, she did start out saying she was sexually assaulted at the beginning of her testimony, so.

THE COURT: Did she specify -- she did not specify --

MS. COHEN: She did not.

THE COURT: Right. Okay.

MS. COHEN: But I think this is --

THE COURT: Okay. I think we're going to proceed. We need to bring the jury out, and then we will bring out the witness, but was there -- so you will, on the record, address those two exhibits that we talked about earlier, and then when we get to the exhibits, that will be admissible, and I assume that the defense will just make their objection on the record.

MS. FARRELL: Correct. My only intention is to move them into evidence. Again, I don't think we are having argument again; is that correct?

THE COURT: Correct.

MS. FARRELL: Okay. And may I just bring the witness out now?

THE COURT: Yes. I think that's fine. The jury is coming out simultaneously.

(Jury re-enters the courtroom; witness takes the stand.)

THE COURT: I hope everyone had a good lunch. Everyone may be seated.

Ms. Farrell, you may continue.

MS. FARRELL: Thank you, Your Honor.

I just want to revisit two exhibits. The first is 3501-10. And, Your Honor, the government moves to admit this exhibit into evidence.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 3501-10 is admitted.

(Government Exhibit 3501-10 received in evidence.)

MS. FARRELL: And if we can just briefly publish that, Mr. McNett.

DIRECT EXAMINATION OF REBECCA HALPERN (cont'd)

BY MS. FARRELL:

Q Ms. Halpern, earlier we were talking about a payment plan you had established for the coaching program. Is that what this e-mail relates to? If you can see it.

A I don't have anything on my screen, but, yes. Okay. Now I do.

THE COURT: You have it?

THE WITNESS: Yes.

THE COURT: Okay.

Q Thank you.

MS. FARRELL: And then, Your Honor, I move to admit Government Exhibit 3501-5.

THE COURT: Any objection?

MS. COHEN: No objection, other than what we put on the record. Thank you, Your Honor.

MS. BONJEAN: Same. No objection other than what's already been made a record.

THE COURT: Okay. The Exhibit 3501-5 is admitted.

(Government Exhibit 3501-5 received in evidence.)

MS. FARRELL: If Mr. McNett could zoom in on the top e-mail.

Q Ms. Halpern, earlier we had looked at an e-mail in which you and Ms. Cherwitz were discussing your moving from coaching program 5 to coaching program 6, and the finances involved in that; do you recall that?

A Yes.

Q And so was this a response that was written in connection with that exchange?

A Yes.

Q And if you could just read that top line of the e-mail after "hi," please.

A Becky's paid $5,126 and owes $7,021 for CP5. Let me know if you need any more info, Rob.
Q All right. Thank you.
MS. FARRELL: You can take that down, please.
Q So did you ultimately participate in CP6 or coaching program 6?
A Yes.
Q And during CP6 -- first of all, I'd like to show you what's been marked, and this is only for -- I'm sorry. Hold on.
MS. FARRELL: This is already in evidence, Your Honor, so we can put it up in front of everyone. I would like to show the witness and everyone else Government Exhibit 3234.
Q Do you recognize this document?
A Yes.
Q What is it?
A This is the packet that you received when you sign up for the coaching program.
MS. FARRELL: So if we can go to page 10, please, Mr. McNett.
Q According to this document, when did the coaching program take place?
A Between February and November of 2013.
Q And is that consistent with your recollection?

A It is, yes.
Q And so during this time, February 2013 through November 2013, we have skipped ahead of little bit, where were you living?
A I was living in New York City at the OM residence called the Morellino.
Q When you say the "OM residence," what is that?
A So OneTaste had residences in all of its cities that it had a presence in, and so members of the community or people working for OneTaste could live in one of those OM houses. And it's essentially like a commune.
Q Okay. And we will come back to the OM house in a little bit, but just to center us in time, it is in 2013 and you are living in the OM house; is that correct?
A That's right.
Q All right. So turning to page 11, if we could look at that, please.
Was OMing, or as you described earlier, having a woman having her genitals stroked by a partner, was that part of the coaching program?
A Yes.
Q And was it the expectation that you would be a strokee as part of OMing in this coaching program?
A Yes.
Q And that was stated in the course packet; is that

correct?
A Correct.
Q If you could read the bullet point on the bottom, please.
A It says: Please note that group OM practice will occur at the immersions and is a requirement for participation in the program. Should you wish to bring your own OM partner, please contact us to discuss.
Q And I think you testified about this before the break, but just to remind us, how frequently were -- was the coaching program happening?
A It was one weekend a month, for the duration.
MS. FARRELL: So let's please turn back to page 8. I'm sorry. If we can actually go to page 3.
Q Could you read the first two sentences please, Ms. Halpern.
A At the heart of OneTaste coaching is a practice: orgasmic meditation (OM). OM is a simple sexuality practice that offers practitioners the visceral experience of connection, sensation, and turn on. OM becomes a process for discovering the answers that live deep inside of us. It gives us access to what we want in life as a whole. Desire, sex, shadow, and relationship become crucibles of growth.
Q All right.
MS. FARRELL: So if we could now turn to page 6, please.

Q Does this show the different teachers who were participating in the coaching program?

MS. COHEN: Objection, Your Honor. Leading.

THE COURT: Sustained.

Q What does this page show?

A It's introductions and bios of Nicole Daedone and Ken Blackman who were some of the teachers in the coaching program.

Q And if you could -- is that a picture of Ms. Daedone at the top?

A Yes.

Q And if you could read the top line of the second paragraph, please.

MS. FARRELL: Mr. McNett, if you could zoom in where it says "Nicole is the author."

A Nicole Daedone -- sorry.

Nicole is the author of Slow Sex: The Art and Craft of the Female Orgasm, grand Central/Hachette, May 2011, and is the founder of OneTaste.

Q Have you ever read that book?

A I have read certainly pieces of it. Yes.

Q And is it your understanding that Ms. Daedone was the author?

A Yes.

MS. FARRELL: And then if we can back out, please,

Mr. McNett.
Q Do you know Mr. Blackman who's featured below?
A Yes.
Q And who is he?
A He was referred to in OneTaste as a master stroker. He was one of the people who was sort of in the upper leadership group, and he would -- he was one of the teachers in the coaching program.

MS. FARRELL: And, Mr. McNett, if you can come out and just go to the next page.

Q Who are the next two people featured?
A That's Yia Vang and Alisha Price.
Q And is Ms. Vang on the board next to you?
A Yes.

MS. FARRELL: And if we can go to the next page, please.

Q Who are these two individuals featured here?
A That's Joanna Van Vleck and Rachel Cherwitz.
Q And were both of them coaches in the CP6 program?
A Yes.
Q And focusing on Ms. Cherwitz' bio, could you read the last sentence, please.
A Sure.
Q Aloud.
A She is now head of sales for OneTaste, bringing her

expertise in business development and sales, she now trains people to sell in an ethical way.

Q What did you understand "she now trains people to sell in an ethical way" to mean?

A Not sure how to answer that.

Q Let me back up.

At this point were you working for OneTaste?

A Yes.

Q Were you in sales?

A Yes.

Q Was Ms. Cherwitz your boss?

A She was.

Q Based on your personal knowledge and understanding, was she -- had she trained you how to sell in an ethical way?

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: What is it? It is as to -- yeah. Leading and foundation.

THE COURT: Overruled.

A It is my opinion that, no, it was not -- I was not trained to sell in an ethical way.

Q All right. We'll come back to the sales in a bit. I want to focus on the coaching program for now.

MS. FARRELL: If we can please go to page -- actually, if we can just put this document away, please,

Mr. McNett.
Q So you mentioned that the coaching program took place over a series of weekends.
During the coaching program, did Nicole Daedone give any presentations?
A Yes.
Q Do you recall any of the topics specifically that she discussed?
A Yes. There was -- there was a lecture that she gave that centered around trauma and darkness in her past. Yeah.
Q And were you present for that lecture?
A Yes.
Q Were you present for all the lectures given in CP6?
A Yes, I was.
Q Typically, were lectures in the coaching program filmed?
A Yes.
Q And was that -- in your experience, was that the common practice of OneTaste, that they would film seminars and presentations?
A Yes. They filmed a lot of things. Almost all of the coaching program.
Q And this particular presentation that you are recalling that Ms. Daedone gave, why does that stick out in your mind?
A It was -- I mean, first of all, it was always a big deal when Nicole would be present for anything, for a course, or in

the coaching program.
Q And why was that?
A She, in my opinion, was treated like a guru, you know, like a big leader, because she was the leader of OneTaste. And so there was a lot of like hustle to get ready to make everything prepared for her arrival, to make sure that things were running on time, to make sure that she had everything, you know, that she wanted available.
MS. BONJEAN: Object to the nonresponsive nature of the answer.
THE COURT: Sustained.
Move on to the next question.
Q You used the phrase "guru" to describe her. What do you mean by that?
A I -- you know, in my opinion, both at the time and later, it -- OneTaste, to me, is a cult. And --
MS. BONJEAN: Objection to the nonresponsive nature of that --
THE COURT: Sustained.
MS. BONJEAN: Move to strike.
THE COURT: Granted. That last comment will be stricken.
Ask your next question. Or ask the same question, if you wish.
Q You used the word "guru." What is the reason you used

the word "guru" to describe Ms. Daedone?
A She was -- she was in many ways a spiritual leader for the people at OneTaste.
Q And so my earlier question was, why does this particular talk that she gave during the CP6, why does that stick out in your mind? And you, just to refresh, you said it was a big deal whenever Nicole was coming to speak. And is there any other reason this particular speech sticks out in your mind?
A Yeah. That particular speech really stuck with me because it was -- the subject matter was just very intense, and I learned things about her history that I didn't know before.
Q And did the subject matter contain teachings that you absorbed as someone who was an employee and a practitioner at OneTaste?
A Yes. Absolutely.
Q And did those teachings influence and impact you in your decisionmaking?
A Yes. Absolutely.
Q In preparation for your testimony today, did you review a video?
A Yes.
MS. FARRELL: And, Your Honor, may I approach the witness, please?
THE COURT: Yes.

MS. FARRELL: Thank you.

And let the record reflect I just approached the witness and handed her a disk that's marked Government Exhibit 3875 and 3879.

THE COURT: Sorry, is it one disk you handed?

MS. FARRELL: It is one disk with these two exhibits --

THE COURT: Okay.

MS. FARRELL: -- and clips, Your Honor.

Q So, Ms. Halpern, in preparation for your testimony today, did you review two separate videos?

A Yes.

Q And what were those two videos?

A I reviewed clips of that speech that I was referring to that Nicole Daedone gave on trauma and her personal history.

Q And what is the other video that you reviewed?

A I also reviewed also in the same coaching program there was something called the beast exercise.

Q And so right now I only want to focus on the first one, which is Government Exhibit 3875.

In preparation, did you go through the entire video and ensure that it was a full copy of the speech?

A Yes.

Q And does that disk contain the video that you watched?

A Yes.

Q And how do you know that if?
A Because it has my signature on the front.
Q You signed it after viewing it?
A I did, yes.
Q And is that video a true and accurate copy of the speech that Ms. Daedone gave that you've described today?
A Yes, it is.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 3875 into evidence.

THE COURT: Any objection?

MS. COHEN: Your Honor, we noted our objections before and continue those objections.

MS. BONJEAN: Subject to our prior objections, no objection.

THE COURT: And any objection is overruled. Government Exhibit 3875 is admitted.

(Government Exhibit 3875 received in evidence.)

Q So if we could please have that video prepared to show the jury.

We will start with -- I am going to only review with you some clips. We are not going to watch the whole thing.

MS. FARRELL: So I'd like to start with the first one, Mr. McNett.

THE COURT: Ms. Farrell, you are at this point only focusing on 3875, correct?

MS. FARRELL: That's correct. I will separately address 3879. The disk is there for her to authenticate the videos.

THE COURT: Okay.

MS. FARRELL: So, for the record, I'd like to begin by playing a clip from the time stamp 000 to time stamp 1 minute, 11 seconds. And if we can please play that, Mr. McNett.

(Video played.)

MS. FARRELL: Mr. McNett, if you can go back and just start it again, and I will have you pause it after a few seconds. I will tell you when.

Q Ms. Halpern, do you see yourself in this video?

A Yes, I do.

Q Can you touch the screen to show us where you're located?

A I'm right there.

MS. FARRELL: And let the record reflect Ms. Halpern has drawn a circle around a woman with her back to the camera, on the right side, right lower side of the screen, with curly hair.

If we could watch the next clip, please.

For the record, we are going to play time stamp 5:18 to 6:31.

(Video played.)

Q As a listener of that, when you hear her saying these

things, what effect is it having on you? At the time. I don't mean right now.

A Um -- sorry.

I think at the time I was -- I was certainly taken aback. It was, you know, it is a little bit shocking. I think part of the intent is a little bit of shock value, and, you know, it definitely caused me to think about the relationship between sex and power in a way that I hadn't thought about it before.

MS. FARRELL: If we could please take a look at the next clip. For the record, it is time stamped 9:58 to 10:28.

(Video played.)

MS. FARRELL: And if we could please watch the clip time stamped 20:31 to 21:05.

(Video played.)

Q Do you need a minute?

A I am okay. Thank you.

Q So you are obviously very emotional. Why does seeing this make you so upset?

A It --

THE COURT: There's some tissues in front of you, if you need.

THE WITNESS: Thank you. Sorry.

A It is just -- it's intense to go back in time and see that. I remember it really clearly. And it's just -- it

is -- I find it really upsetting this idea of like a perpetrator of rape.

MS. BONJEAN: I am going to object to the narrative and the non-responsive nature.

THE COURT: Sustained.

Can you repeat your question?

MS. FARRELL: Can I just give her a moment.

THE COURT: Yes.

MS. FARRELL: Thank you.

(Short pause.)

A I'm sorry. Can you repeat your question?

Q Sure. I'm going to ask a new one.

A Okay.

Q This concept of the way to deflect rape is just to be turned on --

MS. BONJEAN: I'm going to object to the characterization.

THE COURT: Yeah. Just ask a question. I don't think you need any lead-up.

Q The concept that we just heard about from Ms. Daedone's mouth on the video, was that a concept that was newly introduced to you on this day, or was this something that you had heard before at OneTaste?

A The concept of specifically how to deflect rape by a turn on was newly introduced that day.

Q Were there similar concepts introduced to you previously?
A Yes.
Q And what were those?
A In the sort of teachings about OM and everything related, this idea of "turn on" is really important, where if a woman or a person, you know, can be as turned on as possible, then that's how she becomes powerful and can affect the world around her.
MS. FARRELL: If we can please watch the next clip, which is time stamped 40:44 through 43:23.
(Video played.)
MS. FARRELL: And then if we could please watch one hour and one minute through one hour, four minutes and 14 seconds.
(Video played.)
Q So having watched all these clips again, my question is, how did hearing these teachings from the leader of OneTaste affect you at the time?
A It was -- I was at first a bit confusing and challenging because it's really -- you know, what she's saying is such a reverse of everything that I knew at the time that anybody knew. You know, my understanding -- it was challenging my understanding of, you know, what we think of as right and wrong, what we think of as traumatic, what we think of as a crime or a perpetrator and a victim. And I remember it

feeling very uncomfortable on one hand, and I also remember sort of trying to open my mind to this idea that, maybe, okay, like, there is -- maybe there's something that I can try and learn here about, I don't know, use it -- like using my own power to try and deflect bad things from happening. Like it just -- my mindset was trying to make sense of it.
Q And at the top of your testimony today, you -- we talked about labor and services you provided OneTaste.
How, if at all, did hearing these teachings from Ms. Daedone affect your provision, your subsequent provision of labor and services for the company?
MS. BONJEAN: Objection.
MS. COHEN: Objection.
MS. BONJEAN: Objection to that.
THE COURT: Overruled.
A This very much is in line with the idea that we've talked about a little bit, which is that turn on, a woman's turn on is like the ultimate power. And so I definitely remember putting -- like putting myself in sort of increasingly unsafe circumstances to kind of try and test that idea. And, you know, OMing with other people in the community and not saying stop if I wanted to stop, for example. Yeah. It definitely affected how I continued my work there.
(Continued on the next page.)

BY MS. FARRELL:

Q So I'd like to switch gears to Government Exhibit 3879. You mentioned there was a second video that you watched in preparation for your testimony today. So that's what I'm talking about. Are you familiar with something called a beast exercise?

A Yes.

Q What is that?

A It was an exercise done in the coaching program, I think maybe in other programs as well, where the participants broke up into groups, into pairs, and one person would be letting their beast out to the other person, which looked like yelling and screaming and cursing and saying whatever they wanted to say, to kind of let all of that darkness and anger out; and the other who was in that pair would sort be on the receiving end of that. And it was just an extremely intense, emotional exercise.

Q And did you participate in a beast exercise in CP6?

A Yes.

Q Was that videotaped?

A Yes.

Q Have you reviewed that videotape?

A Yes.

Q That is Government Exhibit 3879. Is that on the disk in front of you?

A Yes.
Q Is that a true and authentic copy of the video that was taken of the beast exercise that you participated in during CP6?
A Yes.
Q How do you know that that's what you have in front of you?
A Because I signed it as well.

MS. FARRELL: I move to admit Government Exhibit 3879 into evidence.

MS. COHEN: Subject to the same objection.

THE COURT: Ms. Bonjean?

MS. BONJEAN: Subject to the same objection.

THE COURT: The objections are overruled. And Government 3879 is admitted.

(Government Exhibit 3879, was received in evidence.)

MS. FARRELL: May I have a moment to speak to my colleague?

THE COURT: Yes.

BY MS. FARRELL
Q I'd like to begin by playing a clip. So this is 3879, time stamp 0 through 32. Mr. McNett, if you can play that.

(Video played)

Ms. Halpern, who are the two individuals on the

screen?
A Justine Dawson and Rob Kandell.
Q Are they on the board next to you?
A They are.
Q Mr. McNett, if you can play the next clip which is at 44:41 through 45:11.
(Video played)
Ms. Halpern, what are we just seeing?
A That was the beast exercise happening.
Q For the record, what happened?
A We saw several participants in pairs getting up in each other's faces. The person who is letting their beast out is screaming and yelling and cursing, and some of the people participating were getting physical with one another locking their arms together and wrestling.
Q If we could please watch clip two, 45:37 through 45:56.
(Video played)
Who did we see depicted in that?
A That was Rachel Cherwitz and another participant in the coaching program.
Q Which woman is Rachel Cherwitz? What color is her hair?
A On the right with the reddish hair.
Q If we could please see, 45:22 through 45:37.
(Video played)

We can pause it, please.
Are you in this video, Ms. Halpern?
A Yes.
Q Where are you?
A I'm in the background beyond the two men in the foreground.
Q In the skirt and tank top?
A Uh-huh, on the right side.
Q Keep playing it.
(Video played)
What was going on with you in that clip?
A I was -- I don't remember which, whether I was being the beast or the recipient at that moment, but I was breathing really heavily and crying and standing on the side lines throwing up my hands, like, I don't know what to do.
Q If we could go to clip four, which is 46:27 through 47:15, Mr. McNett.
(Video played)
Pause it. What do we see here, Ms. Halpern?
A This is just after the beast exercise was over. Rachel Cherwitz and Rob Kandell are in the middle, and all of the other participants are in a circle. I'm next to Rob Kandell. And we're sharing I think like a word about how the exercise went.
Q So at this point in time, 2013, what is Mr. Kandell's

relationship to you?
A He was certainly in the upper leadership of the company. So he was in someways my boss, definitely my boss. And we were also in a sort of on again off again sexual relationship as well.
Q If we could play the rest of the clip, please.
(Video played)
You can pause it. What just happened?
A So you could see Rob putting his hand on my thigh and ostensibly comfortable me after that experience.
Q Keep playing it, Mr. McNett.
(Video played)
You mentioned you had a sexual relationship with Mr. Kandell. Based on your personal experience and observations, was it common for members of the executive team at OneTaste to have sexual relationships with employees?
A Yes.
MS. COHEN: Objection.
MS. BONJEAN: Objection to that.
THE COURT: Overruled.
BY MS. FARRELL:
Q I believe your answer was yes; is that correct?
A Yes, all the time.
MS. FARRELL: If I may have just one moment?
THE COURT: Yes.

BY MS. FARRELL:
Q So again, at the very beginning of your testimony, you talked about, you summarized some of the labor and services you provided the company. How, if at all, did the beast exercise and other similar exercises affect your provision of labor or services?
MS. COHEN: Objection, your Honor.
THE COURT: You wish to be heard, Ms. Bonjean, if you have an objection? Ms. Cohen objected.
MS. BONJEAN: I join.
THE COURT: Overruled.
BY MS. FARRELL:
Q Do you remember the question?
A Yes. So the beast exercise and other exercises like it absolutely affected sort of how I presented and presented myself and worked for the company; in that, we would reference this idea of bringing out your beast when we were talking with community members or talking with our OM training clients. And so bringing out somebody's beast was something that we were kind of trying to do when we were in OM training sessions with people or coaching with people. It was seen as an important and positive thing.
Q I'd like to switch topics. You testified earlier that at some point you moved into something called an OM house do you remember?

A Yes.
Q What is an OM house?
A An OM house is a commune a communal living situation where people who are involved in OneTaste in someway, either employed or just somebody taking courses, could live, live and eat and work and do all of those day to day activities.
Q Approximately when did you move into an OM house?
A I believe I moved into the OM house in New York right around the same time that I joined the CP, so like the summer of 2012ish, '13.
Q Just to refresh you. Earlier today we saw emails between you and Ms. Cherwitz in the summer of 2012 where you were discussing payment?
A Right.
Q And then you switched to CP6 in 2013?
A Right.
Q So where along that timeline is your recollection that you moved in?
A Yes, it was probably, I think it was in between those two times. It was somewhere close to the start of the coaching program in 2013.
Q At the time were you an employee of OneTaste, if you remember?
A Yes.
Q Where was this residence located?

A This was in Harlem, New York City.
Q Did the residence have a name?
A Yes, we called it the Morellino.
Q When did you move into the Morellino -- sorry, withdrawn.
How did you come to live at the Morellino?
A I spent a bunch of time wondering and asking myself if I wanted to move into an OM house or not. It felt like a really, really big step; in someways a bigger step than working for the company or taking the coaching program, to really immerse myself in this whole culture. I remember people in my life being freaked out and saying like don't do this, you're kind of going too far.
MS. COHEN: Objection. Hearsay.
MS. BONJEAN: I join the objection.
THE COURT: Sustained.
BY MS. FARRELL:
Q So how did you come to live there?
A I eventually made the decision to -- I just decided to go for it. And I just sort of quit everything else that I was doing and really went all the way into OneTaste and lived there.
Q Did that include the job you had had outside?
A Yes.
Q Did it include finding new housing?

A Yes.
Q So approximately how many other people -- let me take a step back.
At the time did you have any misgivings about throwing your life into OneTaste?
A Yes.
Q What were those?
A I was very scared. I was very nervous. Because I knew that it was, I knew that it was odd. I knew that it was unusual and weird. And in someways I was drawn to that, and in someways I was just -- I knew that I was really veering off of the beaten path. And I knew that it was a big risk to take financially, emotionally. I was aware that I was about to head into something that was going to be, that was going to affect my life in a big way.
Q And you chose to do it?
A I chose to do it.
Q Approximately how many other people lived at the Morellino?
A Like a dozen or so, it varied, it went up and down a little bit.
Q Did either of the defendants live at the Morellino?
A Rachel Cherwitz did. And Nicole Daedone would come and spend time at the Morellino for like a weekend at a time.
Q I'd like to show what you is in evidence as Government

Exhibit 12, so the jury may see this. What is this?
A That's the front door of the Morellino, the OM house.
Q Where in the city is this located?
A In Harlem.
Q Describe for the jury what the layout of the residence was?
A Sure. So it was in a luxury apartment building. There were three apartments that were combined together to make the Morellino OM house. There was one on the second floor, then two on the top floor that were penthouses.
One penthouse was where the sort of upper-level leadership people slept, so like Rachel Cherwitz and Kim Howerton and Nicole Daedone when she was in town. And then the other penthouse next door was where I lived for the most part with a bunch of my colleagues kind of on the same level.
Q Approximately how many beds were in each room? I'm focusing on your apartment now not the separate apartment that the executives lived in.
A Sure. There was usually, it was usually one bed in each room and two people would sleep in that bed. I also slept in a room that had bunch beds as well.
Q How many people slept in each bed?
A Two per bed.
Q Did you share a bed?

A I did.
Q Who did you share a bed with?
A I shared a bed with various people across my time there. From beginning to end I think I probably shared with Chelsea Hunter, Ruwan Meepagala, several other friends and colleagues.
Q Do you recall who you shared with you when you first moved into the Morellino?
A I believe I started out sharing a room actually down on the second floor with Rafael Martinez.
Q Can you explain to us what the purpose of everyone sharing beds was?
MS. COHEN: Objection, your Honor.
THE COURT: Basis.
MS. COHEN: As to her understanding.
THE COURT: I'll sustain it as phrased. You can ask the next question.
BY MS. FARRELL:
Q Based on your understanding and your personal experience, what was the purpose of you and others sharing beds?
A I think it was partially financial, to make the housing cost less money for OneTaste to run. And I think it was partly to go along with the tenets and ideas of OneTaste, so.

Q Let me stop you. What were those?
A Community being really important, breaking down of your boundaries, so doing things that you wouldn't ordinarily do to kind of test yourself and see what you could handle. And also just like literal proximity to other people played a large role in the day to day at OneTaste and also in the philosophy. It was get as tight and tightly bonded with everybody as possible.
Q If you know, from whom were these tenets being passed down?
A Mainly from Nicole Daedone and then Rachel Cherwitz, it went down in a --
Q While you were living there, what if any, privacy did you have?
A There was very little privacy. You could go to the bathroom by yourself. You could take a shower by yourself. But that wasn't always true. You might, it would be very common for someone to come in while you're showering if you decided to leave the door open. It was very rare to be alone.
Q Did you purchase your own food?
A Food was included in kind of room and board, in the rent that I paid.
Q If you know, who was in charge of coming up with the diet and purchasing the food?

A When I was at Morellino it was Kim Howerton.
Q That's -- never mind she's not on there.
Putting aside using the bathroom, were you ever alone?
A Very, very rarely.
Q Did you pay rent?
A Yes.
Q How much?
A Rent to my recollection was like in the ballpark of 800 a month.
Q And to whom did you pay rent?
A To we made out checks to Caravan. I don't know if it was Caravan Incorporated, but it was a sister company of OneTaste. It didn't have the OneTaste name, but it was very much run by the same people.
Q So earlier you described how you were in debt to OneTaste for purchasing the coaching program. And you also explained how you then became an employee of OneTaste. And now we have sort of a third thing you testified about, which is paying rent. Can you explain to the jury how those different financial obligations or income worked together?
A Sure. So there is the money coming in, which was my salary from being on the sales team. And then there is the money going out, which was paying back my debt for the courses that I had signed up for. And also paying for rent and room and board, the food as well.

Q How was this netting at the end of every month approximately?
A I certainly was not putting anything away for savings or retirement or anything like that. It was, I didn't -- living in the OM house I didn't -- I wasn't really spending money on much outside. So netting close to zero still was liveable.
Q You mentioned that Nicole Daedone occasionally stayed at the Morellino. When she was there, did you have an opportunity to observe her lifestyle?
A Yes.
Q Please describe it.
A Nicole's lifestyle was notably different than most other people's in that there was -- there were just these very blatantly obvious signs of wealth that the rest of us didn't, have like designer clothing and jewelry and bags. And it was very commonly known that she would go to appointments.
MS. BONJEAN: I'm going to object to the commonly known.
THE COURT: Sustained.
Q What did you personally know about her appointments?
A I was involved in sometimes booking like a massage for her or nail appointment or a hair appointment. That was part of what I was doing within my job. And like I would be

making sure sometimes that she would be taking cars back and forth. It was just an obvious level of wealth and financial comfort.

Q Based on your understanding, why is it that Nicole got sort of these treatments and services?

A She, I mean, she was the guru. She was the top of the company. And so everything -- it was extremely obvious to me that the money that was combing from courses, a lot of it, went to whatever her salary was.

Q All the different things you just described, getting cars, getting nails done or massages, do you have an understanding of how that was paid for?

A Not specifically, no.

Q Who, if anyone, cleaned Ms. Daedone's living area at the Morellino?

A We all pitched in to cleaning her living area. Kim Howerton, who was kind of like the house mother of the Morellino, who just ran all the day to day stuff in the OM house, she was definitely the one in charge of making sure that the living area was clean and ready for her. But myself and all of my colleagues pitched in to make beds or mop the floors or whatever it was.

Q You described Ms. Daedone as the guru of OneTaste. Was that your view of her?

A Yes.

Q You were ever there when it was Ms. Daedone's birthday?
A Yes.
Q If you recall, what happened?
A I remember being like on an email chain with various people at my same level, just employees of the company, and making plans to get her a gift for her birthday.
Q Do you recall whether there was money collected from the employees for her gift?
A Yes, there was.
MS. FARRELL: Your Honor, I'd like to show the witness only please Government Exhibit 3501-7.
If you could zoom in a little bit, Mr. McNett.
BY MS. FARRELL:
Q Do you recognize this email chain?
A Yes.
Q What is it?
A This is an email from Yia Vang to staff at OneTaste. So everybody who worked for the company asking --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Don't get into the substance unless and until it's in evidence.
BY MS. FARRELL:
Q It's dated August 22, 2012; is that correct?
A Yes.

Q Is this a true and accurate copy of the email chain that you were describing earlier?
A Yes.
MS. FARRELL: I move to admit 3501-7 into evidence.
THE COURT: Give me one moment, please.
MS. COHEN: Your Honor, I object both on hearsay and on relevancy.
MS. BONJEAN: Join that objection. Also as to authenticity, relevancy and hearsay.
THE COURT: Very difficult to read the print.
MS. FARRELL: I know, I'm sorry, your Honor.
THE COURT: I'll hear you on the hearsay objection briefly.
MS. FARRELL: So we previously discussed your Honor 801(d)(2), and the two separate subdivisions that I think are generally applicable to most of the emails in the case. And so we're moving under that exception.
And as to the second -- I'm trying to be, because we're in front of the jury -- as to the second subsection subject to the connection. The first is the agency relationship.
THE COURT: I don't need to hear more. The objection is overruled. Admitted subject to connection.
(Government Exhibit 3501-7, was received in

evidence.)

MS. FARRELL: Thank you, your Honor.

BY MS. FARRELL:

Q So if we can put it up for the jury. And Mr. McNett, if you could zoom in.

Ms. Halpern, if you could read this email to the jury?

A Hi, guys. Nicole's birthday is coming up on Friday, August 24. For her birthday she would love to have some money to take care of her health and wellness. I'm collecting money from anyone who wants to contribute to the health fund. Please pay me at, Yia Vang's email address. I'd like to give it to her Friday, so send me money. Also, if you guys want to send a little video birthday clips to me, I can put it together and play it for her.

THE COURT: Let me ask you when you're reading, just to do a little more slowly for the benefit of the court reporter.

THE WITNESS: Sorry.

BY MS. FARRELL:

Q So remind us, who is Yia Vang?

A She is on the leadership team and works closely with Nicole Daedone.

Q Is she the woman who is picture closest to you on the board?

A Yes.

Q On the right.

If we could scroll up, please. To the next email. Does Mr. Kandell respond?

A Yes.

Q Remind us, what his role was at the company?

A He was the CFO.

Q Is he also on the board?

A Yes.

Q And then if we could go up to the next email. Who is Justine Dawson?

A Also on the leadership team of OneTaste.

Q Is she also on the board?

A Yes.

Q If you can go on to the next email. Do you know Dana Gill?

A Yes.

Q Who is she?

A She was more on the same level as me, not on the leadership team, but I believe at that time employed by the company.

Q If we can go up to the next. How about Rafael Martinez, who was he?

A Same thing, he was working for the company on the production team.

Q And then if we can go to the last one. Did you reply:

Sent.
A Yes.
Q What does that mean?
A That's me from my OneTaste email address saying that I sent the money.
Q For what?
A For Nicole's birthday present.
Q We can take that down, please.
I'd like to discuss a typical day at the Morellino. What time did you typically wake up?
A Usually around seven or 7:30 in the morning.
Q And what would you do after you woke up?
A There would be an OM circle for just the people living in the OM house every morning.
Q What does that mean, there was an OM circle?
A It's where all of us would get together in a common space and we would set up to all have an orgasmic meditation practice together, so it would be pairs all across the room.
Q Walk me through -- I realize you testified it changed sometimes overtime -- who were the core group of people who lived there participating in this?
A Sure. It was myself, Rafael Martinez, Eli Block, Chelsea Hunter, Ruwan Meepagala, Margaret Pixley, Kim Howerton, Rachel Cherwitz, and there were a handful of others that were kind of in and out. That's it coming to

mind now, but there are more.
Q When you say this core group would join in a circle and OM in the morning, just what does that mean in plain speak?
A We would all come down, like in our pajamas and come down to the kitchen, like common area. And we would set up the pillows and blankets, as you saw earlier in the how to OM pamphlet. Then we would have an OM practice.
So one person was kind of in charge of the timer who would say when to begin and when to end. We would be practicing orgasmic meditation next to each other.
Q What does that mean?
A Where the all the women who were being stroked would have their clothes off from the waist down and have their genitals stroked.
Q Then after this was over, what would the group do?
A Everybody would get their clothes on and sort of immediately jump into what was happening for the day. So just get started on work, have a little breakfast and started on work.
Q What was the work?
A For me, it was sales. So often I'd be going to a sales team meeting, or I'd be calling leads and making my plan for the day, who I was going to speak to.
Q Where were the leads coming from?
A We used the programming Sales Force, which was, it had

a huge bank of anybody that had ever talked to a OneTaste person and given their contact information. So sometimes I would just look through Sales Force to see if anybody jumped out to me like they haven't bought anything in a while. Then new leads would come by us going out into the community and talking to people about OM and getting them signed up.
Q Who, if anyone, at the group that you described earlier was the boss?
A That would be Rachel Cherwitz.
Q Earlier in your testimony you described OneTaste employees tracking sort of traumas or fears that people had shared in classes. How, if at all, was Sales Force connected to that?
A I don't know -- I don't remember particularly notating things about people in Sales Force. But I know in every sales meeting, person to person, we would all have that meeting as a group and we would sort of share information about these leads and what was relevant to, like what in their history would make them easier or harder to sell to.
Q What other activities did you do during the day besides what you described?
A It varied depending on the day. If it was a day when we had -- if it was a weekend day and we had a course that was coming up that evening, we would be preparing for that course and helping to set up everything.

Q Did you have a yoga practice?
A Yes.
Q Tell us about that, please?
A So it was, yoga was something that was an expectation. So everybody who lived in the OM house was asked or directed to go to a Bikram yoga class pretty much every day unless you were very ill, something like that. So we would all walk together to go to a Bikram yoga on a daily bases.
Q What is Bikram yoga, for people who don't know?
A It's hot yoga. And it is a series of poses that are the same each time. And it was something that Nicole really loved to do and Rachel loved to do, so it became something that everybody did.
Q When you say it was expected that everybody go to yoga, what was enforcing that expectation?
A Mainly Rachel Cherwitz and Kim Howerton. Like if you weren't there ready on the sidewalk or in the lobby ready to go for yoga, you would get a text message, like, where are you, what's going on?
Q Speaking of text messages, how did you communicate with the other employees living at the Morellino?
A This was a big part of working with the company, we would be in communication all day, every day via text. So I was on a group for the sales team. I was on a group for the Morellino. I was on a group with just Rachel and Kim.

Every permutation of the people who worked there. It was a constant running, your phone was literally always going off with notifications.

Q What, if any, expectation was there with respect to you responding to those notifications?

A It was a really, really, really big deal, very important that you respond to text messages immediately at all times, unless you had said that you're going offline for some reason. And so if I didn't answer a text message promptly, which was within a minute, I would sometimes get a text message from Rachel that said, hey, where are you, what's wrong?

Q What hours of the day were you expected to respond?

A The hours were from like seven-ish when we woke up for OM circle. You weren't expected to be on your phone during OM, but you would say, offline OM circle, to let people know that you couldn't respond. All the way through, I mean, we worked most nights until midnight or one on a very frequent basis. It was like all, all day unless you were sleeping.

Q So was the expectation from your boss, Ms. Cherwitz, that you would respond between those hours 7:00 a.m. to midnight or 1:00 a.m.?

A Yes.

MS. COHEN: Objection, your Honor, foundation.

MS. BONJEAN: And leading.

THE COURT: Sustained.

BY MS. FARRELL:

Q Just to back up. I asked which hours you were expected to respond, you gave kind of a long answer. Can you summarize which hours you were expected to respond?

A From around seven in the morning to 12 or one at night.

Q You mentioned the OM circle, but what, if anything, did you have to do if you were not going to be responsive?

A You would have to text the main group of everybody, so like everyone in your city at least, offline 15 minutes shower, or offline ten minutes bathroom, or offline 20 minutes OM.

Q Is that hyperbole or do you literally mean when you go to the bathroom?

A I literally mean when you go to the bathroom.

Q You described sales meetings. Tell us about that those?

A Those would usually be led by Rachel Cherwitz. And it would be like talking about sales goals for the day and the week and the month. Talking about what courses are upcoming and how to sell them, who to sell them to, and talking about particular people that each salesperson was working with. And if they, were sort of what you expected them -- so this person is almost definitely going to buy today, or this person is on the fence.

Q How frequently were those meetings?
A They were almost daily.
Q Who led them?
A Rachel Cherwitz.
Q What about weekends? Did you work on weekends?
A Yes.
Q The day that you just described to us, did that include weekends?
A Yes, we worked more on weekends than on weekdays often.
Q What about vacations?
A We were allowed to take vacations if the reason was deemed appropriate. So if we had like a family wedding to go to, for example, we could request to have that time off. That would be unpaid time off -- or I guess it would just sort of -- there was no like PTO, your salary is your salary. But it was very rare for someone to take a vacation. If I was going to go somewhere, even go visit my parents, I would have to get permission to do that.
Q From who?
A Usually from Rachel.
Q Are you familiar with an exercise of completing a fear inventory?
A Yes.
Q What is that?
A So a lot -- there were some things that OneTaste kind

of was inspired by Alcoholics Anonymous, that fear inventory was one of them and something they do in AA.

It's taking a sheet of paper and essentially saying like, Dear God, or whoever you want to write it to, I have fear that blank, I have fear that I'm not going to meet my sales goal, or I have fear that I'm going to get in a fight with a friend, or whatever it is. And then you would write down for as long as you felt, as long as you wanted to: I have feared that, I have feared that, I have feared that. You keep going until you feel like you're done. At the end you would read that fear inventory paper to someone, so to a colleague or to leadership team member.

Q Was fear inventory something you did at OneTaste?

A Yes.

Q How frequently?

A Very frequently, almost every day.

Q Who was requiring or asking you to do these fear inventories?

MS. BONJEAN: Objection to assuming facts not in evidence.

THE COURT: Sustained.

BY MS. FARRELL:

Q Did someone instruct you or ask you to do these fear inventories?

A Yes.

Q Who was that typically?
A Quite often I remember Rachel saying, okay, you need to do fear inventory on that. If I brought up something in a sales meeting that was like, I'm not sure I'm going to meet a goal, or I'm feeling uncomfortable about whatever, she would say, you have to do fear inventory on that.
Q Who would you typically share your fear inventory with?
A I would share, I preferred to share with a roommate or colleague. But sometimes I was instructed to share it with someone in particular on the leadership team if it was something more important.
Q Sitting here today, can you remember anyone instructing you to share these things with people on the leadership team?
A I remember Rachel somewhat frequently asking me to do fear inventory. And then she would instruct either to read it her later or you should read this to Eli Block, or you should read this to Yia or someone.
THE COURT: Is now a convenient time to take a break?
MS. FARRELL: Yes, your Honor.
THE COURT: We've been going a while. I want to give the jury a break. We'll come back at 3:45 p.m.
(Jury exits the courtroom.)
THE COURT: I'll see everyone at 3:45.

The witness can step down.

(Whereupon, the witness steps down.)

(Recess taken.)

(Continued on the next page.)

(In open court; jury not present.)

THE COURT: Everyone may be seated.

We can bring in the jury.

MS. FARRELL: May I get the witness, Your Honor?

THE COURT: Yes.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

You may continue, Ms. Farrell.

MS. FARRELL: Thank you, Your Honor.

BY MS. FARRELL:

Q So, Ms. Halpern, before we took the break you had just gone through a number of things with us with respect to your work and living at The Morellino. And just to get everyone sort of reoriented, you talked about your hours, you talked about yoga, your daily OM circles, the text threads, fear inventories, and the work you were doing.

Did I miss anything that we covered before the break?

A That sounds right.

Q So my first question is, who, if anyone, was setting the expectations for all of these things that you were doing on a daily basis?

A I would say it was a combination of expectations set by Nicole, expectations set by Rachel. Pretty much, yeah, I

would say the two of them and then filtering down.
Q And how, if at all, did all of these things that you just described before the break affect your physical health?
A Hm. Um, you know, like, as -- the beginning of my time there and the end of my time there were incredibly, incredibly different. So the longer that I worked for the company and the longer that I was there, the worse my physical health became.
Q In what way?
A I -- like, I remember once someone asking me at an immersion --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Basis?
MS. BONJEAN: Calls for a hearsay response. Nonresponsive.
THE COURT: Well, it depends on who is asking her.
Do you want to --
MS. BONJEAN: Foundation.
THE COURT: I will sustain for now, this question, and you can ask a different question.
MS. FARRELL: Sure.
Q So, I will just ask it again but ask that you respond in a way that doesn't call for hearsay.
So my question was how did all of this affect your

health. And you said it got worse over time, and my question was how so.

So, can you explain to the jury how your physical health worsened over time and in what way?

A Sure.

I, it was really hard to -- I mean, primarily, I was not getting enough sleep. Like, not even close. And I was young, so I could handle it, but it just -- it really accumulated over time. And, you know, I could see the dark circles and I felt really sluggish and fatigued all the time because I was sleeping quite little from the stress and also just from the hours.

And food was also a thing. I think wrapped up in my time at OneTaste was a lot of expectation of thinness, a lot of expectation of eating healthfully or, like, eating clean and going to, you know, yoga all the time. Which on its face sounds like good things, but I, I think I really overdid it and got into a very kind of -- like, got into that kind of disordered eating territory where I really dropped a ton of weight and got really in my head about it.

Q And you described lack of sleep earlier. How, if at all, did lack of sleep affect sort of your mental health at the time?

A I was -- you know, like, sort of like toward the -- in the latter, like, half of my time there, I just remember

feeling really, really foggy all the time and, like, needing to drink more and more coffee and tea and stuff. And just, like I remember trying to sort of steal naps from -- you know, for ten minutes here or there to kind of get by.
Q Why didn't you just sleep more?
A Um, I -- I knew that I couldn't. I knew that the expectation was for me to be on, you know, as many hours out of the day as possible.
Q And who was that expectation from?
A Um, I mean, it was sort of -- that was like -- that was the status quo. That was what everybody did and --
MS. COHEN: Objection, Your Honor.
THE COURT: Overruled.
MS. COHEN: Foundation.
THE COURT: Overruled.
A And it was enforced by Rachel. You know, getting those text messages, like: Hey, you're going to sleep at 9:00? Like, what's wrong?
Q Why didn't you just eat more?
A That's a good question.
Um, I was -- I was really, really conscious of the fact that I was -- particularly being a part of the sales team, I was, like, a face of OneTaste and I was a very public-facing role and part of my job was to be young and sexy and cute and thin and attractive to kind of help get people

interested in OneTaste.

Q When you were feeling stressed out, lack of sleep, eating, why didn't you just leave at the time?

A Toward the end I did try to leave a couple of times. I thought about it all the time.

Q But before you left, to the extent you had urges to leave, why didn't you?

A Yeah, I mean, that's a really important question.

I mean, I think sort of what -- what's important to understand is, like, this became my entire existence, my entire life. I was not speaking to any of my friends or family from the outside world after a certain point. And so to leave would be to leave everything that I knew; to leave my job, to leave my friends, to leave my home, to leave any sense of security. So it was -- it was hard to actually commit to that.

Q And did anyone at OneTaste discourage you from speaking to your friends?

A Yes.

Q Who?

A If -- I mean, it was sort of -- it was kind of wide -- like any -- like, Rachel certainly discouraged me from that to kind of, you know, some people on this board, you know, Eli or people who were kind of in that middle management role who saw me on a day-to-day basis.

Like, if I mentioned, you know, wanting to speak to my friends or family, it would always be like: Well, are you sure? What are you going to talk to them about? Why? Like, do you think that they're going to try to talk you out of anything?

And it was very much this sense of, like, people who are not in OneTaste are --

MS. BONJEAN: Objection to the nonresponsive nature of the question -- or answer.

THE COURT: Overruled.

THE WITNESS: Should I continue?

MS. FARRELL: Yes, please.

A People who are not in OneTaste, either in the community or working for OneTaste, are outsiders. Like, we -- you know, the term that we used was "Muggles," which is from Harry Potter. It means non-witches. It basically means, like, they're on the outside, we're on the inside. If you interact with them, you are doing something potentially dangerous that's going to affect your journey. And so I really started to believe that. I really felt like it was -- like, I couldn't -- it wasn't a good idea to talk to outside people.

Q And specifically with respect to the word "Muggles," did you ever hear Rachel Cherwitz use that word?

A Yes, all the time.

Q And how about Nicole Daedone?

A Yes.
Q So on that note, I would like to switch topics slightly.
Was there -- putting aside Muggles, which you've already testified about, was there a particular language that people at OneTaste used that was sort of different from common parlance?
A Yeah, definitely.
Q So off the -- I don't want -- excuse me.
Can you just list some examples?
A Sure.
Some of the ones that we've already mentioned are, like, "orgasm" not meaning orgasm the way it usually does, "turn on" meaning something totally different than it usually does.
Let's see. There was so much.
Like, oh, I mean, the "third and fourth dimension." That's a big one.
And yeah, I mean, it really -- I'm sort of struggling to come up with the specific examples at the moment, but it was like -- it really was speaking an entirely different language that other people -- like I'm having to explain a lot what terms mean to make somebody understand.
Q Are you familiar with the term "aversion" as it was used at OneTaste?
A Yes.

Q What did you understand aversion to refer to?
A Aversion, you know, similar to what it means in regular speech. It's like if you're averse to something, you don't necessarily want to do it, you're hesitant to do it.
So, like, aversion, the way it was often used is like an aversion practice. So if you don't particularly like something or you don't particularly want to do something and you're averse to it, the idea is to kind of move toward it rather than move away from it and see what happens to kind of push your boundaries.
Q And how, if at all, was this concept of aversion practice used with respect to sexual services in particular?
A There was this common idea that was like if you are averse to somebody, if you don't really feel sexually attracted to them or you don't particularly like them, like even people who were sort of butting heads, you know, in the community or who were colleagues, it would -- there would often be -- like, I would get the advice, you know, you should OM with that person so that you can, like, work it out.
Q And who, in your memory, gave you that advice?
A It was frequently Rachel. And every once in a while some other kind of management, like Eli Block or someone like that.
Q And at the time, Rachel Cherwitz would tell you to OM with someone that you were feeling an aversion towards?
MS. COHEN: Objection. Leading.

THE COURT: Overruled.

Q Was she your boss?

A Yes.

Q Are you familiar with the term "tumesce"?

A Yes.

Q What is that?

A That's a primary example of the jargon.

So tumesce or tumescence literally means, like, swollen or engorged, like an erect penis. But in the -- so, like, in the OneTaste way of using it, it kind of meant if you were tumesce, you were like pent up, like there was a lot of kind of bad energy that you were holding onto and it was -- it was really used quite a bit as an insult, like oh, well, she's just tumesce, so don't listen to her. Or she's just tumesce, she needs to, like, go, you know, have sex with somebody or have an OM with somebody and fix it.

Q Did you ever hear Rachel Cherwitz use that phrase?

A Yeah, all the time.

Q And how about Nicole Daedone?

A Yes.

Q And you just gave the example of she's tumesce, go have sex with somebody.

Did you actually hear either of the Defendants ever say that?

A Yeah, all the time.

Q And did you or did people listen to that instruction?
A Yes.
Q Why?
A Because that was the expectation. That was part of what was, like, the teaching of OneTaste and, you know, the teaching of Nicole, like that kind of -- that sex was the outlet for everything. Sex was the vehicle for everything and you could use sex or OM in a particular way to kind of get yourself into a different mental state.
Q And for you personally, is that what you were trying to achieve by following these teachings?
A In many ways, yes, I think was trying to achieve that by following these teachings. I think I was trying to, you know, find myself and find a calling. But I also -- I did believe that sex and sex related -- you know, anything kind of in that realm was powerful. Like, I did believe those teachings.
Q And how, if at all, did those teachings affect your willingness to provide labor to the company?
MS. FARRELL: Your Honor, I would just ask that there be, like, less commentary when I'm asking questions.
THE COURT: I think she's about to object.
MS. BONJEAN: I'm objecting, yes.
THE COURT: But if you're hearing other noise that I'm not hearing, you can flag it for me.
MS. FARRELL: Thank you.

THE COURT: But I don't hear commentary. I hear somebody about to make an objection.

MS. BONJEAN: Yes, Your Honor. I'm going to object to the foundation and the assuming facts not in evidence.

THE COURT: The question was how, if at all, et cetera. So I overrule that.

Q So I don't have the transcript, but I believe my question was how, if at all, did these teachings around sex affect your willingness to provide labor and services for the company.

A I think it absolutely affected my willingness to provide those services. It was all wrapped up into one thing. Like, my work was not separate from these teachings. It was a combination. And so the expectations of these teachings followed me into my work. And so if I -- you know, to go back to what we were talking about, if I was averse to something, then I would try to push through that in my work to be doing a good job.

Q And what parts of your work required you to push through aversions?

A I mean, there were many times that I had -- that I OM'd with or had some other type of sexual experience with people that I wouldn't ordinarily do that with or in settings that I wouldn't ordinarily do that with. I remember several examples of having unwanted sexual experiences but feeling like, okay, this is aversion practice, like I'm averse to it, I need to

continue and see what's on the other side.
Q And the teachings of aversion practice, where did that originate from?
A I believe -- I believe from -- from Nicole. I don't know if it came from sort of prior -- like, I don't know if it came from Morehouse and Dewey and their -- so that's a different thing. I don't know if it came prior to Nicole or if it was Nicole's original idea. I'm not sure.
Q And then who specifically was instructing you on this idea of aversion practice?
A Rachel, Nicole, Rob. I mean, all of the people that we've talked about today. All of the people on the board.
Q While you were there, were you able to observe whether Nicole and Rachel received any benefits as a result of your willingness to do the type of work you've just described?
MS. BONJEAN: Objection, Your Honor. The foundation for that.
THE COURT: Well, she asked what she observed, so I will overrule that.
THE WITNESS: Can you repeat?
MS. FARRELL: Sure. I may not say it exactly the right way that I just did, but...
Q While you were at OneTaste, were you able to observe whether Nicole or Rachel got any benefit from your willingness to -- from your exercising this aversion practice?

A Mm-hm. Um, yes.
Q And what were those benefits that you observed the Defendants getting as a result of --
MS. COHEN: Objection, Your Honor. I still think this is lacking foundation.
THE COURT: Overruled.
Q What benefits did you observe to the Defendants?
A So there was a -- you know, there was kind of a pipeline and I was part of that pipeline. So there would be -- like, I would go out and generate leads, you know, bringing people in who were potentially going to buy something, you know, buy a course from the company. And then those leads wouldn't necessarily belong to me. And sometimes those people, sometimes, you know, that became Rachel's client or that became Rachel's sale. And that happened quite a lot. There was a lot of just moving around of who was working with whom and who was making money off of the sales.
Q So were there individuals that you had sexual experiences with pursuant to this practice of aversion where other people made money off of it?
A I would say so, yes.
Q And specifically, who?
A It --
Q I don't mean the clients. I mean who was making the money.

MS. BONJEAN: Objection. Foundation.

THE COURT: I'll sustain that.

Are you asking her if she observed something?

MS. FARRELL: Yes.

THE COURT: Just ask a different question then.

Q Did you observe anyone else other than you making money off sexual experiences that you had pursuant to this aversion practice?

A Yes.

Q Who made the money?

A Everyone above me on the ladder. Frequently Rachel, being my boss.

Q And what about Nicole Daedone?

A Being the leader of the company, that's where -- to my understanding, that's where a lot of the money went.

MS. BONJEAN: I'm going to object to the speculation.

THE COURT: She's giving her understanding. She's not speculating. Overruled.

Next question.

MS. BONJEAN: Objection to the fact that it relies on hearsay evidence also then.

THE COURT: Overruled.

Go ahead. Next question.

Q Did Nicole Daedone ever give sexual assignments?

A Yes.
Q What were -- explain.
A For example, you know, there would be -- there was -- I was involved in an immersion with Nicole Daedone, which meant it was like a smaller group setting, smaller class. I don't fully remember if I was a participant or working that event, but I know I was there. And she would give sexual assignments to the participants, the clients in that group. So this is not specific, but just like, you know, if somebody was married, like, have sex with your husband tonight and try this, try that. That was very common.
Q What about Rachel Cherwitz, did you ever observe her giving sexual assignments?
A Yes.
Q And explain.
A Yeah, that was very common. You know, Rachel would frequently say to, you know, myself and my colleagues, you know, you and you should go have an OM together, you and you should go have a make-out together. That's another piece of jargon, which means anything sexual that is not an OM is a make-out. And she -- you know, she instructed me to make out with, you know, a particular colleague to -- I don't really know to what end, but yes, that happened.
Q And would you follow those instructions?
A Yes.

Q Why?
A Um, because -- I mean, quite frankly, because I was afraid. I was afraid of repercussions. I was afraid that if I didn't want to do that and I made that known, that that would be -- that I would -- that, like, she would not take that as an answer and that she would say, like, you're not being -- like you're not being turned on enough and this is not appropriate. Like, you need to -- like, you're getting in the way of your orgasm, you're stopping yourself from, you know, moving forward. Things like that. It would be a long conversation.
Q If you can, remind us when, in your recollection, you became an employee of OneTaste.
A The summer of 2012.

MS. FARRELL: So I'd like to show -- actually, give me one moment. Let me make sure it's in evidence.

Counsel will correct me if I'm wrong, but I believe 3768 is already in evidence, the employment agreement.

MS. COHEN: Yes.

Yes, Your Honor.

MS. FARRELL: Thank you.

So this is Government Exhibit 3768 and it's already in evidence.

(Exhibit published.)

Q Do you recognize this document, Ms. Halpern?

A Yes.
Q What is it?
A This is my employment agreement with OneTaste.
MS. FARRELL: If we could zoom in at the very top, the first paragraph.
Q This is dated October 13, 2013.
Do you see that?
A Yes.
Q Is that when you began working for OneTaste?
A Yes.
I was sometimes a little off in my -- close.
Q Okay.
My question is: Did you have this employment agreement upon first starting to work for OneTaste?
A I believe so, yes.
Q Or did you get it later?
A Not 100 percent certain, but I know I received it.
MS. FARRELL: Okay. And then if we could scroll down to paragraph 73. It's not actually the 73rd paragraph I think you just saw. Just 1, 2, 3, which has the 7 in front of it. Do you see that?
If you could go to 73. If you could highlight "base pay," Mr. McNett.
Q And what was your base pay?
A My base pay was $1,500 per month.

Q And we don't have to go through this in detail, but does this list out sort of your responsibilities, your roles, and your agreement with the company with respect to your employment?
A Yes.
MS. FARRELL: I'm happy to give you a copy if that -- let me do that. Give me one sec.
May I approach the witness, Your Honor?
THE COURT: Yes.
MS. FARRELL: So I just handed the witness a full copy of the document so that she's not doing this from memory.
And feel free to take time if you need a moment to read it, but you've described -- I'm sorry. Withdrawn.
Q To your recollection, is there anything in this employment agreement about, for example, providing sexual services?
A I'm going to look it over for a minute.
Q Sure.
A I don't see anything in here that's specific to sexual services.
Q Or about fulfilling instructions to have sex with certain people?
A No.
MS. FARRELL: Sorry, I just need a moment, Your Honor.

THE COURT: That's fine.
Q Ms. Halpern, you could put that aside.
During the time you were involved in OneTaste, approximately how often did you interact with Nicole Daedone?
A Sometimes -- there were periods of time where it would be daily, but sometimes I wouldn't see her for a few weeks or maybe a month.
Q And how would you describe her as a boss?
A Um, very tough. Very, very, very committed to the work and her mission. And very, very warm as a presenter and then very, like, tough and scary sort of when it's just like more behind closed doors with just, you know, employees.
Q And then how about Ms. Cherwitz, how often did you interact with her when you were at OneTaste?
A When we were in the same city, daily.
Q And did you live with her?
A Yes.
Q And how would you describe her as a boss?
A Um, extremely tough, extremely intense and intimidating. And she used a lot of -- like, there was -- she used a lot of both love and fear to be a manager, to be in that role of people's -- of my boss. So this kind of constant, you know, I love you, but you're in trouble and I hate you and switching rapidly between those two.
Q And you used the word "rapid."

Was there any jargon at OneTaste involving the word "rapid"?
A Yeah. The word "hyper-volatile" comes to mind for sure.
Q What does that mean?
A In OneTaste speak, that means someone whose personality is prone to high highs and low lows. And yeah, Rachel certainly described herself as hyper-volatile.
Q So, switching gears a bit.
Were you ever encouraged to report on other people to Rachel Cherwitz?
A Yes.
Q Can you explain that?
A I think myself and others, you know, it was frequent that Rachel would sort of -- would send a text message or an e-mail that said, you know, give me -- like, give me a pulse on everybody or give me the weather report on everybody, how are all your colleagues doing. And we would report back on who was feeling what way or who was working on what.
Q And do you have an understanding of what Rachel Cherwitz was doing with that information?
MS. BONJEAN: Objection to -- foundation.
THE COURT: She asked if she has an understanding. Overruled.
MS. BONJEAN: Objection to the use of the understanding.

THE COURT: Overruled. Overruled.

Go ahead.

MS. BONJEAN: No foundation.

THE COURT: You can answer.

THE WITNESS: I'm sorry. Can you repeat?

MS. FARRELL: Sure.

Q It's just a yes-or-no question.

Do you have an understanding of how Rachel Cherwitz was using that information that you were reporting about people?

A Yes.

Q And what is your understanding?

A My understanding was that -- and my observation was that this information that I shared about my colleagues and that my colleagues shared about me was Rachel keeping very close tabs on what everybody was up to and how, like, close in everybody was. So if somebody -- like, if I were reporting, you know, Rafael feels far out today, that's jargon for, like, he's not doing what he's supposed to do. And so Rachel would then have that information and kind of be able to act on that and try to, like, get him back to what he's supposed to do.

Q And would you put these reports in writing?

A Sometimes, yes.

MS. FARRELL: So I'd like to show the witness only Government Exhibit 3501-14.

And if you could -- just for the witness, please.
Thank you. Sorry.
And the parties, obviously.
And if you can zoom in, Mr. McNett, so the witness can read it.
Q Do you recognize this document?
A Yes.
Q What is it?
A This is an e-mail from me to Rachel on August of 2013.
Q And is this one of the documents you just described?
A Yes.
Q Is it a true and accurate copy of one of the e-mails you sent to her reporting on others?
A Yes, it is.
MS. FARRELL: I move to admit Government Exhibit 3501-14 into evidence.
MS. COHEN: Your Honor, we have the same objection as we have on the others. This is hearsay.
MS. BONJEAN: Join. It's hearsay.
THE COURT: Let me hear from the Government briefly.
MS. FARRELL: Your Honor, we're not offering it for its truth of the contents, but rather that this was an employment practice and information that was conveyed to Ms. Cherwitz.
MS. BONJEAN: Hearsay objection maintained.

MS. COHEN: Yes. Same, Your Honor.

THE COURT: Just give me a moment to look at it.

MS. FARRELL: Certainly.

THE COURT: Tell me more about your basis for offering this.

MS. FARRELL: We're not putting forth the truth of any of these reports contained therein. This is just an example of the types of reports that would be sent to Ms. Cherwitz. We have no intention of relying or showing truth of any of these statements.

MS. BONJEAN: Objection. That is cumulative. I mean, she's testified to this, so.

MS. COHEN: I would also say it is being offered for the truth of the employment practice, which she indicated before.

THE COURT: I'm hearing the Government's offering it for notice.

Is that what I'm hearing from the Government?

MS. FARRELL: That's correct.

THE COURT: Okay.

MS. FARRELL: And it's corroborative.

THE COURT: And --

MS. FARRELL: And, therefore, not cumulative.

THE COURT: Yes. Objection is overruled.

MS. FARRELL: Thank you.

(Government Exhibit 3501-14 received in evidence.)

MS. FARRELL: May we please publish it, Mr. D'Agostino?

Thank you.

(Exhibit published.)

BY MS. FARRELL:

Q Is this an example of the reporting that you would do to Ms. Cherwitz on your colleagues and what was going on?

A Yes, it is.

Q And is it your understanding that your colleagues were doing the same about you?

A Yes.

Q And in the subject line is the word "forecast."

Did that mean anything in particular?

A Yeah. Forecast was kind of what I was referring to about, like, getting a pulse on everybody. It included what the -- you know, as you can see in the top line, it's like what the sales forecast was, so what the sales goals were and how close we were to reaching them. And then it was also, like, a weather report on how all of the employees are doing.

MS. FARRELL: All right. We can take that down.

THE COURT: Okay. I don't know if I actually said admitted when I said I overruled the objection, but Government Exhibit 3501-14 is admitted.

MS. FARRELL: Thank you for making the record clear.

Q So, switching gears slightly. Well, no, let me go back.

Earlier you had described, while living in The Morellino, how you didn't have a lot of physical privacy.

Is that an accurate statement of your testimony?

A Yes. Mm-hm.

Q And then how did these forecasts affect your privacy, if at all?

A I was acutely aware that I was not only being observed and watched by Rachel or Kim or other leaders, but also watched by my peers. And if I did something that was sort of out of line with the expectations set, that I knew very clearly that that would get back to Rachel through one of my colleagues.

Q And how, if at all, did that practice affect your provision of labor and services for the Defendants?

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: The same basis on foundation.

THE COURT: Overruled.

A How did the, um...

Got it. I...

I, I mean, it's what I was -- it's what I was thinking about all the time. So I knew -- I knew what the expectations were. I knew that I was expected to show up at OM Circle to be not only physically present, but turned on and

joyful at all of the events. And so, you know, the labor and services were tied very closely with all of these kind of forecasts and people talking about one another to our bosses because it was like, you know, if -- if I -- if I mentioned to a colleague that I really don't want to go to a TurnON event or a course or something, I know that whether I talked to Rachel or not, she's going to come and find me and say, well, here's why you have to do this. Like, you're going to go anyway.

Q Did there -- sorry.

Did you ever attend addiction meetings?

A Yeah.

Q Why?

A This was -- this became a trend at a certain point.

MS. BONJEAN: Objection to the nonresponsiveness.

THE COURT: Sustained.

Q Who, if anyone, instructed you to attend addiction meetings?

A Rachel Cherwitz and Nicole Daedone instructed me. Because there was this --

Q Let me stop you.

A Sure.

Q What is your understanding, based on your personal experience, of why Rachel Cherwitz and Nicole Daedone instructed you to attend addiction meetings?

MS. COHEN: Objection. I think that was compound.

THE COURT: Overruled.

A So my understanding was that several people in the leadership team, including Nicole and Rachel, attended various Alcoholics Anonymous and offshoots of AA for, you know, addiction in their history for -- you know, for being in recovery. And then that, that sort of filtered into the teachings of OneTaste.

So like I mentioned before with fear inventory, that was something that came from AA. And there became a real trend, a real wave of Rachel and others suggesting, you know, hey, you should go to Sex and Love Addicts Anonymous, or you should go to Overeaters Anonymous. So after a while it was kind of of like everybody would go to OM Circle, yoga, and also some sort of AA related meeting.

Q And did you go to them?

A I did.

Q Which types of addiction meetings did you go to?

A My recollection is that Rachel recommended Sex and Love Addicts Anonymous to me. And so that's SLAA. Those are the meetings that I went to.

Q Were you a sex and love addict?

A I really believed it at the time.

Q What made you believe it?

A I mean, there was a period of time toward, like getting

toward the end of my time there where, you know, I was told over and over again that I was using my sexuality or using my sort of relationships, sexual and romantic relationships with others for -- not for good, you know, for bad purposes. And so that's why -- and so I really started to -- because that was repeated so much, I really started to believe that.

Q And who told you that?

A Mainly Rachel.

Q And based on your own observations, what is your understanding of why she was repeatedly telling you that?

MS. BONJEAN: Objection. Saying "understanding" doesn't change --

THE COURT: I believe she said "observation" as well.

Give me a moment, please.

MS. BONJEAN: It still --

THE COURT: No. Give me a moment, please.

Overruled.

THE WITNESS: Could you repeat?

MS. FARRELL: Sure.

Q So based on your own observation, what is your understanding of why Ms. Cherwitz repeatedly told you that you were misusing your sexuality to hurt people?

MS. BONJEAN: Same objection.

THE COURT: Overruled.

A There came -- there was a real, like, clear line of -- there was a real clear moment when Rachel went from, you know, being friendly with me to no longer being friendly with me and really openly hating me. And I think that that was tied -- that was one of the things that she used to really make me question my character and who I was and what I was doing there.
Q And just very briefly, what was that thing you're referring to?
A I mean, certainly it makes me think of, like, this virus idea, that she said that I was a virus or that I had a virus.
Q Okay. So we'll get to that in a moment, but first I want to just briefly talk about OneTaste's sales practices.
What was the sales culture at OneTaste?
A It was really all consuming. It was the main thing that the company does. Like, everything else is in service of sales.
Q What were you selling?
A I was selling courses and coaching.

(Continued on the next page.)

(Direct examination, continued.)

BY MS. FARRELL:

Q And you were -- what was your primary motivator in engaging in this work?

A The goal was to make as much money as possible for the company, to sell as many classes as you possibly could to watch those numbers go up.

Q Were you seeing that money?

A There was a -- there was technically a commission structure of some kind. I very rarely got commission, in part because, truthfully, I was not a really great salesperson, but in part because sometimes I would get close to, you know, closing a sale, and then that sale would go to someone else.

Q Like who?

A Usually Rachel.

Q Generally speaking, did OneTaste target particular types of customers for sales?

A I would say so, yes.

Q And who were those types of people that OneTaste was targeting as customers?

A I would kind of break it up into two categories. I feel like there's a category of people who are good sales leads because they're young, idealistic, seekers of some larger truth. I think I kind of fell into that category. And then the other category is just people who are rich, have a lot of

money.

Q And how about gender? Was there any focus with respect to gender one way or another?

A Not particularly. I mean, I think it was good to sell to men or women or anybody of any gender identity. Sometimes we would try and sell more to one gender or another to kind of make a course be even.

Q And when a course wasn't even, how would the gender be balanced during like an OM circle, for example?

A If there was an imbalance and there were more women than men, which would happen from time to time, sometimes women would -- women would stroke during the OM portion.

Q And then what about the reverse, if there were more men enrolled in the case than women?

A That didn't happen quite as often. Yeah, usually, we would just try to kind of fix that ahead of time.

Q I want to focus on the issue of consent.

What was OneTaste -- based on your understanding, your experience, what was OneTaste's official teaching on consent?

A So there was a little kind of spiel that everybody was taught that was like, you know, asking for an OM is like asking for a cup of tea. It should be just that neutral. So like, hey, do you want to have a cup of tea with me? Sure. Or, no, no, thank you. And that was repeated quite a lot.

Q And were those official teachings followed and practiced?
A I don't think so.
Q And is that based on your own experience?
A Yes.
Q And can you explain?
A I think there's a big difference between how the practice of OM is understood when you're at the very, very beginning of your experience with OneTaste, and then once you get deeper into it, and once you have been there for a while, that reality changes very, very, drastically.

So when I was new coming into the community, I could say easily yes or no, like saying yes or no to a cup of tea. And that was true. But then certainly once I worked for the company, that was not true anymore.
Q Why not?
A Because my -- because that was part of my job. That was part of my job to be open to anything. And it's not like I could never say no to an OM. That's not true. Like I could, from time to time, but I had to have a really good reason, and I'd just be -- it was very, very clear that the expectation was like the longer you have been in this practice, the more you are able to do things that you are averse to or don't want to do.
Q What, if any, fears did you have, if you were to say no, without a really, really good reason, as you describe it?

A If, for example, you know, like that client who came in and I OM'd privately with him before an OM circle, if I said, no, I don't want to do that, it would be, you know, either a text message conversation or a conversation in person, often in front of other people. It's like, well, why? Let's dig into that. What do you think you could be doing better here? What about -- what's going on in you is causing this to happen? And it would be such a long drawn out kind of like aggravated process that it was really common to just feel worn down, and I would say okay, okay, okay, forget it. Like I'll do it.

Q And was there anything about your mental state at the time that made it more or less likely that you would consent or you would do the thing that you were being asked to do?

MS. BONJEAN: Objection to the foundation.

THE COURT: Overruled.

A Yes.

Q And what was your mental state at the time?

MS. BONJEAN: Objection to "at the time."

Q At the time you worked for OneTaste -- I'm sorry.

THE COURT: Overruled.

Q In the moments you're describing where you would be worn down and just say, okay, I'll do it, at that time, what was your mental state?

A At that time, you know, having been in the community and

the company for a while, I really, really lost touch with reality, and I really was so, so immersed in this world that my sense of up and down and right and wrong was completely skewed. And I was -- but more to the point, I was just exhausted. Like, I was just so exhausted and scared and wanting to -- just wanting to hide and wanting to do the right thing to kind of get by.

Q And then in those moments why didn't you just quit?

A I mean, as I mentioned earlier, I thought about it a lot. And I did walk off a lot. Like there was a time that I opened a door of a moving car and like wanted to -- and like really was like I need to run away, I need to get out of here.

And each time that happened, I would just -- like even if I turned my phone off for a while, which was a big no, no, I would then turn my phone back on and I would see all these messages from my friends. Like there was all of this madness going on, but then there were these very real friendships with people that were so important to me, and I didn't want to lose those. So it was this real push-pull. It was just overall very hard to leave.

Q Earlier we talked about third dimensional and fourth dimensional.

Did there come a time when the company cared more about sort of third dimensional policies and practices?

THE WITNESS: Yes.

MS. BONJEAN: Objection.
THE COURT: Sustained.
I will strike the answer.
Q Are you familiar with the term "third dimensional" being used in connection with policies or practices?
A Yes.
Q And what does that mean?
A "Third dimensional" means the real world. So the laws of the country that we live in, the expectations of our culture. That's what the third dimension is.
Q And did there come a time when those things were discussed at OneTaste?
A Yes.
Q And do you recall engaging in any e-mails about that?
A Yes.
Q And what do you remember?
A I remember at various points there would be all of the sudden a focus on kind of like cleaning up our act and making sure that OneTaste looked to the outside world to be, you know, following the law, doing everything aboveboard. Yeah.
MS. FARRELL: I'd like to show just the witness and the parties, please, Your Honor, Government Exhibit 3501-37. And if you could zoom in. Thank you. And if you could scroll down to the bottom, just to give everyone a chance to look at it. And then if you could just scroll up just to show the

witness.
Q Do you recognize this e-mail?
A Yes.
Q What is it?
I'm sorry. Don't say what's in the e-mail, but for the purposes of authentication, what is it?
A It is an e-mail chain that I'm on.
Q And who is the original author of the e-mail? At the very bottom.
A Rachel Cherwitz.
Q Looking at -- what is that -- who is that first e-mail from?
A Oh, right. Adam Jacobwitz.
Q And then later does Rachel Cherwitz respond -- or did she respond to the next e-mail?
A Correct.
Q Okay. And then do other people respond as well?
A Correct.
Q And what is the date of this e-mail?
A October 11, 2013. Or sent October 12. It was like early in the morning, so.
Q And at the top, there is an e-mail that says, staff@OneTaste.US. What is that?
A That's all staff of OneTaste. So everybody who worked for the company, including me.

Q So were you on that list serve --
A Yes.
Q -- for the e-mail address?
A Uh-huh.
Q Is this a true and accurate copy of this e-mail as you remember it?
A It is.

MS. FARRELL: Your Honor, I move to admit Government Exhibit 3501-37.

MS. COHEN: Your Honor, we object to this. First of all, the bottom part, we would object on grounds of privilege. And, in addition, for the other reasons. Hearsay as well.

MS. BONJEAN: Objection on hearsay. I don't think there's an applicable exception at this juncture based on the from/to, as well as the privilege grounds.

THE COURT: Okay. At this time I am going to sustain the objection.

You can ask a different question.

Q Switching gears, did you ever discuss -- did you ever hear Rachel Cherwitz discuss prostitution in a sales meeting?
A Yes.
Q And what did she say?
A This is like really clear. In my memory, there was this one sales meeting where all of the sudden the word prostitution came out of Rachel's mouth, and everybody kind of

like stopped, like, what? And that was -- she was basically saying, candidly, to all of her colleagues and the people that worked under her, you know, with no community members present, like, hey, guys, we have to be -- like, we have to start being really careful about the words that we're using, about the way that we describe, you know, OM practice, and we need to be careful because some of this could be construed as prostitution.

MS. COHEN: Your Honor, sorry. Objection. Relevancy.

MS. BONJEAN: Join.

THE COURT: One moment, please.

MS. FARRELL: May I respond, Your Honor, before you rule?

THE COURT: Yes, but give me a moment, please.

(Short pause.)

MS. FARRELL: So our response is 801(d)(2). And then, also, notice and state of mind. In terms of the relevance, it goes to notice and state of mind.

MS. COHEN: Your Honor, we add, obviously --

THE COURT: One moment.

MS. COHEN: Sure.

(Short pause.)

THE COURT: Overruled.

Q So switching topics again, while working on the sales

team, did you also continue to attend OneTaste courses beyond the coaching program we discussed earlier?

A Yes.

Q And I think earlier today you described something called the Mastery course.

A Uh-huh.

Q What was that?

A Mastery was a course that I took after the coaching program. It was talked about as a more upper level course for people who had done all of the introductory ones, and it was the course that had the most content in it about sexual practices outside of typical orgasmic meditation.

Q And what were some of those sexual practices?

A Male OM was a big one. So a man's penis being stroked. There was a section on anal play. I believe there was a section on like S&M and related like fetish and kink. Yeah. It was the most sort of wide-ranging of the courses.

Q Approximately how much did that class cost?

A I believe it was around 5,000.

Q And did you pay for it?

A Yes.

Q How were you able to pay for it?

A It was the same as with the other courses, where it was just taken out of my paycheck, and so I was in -- I was working off that debt.

Q With respect to the male OMing and the anal play, were there -- did participants do those things during the course?
A Participants did engage in male OM during the course.
Q Did you?
A Yes.
Q Were you able to participate fully as a student in the class?
A In my opinion, no. I was not.
Q What do you mean by that?
A I had been working for the company for some time at that point, and I remember really wanting to just be a student in that course because I paid for it and wanted to take it. But I was constantly being pulled to do like production related tasks or just kind of help out on the back end.
Q So switching topics again, are you familiar with a man named Ruwan?
A Yes.
Q And what is his full name?
A Ruwan Meepagala.
Q And did he live with you?
A He did.
Q Did he have a girlfriend while you were at OneTaste?
A Yes.
Q And did she also work at OneTaste?
A Yes.

Q Were they both your coworkers?
A They were.
Q Were there any ever instances where you attended sales meetings with the two of them?
A Yeah. All the time.
Q On any of those occasions, did Rachel Cherwitz instruct you to engage in any sexual acts with Mr. -- with Ruwan?
A Yes.
Q And what happened?
A We were in a sales meeting, and there was something -- I don't remember specifically what was going on, but there was something going on socially within the group. So having to do with Ruwan's relationship with Chelsea. That was his girlfriend. I was very, very close friends with both of them. And for some reason that's not entirely clear to me, Rachel said, okay, we need to like clear the tumescence, to use that word again, clear this, you know, this feeling, this kind of bad vibe. So Becky and Ruwan, you guys go have a makeout.
Q And did you?
A Yes.
Q What did you do?
A Make out, again, meant like anything sexual that was not an OM. So it could be sex, it could be, you know, anything.
But we -- yeah. I mean, we left that sales meeting, and then I remember like -- neither -- we were both really

awkward. We were just close friends, and we never had a sexual relationship together, and I certainly didn't want to because Chelsea was my -- his girlfriend was my really close friend. We both just felt really uncomfortable. But we followed orders, and we went upstairs, and we -- I don't remember exactly what we did, but we had a makeout of some kind, and it was sort of brief, and we were like, okay, we did that. Let's go report back.

Q Switching topics again, did you have text exchanges with Rachel Cherwitz during your time at OneTaste?

A Every day. Yeah.

Q And in connection with this investigation, did you provide copies of text messages that you had --

A Yes.

Q -- with Ms. Cherwitz to the FBI?

A Yes, I did.

Q So I'd like to show you Government Exhibit 3501-20.

MS. FARRELL: And this is only for the witness and the parties.

Q Do you recognize this?

A Yeah.

Q What is it?

A This is a series of texts between myself and Rachel.

Q And are these from the time period that you worked at OneTaste?

A Yes, they are.
Q The time period at which she was your boss?
A Yes.

THE COURT: I don't think I have a copy of this.

MS. FARRELL: I think it was provided electronically because of the format.

I can hand you up a copy, it is just very tiny, Your Honor.

THE COURT: I'll take it.

Do the defendants have this?

MS. FARRELL: Yes, Your Honor.

Ms. Bensing is going to approach the bench, if that's okay.

THE COURT: Yes. Thank you.

(Said document tendered to the Court.)

THE COURT: I think I got more than I asked for.

MS. FARRELL: That's correct, Your Honor. These are coming up so I just wanted to provide you -- it is the one with many entries on it.

THE COURT: Okay. Go ahead.

Q Sorry. Just to recap, are these text messages between you and Rachel Cherwitz during the time you were employed at OneTaste and she was your boss?
A Yes.

MS. FARRELL: Your Honor, I move to admit Government

Exhibit 3501-20.

MS. COHEN: Your Honor, we object under Rule 901.

I don't understand the format of these. It is not clear that this is a regular text message. They are in an Excel format. We also object on foundation related to the authenticity.

MS. BONJEAN: Yes. We, too, object on authenticity. There hasn't been a sufficient foundation laid, and, also, I don't know what specific messages are going to be questioned about, but it could call for hearsay.

THE COURT: Let me just stop you.

You have the document, correct?

MS. BONJEAN: I have the document, correct.

THE COURT: Give me a moment.

(Short pause.)

THE COURT: I will allow you to ask more questions to lay a foundation, and then if you still have an objection, you will let me know.

Q So with respect to the format of these, this is in an Excel format?

A Yes.

Q And is that how these text messages were extracted from -- taken from your phone and provided to the FBI?

A Yes.

Q And does it list the sender?

A Yes.
Q And the participants of the conversation?
A Yes.
Q And does it list the message sent, date, slash, time?
A Yes.
Q And then does it list the message itself?
A Yes.
Q And do you have personal knowledge of these text messages?
A Yes, I do.
Q How do you have personal knowledge of them?
A They came directly from my phone, and I remember the exchange.

MS. FARRELL: Your Honor, we move to admit Government Exhibit 3501-20.

MS. COHEN: Your Honor, the same objection. I am not sure I understand how they were extracted from the phone. It doesn't look like something that a layperson could do. So we renew our objection.

MS. BONJEAN: Yes, Your Honor. We still object on foundation, authenticity.

THE COURT: The witness is testifying that these are the text messages, she's reviewed them, and these are the -- this is the content, correct?

MS. FARRELL: That's correct, Your Honor.

MS. COHEN: I understand that, Your Honor, but --

THE COURT: Okay. I just need to look at it a bit more closely. Again, it was just handed up to me.

Are there texts going in both directions?

MS. FARRELL: There are, Your Honor. The witness is both the sender and the receiver, and so Ms. Cherwitz is also a sender and a receiver of the messages. And if you look in the column "sender," you can see.

THE COURT: Okay. Given where we are, it's 5:00, and I would like to look at this more carefully because it was just handed to me, and it is incredibly difficult to read, and I will need some time to look at it. So I think we will not deal with -- do you want to withdrew your offer of this at this time, and this can be revisited?

MS. COHEN: Can you give us one moment, Your Honor.

THE COURT: Yes.

MS. COHEN: Thank you.

(Short pause.)

THE COURT: Ms. Farrell, I had understood that I had been provided copies of everything you were going to be using today with this witness. So to the extent that there's anything else, I would like to have the hard copies of those as well.

MS. FARRELL: Understood.

THE COURT: Do you want to withdrew your offer of

this at this time?

MS. FARRELL: I do, Your Honor.

And if I may make a proposal, I expect to wrap up with this witness right around 5:30 today, and so my request would be we table it until the end of the day, and then when she is called tomorrow morning, we can revisit this and the other texts that I provided you.

THE COURT: Is that the other new things you handed to me?

MS. FARRELL: Correct.

THE COURT: Yeah. I need time to look at these.

MS. FARRELL: Understood. They're tiny. That's why they were produced that way.

THE COURT: It is not even that they are tiny, it's just that they were just given to me now, in a hard copy, which is not ideal.

So move on to your next question. You have withdrawn your request to admit that.

MS. FARRELL: Yes, Your Honor.

(Continued on the next page.)

BY MS. FARRELL:

Q Earlier today you described that there were multiple instances in which you tried to leave OneTaste, and you referred to getting out of a car, can you describe what happened there?

A Yes. On that particular day I was in a car with Rachel Cherwitz and a couple other people from, colleagues of mine. And I just remember her screaming at me so much and so loudly that I, I just couldn't take it any more. And we weren't moving fast or anything, we were about to pull away from a curb or pull to a curb, maybe a red light, we were going slowly. I just freaked out and opened the car door and walked out and left because I couldn't take it. They tried to get me to come back. I was like, I just need a minute.

Q Were there other times that you physically took steps to leave?

A Yes.

Q Do you remember any of those other times?

A I remember once during some course getting, getting some comment from Rachel about my performance and my character and my personality that really pushed me over the edge. And so I remember walking out of that course, not telling anybody where I was going, which was really a big no-no and just walking around the West Village for like

literally a couple of hours. Kind of in a daze, in this really messed up mental state, not knowing what to do, toying with the idea of should I really walkway.

Q What kept you from doing that?

A I was scared.

Q We touched on this earlier. Are you familiar with the term virus as it was used at OneTaste?

A I am.

Q Were you ever called a virus?

A Yes.

Q Is there a particular instance where this occurred that stands out in your mind?

A Yes.

Q Can you describe for the jury to the best of your recollection what happened?

A This is kind of a bit of a longer story. Toward the sort of later portion of my time there, we were in the Morellino, the New York residence, and Rachel called sort of an impromptu meeting of everybody in the house. And we all gathered together. And she just announced that to everybody: Becky, there is something going on with Becky, there is something wrong here. She either has a virus or is a virus. And we need to do like a virus extraction of some kind, kind of like an exorcism of this virus.

MS. COHEN: Objection, your Honor.

THE COURT: Overruled.

Q To be clear, who is saying this?

A Rachel.

Q Continue.

A And so all of my colleagues and friends are in this circle and I'm kind of also sitting in this circle. And it -- it's so hard to describe, I just, I was not prepared for that at all.

I didn't know what was happening. Nobody else knew what was happening either. It was not like a normal meeting.

She just proceeded to say, just like horrendous things about my character. About how I'm, I'm sucking energy from the group, or I'm of -- because I'm not being a good enough believer essentially. Because I had these episodes -- this is how I understand it -- because I had these episodes of wanting to leave and not liking the way things were done, I expressed this kind of dissenting opinion. And then it became like this big thing, you know, you're like a virus that is sucking all of the goodness from this group. So you're infecting everybody else with your BS. And we need to cut out this virus, cut it out like a cancer and get rid of it so everybody else can be okay.

Q So what did that mean? What did she do to cut the cancer out?

A She, after spending a long time just like really going, laying into me and assassinating my character in all kinds of ways, it was then -- she instructed everybody really clearly, like, you are not allowed to talk to Becky from this point forward. You can sort of acknowledge her with eye contact, maybe, but like just don't talk to her, don't associate with her, because otherwise the virus is going to infect you too. And they listened. Everybody stopped talking to me.
Q For how long?
A For a while. I don't know exactly how long.
Q Hours, days?
A Days or weeks. I think I ended up kind of leaving New York pretty soon thereafter because nobody was talking to me.
Q How did you react when this was happening?
A I was just, I was so shocked and confused. And it was -- it's really hard to describe how intense and upsetting this was. Just listening to all of this stuff about what I was, who I was. And like I just, I went like -- it's hard to remember details because it was -- my mind was just so overwhelmed. I just started sobbing and, like, I knew that this was so serious and I knew that everything that I worked toward was in such jeopardy. I knew that I was losing all of my friends. I was just

weeping.
Q Are there any other experiences from OneTaste that stand out in your mind because of the strong effect they had on you?
A Yes, sure.
Q I'd like to draw your attention to an OM demonstration. Do you recall participating in an OM demonstration at the Morellino?
A Yes.
Q Approximately when did this occur?
A This was just prior to when I requested to move to San Francisco. I'm not sure of an exact date, it was in the later portion of my time there.
Q Let me stop you there. After this virus thing happened, did you want to stay in New York?
A No.
Q So what happened?
A I, being fully cut out and ostracized from everybody that I knew, I still kind of foolishly, crazily wanted, I wanted to still be committed to this purpose and this company and this mission and whatever. And so I didn't want to leave-leave, but I knew that I couldn't be around Rachel any more.
And so I requested, I think I talked to Yia and said can you, please, please get me to another city? Can I

please go to San Francisco?
Q How, if at all, did your psychological state at the time affect your decision making with respect to your next steps?
A I was completely, completely incapacitated at that point. It's hard to describe the extremeness of how, like, disconnected from reality I was.
Q You started telling us about a time in which you participated in an OM demonstration at the Morellino. So when did that happen?
A That was pretty shortly after the virus thing.
Q And what happened?
A This was another impromptu meeting that was just like, we got a text message that said come down to this apartment, and everybody meet. And so all of the people that I lived with, all the people that I worked with in New York were there in that room.
Q Who sent that text message?
A Rachel.
Q And what happened?
A So up until that point, I had been doing demonstrations of OM in courses. Other people would be teaching the class, but I would come in and show the participants in the class what an OM looks like in real life. And this was a, this was really, frankly, kind of an honor, like it was a really

prestigious thing in a way to be doing these demos. It felt like that way to me, it felt like an important part of my work.

And so in that meeting Rachel kind of got up at the front and said: Becky is not going to be doing OM demos any more, that's over. The new people who are going to be doing demos are Margaret Pixley and Hamza Tayeb, and she's not doing them any more.

I remember, I was wearing my pajamas. I don't know if I brushed my teeth. I was so messed up at that point that I just said, okay, fine, I'm not surprised at that, whatever.

Do I want me to keep going?

Q Yes, keep going, please.

A Sorry, it's just intense to talk about.

We're like sitting there and I'm just messed up and nobody is talking to me. And so Rachel says: Okay, Margaret and Hamza get up and you guys do a demonstration of OM.

This was not typical. This was not like, this was not something that had happened before in any meeting. So they did. They had an OM. Rachel was kind of like doing commentary during the OM.

When they were done everybody was very, was kind of giving a lot of praise, oh, my God, that was amazing, that was wonderful. And Rachel was making comparisons and

saying, that's what a demo should look like. Making this comparison to me, like I hadn't been doing it properly.

And then after that, she very abruptly made eye contact with me and said: Becky, you get up there now.

I just, like, my heart dropped, and I -- I just -- I don't know if I said anything, but I was like, no, no thanks, I just don't want to right now. I just like, I remember I started like shaking, getting nervous. I knew this was going to be really bad. I didn't know what was happening. And she, just said: No, Becky, get up here. We went back and forth a few times, really, please, I don't want to do this. And then she just -- it was in front of everybody, there was so much pressure being in front of everybody, I was like, okay, okay fine.

So I got up on the OM table and I didn't really know, I didn't really know what was happening or why I wasn't doing demos any more. It didn't make sense to me. Then she said: Okay, Rafael is going to stroke you.

And so I undressed from the waist down and I just like, I remember kind of just being like, okay, you can just try and disassociate and get through it, just do this, do what she's asking you to do and get through it. And so he started, Rafael started stroking me. He did that for a few minutes. Then Rachel brushed him aside and was like, no, no, no, let me do this. And so she started stroking me.

I don't remember her asking me, if she did I don't know. I certainly did not want her to at all. And it was an incredibly, incredibly uncomfortable experience.

Because I knew that I was supposed to like project out to the room, that's what you do in a demonstration, you are supposed to let people feel your orgasm and your turn on. You're supposed to be making noises. You're supposed to be looking like you're really into it. And I was not into it. And I was freaking out. And it didn't feel good. I didn't want to be there, and I said no.

And then she said, she instructed Hamza to walk, it was a really long apartment, she instructed him to go to the end of the hallway where the door was, she said: Hamza tell me if you can feel her. Which meant, like, tell me if you can feel the orgasm that she's projecting, this energy, this turn on that I'm talking about. She kept calling to him, can you feel her yet? He said no. Can you feel her? No.

Q While she's saying that to you, is she still stroking you?

A Yes.

Q Continue.

A I'm like faking it and trying to do the right thing just to get out of it. And then she abruptly stops. And like this was not a timed OM, this was just sort of like its own weird thing. I sat up. And everybody is just like

staring at me. I'm there naked from the waist down.

And then she just starts like laying into me the way that she did at the virus thing, saying all the things that I -- why I'm not doing demos any more, my orgasm is broken, and I'm not good at this any more. And just repeating kind of this virus idea, that I'm infecting everybody with my bad ideas, and I'm going to drag everybody down with me.

And then I just, I just like I started shaking. The only other time I ever felt that was after a surgery or something. I was shaking so violently. I was crying and kind of trying to catch my breath. Because there was so -- it was just so insane. Then I couldn't, I couldn't stop crying.

She told Margaret Pixley to take me to Costco to do some sort of production thing to go shopping. I remember just like crying in Costco, which was so embarrassing, but I couldn't stop, I couldn't stop shaking for like hours. I don't really have any memory after that.

Q Did you speak with anyone at OneTaste after that happened?

A No, no one was talking to me.

Q Did you leave OneTaste right then and there?

A I did not. I probably should have, but I instead just requested like, please, get me out of New York.

Q Did you get out of New York?

A I did, yes.
Q Later on did you speak with any of the leaders at OneTaste about how Rachel had done this to you?
A Yes. I spoke to Yia Vang on the phone. And I don't remember exactly if I told her specifically what had happened, but I just remember begging her, like, Rachel and I can't be in the same place, can you please, I just I don't want to leave entirely but I need to get away.
Q What was Yia's response?
A She kind of understood to some degree. And like it was, it was not -- this was -- it was known that Rachel --
MS. COHEN: Objection, your Honor. Hearsay.
THE COURT: Sustained.
BY MS. FARRELL:
Q If you could just focus on what Yia's response was of you reporting this incident that you just described.
A Yia said to me on the phone --
MS. COHEN: Objection, your Honor, hearsay.
THE COURT: Government?
MS. FARRELL: Your Honor, Ms. Vang is one of the individuals we anticipate connecting consistent with what we discussed earlier.
THE COURT: You're offering this subject to connection?
MS. FARRELL: Yes, your Honor. Also for effect on

the listener, the witness.

THE COURT: Is there an objection?

MS. COHEN: I mean, yes.

THE COURT: Ms. Bonjean, do you object?

MS. BONJEAN: Objection for the hearsay purpose. No objection on the non-hearsay purpose.

THE COURT: She can answer. Overruled.

BY MS. FARRELL:

Q What did Ms. Vang say to you when you told her what happened?

A She said to me on the phone, like, I know that Rachel can get a little crazy with some of the stuff she does. I understand that she goes overboard sometimes. I will try to see if I can get you to be able to go to San Francisco.

Q Ultimately were you able to move to San Francisco?

A Yes.

Q When I want to go back. If we can please put on the screen Government Exhibit 3120.

THE COURT: Is this in evidence?

MS. FARRELL: Yes, your Honor.

Q Go to page eight, please.

THE COURT: I'm going to ask you that this be the last exhibit with this witness. It is 5:25.

MS. FARRELL: Yes, your Honor.

Mr. McNett, if you can pull up number five, the

safeport that we looked at earlier, and blow that up for us.
Q At the beginning of the testimony I asked you if you had a circumstance where you were OMing and safeport wasn't used appropriately. And you said no.
Did that apply to the thing you just described to us that happened with you and Ms. Cherwitz?
A Yes, I said no because I was thinking of a regular OM in a regular OM circle with actual rules. This was an OM in that she was stroking me; but, no, there was not safeporting.
MS. FARRELL: Your Honor, I'm ready to conclude for the day, if that's okay.
THE COURT: Yes. The witness can step down. We'll come back tomorrow. And then I'll address something with the jury and the parties.
The witness can step down.
(Whereupon, the witness steps down.)
THE COURT: We are going to recess for the evening. If you can all again be here in the jury room on the fourth floor by 9:15 tomorrow. We'll get started at 9:30.
I did want to mention that there is one day that we know of that we will not be having court, that is May 16th, which is next Friday. So I thought for your planning purposes you should know that sooner rather than

later, that's May 16th.

Let me just give you some of the reminders, I told you this all yesterday and I mentioned it briefly earlier.

When you leave here, go have a good evening, relax, don't discuss the case with anyone including your fellow jurors. Don't let anyone discuss the case with you. If anyone tries to do that, let me know about it immediately. Don't read, listen to, watch any news or other media reports. Don't conduct any independent research about the case or about the matters involved or the individuals involved. Don't talk to any of the parties, witnesses, attorneys about anything. And please keep an open mind. And again, I can tell everyone was very, very attentive today, and I appreciate that.

And have a good evening and we'll see you tomorrow morning at 9:15 in the jury room and then out here at 9:30.

(Jury exits the courtroom.)

(Short pause.)

(Proceedings continue in open court; no jury present.)

THE COURT: Everyone may be seated.

I'll let you out in a few minutes.

I did want to address those exhibits that the Government handed up and started to question the witness on. My rules typically require three hard copies. We had

discussed a while back that given the volume the Government wouldn't be required to do that, but I did say I needed a hard copy, one hard copy. Does the Government understand that?

MS. BENSING: Yes, your Honor. We apologize and the Court's main copy of exhibits, I understand, is ready and so should be brought over tonight or first thing tomorrow morning. We apologize again.

THE COURT: I don't want to waste everybody's time. But handing me something that, first of all, needs a magnifying glass to look at, that has a lot of content on it, it's just not a good use of time to do that while everybody is waiting and watching.

But I do think the parties should talk to each other. I am inclined to allow this document related to the text exchange. I want to look at it more carefully though, because the parties can represent, but it looks like it's only emails between the witness and Ms. Cherwitz; is that correct?

MS. FARRELL: It's text messages.

THE COURT: Sorry, text messages, yes.

MS. FARRELL: Correct, your Honor.

THE COURT: And are you offering all of this under the same theory, or parts of it under a different theory? By that I mean, the statements by Ms. Cherwitz under one

theory and perhaps the statements of the witness under a different theory?

MS. FARRELL: Yes, your Honor.

THE COURT: I thought that would be the case. But if you want to make a record now, we can also do this tomorrow, I just need to look at the content more.

MS. FARRELL: Understood. Maybe we'll give you the opportunity to review it tonight. I believe you have an electronic copy to review on the computer for the content.

THE COURT: Do you want to be heard about it now?

MS. COHEN: No, your Honor. I may have missed this in the record, I didn't know if she identified the person she was talking to, the other number, as Ms. Cherwitz.

THE COURT: She did.

MS. COHEN: Okay.

THE COURT: That's why I was a bit surprised. But I took your point that you wanted to look at maybe the format of this more.

MS. BONJEAN: I didn't remember her testifying that that was her phone number, so I think that was one of our objections.

THE COURT: She did testify that these were the texts between her and Ms. Cherwitz, which is a foundation. So you can look at it more carefully. You can talk to the

Government, but that's what I'm incline to do when they are offered tomorrow.

But, let me go to -- I don't know what else you handed up to me, is there anything to look at tonight?

MS. FARRELL: Those are texts between witness and Rob Kandell, the gentleman on the top row. We would offer those under co-conspirator statement theory; if you have an opportunity to look at them, great.

THE COURT: I'll look at anything the parties think is efficient for me to look at tonight in terms of evidence. I had looked at your evidence, but it's helpful to have you flag for me what is coming next.

MS. FARRELL: Your Honor, just for everyone's information, I actually think we're now, with those exceptions, I think we're now through everything that is a contested exhibit with this witness. I expect to wrap up with that witness early tomorrow morning. I have very little left of her direct.

THE COURT: There were certain objections made, and I don't want speaking objections in front of the jury. I do want to know your basis. I think sometimes the defense was giving alternate any bases or saying that they only objected to on certain grounds but not other grounds. That's fine.

I just want the parties to be very clear. The

Government is offering something that's under a hearsay exception, you let me know that. Right. I think, largely I think, again I'm generalizing, I think the Government was offering certain documents as statements of co-conspirators, which I have said the Government can introduce evidence subject to connection. And of course, the Government must satisfy at the appropriate time the *Bourjaily*, right, the Government runs the risk if it doesn't do that. But the Government knows what those requirements are. We talked about that before trial. Then the other category is statements of agents of one or more of defendant.

MS. FARRELL: Correct.

THE COURT: My understanding or bases correctly, that's what I understood from what you're saying, I understood that the objections may be, some them I think were on different grounds or on relevance grounds or authenticity grounds or foundational grounds.

MS. COHEN: Yes, your Honor. I think that's fair. I also, trying not to have speaking objections, but I understand.

THE COURT: You can tell me the basis, for sure.

Also, some the documents were offered for the fact that they had been given, not for the truth of the matter or the contents in them, but for the fact that they had been given to a defendant, one defendant or the other, to put

them on notice; whether what was being put on notice is true or not, but what was in the documents was transmitted to the defendants.

MS. FARRELL: That's exactly right, your Honor.

THE COURT: And I don't know that you had objections to certain of those on the notice grounds, right?

MS. COHEN: On the notice grounds, no, your Honor.

MS. BONJEAN: To the extent that notice was relevant for some purpose. But I think we probably disagree on what the relevance of notice was.

THE COURT: I certainly did not admit anything that the Court did not find to be relevant.

Okay. Let me talk, though, about the filing from last night.

MS. COHEN: Just to clarify, your Honor, about the co-conspirator and the agency. We are putting those objections on the record, we understand, your Honor. I want to make sure understanding that --

THE COURT: Of course.

MS. FARRELL: Before we move on, your Honor, I want to make sure this process is working for, your Honor. We've been emailing a couple nights a head of time what our exhibits are that we intend to put in through the witness coming in in the future. We confer. We get a list from the defense of what they are stipulating to and what is in

issue, so we know that walking in. And then we today, we resolved it from front of, your Honor.

Is that fine from the Court's perspective? Or you would like us to --

THE COURT: So what works well was when you read out all the exhibits that had been agreed to, that was helpful. You don't need to flag every exhibit over which there was disagreement, but if there were buckets of evidence that the parties are disagreeing over, it probably would have been more efficient for us to talk about that. But I think some these issues are just going to recur. And I think it's clear to all parties why the other party is taking the position that they are taking. And I will make my rulings on the evidence as it comes in.

I think you're also giving me hard copy binders per witness. Is that right? I know I have one that was given based on today's witness.

So you're paralegals are doing it in front of you without you knowing it. Okay. So that is helpful.

(Continued on next page.)

(continuing)

MS. BONJEAN: Your Honor.

THE COURT: Yes.

MS. BONJEAN: Maybe now is not the moment, but I do want to just clarify one issue that -- one objection that we raised earlier that I know the Court cut me off very abruptly and didn't want the speaking objection, but I do want to elaborate.

THE COURT: Go ahead.

MS. BONJEAN: At the beginning of this examination, there was a series of questioning that, from our perspective, was improper insofar as it asked the witness to reach the conclusion that the jury is going to be reached.

THE COURT: No, no. I know your -- I understood your objection, you didn't need to say much. I understood exactly why you were objecting. But the witness is being asked about providing labor. She's not giving a legal conclusion. The jury will be instructed and they will make the determination of applying the facts to the legal instructions -- or, rather, reverse, providing the legal -- you know, the law to the facts. But she has to be able to talk about services she provided, work she did. I mean, this is -- you know, I understand your objection.

If there's more to it, you can let me know, but --

MS. BONJEAN: I --

THE COURT: But she's using terms colloquially and the jury will have legal instructions and they will be able to apply the law.

MS. BONJEAN: Yes, I understand, Judge. I think -- and I hear you, but I disagree. I think asking her what services she provides is a legal issue, that it will get a definition. And she could have just said this -- you know, she could have said that in any number of ways, but it was elicited that way. I'm voicing my objection. It goes to an ultimate question -- it intrudes on the function of the jury. That was our objection.

THE COURT: I understood your objection, yes.

MS. BONJEAN: I just wanted to make sure that was clear.

The only other issue that I wanted to raise is, again, this witness has -- throughout the course of the examination, did not -- there was no foundation laid. And just because she said "it's my understanding that" is not laying foundation, from our perspective.

THE COURT: No, she -- a couple of the times I think you made that objection. She had been asked about observations. That, she can talk about what her observations were. She worked there. She laid the foundation that she was on, for instance, all these group texts and, you know, she -- the foundation was laid. So the ones that you -- some of the

ones that you objected to were certainly where she was being asked for observations. So, that can happen. And she can also give her understanding and she'll explain what it's based on.

MS. BONJEAN: I just want to make the record very clear. I understand the difference between an observation, but just changing -- asking her to speculate how people got paid or how things happened --

THE COURT: Nobody was asking her to speculate. There's no speculation. Nope. She was giving -- there was a foundation that was laid.

Your client appears to disagree, but you can have a conversation with her. She can --

MS. BONJEAN: Your Honor, I know you're the judge --

THE COURT: -- express her disagreement here.

MS. BONJEAN: -- and you make the rulings.

THE COURT: Yes.

MS. BONJEAN: But can I just make my record?

THE COURT: Yes, you --

MS. BONJEAN: Can I please do that?

THE COURT: But the way you make a record is by making an objection. You've made your objection.

MS. BONJEAN: No, I would like --

THE COURT: Go ahead. Go ahead.

MS. BONJEAN: You've interrupted me every single

time. And I know you're the judge, but I would like to make a record.

THE COURT: I have told you -- let me tell you. I have told you, you can say "objection" and one or two words. If I need more, I will ask you, which I have done. So, I'm not having speaking objections in front of the jury. You could if there is something you would like to say now. But, you know, there are ways to make your objections. You've made your record, you've made objections, the Court has ruled on them. You've objected to, you know, every third question or so. You know, I've made my rulings on those. Is there something more that you haven't said already? Because you are making your record; you're objecting.

MS. BONJEAN: Can I answer?

Okay. So I disagree that I've been able to make a sufficient record. And I'm not trying to do it in front of the jury.

I will say that the record will speak for itself, the transcripts will speak for itself where she was asked to speculate about things she did not have personal knowledge and then the U.S. attorney just changed it to "what is your understanding," which does not provide --

THE COURT: Give me an example.

MS. BONJEAN: I mean, I don't have the transcript in front of me, but it happened over and over again where she was

asked what was your understanding about why something was happening, why an e-mail was sent, why people were doing this practice or that practice. And it wasn't "what was your observation," it was --

THE COURT: She's allowed to give her understanding as well.

You'll have your cross-examination as well. If you think there's no foundation, you'll make a foundational objection. But, you know, the Court made its ruling. The Court does not think that there was an improper questioning going on.

If the Government wants to be heard on this, the Government can be heard.

MS. FARRELL: No need, Your Honor. Unless Your Honor has questions.

THE COURT: I don't have any questions for you.

Let me go, though, to the issue that I want to talk about briefly, which is the filing from last night.

Where do things stand from the Government's perspective? It looked like the Government had a couple of different ways that it was planning on potentially trying to offer certain exhibits and I'd like to know if there's any updates since you filed this last night.

MS. FARRELL: There is an update.

So, this morning -- so, just to take a step back.

Obviously, we tried to keep this as short as possible, given Your Honor's constraints. But we have been in extensive conversations with counsel for OneTaste since April, since I joined the case, about authentication of these text messages and we served a subpoena on OneTaste for a custodian. Obviously, it's the company's obligation to produce a custodian who is competent to certify the records that they've produced pursuant to the subpoena. We had understood throughout from counsel that the relevant records custodian for the text messages was a gentleman named Eli Block and that he would be made available for testimony.

I think two nights ago we learned that Mr. Block had obtained his own counsel. We reached out to that person. They said they had not yet been retained. Today we learned that Mr. Block, they are not going to produce Mr. Block to testify as the records custodian -- and when I say "they," I mean OneTaste -- that there is no other competent witness, from the company's perspective, to testify about the production of these text messages, and that Mr. Block intended -- in order for his appearance to be procured, we would have to individually subpoena him, and that he intended to assert his Fifth Amendment privilege. Putting Mr. Block aside, in our view, it's the company's obligation to provide a competent records custodian in response to our subpoena. And as Your Honor knows from our letter, we have cast our net far

and wide to ensure our ability to authenticate these text messages.

So, sort of addressing these at these various options that we've laid out, at levels of sort of easiest to hardest, I think the -- from our perspective, the easiest path here, the most efficient path is, if Your Honor agrees with us legally, we would request a ruling from the Court that the act of production applies to -- in response to a subpoena, applies to authenticate the text messages. There are cases addressing this, which we've previously briefed. And our expectation would be that we would put on a witness from the U.S. Attorney's Office who is familiar with the process of receiving subpoena returns and how they're stored on our system and all of that, and they can authenticate that these are text messages that were produced by OneTaste in response to a subpoena. So, that's sort of like Path Number 1 which is, from our perspective, sort of the easiest and most efficient. But it necessitates Your Honor agreeing with us on the law and making a ruling.

Path 2 is to have somebody else, another -- a different competent witness provided by OneTaste take the stand. Now, we understand from OneTaste that the company intends to assert work product privilege over any response to basic factual questions about the materials that were produced to the Government. As we lay out briefly here -- and we're

happy to supplement if Your Honor needs us to -- we do not believe work product privilege applies, especially when you, in fact, produced --

THE COURT: Produced it already.

MS. FARRELL: Correct. Exactly.

And so Option 2 is OneTaste has to provide, pursuant to our subpoena, a competent records custodian.

THE COURT: The company is taking the position that it does not have a competent records custodian in all of the company? Is that the position the company is taking, your understanding?

MS. FARRELL: Yes. With respect to the text messages in particular.

THE COURT: Yes.

MS. FARRELL: And it's two objections, as I understand it, from the company. One, that they don't have a competent records custodian other than Mr. Block, who now intends to plead the Fifth; and two, that that person, whoever it is, would assert privilege over the answers to the factual questions about the production.

So, that's Option 2.

Option 3 is, we have separately now begun subpoenaing -- have subpoenaed nine witnesses and we actually now intend to subpoena two more for the purpose of just putting the people whose texts they are on the stand to

authenticate their own text messages.

Now, this has a number of challenges. These are all people who are still involved with OneTaste and are likely to assert the Fifth Amendment privilege. We obviously need to get approval in order to immunize people.

THE COURT: That can be done quickly.

MS. FARRELL: Correct.

We're in the process of doing --

THE COURT: I know that you guys can do that quickly.

MS. FARRELL: That's correct, Your Honor.

And we're already doing it and we expect to get approval for it. But we're doing it.

And you know, as Your Honor knows, part of getting that approval is showing exhaustion, especially with respect to attorneys.

THE COURT: Right.

MS. FARRELL: And we do intend to subpoena attorneys if necessary.

So it's -- you know, on the one hand, we have to show exhaustion for the work product. On the other hand, we have to show exhaustion to the Department of Justice to get immunity.

THE COURT: Yes.

MS. FARRELL: So we've been sort of proceeding on

those two tracks.

And so from our perspective, Option 3 is (a) the least efficient because we'll have to put a parade of witnesses on, I'm sure many of whom will be hostile and won't remember or will be difficult. We're prepared to do it if we have to, but we would obviously like to avoid it.

There may well be additional paths that I haven't raised here. But from our perspective right now, those are sort of the three paths that the Government has to authenticating these documents that were produced by the company in response to a subpoena.

And so again, our main request is Option A because we view that as being legally permissible and sufficient to meet the -- what we all know is a low bar for authenticity.

THE COURT: Right.

MS. FARRELL: We're not talking about admissibility here.

THE COURT: Correct.

MS. FARRELL: We're talking about authenticity.

But if Your Honor disagrees with us, then we would sort of proceed to Option B and then Option C.

THE COURT: Okay.

I will hear from the Defense on this.

MR. ROBOTTI: Yes, Your Honor.

So I think we can start -- Mr. Robotti for

Ms. Cherwitz.

THE COURT: Yes.

MR. ROBOTTI: I think we can start with Option No. 1 here. I think the view of the Defense is that these are not OneTaste documents. These are documents that were collected from personal phones. Before they were collected by the company, there's no record of, you know, what happened to that data, whether it was manipulated, whether it was altered, whether it was changed during the course of the collection process. And so we don't think simply the fact that people turned over data from their devices to the company that the company then turned over to the Government in any way identify -- authenticates that.

You know, to the extent that there are individuals who are on these messages who are going to testify at this trial, like similar to what happened today, you know, we think it is likely that the Government could authenticate those messages that were produced by OneTaste. But to the extent that they are trying to authenticate messages for individuals who are not testifying at this trial simply by virtue of the fact that those messages were turned over to OneTaste and then produced to the Government, that does not meet the bar for authentication, in our view, even the low bar under 901.

So, you know, we don't think that Path 1 is viable here for that --

THE COURT: Well, let me just stop you for a moment because I need additional information from the Government.

The Government intends to be offering these for truth of the matter or for something else, these text messages?

MS. FARRELL: Both.

So, there are many texts. I think the ones, frankly, the Defense cares about the most is the text messages on which their clients are participants. And for those, we would absolutely be offering them for their truth as statements of a party opponent. And then others, offering either as context or coconspirator statements.

And so, there's one example where it's just this -- the excerpts that was produced is solely between Ms. Cherwitz and Ms. Daedone. So obviously, we would not be in a position to call the participants of that chat when it's the two defendants in the case. But that doesn't make it inadmissible or inauthentic when it was collected by the company in anticipation of litigation.

Just to take a step back. We understand from counsel for OneTaste that the exercise of collecting these text messages happened in approximately 2018, after the salacious Bloomberg article came out, and they were collecting text messages of employees in order to assess their legal risk. Then those were subsequently produced to the

Government, and so any work product privilege over sort of the mental impressions of the attorneys as they were planning out their legal defense no longer applies once the materials have, in fact, been --

THE COURT: What you're looking for, as I understand your submission, is that you want a records -- to the extent you're going the records custodian route, you want a records custodian who will say: We obtained X document from Y person on Z date. And that's it.

Is that correct?

MS. FARRELL: And produced to the Government in response to a subpoena.

THE COURT: Right. Correct.

MR. ROBOTTI: Your Honor, I'm sorry to --

THE COURT: And I'm going to come back to you.

Go ahead.

MR. ROBOTTI: So I think that's, you know, Path 2, which implicates the work product assertion by the company. Company counsel is here today and is prepared to address that point. You know, my understanding is that these phones were collected as part of an internal investigation. And the company is not taking the position that the underlying facts, which are the messages themselves are privileged, but their process, their internal process of collecting them and who they collected them from and other steps they may have taken,

that is all work-product protected.

THE COURT: Why?

MR. ROBOTTI: So my understanding, Your Honor, is that that was done at the direction of counsel, that certain decisions were made about who to collect things from, what to collect and, you know, how to preserve it and that was all --

THE COURT: But none of that would be the subject of any testimony, who to collect from, how to collect. Just the fact that certain information came from a certain person on a certain date.

I'm not persuaded yet by your argument, but I'll allow you to keep going.

MR. ROBOTTI: Well, Your Honor, and it is -- I am not as familiar with the internal processes and the work product assertion as the company is, so if you would like to hear from company counsel, I believe Mr. Pelletier is here. But, you know, my understanding is that the decisions about who to collect the devices from was something that was done at the direction of counsel.

THE COURT: But nobody is getting into who to collect it from at this stage. It is just that it was collected from a particular person. That doesn't seem to give away any strategy.

You know, we can hear from -- well, let me hear from Ms. Bonjean. She looked like she wanted to say something.

MR. ROBOTTI: Sure.

MS. BONJEAN: Not exactly, Your Honor. I mean, I join in these remarks.

I mean, I would point out though that, you know, the U.S. Attorney's Office has really -- I --

THE COURT: You have a timing issue. You have a timing issue, I think you've raised.

MS. BONJEAN: Yes, but -- yes.

And I would also just point out -- and, again, I can't speak for the company, but literally anyone who could probably be a records keeper, they have essentially said are coconspirators. So, you know, I don't know how that is going to play out. It's not a matter of just producing someone who is a records keeper. They're saying everybody who would have been in that role is part of this conspiracy. And so, you know, I'm not sure if everyone is going to invoke the Fifth, but it does create a problem in light of the Government's position.

THE COURT: But what is the privilege that people are invoking here? As a custodian. In the capacity as a custodian.

MR. ROBOTTI: Your Honor, so I think what was turned over to the Government was the messages themselves which do not, in fact, reveal who they were collected from. There are a variety of different people on these chats. Some of these

chats have names identified on them, some just have phone numbers. But it is not clear from the messages themselves who the company went to to collect these items from. That is what the company is asserting work product over because that decision, this list of people about who to get devices from as part of an internal investigation was done at the direction of counsel.

And I think to invade that work product, the Government has to show substantial need here. And that's where we get into the timeliness issue, which is the fact that the Government has been on notice about this for months and has not taken the appropriate steps to do this despite company counsel repeatedly saying that they were not going to authenticate that.

So we think that there is a work product -- proper work product assertion here and we don't think that the Government --

THE COURT: Articulate it for me.

MR. ROBOTTI: Well, I don't think I could.

THE COURT: If you can't do more than you can.

MR. ROBOTTI: I don't think I could do more than that. And again, which is that --

THE COURT: Okay.

MR. ROBOTTI: -- there were decisions made about who to collect from and that those decisions were done at the

direction of counsel. Right? It is decisions that are made by attorneys and any internal investigation about the list of people --

THE COURT: No, I understand the doctrine you're talking about.

MR. ROBOTTI: Yes.

THE COURT: What I'm talking about is what the Government is seeking to put in at this trial, and that does not seem to get -- to implicate attorney strategy at all. I'm not seeing it.

MR. ROBOTTI: Well, if I just may finish the thought, Your Honor?

THE COURT: Yes, go ahead.

MR. ROBOTTI: I think it does because all that the Government can put in at this point are messages that are from an unidentified source without anybody to identify the participants in the conversation, especially where there is no, you know, name and just a phone number there. So they're not going to be able to say this came from this person's phone in an effort to show that they were authentic. That is the piece they're missing in the puzzle here.

THE COURT: But that's a separate issue, I think, than the privilege issue that you're raising. That's a foundational issue, I think.

MR. ROBOTTI: Right.

I think what the company would produce, Your Honor, in terms of a custodian is someone to say that there were text messages collected from phones. Right? And if the Government thinks that's enough to authenticate it, we can have that fight, right, when they call the custodian. But I think what the company is saying they won't do is produce a custodian to say we collected messages from these particular devices. And if the Government thinks they need that for authentication purposes, and we think they do, they're not going to be able to get it, I think, over the company's work product assertion.

MS. FARRELL: May I respond?

THE COURT: Go ahead, yes.

MS. FARRELL: Thank you, Your Honor.

So first with respect to the timeliness issue, we have been engaged with conversations with OneTaste counsel on this issue since -- I wasn't around, but I understand December of last year.

THE COURT: But there was discussion about business records. And I think the Government has walked away from that, right? I mean, wasn't that the initial theory of the Government, that these would be coming in as business records of OneTaste?

MS. FARRELL: So I just want to be clear, Your Honor. There have been conversations that Defense Counsel have been involved with and other

conversations with OneTaste counsel directly that the Defendants have not been involved with at all.

THE COURT: Okay.

MS. FARRELL: So the recitation of, you know, communications that is in the Defense position is incomplete because they weren't -- they just simply weren't party to many of the conversations we had with OneTaste counsel about authenticity.

THE COURT: Okay. Is there a reason for you not to share that information now?

MS. FARRELL: There have been many phone calls with Mr. Pelletier and an in-person meeting and I just -- I don't have a list of the dates here prepared to say them to you, Your Honor.

THE COURT: Okay.

MS. FARRELL: And the other thing is -- and I'm not faulting Mr. Pelletier for this, but there have been shifting positions by the company of who they were going to provide, what they were going to say. And so the idea that this is untimely because we're raising it before the Court now, it's because we were acting in reliance on the representations made by --

THE COURT: And the representation was that they would provide a records custodian to you for these very documents?

MS. FARRELL: Correct. Mr. Block. Who is now -- we understand now is in the process of obtaining his own counsel and intends to assert the Fifth Amendment if called to testify. Which we can deal with, but (a) I don't think we need to because I think they can provide a different competent records custodian who may not assert the Fifth and (b) I don't think we need to because we have Option A.

In any event, with respect to the work product privilege, it would be our intention -- although I don't think we actually need this to establish authenticity, it would be our intention to ask the records custodian from whose phones the text messages were collected. I do not believe that gets into work product. We're not asking why did counsel decide to collect from these people as opposed to these people. All it is is the factual information of from whose phones the texts came and I think that is not covered by work product. But even if it were, at this point I believe we have exercised the demonstrating necessity and exhaustion now that we are literally in trial and still fighting about this.

MR. ROBOTTI: If I may just raise a couple of points, Your Honor?

THE COURT: Yes, go ahead.

MR. ROBOTTI: So in terms of Mr. Block's assertion of the Fifth Amendment, I mean, that's obviously his decision with counsel if he does that. I mean, I will point out he's

sitting on that board right under Ms. Daedone, so it would not be surprising that he wants to assert the Fifth Amendment.

But in terms of substantial need, you know, our understanding is that the Government shifted its position from these being business records to seeking to a stipulation to regarding authenticity in response to our motion where we pointed out that these were not, in fact, business records.

Prior to that, they had sent this entire list of text messages to the company, requesting that they be certified as business records, which we pointed out was not accurate under the law.

So I don't know that it is correct to say at this point that they had been seeking this stipulation all along.

THE COURT: No, but I think what I'm hearing Ms. Farrell say is that there are conversations that you were not a party to with the company that led the Government to believe that there would be a competent records custodian who would be testifying.

MR. ROBOTTI: Sure.

Well, in any event, Your Honor, even if there were, the Government shouldn't be relying on the idea that they're going to secure a stipulation or a records --

THE COURT: I don't think they were asking -- they weren't -- I don't hear them to be saying they're going to be relying on a stipulation or a records certification. It

sounds like what Ms. Farrell is saying is that they were told by OneTaste that there would be a records custodian testifying.

Do I have that right?

MS. FARRELL: Correct. Pursuant to the subpoena that we served on OneTaste.

THE COURT: Right. Correct.

MS. FARRELL: As any company is obligated to do when subpoenaed for such a witness.

MR. ROBOTTI: Your Honor, on April 7th the company counsel wrote to the Government and said that we are not in the position to certify these text messages and they specifically recommended to them that they issue trial subpoenas to the custodians of these devices.

THE COURT: Certify for what?

MR. ROBOTTI: My understanding is that they were not willing to certify them as business records.

THE COURT: But that's not the issue we're talking about anymore. We're not talking about business records anymore.

MR. ROBOTTI: I understand, Your Honor.

My point simply is that the Government has the subpoena power. They could have subpoenaed --

THE COURT: They utilized it. They've subpoenaed OneTaste for a records custodian.

Is that correct?

MS. FARRELL: That is correct, Your Honor.

MR. ROBOTTI: But in terms of assessing substantial need, Your Honor, they could have issued the subpoenas for all of these records custodians weeks ago and they could have immunized them or taken the other steps that they need to do in order to get these certified.

THE COURT: But they were told they were going have a -- I'm going on the representation here, but the Government is representing that they were told that they would have a records custodian; namely, Mr. Block.

MS. FARRELL: That's correct, Your Honor.

And we explicitly discussed the issue of whether or not he would invoke. And our understanding was that if we made the representation, which we did, that he was not the subject or target of a current investigation, that he was not going to invoke. And so we -- and again, I don't fault Mr. Pelletier at all. He -- if Mr. Block wants to invoke, that's obviously his right. And we're not suggesting he doesn't have that right. But from the perspective of us subpoenaing the company for a competent records custodian, we relied on that representation in then not going out and subpoenaing the universe. And now we have.

MS. BENSING: Your Honor, may I make one point?

THE COURT: Yes.

MS. BENSING: I think it's just worth noting that the company produced thousands and thousands of these text messages to us. We've significantly -- obviously, we don't want to be here forever. We've significantly narrowed that. So to the extent we're asking, with respect to like this small universe of text messages, did you collect it from one of the participants in this, I don't think that that would even remotely intrude on work product because it wouldn't include the full universe of custodians from whom the --

THE COURT: Yes, I mean, look, we can do this the easy way or we can do this the hard way. But it sounds like the Government is going to be able to lay a foundation here, either through immunized witnesses or otherwise. So, we can do it the hard way. We can have a parade of people here.

MS. FARRELL: We would really prefer not to do it the hard way, Your Honor.

THE COURT: I know that. I know that.

MS. FARRELL: And would request that you rule on Option A. On Option A.

THE COURT: I will let you know tomorrow.

MS. FARRELL: Thank you very much, Your Honor.

THE COURT: When do you, though, really realistically think any of these documents are documents that you would want to put in?

MS. FARRELL: Later. Through the FBI summary

witness who will --

THE COURT: When you say "later," just time frame wise?

MS. FARRELL: Towards the end of trial. And so, not this week or likely next week.

THE COURT: Then I may not give you an answer tomorrow.

MS. FARRELL: Okay.

THE COURT: But I will give you an answer.

And if there's anything more you want to let me know about it, you can let me know in the coming days.

MS. FARRELL: Understood, Your Honor.

The one -- I don't think this --

THE COURT: Can I see the documents, though, that are at issue? Tell me where they are.

MS. FARRELL: Yes. We will provide you --

THE COURT: I mean, I know I probably have them. But I have a lot of documents from you. Just tell me the numbers so I can look at them.

MS. FARRELL: Would you like us to provide you a separate binder?

And here is why I ask this: The texts are very difficult to read and --

THE COURT: But just tell me where to find them then.

MS. FARRELL: Okay.

THE COURT: And if I want paper, I'll ask for paper.

MS. FARRELL: Well, if I may?

THE COURT: Yes.

MS. FARRELL: We are -- they're very difficult to read in the way that they were produced. Very tiny, hard to read.

THE COURT: Even electronically?

MS. FARRELL: Yes.

We are having -- it seems like they were PDF'd and then scanned, so they're very difficult to read. We had a graphics firm create demonstratives so that they're easy to read for the jury. And so what I would suggest is -- I don't think they're all done yet, but we could provide Your Honor a binder of those and it will be much more easy for you to read them.

THE COURT: I take it you're going to give it to the Defendants as well?

MS. FARRELL: We've been producing them on a rolling basis.

THE COURT: That's fine.

MS. FARRELL: Thank you.

MS. BONJEAN: And I think this probably goes without saying; obviously, we have objections apart from authenticity as it relates to these text messages.

THE COURT: What would be the basis? Would it be relevance or would it be something else?

Because if it's your client's or your client and Ms. Cohen's client's statements --

MS. BONJEAN: It's not so much those text messages.

THE COURT: Okay.

MS. BONJEAN: It's other text messages.

It's also doctrine of completeness. These are very --

THE COURT: Okay. So I need to look at them then. I need to see what it is you all are --

MS. BONJEAN: It's not clear where things start, where they end, who's talking. That type of thing.

THE COURT: Okay.

MS. FARRELL: And just to be very clear, we are talking about authenticity here, not admissibility. We understand that that is a separate issue and that they preserve all their objections with respect to admissibility. Our focus today is the low bar of authenticity.

THE COURT: I understand.

MS. FARRELL: Thank you, Your Honor.

THE COURT: Okay. If you could be back at 9:15 tomorrow if there's any issues, but I don't anticipate that there are.

I guess tell me how much longer. You said not much

longer with this one witness.

MS. FARRELL: Less than half an hour. Probably less than 15 minutes.

THE COURT: Okay.

And then who is going to be doing cross-examination first?

MS. COHEN: I think I'll be going first and then Ms. Bonjean.

THE COURT: Okay. And I won't hold you to an estimate because, you know, you probably want to think about that overnight, but approximately how long do you think? Combined.

MS. COHEN: I think until lunch. Well, depending on when it starts.

MS. BONJEAN: I don't know how long Ms. Cohen has. Obviously, I'm not going to go over what she's gone over, but, you know, it's going to be several hours.

MS. COHEN: Yeah.

THE COURT: Yes, I'm just wondering, is it the bulk of the day or not? Are we going to get to the next witness tomorrow?

MS. COHEN: I think we'll get to the next witness. But I think we'll be -- yeah, I mean, depending on when they end and lunch and --

THE COURT: That's fine. That's fine.

And we got started late this morning. I'm hoping, you know, that there won't be issues to take up, but I'm also hoping that they all get here really on time and then we can really start at 9:30.

MS. BONJEAN: Can we get a sense of the second witness? Do we expect that to go through the day?

MS. BENSING: He's short.

MS. BONJEAN: Okay.

THE COURT: I'm sorry. Tell us who that is. Because that was not one that was covered under my ruling, right?

MS. BENSING: No, no, no. I made a record of this yesterday.

THE COURT: Right.

MS. BENSING: Chris Hubbard.

THE COURT: Yes. Okay.

MS. BONJEAN: What do you consider short?

MS. BENSING: Probably an hour or less.

MS. COHEN: And then depending on what happens with the custodians.

MS. FARRELL: I don't think we're going to have the custodian issue resolved --

MS. COHEN: Okay. I'm just trying to get a sense of the next couple because we talked about custodians, so okay.

THE COURT: Sorry, you're talking about custodian

issues separate from the one we were just talking about?

MS. FARRELL: Just to be clear, originally, we had noticed that we would put the custodians on this week, and then these issues cropped up.

THE COURT: Okay. I understand.

MS. FARRELL: Thank you.

THE COURT: Okay. We're adjourned. Have a good evening, everybody.

I will see you at 9:15, and we will start with the jury at 9:30.

(At 6:06 p.m., the proceedings were adjourned until Thursday, May 8, 2025, at 9:15 a.m.)

INDEX


| WITNESS | PAGE |
|---|---|
| REBECCA HALPERN | 103 |
| DIRECT EXAMINATION BY MS. FARRELL | 103 |

| EXHIBIT | RECEIVED |
|---|---|
| Government Exhibits 3120, 306, 309, 201, 211, 290, 242, 302, 281, 221, 292, 284, 3234, 3224, 12, 3768, 207, 260, 254, 382, 388, 228, 265, 269, 208, 374, 408, 261, 404, 3766, and 3500-RW-12 | 102 |
| Government Exhibit 3501-3 | 163 |
| Government Exhibit 3501-30 | 175 |
| Government Exhibit 3501-10 | 203 |
| Government Exhibit 3501-5 | 204 |
| Government Exhibit 3875 | 215 |
| Government Exhibit 3879 | 222 |
| Government Exhibit 3501-7 | 237 |
| Government Exhibit 3501-14 | 273 |