UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

May 14, 2025

Defendant. : 9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.
KELLY LENAHAN-PFAHLERT, ESQ.

(Appearances continued on the next page.)

Court Reporter: Sophie Nolan
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Sophie Nolan, CSR, RDR, CRR
Official Court Reporter
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201
NolanEDNY@aol.com

THE COURTROOM DEPUTY: *United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes.

Kayla Bensing, Kaitlin Farrell, Nina Gupta, and Sean Fern, joined by paralegal specialist Liam McNett and FBI Special Agent Christine Meyer.

Good morning.

THE COURT: Good morning, everyone.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, here on behalf of Rachel Cherwitz. And we also have associate Kelly Lenahan-Pfahlert. And we're also joined by paralegal Camille Simonson.

THE COURT: Good morning to all of you.

MS. BONJEAN: Jennifer Bonjean, B-O-N-J-E-A-N, along with attorney Kelsey Killion.

THE COURT: I know the parties want to take up at least one issue. I wanted to note that the Government did make two filings since we were together yesterday. They're both under seal. One is at ECF 377 and relates to the impeachment issue that was discussed yesterday and would as at 378 and relates to the text messages.

The 378 just was filed this morning. I have not had a chance to look at it in any detail, but I want to make sure

that everybody has those filings. Does everybody have those filings? Defense?

MS. COHEN: I haven't seen the one from this morning, but, yes.

THE COURT: I am not going to address the one from this morning because nobody has had a chance to fully absorb it yet.

Ms. Bonjean, I think yesterday you said you wanted to maybe be heard on the matter of impeachment. I can hear you on it now. The jury is not all here yet unfortunately so we have a few minutes.

MS. BONJEAN: Just briefly, Mr. Kosley is -- his credibility obviously is in play. We believe he's demonstrated a pattern of taking electronic equipment from his employers and it is a fair area of impeachment. He's also misused material that he's taken. It's not that he's just stolen laptops for the purpose of selling them or something of that nature, but that he's taken proprietary information which really is a fundamentally dishonorable thing to do and it goes to his credibility.

THE COURT: You would intend to be asking him about these. You wouldn't be able to admit any extrinsic evidence of these issues.

MS. BONJEAN: I don't think there's a prior conviction of it. Even if there was, it would be out of the

time frame. I think it goes to honesty.

THE COURT: The Government has put in the case law that suggests that theft doesn't go to truthfulness. I can hear you out on that, Ms. Bonjean.

MS. BONJEAN: You know, it's funny I've made that argument in the past and I've never really been successful at it. I'm glad to know that I now have a pleading to cite to in case I want to make that argument.

THE COURT: Tell me what your anticipated cross-examination would look like on this. Because I'm not entirely persuaded by the Government's argument.

MS. BONJEAN: Again, I don't think I would spend a lot of time on it, but I would draw out that he was -- that he essentially thieved or stole or pilfered, whatever word you want to use, electronics from a prior employer. And that's pretty much it. I don't think I would do much with it. I don't think he did anything with any material that he received, but I think it's fair to ask him about it and because I do think it reflects on, you know, his truthfulness. I think it's -- you know, it's classic just credibility. No, I'm not trying to make a minitrial out of it.

THE COURT: That definitely won't be happening and I didn't think you would be on this issue.

Let me ask the Government a bit more about the actual factual basis for this event.

That's a representation he eventually told this company about the incident and was terminated. Is there any more information to provide about how it came about that he told the company? Was that something he was confronted with or something he raised himself?

MS. BENSING: Yes, he raised it himself. The company was going to do an inventory. He knew they were going to do the inventory and before they were doing the inventory he raised it with his employer and let them know. He created a payment plan and repaid it.

THE COURT: What is the amount of money?

MS. BENSING: He repaid $5,000.

THE COURT: Okay.

Ms. Cohen, do you wish to be heard?

MS. COHEN: We join, Your Honor. I would point out the fact that it is showing a pattern here and the person directly relates to the issues in this case.

THE COURT: There's different issues here. One is impeaching on sort of her general credibility and truthfulness, right, and the other is you're talking about pattern. I don't know exactly what you're intending to try to elicit with the witness in terms of whatever he did at OneTaste. That's a separate issue, I think, so I'm not persuaded by this pattern argument.

MS. COHEN: It goes to his credibility to the extent

that he's denying things that he did at OneTaste.

THE COURT: I am inclined to allow sort of appropriate limited cross-examination on this along the lines of what Ms. Bonjean is suggesting here, particularly given the timing. I know the Government says it's a long time ago, but the events at issue I think overlap with the time frame; is that correct, roughly?

MS. BENSING: I think it's correct, but to impeach a witness on credibility or attack a witness on credibility grounds for the witness' testimony today. If it's longer than ten years it becomes far less --

THE COURT: Well, that's for convictions.

MS. BENSING: Correct. And here he wasn't even convicted. He voluntarily --

THE COURT: I am going to deny the Government's motion. I would not expect there would be really on these facts anything too extensive.

Okay. Anything else to take up on this?

MS. BENSING: No not on this, Your Honor.

THE COURT: Okay. The other issue again on the text messages I'm not going to take up right now, but I need to look at --

MS. BENSING: We know.

THE COURT: And I know the Government also handed up some transcripts. I take it those are of the clips that you

flagged yesterday; is that right?

MS. BENSING: Yes, Your Honor.

THE COURT: I looked at the actual clips. The Transcripts came today. I assume they align.

MS. BENSING: Yes, Your Honor.

THE COURT: Is that what you would like to raise?

MS. BENSING: Yes. So I have spoken with the defense attorneys. I understand that they are not going to be raising today any kind of rule of completeness arguments with the caveat that the Government will agree, if appropriate, at a later time to admit other portions of the same clips if they are, in fact, necessary.

THE COURT: In the Government's case in chief?

MS. BENSING: It doesn't really matter to the Government either way. Whatever the defense prefers, honestly, if they're proper and typical completeness. So we may have a disagreement about the scope of the rule of completeness, but we won't need to recall the witness to establish authenticity.

THE COURT: Which witness is this?

MS. BENSING: Mr. Kosley.

THE COURT: Go ahead.

MS. BENSING: So, my understanding is that that's okay for every party, but they may have other objections as to relevance or hearsay and so I don't know --

THE COURT: I mean, just based on what I've seen so far in this trial, I would really encourage the Government to be laying a proper foundation before it's seeking to introduce this because we're just going to delay this jury while they sit there and watch some fumbling and it doesn't seem particularly efficient or in anybody's interest.

I will tell you, having watched these clips in isolation, I'm waiting for the foundation and I'll leave it at that.

MS. BENSING: Of course, Your Honor.

MS. BONJEAN: Your Honor, I just want to point out a couple of things here. The Government has proposed this as a solution because we initially got on Monday a series of clips which I think the Court had an opportunity to look at although they changed even as of yesterday. There was an additional one added yesterday, which is an audio clip.

THE COURT: There were a couple that were only audio.

MS. BENSING: There's one that's only audio.

THE COURT: There was at least one other that I didn't see a video on. I can get the number on that.

MS. BENSING: Let us know because there should only be one that's audio only.

THE COURT: Okay.

MS. BENSING: And we did produce these initially to

the defense on April 25, April 30th and May 3d. There's a variety I can give the Court with the clips, but they have had them.

MS. BONJEAN: We had about multiple terabytes of video, so we're not suggesting it wasn't given to us but it's sort of -- we became clear as of Monday the actual clips that were going to be used with Mr. Kosley. They were pulled from about six hours of video. If we were doing completeness right now, the trial would come to a halt because the Court can't even look at six hours of video, I assume.

THE COURT: I can. I can. It's not ideal, but I can.

MS. BONJEAN: So suffice it to say we're pulling out small clips of long videos which I think the Government has acknowledged has created a little bit of problems. We still have relevance objections. And even yesterday at 4:30 there was an audio clip that was seven minutes long that came from 4.5 hours of audio from an event I have no idea or --

THE COURT: What do you mean at 4:30 p.m.?

MS. BONJEAN: At 4:30 p.m. yesterday.

THE COURT: What happened at 4:30?

MS. BONJEAN: The Government identified a new exhibit.

THE COURT: Nothing in court?

MS. BONJEAN: No, no, no. It wasn't actually here.

It was by e-mail which I didn't look at until we were out of court obviously, but there's a seven-minute audio that's right in the middle of some statement. I have no idea where the audio is from.

I assume Mr. Kosley will testify to it, but when I went back to the original audio, it's literally 4.5 hours. I'm home at 8 o'clock. I can't listen to 4.5 hours of audio at 8 or 9 o'clock when I'm getting ready for today.

So that is a part of the issue. Now, it is true that the prosecutors and I spoke last night a couple of times at midnight trying to come up with a solution to this and that this was a solution that sort of was --

THE COURT: Okay. One other issue with the videos, they have subtitles, I don't know if that's the right word, but they have the text. Is that something that's agreed on?

MS. BENSING: I believe so, Your Honor, but to the extent not, we would just offer that for demonstrative purposes and the clip we're going to use we can remove those. I'll defer to the defendants. I would like to display the version with subtitles in court for demonstrative purposes. If that were an issue, we're completely fine admitting the versions that don't have the demonstrative subtitles.

MS. BONJEAN: At least one is not synched up. There's not sufficient time -- I'm not trying to be difficult but I'm not going to throw caution to the wind and then

later --

THE COURT: I understand, believe me.

MS. BONJEAN: So I think that the subtitles are helpful, but I haven't had a chance to do a comparison that would make me feel comfortable just agreeing to them at this juncture.

THE COURT: I do think at least the videos that I could see, they're easy to hear. I don't think you need -- this is not a situation where the jury is not going to be able to understand the words. They're in English and easy to hear. So, if there's any objection to the subtitles, I'm not going to allow them to be shown to the jury today.

MS. BENSING: We understand, Your Honor.

THE COURT: You can remove them?

MS. BENSING: Yes.

MS. BONJEAN: We maintain objections certainly to the relevance of this, but that's different and I know you don't want to take that up right now and that's fine.

THE COURT: I do not think I can take it up right now without hearing the testimony, but I am telling the Government it needs to lay a foundation and I'm not going to be waiting while there's fumbling around. So, if the appropriate questions are asked where you lay the right foundation, you'll offer it, and if there's an objection I will rule on the objection, but it sounds like you talked to

each other at least about --

MS. BONJEAN: We have. It's less than ideal frankly to be putting in completeness later down the road, but it is what it is. I know the Court wants to keep it moving and we do too. We are making a compromise on that. We would like to put in completeness on cross, but there was no time to really, again, dig into what amounts to ten -- ultimately ten and a half hours of video to really -- and I know that they gave it to us a long time ago, but I would still have had to review it again. There's no way I can memorize hundreds of hours of videos.

THE COURT: I understand and I agree with you.

MS. BENSING: Your Honor, I apologize.

THE COURT: Go ahead.

MS. BENSING: With respect to foundation because I hear the Court and I do want to make sure that I'm laying a proper foundation and, so, what I intend to do is elicit, you know, how he knows what this is, the year that this is from, the type of, you know, course -- like, student interaction and in some cases he's not able to give an exact date, but he's able to give a year and we'll refresh him on that and that's essentially the foundation.

THE COURT: The point I'm making is that when you look at these clips, I looked at these clips, I have no idea what kind of these events some of these are. So, there

obviously has to be that foundation, and I assumed you would do it, but do it before you try to offer the evidence.

MS. BENSING: Of course, Your Honor. I just wanted to flag that in some cases he's not able to give a specific date. He can give a year and it can be within the time period.

THE COURT: That is fine.

MS. COHEN: We spoke to the Government about this and I wanted to put it on the record. As you know, we were here right before trial we were pressing to get a witness lineup order.

THE COURT: Yes.

MS. COHEN: I completely understand that these people have to be flown out and they don't know exactly when, but what we were trying to get is best guesses of who you were going to put and then yesterday we heard for the first time -- we hear that Ken Blackman who we believe -- two witnesses, yeah, and Lindsay --

THE COURT: You're speaking in half sentences and I'm not sure what you're saying.

MS. COHEN: Sorry. Two witnesses, Ken Blackman and you Lindsay --

MS. BENSING: Your Honor, the second witness --

THE COURT: So no names. So you're saying that they've switched up the order. Is that what you're telling

me?

MS. COHEN: Yes. And if we had had an idea that Mr. Blackman was going to be at the beginning, it would have had us prepare. There are witnesses I understand are not in the lineup I am prepared for --

THE COURT: Okay. I hear you, but I think the cross-examinations have been going longer than the Government anticipated. They're certainly going longer than the Court has anticipated so I think that's thrown off the Government's planning.

Do I have that correct?

MS. BENSING: Yes. And these are just the witnesses who are available to go next in the time that we have and we want to be sure we have witnesses here to testify next. So we're still trying to stay within the order. These are the next witnesses who will be coming --

THE COURT: There's not much we can do right now, but I do -- and I think the jury is here, yes.

But I do want the Government to -- and if you can't use the names right now, you can't.

MS. BONJEAN: Your Honor, it wasn't so much the order was changed up. They threw two names on us yesterday that they never said were in the order at all. That's the problem.

THE COURT: You mean that they were never going to

be witnesses at all?

MS. BONJEAN: No, they were going to be witnesses, but nowhere down the -- we got two names last night at 10:00 that, oh, we might just throw them up this week.

THE COURT: This week is today and tomorrow because you're out Friday; right?

MS. BONJEAN: Right.

THE COURT: We're all off because you have a wonderful occasion.

MS. BONJEAN: I don't mind tomorrow, but I'm saying they told us at 10:00 last night that Ken Blackmon might testify tomorrow. That's the issue.

MS. COHEN: If we had had -- if it goes fast --

THE COURT: I understand, I understand.

Let me hear the Government on that.

MS. BENSING: Your Honor, we are moving at a pace that has been difficult for the Government to determine. We are now going to have two witnesses that I hope to call in the order we told the defense. There was some disagreement with respect to the Kosley exhibits and I'm not going to put on a witness from whom I can't elicit the relevant testimony.

So, the next witness who was available to come to New York, we told them as soon as we finalized his travel plans, Your Honor. So, we are doing our best. This is a witness we have been preparing with for the last few weeks.

They've been getting 3500 productions for him. I don't think there should be any surprise that he's going to be one of the Government's witnesses and the Government has to be prepared to call a witness.

We have now told them the rest of our witnesses and we are doing our best to tell them the lineup, but it is shifting a little bit.

THE COURT: I understand. I understand. And that's understandable as long as they know what witnesses you are planning on calling in this trial and if you are in good faith telling them as early as you can tell them, when do you think that people are going to be testifying. That's the best we can do. I would encourage -- and it's not so much the substance. It is the pace at which these cross-examinations are going. There are a lot of long pauses. I think it just needs to be a bit more -- it's not disorganized. It's just slow.

MR. ROBOTTI: I do want to flag that yesterday's cross-examination was the same length or shorter than the Government's direct. Our cross-examination is not rehearsed ahead of time and when you have the witness on the stand saying -- repeatedly saying I don't remember things, we have no choice but to refresh their recollection.

THE COURT: Like I said, it's not the content. It's the pace. I'm not going to tell you how to refresh a

witness's recollection or whether you want to have a witness look at more than one page of a document at a time, you do what you're going too do, but I will tell you I think it's to the scheduling issue. It's not a content comment and I think I made it clear.

MR. ROBOTTI: I appreciate that, Your Honor. I do want to say that last night my understanding from the Government is not that we're going too slow, but that we're going too fast for them and it's throwing them off.

MS. BENSING: Your Honor, given the pace of the cross-examination last week we made some adjustments --

THE COURT: You're going to have to adjust, readjust. Everybody has known this trial is coming. Everybody knows what the issues are.

Let's get the jury. I don't want to keep them any longer. There are no topics that we need to address right now, is that correct?

MS. BENSING: Correct. I do have some happy news that I think we're on pace to finish within the four weeks that the Government originally anticipated. So I wanted to share some positivity, Your Honor.

THE COURT: You should have led with that, Ms. Benson.

MS. COHEN: I'm going to talk to the Government about one issue.

THE COURT: Okay. Ms. Bonjean, you don't need to reveal any personal information, but do you have any constraint about what time you can stay until tomorrow because I know you have to get to --

MS. BONJEAN: I have a flight to catch, but I wasn't trying to leave early.

THE COURT: I just wanted to --

MS. BONJEAN: Are you going to keep us late?

THE COURT: No.

MS. BONJEAN: I appreciate that. I had planned to stay until quitting time.

THE COURT: I mean, it can be -- air travel can be difficult these days if we have a big storm. Just let me know.

Let's bring the jury and you can bring the witness.

(Witness resumes stand.)

(Jury enters.)

THE COURT: Everyone can be seated. Good morning to the jury.

Ms. Bonjean, you may resume your examination of the witness.

THE COURTROOM DEPUTY: Ms. Gill, the Court reminds you that you are still under oath.

THE WITNESS: Thank you.

(Continued on the following page.)

**DANA GILL**,
called as a witness, having been previously duly sworn, was examined and testified as follows:
CONTINUED CROSS-EXAMINATION
BY MS. BONJEAN:
Q Good morning, Ms. Gill.
A Good morning.
Q I want to pick up where we left off yesterday.
I believe yesterday I had asked you before we broke whether you recalled telling the Government at some point that you never -- you never felt pressured to pay for any courses. Is that right?
A I don't recall saying that.
Q Okay. And we'll go back to that, but I want to move forward and -- when you --
Let's go to the time when you moved into 1080 Folsom, okay? How long had you been associated with OneTaste when you moved into the residential center there?
A I don't have a distinct recollection of the exact amount of time, but if I had to give my best guess, I would say -- it was very short. It was a short amount of time. I had just started the coaching program. So, in my mind, it was maybe a month or two.
Q Okay. So you had this TurnON event and in a fairly short period of time, you were already living at 1080 Folsom; right?

A I believe so, yes.
Q And you understood, of course, that you were joining an intensive program for members of a community who were interested in deepening their understanding and practice of OneTaste's teachings; right?
A I don't know that I fully understood OneTaste teachings, but that was kind of the point of going into the program.
Q Well, you had to apply for the program; right?
A I never thought of it as an application. It was more signing up for something, like buying a course.
Q Well, you had expectations of you; correct?
A I'm sorry?
Q There were expectations if you were going to live at 1080 Folsom; correct?
A Can you ask that a different way, please?
Q Sure. Do you remember getting a program overview, policies and practices manual?
A Not a very clear recollection. I know that there were certain -- like, you know, you couldn't be naked on the second floor kind of guidelines, but I don't recall a policy and procedure manual.
Q You remember rules that were articulated somewhere; right?
A The main rule that I remember is no being naked on the second floor and no children.

Q No children, no running around naked; right?
A On the second floor.
Q On the second floor.
And the reason there was no running around naked on the second floor was because the second floor was a slightly different program than the third floor; right?
A I wouldn't call it a program. It was just a tier of acceptance or involvement.
Q It was a tier of sort of the level of intensity you wanted with the program; correct?
A That's not quite how I would put it. I just say it was just geared with your involvement.
Q Well, you remember you couldn't use narcotics or drugs in the house; right?
A I do remember that, yes.
Q Did you?
A No.
Q It sounds like before you started living there you were having -- you were using drugs. Did you stop? Is that what happened?
A Yes.
Q So that was a good thing; right?
A It was.
Q I'm going to ask that you take a look at defendant's --
Well, let me ask you this: You said you didn't

remember a living center program overview, policies and protocols document that was provided to you; correct?
A Correct.
Q You're not saying it doesn't exist, you just say you don't remember it?
A Correct.
Q I'm going to have you look at Defense Exhibit 2-BJ to see if it refreshes your recollection. Okay?
MS. BONJEAN: Your Honor, I don't know if you have it.
THE COURT: I am okay on the screen with this.
Actually, Ms. Bonjean, I don't think I was ever given a paper copy. If you have one, I'll take it. I don't want to slow things down.
(Counsel approaches.)
(Exhibit published.)
BY MS. BONJEAN:
Q So, Ms. Gill, I don't want to take too much time, but if you would flip through this document and see if this refreshes your recollection about the policies and protocols of the 1080 Folsom living center?
A (Reviewing.)
I still have no recollection of ever looking at this.
Q Okay. Give it a second. Maybe it will trigger a memory.

A (Reviewing.)

It's still not triggering any recollection.

Q Okay. You can put it down.

So, you recall at least that there was an immersion program; right?

A Are you talking about the coaching program?

Q No. I'm not talking about the coaching program.

I'm talking about living on the third floor of 1080 Folsom was an immersive experience, we'll call it that; right?

A I did not ever see it that way. I don't recall it ever being called an immersion program.

Q Okay. You knew it wasn't just like renting a room though; right?

A In my memory that's what it was.

Q Just renting a room?

A Renting a room and then also living within community people that are practicing similar things.

Q But you recall testifying that you had --

If you were just renting a room, you wouldn't need to get up at 5 a.m. and OM every day; right?

A There were still expectations, but I don't recall it being a requirement. It was more of a -- to me it felt like a, you know, why would I be living there if I wasn't, but I still wouldn't have called it an immersion. There's a difference in my mind.

Q Okay. But you were just using it because, apparently, it suited you in the moment because you needed a place to stay; is that what you're saying?
A I think that it's more complicated than just that.
Q Okay. You were using OneTaste just to get something out of it, right?
MS. GUPTA: Objection.
THE COURT: Overruled.
A That's not how I feel about it.
Q So you understood then -- let's go the other way.
You understood then that there were expectations of the people who lived in the community at 1080 Folsom; right?
A I did understand that there were certain -- like, again, why would I -- like, why would you move into 1080 if you weren't planning on OMing and immersing yourself in that community and, again, I would still not call it an immersion program.
Q We can quarrel over the word, but the reality is you wouldn't move into 1080 Folsom unless you were embracing a particular tenet that involved OMing; right?
A I was definitely excited about embracing OM, yes.
Q Okay. And that was something that you did every day with the people that lived at 1080 Folsom; right?
A Yes.

Q In fact, I think according to you, at one point you were doing it, what, four or five times a day?
A Yes.
Q You also did yoga with the people who lived there; correct?
A I did.
Q You journaled. That was part of the experience; right?
A I did journal, yes.
Q Everybody journals; right?
A Not everybody.
Q Did Aubrey journal?
A I don't know.
Q There was also a requirement for living there that you did have to contribute service hours to the program; correct?
A I don't remember that.
Q Okay. You could come and go as you pleased, of course, right?
A Yes.
Q I think you said your parents visited at least once; right?
A For a meeting with Rachel and Rob, yes.
Q At least once?
A Yes.
Q And did you have other friends visit where you were living at any point?

A Yes.
Q People outside of OneTaste; right?
A Yes.
Q And part of the requirement or expectation of living at 1080 Folsom was that you would participate in OneTaste courses; right?
A Again, I don't recall it being a requirement and I also know and agree that there was an unspoken expectation.
Q Can you think of anyone who lived there that did not participate in OneTaste activities?
A There were some people who were very minimally involved.
Q So you could have been very minimally involved; right?
A If I had had the capacity to, yes.
Q I mean, you could have been minimally involved, you were there -- well, strike that.
Did you have the capacity to make your choices when you had only been associated with OneTaste for, what did you say, like, a month?
A At that point in my life I was still a very lost individual and I did not have the capacity to -- or the wherewithal to know and make fully informed choices, I think.
Q You came to OneTaste that way; right?
A Damaged, yes.
Q Lost, you said; correct?
A Yes.

Q You entered OneTaste as a lost person, according to you; right?
A Yes.
Q Okay. And you were trying to find some meaning in your life and you entered OneTaste or entered the community there; right?
A Yes.
Q OneTaste had nothing to do with you being lost for everybody reason prior to you coming to OneTaste; right?
A Correct.
Q They're not responsible for that too; right?
A Correct.
Q Nicole isn't at fault for your troubled childhood or whatever it was that made you lost that brought you there; right?
A Correct.
MS. GUPTA: Objection.
THE COURT: Overruled.
A Correct.
Q Okay. And do you recall that the third floor --
The people that lived on the third floor were sort of more -- I'll use the word immersed or you can use whatever word you like, more immersed in the program or the community, than the people on the second floor?
A That is a fair statement.

Q So people who wanted to have their 9-to-5 job and go about their business but maybe wanted to have some connection with this community but didn't want to make it the center of their life lived on the second floor? Does that sound about right?
A Yes, that sounds about right.
Q And that's why there were more boundaries on the second floor. You couldn't walk around naked; correct?
A That seems like it would be an accurate statement. I don't know there were all of the boundaries on the second floor, but that sounds accurate.
Q Logical; correct?
A Uh-huh.
Q And that's why the bathrooms were not sort of an open shower or an open -- like at a gym or something; there was more privacy on the second floor?
A There were stalls in the shower, yes.
Q And the third floor was a little more -- a lot more open; right?
A Yes.
Q And that was for people who -- for -- the people that lived up there were more intensely involved in the community; right?
A For the most part, yes.
Q And that included you eventually; right?

A I believe I moved into the -- onto the third floor immediately.
Q So right out of the gate you were all-in, onto the third floor; right?
A I don't recall it necessarily being like -- when I moved in, necessarily knowing the difference until it was explained to me and, yes, I jumped in with both feet.
Q Okay. Now, part of the program or part of living at 1080 Folsom, as you testified to, was you had to share a room. It wasn't a place where you had private rooms; right?
A Not unless you had money. You were allowed to have your own room, but I didn't have the money to afford my own room.
Q Okay. So there was an option to afford your own room right?
A Uh-huh.
Q And if you had the money to pay for your own room, you would have your own room, but you didn't have the money; right?
A There were a few people who had their own rooms, yes.
Q And you shared a room were a fellow named Henry; right?
A Yes.
Q He was the Doctors without Borders guy?
A Yeah, he was an engineer for them.
Q You testified on direct that you kind of lucked out thanks to the 2010 Haitian earthquake because he had to go

there to work there and save people's lives and, so, you were left without a roommate so you kind of got your own room; right?
A Yes.
MS. GUPTA: Objection.
THE COURT: Overruled.
A Yes. I essentially ended up having my own room because he was gone in Haiti.
Q The coaching program that's separate and apart from the residential living aspect; correct?
A Can you say that again? I'm sorry.
Q The coaching program in which you participated was a separate activity from your living at 1080 Folsom; right?
A In my mind they were married and it was a separate payment and I was making payments to a separate entity, but they were hand-in-hand for me, in my experience.
Q Were you making rent payments, like writing checks or were you just working it off because I heard both?
A I was making rent payments and I was doing payment in kind. It depended on the season.
Q All right. And you know what a d/b/a is; right?
A I do.
Q So Caravan Retreats is who you were writing your rent checks too, right?
A Yes.

Q But they were doing business as OneTaste; right?
A That's how I understood it.
Q And then you could do the coaching program without living there; right? A lot of people did, right?
A Yes, absolutely.
Q Okay. And you really wanted to take the coaching program?
A I was very excited about the coaching program, yes.
Q And you knew you couldn't afford it; right?
A I did.
Q Okay. And you knew how much it cost; right?
A I did.
Q And you didn't wait and save money to take it. You talked to Rachel and said I really want to take it and she said maybe we can try to raise some money or something like that?
A She said, don't worry about it, we'll figure it out.
Q And you did figure it out, you raised some money; right?
A I did, yes.
Q And, in fact, you even borrowed money from boyfriends along the way to take OneTaste courses; correct?
A I don't -- I recall borrowing $800 from one person who I would not consider a boyfriend.
Q Okay. You borrowed money from a friend; is that better?
A Yes.

Q You borrowed money from a friend to take a course, maybe not the coaching program, but you had borrowed money to take courses; right?
A I don't remember why I borrowed the money, whether it was for rent or for a course, but I did borrow $800 from a friend.
Q All right. And you also did not even end up paying off the whole coaching program; right?
A Because I ended up quitting partway through, yes.
Q Usually when you purchase a product and you don't want to use it, you don't necessarily just, you know, not get your money back; right?
A We -- I remember talking to Rob about it and agreed it would end up being a prorated amount. So I would pay for the course work that I went through and not the rest of it.
Q Yeah. So, Rob gave you a break and said, you know, you signed up for this course, you committed to this course. You now don't want to do it so we're not going to hit you with the whole amount; right?
A I don't recall the specifics of the arrangement and, yes, I did not pay for the whole course. I paid for maybe half of it.
Q All right. And then how long after you were living at 1080 Folsom did you start doing the Sugardaddy thing?
A I don't recall. I'm sorry.
Q Okay. You put -- you put up a profile on Sugardaddy;

correct?
A A profile was put up on -- on the site, yes.
Q You say it "was" like it happened magically. You put up on a profile on Sugardaddy.
A I -- I did not actually do it myself.
Q Okay. You mean you didn't push the buttons?
A I did not.
Q But you wanted and chose to put your profile up on Sugardaddy?
A I eventually agreed to it. It took me a while to get me to being okay with it; and, yes.
Q What about being okay with it? Who would force you to put your profile up on Sugardaddy?
A There was no, like, gun to my head forcing, and I do think that there was -- it was a slow introduction that kind of got me and normalized it over a period of time.
Q Your friend Aubrey Fuller was doing Sugardaddy; right?
A I don't remember if she was doing that or not, but I know she was doing Redbook.
Q You were doing Redbook too; right?
A Yes.
Q Who was it that put this profile up for you?
A Aubrey.
Q So she did it without your knowledge?
A It was with my knowledge.

Q So she did it with your knowledge; right?
A Uh-huh.
Q You picked the photos; right?
A I had a say in the photos. She helped to take the pictures and posted them and wrote the words.
Q Did she get a cut of what you were making?
A No.
Q Okay. So -- but you're blaming her for that, too?
MS. GUPTA: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q The information that went on your profile, you gave that to Aubrey; right?
A That's not my memory of it.
Q Your memory is that you were responsible for absolutely nothing over the course of five years of your life as far as I can tell; is that right?
MS. GUPTA: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You set up a profile or she helped you put it up like friends do with dating apps; right?
A Again, I -- it did not happen without my knowledge.
Q And it happened with your consent?
A Yeah, I -- I said it was okay for it to happen.

Q And when you went on your first Sugardaddy date, it was you who went and not Aubrey; right?
A Correct.
Q And that you did of your own volition, can we agree on that?
A Yes, I went there.
Q Right, you did. And you -- and you accepted the payment or whatever benefit came from doing that; right?
A Yes.
Q You didn't share that with anybody; right?
A You mean, like, giving someone a part of the payment?
Q I don't know how you accept the payment, ma'am, and I'm not trying to get into the details, but you received some payment for your services on Sugardaddy; right?
A Yes, absolutely.
Q You took that benefit, whether it was clothes or money or cash or whatever it was, paying your bills, you took that for yourself, you didn't share it with anybody; right?
A I mean, I was very generous with my money and it's not like I was regularly sharing a portion of the money made.
Q Okay, so what -- did you or did you not share the income you made from your services on Sugardaddy with anyone, yes or no?
A It -- it, I don't know that I know how to answer that while being truthful to my truth.

Q I'm interested in the facts. What don't you understand about the question?
A I -- I feel like I answered it. I was very generous with the money that I made. I took my friends out to lunch and that sort of stuff, but -- in that sense I shared it, but I was not handing over payments.
Q Right. That's what I was asking.
You didn't, like, take some percentage of your income from your Sugardaddy services and give it to anybody else; right?
A Correct.
Q You did what friends do sometimes which is maybe when you have a little money in your cash, take them out to coffee, right?
A Yes.
Q So that's just being a good friend; correct?
A Yeah, I feel like I was generous with the money that I made.
Q Okay. You also signed up for Redbook, through Aubrey too?
A It was Aubrey.
Q And she did so with your knowledge; right?
A Yes.
Q She did so with your cooperation; correct?
A Yes.

Q She did so with your consent; right?
A I'm struggling with the term "consent" because from my mind there was some coercion over a period of time.
Q From Aubrey?
A Yes.
Q She had a personal interest in you working on these platforms to make money?
A I think so.
Q And she told you that?
A I don't have a distinct recollection of that specific word coming out of her mouth or anything, but that was my sense of it.
Q And just to be clear, you met Aubrey before you were even associated with OneTaste?
A She was the one who introduced me to OneTaste.
Q Right. And she was not a leader of OneTaste, however you want to use the word "leader," but she was not part of the core leadership of the company; right?
A Not yet.
Q She was a participant; right?
A Correct.
Q She was in the same position as you were, correct, in terms of status?
A I always felt like she was always a little bit higher up than me from my perspective, but yes we were both

participants.
Q And you were both living on the same floor of 1080 Folsom?
A Yes.
Q She was still paying for courses like you did; right?
A Yes.
Q She still OM'd like you did; right?
A Yes.
Q She journaled and did all of those things that people in the community did; correct?
A Again, I can't speak to whether or not she journaled. I don't recall that.
Q Okay. So, at no point did you say, hey, Aubrey, I don't want to do this, did you?
A There was definitely a time at the beginning when she was talking about it that I said, this is not for me, I don't want to do this.
Q And you didn't, correct, right at the beginning; right?
A Correct. And then as it continued to be talked about and exposed, it became normalized for me.
Q So, Aubrey talking about her own experience normalized prostitution for you? Is that what you're telling the jury?
A Yeah, it became normalized for me, the concept.
Q Sorry?
A The concept of sex work became normalized for me.

Q You heard your friend, Aubrey Fuller, say I'm involved in these things, right? She shared her experiences and then from that, it's your position that that -- just her talking about it, normalized it for you; right?
A Yes.
MS. GUPTA: Objection asked and answered.
THE COURT: Sustained.
BY MS. BONJEAN:
Q When you say "normalized," it wasn't normalized, right? You didn't go and share it with your parents that you were engaging in prostitution work; right?
A I never shared it with my parents.
Q Right. You didn't share it with your sister, I assume; right?
A That, I can't remember.
Q It's not something that you shared with everybody in the OneTaste community; right?
A I was selective about who I shared it with in the OneTaste community because it was advised -- they wanted to make sure that they weren't looking like a sex cult.
Q And I think you testified on cross-examination with Mr. Robotti that -- well, strike that.
You actually said in -- I don't know if it was in a podcast, but somewhere you said that it was hush-hush; right?

A I do recall that being a part of the cross yesterday.
Q Okay. And you remember -- you remember saying yourself with your own words that it was -- that you had to keep it hush-hush; right?
A Again, it was told by many in the core team to not talk about prostitution because it gave OneTaste a bad look.
Q You going on Redbook and Sugardaddy had absolutely nothing to do with OneTaste, did it?
A That's not how I viewed it. It's more complicated than that.
Q Can we agree that Sugardaddy and OneTaste have no correlation to each other?
MS. GUPTA: Objection. Asked and answered.
THE COURT: Overruled.
You may answer.
THE WITNESS: Thank you.
A Can you repeat the question, please?
Q Can we agree the company Sugardaddy or the platform Sugardaddy has zero connection to OneTaste?
A It's -- that's not how I understand it and I think it's more complicated than a yes or no answer.
Q Is it your testimony here today, ma'am, that the website Sugardaddies.com is a OneTaste company?
A No, it is not a OneTaste company.
Q And you didn't need to sign up for Sugardaddies to be

part of the community there at OneTaste, it was not a requirement; correct?
A It was not a requirement to sign up for sex work to be involved in OneTaste, no.
Q And most people who were involved in OneTaste did not do sex work; isn't that correct?
A I can't speak to what most people involved in OneTaste did. I can speak to what I did and what I know some of my friends did.
Q Okay. So you and your friends did sex work. Who were they; Aubrey, you and who else?
A I know Hadas (ph) participated in sex work.
Q Who else?
A Those were the only three that I know who overtly participated in it.
Q So the three -- so, you and your two friends did sex work and you agree that it had absolutely -- it was absolutely not required, mandated or otherwise required by OneTaste; right?
A No, sex work was not required by OneTaste.
Q The same with Redbook, right? How were Redbook and Sugardaddies different?
A That's a good question. Sugardaddies was meant to be or, in my mind, it was more, like, relational. Whereas Redbook was more, like, Johns; sex work.

Q A what?
A A -- a John is a client a male client who is purchasing sex.
Q And just to be clear, you would agree that Redbook, the platform, the company, whatever it was, is not a OneTaste company affiliate or anything of that nature; right?
A Correct.
Q OneTaste wasn't getting any cut of your services that you provided on the Sugardaddies and Redbook's platforms; right?
A No, they -- it is not a company -- they were not getting a cut. They were benefitting from my sex work.
Q I know esoterically that's where you are at. I'm asking a concrete question.
You have no basis to believe that there was any business relationship between OneTaste and these platforms; correct?
A Correct.
Q And you agree that there was -- OneTaste gave you no mandate that you had to participate in sex work, right?
A Correct.
Q In fact, they actually were -- you actually kept it from them, meaning you kept the information concealed from them; right?
A That's not my memory of it, no.

Q And the only three people that you know who actually engaged in this sex work were you and your two friends, right?
A Definitively, yes.
Q All right. You, yourself, gave yourself the nickname Mother Teresa of Orgasm; right?
A It was a group collaboration and, yes, I was the one who ended up claiming it.
Q And Mother Teresa, of course, is a religious figure, right, or was -- is, I guess?
A Yes.
Q She was sainted after her death?
A She is a saint, yes.
Q And you have always been connected to the church, right even at OneTaste?
A No. I stepped away from my faith for a long time. I left the church and I was not involved in church until the last year of my time at OneTaste.
Q All right and so when you gave yourself the name Mother Teresa of Orgasm, had you stepped away from your faith?
A I was still stepped away from my faith at that point, yes.
Q You weren't attending church?
A Not to my memory, no.
Q You testified that you recalled some names like TurnON

Bunny or TurnON Fairy; is that right?
A Can you say that again?
Q You testified on direct that you were called these names, TurnON Bunny or TurnON Fairy, right?
A Yes.
Q You never said don't call me that, right? You never said to anybody, don't call me the TurnON Bunny?
A I don't remember ever saying that, no.
Q Okay. And you didn't say don't call me the TurnON Fairy -- did I just repeat that?
A I never said either of those names.
Q You didn't object verbally to anybody, like, I don't like that you're calling me that, please don't call me that?
A Correct.
Q In fact, at the time you sort of embraced the monikers; right?
A I think it's fair to say that I embraced it. I was very excited to be accepted and -- not just accepted but lifted up for being a sexual person.
Q Right. And you testified on direct that you now see OM as a sexual -- all OMing as a sexual service; right?
A I do.
Q But you didn't view it that way back when you were associated with OneTaste between 2009 to 2013-ish?
A Thereabouts, yeah.

Q You didn't view it that way then?
A It started off in my mind, like, with -- especially with my upbringing, woo, this is a little bit woo and I was still a little bit excited about it and it was taught to us that asking for OM was like asking for a cup of tea. So it really took the sex and that sexual charge out of it.
Q Right. That's OneTaste, isn't it?
A The normalization --
Q Of OMing, yeah, is the central core tenet of OneTaste, right?
A Yes, OM is definitely a core tenet of OneTaste, yes.
Q They never hid it from you; right?
A Correct.
Q That's frankly all they ever talked about; right?
A Yes.
Q You're getting that message pretty regularly, yes?
A About OM being a tenet, yes.
Q Your power comes from OM, right?
A That was one of the things that they said about OM, yes.
Q And even up until March of 2013, you were OMing regularly for your own practice; correct?
A Yes, I was OMing pretty regularly up until I left.
Q And my point is up until you left, you viewed OM as a practice that was beneficial to you; right?
A Yes.

Q You testified about some other experiences that, looking back, you did not -- you see as a service, but let's talk those experiences in a moment, if we could, okay?

For instance, you told the ladies and gentlemen of the jury about an experience where you -- I think you put on a -- I don't want to get the word wrong, like a dildo or something?

A Yeah, a strap-on or a dildo. I don't remember which one it was.

Q And I think Alisha Price performed fellatio on the dildo for a demonstration; is that right?

A Yes, in a course.

Q Again, at the time that you did that, you didn't object to that; correct?

A It was very exciting to be asked to do something in the front of a course. I had never been asked to do any kind of demo, so it felt like -- it was -- to use their term, it was a huge upstroke and a point of pride to be asked.

Q And that's how you experienced it at the time?

A Yes.

Q You testified on a number of occasions that you were either directed or -- I think maybe the Government used the word, but you agreed that you were directed to OM with certain people; right?

A I was asked to OM with certain people, yes. (Continued.)

(Continuing.)

BY MS. BONJEAN:

Q You were asked and you agreed, right?

A Yes.

Q Like Matt Gottlieb --

A Mark Gottlieb.

Q Okay, sorry. As an example, Mark Gottlieb.

A Yes.

Q You were asked and you agreed, right?

A They said, hey, will you go OM with him, and I'd say, like, oh -- sometimes I'd be like, oh, why. But usually it would be like, oh, okay. If someone asks you to do something, you say okay.

Q Actually, no, if someone asks you to do something you don't want to do, you can say no, right?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q Like the text message we looked at where Ms. Cherwitz was saying, oh, my gosh, something about Ken not being, you know, handled, and she's saying where is, who was it, Jordan? I can't remember the name that was --

A Blake?

Q Blake, that's it. I don't know where I'm getting these names from. Okay.

Where is Blake? Blake was supposed to be

handling --
A Ken.
Q -- Ken, right?
And you actually said, you know, what do you want me to do, can I help, something of that nature, right?
MS. GUPTA: Objection. I believe that misstates the testimony.
THE COURT: Yes, sustained.
Q Do you want me to pull it out? It does take us a longer time.
Do you remember what you said?
A I do remember what I said.
Q What is your recollection?
A To my recollection, I believe I responded, do you want me to do something.
Q Right. So you offered, correct?
A In my mind, that was a clarification, is there something that you want me to do.
Q And she said, will you either handle or stroke or whatever the word she used, Ken, and you said yes, right?
A Yes.
Q You even said, I already got a room, right?
A At some point I did tell her that I found a room to stroke him, yes.
Q It was actually the very next message. You want to

look at it?
A I don't recall the exact order of it, I'm sorry.
MS. BONJEAN: If you could give me one second, Your Honor.
THE COURT: Sure.
MS. BONJEAN: Your Honor, I would like to pull up, it's in evidence, Government Exhibit 4518-A.
THE COURT: Go ahead.
MS. BONJEAN: If we have it. If not, I'm going to start making my way up.
THE COURT: Do you want it published or do you want to just give it to the witness?
MS. BONJEAN: I wanted to publish it, but this seems to be moving at a glacial speed.
THE COURT: It's on.
MS. BONJEAN: Great. I would like it published.
THE COURT: It is on. We just need to turn down the lights so they could see the screen.
(Exhibit published.)
BY MS. BONJEAN:
Q Okay. Ms. Gill, let me turn your attention, if we could, to I guess it's the -- is it the third page of this? Yes, the one that starts with:
Ken, do you want me to do something?
Do you see that?

A At the very bottom of the page?
Q Yes.
A Yes, I see: Where is he right now? Downstairs --
THE WITNESS: Is it okay that I'm reading this?
THE COURT: Yes. It's in evidence.
THE WITNESS: Okay.
A Downstairs talking to a student, I don't know his name. Ken, do you want me to do something?
Q Right. And Rachel says:
Will you stroke him? Ken, I mean.
As opposed to Blake, I think, right?
A I do believe that's the point of clarification, yes.
Q And you were kind of talking over each other, but ultimately you said yes, and right after that you said I found a room, right?
And I found a room.
A Yes. It says:
Will you stroke him? Ken, I mean.
You want me to do something?
Yes. Responding to will you stroke him.
And I found a room.
Q And you never said to her, oh, I don't want to stroke Ken. You didn't say that, right?
A I did not.
Q And you didn't say, oh, let me see if I can find Blake,

right?
A I did not. That wasn't the question.
Q Right. Well, you -- but you didn't say anything to indicate I have no intentions of stroking Ken, right?
A Correct.
MS. BONJEAN: Okay. We can take that down.
Q You testified also, I believe, another example yesterday was you were asked or directed, I don't remember which word you used, to either OM with or have some type of experience with a fellow named Antonios; is that right?
A I was told to make sure that he stayed in the coaching program.
Q Okay. And who told you that exactly?
A I don't have a specific recollection of who it was.
Q All right. And that person, whoever it was, didn't say I want you to go OM with him, right?
A No.
Q That person didn't say, I want you to go do a make-out session with him, right?
A To my memory, no.
Q Okay. So this person is like, we want to keep this guy as a customer, correct?
A My interpretation of what was asked of me is essentially do what you need to do to keep him in the coaching program because -- with the implication of we want

to keep him as a customer.
Q That was your interpretation, but nobody told you expressly what to do, right?
A There was no one saying, go suck his cock.
Q Right. I mean, no one said go make out with him, no one said go talk to him -- well, let me go one by one.
No one said, go make out with him, right?
A I don't recall if that was specified or not.
Q No one said, go suck his cock, correct?
A I'm pretty certain that those words were not used, correct.
Q Right. No one said, go OM with him, right?
A Those words definitely not used, correct.
Q No one gave you any explicit instruction other than try to keep him in the program, correct?
A My recollection is of I was -- it was requested of me to make sure he stayed in the program, yes.
Q And the program, you understand, was a product that had been -- I mean, it was an actual -- this was a business, you understood that, right? OneTaste was a business.
A Yes, OneTaste is a business.
Q Okay. And the coaching program was a product of that business, correct?
A Yeah.
Q Okay. So whoever -- we don't know who it is, but

whoever it was that asked you to try to keep him in the program was saying, keep this customer in the program because we want to keep our customers, right? Fair?
A I think that's a fair statement, yes.
Q And your interpretation was go do something sexual with him, right?
A It was the implication.
Q Okay. Can you give me -- well, strike that.
You drew from that to go suck his cock?
A That was part of it.
Q But that sexual act itself was a sexual act you chose to do, right?
A I'm -- I'm struggling with the word choice. Probably no surprise.
Q No surprise.
A And I -- I think that there is a limit in choice when coercion has been underlying everything.
Q Okay. I know -- I'm asking you really -- I'm not asking you for the psychobabble. I'm asking you, in the moment --
MS. GUPTA: Objection.
THE COURT: Sustained.
Q I'm asking you, in the moment, did you make the choice about what sexual activity you were going to go do with Antonios?

A It didn't feel that way to me.
Q In the moment it didn't feel that way?
A It felt like what was being asked of me was to go do sexual acts with him to keep him in the program.
Q Even though no one told you to go do sexual acts, it felt that way?
A Correct.
Q And it felt that way and you just went and did it, right?
A Yes.
Q You didn't walk out the door and say, heck no, correct?
A Correct.
Q You didn't call up your family and say come get me, right?
A Correct.
Q You didn't call up your sister and say, you know, can -- can -- I'm going to get a ride to your house, I'm coming there right now, right?
A Correct.
Q You didn't even object when the person told you to keep him in the fray, right? Or keep him in the program.
A I don't recall. I doubt I did.
Q Okay. You didn't say anything to the person who was supposedly giving you this direction like, I object to this, I don't want to do it, and I'm not going to do it. You said

nothing along those lines.
A I didn't have the capacity to.
Q Right, because you -- you were already -- well, strike that. We're not going to go backwards. Let's keep going. I know that's your testimony.
Mr. Robotti touched on some of this, but I want to ask you a couple of questions about your testimony that -- I think the testimony was along the lines of that the message that you got from OneTaste is that if you were anywhere else other than OneTaste, you would lose your orgasm, or something of that nature, right?
A The -- I believe what I said and my memory of the way that it was taught to me was if you -- if I was to leave and go to, say, the island that my friends wanted to go to in Clear Lake, that it was a waste of my time and I would be undoing all of the hard work to cultivate my power in orgasm.
Q So your friends at OneTaste gave you this kind of, you know, wild idea, right, that if you go do things elsewhere, you're not staying focused on this community and what the community is all about, right?
A Yes.
Q Okay. And yet you did exactly that. Throughout your time at OneTaste, you went to a myriad of places unassociated with OneTaste, right?

A My -- my time at OneTaste was not devoid of extracurricular activities.
Q Right. So you were working outside of OneTaste, correct?
A On occasion, yes.
Q Right. They didn't kick you out when you were working outside of OneTaste, right?
A Correct.
Q You had colleagues wherever you worked, right? Guys that worked in the kitchen, women that helped wait tables, these were people that were not associated with OneTaste, right?
A Correct.
Q You had bosses in your other jobs, right?
A Correct.
Q And these people are all people you developed relationships with, or could have, correct? Friendships.
A I -- yes, I could have. I didn't connect that much with any of them until the church job.
Q You -- we've already established you vacationed with your friends and your family from time to time, right?
A There were a few vacations in there, yes.
Q You went home for the holidays, right?
A Occasionally, yes.
Q Went home for Thanksgiving, correct?

A Occasionally.
Q Even moved out of Folsom to go move in with a romantic partner on at least one occasion. Was it one or two?
A I believe it was just once, if I'm remembering correctly.
Q You actually left the residential place and went and moved in with a boyfriend, correct?
A Correct.
Q And was that boyfriend someone associated with OneTaste?
A He was very supportive of OneTaste.
Q All right. But he wasn't -- he wasn't part of the community, right?
A Correct.
Q Okay. So the actual person who is your romantic partner, your boyfriend, you're living with him, he's not even associated with OneTaste, right?
A He had -- he had learned OM, but he was not involved with OneTaste, especially to the extent that I was, correct.
Q He didn't take the coaching program, right?
A Correct.
Q He didn't take courses, right?
A Correct.
Q He worked outside of OneTaste, right?
A Correct.

Q He didn't have any friends in OneTaste other than you, right?
A He became friends with some of the folks in OneTaste.
Q Okay. But all through you.
A Correct.
Q He would have never known that OneTaste existed but for you, correct?
A Probably.
Q All right. So this is a main influence in your life, right?
A Can you say that a different way --
Q He was a main influence in your life at that time, correct?
A He was a big part of my life at that time, yes.
Q And just to be clear, OneTaste didn't kick you out because you were literally living a whole different life with your boyfriend in an apartment completely unconnected to OneTaste, right?
A Can you repeat that, please?
Q Yeah.
When you were living with your boyfriend in some other location who was a boyfriend who was not involved in OneTaste, OneTaste did not excommunicate you from the community, did they?
A No.

Q You talked that one of the coercions or manipulations was love bombing, right, that you received?
A Yes, I did say that.
Q Love bombing was not a word you used back then, right?
A It didn't exist. It wasn't -- it wasn't really a phrase that was known to me, correct.
Q That's, like, a more recent sort of social media phrase, correct?
MS. GUPTA: Objection.
THE COURT: Overruled.
A I have not really been very active on social media. My experience from love bombing comes from my therapy sessions.
Q Ah. Great point. You even had a therapist when you were at OneTaste, right?
MS. GUPTA: Objection. Misstates the testimony.
THE COURT: Yes, sustained.
Q Did you have a therapist that you were seeing when you were still associated with OneTaste?
A I started seeing a therapist after my miscarriage because I couldn't get out of bed.
Q Right. Again, you don't blame Nicole Daedone for your miscarriage too, do you?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q The miscarriage was something that you experienced,

terrible, traumatic, and I'm sorry for that. But just to be clear, the miscarriage brought you to therapy, right?
A Yes.
Q You had a therapist that you could go talk to about anything and everything, and you probably did, right?
A It's because of therapy that I ended up leaving OneTaste.
Q Right. And just to be clear, OneTaste never said you have to leave if you have a therapist, right? They supported you in therapy.
A I can't speak to whether or not they supported me in therapy, but they never told me that I had to leave if I had a therapist.
Q In fact, you had a nice -- Nicole gave you words of support after your miscarriage and even told you, like, go see a therapist, didn't she?
A I don't recall her ever saying that I should go see a therapist. She did give me some very wonderful advice, to go to Grace Cathedral and sit in the labyrinth.
Q She told you to go back to your roots in your faith, didn't she?
A I'm not -- I'm not sure that that was her point, but maybe it was. I can't speak to what her intentions were.
Q She wasn't telling you to go OM at Grace Cathedral, though, right?

A No, she did not tell me to go OM at Grace Cathedral.
Q Grace Cathedral has a different purpose, right?
A Their labyrinth is beautiful.
Q When she wanted you to find peace, she told you to go to the church where she thought you would find peace, right?
A Yeah. I believe that she thought that that would be a healing experience for me.
Q Okay. One of the other things you complained about on direct examination -- or testified about -- I'm not trying to be argumentative --
THE COURT: Be careful, Ms. Bonjean.
MS. BONJEAN: Yes.
Q One of the things you testified about on direct examination was that you felt that OneTaste interfered in some relationships that you wanted to have along the way, right?
A Yes.
Q Now, you understood that OneTaste -- that the philosophy of OneTaste was to, frankly, reject sort of the convention of monogamous relationships in sort of a normative world, right?
A I don't know that I would put it that way. I do know that they -- monogamy was not done among very many people. There were a few people who stayed monogamous at OneTaste.
Q So it was possible, right?

A For some people, yes.
Q And it's also just possible generally. You don't have to be at OneTaste. You can go leave and marry somebody outside of --
You didn't need OneTaste's approval to leave and go marry somebody, right?
A No.
Q Okay. I think you testified that you started dating someone by the name of Billie something. I don't remember the last name.
A You want me to say it?
Q Sure.
A Stubblebine.
Q Okay. That's why I don't remember it. Stubblebind (phonetic)?
A Bine.
Q And just to be clear, you testified in the context of this that you didn't think OneTaste supported lesbian relationships, right?
A I don't know that I ever said that, but I did -- and I did say -- or I remember saying that I was made fun of for being in a lesbian relationship. Mocked, I believe is the word I used.
Q Okay. But didn't you also testify that you had this great disappointment in the fact that Justine Dawson started

seeing Billie, right?
A Uh-huh.
Q And they're both women, right?
A Uh-huh.
Q That's a yes?
A Yeah, sorry, yes.
Q And Justine Dawson, according to you, is in this core group or this top level of OneTaste, right?
A So it didn't make sense to me why I was being mocked and Justine wasn't.
Q Okay. You felt mocked, but there's other evidence that there was same-sex hookups going on or relationships, right?
MS. GUPTA: Objection.
THE COURT: Sustained as to form.
Q Well, Ms. Dawson's a woman and Billie was a woman, right?
A Correct.
Q Okay. And also it is no secret that there were other members of the community, including Ms. Daedone, who had sexual relations with women, right?
A Correct.
Q Okay. So that was an activity that was fairly common, correct?
A It wasn't unheard of. I don't know that I would say it was common.

Q Women OM'd with other women?
A It was -- it was not encouraged until you were well developed in your OM practice, and yes, women OM'd with other women.
Q Fair to say, though, that the sexual activities that you now look back at, whether it was OMing or make-out sessions, I'll say, with some of the participants, at the time, you did not communicate to Nicole Daedone, Rachel Cherwitz, or anyone at the upper staff of OneTaste that you did not want to participate in those activities, correct?
A I never overtly said I don't have the capacity to do this, or I don't want to do that.
Q Okay. And that was true also for your relationship with Reese Jones, right? Meaning you didn't communicate your -- that you didn't want to have sexual relations with Mr. Jones, right?
A I -- I never said I don't want to do this.
Q In fact, there were aspects of it, you know, you enjoyed, according to you, correct?
A I believe my testimony was it was not devoid of pleasure. I did not enjoy it, though.
Q Okay. But you agreed to it?
A I did.
Q And even as of September of 2012, you very much wanted to stay connected to OneTaste, right?

A Can I have more context, please?
Q Yeah, sure. It wasn't a great question.
You wanted to be a certified coach and an OM coach, right?
A I -- I do remember seeking certification, yes.
Q Okay. And you wanted to integrate OM into the church community, right?
A My -- yes. My original vision was to focus on sexuality within the church. I had not -- I was unable to pull apart and unmarry all of the things that I had learned.
Q All right. You wanted to free people's orgasm, especially in the normative communities; housewives and families, right? And I'm talking September of 2012, not now. Right?
A That sounds like a fair statement of what I was hoping to do back then, yes.
Q And you wanted to have the freedom to travel and teach about OM in different cities and in different languages all over the world. That was what your vision was for yourself in September of 2012, right?
A I don't recall the traveling, and I don't know why anyone would not want to travel. That sounds delightful for anyone, I think.
Q Agreed. But you wanted to travel to spread the mission of orgasmic meditation in that time period, right?

A Yes.
Q Okay. You testified on direct examination, of course, about this -- this sham marriage you entered into. I'm not going to talk about that too much. But you remember that testimony, right?
A I do.
Q You agree that, you know, lots of people go into debt, right? Like, I don't know a percentage, but many people are in debt?
A Yes. Consumerism is a problem.
Q Right. And not everyone crosses the line and breaks the law, right?
A Correct.
Q Now, you testified that I think sometime in 2013 you were off to new things. But while you were still at OneTaste, you were applying for graduate positions -- graduate school positions, right?
A I don't recall applying, like actually submitting the application until after I left OneTaste. I remember submitting my application at the very last minute before the deadline hit. But that being -- and I also remember saying in my cross-examination yesterday that the -- they call it the discernment process in the church, and the discernment process, which is different than the application process, is very long. So I had to, like, talk to my pastor and read a

book and then talk about the book before I even applied to grad school.

Q Discernment practice, that sounds like --

A Discernment process.

Q Discernment process, that, like, a unique phrase, language for the church, right, that process?

A I don't think discernment is a unique word for the church, but --

Q No, no. Discernment isn't a unique word any more than aversion is a unique word. But that particular use of the word in that context meant something, right?

A Yes.

Q Okay. So there was this pre-application process that you were exploring while you were still at OneTaste, right?

A I -- again, I don't remember the specifics of the timeline, and I wouldn't be surprised.

Q And even after you joined the graduate program, you stayed in contact with certain members of the community, including people that you considered, you know, upper executive staff for OneTaste, right?

A Yeah. It took me a while to pull away from the community completely.

Q My question is a little different, though.

These people still stayed in contact with you. They didn't not communicate with you.

A Can you ask that a different way or give me more context?
Q Sure, sure.
When you started your graduate program and had really disassociated on every level with OneTaste, you still did maintain some of your friendships with people at OneTaste, right?
A There were a few folks that I stayed in touch with. There's something -- I don't know how to describe it. When people experience something that is so unique as the experience of OneTaste, there's something comforting about knowing someone who has gone through something similar.
Q I'm not talking about people who left. I'm talking about people who stayed. You still were associated. Like, for instance, Rachael Hemsi, right?
A We -- I mean, we did not stay in regular contact. She contacted me that once after -- when I was in Texas. I had moved away from the East Coast, to my memory, and that was the first time that we stayed in touch. If there was contact at the beginning part of my grad program, I don't recall it.
Q Do you recall having Facebook messaging with her in March of 2014?
A No.
Q

THE COURT: Ms. Bonjean, approximately how far how much miles per hour time --

MS. BONJEAN: I'm almost finished.

THE COURT: Okay. I'm just thinking about break time.

Go ahead.

MS. BONJEAN: Do you want to take a quick break now?

THE COURT: No, keep going, that's fine.

MS. BONJEAN: Your Honor, I don't know if you have this one.

THE COURT: Thank you. What's the number?

MS. BONJEAN: It's going to be Defendant's Exhibit 2-BO-R.

THE COURT: 2-BO-R. Okay, thank you.

The Government has it?

MS. GUPTA: We just received it, yes.

THE COURT: Okay.

Q You could thumb through that, if you would, Ms. Gill.

(Pause in proceedings.)

Q Did you have a chance to look at that?

A I did, yes.

Q Okay. Do you recollect Ms. Hemsi reaching out and checking in and saying hi to you?

A I -- I don't have a recollection of this conversation,

and it doesn't surprise me. She and I bonded in the hospital.

Q And Ms. Hemsi was someone that you maintained a cordial relationship with, a friendship with -- strike that. I'm going to ask it this way.

Ms. Hemsi was someone you maintained a positive relationship with after you went to grad school, right?

A I -- I have -- I have a lot of love and connection for her. Again, like, she sat with me and I can still remember her mint green nail polish.

Q Right. She sat with you the whole time in one of your darkest places, correct?

A She did.

Q And when she checked in with you, she wanted to say, hey, what are you up to, what are you doing, I hope you're happy, right?

A Yes, that's what it seems like here.

Q And she even asked you about, like, do you get to have sex there, right?

A Yeah.

Q And you told her: Heck yeah, I wouldn't be able to be celibate. Right?

A Correct.

Q And she said: Sounds great, just thinking of you. Correct?

A Correct, that's what it says here.
Q Yeah. And you have no reason to doubt that Ms. Hemsi sent you those nice messages?
A Right.
Q Can you tell me the names of the friends that you stayed in contact with after you parted ways with OneTaste back in 2013?
A I -- I don't know if I can provide you with an exhaustive list, but I will do my very best.
Q Great.
A The main people I remember staying in contact with -- and you mean people who are still currently involved, not people who left; is that right?
Q Sure, yeah. That will help us, yes.
A Then it would be Aubrey, and then occasionally Rachael. I believe Eli Block reached out to me once. But I tried to maintain as minimal contact, even with Aubrey, as I possibly could.
Q Michelle?
A Yeah. Sorry, in my mind, she wasn't someone who stayed in OneTaste. So yes, Michelle, Liana, Maddie, Drea.
Q So you were ultimately able to keep the friendships -- whether they stayed or not, you maintained some of those friendships post your departure from OneTaste, right?
A Yes.

MS. BONJEAN: Give me one second, please.

THE COURT: Sure.

(Pause in proceedings.)

MS. BONJEAN: I have no further questions, Your Honor.

THE COURT: Is there any redirect examination?

MS. GUPTA: Yes, Your Honor.

THE COURT: Approximately how much time do you think you have?

MS. GUPTA: Maybe a half hour to 45 minutes.

THE COURT: Why don't you start.

MS. GUPTA: Okay.

Could I pass up two exhibits, Your Honor? They're the same ones from yesterday, but I just have extra copies.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MS. GUPTA:

Q Good morning, Ms. Gill.

A Good morning.

Q You just testified about initially maintaining contact with certain people still at OneTaste, and you mentioned Rachael. Can you clarify which "Rachel" you were speaking of?

A Well, I -- I mean, technically, I contacted Rachel Cherwitz that one time. But when I was testifying just now,

I was speaking of Rachael Hemsi.
Q And when you're referencing the one time that you and Rachel Cherwitz had contact, are you referencing the time in 2014 that you testified to on direct?
A Yes.
Q Now, you testified on cross-examination about a podcast that you participated in with Mai Vu.
Do you recall that?
A I do.
Q Who was Mai Vu?
A She was the teacher for the coaching program on the coaching side of it, not the orgasmic meditation side of it.
Q So she was a participant at OneTaste, as well?
A She was -- she was more of a teacher, but I think she also -- I mean, I'm pretty sure she learned how to OM, and she and I had a friendship. I went and spend the night at her house one night.
Q When was that podcast recorded, approximately? To your recollection.
A Oh, god. Maybe 2011 or '12. I don't know.
Q Was that when you were still at OneTaste?
A Yes.
Q What information, if any, were you trying to spread about OneTaste during that time?
A I mean, we were -- we were encouraged -- I was doing a

lot of lead generation, so we were sharing the message of orgasmic meditation and trying to get as many people to participate in OM as possible.
Q And did you do that during the podcast?
A Yeah --
Q To your recollection.
A Yeah, to my recollection, I was constantly -- I don't want to use the word "evangelism" because that's usually a churchy word, but I was constantly evangelizing for OneTaste, absolutely.
Q And what else do you recall about that podcast? What, generally, did you discuss?
A I -- I do remember discussing, in a vague sense, sex work, and I remember -- I remember talking about, you know, the positive experience it was for me, which is kind of -- I don't know, am I allowed to speak to hindsight?
Q You can finish responding to the question that was asked.
A Can you repeat the question, please?
Q Yeah. I was asking about what else you recall discussing during the podcast.
A Thank you.
I mean, those are the main things that I recall discussing in the podcast.
Q Now, you testified on cross that what you said on the

podcast showed how far you had deviated from your values. What did you mean by that?
A I -- I look back at it and I don't understand how I got to the place that I was at where I was like, yeah, I get to have sex with strange men, from what I heard on the audio yesterday. That's not -- that's not who I am, and it just shows that I had been -- it had -- that had been normalized, because that part of me had been celebrated and embraced so much and I was given all of this positive reinforcement around having sex and being a sexual person, and even an overly sexual person because I got off on every stroke. And so when that part of me was celebrated, I was like, oh, yeah, I'm gonna to keep leaning into that, and it ended up causing a lot more harm than it did good. It was not freeing, in fact, in hindsight.
Q Now, you testified about engaging in sex work. Approximately what time period was that in?
A If I had to give my best general guess, it was from about the time that I started at OneTaste, because in my mind I had to start paying more for courses. And there's definitely a peak of how many clients I would see that dropped off maybe two years. Again, I'm horrible at guesstimating, but maybe about two years. But I do know that I continued to see one particular client who I mentioned yesterday, Stan, up until I left.

Q You just testified on cross that the relationship between OneTaste and the sex work that you engaged in was complicated. What did you mean by that?
A My involvement in OneTaste and exploring my sexuality normalized that type of behavior, and it was encouraged, right? They were like, yeah, go pollinate more flowers. Go, you know, keep getting off on every stroke, I'm so proud of you, you're getting off on every stroke. So -- and then they wanted the money and they, like -- while they said, like, don't share this too much with other people because it -- you know, we don't want to look like a sex cult, it also was known. Like, I remember having a conversation with Rachael Hemsi in the kitchen and she was like, oh, you're --
MS. BONJEAN: Objection to the hearsay.
THE COURT: Sustained.
Q So you were testifying that core staff at OneTaste told you to keep hush-hush about prostitution. Remind us, who do you include in core staff?
A Rachel Cherwitz, Rachael Hemsi, Yia Vang, Justine Dawson, Joanna van Vleck, Nicole Daedone, Rob Kandell, Ken Blackman, Chris Kosley, and then eventually Maya Gilbert, Eli Block, and Aubrey Fuller.
Q Who specifically, if you can recall, told you to keep hush-hush about prostitution?
A I remember Aubrey telling me that it needed to kind of

be kept quiet. I remember Rachel Cherwitz telling me that it needed to be kept quiet. Those are -- those are the main two in my mind that I remember.
Q Did Rachel Cherwitz or Aubrey explain why it needed to be hush-hush?
A Because it made a -- made OneTaste look like a sex cult.
Q And who, if anyone, did Aubrey Fuller report to at OneTaste, to your knowledge?
A To my knowledge, it was Rachel Cherwitz, and occasionally Rachael Hemsi.
Q Ms. Gill, did you get paid for your work generated from Sugardaddy.com and Redbook?
A Yes.
Q Where did that money did?
A To OneTaste.
Q Now, on cross, Ms. Bonjean asked you about how OneTaste gave you no mandate that you had to participate in sex work.
Do you recall that question?
A I -- I think so.
Q And that was in reference to your sex work for Sugardaddy and Redbook, right?
A Yes.
Q And just to clarify, did your bosses at OneTaste instruct you to participate in sex work for OneTaste?

A No.
Q Did they instruct you to participate in sex acts to benefit OneTaste?
A Yes.
Q What sex acts?
A I mean, I would say OM as a sex act. Going and having me make out with Antonios was an instruction. And then all of my work with Reese Jones, as well.
Q And unlike your work for Sugardaddy and Redbook, did anyone at OneTaste ever pay you money for the sex work that you did on behalf of OneTaste?
A No.
Q You also just mentioned Antonios, and you testified on cross regarding being asked to keep him in the coaching program.
Do you recall that?
A Yes.
Q You testified that it was implied that you should do something sexual with him. Why did you believe that was implied?
A It was the way the conversation happened. There -- there were few times that it happened, but a group of us would be -- of women would be pulled in and they'd be like I have a secret mission for you and you need to not tell anyone about this, Antonios is going to -- he's thinking

about dropping out of the coaching program, I need you to go keep him in there. It was -- it was just understood that what was meant -- like --

MS. BONJEAN: Objection. Speculation.

THE COURT: Sustained.

Q Did you ever learn of anyone in the core staff at OneTaste having engaged in sex work?

MR. ROBOTTI: Objection.

MS. BONJEAN: Can I just hear the question again?

THE COURT: You know what? Actually, I was going to take a break now, so maybe you want to talk to each other.

So let's take a morning break. If the jury could just be back in the jury room at 25 after, and then we'll start in here at 11:30.

Keep an open mind. Don't talk about the case. Don't let anyone talk to you about the case.

And the witness can step down.

(Witness leaves the stand.)

(Jury exits.)

THE COURT: We'll be back at 11:30. You can talk to each other if there's an issue.

(Court is in recess.)

THE COURT: Okay. We can bring back the witness, and we can get the jury, please. Thank you.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Gupta, you may resume your examination.

MS. GUPTA: Thank you, Your Honor.

BY MS. GUPTA:

Q Ms. Gill, you testified on cross-examination that you were trying to find meaning in your life at the time that you joined OneTaste.

At that time, did you feel that you needed to purchase OneTaste courses to find meaning in life?

A I did, yes.

Q Why did you feel that way?

A I -- I was lost and I had -- I had a part of who I knew myself to be rejected by my family for so long and then found that part of me celebrated and encouraged. I just -- I was so young, you know. My prefrontal cortex wasn't done developing. I just --

MR. ROBOTTI: Objection.

THE COURT: Yes, sustained.

Q And you testified earlier about a number of ways that you paid off the courses and other debt to OneTaste, and you testified regarding a sham marriage you entered while you were at OneTaste.

Do you recall that testimony?

A This is the one from yesterday, not today?
Q Correct.
A Yes.
Q And you testified on cross that OneTaste normalized entering into a sham green card marriage for you. Can you explain what you meant by that?
A Yes.
I had heard of quite a few people who had gone into green card marriages. Justine Dawson was in a green card marriage, and I talked with her about it a fair amount before I had decided to go into it. My friends Rob and Kelly were in a green card marriage, and I talked to both of them about it. It was a thing that happened. Not everyone did it, but it was normalized, for sure.
Q And Rob who and Kelly who? If you know.
A I don't remember their last names. English Rob; British Rob.
Q Mr. Robotti asked you about lying to the Government with respect to this marriage. To be clear, when you said you were lying to the Government, you were referring to lying to immigration authorities in 2011, correct?
A Correct.
Q And just to be clear, did you lie to the prosecutors or FBI agents in this case about the marriage?
MS. BONJEAN: Objection.

THE COURT: Basis?

MS. BONJEAN: Foundation, for one thing.

THE COURT: Sustained.

Q And you testified that you did all of this for $10,000, right?

A Correct.

Q What did you use that money for?

A To pay for the third coaching program -- my second coaching program.

Q Now, you testified yesterday that at some point you told Rachael Hemsi you had a crush on Reese Jones.

Do you recall that?

A I do recall that, yes.

Q What did you mean by that?

A I mean, it was just a term of endearment for liking someone and thinking someone was neat. It wasn't, like, a crush as in, oh, my gosh, I want to date them and marry them and be with them for the rest of my life. It was like, oh, I like this person. Like, I've got -- I met a friend of mine two years ago, and as soon as I met her I was like, oh, I've got a crush on her, I want to, like, be best friends with her and get to know her more. It was more like that.

Q Did you want to date Reese Jones?

A No.

Q Did you want to sexually service Reese Jones?

A No.
Q You testified yesterday that you were invited to a concert to audition to be Reese Jones's handler. Did you ask to go to that concert?
A No.
Q And this was in December 2012, correct?
A If I'm remembering those text messages correctly, yes.
Q Were you in communication with Rachael Hemsi via text message in late 2012?
A Yes.
Q And did you discuss Reese Jones with Rachael Hemsi via text message?
A Yes.
Q Did you provide screenshots of those text messages between you and Rachael Hemsi to the Government?
A Yes.
Q How did you provide those screenshots?
A I sent them to an agent via text.

MS. GUPTA: I'd like to show the witness only what's been marked as Government Exhibit 4520-B.

And, Your Honor, may I approach the witness with a copy?

THE COURT: Yes.

Q Do you recognize this, Ms. Gill?
A I do.

Q How do you recognize this?
A It's my text messages with Rachael Hemsi, the screenshots that I sent.
Q And what is the first date of the text messages on the first page?
A December 9, 2012.
Q And what is the last date?
A On the very last page? Is that where you're talking about?
Q Yes. What is that date?
A December 25, 2012.
Q Is this a fair and accurate depiction of screenshots of text messages that you exchanged with Rachael Hemsi between December 9th and December 25th of 2012?
A Yes.

MS. GUPTA: Your Honor, we would move to admit.

THE COURT: Any objection?

MR. ROBOTTI: Objection.

MS. BONJEAN: Yes.

MR. ROBOTTI: Hearsay.

MS. BONJEAN: Hearsay. There's also foundation and completeness, irrespective of the date there.

THE COURT: I'm sustaining the objection to the extent you're seeking to offer the entirety of 4520-B. You may inquire further about the document.

MS. GUPTA: Yes, Your Honor.
Q In addition to discussing Reese Jones with Rachael Hemsi, did you also discuss your relationship with Robert Bakhshai?
A Yes.
Q And you were asked about your relationship with Robert Bakhshai on cross-examination as well, correct?
A Yes.
Q And did you discuss both Reese Jones and Robert Bakhshai between December 9, 2012 and December 25, 2012? And you can take a moment to flip through.
A Thank you.
(Pause in proceedings.)
A Can you repeat the question, please?
Q Yes.
Did you discuss both Reese Jones and Robert Bakhshai with Rachael Hemsi between December 9, 2012 and December 25, 2012?
A Yes.
Q Is this a fair and accurate depiction of screenshots of text messages that you exchanged with Rachael Hemsi regarding both Reese Jones and Robert Bakhshai between December 9th and December 25th of 2012?
A Yes.
MS. GUPTA: Your Honor, we move to admit

Government Exhibit 4520-B.

MR. ROBOTTI: Same objections.

MS. BONJEAN: Same objection.

THE COURT: Response?

MS. GUPTA: Your Honor, to the extent that the objection is based on hearsay, we again believe there's an exception under 801(d)(2)(E) subject to connection, as well as an agency statement.

MS. BONJEAN: It's not just based on hearsay, though, the objection. Other bases, too, that we've identified; the foundation, completeness.

THE COURT: Sustained.

MS. GUPTA: Your Honor, we would also offer it as a prior consistent statement based on the cross-examination on these topics.

THE COURT: Which portion of this document are you offering on that basis?

MS. GUPTA: Your Honor, page 1 of the document, which is denoted as 33 on the bottom, if that's helpful.

THE COURT: Sustained.

BY MS. GUPTA:

Q Ms. Gill, in December of 2012, did Rachael Hemsi send you contact information for Reese Jones?

A Yes.

Q Did she tell you to contact him?

A Yes.
Q Did you have an understanding of why?
A I -- I believed it to be that it was being arranged that I would start dating him and servicing him.
Q And did you understand that Nicole Daedone knew about this arrangement?
A I asked -- I don't remember if I understood Nicole initially, but it was told to me that she knew about it and he did not.
Q Who told you that?
A Rachael Hemsi.
Q She told you Nicole knew you would be dating Reese, but that Reese did not yet know?
A Correct.
MR. ROBOTTI: Objection.
THE COURT: Basis?
MR. ROBOTTI: Hearsay.
THE COURT: Overruled.
Q And this was prior to the concert you attended, correct?
A I believe so.
Q It was prior to your audition to be Reese Jones's handler; is that right?
A I believe so.
Q What is your understanding, if any, of why Nicole

Daedone would have known about the fact that you were going to be dating Reese Jones before you actually went out with Reese?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

MR. ROBOTTI: Form. Knowledge of defendant.

MS. BONJEAN: Foundation.

THE COURT: One moment, please.

I'm going to sustain it as to form.

Q Do you have an understanding of why Nicole Daedone was informed that you would be dating Reese Jones?

MS. BONJEAN: Still objection.

THE COURT: Sustained.

Q Now, you testified again about your audition on both direct and cross-examination. Who ultimately invited you to the concert for your audition with Reese Jones?

A Yia Vang.

Q And you testified that Nicole Daedone was present at that audition, correct?

A She was.

Q Now, you testified on cross that you viewed it as a good opportunity to be Reese Jones's handler. Why did you view it as a good opportunity?

A I had been out of the 1080 building, even though I was still involved since my apartment was right across the

street. And when I moved back in, I felt like I had to prove myself to them again because I had left.
Q Did you believe you would prove yourself by agreeing to be Reese Jones's handler?
MR. ROBOTTI: Objection. Leading.
THE COURT: Overruled.
A I hoped that I would, for sure, yes.
Q Whose approval were you seeking?
A The core staff; Nicole's, Rachel's, Rachael's, Yia's.
Q You testified on cross-examination that you ultimately lived in a mansion with Reese for a period of time. What did you have to do to live in that mansion?
A I had to cook him breakfast, I took him for walks and hung out with him, and then I would sexually service him.
Q What sexual service?
A We would occasionally OM, and I would perform fellatio, or I would fist him.
Q I'm sorry, what was the last part?
A Fist him.
Q What does that mean?
A I would put my entire hand up his anus.
Q Did you want to engage in that activity?
A No.
Q And you testified that you kept your room at 1080 where you continued to pay rent. Did you want to keep that room?

A No.
Q Why did you keep it?
A Because I was told that I had to so that I would have somewhere to sleep when Nicole came over.
Q Who told you that?
A Rachael Hemsi.
Q You were asked on cross-examination about volunteering to take care of Reese Jones.
Do you recall that line of questioning?
A Vaguely.
Q Did you volunteer to bring Reese Jones breakfast every morning?
A No; I was asked to.
Q Did you volunteer to walk Reese Jones on a leash?
A No; I was asked to.
Q Did you volunteer to fist Reese Jones?
A No. I was told to practice my top, and that was the only thing that I could think of for topping.
Q Did you volunteer to perform any BDSM sex acts with Reese Jones?
A No.
Q Now, you testified on cross-examination about a journal that you kept while you were at OneTaste. Did you record information in it at the time?
A In my journal?

Q Yes.
A Yes.
Q And some of the journal entries that you viewed on cross-examination were dated. Would you record information from that particular date?
A It -- it was the date that I was writing in my journal.
Q And did you at some point provide some of those journals to the Government?
A I did.
Q Do you remember writing on January 9, 2013 that your relationship with Reese was sort of arranged and not completely organic?
A I -- I do not. Do you have my journals that could refresh my memory?
Q Yes.

MS. GUPTA: Could we pull up for the witness only Government Exhibit 911-B?

THE COURT: I don't think I have 911-B.

MS. GUPTA: Your Honor, we'll bring up a hard copy.

THE COURT: And I don't think it's on your exhibit list. You said B, as in boy? 911-B?

MS. GUPTA: Yes, Your Honor. I apologize. They're excerpts from Government Exhibit 911. I'll pass it up right now.

THE COURT: Thank you.

And all parties have copies of this?

MS. GUPTA: Yes, Your Honor.

MR. ROBOTTI: No, we don't.

MS. BONJEAN: We do not.

MS. GUPTA: Oh.

THE COURT: Okay. Take care of that first, please.

MS. GUPTA: Yes.

THE COURT: Is this, by any chance, a portion of the exhibit discussed I believe yesterday, Defense Exhibit 2-W, or is it something else?

MS. GUPTA: Correct, Your Honor.

THE COURT: Okay.

MS. GUPTA: And, Your Honor, these were produced last week to --

THE COURT: That's fine. As long as now the witness has it, everybody has it.

You can proceed with your questioning.

(Continued on the following page.)

(Continuing...)
BY MS. GUPTA:
Q And, Ms. Gill, I would just direct you to the middle of that page.
A Yes. I --
Q Does this refresh your recollection that you had stated that your relationship with Reese was sort of arranged and not completely organic?
A I do. This was a very big topic of conversation with my therapist on a regular basis.
Q And what did you mean by "sort of arranged and not completely organic"?
A It was set up. It wasn't like I started just dating him because we were around each other a lot and enjoyed each other. It was an arranged relationship.
Q And who arranged it?
A I believe Nicole did, and Yia, obviously.
Q Do you remember writing on January 9, 2013 regarding your relationship with Reese that it does feel a little like a job sometimes with having to bring him dinner and cook breakfast?
A I definitely felt like it was a job. It was not a relationship, in my mind.
Q Now, you testified on cross-examination that whether you wanted to live at Reese Jones' house was complicated.
Why was it complicated?

A Are you referring to the part in my journal where it said that I would live there, or is that a different --
Q No. Sorry. We can take down this exhibit. I am just referencing your cross-examination yesterday.
A Okay. Can you repeat the question, please?
Q Yes.
You were asked on cross-examination whether you wanted to live at Reese Jones' house, and you responded that it was complicated.
What did you mean by that?
A I wanted to prove myself and be accepted into this community that I felt like I was on the outskirts again, once again.
Q You testified on cross that you had said you loved Reese Jones. What did you mean when you said that?
A It's really easy to love a person without wanting to be romantically involved with them or loving them in the way that you would a romantic partner. And that's what I meant. Like, he's a very loveable person.
Q Did loving him mean you wanted to perform sex acts on him?
A No.
Q So why did you do that?
A Because I was asked to, and it was -- I felt like it was expected of me so that I could prove that I was worthy of

being in this community that, you know, I thought were my people.
Q Who, ultimately benefited, if anyone, from the fact that you sexually serviced Reese Jones?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
MR. ROBOTTI: Foundation.
THE COURT: Sustained.
Q Did anyone benefit from your sexual services to Mr. Jones?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
Q You testified that when you did finally leave OneTaste and move out of 1080, Reese Jones offered you money to stay with him, and you said no, correct?
A I did.
Q Why did you say no?
A I was done. I had been working in therapy around everything that was going on and the manipulation and if it felt good for me, and I just wanted to start cutting more and more ties, and that was a very direct tie. I wasn't interested in the money. I wanted a life with Rob.
Q Now, you testified on cross-examination that Aubrey

Fuller advised you not to be with Rob Bakhshai.

Who else at OneTaste advised you of that?

A Rachel Hemsi, Yia Vang, and Nicole Daedone.

Q And you testified on cross that you were very upset about Robert and the manipulation behind the scenes. What manipulation behind the scenes were you referencing?

A From my perspective, there was -- like every time I would talk to Yia about, you know, my relationship with Rob and the issues, like the next day after having a conversation with Yia, Rob called me and was like Yia called me and offered me a job in Vegas. It just seemed to -- it was too coincidental, too convenient for it not to be intentionally manipulative.

Q And was there a time when Rachael Hemsi encouraged you to try 30 days monogamy with Reese instead of Robert Bakhshai?

A Rob really wanted to try out monogamy. He was really pushing for it. And I kept getting the outside reinforcement that, Dana, you can't be in a relationship, you can't -- like, monogamy kills you. Like all of these things. You will lose all of the power that you've cultivated.

And so my therapist had posited, like what if you just did 30 days of monogamy. Surely that won't be an issue. And when I suggested I wanted to try it, it became -- it became explosive, from my perspective. And Rachael Hemsi kept pushing Reese. Like, oh, you can't -- don't do it with Rob. He's selling goo. I don't think that he would be good for

you. I see it with Reese. I was like, no, I don't want to do it with Reese. And she just kept pushing Reese.

Q Who did Rachael Hemsi report to?

A As far as I know, Nicole Daedone.

Q Now, you testified on cross that there was an instance where Robert was upset with you because you made out with someone named Paul. Do you recall that testimony?

A I do.

Q Who is Paul?

A He was a high-paying client that I was seeing. He had given me a Jeep, wanting to be my girlfriend (sic.) and I told him very clearly that I wasn't going to be his girlfriend.

And I had been encouraged by, I believe, Maddie, and to continue seeing him because we, you know, we need to keep the men in programs happy. And so I ended up having a makeout session with him, and Rob got really upset because we were going in the direction of trying for monogamy.

I really struggled with it, with monogamy, because I learned over the years that I would kill my orgasm, and, therefore, myself, if I were to be monogamous.

Q Who taught you that?

A Nicole, Rachel Cherwitz, Rachael Hemsi, Yia, Aubrey.

Q You said Paul was a high-paying client. Client of what?

A I think he was in the coaching program. I am pretty sure

he was in the CP4.
Q So he was a OneTaste client?
A Yes, he was.
Q Was he considered a VIP?
A I don't know if he was formally considered a VIP. I would have considered him a VIP because he had a lot of money.
Q And you testified on cross that you wrote in your journal that you were the Mother Teresa of orgasm. Why did you refer to yourself in that way?
A Because it was affirmed by others, and I always got a positive reaction whenever I said it. So, you know, I got that positive reinforcement. And when you're celebrated for both being nurturing and pollinating more flowers, it just made sense to lean into it.
Q Did you ever discuss your relationship with Robert with Nicole?
A Yes.
Q What do you recall about that?
A I remember it was after Yia and I got into a pretty big text fight, and Nicole reached -- I don't know if Nicole initially reached out to me or if I reached out to her, but in my memory, she reached out to me, and we talked about it. And she, in a much more kind way, at least, reinforced the same thing Yia said. Like, he -- you're pulling on him, you're going to, you know, kill all of the power that he's

cultivating, you're going to kill all of the power that you've cultivated, he's selling goo, you can't be in a relationship with him, it is not good for you.

Q What did you understand Nicole Daedone to mean when she told you you couldn't pull on Robert?

A That I couldn't be in a relationship with him, that I needed to let him have sex with other women and be in relationship with him.

Q Now, you testified that you started to go back to church during your last year or so at OneTaste. Why did you decide to go back to church at that point?

A I don't know why I decided to go back to church. I just kept getting this voice that I can only now explain as the voice of God telling me to Google, United Methodist Church. And it wouldn't go away.

Q How, if at all, did going to church contribute to you ultimately leaving OneTaste?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A I still, to this day, say that it saved my life.

My pastor, I was talking to him about the manipulation --

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Q And you testified on cross about going back to the church

and needing to overcome your feelings regarding monogamy. When exactly did you need to overcome?
A Sorry. Can you say that again?
Q Yes.
You testified on cross about needing to overcome your feelings regarding monogamy when you returned to the church.
What exactly did you need to overcome?
A All of the conditioning that told me that monogamy was bad and that it would end my life as I knew it.
Q What conditioning?
A All of the conditioning from OneTaste.
Q Now, you testified on cross that there were several events that happened at OneTaste that you didn't quite remember, right?
A Yeah.
Q And you testified that memory can be unreliable at times, right?
A Yes.
Q Are there events from during your time at OneTaste that you don't remember?
A Yes. There's lots. I don't have room in my brain to remember everything.
Q And you testified on cross that you don't forget the feelings, though. What did you mean by that?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A The trauma has not gone away. The pain. And the constant -- it is like death by a million paper cuts.

Q What do you mean by that?

A It's so subtle, the coercion. Someone constantly telling me that my inner voice is wrong and that I need to listen to them. It doesn't go away. I don't remember the specifics and the details. But the pain stays.

Q Ms. Gill, you also testified on cross regarding certain jobs that you had outside of OneTaste. Do you recall that?

A Yes.

Q And you were asked on cross about volunteering for various roles at OneTaste as well. Do you recall that?

A I think so. Yes.

Q Were you also directed to work for OneTaste at times?

MR. ROBOTTI: Objection. Vague.

THE COURT: Overruled.

A I believe so. Could I have a little bit more context?

Q Yes.

Did people in the core staff direct you to perform work for OneTaste?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

MS. BONJEAN: Asked and answered.

THE COURT: Overruled.
A Yes.
Q Did your jobs outside of OneTaste give you a paycheck?
A My jobs outside of OneTaste? Yes. They gave me a paycheck.
Q Did OneTaste ever give you a paycheck?
A Not to my memory, no.
Q Now, at one point during cross-examination Mr. Robotti asked you, is that what the government told you to say. Do you recall that?
A I do.
Q Did the government ever tell you what to say?
A No.

MS. GUPTA: No further questions.

THE COURT: I will permit a brief recross. Is there any recross?

MR. ROBOTTI: Yes, Judge.

THE COURT: Go ahead, Mr. Robotti.

RECROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon.
A Good afternoon.
Q You were asked some questions, Ms. Gill, on redirect examination about this podcast. Do you recall those questions?

A I believe so, yes.
Q And specifically about the relationship between Mia Vu, who was interviewing you, and OneTaste; do you recall that?
A Yes.
Q And you had mentioned that she OM'd a few times, correct?
A If I am remembering correctly, I said I think she learned How to OM.
Q So this was not a OneTaste podcast, right?
A No, I don't believe it was.
Q And this -- Mia Vu is a podcaster who does regular podcasts about sex; is that fair?
A I don't know if they are about sex or not, but she does do regular podcasts.
Q And you appeared again on her podcast a couple of years ago; isn't that right?
A I did.
Q In 2021?
A I did.
Q And that was kind of an update episode, right, based on your earlier podcast?
A No.
Q Did you reference the fact in your 2021 podcast that you had previously appeared?
A Not to my memory.
Q Is it fair to say that in 2021 you fully remembered that

you had appeared on this podcast in 2011?
A I did remember that I had done a podcast in 2011, and I specifically asked her not to bring up OneTaste before the podcast started.
Q Okay. So in 2021 you recalled that you were on this previous podcast, right?
A Yes.
Q So it was not a surprise to you yesterday when you were played portions of that podcast, you remembered it, right?
A I remembered that I had done the podcast and I had remembered the general topics, but not the specific conversations necessarily.
Q And when you did the podcast in 2011, that podcast was mostly about prostitution, right?
A I -- yeah, I think so. I know it was around sex.
Q It was an hour long podcast or so, right?
A I don't know.
Q And for most of that, you spoke about being a prostitute, correct?
A Again, I don't know. I do know that I did speak about prostitution.
Q And you spoke at length about the fact that, you know, prostitution had benefitted you, right?
A Again, I can't speak to how long I spoke about those things. But I did speak about it.

Q And it was you that brought up orgasmic meditation, correct?
A I don't recall.
Q And that was just a brief portion of that podcast, right?
A I don't recall.
Q And you talked again about how beneficial orgasmic meditation had been for you, right?
A Again, I don't recall the specifics of the podcast. I am not surprised. I would not be surprised that I talked about the benefits of OM.
Q And how orgasmic meditation had helped you move on from being a prostitute; is that correct?
A I do remember hearing that yesterday, if that's helpful. A better way to put it.
Q And you agree yesterday that those were the words you said in 20 --
A It was my voice, yes.
Q Okay. And, in fact, OneTaste discouraged you from engaging in prostitution; isn't that correct?
A That's not how I remember it.
Q OneTaste asked you to keep it hush-hush because they were discouraging you from engaging in prostitution, right?
A Asking me to keep it hush-hush is different from discouraging me to do it.
Q And you said on redirect examination that some people at

OneTaste were concerned this was making it look like a sex cult, right?
A Which is why they wanted it to stay somewhat quiet with the general public.
Q All right. So they were concerned that your conduct was making OneTaste look like a sex cult, right?
A Yes. And, yes, they still continued to allow it.
Q So even though they were concerned about your conduct, they let you continue to engage in it, right?
A Yes.
Q They were concerned that your choices were reflecting badly on OneTaste, correct?
A I think that's probably fair.
Q Now, there were some questions asked on redirect examination about your sham marriage. Do you recall those?
A I believe so.
Q And you said something like OneTaste normalized this decision, right?
A Yes. Something along those lines.
Q So just to be clear, you're blaming OneTaste for the fact that you committed this crime?
A I think that OneTaste contributed to my decisions.
Q Right. And it was your coworker, right, who approached you and asked you to do this, correct?
A Yes.

Q It was nobody at OneTaste who asked you to do this, right?
A Correct.
Q And you had other jobs, right?
A Yes.
Q And, in fact, you were approached at your job about committing this crime, correct?
A Yes.
Q And you choice to make that decision to commit that crime, right?
A I'm sorry, can you repeat that?
Q You chose, when your coworker asked you to do this, you chose to make that decision to commit the crime, right?
A I did.
Q Now, you were asked on redirect examination to clarify whether you had lied to immigration officials or lied to the government in this case; is that right?
A Yes.
Q And you clarified that you lied to immigration officials, correct?
A Yes.
Q Is that any better than lying to the officials in this case?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q Either way, it's a crime?
A Lying to immigration officials?
Q Lying to the government officials, correct?
THE COURT: Sorry. Pose the question again.
MR. ROBOTTI: Yes, Your Honor.
Q It is a crime to lie to government officials --
MS. GUPTA: Objection.
Q -- correct?
MS. GUPTA: Calls for a --
THE COURT: Sustained.
Q You were asked about some communications that you had with Rachael Hemsi and Yia Vang about Reese Jones; do you recall those?
A Yes.
Q Specifically about text messages that you provided to the government in this case?
A Yes.
Q Do you remember telling Ms. Hemsi that your experience with Reese Jones was awesome and that you loved making out with him?
A I have a vague recollection of it, yes.
MR. ROBOTTI: Can we show just for the witness on the Elmo -- I just got this, Your Honor. Apologies. I only have one copy unless the government has --
THE COURT: What's the number?

MR. ROBOTTI: It's Government Exhibit 4520-B.

THE WITNESS: I have it.

MS. GUPTA: Your Honor, we had passed up a copy to you earlier.

Q You have it in front of you, ma'am?

A What page are you looking at?

Q I am looking at -- if we are using the bottom set of numbers, page 3.

Does that refresh your recollection that on December 14, 2012, you told Ms. Hemsi that it was -- that last night with Reese Jones was awesome, I loved making out with him?

A Yes.

Q And turning to page 5 of the same document, do you recall on December 23, 2012 that you said "things with Reese are really good," to Ms. Hemsi?

A Yes. I do see that here. Yes.

Q And now turning to your messages with Ms. Vang. This is Government Exhibit 4519-A.

A I don't know that I have that in front of me.

MR. ROBOTTI: Do you have an extra copy?

MS. GUPTA: Yes.

THE WITNESS: Thank you.

Q Now, do you recall, ma'am, on December 13, 2012, and I am looking at page 4, do you recall telling Ms. Vang that your experience with Reese was great the evening before?

A Yes. He had come to my talk at church around technology and religion.
Q And did you recount that you had had an interesting conversation with him?
A Yes.
Q And turning to page 5, do you recall on the same date that you told Ms. Vang, I'm excited to be with Mr. Jones?
A Yes. I see that here.
Q And do you recall at various points when Ms. Vang asked if you could go see Mr. Jones, that you said that you were too busy with work?
A I do remember getting busy with work, especially at the end of my time when I started to feel more and more pulled away from this job.
Q So specifically on December 18, 2012, and I am looking at pages 7 and 8, Ms. Vang asked you if you were going up to the house, and you said, no, I'm still working?
A Yes. I see that.
Q So you told Ms. Vang no; is that correct?
A I'm still working. Yes.
Q And you weren't staying at Mr. Jones' house every night, correct?
A Most nights, but not every night. Correct.
Q And you recalled on redirect examination that you said you were annoyed that you had to keep paying rent at 1080; is

that correct?
A Correct.
Q So the other option was to live at Mr. Jones' house full time, correct?
A That was not an option.
Q Okay. So then you did want to keep the room at 1080, right?
A No.
Q Ma'am, is it fair to say that if you're going to have a room at 1080, you had to pay rent?
A When I was staying the night at a place outside of Reese's, it was usually with someone like Paul, until it was -- until Nicole came in and I was told to leave. And then I would go to 1080 because I -- unless I had a sleepover with someone else.
Q So it's fair to say that if you are going to have a room at 1080, you should pay rent, right?
MS. GUPTA: Objection. Asked and answered.
THE COURT: Sustained.
Q Now, you spoke a little bit on redirect examination about Rob Bakhshai, right?
A Yes.
Q And you said that you were upset because you felt people at OneTaste interfered with your relationship with Robert; is that correct?

A Yes.
Q And these are your friends and coworkers basically saying they don't like your boyfriend, right?
A No. That's not what they were saying.
Q They had indicated to you that they did not think that this relationship was good for you, correct?
A They told me that I would not physically die, but energetically die if I was in it. Yes.
Q So they were encouraging you not to be with him; is that right?
A I wouldn't have called it encouraging.
Q And Robert, again, had made the decision to move to Las Vegas, right?
A Yes.
Q And he had prioritized Las Vegas over your relationship, correct?
A I don't think that it was an "either/or" for him. I think it was a "both and."
Q And you talked about the fact that you made out with Paul, correct?
A Yes.
Q And that led to problems with Robert, right?
A Yes.
Q And the agreement you had struck with Robert was that you would tell him in advance if you were going to make out with

someone, right?
A We eventually came to that agreement, yes.
Q And the problem with Paul was not that you made out with Paul, but that you didn't tell Robert in advance, correct?
A If I am remembering the words for my journal that I looked at yesterday, that seems accurate. He was upset because I didn't tell him, and I also said I didn't know that it was going to happen. I genuinely went in thinking that I would be able to say no.
Q But do you recall saying that "I knew there was a possibility, and that's where I fucked up"?
A I do remember seeing that on the page, yes.
Q So, ultimately, it was the choice you made not to tell him that led to the problems?
A To that particular problem, yes.
Q And I know we went back and forth a bit yesterday about whether you broke up with Mr. Bakhshai, right?
A Yes. Yes, we did.
Q Do you recall writing on February 26, 2013 that: I think this breakup has been harder on me than I initially thought. I shifted a lot and made a lot of changes?
A I don't recall writing that. And I do, last night, as I was trying to fall asleep, I did remember there was this one point I think I was still living in this room with -- I don't remember which room I was in. It doesn't matter.

There was this one point where I had a conversation with Rob, and we talked about taking a break from each other so that we could focus on other things, and then it ended up not really being a break. We ended up coming back together. And if I had to guess, that's what it is referencing. Because in my memory, we never broke up.

Q Okay. And is it fair to say that this break was heartbreaking for you, right?

A Yes.

Q And this was right before you moved out of 1080, correct?

A I don't recall the timeline.

Q It's fair to say in February 2013 that you were heartbroken about the situation with Rob?

A About the manipulation of my relationship with Rob, yes.

Q And, well, both about the manipulation and the fact that you took this break, correct?

A I don't recall being heartbroken about the break, per se. I do recall being heartbroken about how difficult the relationship was because of the back-end manipulation.

Q Well, in February 26, 2013, do you recall writing: I feel solid, down, but solid. I still think about Robert constantly, and I hate it. I know what I did was for the best, but I'm heartbroken and I don't want it?

A I recall seeing those words on my journal yesterday when I was perusing it, and I recall being heartbroken that there's

this constant back and forth in our relationship, yes.
Q And do you recall writing that same month: I didn't want to let him go. Why can't I just accept it and let go. There's still that part of me that's holding on that he'll text or call and say he's ready to talk and still wants to be with me. And every day that goes by and he doesn't, I die a little bit more.
Do you recall that?
A Same as the last one. I remember seeing that on the pages that I read over yesterday. I don't have specific memory of that actually happening, of writing those physical words.
Q But you don't agree that these are the words you wrote?
A Correct.
Q Now, you were upset about Robert, you were upset that you felt you were being manipulated, and you decided to move out, right?
A Uh-huh.
Q Is that a yes?
A Sorry. Yes.
Q And you decided to leave 1080, and you decided to get a new job, right?
A I didn't get a new job. I was still working at the church.
Q You took on a nanny job, a live-in nanny job?

A Yes. Yes. Sorry. Yes.
Q So you decided to move out in response to this situation, and you got a new job, right?
A Yes.
Q And that was something that you always had the option to do, correct?
A No. They had just had the baby. It would not have been an option before the baby.
Q Okay. You could always look for another job, correct?
A It didn't feel that way in the moment.
Q You had multiple other jobs while you were there, ma'am?
A I did. That's true.
Q That was an option that was always available to you, correct?
A It was so expensive to live in San Francisco, it did not feel like an option.
MR. ROBOTTI: No further questions.
THE COURT: Ms. Bonjean, do you have any recross-examination?
MS. BONJEAN: Yes. Just a little bit.
THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Just to clarify, Ms. Gill, you were engaging in prostitution within your first month at OneTaste, right?

A Again, I don't have a clear recollection of the timeline, but that would not surprise me.
Q And at the time, maybe still, prostitution was illegal, correct?
A Yes.
Q And, actually, it was the policy of OneTaste that you could not engage in illegal activities, right?
A I don't -- I don't recall that.
Q In fact, as of August of 2010, it was a policy of OneTaste, written policy, that -- well, there was a code of conduct for OneTaste teachers, leaders, and representatives, right?
A Again, I don't have any recollection of their policies.
Q Okay. And one of those -- one of that code of conduct was that you not offer illegal services or sexual entertainment in exchange for money, right?
A Again, I don't have any recollection of that service or of that policy.
Q And also part of the code of conduct for OneTaste teachers, leaders, and representatives was to refrain from illegal activity during their service in one of these roles, right?
A I don't have any recollection of this policy.
MS. FARRELL: Can we see what you're reading from?
MS. BONJEAN: Sure. I'm going to see if it

refreshes her recollection. It may or may not.
Q I'm going to show you what's been marked as Defense Exhibit 2-BP.
THE COURT: Is this something new today, or did you already use this?
MS. BONJEAN: No, I did not.
THE COURT: Okay. I will take a copy then.
Sorry, BP? What's the rest of it?
MS. BONJEAN: Defense Exhibit 2-BP.
THE COURT: Thank you.
Q Ma'am, just to walk you through it. You see there's an e-mail communication from an Aubrey Fuller?
A On the top of the first page?
Q Yes.
A Yes.
Q Okay. And then if you go to the third page, there's a document there that's dated June 27?
THE COURT: Sorry. This is not in evidence, right?
MS. BONJEAN: It's not.
THE COURT: So I don't want you to read from the document if it's not in evidence.
MS. BONJEAN: I'm not going to read from it, Your Honor. I just wanted to point her to the third page, if you could, please.
THE COURT: Okay.

Q And, specifically, I'm going to be asking you to look at the middle of the page, of the page 3 of that document, and see if that refreshes your recollection about whether there was a written code of conduct as it relates to the OneTaste teachers, leaders, and representatives.
A It does not.
Q Okay. You can put it aside.
Now, you testified that you auditioned to be Reese Jones', I don't know what, servicer, handler, girlfriend, it is unclear, but one of those things, right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q You were auditioned for whatever role you were playing for Mr. Reese, right?
A Yes.
Q No one told you that you were auditioning for some role, though, right?
A No one ever used those exact words, "you are auditioning," no.
Q You interpreted it that way, but no one said you were going to go addiction for this position, right?
A No one ever said those words. Correct.
Q In fact, you just were asked to go along on an outing that he happened to be at, correct, like a concert?
A That's not how I remember it.

Q Were you asked to go to a concert that he was attending with other people that you affiliated with at OneTaste?
A It was a concert with Nicole and Reese and Yia.
Q And you were invited to that event, correct?
A Yes.
Q And then after that event you ultimately ended up playing some -- having some relationship with him, right?
A Yes.
Q Okay. Now, you agreed to have that relationship with him; fair?
A I did.
Q Okay. And you didn't have to cook breakfast for him, but you did, correct?
A It -- that's not the way it felt.
Q Well, you didn't tell anybody you didn't want to cook breakfast for him, right?
A I'm pretty sure I told Maddie that I didn't understand why I had to do all of those things.
Q Okay. But you didn't tell anybody that, you didn't tell Nicole, you didn't tell Yia, you didn't tell Reese, hey, I don't want to cook breakfast for you, I'm not coming over to cook breakfast for you anymore, right?
A It was not within the realm of my abilities.
Q So that's a no, you didn't communicate that to anybody?
A No.

Q You didn't -- more importantly, you didn't communicate that to Ms. Daedone or upper staff of OneTaste, right?

MS. GUPTA: Objection. Asked and answered.

THE COURT: Overruled.

A I never overtly said that, no. I was still seeking --

Q That's a no, right?

A -- acceptance.

Q I am just asking, did you say those words?

A I never said those words.

Q Okay. And you also didn't tell Mr. Daedone, Mr. Cherwitz, or anybody at the upper staff of OneTaste that you didn't want to take him on walks, right?

A I never used those words.

Q And you also didn't tell Ms. Daedone or Ms. Cherwitz or anyone in the upper staff of OneTaste that you didn't want to fist him, right?

A The question is specifically to the upper staff --

Q Yes.

A -- not to someone like Maddie?

Q No. I am not talking about complaining to your friends. I'm saying, you didn't report that to Nicole, Rachel --

MS. GUPTA: Objection.

Q -- or anyone in the upper staff at OneTaste?

THE COURT: Sorry. There was an objection?

MS. GUPTA: Yes, Your Honor. As to form.

THE COURT: Sustained.

Q You didn't report your distaste with sexual activities with Reese to Ms. Daedone or anyone in the upper staff of OneTaste, right?

A Correct.

Q Okay. And even when you journaled -- and this journal that's been marked as 2-W, you've looked at the whole -- you've looked at the journal?

A I don't have a copy of it, but I have looked at it before.

Q Okay. I will bring it up, if you need it. But I only have a couple questions. This was a journal you wrote for yourself, right?

A Yes. It was my way to work out things that I was working through in therapy.

Q This was a private writing to yourself, right?

A Correct.

Q You weren't writing it so, you know, you could -- for any -- because you knew you were going to give it to the federal government some day, correct?

A Correct.

Q All right. And the government had you look at an excerpt from it, which has been marked as 911-B, just for identification. And you were asked a question on redirect about you saying -- you writing that the relationship with

Reese was sort of -- it was sort of arranged and not completely organic, right?
A I do remember that. Yes.
Q You did reference it as a relationship, though, right?
A I mean, we have a relationship.
Q Do we?
A It depends. We have -- we are talking to each other.
Q So that's what you meant, like the relationship of just talking with one another, rather than like fisting someone?
A We definitely had a deeper relationship than you and I do.
Q I hope so.
But the way you described it was, it was sort of a range and not completely organic. You didn't call it like I auditioned to be his handler, right?
A I wasn't there in my processing and therapy yet. I was still working through what was going on. It took a while to uncover that.
Q Right.
And that's what I'm getting at. And I understand that. It is only later that you sort of thought of it that way, as an audition to be his handler, right?
A It's not that I thought of it that way later. It is that I did a lot of work in therapy on myself and on the things that had happened in my life and the choices that I had made

in my life as well.
Q Correct.
And you also were asked on redirect about writing, "it does feel a little like a job sometimes." You referenced it, it feels a little bit like a job, correct?
A I was starting to unearth that aspect of it in therapy. Yes.
Q You didn't write, you know, this is a job I am not being paid for, and I'm being a handler, and I really don't want to be part of this? You didn't express that?
MS. GUPTA: Objection.
THE COURT: Overruled.
Q That wasn't the sentiment of your expression. You just said it feels a little bit like a job, right?
A Yeah. I hadn't gotten all of the way through my therapy.
Q Right.
And this was a journal you wrote to yourself, for your own benefit, correct?
A Yes.
Q All right. You testified about how you felt that people at OneTaste and the upper echelon, as well as Nicole, had discouraged your relationship with Robert, right?
A Yes.
Q And you thought they discouraged your relationship with Billy, and there were other -- those were like two examples

that you provided over the course of your examination, right?
A Yes.
Q Isn't it true that Nicole and other people at OneTaste were concerned about the high risk men you dated?
A I don't know what you mean by high risk men.
Q Well, didn't you write to yourself in your private journal, why do I always invest in high risk men?
A I don't recall that. If I had to make a guess, high risk men were what -- the language around OneTaste from the core staff was they were men who would pull me back into sleep, as they would talk about it.
Q Like Malechai, who was assaulting you?
A No.
Q Okay. That's a high risk man, right?
A Not in the context of what they were talking about. And yes.
Q But he is a high risk man, correct?
A I would say so. I have not made good choices in the past.
Q You were dating someone who was HIV positive, right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q And Robert, himself, was involved in sex work, correct?
MS. GUPTA: Objection.
THE COURT: Sustained.

Q And isn't it true that Nicole reinforced that there were certain men that you were associating with that weren't good for you, like any friend would, correct?
A I don't think it was friendly.
Q Okay. And, lastly, you referred to what happened to you at OneTaste as coercion, right? Do you remember your testimony about that?
A Yes.
Q Okay.
A I think so.
Q Okay. This coercion that told you to doubt your inner voice, I think is something you said. Does that sound right?
A That sounds about right.
Q But you testified over and over, you didn't communicate that you didn't want to do these things to Nicole, meaning these sex acts, correct?
A I never communicated overtly. I did communicate through my fear inventory the struggles that I was going through and the trauma that I had already endured.
Q Okay. But you didn't read your fear inventories to Nicole, regardless, right?
A Not that I remember.
Q Okay. But you didn't expressly, in words, tell anybody in the upper staff of OneTaste, including Nicole, that you didn't want to engage in the activities that we have discussed

at length this morning, including the sexual activities, the working with Reese, the OMing, any of those things, right?
A I would talk with people like Rachel Cherwitz and Rachael Hemsi, and Yia about my struggles. I would share that pretty openly.
Q Okay. Did you tell any one of them you did not want to OM?
A No. I would talk about my struggles and my internal wrestling.
Q Right. Everybody did at OneTaste. But you didn't tell them you didn't want to OM, correct?
A I never used the --
MS. GUPTA: Objection.
THE COURT: Sustained as the commentary.
Q You did not tell them you didn't want to OM, right?
MS. GUPTA: Objection. Asked and answered.
THE COURT: Overruled.
A I never used those words.
Q Okay. And even when you parted ways with OneTaste, you didn't initiate any type of lawsuit against them for some --
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Until the federal government came knocking on your door, you didn't take any action to voice your complaints in a legal way regarding OneTaste, right?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q What, if any, actions did you take before the FBI knocked on your door to voice your complaints about OneTaste in a formal way?

A I had been working through in therapy and continue to work in therapy on unearthing and unpacking the trauma that I sustained during my time at OneTaste, and I finally got to a place where I felt like I was comfortable sharing my story. And I had heard that the federal government was investigating them, so I called them. They never came knocking on my door.

Q Okay. So when you heard about a federal investigation is when you decided to speak up, right?

A After I had done at least ten years of therapy, yes.

Q And that's also when you started trying to get victim services money for your alleged harm, right?

A It was -- no. Not at the same time. It was put on the table as something that I could seek, and I went back and forth with my therapist a lot about whether or not I should file for those services. And I have never fully completed seeking those services.

Q And who told you you could apply for monetary services?

MS. GUPTA: Objection.

Q Monetary benefits?

THE COURT: Sustained.

Q You did fill out an application to get --

MS. GUPTA: Objection.

THE COURT: Sustained.

MS. BONJEAN: It goes to --

THE COURT: Sustained. Please. Move on to the next question.

MS. BONJEAN: All right.

Q Ms. Gill, I have no further questions.

THE COURT: And the witness may step down.

(Witness excused; witness exits courtroom.)

THE COURT: And the government can bring its next witness.

MS. BENSING: Thank you, Your Honor.

The government calls Margaret Pixley.

For planning purposes, when does the Court plan to take a break.

THE COURT: Shortly before 1:00.

MS. BENSING: Thank you.

(Witness enters courtroom.)

THE COURTROOM DEPUTY: Please step up, remain standing, and raise your right hand.

(Witness duly sworn.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record. Spell your last name slowly, and speak into the microphone.

THE WITNESS: Margaret K. Pixley. That's P-I-x-l-e-y.

THE COURT: You may proceed, Ms. Bensing.

MS. BENSING: Thank you very much, Your Honor.

MARGARET K. PIXLEY,

called as a witness herein by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q What is your full legal name now? I know you just stated it, but --

A Margaret K. Pixley.

Q And what name do you go by now?

A I go by Max.

Q Do you know somebody named Nicole Daedone?

A I do.

Q And how do you know her?

A Nicole was the CEO of OneTaste when I was involved in the organization.

Q And do you know someone named Rachel Cherwitz?

A I do.

Q How do you know her?

A Rachel was the head of sales at OneTaste.

Q Do you see Nicole Daedone in the courtroom today?

A I do.

Q And I'd ask that you identify her by an article of clothing.

A She's wearing a gray or tan shawl.

MS. BENSING: Your Honor, I'd ask that the record reflect that the witness has identified the defendant Nicole Daedone.

THE COURT: Yes.

Q Do you see Rachel Cherwitz in the courtroom today?

A I do.

Q And can you please identify her by an article of clothing.

A She's wearing a white jacket.

MS. BENSING: Your Honor, I'd ask that the record reflect that the witness had identified the defendant Rachel Cherwitz.

THE COURT: Yes.

Q You just talked about being involved in an organization called OneTaste. Approximately when did you become involved with OneTaste?

A In the middle of 2012.

Q And approximately how old were you then?

A 22 years old.

Q Did you ever perform work for OneTaste?

A I did.

Q At a very high level, what kind of work?

A At the beginning I was a production manager in New York, so I'd help them put on their events, and later worked as the assistant to Rachel Cherwitz, who is the head of sales.
Q Did you ever provide sexual labor on behalf of OneTaste?
A I don't think I would have classified it as that at the time, but there were times when I worked for OneTaste when I was involved in OMs and sexual situations with prospective clients.
Q Okay. Did there come a time when you stopped working for OneTaste?
A Yes.
Q And approximately when was that?
A December 2013.
Q And we will get into this topic a little bit more later, but what, if any, psychological harm did you experience from your time with OneTaste?
MS. BONJEAN: Objection, Your Honor.
MR. ROBOTTI: Objection.
THE COURT: Overruled.
Q You can answer.
A I think there was a lot of psychological harm that happened at my time with OneTaste.
Sorry. It's like a little emotional for me.
I think there was kind of a slow whittling down of who I was and how I saw the world and my own personal

boundaries when I was in that organization, and it's taken me a lot of years since leaving to kind of feel right with myself.

Q What, if any, role did the defendants Rachel Cherwitz and Nicole Daedone play in that psychological harm?

MS. COHEN: Objection.

THE COURT: Sustained.

Q I want to go back to before you became involved with OneTaste. Where did you grow up?

A So I am from rural northern California. It's a place called Humboldt County.

Q What was your childhood like?

A It was a tough childhood. So I grew up in pretty extreme poverty. I had a single mom who took care of me, and she was struggling with drug and alcohol addiction, and there was a lot of neglect and verbal and physical abuse.

Q Did there come a time when you left Humboldt County?

A Yes. I actually -- I left when I was 15 to go study abroad in Denmark, and that was actually the year that my mom died of a heroin overdose. And so after my time abroad, I came back, finished high school, and then went to college, where I was like the first person in my family to go to college.

Q And approximately when did you graduate from college?

A 2011.

Q How did you finance college?
A I had some need-based and merit scholarships. I worked multiple jobs while I was in college, and I took out loans.
Q Jumping ahead, ultimately, what is your highest degree of education?
A I'm a medical doctor.
Q And approximately when did you receive that degree?
A 2024.
Q What did you do after you graduated from college in 2011?
A I worked in a chiropractic clinic as like a front desk secretary.
Q And we're going to discuss this a little bit more later. But how, if at all, did the circumstances you described growing up impact why you later joined OneTaste?
A I think at that point in my life I was very young, naive. I didn't have a strong sense of community. I had quite literally been orphaned and didn't have any family. And I think one of the things that was very appealing to me about OneTaste was the sense of community there, and getting to feel like I belonged to something that was greater than myself. And sometimes now when I look back on it, I think that if I had had --
MS. BONJEAN: I am going to object to that.
THE COURT: Sustained.
MS. BENSING: And just for the record, it's just to

the last portion, Your Honor?

THE COURT: Yes. You can ask the next question.

MS. BENSING: Thank you.

Q Approximately when did you first hear of OneTaste?

A Probably early to -- probably early 2012.

Q And what -- how did that come about? How did you first hear of OneTaste?

A Yeah. So I had gotten involved in a self-help community that was based here in New York called like the Mama Gena's School for the Womanly Arts. And so I was taking kind of a self-development class here in New York, and at our graduation weekend Nicole Daedone came and spoke.

Q And what, if anything, do you recall about that speech?

A Nicole is a very powerful figure, a very persuasive speaker. She was championing like female orgasm at the time, and I remember just learning about OneTaste, learning about this organization that was invested in like cultivating and spreading women's orgasm throughout the world and women getting more in touch with their power through that, and all of that was something I was very interested in at the time.

Q I think you testified that that was in New York, correct?

A Yes.

Q Where were you living at the time?

A So I was actually still living in San Francisco, and I was flying to New York like about a weekend a month to take

those self-development classes.
Q So after you heard Nicole Daedone speak at this lecture, what happened with respect to your involvement with OneTaste?
A At that point, OneTaste was headquartered in San Francisco, and I was living in San Francisco, and I just thought like this seems cool. I will go check it out. So I went to one of their like TurnON events and then signed up for their How to OM class.
Q And what is a TurnON event?
A I now understand it to be this kind of what we would call lead generation event. So very free or low cost event that people could come to. They would typically have a few of the coaches at the front of the room who would facilitate different like communication games, and then they'd like pitch you on a class at the end.
Q And what is the How to OM course?
A I think that was a two-day course where we would learn the basics of orgasmic meditation, and then at the end you'd have an opportunity to have an OM.
Q And how were you supporting yourself financially at this time when you first became involved with OneTaste?
A I was still working at the chiropractic clinic.
Q Who was leading these initial courses that you attended that you just testified about?
A I believe the facilitators at my How to OM class were

Joanna Van Vleck and Rob Kandell.

Q And who is Joanna Van Vleck?

A She was one of the like high executives for OneTaste at the time.

Q And who is Rob Kandell?

A Also a senior member of OneTaste. I think he had been involved like practically since the beginning or for a very long time.

Q And you testified earlier that you at some point later began working for OneTaste, correct?

A That's right.

Q Did you come to learn who Joanna Van Vleck reported to?

A My understanding is that it was Nicole Daedone.

Q And what about Rob Kandell?

A I would also say, ultimately, he reported to Nicole.

MS. BENSING: I'd like to pull up for everybody, it is in evidence, Government Exhibit 309.

And I just want to make sure everybody can see it.

A I can see it where I'm sitting.

Q Okay.

(Continued on the next page.)

BY MS. BENSING: (Continuing.)
Q And we've already talked about Rachel Cherwitz. What if any nicknames did she go by when you were at OneTaste?
A I'm not aware of any nicknames. I would just call her Rachel.
Q I want to pull up Government Exhibit 102 do you know this individual?
A Maya Gilbert.
Q Maya and I went to college together at Mills. We were only acquaintances at college but she was present in the first few -- like, when I was first getting involved in OneTaste. She was already working for them and a coach for them and because we sort of knew each other from college she was one of the first people from OneTaste to reach out to me.
MS. BENSING: I want to show you Government Exhibit 281 which is already in evidence.
(Exhibit published.)
BY MS. BENSING:
Q Do you know who this is?
A That's Rachael Hemsi.
Q Who is that?
A Rachael is someone I met at OneTaste. I don't know what her official job title was, but she supported everyone and she was one of the -- I think she was the one who ended up selling me the coaching program.

Q So you just talked about ultimately getting someone on the coaching program?

THE COURT: If you're going to change to another topic, I think we're going to break for lunch.

MS. BENSING: I'm flexible, Your Honor. We can break now.

THE COURT: I think that makes sense to do since it's getting close to 1.

(Witness steps down.)

THE COURT: And I'll just ask the jury to come back -- really be ready to come in here at 2:00. Come back to the jury room five minutes before 2.

Don't talk amongst yourselves about the case. Don't let anyone talk to you about the case. Just go enjoy your lunch and I will see you back here at 2:00 in the courtroom.

(Jury exits.)

THE COURT: If the parties can come back at five minutes to 2.

(Luncheon recess taken.)

AFTERNOON SESSION

(Time noted: 2:00 p.m.)

THE COURT: We got the followup note from Juror No. 5 just about his schedule so Mr. D'Agostino is going to show you that. The note which I've marked Court Exhibit 8 indicates that this juror was able to reschedule the appointment to June 5th at 4 p.m. I'll hear from the parties, but that sounds reasonable to me and we can most likely end early that day.

MS. BENSING: Yes, Your Honor. That seems fine.

MS. COHEN: Yes, that seems fine.

MS. BONJEAN: That's acceptable.

MS. BENSING: Should we get the witness, Your Honor?

THE COURT: Yes, we can get the witness and the jury.

(Witness takes the stand.)

(Jury enters.)

THE COURT: Welcome back from lunch. Everyone can be seated and Ms. Bensing you can resume your examination.

MS. BENSING: Thank you very much.

(Continued on the following page.)

DIRECT EXAMINATION
BY MS. BENSING: (Continuing.)
Q And just a reminder you are still under oath. Okay?
A Okay.
Q I think you were just testifying before we took the break about your initial involvement in OneTaste.
Where did you attend these early courses? I think you've described the how-to OM and the TurnON.
A Those were both in San Francisco.
Q Do you remember where they were?
A There was a classroom space not far from the -- so, there had been a residential location in the South of Market District that was called 1080 and kind of, like, down the block from that there was a space that OneTaste rented where they held their events.
Q And around this time did you begin attending OM circles?
A I did.
Q And what is an OM circle?
A So, I guess, briefly it's an event where people practice orgasmic meditation. So you would have a partner and, like, I would take off my pants and lay down in this nest and there would be a 15-minute OM in which my partner would stroke my clitoris and often we would have two OMs. So we would rotate partners and have another session.
Q And how were those partners referenced?

A Strokers. Is that what you mean?
Q And when you referenced taking off your pants, what would you be called in that partnership?
A The strokee.
Q What happened next with respect to your involvement at OneTaste?
A I had signed up for a winter retreat in the Santa Cruz mountains.
Q And did you attend that retreat?
A Yes.
Q And when approximately was that?
A That was, I believe, December 2012? Is that right? I -- I think it was December of 2012.
Q And is there something that might refresh your recollection?
A Yes.
Q Okay.
MS. BENSING: If we can pull up, please, 3500-MPI-3, just for the witness.
(Exhibit published to witness only.)
BY MS. BENSING:
Q Can you see the screen right in front of you?
A This is an e-mail.
Q You don't need to describe it. Take a look at it --
A December 2012 was the winter retreat, yes.

MS. BENSING: We can take that down. Thank you.
BY MS. BENSING:
Q Do you remember approximately how much the winter retreat cost?
A It was upwards of $2,000.
Q At or after the winter retreat what, if any, additional financial investment did you make in OneTaste?
A Oh, I was pitched on the coaching program at the end of the retreat and although I didn't, like, sign up while I was there, I think a few days later I signed up to become a coach with OneTaste and that was about, like, a $15,000 program.
Q And what is a coaching program?
A So, it was this idea that you were going to become one of the coaches for OneTaste. You would be able to be a relationship coach, teach other people how to OM and I, at that point, thought it would be a good step for me professionally. So, I signed up for it.
Q And I think you testified it was about $15,000. How did you pay for that?
A So, my best friend's mother financed it for me.
Q What was the name of that coaching program?
A I was enrolled in the Coaching Program 6, so it was a sixth of these programs that they had done.
Q How was it referenced?
A CP6.

Q At this time when you started CP6, where were you living?
A San Francisco.
Q Where was the coaching program?
A It was in New York.
Q How did you participate?
A I flew to New York for about a weekend a month.
Q Approximately when did the CP6 start?
A I believe it was February 2013.
Q Why did you sign up for that coaching program?
A I think on a high level I didn't know where I was going professionally after college. I had a BA in anthropology. Having been the first person in my family to go to college, I studied what I loved, but I didn't have a grand plan for my career and then after college I felt a little bit lost and professionally, like, maybe underutilized in the job that I had and this was a chance to get involved in something that at the time for me felt a lot more, like, mission driven. Like, I had always been a feminist. I was interested in the work that OneTaste was doing and I saw it as a way to both, like, work on healing myself and cultivating my own orgasmic meditation process as well as be able to share that with other people.
Q Did there come a time during the pendency of your participation in CP6 that you moved to New York?
A Yes.

Q And what brought you to New York?
A So, I had basically -- I had been -- I had a conversation with Rachel Cherwitz in which she had said you're going to come to New York and run production for the New York office and I was really excited to be offered a job in the middle of all of this and so I moved to New York.
Q And I think you had testified that at some point you were working as an administrative assistant?
A Uh-huh.
Q What happened to that job?
A I left that job.
Q And was that around the time that you moved to New York to take on this production role?
A Yes.
Q What, if anything, did you learn from Rachel Cherwitz about why a production position was available in New York?
A I didn't know at the time when I left San Francisco that the two people who had been working production in the New York office had left very abruptly. I found that out when I got to New York.
Q And who were those two people?
A So, I recall their first names, Drea and Maddie. I think it was Andrea Mars and, I'm sorry, I don't know Maddie's last name.
Q And what, if anything, did Rachel Cherwitz tell you about

why they had abruptly left?
A I think that a lot of people would --
MS. BONJEAN: Objection, relevance.
MS. COHEN: Objection.
THE COURT: Overruled.
A I don't know that I ever had a clear reason why about they left. I just knew that they left abruptly and that they were no longer really welcome and we were discouraged from speaking with them.
Q Discouraged in what way?
A I remember we had a meeting once about it and I wouldn't have reached out to them anyway because I didn't really know them or have any of their contact information, but some of the people who had been in the house and worked with them closely before they left felt a friendship towards them and were sad that they had both quit abruptly and we were told by Rachel basically that we should not be keeping communication open with them.
Q And when you say "Rachel" --
A Rachel Cherwitz.
Q Did Rachel tell you why you were not to keep in touch with them?
A I think -- I don't know that she said this to me, but my understanding --
MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q What, if any, impact did that have on you, learning the reactions --

MS. COHEN: Objection, Your Honor.

THE COURT: Sustained.

BY MS. BENSING:

Q What, if any, impact did learning about the abrupt departure and not talking about them anymore did that have on you?

MS. BONJEAN: Same objection.

THE COURT: I am going to sustain to form.

BY MS. BENSING:

Q Let me make sure I understand your testimony.

You testified that they left abruptly; correct?

A Yes.

Q And you testified that you were discouraged from speaking to them; is that correct?

MS. COHEN: Objection, Your Honor.

A Yes.

THE COURT: Just ask your next question, Ms. Bensing. I'm going to sustain it.

BY MS. BENSING:

Q How did learning that affect you at that time?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q Approximately when did you move to New York?

A It was the middle of 2013, I believe.

Q And where did you live when you got there?

A I moved into the OM house. There was also our work headquarters in Harlem. It was 118th and Adam Clayton Powell in an apartment called the Morellino.

Q And what happened when you initially got there, what did you do?

A Just started working for OneTaste in earnest, understanding how to help out and be useful in the New York location and then I took responsibility for learning how to do production of the events in New York.

Q And who did you report to?

A Pretty much to anyone on the exec team that was around but I think one of the people who was most consistently around was Kim Howerton.

MS. BENSING: I want to show just the witness Government Exhibit 215.

(Exhibit published to witness only.)

BY MS. BENSING:

Q Do you recognize this exhibit?

A It's Kim Howerton.
Q And is it a fair and accurate copy?
A Yes.
MS. BENSING: The Government moves to admit Government Exhibit 215.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 215 is admitted.
(Government Exhibit 215 received in evidence.)
(Exhibit published.)
BY MS. BENSING:
Q I think you testified that Kim Howerton was one of the people you reported to?
A Yes.
Q And who else on the team did you report to?
A Rachel Cherwitz.
Q What was Rachel Cherwitz like as a boss at that time?
A Intimidating, fiery. She had a reputation for --
MS. COHEN: Objection.
THE COURT: Sustained.
Q You can just testify about your own observations.
A Okay. Intense, confrontational and direct.
Q And I think you testified when you initially moved to New York you were working in production; is that correct?

A Yes.
Q Were you paid by OneTaste for the work that you performed at that time?
A Not initially. We had to basically say, hey, you had given me this job and I had been working there for several months along with other members of the New York team who had also been told that they were hired --
MS. BONJEAN: Objection.
THE COURT: Sustained as to that part.
Q So, just focusing on the time period that you moved to New York, were you initially paid when you moved to New York?
A No.
Q And for approximately how long did you work as an unpaid worker?
A Two to three months.
Q What were your hours like when you first moved to New York?
A All -- all day, all night. I mean, there was never a time when we were not on in a way. It was a 24/7 job.
Q And you testified earlier that when you moved to New York you were residing at a place called the Morellino?
A Yes.
Q What is the Morellino?
A It's just an apartment building and we had two of the different apartments. There was the one that I was living in

and that most of the, I guess, like lower, less-tenured workers were living in and another one that was more reserved for Nicole when he she was in town and the executive team.
Q So I want to talk first about the one that you lived in. How many bedrooms?
A I believe it was three.
Q And how many beds to a bedroom?
A Usually just one. In the top room there was a bunk bed.
Q And how many people to a bed?
A Two.
Q What, if any, impact did that have on you?
A There was no private space whatsoever in the house. I mean, you're working with people and we had a lot of people living in that house all together. And at any moment you could be asked to share a bed with somebody else or move rooms. There was no sense of, like, anything that was actually your own or private.
Q Approximately how many people lived at that apartment, the Morellino, at any given point in time?
A Like eight to ten.
Q And who do you recall living in that apartment with you?
A People would come and go. So I'll just mention some people who were there when I was there. There was Pooja Lakshmin. I'm sorry, I don't know how to pronounce her last name. Ruben Flores. There was Chelsea Hunter -- Ruwan

mepagala, Chelsea Hunter, a man named David from France, a Luna. There were other people that came and went as well.

MS. BENSING: I would like to briefly pull up Government Exhibit 382, which is in evidence.

(Exhibit published.)

MS. BENSING: And this can be for everyone, thank you.

BY MS. BENSING:

Q Who is that?

A That's Becky Ummah.

Q And she's one of the people you lived with?

A Yes.

MS. BENSING: If we can pull up Government Exhibit 234. Just for the witness it's not in evidence yet.

(Exhibit published to the witness, counsel and the Court.)

A That's Chelsea Hunter.

Q Is that a fair and accurate copy of Chelsea Hunter?

A Yes, it is.

MS. BENSING: The Government moves to admit Government Exhibit 234.

THE COURT: Any objection?

MS. COHEN: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 234 is admitted.

(Government Exhibit 234 received in evidence.)

MS. BENSING: If we can publish it quickly for the jury.

(Exhibit published.)

MS. BENSING: And for the witness only, Government Exhibit 286.

(Exhibit published to the witness, counsel and the Court.)

BY MS. BENSING:

Q Who is this?

A Ruwan Meepgala.

Q Is this a fair and accurate copy of a picture of Ruwan Meepgala?

A Yes.

MS. BENSING: The Government moves to admit Government Exhibit 286.

THE COURT: Any objection?

MS. COHEN: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 286 is admitted.

(Government Exhibit 286 received in evidence.)

MS. BENSING: If we could publish it to the jury, please.

(Exhibit published.)

BY MS. BENSING:

Q I think you testified that the three photos that we just looked at, those are the three people you lived with at that time?
A I lived with all of them at that time.
Q Were these people also working for OneTaste, to your knowledge?
A Yes.
Q What did Becky do?
A Becky did sales.
Q And what about Chelsea?
A Chelsea did some sales, but also some of like -- some production and some kind of supporting everything that the team was doing.
Q And what about Ruwan?
A Also the sales team.
MS. BENSING: We can take that photo down.
Q Did you pay rent?
A Yes.
Q Approximately how much?
A I wish I could remember exactly, but it was about $500.
Q Per month?
A Yes.
Q And what, if any, other expenses did you have at this time?
A We would pool in for, like, shared food. So, groceries,

electricity, the phone bill, your internet, student loans.
Q You testified earlier that when you first moved to New York you weren't being paid at all. How did you support yourself?
A I was still fortunate to have some financial support from my best friend's mom who was kind of helping me cover my bare expenses every month, but I was just scraping by.
Q You mentioned that there was another location within the Morellino where other OneTaste staff lived; is that correct?
A Yeah, there were two apartments.
Q Okay. I think you've just described the first apartment?
A Yes.
Q So, can you describe the second apartment?
A It was similar, but nicer. Both of them had two floors. So you would enter into a hallway and there would be bedrooms off the hallway and you would come into the main, like, open floor plan, kitchen/living room area and then upstairs in the other apartment was Nicole's penthouse suite.
Q And who lived in the other apartment, the second apartment?
A Kim Howerton. Rachel would stay there when she was in town. Nicole had her room if she was in town. And if any other execs or higher-ups in OneTaste were visiting that's usually where they would stay.
Q And how did you know about this other apartment?

A We would often work there in the morning. We would circle up and start our work for the day. A lot of the work was happening out of the living room. So, we were constantly in and out of all of the apartments. And I had duties in the other apartment as well like cleaning Nicole's room before and after she left town.
Q And what did -- this is the penthouse room for Nicole?
A Yeah.
Q What did your duties of cleaning her room entail?
A I would, you know, do the laundry, make the bed, like, clean the bathroom, wash the windows, set everything up for her. I mean, I would -- it was kind of, like -- like, there were times when Nicole had sex in that room and I would be cleaning up, like, used condoms.
Q Why did you provide these services for Nicole Daedone?
A I mean, Nicole was our -- our leader in many ways and we -- it was seen in that capacity to be an honor to take care of Nicole and it was just part of what I understood to be my job.
Q What, if any, other OneTaste homes in New York were you aware of?
A So, at some point some people formed an OM community in Brooklyn and there was -- this one I will mention is not OneTaste-affiliated, but Ravi and Ayries were living down the street from the Morellino in an apartment.

Q I think you mentioned two different places; is that right?
A That's right.
Q Did you ever live in the Brooklyn communal home?
A No, I think I stayed there for two weeks one time.
Q And then you mentioned, I think, a second separate residence a few blocks away from the Morellino?
A That's right.
Q Where was that location?
A It was literally around the corner from the Morellino. I can't remember if it was Adam Clayton Powell, but it was probably like point two miles away.
Q And you mentioned two individuals who lived there. Who were those?
A It was Revi Agrawal, I believe is the last name, and Ayries Blanck. I'm sorry, I'm bad with everyone's names.
Q Were they also working for OneTaste?
A They were at the very least doing back of house and volunteering a lot of their time for OneTaste and -- or didn't hold other jobs. They were solely involved with supporting OneTaste.
Q And what about the individuals who resided in the Brooklyn home, did they work for OneTaste?
A I don't know if any of them were on the payroll for OneTaste, but similarly they would support at events and were

often involved in the community in New York.
Q I want to talk about what your days looked like when you moved into the Morellino. What was your schedule like?
A We would be waking up shortly after 6 and we would have our morning practices which were rather strict. We would typically OM twice, do seating meditation and then sometimes do fear inventory and then often we would go to a Bikram yoga class.
Q What would happen after that?
A We would come back to the apartment and get started with our workday.
Q And so the workday was also in the Morellino?
A For the most part.
Q You testified that you did fear inventory. What was that?
A It was an exercise that OneTaste borrowed from the twelve-step world where you would catalog your fears and your resentment and then read them to people to try to get free of them.
Q You also testified that you did yoga. What kind of yoga?
A It was Bikram yoga which was done in a very hot room. The rooms are, I think, 102 degrees.
Q You mentioned that it was fairly strict. What do you mean by that?
A If you weren't feeling good -- if I was not feeling good,

there was no possibility of not doing morning practice. It was just expected and, like, everyone in the community was held to a very high standard of participating in our morning practices and that was how we were -- we were told that that was how we would, like, keep our energy clean and be an effective sales team.

Q Who set the schedule for these morning practices?

A It was very similar to the morning practices that had been happening in the San Francisco community. So, I believe it's something that was well-established before I entered OneTaste, but I believe ultimately this was, like, a practiced schedule that Nicole had set up for all of us.

Q And in the New York community who enforced your participation?

MS. BONJEAN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q Did anyone enforce your participation in the New York community?

A Yes.

Q Who?

A I think we all mutually enforced each other's participation, but definitely Rachel Cherwitz always wanted to know who was, like, showing up and was very invested in making sure that --

MS. COHEN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q What, if anything, did Rachel Cherwitz say to you about your participation in these morning programs?

A I honestly don't remember anything specific about that.

Q Okay. You testified that you were involved in production. What, if any, involvement did you have with sales?

A Very little. I mean, I would be present sometimes for, for example, after a TurnON event when we would be doing our lead generation, we would always meet up at the end of the night and we'd go over who we thought the potential leads were, what classes we thought we could potentially sell to them and, so, I was part of some of the sales discussions, but I was not someone who did a lot of direct sales myself.

Q And who was involved in sales full-time when you were living in New York?

A It was Becky and Ruwan and Ruben for sure and then other people helped out some here and there.

Q And you just mentioned Ruben? Who is that?

A So, Ruben Flores was someone who was living at the OM house at the time I would say he was one of our most effective salespeople in New York. And New York was at that time leading, like, the OneTaste offices in London, Austin, San

Francisco and L.A. and New York was making more money than any of the other cities and it was largely because -- well, sometimes Rachel was in New York and she was very hectic with sales and so was Ruben.
Q Are you familiar with the term "fluffing"?
A Yes.
Q How, if at all, was that phrase used at OneTaste?
A Fluffing someone meant to kind of, like, prepare them for a sale. So, there might be someone at a TurnON event and maybe we would put our attention on them. We would act interested in who they were. We would try to get to know them. We would try to get them to feel loved and accepted and part of the community and, I guess, butter them up for a sale, essentially.
Q And who taught you how to do that?
A I don't know that anyone actually taught me. It was just some thing -- it was a practice that we would -- all of the employees would be doing that at all of our sales events.
Q Who would you fluff?
MS. BONJEAN: Objection. Foundation, vague.
THE COURT: Sustained.
BY MS. BENSING:
Q I think you testified that you participated in fluffing; is that correct?
A That's correct.

Q And when you were living in New York, who you were expected to fluff?
A For me, because I had been part of the Sister Goddess community, when Sister Goddesses came to the OneTaste events, those were usually my targets.
Q And that's the Mama Gena school that you mentioned?
A That's right, yeah.
Q What if any other work did you perform in this initial time period living in New York that we haven't talked about yet?
A It was varied. I mean, I would -- if executive members were coming into town, I would be searching for their particular supplements that they needed to have and checking them into their flights, picking them up from their hotel. I would drive Nicole around when she was in town and wanted to get coffee or go tanning or get her heir done.
I was the person who would go to the storage unit and pulling out all of the nests and the chairs for our events and making sure that the spaces were set up. I would book the venues and the stages and the microphones that we would rent and plan food for the courses and make sure we had food for everybody and just coordinate -- and coordinate with the back of house to support the events.
Q You mentioned work that you performed for executive members. Who do you mean?

A It could have been Rachel Cherwitz or Nicole Daedone or Ken Blackman or Rob Kandell or Jonathan Black or Yia Vang. I apologize if I'm getting the name wrong. Really, anyone. Even Eli Block. Marcus Ratnathicam.

If anyone -- if anybody who was higher up than me in OneTaste came to the New York office, I was, like, expected to be essentially, like, whatever kind of personal assistant they needed.

Q And when you said you would drive Nicole around, who were you talking about?

A Nicole Daedone.

Q You mentioned that you would go to a storage unit to get nests?

A Uh-huh.

Q What is a nest?

A The nest is for the -- the physical supplies we would use for OMing. So there would be a yoga mat, a blanket, a Zafu, which is a meditation cushion, and pillows to support the strokee's legs. Also we also laundered the -- we had wash cloths that we would put underneath people's bottoms essentially. And, so, bringing all of the supplies so that people could actually show up and have an OM circle.

Q You mentioned that the job was 24/7. How did communication work amongst the team members?

A For the most part it was a constant stream of text

messages.
Q When you say "constant," what do you mean?
A We would get thousands of texts in any given day. We were on -- I was on many different text threads and there was always an expectation for you to be readily available for any communication that came through. And then there were times when I was also expected to, you know, be responding to -- text events that were happening in the London thread, even though that was in the middle of the night our time.
Q How quickly did you respond to these text threads on average?
A As soon as I saw the text. Immediately was the expectation.
Q And how come?
MS. BONJEAN: Objection to the foundation.
Q How come you responded so quickly?
THE COURT: Do you maintain this objection?
MS. BONJEAN: I withdraw my objection on that question.
THE COURT: Go ahead. You may answer.
A That was the expectation for us as employees. We were always available, always connected. That was the whole foundation and the theory of OneTaste.
So, if you were not available for connection, you were doing something seriously wrong at your job.

Q And who set that expectation for you?
A Rachel Cherwitz.
Q What, if any, impact did that have on you?
A I mean --
MS. BONJEAN: Objection to the form and vagueness of that question.
THE COURT: Overruled.
BY MS. BENSING:
Q You can answer.
A The question was what effect did it have on me to have to be immediately available for communication 24/7?
There was no personal space for myself and I felt like they owned me all the time.
Q Did you take vacation while at OneTaste?
A No. We were not permitted to do that.
Q Did you take days off?
A No. We were not permitted to take sick days.
Q Why not?
A It was essentially company policy you could not be sick. You could not take a day off if you were sick.
Q How, if at all, did that impact you physically?
A I -- I was burned out. I think I was young and I had a lot of energy at the time, but I was burned out.
Q Were you in a committed relationship while you were involved with OneTaste?

A I was when I first started taking classes there. In San Francisco I was dating someone when I first got involved.
Q And what happened?
A It had been a monogamous relationship and at that time it was fairly openly discouraged in OneTaste. It was felt that if you were a serious practitioner cultivating your orgasm, that being in that kind of relationship was closing you off to your potential and it was just -- eventually I left that relationship.
Q And who taught you that you should close -- discouraging monogamy?
MS. BONJEAN: Objection to the foundation. Assumes facts.
THE COURT: Sustained.
BY MS. BENSING:
Q Who taught you what you just described in your previous answer?
A I remember it specifically coming up with my coach, Amy Jones, who was the coach that was assigned to me while I was in CP6 and it was not only coming from her. That was -- that was just part of the doctrine at OneTaste at that time.
MS. BONJEAN: Objection.
MS. COHEN: Objection.
THE COURT: Sustained.
BY MS. BENSING:

Q When you were in CP6, did you learn the teachings of OneTaste?
A Yes. They were -- like, we were there to learn the teachings so that we could spread the teachings.
Q And what, if anything, did you learn as part of your participation in CP6 about being in a committed relationship?
A I'm not sure I have, like, one exact memory teaching about that. I think they would just describe a lot of attention was put on expanding our definitions of relationships and expanding our definition of orgasm and connection. And, so, there was -- we were often -- I was often encouraged to essentially just be open for what we would have called orgasm anytime, anywhere, with anyone.
Q I want to ask you about some phrases. Are you familiar with the phrase "golden handcuffs"?
A I am.
Q What is that?
A It's a bit like gilded cage. So the way that it was used to pertain to me and my sex life was that if you thought -- if you thought that it was only worth having sex with people that you were attracted to interested in or even liked as a human being, that you were somehow being too precious about guarding your sex and that was a limiting belief.
And so you were -- your golden handcuffs were essentially that, like, you were limiting your own power by

having your preferences and desires about who you wanted to have sexual interactions with.

(Continued on the following page.)

(Continuing.)

BY MS. BENSING:

Q And is that something you were taught at OneTaste?

A Yes.

Q Are you familiar with the phrase "make-out"?

A Yes.

Q What is that?

A Broadly speaking, it was a hookup. It sounds like kissing, but it could be a lot more than that. Often make-outs were -- could involve oral sex, they could involve full-on penetrative sex, it could be heavy petting. It could be really any sort of hookup.

Q And that's a phrase that was used when you were at OneTaste?

A Yeah.

Q Are you familiar with the phrase "muggles"?

A I am.

Q And how, if at all, was that used at OneTaste?

A So it's obviously borrowed from the Harry Potter universe where there are, like, the magical people, the wizards, and then there are the non-magical people, the muggles. So if you were part of an In Group at OneTaste, if you were kind of behind the scenes or you were part of the organization, you were not a muggle. But the people who were not initiates were muggles.

Q Are you familiar with the word "tumescence"?
A Yes.
Q How, if at all, was that word used at OneTaste?
A So it was kind of like unpotentiated energy. We were often trying to build and generate energy. It was thought that that energy would lead to greater sales and us being more effective at our goals. And so tumescence was something that could be used to channel for good purposes, but could also create a feeling of, like, irritation. It comes from this, like, anatomy word for swelling. So they would use it as an adjective as well, like if you were -- like you could have tumescence of your genitals, for example, if there was that swelling and that heat and that arousal. It was basically TurnON that wasn't going anywhere yet.
Q When you say they used that word, who are you talking about?
A Nicole Daedone, the whole exec team, everyone in the community. I mean, we ended up having a shared vernacular amongst us.
Q Are you familiar with the word "hypervolatile"?
A Yes.
Q And how, if at all, that was word used at OneTaste?
A So it was thought that there were -- or it was taught to us that there were different ways that energy could

present in people, and it was almost like personality types. So a hypervolatile person might be very impassioned, energetic, fiery, like you could fly off the handle at any moment. It was kind of like having a live wire or a lightening bolt. It was that kind of connotation.

Q Are you familiar with the phrase "rapidly changing realities"?

A Yes.

Q And how, if at all, was that phrase used at OneTaste?

A We would often pivot in our work. Like, reality was something that seemed to change at a moment's notice. Like, you might have one thing planned and then something else comes up. We were taught that that was just the nature of orgasm, that things could change at any time. So we were not to get too fixated on any, like, one reality, but to be fluid in our understanding of reality and to be able to change and pivot and lead the direction they would say, like, the stroke was going or the direction things were unfolding in. It was about being flexible.

Q And how, if at all, did use of this vernacular impact you at that time?

MS. BONJEAN: Objection to the vagueness of the form.

THE COURT: Sustained.

Q How did the use of that vernacular make you feel while

you were at OneTaste?
A I remember I had a hard time even talking to anyone who wasn't, like, a OneTaste member. I became so -- this was just our vocabulary every day and how we would speak to one another. And these concepts and these teachings reshaped my own understanding of the world I was living in and made it -- I mean, it's funny, I'm thinking that when I left, it was really -- it took me a long time to get those words out of my vocabulary and learn to just, like, talk like a normal person again.
Q Are you familiar with the concept of aversion practice?
A Yes.
Q What is that?
A So aversion practice was essentially you would practice doing something you did not want to do or something you perhaps felt gross or wrong about. But by engaging in it, the teaching was that you could reclaim more of your power. So if you wanted to be an advanced-level practitioner, you'd be able to put yourself in a situation that you did not want to be in and still find a way to get off.
Q And was aversion practice something you were taught at OneTaste?
A Yes.
Q By who?
A Nicole Daedone and -- I mean, it was just part of -- as

I said, like part of the doctrine that a lot of the teachers espoused.

MS. BONJEAN: Objection.

Q Are you familiar --

MS. BENSING: Oh.

MS. COHEN: There was an objection to the last part.

THE COURT: Overruled.

Q Are you familiar with the beast exercise?

A Yes.

Q What is that?

A It was an exercise we did in the coaching program, and it was essentially to let out whatever your dark side was and to have it be seen and witnessed and accepted. But people would --

MS. BONJEAN: Objection to the nonresponsive. I think it was answered, but --

MS. BENSING: I think she's finishing --

THE COURT: I think she's continuing her answer. I'll let her continue.

Overruled.

Q You can finish your answer.

A That's all I have to say about the beast exercise for now.

Q Okay. What, if anything, did you learn at OneTaste

about boundaries?

MS. BONJEAN: Objection to the vagueness and form of that question.

THE COURT: Overruled.

Q You can answer.

A I mean, for us, boundaries were something to be played with. It was an edge. That's where your prove your practice. You would go right up to the edge and over it, and that's how you would get stronger and how you would get respect in the community and how you would prove that you were mastering the art of orgasm, was often -- like, you weren't proving yourself when it was easy, right? You were proving yourself when it was hard.

Q And how did you receive these messages at the time that you were involved with OneTaste?

A Well, you know, from, like, direct coaching we would get, like -- even if it was part of our workday, part of the sales team meeting, people were coaching each other all the time, and this was a whole organization of people who fancied themselves as coaches and wanted to, whatever, train the initiates or whatever. So these -- these coaching theories were just kind of getting thrown around all the time by members -- by people who worked for OneTaste, by people who had been trained by OneTaste.

Q When you were living in San Francisco before you moved

to New York, did you maintain your own apartment?
A I did.
Q And I think you said you had separate employment?
A I did.
Q How, if at all, did moving to New York change your relationship with OneTaste?
A Everything became a lot more insular for me. So I didn't have -- I was isolated a lot. My whole life and my whole world was OneTaste. All of my community, all of my friends, where I lived, where I worked, what I did every day, the only people I talked to really. It was not like when I was in San Francisco and I had, like -- if I had my own apartment with my own roommate, I could go home and talk to somebody who wasn't involved with OneTaste about what I was doing with my life and what was going on for me, and I had a space where I could still be me and I wasn't being expected to perform or, like, watched quite so closely or constantly available for correction.
Q You testified earlier that for a time period in New York, you worked without pay. Did there come a time when that changed?
A Yes.
Q And how did that change?
A So many of us as employees -- like I started having conversations with Becky and Chelsea and Ruwan, and we had

all been told something similar, that --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Sustained.
A I can speak for myself?
Q Just speak for yourself. Thank you.
A I had been told that I was moving to New York --
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q So let me take a step back.
When you moved to New York, you had a conversation with Rachel Cherwitz about your employment; is that correct?
A Before I moved to New York.
Q Right. And what from that conversation did you understand was going to be the plan when you moved to New York?
A That I was going to be working for OneTaste, and that I was going to be getting paid.
Q And you've already testified that there was a time period where you were not paid. How did that change?
A Myself and other members that were living in the house all brought it forward that --
MS. COHEN: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.

Q You can answer.
A That it was -- that we were workers and we wanted to be paid as we said we had --
MS. BONJEAN: Objection to hearsay of other people.
THE COURT: Sustained.
Q Just speak for yourself, to the extent possible.
A Yeah. I apologize.
I was working, I was working very hard, I was putting in a lot of hours, I was doing my job. I wanted to get paid for that. Eventually I brought that forward to Kim Howerton, who passed it up the ladder to the exec team and was told that --
MS. COHEN: Objection.
THE COURT: Sustained.
Q And after that, after you raised these concerns and it was brought up the ladder, did there come a time that you started getting paid?
A Yes.
Q Who, if anyone, was involved in the conversations regarding your getting paid? Without getting into the substance of those conversations.
A Yia.
Q Who is Yia?
A Yia was Nicole's assistant and a member of the

executive team.

MS. BENSING: Can we briefly pull up Government Exhibit 290, which is in evidence. And this can be for everyone, please.

(Exhibit published.)

Q Who is this?

A That's Yia, I believe her last name is Vang. I apologize if I'm getting her last name wrong.

Q That's the same person you were just testifying about?

A Yes, yeah.

MS. BENSING: Okay. We can take that down.

Q So once you did start getting paid, what was your salary?

A I don't remember exactly, I apologize. It was like 13 years ago. But it was not a lot of money. I was barely scraping by.

Q Once you started getting paid, which legal entity paid you?

A I believe it was OneTaste Incorporated.

Q Did you get commissions?

A No. I didn't really do sales, so that wasn't part of my pay structure.

Q Are you familiar with anybody name Beverly Daedone?

A No.

Q What, if any, sexual acts did you perform while you

were at OneTaste?

MS. COHEN: Objection.

THE COURT: Sustained.

Q Well, you testified earlier that you were sometimes asked to OM with people; is that correct?

A That's correct.

Q I want to ask you about the practice of orgasmic meditation. In brief, what was it?

A 15 minutes of clitoral stroking.

Q While you were involved with OneTaste, under what circumstances did you participate in orgasmic meditation?

MS. COHEN: Objection.

THE COURT: Overruled.

A Both in my -- in the morning practices in my own practice, and then there were times where we would help prospective either coaching clients or prospective, like, leads, essentially, people we were trying to sell courses to who might be getting a trial of OM, and there were times when I was both asked to be stroked and to stroke those people who were potential clients of OneTaste.

Q Did you always want to?

A I don't -- I think what I wanted, to me at that time, was irrelevant.

Q Explain what you mean by that.

A It was my -- I was on a pathway to try to be an

advanced practitioner, and so the way to get the practice was by OMing more, and whether or not, like, I wanted to have any particular OM, I would do it for what I believed was my own personal growth and spiritual enlightenment.

MS. BENSING: If we could please pull up Government Exhibit 267, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yeah. That's Mark Gottlieb. He was a resident at the 1080 apartment.

Q What, if anything, happened with respect to you and Mark Gottlieb?

MS. BONJEAN: Objection. Foundation.

THE COURT: Overruled.

A The first OM that I had that I didn't want to have was with Mark Gottlieb.

Q What do you mean OM that you had that you didn't want to have?

A It was in the morning practice at San Francisco, and Mark was an older guy and he was -- like, he grossed me out a little bit. He wasn't -- like I was still very early in my time at OneTaste, and he wasn't exactly the person I would have wanted to touch my genitals. And because I had made this commitment to becoming a coach and to growing my own practice, it was -- I wish I could remember who I had

that conversation with, but I remember that morning being like, I don't know that I want to do that OM --

MS. BONJEAN: Objection.

THE COURT: Sustained as to the conversation.

Q Do you remember raising with somebody at the time that you didn't want to OM?

A Yes.

Q Okay. Are there any other occasions where you OM'd when you did not want to?

A Often.

Q Do you recall any specific instances?

A There was the OM I was asked to do with Eli Block, in which I was asked to stroke him.

Q You mentioned Eli Block earlier.

MS. BENSING: I want to pull up Government Exhibit 242, which is in evidence.

(Exhibit published.)

Q Who is this?

A That's Eli.

MS. BENSING: We can take that down.

Q What happened with Eli?

A Rachel told us that we were going to have an OM together, that it was time for me to own that part of my practice. Eli and I did not get along. We did not have a good relationship and we did not work well together. And so

my understanding was we were being given this assignment to kind of get over that.
Q Sorry. Who gave you the assignment?
A Rachel.
Q Rachel Cherwitz?
A Cherwitz.
Q At the time that Rachel Cherwitz assigned you to OM with Eli Block, what was his position at OneTaste?
A I wish I could remember everyone's job title. He was definitely senior to me in the organization. He was one of the leaders in San Francisco, he was one of the head coaching. I have no idea what his job title was.
Q What happened after Rachel assigned you to OM with him?
A We did it. We had an OM where I stroked him, and it was really uncomfortable for the whole -- I think it was uncomfortable -- it was definitely uncomfortable for me, and I believe it was for him as well.
Q How did that make you feel?
A Just confused.
Q And what do you mean by that?
A I think I felt shame at the time, actually, because I did not get off in that OM and I was not finding it pleasurable. The whole point of, like, if you were stroking a man was that you were supposed to be garnering pleasure out of the experience, and I think I was so indoctrinated at

that point that I felt like I was doing something wrong because I didn't like it.
Q When you say that you stroked him, what do you mean?
A He was the strokee, so he took his pants off and laid -- typically, the teaching was you didn't OM on a bed, you only OM'd in a nest. But we didn't have any space in the house, so we were OMing on that, like bunkbed upstairs in the apartment I lived in. It was like 15 minutes of basically just holding his flaccid cock in my hand because neither of us were enjoying the experience.
Q Why did you participate in this if you didn't want to?
A I would have done anything that Rachel told me to do at that time.
Q Why?
A I honestly believed at that time that she had my best interest at heart, and if she was giving me some sort of assignment, it was for my own spiritual growth and development.
Q Are there any other occasions where you OM'd when you did not want to that you can recall?
A I'm remembering right now an occasion where Jim Quick came to the house, and he was somebody who was a powerful entrepreneur and had a lot of money and he was one of these big names that we were going to maybe bring into OneTaste. So I was told that I would be the strokee --

MS. COHEN: Objection.
A I was the strokee for that.
Q And who told you --
THE COURT: Sorry. I'm going to sustain the objection.
You can ask a different question.
Q Who told you that you would be the strokee?
MS. BONJEAN: Objection. Assumes facts. Foundation.
THE COURT: Sustained as to form.
Q How did you --
How did it come about that you were going to be the strokee?
A It was the morning that he was going to come to the house, and he was going to have a session with Rachel where she would teach him how to OM, and then I was going to be the strokee for him to practice with.
Q And when you say "Rachel," who are you talking about?
A Rachel Cherwitz.
Q And what, if anything, did Rachel Cherwitz tell you about your participation in the OM with Jim Quick?
A Basically, just you are going to OM with him when we're practicing.
Q And did you?
A Yes.

Q What happened?
A I was really nervous about it. We went into one of the bedrooms and on one of the beds, and he stroked me for 15 minutes and then it was over.
Q How did that make you feel?
A I think at the time I honestly was just really hoping I didn't, like, mess anything up and that I wanted it -- I remember wanting it to be a good experience for him so that he would sign up, and so I would have done a good job.
Q Why did you say yes to this if you didn't want to do it?
A You know, it was for the good of OneTaste, for the good of our team, right, that if we could land this sale, if we could get this -- it was always, like, very near and dear to us when we had high profile people who were involved, and that was seen as very successful, and I wanted the New York office to be successful; I wanted to be successful.
MS. BENSING: I want to show the witness only, please, what's been marked as Government Exhibit 413.
THE WITNESS: That's Jim Quick.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 413 into evidence.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
THE COURT: Hold on. I want to hear from

Ms. Bonjean. Any objection?

MS. BONJEAN: No objection.

THE COURT: Okay. Government Exhibit 413 is admitted.

(Government Exhibit 413 received in evidence.)

MS. BENSING: And if we could just briefly publish that for the jury. Thank you.

(Exhibit published.)

MS. BENSING: We can take that down. Thank you.

Q What if any other occasions do you recall where you OM'd when you did not want to?

A I think they're too numerous to -- to really count. Those are the main ones that stand out. There were other times where I was asked to OM with clients, but I saw it as just part of my practice.

MS. BENSING: I'd like to briefly pull up Government Exhibit 221. Sorry, if we could publish this for everybody.

(Exhibit published.)

Q Who is this?

A That's Rob Kandell.

Q When, if ever, did you OM with Rob Kandell?

A In the New York apartment where I lived when he was in town.

Q And how did that come about?

A It was just part of, like, our morning. We were doing morning practices, and most often we would set up, like, our first OM of the morning, and then people would rotate nests, and then you'd be stroked by whoever happened to be sitting beside you. And I think there was a morning where Rob -- there was a morning, let me just say, that Rob had said, like, okay, Pixley, let's do this.
Q And how did that make you feel?
A I was nervous to OM with him because he was such a senior member in the organization, and honestly all of my interactions with him made my nervous. I don't think -- to be honest, I don't think he did it that morning in, like, a predatory way. I think it was just part of how our practices happened.
Q You testified earlier that you found Rachel Cherwitz as a boss to be intimidating. Why?
A She has a very big presence and would often -- if she -- she would call you out on stuff in front of everyone. Rachel kind of set the tone and the pace for all of us in New York, and if Rachel didn't like you or had a problem with how you were showing up at work, it would make your life hell.
Q In what way would it make your life hell?
A Then everyone -- everyone followed what Rachel said and thought and did what she asked all the time. And so if

Rachel thought that you were not performing up to her standards or expectations, it was, you know, pretty much, like, everyone else would start criticizing you as well.
Q You testified earlier that as part of your day while you were living in New York, you would attend certain sales meetings; is that right?
A That's right.
Q And where were those meetings held?
A Most often in that living room of the executive apartment.
Q Inside the Morellino?
A Yes.
Q I want to direct your attention to a sales meeting involving Ruwan and Becky, who you testified about earlier.
What, if anything, happened during that sales meeting?
A There was one morning where we were having our meeting, and we had not been meeting our sales goals in New York and Rachel was very upset. She said that there was a lot of tumescence on the team, and that's why we were not being able to be effective in our sales role. She attributed that to the sexual tension that was between Ruwan and Becky on the team. Ruwan and Chelsea were in some sort of a relationship. They loved each other and they were partnered.

I guess there was some sexual tension between Becky and Ruwan as well, and Rachel said, we're not making any more sales calls, we're not doing anything today until you guys handle the tumescence. So Ruwan and Becky, I want you guys to go have sex right now, I'm done with this, and they got up and went into one of the bedrooms and had sex. And I was sitting there with Rachel and Chelsea, who was Ruwan's partner, just watching Chelsea just completely break down.

Q To be clear, who at the time was your boss?

A Rachel Cherwitz.

Q And was that the case for the other employees that you just talked about?

A Yes.

Q How did you react to that?

A I felt so sick inside. I think that was the moment when I just woke up to how -- I had kind of slowly been like a frog boiling in hot water, you know, not jumping out. But that was a moment where something really broke inside me. I felt like what happened was wrong and hurtful and a power play and manip ulative, and it changed how I felt about Rachel Cherwitz and OneTaste and my involvement in the organization.

Q You have testified that you worked in production. Did there come a time when you took another role at OneTaste?

A I was asked to be Rachel Cherwitz's assistant, the assistant to the head of sales.
Q And do you recall approximately when that happened within your time at OneTaste?
A Late 2013; not long before I left.
Q How did being Rachel Cherwitz's assistant come about?
A I think she wanted to have more control over me, and I wanted -- I was --
MS. COHEN: Objection, Your Honor.
THE COURT: Sustained.
Q What did Rachel Cherwitz tell you about your getting the assistant role?
A That she was grooming me for something greater --
MS. COHEN: Objection.
THE COURT: Overruled.
Q Did you want to take the assistant position?
A No, I did not.
Q Why not?
A I didn't want to work more closely with Rachel.
Q Why didn't you say that?
A At that point my job was just doing whatever I was told, and so if they believed that was how I would be the greatest use to OneTaste -- I think I didn't really own my know at that point in time. It didn't feel like I could say, oh, I just want to keep this job and not do this other

thing you're asking me to do. I just always was going to do what they asked me to do.
Q What was expected of you as Rachel's assistant? What work did you perform?
A It's interesting because it wasn't really all that sales related, but it was essentially making sure that Rachel had everything she needed at all times and was well set up to close clients. And then the other piece that changed when I started working more directly with Rachel was that I was expected to report to her more often, and she asked me to send her daily updates about all of the members on our team. So essentially, to provide report from my vantage point to the dynamics in the house or to report on the activities of my teammates and what they were thinking, doing, and how they were acting.
Q And how did that make you feel?
A I felt like I was a snitch, I guess. It made me feel gross -- like there's dirty, gross, wrong feeling inside thinking about that.
Q And did you do it nonetheless?
A I did.
Q Again, why?
A I don't know what I imagine the retaliation to have been if I had said no, I'm not going to report on my coworkers, but it just felt like I couldn't say no to that.

MS. BENSING: I'd like to show the witness only what's been marked as Government Exhibit 2676. And if you could zoom in, please.

Q I'm going to ask that you take a look at this. Do you recognize this?

A I do.

Q And what is this?

A This is an email I sent to Rachel reporting on dynamics in --

MS. BONJEAN: Objection to her testifying about the content. It's not in evidence.

THE COURT: Overruled.

Q What is the date?

A July 11, 2013.

Q Is it a fair and accurate copy of an email that you sent to Rachel Cherwitz on July 11, 2013?

A It is.

MS. BENSING: Your Honor, the Government moves to admit Government Exhibit 2676 into evidence.

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: I'm going to need you to hand me a copy of this.

MS. BENSING: I believe it's tab 44 of your binder, Your Honor.

THE COURT: Basis?

MS. BONJEAN: It contains hearsay, and that's the primary basis.

THE COURT: Response, Ms. Bensing?

MS. BENSING: The Government is not seeking to introduce it for its truth, Your Honor.

THE COURT: The objection is overruled.

MS. BENSING: Okay. If we can -- so just to be clear for the record, Your Honor, is Government Exhibit --

THE COURT: I'm sorry. Government Exhibit 2676 is admitted.

MS. BENSING: Thank you.

MS. BONJEAN: Your Honor, could we ask for an instruction that it's not being used for the truth of what's asserted there? Or maybe at a later point?

THE COURT: We can raise that at a later point. But continue with your questioning.

MS. BENSING: Thank you.

(Government Exhibit 2676 received in evidence.)

MS. BENSING: If we could just briefly publish this for the jury.

(Exhibit published.)

MS. BENSING: And if we could please zoom in just on the header information.

Thank you.

BY MS. BENSING:
Q What does the subject line read?
A House Update.
Q And what is the date?
A The 11th of July 2013, at 12:44 in the morning.
Q Is this representative of the hours that you worked?
A Yes. This was the end of my workday.
Q Is that your email address?
A It is.
Q And is that Rachel Cherwitz's email address?
A It is.
MS. BENSING: If we can just briefly go down and publish the contents.
Q If you can just read the first sentence, please.
A Hi Rachel, five things I'm noticing about the team.
Q If you can read number 2?
A We've been putting our attention in words too much. We need to prioritize lead gen for our sanity as much as sales. We need to spend more time outside of the house at events spreading what we have.
Q And number 3?
A Becky's being harder on herself about sales than is really useful.
Q Number 4?
A I personally feel distant from the team. I feel

annoying, even to myself, like I should isolate because of it, and that hasn't been possible. Oh, well.

Q And number 5?

A Ruben, while leading TurnON tonight, after the prompt, what is it that you wanted to say, but didn't, said, this isn't fun anymore and I don't know how to fix it. I took it to mean working with the team.

Q And let's just go down to the paragraph right under 5.5. Can you read that?

A I've been a little whacked due to an uncertainty between my role in production/sales. I'm working on lots of production stuff for movie premier. It's my first OM day in production, so I'm a little nervous. Today in our ops call Rachael Hemsi said something interesting, that production has to be properly handled ahead of time for people to actually register for and fill up the course, which sounds woo-woo, but I believe it.

Q Okay. And we can pause there.

Is this an example of the kind of updates that you would provide to Rachel Cherwitz?

A Yes.

Q And I think you testified earlier --

MS. BENSING: If we could go back up --

THE COURT: I'd just ask that anyone that's in the courtroom sit down.

MS. FARRELL: Your Honor, on that, would you mind reminding everyone of the sequestration rule.

THE COURT: Yes. I think I'll give counsel a moment here.

MS. FARRELL: Thank you.

(Pause in proceedings.)

THE COURT: Okay. I think we with resume.

Please go ahead, Ms. Bensing.

MS. BENSING: Thank you.

If we can just blow up the header again -- sorry, the top header, the date information. Thank you.

BY MS. BENSING:

Q I think you testified earlier that you were working as Rachel Cherwitz's assistant later in 2013. The date here is July 2013. Can you explain that?

A I don't believe I was -- it's hard for me to say, to be honest. I don't have a great memory of that time. But I don't believe I was her personal assistant in July.

Q So did you provide these updates even upon prior to becoming her assistant?

A Yes.

MS. BENSING: Your Honor, I'd like to pull up for the witness only Defense Exhibit 13-AO. I can bring a copy up to the Court.

THE COURT: Is it something I've had before or no?

MS. BENSING: I believe the defense provided it to Your Honor.

THE COURT: Okay. I'll take it. It's quicker.

Thank you.

MS. BENSING: If we can just scroll up to the top, please.

Q I'm going to give you a minute and ask you whether you recognize this.

A I do.

Q And what is this?

A It's an email I sent to Rachel.

Q On what date?

A The 13th of July 2013.

Q Is it a fair and accurate copy of an email that you sent to Rachel?

A It is.

MS. BENSING: Your Honor, the Government moves to admit Defense Exhibit 13-AO.

THE COURT: Give me one moment, please, to take a look at it.

(Pause in proceedings.)

MS. COHEN: Your Honor, I object on the same grounds, hearsay.

MS. BONJEAN: We're objecting. It was produced, obviously, for different purposes.

MS. BENSING: And, Your Honor, the Government is not seeking to admit it for its truth.

THE COURT: Overruled.

It's labelled Defense Exhibit, so Defense Exhibit 13-AO is admitted.

MS. BENSING: Thank you.

(Defense Exhibit 13-AO received in evidence.)

MS. BENSING: If we could please publish Defense Exhibit 13-AO for the jury.

(Exhibit published.)

MS. BENSING: And if you could zoom in to the header again, please.

BY MS. BENSING:

Q What is the date on this exhibit?

A The 13th of July 2013, at 12:50 in the morning.

Q Again, is that representative of the hours that you worked?

A It is. That's the end of my workday.

Q Who is it from?

A It's from me to Rachel Cherwitz.

Q And if we can just go down, I'm going to ask that you read the first paragraph.

A Rachel, so excited you're coming home tomorrow. We did team bonding, Bikram, and dinner tonight, so we were all lubed up and awaiting your arrival.

Q And the next paragraph, please?
A Chelsea is having some feelings because her dynamic with Ruwan has some changes on the horizon. I think this is going to be a big time for her to step into her own and anchor herself in her purpose, not simply to go along with her partners.
Q And can you go down to the fifth paragraph? Becky is whacked.
A Becky is whacked about the concept of romance as a toxin that draws attention and has people easily fall asleep. Go figure.
Q And the next paragraph, please.
MS. BENSING: Oh, can we scroll to the left? Sorry about that.
A There's sexual tension between Rafael and I. There's a way in which that fuels our collaboration and production. However, I think we've had our attention on one another to the detriment of the team. We have a tendency to splinter off for production stuff, and it's important that we stay connected. Thank you. Moving fast.
Q And is this another example of the kinds of updates that you would provide to Rachel Cherwitz?
A Yes.
MS. BENSING: We can take that down, please.
Q I want to ask you about the term "whacked." What does

that mean?
A I think about, like, the verb, like Whac-A-Mole or something. Like, imagine you get kind of like whacked across the head with something and you're just stunned. It's like that cartoon where you have the stars going over your head and you're not quite in your right state of mind after something struck you.
Q I want to ask you about the term "energy vampire."
A Uh-huh.
Q Was that a phrase that was used at OneTaste?
A Yes.
Q And what does that mean?
A An energy vampire is someone who is there to, like, prey and suck on the energy of the community and they're taking more than they're giving.
Q And who, if anyone, used that phrase while you were at OneTaste?
A Maya Gilbert used that phrase referring to me once, and it hurt my feelings.
Q Are you familiar with the word "virus"?
A Yes.
Q Was that word used at OneTaste?
A It was.
Q And how was that word used at OneTaste?
A I remember an occasion in which I was having a mental

breakdown and Chelsea was comforting me, and Rachel Cherwitz interrupted and told Chelsea that there is -- like, she needed to not give me attention when I was having a breakdown because my virus was operating me.

Q You testified that you were having a mental breakdown. What prompted that?

A I can't remember on that specific occasion. It was not uncommon for in all of the, like, stress and heightened experiences we were having, to cry or to have intense feelings about things.

Q And how did Rachel Cherwitz calling you a virus affect you in that moment?

A It was really terrible, honestly, like, to be having a moment of, like, deep feeling and to be told that, like, this is just your virus operating you or you're just a virus. It was -- it was part of -- I saw it as part of these deflexion strategies. So maybe you might be unhappy with something that was happening on the team or -- essentially, it was a way to make you wrong in that moment, you know. Obviously if I was just a person having feelings, that's different than being a virus. So reducing me as a whole human being to something infectious and contaminatory like a virus was dehumanizing.

Q Did you hear Rachel Cherwitz call other people viruses?

A Yes.

Q Who can you recall?
A I don't recall anyone in particular, I apologize. It's just part of how she would talk about people that she was upset with in the house.
Q Including employees?
A Especially employees.

MS. BENSING: I would like to show the witness only, please, Government Exhibit 1309.

Q Do you recognize this?
A I do.
Q And what is this?

THE COURT: What is that, Ms. Bensing?

MS. BENSING: Government Exhibit 1309, which is --

THE COURT: 21, okay. I have it. Go ahead.

Q Do you recognize this?
A I do.
Q And what is this?
A An email I sent updating Rachel that I checked her in for her flight to negotiation.

(Continued on the following page.)

(Direct examination, cont'd)

BY MS. BENSING:

Q And is it dated September 18, 2013?

A It is.

Q Is it a fair and accurate copy of that e-mail?

A It is.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 1309.

MS. COHEN: Objection.

MS. BONJEAN: Objection. Relevance.

THE COURT: Sustained.

MS. BENSING: I would like to show the witness Government Exhibit 1322. And we can just zoom in on the top.

BY MS. BENSING:

Q Do you recognize this?

A I do.

Q And what is this?

A This is me sharing my flight details for when I was doing back of house for the 7th coaching program, flying from New York to San Francisco to do back of house for that program.

Q And just taking a step back for a minute, what back of house work are you talking about?

A Being there for the entire event, from like before it starts to after it ends, helping set things up, making sure all of the participants have everything they need, all their

fresh tea and cookies, and basically doing any errands that you are asked to run during the event. Like you might be asked to go out and pick up lunch for the exec team and bring it back to the venue. Something like that.

Q And you testified that you were doing that for a different coaching program?

A That's right.

Q Which coaching program?

A So that was the 7th one. I took part in the 6th.

Q Okay. And did you have -- where was CP7?

A CP7 was based in San Francisco.

Q And so how did you get to San Francisco?

A I flew from New York to San Francisco, and that's what this document is, is my flight details.

Q And which airports would you fly out of?

A Usually JFK and into SFO.

MS. BENSING: Okay. We can take that down, please.

THE COURT: Ms. Bensing, I am just going to stop you for a moment. In the next five to ten minutes, I would like to take a break. You can let me know if now is best or if you want to do it within five to ten minutes.

MS. BENSING: Can I ask two more questions?

THE COURT: Yes. Go ahead.

BY MS. BENSING:

Q So you testified earlier about your work hours when you

were working at production. What about when you were Rachel Cherwitz' assistant?

A I mean, the expectation the whole time was 24/7, basically. It didn't -- I mean, it's hard to -- it was more duties, more responsibility, more oversight. But there was -- I mean, I was always just working for them anytime I was awake. So that didn't change.

MS. BENSING: Your Honor, now is a good stopping point.

THE COURT: Okay. So I am going to ask that the witness step down.

(Witness exits the courtroom.)

THE COURT: And we can reconvene at 10 minutes to 4:00.

Don't talk about the case. Don't let anyone talk to you about it. And we will be back here at 10 minutes to 4:00.

(Jury exits the courtroom.)

MR. ROBOTTI: Your Honor, we have a brief issue.

THE COURT: Okay. Everyone can be seated.

Yes. Go ahead Mr. Robotti.

MR. ROBOTTI: Your Honor, I think the defense is a little troubled to see defense exhibits show up in Ms. Bensing's direct examination of this witness.

As you know, in order to move things along here, we have been trying to provide our exhibits, including

impeachment material, to the defense -- to the government in advance.

We don't have an obligation to do that under the law, and we have been doing that as a courtesy, not so that the government can front our exhibits in their direct examinations.

So if that's what the government is going to be doing here, then we're not going to provide the exhibits until right before cross.

THE COURT: I appreciate your raising that. Thank you.

Does the government want to be heard on this? Or if you need a minute, we can come back a minute before ten of and you can be heard then. But I appreciate Mr. Robotti raising this issue.

MS. BENSING: Yes, Your Honor.

We just want to check one production-related issue with respect to that defense exhibit and when we received it. So if we can address it right after the break.

THE COURT: You can.

MS. BENSING: There was also a Rule 16 production, which I had understood that to be a part of, that the --

THE COURT: I thought when you had handed it up -- I can look back exactly what you said. I thought you were suggesting that this had already been addressed.

MS. BENSING: So it was -- the exhibit version was provided to the government this morning. I had understood it to have been previously provided by the defendants as Rule 16. So I can --

THE COURT: All right. I am not going to get involved with this, because I think you need to check first, and then if there's anything else to take up --

MR. ROBOTTI: If I can just briefly respond, Your Honor.

THE COURT: Yes.

MR. ROBOTTI: I don't think that's the point, whether it was produced previously --

THE COURT: I know your point. I know your point. But I do think that the government should have the facts that they need. I understand your point well, and I really do appreciate you bringing it up.

MR. ROBOTTI: Thank you.

THE COURT: Okay. And we will come back at 10 minutes to 4:00.

Thank you.

(Recess taken.)

THE COURT: Before I bring back the jury, two issues.

One, we got a juror note, which is -- I don't think requires any action, but you can all take a look at. It has

been marked Court Exhibit 9.

(Court Exhibit 9, so marked.)

THE COURT: It was ripped, that's why -- oh, you have it. I have the copy. You have the original. It is ripped.

Okay. Does anyone want to be heard on this? I don't think there's any action that needs to be taken on this.

MS. BONJEAN: Definitely not us.

MS. COHEN: I hope it is not me.

MS. FARRELL: Nobody here.

THE COURT: I am sure the reference to "older woman" has nothing to do with anyone in this courtroom.

Does anyone wish to be heard on this note? I am not planning on taking any action unless the parties have a different view on that.

MS. BENSING: No, Your Honor.

MS. BONJEAN: No, Your Honor.

MS. COHEN: No, Your Honor.

THE COURT: The one other issue is that, Ms. Bonjean, you raised I think a request for some sort of limiting instruction.

That's fine. I just usually would like the parties to propose language, and if you agree with each other, great. If not, if you want to do it, you know, talk to the government, want to propose something in writing, or just read

it out to me, that's fine, we can do that today. I think this witness is still going to be on the stand, so tomorrow we can also just address it in the morning and then do it then.

You tell me your preference.

MS. BONJEAN: I will propose something, to the government later this evening, it will be short, and they can weigh in, just --

THE COURT: I think it is pretty noncontroversial. So I think that's the best way to handle it. Okay.

MR. ROBOTTI: Your Honor, just on the point we talked about before the break.

THE COURT: Yes. Go ahead.

MR. ROBOTTI: We conferred with the government. I think we have an understanding that our exhibits will not be showing up in their direct examinations anymore.

THE COURT: Okay.

MS. BENSING: Although, materials produced in their Rule 16 production obviously may.

THE COURT: Okay. Fine.

Let's bring the jury in.

And the witness can come back, too.

(Short pause; witness takes the stand.)

(Jury re-enters the courtroom.)

THE COURT: Everyone may be seated.

And, Ms. Bensing, you may continue.

MS. BENSING: Thank you, Your Honor.

(Direct Examination cont'd)

MS. BENSING:

Q So you've testified that Rachel Cherwitz was your boss when you worked at OneTaste. Who did she report to?

A To Nicole Daedone.

Q And what was Nicole Daedone's role while you were at OneTaste?

A CEO.

Q And how did you view her?

MS. BONJEAN: Objection. Form.

THE COURT: Sustained.

Q What, if any, personal interactions did you have with Nicole Daedone?

A Occasionally being coached by Nicole in the programs that I was in. Interactions where, as I mentioned, I would drive her around New York at times. So normally we wouldn't talk, but I would be the driver in the front of the car taking her places. We had a sales conversation at one point for the Nicole Daedone Intensive.

Q And you mentioned some interactions that you had with her in your coursework; is that right?

A That's right.

Q What, if any, interactions can you recall having with her, as part of your coursework?

A I was a pretty quiet person. I wasn't very outspoken in the classes. So the one time that I remember getting coaching from Nicole in the coaching program, it was I think I was telling my sob story a little bit, or being -- basically, yeah. Telling my story about my life in a way that was not turned on, and her coaching or instruction to me at that time was that I should retell the story in a Daffy Duck voice. And I was like holding a microphone in front of a room full of people and just couldn't bring myself to, you know, tell the story like Daffy Duck and turn it around like that. So I just sort of froze, and eventually she just moved on to working with the next person she was coaching.
Q And when you are talking about telling your sob story to Nicole Daedone during this course, are you referencing your childhood that you testified about earlier?
A Yeah. My traumatic upbringing.
Q How did that interaction with Nicole Daedone make you feel?
A I felt like I failed because I couldn't do what she asked me to do in that moment. I felt like at OneTaste there was this teaching that was if someone won't get off, you just remove the stroke, so you remove your attention from them. And that's what my interpretation of what happened was, was I wasn't able to get off or transmute my sadness around that and my like victim story around it in the way that she was trying

to coach me to. And so rather than like help me get through it or spend more time working with me on it, just she knew I wasn't going to be able to respond in the way she was hoping, and so she just took her attention and her focus off of me and onto the next person.

Q You testified about your participation in CP6.

A Uh-huh.

Q What was the end of CP6? What were you working towards?

A So the whole idea for the coaching program was to become a certified coach and OM trainer for OneTaste.

Q And did you have to take any test as part of that?

A Yeah. There were multiple tests. One of them was like a written portion about OneTaste teachings. There was also on the final weekend of our graduation, there was a sales test as well, a test on our sales skills.

Q And what happened when you took the sales test?

A Basically, Rachel was present, and she was the head of sales for New York, and she flew off the handle and yelled at everyone that none of us were good enough, and none of us had done enough work to master the skills of sales, so absolutely every person in the coaching program had flunked and would not be graduating, and we would have to make up the work and try to retest at a later time.

Q And what does making up the work mean?

A We had to send in, if we wanted to then become certified,

we'd have to record ourselves like doing coaching sessions, doing exploratory sessions, and provide those recordings to the executive team to go over, and then find a time to be retested on the sales portion.

Q Did there come a time when you enrolled in an additional OneTaste course?

A While I was still working at OneTaste, I enrolled in the orgasmic mastery class.

Q What is the orgasmic mastery class?

A It was something they had not taught before, to my understanding, and it was going to take OM principles and apply them to sex more broadly. So not just that 15 minutes clitoral stroking, but they were going -- when they pitched the class, the idea was they were going to be teaching cock sucking, pussy sucking, and that like people would even have -- be having like full-on sex in this class.

Q Why did you enroll?

A I mean, at the time I was working for OneTaste and so there was always a lot of pressure to be involved in the classes as they would come out, and that if you weren't on the leading edge pushing yourself to become better, than you were kind of not part of the game that everyone else was playing. And so it was, yeah, just a class I decided to take.

Q And how much did the orgasmic mastery course cost?

A I believe it was 5,200, early bird.

Q And so how much did you pay?
A I paid the early bird amount.
Q Did you participate in orgasmic meditation during the mastery course?
A Yes.
Q Are there any occasions that you can recall?
A I think it was like a weekend, a month for five months, and at the beginning of every day and then I think most days when we would come back from lunch as well, there would be a few rounds of OMs.
Q And are there any OMs that you participated in with respect to the mastery course that you did not want to participate in?
A There was an exercise that we did that was a prostate massage where I was the stroker, and that was an example of a 15-minute male stroking experience that I also was -- that I was not that interested in doing.
Q And what is a prostate massage?
A So prostate, in male anatomy, can be accessed through a man's rectum. So I had gloves on and was partnered with somebody and inserted my fingers inside his ass.
Q And so that differs from a male OM?
A Yes. Because I was not stroking his penis at the time.
Q Why did you participate in the prostate massage when you didn't want to?

A I think I was really bought into the idea at the time that doing these like aversion practices or doing these -- like expanding my OM practice was something that was ultimately going to benefit me like spiritually and personally in my own path towards enlightenment.
Q And at this point in time when you participated in the mastery course, were you living in New York?
A Yes.
Q So living at the Morellino that you have already testified about?
A Yes.
Q And were you also still working for OneTaste?
A Yes.
Q Did you perform any work at the Mastery?
A I did work to like set it up. Like during the day when the class was in session, I was not working. But like between the weekends there was a lot of work going on behind the scenes to make this course happen and I was responsible for that work.
Q Are you familiar with the term "demo"?
A Yes.
Q And how was that word used at OneTaste?
A So the demo is presented as the pinnacle of an OM practice. It was essentially -- typically it was the classic like clitoral stroking 15-minute OM, but it was at a much

higher level because it was done to demonstrate the full breath and depth of orgasm. So the idea was you'd have like -- typically in our practice no one's sitting there like observing you, but in a demo it's -- you are putting on a show, basically. And so everyone in the room is captivated, they are feeling sensations in their body, they are along for the ride, and it was something that very masterful practitioners did as part of their like initiation, into being an advanced practitioner of clitoral stroking.

Q And I think you testified that you had to do a demo at the end of CP6?

A That's correct. That was our graduation.

Q So a demo was required to graduate?

A Yes. They would say the demo is your graduation.

MS. BENSING: I want to show the witness only, please, what's been marked as Government Exhibit 1442, which I believe is tab 25, Your Honor, in the Court's binder.

And if we can pull this up for the witness.

Q Can you see this in 1442?

A I can.

Q And what is this?

A This is an e-mail from Yia Vang to the Mastery class with introducing Nicole's notes on a demo.

Q And did you receive this e-mail?

A Yes.

Q How do you know that?
A I was enrolled in Mastery, and all of the Mastery students got this e-mail, and I remember getting it.
Q And did you provide this e-mail to the government?
A I may -- I'm sorry. I may have. I don't recall explicitly.
Q Okay. But you remember receiving this e-mail?
A Yes.
Q I'm going to show you -- and I'll just ask you to read to yourself the body of the e-mail.
A All right.
Q I want to show you Government Exhibit 2604, which is in tab 26 of the binder. And if you can please flip through to the second page and the third page.

THE COURT: This is very small on the screen. If you want her to read it, you are going to have to give her a hard copy or just blow it up.

MS. BENSING: Yes. May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. BENSING:
Q Do you recognize this?
A I do.
Q And what is this?
A These are Nicole's notes on what it means to do a demo.

MS. BONJEAN: Objection.

THE COURT: Overruled.

BY MS. BENSING:

Q Are they a fair and accurate copy of that?

A Yes.

Q And is this what you received in response to the e-mail that we looked at in Government Exhibit 1442?

A Yes. This was the attachment on that e-mail.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 2604 into evidence.

MS. BONJEAN: I am going to object, Your Honor, on, A, authenticity, foundation, double hearsay. Maybe -- that's -- those grounds.

MS. COHEN: Join, Your Honor.

THE COURT: At this time, I am going to sustain the objection.

BY MS. BENSING:

Q Okay. And I just want to focus your attention to the first page of Government Exhibit 2604.

A Okay.

Q And then if we can turn to the second page, and do you see a line halfway through, of the second page?

Are there two different sections in this document?

A Yes.

Q And focusing just on the first section, what is that?

A Oh. The line that's isolated, would you like me to read that?

Q No, no, no.

Just focusing on the first page and a half of Government Exhibit 2604. What is the first page and a half of Government Exhibit 2604.

A It is Nicole Daedone waxing philosophical about what a demo is.

MS. BONJEAN: Objection to the --

THE COURT: Sustained.

MS. BENSING: May I lead briefly, Your Honor?

THE COURT: Yes.

MS. BONJEAN: No problem.

THE COURT: Go ahead.

BY MS. BENSING:

Q Is the first half of this an excerpt from a Nicole Daedone reading?

A Yes.

MS. BENSING: Your Honor, the government would move to admit the first half of Government Exhibit 2604. We will redact the latter half.

Q And is this a fair and accurate copy of that reading of Nicole Daedone that you received?

A Yes.

MS. BONJEAN: Judge, we object because it's not

clear who wrote it.

MS. BENSING: The witness has testified, Your Honor.

MS. BONJEAN: No.

THE COURT: Sustained.

You can ask a different question on this.

MS. BENSING: Sure.

BY MS. BENSING:

Q When this was given to you, who -- and we can refresh your recollection if you need it, but what was this represented to you as?

A It was clearly stated both in the e-mail I received and at the top of this document that this is an excerpt from Nicole Daedone's notes on doing a demo.

Q And had you heard Nicole Daedone lecture about demos?

A I had.

Q What did Nicole Daedone say in lectures about demos?

A It was something very sacred to Nicole. She would share about her own experience doing a demo. I think that was in her book as well. We would often do -- there were times when I was working for OneTaste and even before when Nicole would do demos and be stroked. And it was a bit of a -- it was a way to -- it was a lead generating event, meaning, we would try to sell classes after people would come and see a demo. Like they'd come, they'd see someone get stroked, have a 15-minute orgasm, be really impressed by what that was.

And there were a lot of teachings throughout the different courses I took about what it means to own your orgasm, and being able to do a demo was like the highest demonstration or the pinnacle of really mastering the practice.

MS. BENSING: And, Your Honor, the government would move to admit the first half of Government Exhibit 2604, not for its truth, but for its effect on the witness.

MS. BONJEAN: Your Honor, we maintain our objections. Also, I think it would be appropriate to voir dire on this document.

THE COURT: So go ahead. I'll allow you a voir dire on this document.

MS. BONJEAN: Thank you.

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Pixley.

A Hi.

Q Hi.

You looked at 1442, which was an e-mail, right?

A That's right.

Q And that was an e-mail that originated from Yia Vang, correct?

A That's right.

Q And it was Ms. Vang who sent you Mastery demo notes; do I have that right?
A That's correct. Mastery -- the attachment, sorry, is Mastery program demo training.
Q Right. But the e-mail --
A Mastery demo notes is the subject line.
Q Right. The subject line.
And, in fact, the content is also: Here are the demo notes from the last call. Right?
A That is part of the sentence in the e-mail. Correct.
Q And then it also says: I've also included excerpts, it says "experts," but I think it's "excerpts," from Nicole Daedone's reading on a demo.
Do I have that correct?
A That's what it says. Yes.
Q Do you know who wrote the excerpt?
A My understanding is it was Nicole Daedone.
Q And where do you get that understanding from that she wrote the excerpt from her reading?
A I've read a lot of Nicole's writing, and this reads like Nicole's writing.
Q You're assuming it based on style?
A That is one of the things, and also that the top of the page says it's excerpt from Nicole Daedone's reading on a demo.

Q Right. I understand it says excerpt from her reading. She did a reading in CP6; is that right?
A I don't recall.
Q What is a Nicole Daedone's reading on a demo? I guess that's the part I am confused about.
A I agree, I think that language is a little bit vague.
Q Right. So what is it?
A My understanding, when I got this document, was that Nicole had written this for us in the class to get us prepared for the demo.
Q And where did you get that understanding from?
A I guess I -- if it says it is from Nicole Daedone, and it is about the demo. Like no one was more expert on -- no one was more of an authority on demos than Nicole was.
Q I'm sure that's the case, but my question is where did -- how do you know she wrote this rather than somebody else wrote this based on her reading?
A I mean, it's OneTaste copy written, it has OneTaste's stuff all over it, and it is attributed to Nicole. So, that's where I got that impression.
Q Again, I am not suggesting it's not a OneTaste document. I am asking where you got the impression that she actually wrote the words on this page of paper, rather than someone else in the executive staff or somebody else?
A Yeah. I think I understand your question, and I don't

know for a fact that Nicole was the one who composed this. I just know -- I would say that it does read like many of her writings that I had read in her book and her other writings that I read during my time at OneTaste.

Q Okay. Thank you.

MS. BONJEAN: Your Honor, we maintain our objections.

THE COURT: Ms. Bensing?

MS. BENSING: May I ask just a couple follow-up questions.

THE COURT: Yes. Go ahead.

DIRECT EXAMINATION (cont'd)

BY MS. BENSING:

Q Max, you've already testified this is something that you received as part of your coursework, correct?

A Yes.

Q And who did you receive it from?

A Yia Vang.

Q And that was in approximately February of 2014?

A That's correct.

Q And were you still involved with OneTaste in February 2014?

A I had already left my job, and I guess the Mastery program hadn't completely wrapped up yet. So I was there for that graduation weekend, but I was in the process of

extricating myself from the OneTaste community.

Q Okay. And the attachment that we looked at, can we return to the -- the attachment that we looked at in Government Exhibit 2604, this is part of the coursework that you received as part of your participation in the Mastery program?

A Yes, that's right.

MS. BENSING: And so, Your Honor, the government would move to admit the first half of Government Exhibit 2604, the first page and a half, not for its truth.

MS. BONJEAN: We still object on foundation, hearsay. The grounds that I previously identified.

MS. COHEN: Yes. And authenticity.

THE COURT: Okay. The objection is overruled. Government Exhibit 2604 is admitted.

(Government Exhibit 2604 received in evidence.)

MS. BENSING: Thank you, Your Honor.

THE COURT: Sorry. I should make clear that the fist half --

MS. BENSING: As amended.

THE COURT: -- up until the line.

MS. BENSING: Yes. Thank you.

THE COURT: On page 2.

MS. BENSING: If we can please publish Government Exhibit 2604 for the jury.

BY MS. BENSING:

Q And I would ask you just to read the first paragraph, please.

A The first stage of the mythological journey, which we have designated the call to adventure, signifies that destiny has summoned the hero and transferred his spiritual center of gravity from within the pale of his society to a zone unknown.

THE COURT: Can you just slow down slightly when you are reading for the court reporter and for my benefit? Thank you.

THE WITNESS: Of course.

A This fateful region of both treasure and danger may variously be represented as a distant land, a forest, a kingdom underground, a secret island, a profound dream state, but it is always a place of strangely fluid and polymorphous beings, unimaginable torments, super human deeds, and impossible delights. The hero can go forth of his own volition to accomplish the adventure.

Q And the next paragraph, please.

A A demo is a threshold or a portal from one location to the next. It is the crossing over from childhood into adulthood on every plane. It is the gathering both of the first key and the final key orgasm, where we come from and where we are going to.

Q What, if any, impact did these kinds of teachings that we

see here in Government Exhibit 2604 have on you with respect to your participation in demos?

A I mean, I held it as something highly sacred. This was part of like, I think, one of the things that was calling me in OneTaste was like my spiritual unfolding, or that was part of what kept me involved in the organization. And I think these sorts of teachings were things that really spoke to me, and ways in which I would glorify my own participation in these practices.

MS. BENSING: We can take that down, please.

Q Did there come a time where you did a demo?

A I did.

Q Why?

A It was my Mastery graduation. Everyone in the class did a demo.

Q And who is your demo partner?

A Jeff Ridenour.

Q And who is that?

A Jeff is a friend of mine who lives in -- well, I met him first in the San Francisco OM community.

Q And how did it come about that Jeff was going to be your demo partner at the end of your course?

A I would say there was -- so Jeff had deep feelings for me that were not reciprocated on a romantic level, but he and I were good friends and often stroking partners when I was back

in San Francisco. He was probably one of the people I had practiced with the most. And because -- he was also someone who represented aversion practice for me.

Q What do you mean by that?

A Jeff is not someone I'm physically attracted to. He's much older, not really in great health, not someone that I personally have sexual or romantic feelings for. And I never wanted to have sex with Jeff and I never did. But that was often pointed to by my coach and other people who would coach me at OneTaste as an area that --

MS. BONJEAN: Objection to the hearsay. And foundation.

THE COURT: Sustained.

Q Did coaches or your superiors at OneTaste talk to you about Jeff Ridenour?

A Yes.

Q And was that as part of the aversion practice that you just testified about?

A Yes.

Q And what would they coach you on with respect to participating in demos or OMs with Jeff Ridenour?

MS. BONJEAN: Objection.

THE COURT: Sustained. Sustained.

Q So you've already testified that Jeff Ridenour ended up being your demo partner, correct?

A Yes.
Q How did that come about?
A I was told that the highest --
MS. BONJEAN: Objection to the --
A -- form of play --
MS. BONJEAN: -- hearsay. And the foundation.
THE COURT: She's can continue, and then you can renew your objection, if you still have one.
BY MS. BENSING:
Q You can finish your answer.
A I was told that the highest form of play or the highest way to demonstrate my skills in a demo would be to do it with Jeff because that was where there was the most unpotentiated energy.
MS. BONJEAN: Same objection. That's hearsay --
THE COURT: Okay. Sustained. Sustained.
MS. BENSING: Your Honor, may I just make a record that it's not for the truth, but the effect on the witness.
MS. BONJEAN: We further make an objection on foundation --
THE COURT: Sustained. Sustained.
You can ask a different question.
BY MS. BENSING:
Q Why did you end up doing your demo with Jeff Ridenour?
A I was trying to demonstrate my skills as an OM

practitioner, and Jeff was someone I was -- I was comfortable with Jeff, and I was friends with Jeff, and I believed that if I could show that I could get off with Jeff, I would be proving myself in some way.

Q In what way?

A That I could have a 15-minute orgasm with someone that I don't find myself sexually attracted to.

Q And how was that demo experience for you?

A Honestly, it was a little bit of a letdown because I think I had built the demo up to be such a pivotal moment in my practice, and I had trained for it, and I was proud of myself to get up there and do it, but the fact that there were so many people in the OneTaste Mastery program all doing demos that day, I think everyone was just -- had been sitting around watching demos all day. Like, it didn't feel special, it didn't feel like what I had built it up to be in my mind. It just felt like an OM on a stage in front of 50 people watching me get stroked.

Q And how did that make you feel?

A I will say, like debased in some way, because I wanted the demo to be something like special, sacred, holy, and it just kind of felt like a production line of people, you know, getting their, like, moment to shine.

Q I want to show you Government Exhibit 4609.

MS. BENSING: Just for the witness, please.

Q Do you recognize this?
A I do.
Q And what is it?
A This is a photo of the Halloween TurnON we did in 2013. It's a photo of me with some of the other OneTaste members.
Q Is it a fair and accurate copy of that photo?
A It is.

MS. BENSING: Your Honor, the government moves to admit Government Exhibit 4609.

MS. BONJEAN: No objection.

MS. COHEN: No objection.

THE COURT: Government Exhibit 4609 is admitted.

(Government Exhibit 4609 received in evidence.)

MS. BENSING: Can we publish this to the jury, please.

BY MS. BENSING:

Q Okay. I think you said this was a Halloween TurnON; is that right?
A Yes.
Q What is the Halloween TurnON?
A So TurnON was our weekly sales event, essentially, or lead generation event where people who were finding out about OneTaste for the first time could come, and coaches would put attention on them, and then we try to sell them a class or coaching at the end. And this happened to be around

Halloween. So we are all dressed up in Alice in Wonderland costumes.
Q And where are you in this picture?
A I am on the far left.
Q And who are the other folks in the picture? And just maybe you can start with the person next to you and then go one by one.
A Yeah. The woman standing next to me is Claudia. I am going to forget her last name. But she came from Italy and was a CP6 participant. The person standing behind her is Peter, who came from the UK and was also a participant in CP6. And then on the far right is Eli Block. Obviously, you know, one of the lead coaches at OneTaste at that time.
Q And somebody who you testified earlier about, correct?
A Exactly.
Q What, if anything, stands out to you about this picture?
A The thing that's most remarkable to me about this picture is it was right after I cut off all my hair.
Q And why was that significant?
A I think this was the time when I was in my heart not okay with being at OneTaste anymore, and there was a morning where I just woke up -- I don't know. It was middle of the night or early in the morning. And I went to the bathroom with scissors and I just chopped off my hair.
And then in this photo I had come -- I didn't do a

good job cutting my hair, so I had gone to a hair salon and got even more of my hair cut off. And I was coming straight from the hair salon to this event, and it was the first time everyone had seen me with that short hair.
Q And what, if anything, did cutting your hair represent to you?
MS. BONJEAN: Objection to the relevance of that.
THE COURT: Overruled.
Q You can answer.
A I didn't want to be like this female object anymore. I wanted to look in the mirror and felt like I looked like myself, and I didn't want to try to look like -- I feel like there was a way we were supposed to try to look to be attractive at the time, and I was rebelling against that.
Q At the time that you were involved in OneTaste, what pronouns did you use?
A She/her.
Q And what pronouns do you use now?
A They/them.
Q Did you continue to work for OneTaste after October -- after Halloween of 2013?
A Yes. I left in December of that year.
Q And why did you continue to work even after you were at this place mentally?
A I had virtually nowhere to go to. Like my whole life was

OneTaste, right? My job was OneTaste, my house was OneTaste, my income was OneTaste, my friends were OneTaste. Like leaving OneTaste meant leaving everything. I had given up literally everything in my life, and my whole existence was wrapped up in this. And so to like leave the organization meant like cutting my losses, essentially, and moving on.

Q Even after the Mastery program, did you enroll in another OneTaste course?

A OMX happened at some point when I was working there. I think it was concurrent with Mastery, and even though I was helping to put on the event, I bought my ticket to it and worked the event that I paid to be at.

Q Are you familiar with the course called the Nicole Daedone Intensive?

A Yes.

Q Did you sign up for that course?

A I did not. But my friend Jeff Ridenour put down -- the course itself was pitched to us at the end of the orgasmic Mastery, and you would have an opportunity to be in this intensive, this coaching intensive with Nicole. It was $20,000 a person to be in it. And somehow my friend Jeff had put down -- had been encouraged to put down a $10,000 deposit on a credit card with money he didn't have for my enrollment in this class.

Q And I think you testified earlier that you did meet with

Nicole Daedone at one point in connection with this Nicole Daedone Intensive; do I have that right?
A Yes. We had a sales meeting.
Q And what happened at that sales meeting?
A I don't have a great memory of it. It was like a bit like an exploratory session, which is sort of the like what do you think you could get out of this? Like, who do you want to be? How can this help you? You know, like just a conversation with Nicole to try to figure out if I wanted to enroll in this or not, and I ultimately decided not to.
Q Why did you decide not to do the program?
A I didn't believe that being involved with OneTaste anymore was good for me, and I didn't -- certainly didn't want to pay an additional $10,000 to continue being coached by Nicole or enrolling in OneTaste classes. It was already clear to me that my involvement there had cost me dearly, not only financially, but psychologically, and I was just done.
Q What do you mean it cost you dearly psychologically?
A I think my whole world view got like slowly broken down and reshaped until the way that I understood myself and my identity and what reality was was really based on the group think at OneTaste.
Q And how did that impact you psychologically?
MS. BONJEAN: Objection. Asked and answered.
THE COURT: Overruled.

A I didn't have a sense of self anymore. I just -- it is hard for me even now to understand what happened to me while I was there. But it felt like I lost myself, and I lost my perception of reality, and I sacrificed a lot of things in my life for my involvement in OneTaste.

Q I want to show you -- just for the witness, please -- a series of photographs.

Government Exhibit 4601. Do you recognize this?

A I do.

Q And what is this?

A It is a picture Nicole teaching in San Francisco. I believe it is from CP7.

Q And were you there when this photo was taken?

A Yes. I was working back of house.

Q Government Exhibit 4604.

(Continued on the next page.)

BY MS. BENSING: (Continuing.)
Q Do you recognize this?
A It's a picture from the same event of Rob Kandell and Justine Dawson teaching.
MS. BENSING: Government Exhibit 4606.
(Exhibit published to witness only.)
Q What is this?
A This is a picture of Rachel Cherwitz with Rob Kandell at a TurnON event at the offices that OneTaste maintained near 1080.
Q Were you there when this was taken?
A Yes, I took this photo.
Q Government Exhibit 4791, do you recognize this?
A Yes. That's Rachel Cherwitz teaching at the CP7 immersion.
Q Were you there for this?
A Yes, I took this photo.
Q Are these fair and accurate photos of what just described?
A Yes.
MS. BENSING: Your Honor, the Government moves to admit Government Exhibits 4601, 4604, 4606 and 4791 into evidence.
THE COURT: Any objection?
MS. BONJEAN: No objection.

MS. COHEN: No objection, Judge.

THE COURT: Government Exhibits 4601, 4604, 4606 and 4791.

(Government Exhibits 4601, 4604, 4606 and 4791 received in evidence.)

MS. BENSING: If we can briefly publish each of these to the jury, starting with 4601.

(Exhibit published.)

BY MS. BENSING:

Q Is this the photograph of Nicole Daedone that you just testified about?

A Yes.

Q And 4604.

(Exhibit published.)

Q Who are the individuals in 4604?

A Rob Kandell and Justine Dawson on the stage.

MS. BENSING: And if we can pull up Government Exhibit 4606.

(Exhibit published.)

Q Who are these individuals?

A Sitting at the front of the room you have Rob Kandell and Rachel Cherwitz.

Q And 4791?

(Exhibit published.)

A Rachel on stage teaching.

Q I'd like to show you a series of photos that are in evidence.

MS. BENSING: And can we start with Government Exhibit 208?

(Exhibit published.)

Q Do you know this person?

A This is Christina Berkley.

Q And how do you know her?

A I believe she was involved in OneTaste before my time there, but we overlapped in several different self-development communities. I didn't know her very well personally. I would see her posts online.

Q Have you spoken to her since you left OneTaste in December of 2013?

A No.

MS. BENSING: I would like to pull up Government Exhibit 297.

(Exhibit published.)

Q Do you recognize this person?

A I do not.

MS. BENSING: I'd like to pull up Government Exhibit 408.

Q Do you recognize this person?

A This is Michelle Wright.

Q And who is that?

A She worked for OneTaste when I first started getting involved. She was one of the coaches and she was based out of San Francisco and would often come to New York to help with production there as well.
Q Have you spoken to her since you left OneTaste in December of 2013?
A No.
Q I would like to show you Government Exhibit 260.
(Exhibit published.)
Q Who is that?
A This is Lianna Lifson, or something like that.
Q Who is Lianna?
A Lianna worked as a coach for OneTaste and I believe when I was already in New York, they moved her from San Francisco to the Austin community.
Q And have you spoken with Lianna since you left OneTaste?
A No.
Q Government Exhibit 269.
(Exhibit published.)
Q Who is this?
A I don't know who this is.
Q Government Exhibit 228.
(Exhibit published.)
Q Who is this?
A I believe this person has changed her name. I don't

recall the name she's going by now. But this to me is a -- I knew this person as Brooke, and I'm not going to remember the last name. I'm sorry.
Q Who is Brooke?
A Brooke was someone who was in classes at OneTaste when I was working there. She was in a few different cities, but she definitely was in New York for a period of time when I was there and I believe she later got involved in the Sister Goddess community as well.
Q And have you spoken to Brooke since you left OneTaste?
A No.
Q Government Exhibit 404.
(Exhibit published.)
Q Who is this?
A I don't know.
Q Government Exhibit 327.
(Exhibit published.)
Q Who is this?
A I don't know.
Q What prompted you to ultimately leave OneTaste?
A I think I just knew in my heart that it wasn't good for me to be there and just it took me up time to muster up my escape plan.
Q How did you leave?
A I booked a cross-country train ride. I didn't have money

for a last-minute flight. So, I packed up all of my stuff and told them I was quitting. I did not give two weeks' notice. I just let them know that I was out and I was on a train within the next 24 hours.
Q And where did you take the train to?
A To San Francisco.
Q Did there come a time when you communicated with OneTaste leadership after you left OneTaste?
A Yes.
Q How come?
MS. BONJEAN: I'm going to object to hearsay.
THE COURT: Overruled.
A There were still a few events that I volunteered at after I got back to San Francisco. I think I was just -- it was a lot to transition out of such a close-knit community and I still had friends there and I still, on some level, for a while wanted to see if there was a way I could stay involved, stay connected. And, so, for a period of time I was there more, like, on a volunteer basis doing some back-of-house stuff.
Q What did you do after you left OneTaste?
A I was -- I -- I ended up moving in with my best friend's family in Cupertino and I was really lost for a while. I was just kind of trying to rebuild my life and my sense of identity. I took some classes at a community college on

things that had always interested me, like art history and ceramics. And I just kind of focused on building my life up from literally ground zero.

MS. BENSING: May I have one second, Your Honor?

THE COURT: Yes.

(Pause in proceedings.)

MS. BENSING: I have no further questions. Thank you.

THE COURT: Ms. Cohen, any cross-examination?

MS. COHEN: Yes, thank you.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good afternoon.

A Hi.

Q You indicated that you like to be called Max. Is it okay if call you Max?

A Absolutely, yes.

Q I'm Celia Cohen. I represent Rachel Cherwitz.

A Okay.

Q So, I want to go back and talk a little bit about how you first came to OneTaste and a little bit about your background and I understand from your testimony you had a difficult childhood, sorry about some of that -- I mean, all of that.

So you struggled in your childhood but you ultimately put yourself through college?

A I did, yeah.
Q And when you were in high school you raised money to go abroad to Denmark?
A Yes, I was working two jobs in high school and did some fundraising as well for that.
Q It's clear you're a very hard worker; right?
A Yes.
Q And, in fact, you ultimately became a doctor; is that right?
A Yes.
Q And you graduated -- was it 2011, maybe?
A Yeah, I got my BA.
Q From college in 2011. And you were 21 at that time or 22?
A 22.
Q 22 when you graduated, right? And your first job was at a chiropractic clinic in San Francisco?
A My first job after graduation.
Q After graduation?
A Because I had started working at 14.
Q To pay for all of that, right?
And at the clinic you worked after college, what did you do there?
A I was -- my job title was chiropractic assistant, but I sat at the front desk. I basically was the secretary. Helped

people get checked in, insurance, just like admin assistant stuff.
Q As an admin assistant, you would do lots of jobs around the office there?
A Yeah.
Q Ultimately during that first year when you were working after college, you went to a Mama Gena's School course in New York; right?
A Uh-huh.
Q I guess that was -- the course was several months; is that right?
A I think it was about five months.
Q And similar to some of the courses that you testified about today at OneTaste, you had to fly for the weekend to New York for those classes; correct?
A That's right.
Q And you had to pay for those class; is that correct?
A That's right.
Q And Mama Gena's School of Womanly Arts is a women's empowerment course; right?
A Yes.
Q And, in fact, Mama Gena had written a book called *Pussy*; right?
A Yes. She has now, but at not at time, yes.
Q At the end of that graduation that's when you heard

Nicole Daedone speak for the first time; right?
A Correct.
Q And she spoke about women's sexuality; correct?
A Yes.
Q About empowering women right?
A Yes.
Q And she spoke with orgasmic meditation?
A That's right.
Q And that interested you; right?
A Yeah, absolutely.
Q You wanted to explore your sexuality; correct?
A Yeah, I did.
Q And become -- more empowerment, sexuality it's all part and parcel of the same thing at the time; right?
A Yeah. I was interested in feminism and for me that was, like, a radical form of feminism that I was interested in.
Q So you want back to -- well you went back every weekend, but when the class was over you were still living in San Francisco; right?
A Exactly, yeah.
Q You decided to learn more about OneTaste at that point; right?
A That's right.
Q And you went to a how to OM class?
A Yes.

Q And during that class, you learned more about what orgasmic meditation meant; right?
A Yes.
Q And from the very beginning you learned about the nest; right?
A Yes.
Q And you learned that the woman would be clothed only from the waist up during the OM?
A Yes.
Q And you basically learned what it was all about specifically; right?
A I did.
Q And at the end of the class they give you a manual; right?
A Yeah, I'm certain they did. I don't really recall that, but it sounds right.
Q And you said that there was -- I think you said Rob Kandell and Joanna --
A I believe those were the leaders.
Q Would Maya Gilbert have been there?
A Yes.
Q And you knew her from college?
A I did.
Q And so did that also add to anything the OM class for you in your mind? Did that make it more interesting or is it just

a fact that --

A I don't know if it made it more interesting. I think Maya actually tried to sell me the how-to OM class. So she approached me after a TurnON event and maybe tried to sell me books like How to OM or personal coaching with her. Those are two of the offers that we discussed, but I did not agree to pursue a coaching relationship with her and so, if anything, by the time I enrolled in the How to OM class and she had not made that sale, I felt a little awkward around her.

Q You actually went to a TurnON event and then the OM circle; right?

A Yes.

Q Just clarifying that you went to a TurnON and then to the OM circle; right?

A Correct.

Q And after that you began to attend these OM circles; right?

A Yes.

Q And you would go there and do it two times in the morning, right; the OM circle?

A Yes, I would go before work.

Q And you usually had a partner that you were showing up with?

A There would be someone else from the community that I would meet there and typically I would have the first OM

setup, like I would arrange that this is going to be my stroker number one and then we would usually rotate for the second stroker.

Q And sometimes for the second stroker you wouldn't know that person necessarily?

A Correct.

Q And then you -- and you continued to like it; correct?

A Yes.

Q And you liked it so much you took Intro to OM 1 and Intro to OM 2 courses, right?

A I had forgotten that there was a course 2, but it sounds correct.

Q And at one of those courses or maybe both, if you recall, there was a live demonstration of an OM?

A Yes.

Q And, you in fact, felt that it was interesting, but it was also more meditative than sexual; correct?

A Yes. Yeah, I believe it was an awareness cultivating practice that had, like, sexual, like, aspects, but that it was different from sex.

Q When you were first interviewed by the Government --

Do you remember being interviewed by the Government in this case?

A Yes.

Q And the first time was back in 2018. Do you remember

that?
A Yeah.
Q And you, in fact, told the Government that OM was more meditative than sexual. Do you remember that?
A Yes.
Q So after these courses you maintained your interest, right, and you maintained your interest so much that you went to the winter retreat in Santa Cruz, California you said in December of 2013; right?
A 2012.
Q Yes, you're right. Sorry.
A That's okay.
Q So you went to the course in Santa Cruz; is that right?
A Yes.
Q And is that -- did you meet Rachael Hemsi at Santa Cruz or had you met her before?
A I had her before.
Q And you felt very comfortable with her; right?
A I felt very safe with Rachael Hemsi.
Q And during the course at Santa Cruz, you had to do -- you were paying for that course; right?
A Yes.
Q And you had a family friend that has really taken you under their wing; right?
A Yeah. They paid for that class and most of these classes

for me.
Q And you're still friendly with that family?
A They're since deceased.
Q Oh, I'm sorry. During that course that you signed up for and paid for, you OM'd daily at the course; right?
A Yes.
Q And another focus of that program was the twelve-step program; right?
A Yes.
Q And you heard of the twelve-step program from other aspects of life; right?
A Yes. I was familiar with it from a layman's perspective.
Q Because Alcoholics Anonymous uses that twelve-step process, right?
A That's right.
Q And you knew at the time that the twelve-step program was involved in OneTaste?
A Yes.
Q Including the fear inventory; correct?
A Correct.
Q And at the end of that program, again, you obviously loved it, right? You loved the program at the time?
A I had a -- I did have a very good experience at the winter retreat and I felt really connected to the community at that time.

Q And so much that you signed up for the CP6 class; right?
A Yeah. I was, like, I want to be a coach. Let's -- like, I'm all in.
Q You were all in, right?
And that was when you were still living in San Francisco; right?
A Yes.
Q Now the CP6 class was in New York City; right?
A Yes.
Q And that was just like Mama Gena's, you had to fly out to New York City for those classes right?
A Yes.
Q And the CP6 program was a ten-month program; correct?
A Correct.
Q And that went -- this CP6 started in February 2013, does that sound right?
A That sounds right.
Q And so it would have ended about November of 2013; right?
A It did.
Q So, again, you went one weekend a month; right?
A Most months, yeah.
Q Or you were supposed to go. It was available for you each month; right?
A Yes.
Q And that's what you paid for; correct?

A Yes.
Q And you also had your family friend that paid for this class, right?
A That's right.
Q And at first when you first started, you were working at the chiropractic clinic; right?
A Yes.
Q And a couple of minutes in, though, you decided you wanted to quit your job; right?
A I did.
Q And nobody told you to quit your job, right?
A Nobody told me to quit my job.
Q You actually wanted to get hired by OneTaste; right?
A Yeah. I was more interested in being -- the idea of working for OneTaste was more exciting and interesting to me than the idea of working at the chiropractic clinic.
Q Of course, you could have continued to work at the chiropractic clinic, but you made the choice to quit at that time?
A I did.
Q Now, you testified on direct that Rachel told you to come to New York. Do you remember that?
A I do.
Q But, in fact, you were asking to go to New York at the beginning; right?

A That's not how I remember it.
Q You don't remember Rachel saying that -- how intense New York City was and to really think about that?
A I think we had talked about me moving to New York because I had been in New York so much and I had community there and the coaching program was there and the City was really taking off, so I had an interest in going to New York. I did.
Q And do you remember having -- she asked you to write something about why you wanted to go to New York, to make sure you wanted to go?
A I don't recall that.
Q In any event you decided to go?
A Yes.
Q And you testified -- or, sorry. Strike that.
You didn't want to just move to New York City. You wanted to move into the Morellino; right?
A I was moving to New York to take a job for OneTaste so when you worked for OneTaste you lived in the OM house. That was just part of the package.
Q In fact, there were people who worked for OneTaste that didn't live in an OM house; right?
A Nobody that was, like, really inner circle was not living in an OM house.
Q Because you wanted to be in the inner circle?
A I did.

Q And, in fact, the Morellino is where Rachel Cherwitz lived; correct?
A I think they would say she was based in New York for a time, but she was also in L.A. and she would travel and I'm not even sure really where Rachel was living, but for at least a period of time that I was there, Rachel was said to have been living in New York. I'm not sure that she was truly based there when I moved.
Q So, because of her job and her position at OneTaste, she had to travel; right?
A Yes.
Q But she had a place there when she wanted to stay there; right?
A Absolutely.
Q And you also said that the same with Nicole Daedone, if she needed a place to stay, she would also stay in a room at the Morellino on the top; right?
A Yes. Nicole's room was always set up for Nicole and it was Nicole's space for if she was in town and it was usually empty if she wasn't.
Q Right. So you knew that the Morellino was the sort of the center, the hot spot for OneTaste in New York; right?
A I did know that going in.
Q And you could have moved to the Brooklyn OM house, you talked about that?

A I'm actually not sure it had been started at the time I moved to New York, but in any case it made sense for me at the time to move to the Morellino.
Q And no one told you that you had to live at the Morellino in order to work for OneTaste; right?
A I think it was something that was generally understood, but I don't recall anyone, like, sitting me down to tell me that.
Q Okay. So your testimony is you don't know other people that didn't live -- that worked for OneTaste in New York, but didn't live in the Morellino?
A The people who provided labor for OneTaste but were not perhaps on payroll lived in other houses and people who were getting paid by OneTaste lived in the Morellino.
Q That's your understanding?
A Yeah, that's my understanding.
Q Okay. And -- all right, but let's take a -- let me just refresh your recollection. Let me ask you this: Do you remember writing to Kim Howerton on May of 2013 about the Morellino?
MS. BENSING: Objection.
THE COURT: Overruled.
A I don't remember that.
Q And let me just show you something to refresh your recollection.

MS. COHEN: Show the witness 13-AI, Defense Exhibit 13-AI.

And I have -- it's probably going to come up small, Your Honor, so if I could provide a hard copy to the witness.

THE COURT: Sure.

(Counsel approaches.)

THE COURT: Does the Government have this one?

MS. BENSING: I'm looking for it, Your Honor.

MS. COHEN: We can pull it up. It's just for the witness, sorry.

(Exhibit published to the witness, counsel and the Court.)

(Continued on the following page.)

(Continuing.)
BY MS. COHEN:
Q Max, if you could just take a look at this email exchange and let me know when you've had a chance to review it.
A I have had a chance.
Q Okay. And I just want to ask you some questions about that.
Does this refresh your recollection that you requested to move into the Morellino in May of 2013?
A Yes, this refreshes my memory.
Q And, in fact, you specifically asked that -- ideally, you asked to share a room/or rent a bed, right?
A Yes, I wanted to -- I think financially that worked out better for me. And honestly, I don't think anyone had a private room there anyway.
Q But you knew -- you knew that there weren't really private rooms there. Did you not know?
A I knew that there were not private rooms.
Q Okay. So you knew what you were signing up for at the time, right?
A Yes.
Q And, in fact, do you remember that Kim didn't get back to you right away and that she was working on some redefining the move-in rules. Does that refresh your

recollection about that?
A Yes.
Q And then, in fact, a couple weeks went by and you didn't hear again, right?
A That seems to be what's reflected in this correspondence.
Q And you had to reach back out to --
A I did reach back out to Kim Howerton expressing desire to move into the Morellino.
Q And, in fact, you had worked on finding someone to sublet your San Francisco apartment, right?
A Yes.
Q And you were following up because you wanted to make that happen, right?
A Yes.
Q And, in fact, you originally emailed on May 9th, and in addition to asking to move in the Morellino, you -- you wanted to tell Kim Howerton that you were going to be slow in your responses, right, because you were going to be traveling?
A Yes.
Q And, in fact, you were going on a two-week backpack trip at that time, right?
A Yes.
Q And that -- okay.

And at the time, May 9th, you wanted to ideally move in in June, right?
A Yes.
Q Now, at this time you were in CP6, right?
A Yes.
Q And CP6 had a Facebook page, right?
A That's right.
Q And you would post things that the whole CP6 group could look at, right?
A Yes.
Q And that CP6 group would include Rachel Cherwitz, right?
A Yes.
Q And other coaches and people like Eli Block, right?
A Yes.
Q Other executives of OneTaste?
A I assume they all had access to the group.
Q And, in fact, you posted about this trip, the backpack trip. Do you remember that?
A I do not.
Q Okay. Well, let me just show you 13-AE.

MS. COHEN: We'll bring that up just for the witness. I think this should be big enough, the printout, just for the witness, but I'll give you a paper copy.

THE WITNESS: I remember this now.

Q In fact, you testified on direct that you never went on any vacations, right?
A I wasn't working for OneTaste at that time.
Q And at this point -- at this point you had already had it in the works that you were going to be working for OneTaste, right?
A I believe so.
Q Or that at least --
A I had it in the works that I was going to New York, yes.
Q And you were going to need to make some kind of income, right, because you had quit your job?
A Yes.
Q And you wanted to tell everybody in the CP6 class that you were missing the next aversion for this backpack trip in Arizona, right?
A Uh-huh, yes.
Q And you were going with your, you called it your father figure?
A With my legal guardian who, after I was orphaned, was my legal guardian until I turned 18.
Q And he took you on this trip, right?
A Yes.
Q And you told everybody in CP6 about it, correct?
A Yes.

Q And nobody told you not to go, right?
A That's right.
Q And you went on the trip?
A I did.
Q Okay. Now, when you came back, you eventually moved in to the Morellino, right?
A Yes.
Q And we talked about the handbook.
MS. COHEN: We can take that down.
Q We talked about the handbook that was referenced from Kim Howerton. You ultimately received a handbook, right?
A I don't recall that, but I would not be surprised if that was the case.
Q Okay. Well, let me show you what's already in evidence, so we can bring this up for everyone, as Government Exhibit 3500-RW-12.
(Exhibit published.)
Q And we can give you a paper if you can't see it.
MS. COHEN: But if you could blow up the name in the first paragraph. And I'll give it to you.
Q Do you remember this, the residential handbook?
A This looks familiar to me now.
Q These are sort of the rules of moving into the house, right?
A Yes. It says Guidelines to Living in an OM House.

Q And before you moved into the Morellino, you had to agree to all of these rules, right?
A I haven't reviewed the whole document, but I -- I had -- yes, let's just say yes.
Q In fact, that's --
In fact, Kim Howerton had told you, before you were going to move in, that she had to update the house rules, correct?
MS. BENSING: Object -- never mind.
THE COURT: Continue.
A Yes.
Q So in terms of -- I just want to go through this a little bit.
The house rules tell you what the rules of play are at the house, right?
A Yes.
Q And by rules of play, these are sort of like how you're coming in here and these are the things that --
MS. COHEN: I'm looking at the next paragraph. Sorry, the rules of play.
Q These are sort of like, hey, you're moving in here and this is what we're all about, right? It tells you what an OM house is intended for, right? It's intended for adults, spiritual, emotional, psychological, and physical adults, and it reminds you that you're moving in because you want

something deeper, right? Is that what it says?
A Yes.
Q A deeper sense of your orgasm, right?
A Yes, it says that.
Q Yeah. And that's one of the reasons you wanted to move in, too, right? You wanted to have a deeper sense of your orgasm, right?
A Yes.
Q That's what --
A That's what it was all about.
Q That's what it was all about, right. Okay.
And it also tells you that the nature of this work is that on your path to search for these things, you will be confronted, right?
A Yes.
Q In fact, you were confronted. That's part of the rules of play, right?
A Yes.
Q And at some point you'll probably want to blame the other people around you for your experience. It tells you that, right?
A I'm looking for where it might say that, but --
Q Sorry. It's the fourth sentence: At some point, you'll probably want to blame the people --
A Oh, there you go.

Q Yeah, yeah, right? And this is because you're agreeing to move into a house with people you don't know that well, right?
A Yes.
Q And you were agreeing to share a bed with someone you don't know, right?
A I agreed to that.
Q And you took that step because you were wanting to do the things that OneTaste had to offer, right?
A Yes.
Q And part of that was pushing boundaries, right?
A Yes.
Q I mean, let's face it, not everybody would move in and it's not for everybody, right?
A Sure.
Q And when one moves in to a house with people they don't know, problems arise, correct? Well, let me rephrase that.
When you don't know someone and you live with them, you can often have arguments, right?
A It was not --
MS. BENSING: Objection.
THE COURT: Overruled.
A It was not surprising that there was friction in the community.
Q Right. In fact, in a community that's focused on

orgasm and sexuality, it would also, I imagine, create a lot of jealous between people, right?
A That was an aspect of some people's experience.
Q And people wanted to be in the inner circle, as you said, right?
A Yes.
Q And so there was a lot of competitiveness between people, right?
A That's true.
Q And in the Morellino, they say you'll likely be up against your demons, right?
A Yes.
Q Because again, you're signing up to get your boundaries pushed, right?
A Yes.
Q Okay. And then the reason they have these rules, it explains, is that these rules of play help us remember, right, that we're coming into the house, you're coming in fully by your own volition, right? And being ready to take responsibility for your own experiences, right?
A That's right.
Q And that was important for everyone moving in to know that, correct?
A Yes.
Q Okay. Another thing, if we can go to the next

paragraph, another requirement was that everyone in the house stay connected no matter what. Do you see that?
A Yes.
Q And you talked about, on direct examination, about having to be on these text chains, right?
A Yes.
Q And that was actually a requirement of living in the Morellino, correct?
A Staying connected at all times was part of what was expected as someone living in the house and someone working for OneTaste.
Q Right. And the reason why the Morellino said that you have to stay connected is because of the process by which you're going through at OneTaste, right? Let me -- that was confusing.
I mean, it describes, it says:
Usually when we get angry, confronted, embarrassed, or rejected, we disconnect.
That's typical. That happens with people, right? You don't want to face things, you're embarrassed and you don't want to communicate with someone. That happens a lot, right?
MS. BENSING: Objection to the form.
THE COURT: Sustained.
Q What do you think that means: Usually when we get

angry, confronted, embarrassed, or rejected, we disconnect?
A I think that's human behavior at times and it was what we were there to try to -- we were trying to do something different. We were trying to stay connected.
Q Exactly. Because if you don't want to connect with these people, again, you wouldn't move in there, right?
A Right.
Q And part of the reason you wanted to move in there is because you wanted a sense of community, right?
A I did.
Q And you wanted a sense of belonging, right?
A I did.
Q And, in fact, OneTaste, for a while when you were there, gave you that sense of belonging, right?
A I don't know that I ever truly felt like I belonged, but it did give me community.
Q Okay. Well, you testified on direct that you had a lot of friends there, right?
A I'm not sure that I did, to be honest. I don't -- I had a lot of acquaintances. I was connected to a lot of people, but I actually felt like I had precious few friends at OneTaste.
Q Okay. Well, one of the reasons you were there, though, was to try and get more friends, get part of a community, right?

A Yes. I wanted -- I wanted to belong to a community.
Q And you understood that that was a reason why at the Morellino, they wanted its residents to stay connected, correct?
A Yes.
Q And you agreed to let other people know when your feelings were hurt, right?
A Yes.
Q When you're mad, right?
A Yes.
Q And when you loved them, right?
A Yes.
Q And they wanted you, you know -- if you're just not keeping communication with people, you're not being connected and part of community, right?
A Yeah, you couldn't -- you couldn't disappear or not be available. You had to be open for connection.
Q Right. Because that was the point of it, correct?
A Yeah.
Q All right. Now, the next paragraph --
MS. COHEN: Your Honor, could I just get my water?
THE COURT: Yes, of course.
Q The next paragraph, use safe words. And what are safe words?
A I think the common example is green, yellow, red. I

think this is borrowed from the kink community where people would have maybe intense sexual scenes and it was a way to communicate, like, red is stop, yellow is I'm getting really uncomfortable, we need to change something, and green is, like, I'm good, go ahead.

Q And those words were important at OneTaste, right?

A I mean, they're here in this document. I don't recall people really -- there might -- there were times when I think I said I'm at red right now, but I don't know that people were using these terms every day.

Q Okay. But certainly at the coaching program, before certain exercises, they would give you these instructions, green, yellow, red, right?

A This is something I'm familiar with from a lot of the documents, you know, that they would give to attendees and people who would enroll in classes and evidently people who would live in their community house.

Q When you first went into the coaching program, you learned about, I'll find the word -- contain, right, about safe container. The do you remember that?

A Yes.

Q You do you remember, you actually spoke about it at the beginning of the coaching program.

A I don't remember that. That was 13 years ago, so yeah.

Q Well, tell us what that means, to have a safe

container.
A I mean one of --
MS. COHEN: Hold on. I might not have the phrase --
Q Do you know what I'm talking about, container?
THE COURT: Take a minute if you need it.
MS. COHEN: Yes.
(Pause in proceedings.)
Q I think it's safe porting within a container. Does that ring a bell?
A Sure, yeah, safe porting is familiar. Having a contained experience. Both of those are familiar concepts to me.
Q And you had told the class, in fact, what I was saying, that the safe container is a valuable thing.
A Absolutely, right.
Q And that's so you can set up an expectation of what's going to happen, right?
A Yeah. The idea was your vigilant center could relax if the container was safe enough, and you'd be able to actually surrender to the experience.
Q And it allowed you within that container to play safe, right?
A That was the intention.
Q Well, actually, and you said those words at the CP6

course. Do you remember that?
A I don't know what you're referring to, to be honest.
Q Okay. Well, I'll come back to that.
But a container is sort of the parameters of where we're going to be, right? So if you have an OM, there's certain parameters by which you practice in, right?
A Yes.
Q And safe porting is another sort of word. Do you know what that means?
A Yes. The way it was taught to me in the How To OM class is someone might tell you, like, I'm going to touch your thighs now, I'm going to touch your pussy now, and that was -- those are examples of safe porting.
Q Yes, okay.
So getting back to the handbook, the handbook, as we said, lays out these safe words that allows you to play, right? That's what it says.
A It says Rules of Play, yes.
Q That the house is a place for us to play, right?
A Yes.
Q And that's because at the house, you're going to regularly be doing OM practice, right?
A Yes.
Q So let's go to Be Responsible For Your Own Journey, on the second page. And the rules also tell you, make it clear

that you have decided that you want to live in this dynamic, orgasmic house, right? Right, that's what it says?
A Am I looking in the right spot?
Q The second page, Be Responsible For Your Own Journey --
A Oh, sorry, right at the top, yes.
Q Yeah, yeah. And that you had to take responsibility for everything that it means, right?
A Yes.
Q And that you had to keep track of your practices and keep your commitments, right?
A Yes.
Q And that these are the things that will get you what you want, right?
A Yes.
Q Because you're signing up to reach a goal, right? And, in fact, you know, in medical school it's similar, right, in a way? You have to -- you sign up to become a doctor, right? Or sign up --
A I'm not sure what the correlation is there, but --
Q No, I'm just asking you generally that in life, when you have a goal, you have to do the things to meet that goal, right?
A Yes.
Q And your goal at this point, again, was connection, awakening, I think you said spirituality, right?

A Yeah. I was looking for a sense of personal empowerment.
Q And so you wanted to move into the Morellino and do the things that you were supposed to do to reach those goals, right?
A Yes.
Q Okay.
Now, and then the house also has a procedure to, in the next paragraph, Program Application Procedure, and that's, you know, you can't come into the Morellino without taking a How To OM course, right? I mean, you can't walk off the street and say I'd like to be in this house, right?
A That's right.
Q Because you have to know what you're signing up for, correct?
A I mean, I guess that's the intention of this document, is to let people know what they're signing up for.
Q And that makes sense, right? Because if you went into the Morellino and didn't know about OMing, you would have pretty -- it might be shocking, right?
A Yeah, and I think everyone was there to cultivate their practice. That's why they were choosing to live in community.
Q Right. So if we go down to the Residential Practice, and just that whole last few paragraphs, again, you're

agreeing that orgasm is the basis of all activities, right?
A It says that. It says that there, and that was something I believed at the time when I moved in.
Q Yes. In fact, you did daily practices, as you were supposed to, right?
A Yes.
Q Because again, you're trying to reach a goal, right?
A Yes.
Q Okay. And the house also required you to take on a service project, right?
A I'm reading this now. Sorry, it's been a while since I've seen this.
It says that. I don't really recall people doing service projects other than just volunteering for OneTaste.
Q And then movement. You had an increased amount of energy, right, living in an OM house?
A Uh-huh.
Q And that movement keeps you sane and has your body feeling good, and so therefore, they recommended Bikram, right?
A Yes.
Q And you knew when you moved in you would be doing Bikram, right?
A I did.
Q And Bikram is beneficial, right?

A I believe yoga is beneficial.

Q Okay. And at the time, did you believe Bikram was beneficial?

A I did.

Q And so you thought you were doing good by doing Bikram, right?

A Yeah. I was exercising, and exercising is good for me.

Q And lots of people do Bikram, right?

MS. BENSING: Objection.

THE COURT: Yes, sustained.

Q On the next page, Fear Inventory, we already discussed this. You were required, being in the house, to also do fear inventory, right?

A Yes.

Q And that was sort of, as we discussed, part of the 12-step program, right?

A Yes.

Q And the purpose of that is to get things out, right, that maybe are bothering you or that you're fearful about, right?

A Yes. I think it was a way to process our fears and resentments.

Q And again, part of this sort of feeling opening up and awakening, right?

A Yes, I think that's fair.

Q In fact, once you read your fear inventory out, you're supposed to rip them up, right?
A Yes.
Q Get rid of them because it's like a release of the things you're getting off your chest, in a way?
A We were not meant to hold on to those.
Q Right.
THE COURT: Ms. Cohen, I don't want to go more than about five minutes. So if you have a few more questions --
MS. COHEN: I'll just finish up on a couple of questions, if that's okay.
THE COURT: Of course.
Q And, of course, on the last page -- and you probably will remember this without me going there -- but if we go to the last page, there were no drugs or alcohol in the house allowed, right?
A Yes.
MS. COHEN: Your Honor, this is a good -- do you want me to --
THE COURT: That's fine.
MS. COHEN: Before I move on to another topic.
THE COURT: I think that's fine.
The witness can step down.
(Witness leaves the stand.)

THE COURT: So same plan for tomorrow. If you could make sure you're here by 9:15 so that we could start at 9:30.

Same instructions that I've been giving you throughout the trial. Just enjoy your evening. Don't discuss the case with anyone, including your fellow jurors. If anyone approaches you and tries to discuss the case with you, please let me know through Mr. D'Agostino. Don't read, listen to, watch any news or other media reports of the trial. Don't conduct any independent research about the case, the matters in the case, or the individuals involved in the case. Don't talk to the parties, the attorneys, the witnesses about anything. Keep an open mind.

I appreciate your attentiveness today, as always. Have a great evening. We'll see you in the morning.

(Jury exits.)

(Continued on the following page.)

(Open court; no jury present.)

THE COURT: Everyone can be seated.

What's the lineup for tomorrow? I know this witness obviously is still on.

MS. BENSING: So this witness. I think we still anticipate calling Chris Kosley. There's another victim witness. And then we may get to an individual named Ken Blackman.

THE COURT: Okay. And the only other issue, I guess, is that the parties will propose a limiting instruction? You can -- we can do that in the morning.

MS. BENSING: And, Your Honor, just one quick thing, just, again, if we can coordinate with the witness on travel. We obviously won't discuss anything substantive.

THE COURT: That's fine. That's fine.

I have some additional questions, and we don't need to take this up at length now, but I do have some additional questions on the issue of the text messages that the government is seeking to introduce. I have had more time since this morning to look at the submission.

And, of course, I don't have the entirety of the response from OneTaste, of course. There's no reason I would, to the subpoenas. But the subpoenas called for certain information that I think is maybe relevant to this inquiry, and I am wondering whether that was provided.

MS. FARRELL: Sorry.

THE COURT: Sure.

MS. FARRELL: Provided by whom?

THE COURT: I am not intending to be cryptic. Give me a moment here, though, just to flag for you.

So, for instance --

MS. FARRELL: If you can just give me one moment to pull it up, Your Honor.

THE COURT: Of course.

MS. FARRELL: Sorry.

THE COURT: No, that's fine.

And while you're doing that, the two filings that the government made, one yesterday and one this morning, which I mentioned this morning were sealed, at this time, I find it appropriate to maintain those under seal, I find, given the content of the materials, and I would cite you to the *Lugosch* case, which I have cited the parties to many times before. But at this time, I find those proper to maintain under seal.

Do you have the documents up?

MS. FARRELL: I do, Your Honor. If you can just tell me which one you are referencing.

THE COURT: So, for instance -- I will do it by ECF number -- page number, rather. So ECF 378-2.

MS. FARRELL: Because it is under seal, I can't actually tell which one it is.

THE COURT: Oh, okay. Let me do it a different way then.

MS. FARRELL: If you give me the date of the --

THE COURT: Sure, sure.

I am not sure what date now you are asking me for. It is the first document that's not the letter.

MS. FARRELL: Understood.

THE COURT: It is the -- there's a subpoena, and then it's page -- paragraph 9. Let's just say paragraph 9 of that subpoena, the first document there after the cover letter. And it references the company should provide a narrative description of the company's efforts to identify and collect documents responsive to the subpoena and identify which third party, and then it goes on.

So what I am asking now is, was that done, and are there documents along the lines of what efforts were made?

MS. FARRELL: By the government or by the --

THE COURT: By the company. I am asking, the subpoena called for certain information, including what's in paragraph 9. And what I'm asking, was that ever complied with?

MS. FARRELL: I do not believe so, Your Honor.

THE COURT: Okay. And I think I have the same question on paragraph -- a bit of a different question.

Paragraph 7 of that same document. So paragraph 7

of that same document talks about if the company has any knowledge of, and it lists a bunch of things, including alteration.

Was there anything provided by the company in response to this subpoena that addresses this paragraph?

MS. FARRELL: I do not believe so, Your Honor. The reason I am saying "I do not believe so" as opposed to "know" is because I was not on the case at the time. I have reviewed the materials, but I am slightly hedging just because I --

THE COURT: That's fine. Can you please review the materials again, having been informed by my questions now?

MS. FARRELL: Yes.

THE COURT: And then we can --

MS. FARRELL: I'm fairly confident in both of those answers, but just so you know, that's like the slight caveat --

THE COURT: That's fine.

MS. FARRELL: I will review it. If there's any reason to amend my answer, I will. But that's just to --

THE COURT: Okay. So, essentially, then, if that's the case, it sounds like there was not compliance with the subpoena. At least not fully. Is that right? At least with respect to paragraph 9.

MS. FARRELL: Well, if there is, in fact, any loss, destruction -- oh, I see what you mean.

THE COURT: Paragraph 9.

MS. FARRELL: Correct, Your Honor.

THE COURT: Okay. Anyway, I leave you with that, but it sounds like there's still some witnesses to get to before we get to this particular issue; is that right?

MS. BENSING: Yes. And on that note, Your Honor, I know that the Court has the video subexhibits that we have provided to the Court.

And I did flag yesterday, I think, but I am just losing my memory a little bit. So I just want to make sure that I also flagged for the Court that we will be seeking to introduce text message subexhibits of, for example, 4506, 4507, which we have also provided to the Court. And 4504, I believe, is the third one. But I just wanted to let the Court know I don't think there's agreements between the parties, and so there may be objections. I will -- we can take them at the time --

THE COURT: But that's separate from what was produced by OneTaste, correct? Those text messages?

MS. BENSING: Completely. This is completely separate, just for the witness tomorrow.

THE COURT: Okay. So it's the witness -- text messages involving the witness.

MS. BENSING: Yes, yes, yes. His own text messages.

MS. BONJEAN: That's right, Your Honor. And we will

have objections. I also just want to flag for the Court that there are conversations related to, potentially, to Ayries Blanck, and we do see that as -- I don't know what they're intending on eliciting, but to the extent that there is going to be a narrative presented without -- direct testimony from her, we think there's a possibility that that door can be opened to a line of inquiry. I guess we can cross that bridge, but --

THE COURT: What's the testimony that you are anticipating, Ms. Bonjean, that this would be a response to?

MS. BONJEAN: I think the government has indicated that they may intend to elicit testimony about -- I don't know -- I don't think it was through this witness, obviously, we didn't hear about it, but there are text messages, I believe, related to Ms. Blanck that may have been between Mr. Kosley and Ms. Daedone.

But the government can correct me if I am wrong, if they have switched gears, or if they are still intending to go down that inquiry.

MS. BENSING: Your Honor, there are some -- well, first of all, I think that witnesses can obviously testify to what they personally observed involving individuals who are relevant to this case.

THE COURT: Right.

MS. BENSING: We are not seeking to introduce any

kind of -- and I think we have been quite careful, actually, not to seek to introduce any kind of hearsay statements that may have come to these witnesses through Ms. Blanck.

There is one of the exhibits for the witness Kosley that reference -- I would need to -- I just would want to go back and look at the exact language, Your Honor, but it references Ayries Blanck. We would not be seeking to -- the purpose of introducing these text messages is simply for Ms. Daedone's statements. The rest of it is coming in for either completeness or if it is hearsay within hearsay, not for its truth whatsoever, but for the effect on the listener, and then raising concerns with Nicole Daedone.

So I don't think we tread into dangerous territory, but I will talk to Ms. Bonjean about it, and, obviously, we are happy to take any guidance from the Court as well.

MS. BONJEAN: To the extent that they are trying to use it to show that Ms. Daedone was on some notice about an incident with Ms. Blanck, then that does open the door to the Ms. Blanck story. That's what I think --

THE COURT: I don't know what you are talking about, frankly. I understand the arguments you are making, but without the evidence being put before me or the potential evidence, I am not going to be able to give you guidance.

MS. BONJEAN: Okay.

THE COURT: So if you want to direct me to a

particular document, I can look at it this evening, but other than that, I can't really do much for you right now, but I am hearing your dispute here.

MS. BENSING: Yes, Your Honor.

I do think we will have disputes about this subset, particularly with Government Exhibit 4504. There's a series of subsets, I believe it is A through F. And then Government Exhibit 4506, which is text message correspondence with the defendant Rachel Cherwitz. I believe we also may have disputes about that tomorrow, which is just 4506-A through -- I believe it may also be F.

THE COURT: So 4504, A through F. 4506, A through F.

MS. BENSING: I believe so. I can -- if there's any amendment to those letterings, I can e-mail.

THE COURT: Okay. And they are texts with Kosley; is that right?

MS. BENSING: Yes. Mr. Kosley, defendant Daedone, is the 4504 series.

THE COURT: Okay.

MS. BENSING: Mr. Kosley and defendant Cherwitz is the 4506 series.

And then there are also some texts between Mr. Kosley and Joanna Van Vleck, which is the 4507 series, and it's the subexhibits of the 4507 series, I think, that may

come up tomorrow.

THE COURT: Okay. But these are not texts with Ms. Blanck; is that correct?

MS. BENSING: No.

THE COURT: Okay.

MS. BONJEAN: They are talking about --

THE COURT: No, I understand. Okay.

All right. I will take a look at them.

MS. BENSING: And I think that's -- apart from the videos, I hope that that's the only other issue that we just wanted to flag for the Court tonight so that we are in a position --

THE COURT: Sorry, what do you mean besides the video, other than the video?

MS. BENSING: Oh, just as we've already flagged for the Court, the disputes about the video exhibits that the Court has already looked at.

THE COURT: Okay. Remind me. I thought the video was an issue of completeness?

MS. BONJEAN: No, not just of completeness. The videos that they have identified, there are --

THE COURT: Well, you have raised some --

MS. BONJEAN: Relevance --

THE COURT: Right. Relevance, foundation, that kind of thing. But we talked about this this morning. There's

nothing else, right?

MS. BENSING: Yes. There's nothing else. I apologize.

THE COURT: That's fine.

MR. ROBOTTI: Judge, one minor housekeeping matter.

THE COURT: Yes.

MR. ROBOTTI: So we filed a letter, which was not filed as a motion, for electronic access for one attorney and one paralegal.

THE COURT: Yeah. Remember I dealt with that the other day, and I denied it without prejudice to renewal?

MR. ROBOTTI: Yes. We spoke to your clerk. And our understanding is there's no way to file this as a motion on the docket. And so we were going to file it again as a letter, but we wanted to confirm that with you before we did so.

THE COURT: What's the "it" that you're going to file? What are you giving me?

MR. ROBOTTI: Just a renewed letter request for one of our attorneys and a paralegal --

THE COURT: There's no way to file it as a motion? All right. I won't go behind the electronic case filing system. That's fine. Put it in as a letter and I'll --

MR. ROBOTTI: Thank you, Judge.

THE COURT: That's fine.

MS. COHEN: We won't do it again.

THE COURT: Okay.

All right. We will see everybody tomorrow at 9:30, or maybe a few minutes before. I guess if you have a proposed limiting instruction that you want to agree on, or maybe not agree on, but you want to write it, you can hand it to Mr. D'Agostino maybe earlier than 9:30, and that may be most efficient.

MS. BONJEAN: Sure.

MS. COHEN: Thank you.

THE COURT: Okay. Have a good evening, everybody.

(At 5:38 p.m., proceedings were adjourned until Thursday, May 15, 2025, at 9:30 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **DANA GILL** | |
| CONTINUED CROSS-EXAMINATION BY MS. BONJEAN | 1526 |
| REDIRECT EXAMINATION BY MS. GUPTA | 1579 |
| RECROSS-EXAMINATION BY MR. ROBOTTI | 1609 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 1623 |
| **MARGARET K. PIXLEY** | |
| DIRECT EXAMINATION BY MS. BENSING | 1637 |
| VOIR DIRE EXAMINATION BY MS. BONJEAN | 1728 |
| DIRECT EXAMINATION (cont'd) BY MS. BENSING | 1731 |
| CROSS-EXAMINATION BY MS. COHEN | 1750 |

E X H I B I T S

| | |
|---|---|
| **Government Exhibit 215** | **1656** |
| **Government Exhibit 234** | **1660** |
| **Government Exhibit 286** | **1660** |
| **Government Exhibit 413** | **1693** |
| **Government Exhibit 2676** | **1700** |
| **Defense Exhibit 13-AO** | **1705** |
| **Government Exhibit 2604** | **1732** |
| **Government Exhibit 4609** | **1738** |
| **Government Exhibits 4601, 4604, 4606 and 4791** | **1745** |