Celia A. Cohen
Kelly Lin
BALLARD SPAHR LLP
1675 Broadway
19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

Attorneys for Rachel Cherwitz

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                   :

UNITED STATES OF AMERICA,         :  Case No. 23-CR-146 (DG)
                                   :

           Plaintiff,      :  **SENTENCING MEMORANDUM ON**
                                   :  **BEHALF OF RACHEL CHEROWITZ**

       vs.                  :
                                   :

RACHEL CHERWITZ AND NICOLE DAEDONE, :
                                   :

         Defendants.     :
                                   :
-----------------------------------------------------------------X

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

ARGUMENT .........................................................................................................9

I.    The Proper Guidelines Range is 21 to 27 Months ............................................9

    A.    The Base Offense Level for Sexual Abuse Is Inapplicable ...................13

        1.    Rachel Did Not Have the Required Intent to Establish Sexual Abuse ...........................................................................................14

            a.    The Analysis of Intent Must Begin with the Context of the OM Practice for Serious Practitioners ...........................14

            b.    Rachel's Intent at the OM Demonstration Was to Train the Practitioners .............................................................17

            c.    Rachel Could Not Have Known That Ms. Halpern Did Not Consent ...................................................................18

        1.    The Mechanics of Orgasmic Meditation Does Not Meet the Definition of a "Sexual Act" ...............................................21

        2.    The Sexual Abuse Enhancement Should Also Be Rejected Because There Was No Coercion by Means of a Fear of Imminent Bodily Harm ...........................................................................................22

        3.    Because the Jury Did Not Make a Specific Finding of Sexual Abuse, the Enhancement Under § 2H4.1(b)(4)(B) Should Not Apply ..........................................................................................24

        4.    The Jurisdictional Element of Sexual Abuse Under 18 U.S.C. § 2242 Cannot Be Met ...............................................................26

        5.    The Government Failed to Provide Notice of Its Sexual Abuse Allegations .................................................................................30

    B.    The Offense Characteristics Enhancements Under § 2H4.1 Do Not Apply .........32

        1.    The Enhancement Under § 2H4.1(b)(1)(B) Should Not Apply Because There Is No Basis to Find Serious Bodily Injury Occurred .......32

        2.    The § 2H4.1(b)(3)(A) Enhancement Should Not Apply Because There Was No Finding That Victims Were Held in a Condition of Involuntary Servitude for More Than One Year......................................34

            a.    The Enhancement Should Not Apply to a Conspiracy Conviction..................................................................34

            b.    The Facts Here Do Not Align with Cases in Which Courts Have Applied This Enhancement ..............................35

            c.    Even If the Enhancement Were to Apply, the Requisite Time Period Has Not Been Established........................38

    C.    Rachel Was Not an Organizer, Leader, Manager, or Supervisor Under § 3B1.1..............................................................................................38

        1.    The Four-Level Enhancement Does Not Apply .......................39

        2.    The Two- and Three-Level Enhancements Do Not Apply.......................41

D.      A One-Point Reduction Should Apply to Take Into Account the "Trial Penalty"............................................................................................42
E.      Rachel Is a Zero-Point Offender ...............................................................43
F.      Rachel Is Entitled to a Downward Departure Under § 5H1.11 ............44

II.     Rachel Should Receive a Sentence of Time Served .........................................45
A.      Section 3553(a) Factors .............................................................................46
        1.      Rachel's History and Characteristics .........................................46
                a.      Rachel Has Continued Her Commitment to Helping Others at the Metropolitan Detention Center .............................53
        2.      Nature and Circumstances of the Offense ..................................54
        3.      The Need to Avoid Unwarranted Sentencing Disparities.........56
                a.      Defendants Convicted of the Substantive Forced Labor Offense Have Received Significantly Shorter Sentences Than the 188 Months That Probation Recommends....................57
                b.      The Two Post-Booker Cases Sentenced Under U.S.S.G. § 2H4.1 with the Same Total Offense Level and Criminal History Category as Rachel Have Been Sentenced to Less Time than Probation's Recommendation.......................................61
                c.      Defendants Convicted of More Egregious Conduct Have Received Significantly Lighter or Comparable Sentences to the Guidelines Probation Seeks to Impose....................................62
        4.      Affording Adequate Deterrence and Protecting the Public ...................67
                a.      Specific Deterrence and Protecting the Public.............................67
                b.      General Deterrence .......................................................................70
        5.      The Kinds of Sentences, Sentencing Range, and Pertinent Policy Statements in the Guidelines.........................................................71
        6.      Seriousness of the Offense and Just Punishment.......................72
        7.      Restitution ...................................................................................73

CONCLUSION.......................................................................................................78

# TABLE OF AUTHORITIES

***CASES***

*Aleutian Cap. Partners, LLC v. Scalia,*
    975 F.3d 220 (2d Cir. 2020)..................................................................... 27

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009)............................................................................... 18

*Gall v. United States,*
    552 U.S. 38 (2007)................................................................................... 9

*Gozlon-Peretz v. United States,*
    498 U.S. 395 (1991)............................................................................... 27

*Headley v. Church of Scientology Int'l,*
    687 F.3d 1173 (9th Cir. 2012) ......................................................... 55, 57

*Kisor v. Wilkie,*
    588 U.S. 558 (2019)......................................................................... 27, 28

*Koon v. United States,*
    518 U.S. 81 (1996)................................................................................. 44

*Liparota v. United States,*
    471 U.S. 419 (1985)......................................................................... 18, 19

*Muchira v. Al-Rawaf,*
    850 F.3d 605 (4th Cir. 2017) ........................................................... 56, 57

*Pepper v. United States,*
    562 U.S. 476 (2011)............................................................................... 45

*Rehaif v. United States,*
    588 U.S. 225 (2019)............................................................................... 18

*Stinson v. United States,*
    508 U.S. 36,  38 (1993).......................................................................... 27

*Tegete v. Maryknoll Sisters of Saint Dominic, Inc.,*
    2023 WL 2504744 (2023)................................................................. 56, 57

*United States v. Raniere*,
No. 18-cr-204 (E.D.N.Y. Oct. 27, 2020) ................................... 36

*United States v. Chaudhri*,
No. 3:19-cr-85 (E.D. Va. Jan. 23, 2023) ................................... 61

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) .............................. 2, 53

*United States v. Bandrich*,
636 F. App'x 65 (2d Cir. 2016) ........................................... 40

*United States v. Barker*,
771 F.2d 1362 (9th Cir. 1985) ............................................ 46

*United States v. Benjamin, (JPO)*,
2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ........................ 56

*United States v. Booker*,
543 U.S. 220 (2005) ........................................................... 61

*United States v. Botsvynyuk*,
552 F. App'x 178 (3d Cir. 2014) ................................... 25, 40

*United States v. Calimlim*,
538 F.3d 706, 709 (7th Cir. 2008) .................................... 59

*United States v. Calimlim*,
No. 1:04-cr-248 (E.D. Wisc. June 9, 2009) ..................... 57, 58

*United States v. Callahan*,
801 F.3d 606 (6th Cir. 2015) ....................................... 25, 35

*United States v. Canova*,
412 F.3d 331 (2d Cir. 2005) .............................................. 53

*United States v. Comb*s,
1:24-cr-542 (S.D.N.Y.) ....................................................... 62

*United States v. Corea*,
No. 4:05-cr-468 (S.D. Tex. May 12, 2008) ......................... 61

*United States v. Dann*,
4:08-cr-390 (N.D. Cal.) ...................................................... 58

*United States v. Dann*,
  652 F.3d 1162 (9th Cir. 2011) .................................................. 35, 60

*United States v. Dauray*,
  215 F.3d 257 (2d Cir. 2000) ........................................................ 24

*United States v. Days*,
  No. 1:19-cr-619 (CM) (S.D.N.Y. May 12, 2021) .......................... 67

*United States v. Destine*,
  2024 WL 1479777 (E.D.N.Y. Apr. 4, 2024) .................................. 40

*United States v. DiMattina*,
  885 F. Supp. 2d 572 (E.D.N.Y. 2012) .......................................... 53

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010) ........................................................ 45

*United States v. Douglas*,
  713 F.3d 694 (2d Cir. 2013) ........................................................ 46

*United States v. Elias*,
  No. 1:22-cr-317 (E.D.N.Y. Apr. 22, 2024) .................................... 67

*United Ermichine*,
  2002 WL 869825 (S.D.N.Y. May 3, 2002) ................................... 10

*United States v. Fishman*,
  2025 WL 2692069 (2d Cir. Sept. 22, 2025) ............................ 24, 29

*United States v. Granados-Corona*,
  No. 1:16-cr-324 (S.D.N.Y. Sept. 15, 2022) ...................... 36, 63, 66

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) .......................................... 68

*United States v. Hernandez-Velazquez*,
  No. 1:19-cr-306 (E.D.N.Y. July 10, 2025) ............................... 63, 66

*United States v. James*,
  151 F.4th 28 (2d Cir. 2025) ........................................................ 39

*United States v. Jenkins*,
  854 F.3d 181 (2d Cir. 2017) ........................................................ 45

*United States v. Kelly*,
    No. 1:19-cr-567 (N.D. Ill. Mar. 7, 2023) ...................................... 63, 66

*United States v. Lanier*,
    520 U.S. 259 (1997) .......................................................................... 24, 56

*United States v. Lemley*,
    No. 8:20-cr-33 (D. Md. Sept. 30, 2021) ........................................... 63, 66

*United States v. Maksimenko*,
    2007 WL 1834708 (E.D. Mich. June 25, 2007) ..................................... 25

*United States v. Malik*,
    424 F. App'x 122 (3d Cir. 2011) ............................................................ 73

*United States v. Maxwell*,
    No. 1:20-cr-330 (S.D.N.Y. June 29, 2022) ....................................... 63, 65

*United States v. McEwen*,
    No. 7:25-cr-193 (S.D.N.Y. Oct. 30. 2025); ...................................... 63, 65

*United States v. Merchant*,
    No. 1:18-cr-527 (S.D.N.Y. Oct. 12, 2021) ........................................ 64, 66

*United States v. Ministro-Tapia*,
    470 F.3d 137 (2d Cir. 2006) ................................................................... 46

*United States v. Morgan*,
    No. 1:19-cr-209 (S.D.N.Y. May 8, 2020) ............................................... 67

*United States v. Nadirashvili*,
    655 F.3d 114 (2d Cir. 2011) ................................................................... 10

*United States v. Paccione*,
    202 F.3d 622 (2d Cir. 2000) ................................................................... 40

*United States v. Parkins*,
    935 F.3d 63 (2d Cir. 2019) ............................................................... 23, 28

*United States v. Pukke*,
    No. 1:23-cr-168 (S.D.N.Y. Sept. 22, 2025) ............................................ 66

*United States v. Ragano*,
    No. 1:24-cr-50 (E.D.N.Y. Mar. 19, 2025) ......................................... 63, 66

*United States v. Rainford*,
110 F.4th 455 (2d Cir. 2024) ................................................. 27

*United States v. Ramirez-Granados*,
No. 1:11-cr-557 (E.D.N.Y. Feb. 24, 2017) ............................... 64, 65

*United States v. Rioux*,
97 F.3d 648 (2d Cir. 1996) .................................................. 53

*United States v. Sabanani*,
2:07-cr-429 (E.D.N.Y.) ....................................................... 58

*United States v. Sabhnani*,
599 F.3d 215, 228 (2d Cir. 2010) ................................. 35, 59, 60

*United States v. Serafini*,
233 F.3d 758 (3d Cir. 2000) ................................................ 45

*United States v. Stewart*,
590 F.3d 93 (2d Cir. 2009) .................................................. 68

*United States v. Tavberidze*,
No. 1:23-cr-585 (S.D.N.Y. Mar. 4, 2025) ............................. 63, 64

*United States v. Tavberidze*,
769 F. Supp. 3d 264 (S.D.N.Y. 2025) ................................ 13, 42

*United States v. Toure*,
965 F.3d 393 (5th Cir. 2020) ............................................ 57, 59

*United States v. Vigil*,
476 F. Supp. 2d 1231 (D.N.M. 2007) ..................................... 73

*United States v. Wardlaw*,
576 F.2d 932 (1st Cir. 1978) ............................................... 46

*United States v. X–Citement Video, Inc.*,
513 U.S. 64 (1994) ............................................................ 18

*In re Winship*,
397 U.S. 358 (1970) ........................................................... 43

## US CONSTITUTIONAL PROVISIONS

Amendment VI ...................................................................... 30

## FEDERAL STATUTES

18 U.S.C. § 7.................................................................................................. 26

18 U.S.C. § 1111 ............................................................................................. 28

18 U.S.C. § 1589(a) ........................................................................................ 13

18 U.S.C. § 1591 ............................................................................................. 22

18 U.S.C. § 1594(b) .................................................................................. 10, 13

18 U.S.C. § 2241 ........................................................................... 11, 22, 28, 32

18 U.S.C. § 2242 ...................................................................................... *passim*

18 U.S.C. § 2246 ....................................................................................... 14, 21

18 U.S.C. § 3553 ...................................................................................... *passim*

18 U.S.C. § 3561(c)(1)..................................................................................... 72

## STATE STATUTES

N.Y. Penal Law § 130.00 ...................................................................... 23, 31, 33

N.Y. Penal Law § 130.52........................................................................... 32, 34

N.Y. Penal Law § 130.65........................................................................... 23, 31

## OTHER AUTHORITIES

Bibas, Stephanos
   Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of
   Alford and Nolo *Cont*endere Pleas, 88 Cornell L. Rev. 1361, 1386 (2003)....................... 43

La Force, Thessaly
   *The Orgasm Expert Who Ended Up on Trial*, New Yorker (Aug. 29, 2025),.
   https://www.newyorker.com/news/our-local-correspondents/the-orgasm-expert-who-
   ended-up-on-trial.................................................................................. 70

Nerka, Santul
   *Leaders of 'Orgasmic Meditation' Group Are Convicted of Coercion Charges*, N.Y.
   Times (June 9, 2025),  https://www.nytimes.com/2025/06/09/nyregion/onetaste-
   orgasmic-meditation-verdict.html...................................................... 70

Newberg, Andrew, et al
*Neuroimaging Evaluation of the Long Term Impact of a Novel Paired Meditation
Practice on Brain Function*, 3 Frontiers Neuroimaging 368537 (2024) ............................ 14

Newberg, Andrew, et al
Alterations in Functional Connectivity Measured by Functional Magnetic Resonance
Imaging and the Relationship With Heart Rate Variability in Subjects After Performing
Orgasmic Meditation: An Exploratory Study, 12 Frontiers Psych. 708973 (2021) ........... 14

Prause, Nicole et al
Partner Intimate Touch Is Associated With Increased Interpersonal Closeness,
Especially In Non-Romantic Partners, PLoS ONE (Mar. 10, 2021),
https://doi.org/10.1371/journal.pone.0246065 .................................................................... 14

Prause, Nicole et al.
*Not Hypersexual Concerns, Are Associated with More Sexual Arousal in Anticipation of
an Intimate Partner Experienc*e, 19 Sexual Health 79 (2022) .......................................... 14

Prause, Nicole
*Partnered Sexual Arousal Appear Context Depende*nt, Sexual & Relationship Therapy
479 (2023) .......................................................................................................................... 14

Scalia, Antonin et al
*Reading Law: The Interpretation of Legal Texts* 183 (2012) .......................................... 28

Siegle, Greg and Prause, Nicole
Intense Positive Affect Without Arousal Is Possible: Subjective and Physiological
Reactivity During a Partnered Sexual Meditative Experience, 178 Int'l J.
Psychophysiology 99 (2022) ............................................................................................... 14

Tonry, Michael
Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ............................ 71

U.S. Sent'g Comm'n
*Recidivism Among Federal Offenders: A Comprehensive Overview*, 23–24 (Mar. 2016)
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2016/recidivism_overview.pdf ....................................................................... 70

U.S.S.G. § 1B1.1 ..................................................................................... 10, 26, 27, 28, 32

U.S.S.G. § 2A3.1 ......................................................................................................... 27, 28

U.S.S.G. § 2H1.1 ............................................................................................. *passim*

U.S.S.G. § 2X1.1 ............................................................................... 10, 13, 32, 35

U.S.S.G. § 3A1.1 ................................................................................................ 44

U.S.S.G. § 3B1.1 ............................................................................... 38, 39, 41, 44

U.S.S.G. § 3E1.1(b) ........................................................................................... 42

U.S.S.G. § 4C1.1 ......................................................................................... 13, 44

U.S.S.G. § 5H1.11 ............................................................................................. 44

U.S.S.G. § 5K1.1 ............................................................................................... 61

Wise, Alana
    *Leaders of 'Orgasmic Meditation' Company Were Convicted of Forced Labor: What to Know*, NPR (June 12, 2025, 11:59 AM), https://www.npr.org/2025/06/11/nx-s1-5429181/orgasmic-meditation-sexual-womens-wellness-forced-labor-conviction ............. 70

## <u>INTRODUCTION</u>

We respectfully submit this memorandum on behalf of Rachel Cherwitz in advance of her sentencing. As the defense maintained throughout the trial, we do not believe that Rachel committed a crime. Rachel had no intent to force anyone to work for OneTaste, and the victims' contemporaneous statements during the time they were working for OneTaste expressed their choice to be there. But we recognize that we must respect the jury's verdict and that the Court must confront the question of what sentence is "sufficient but not greater than necessary" to meet the purposes of sentencing here, on these complex, novel facts, and taking into account Rachel's personal history and characteristics.

Probation is recommending a sentence of nearly sixteen years in prison – a term that is so grossly disproportionate to the facts of this case that it far exceeds what justice requires. This prosecution was based on a novel theory of psychological coercion that lacks the defining hallmarks of every one of the forced labor cases that have been prosecuted before now. It is *not* a case in which the victims were forced to work based on threats of violence, immigration status, financial desperation, or where there was simply no other option. It *is* a case in which the victims – all of who were college educated – went to OneTaste of their own free will and chose to stay and work. And while we accept the jury's finding that Rachel and Nicole Daedone conspired to force the victims to work through coercion, we ask that the Court recognize that OneTaste was an organization that provided a legitimate service that over 35,000 people availed themselves of and were satisfied with, and which Rachel joined because she believed in its practice.

Rather than acknowledging the substantial mitigating factors present here – including that Rachel did not run a criminal enterprise, did not commit acts of violence, and was engaged in teaching a legitimate practice recognized as such by the government – Probation and the government have instead stretched every possible inference, and imposed every possible

1

guidelines enhancement to maximize Rachel's potential punishment. The result is a recommendation suited for violent offenders who must be deterred and incapacitated, not for a woman like Rachel whose main goal has always been to help others – as evidenced by the over one hundred letters written in her support detailing how she has helped and improved the lives of many. Probation's proposed sentencing outcome is unjust, inconsistent with precedent, and contrary to the fundamental principles of fairness and proportionality and common sense that should guide this Court's sentencing determination. *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (discussing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

Furthermore, the conduct established at trial must be viewed as an anomaly in the scope of Rachel's life. Rachel did not go to OneTaste to commit a crime. She believed in the practice so much that she committed her whole life to it; she worked her way up the ladder of the Company by working harder than anyone else, and for which she made only a modest salary averaging approximately $35,000 per year. While we accept the jury's finding, we ask the Court to consider Rachel's life story, which reveals that her intent at OneTaste was to help others, just as she has helped countless people outside of OneTaste, including those suffering from addiction, poverty, and other personal struggles.

In this case, and given these particular facts and this particular person, any sentence greater than time served is, we submit, substantially greater than necessary to meet the purposes of sentencing. Rachel does not need to be deterred or punished further for a conspiracy to commit forced labor that ended seven years ago – a non-violent conspiracy from which Rachel did not benefit financially, and during which she also provided care, comfort, and counseling to many.

Rachel has been punished through the indictment, the trial, and the overall public humiliation, and has already spent almost six months in prison. Nor does the public need to be protected from Rachel's activity. In the seven years since the conspiracy ended, Rachel's life has been dominated by her commitment to helping others.

The Court is required to fashion a sentence that reflects the seriousness of the offense while recognizing the unique facts and circumstances of this case, as well as the extraordinary mitigation present here. When taking all of that into consideration, a sentence of time served is appropriate, and respectfully, any additional punishment would be inconsistent with the purposes of sentencing.

## BACKGROUND

Rachel was born on November 17, 1980, in Plano, Texas to Nancy and Adam Cherwitz; she is the oldest of four children. Presentence Report ("PSR") ¶ 123. Rachel's paternal grandparents were Holocaust survivors and were imprisoned in Nazi concentration camps before emigrating to Israel. As a young man, Rachel's father emigrated to the United States where he started his own jewelry business. Her mother was born and raised in New York and became a schoolteacher before marrying Rachel's father.

When Rachel was a child, her mother suffered from ███████████████████████, which created instability in the home. During Rachel's adolescence, her mother spent time in treatment, which left Rachel with increased responsibilities at home caring for her younger brothers. These experiences gave Rachel early exposure to the ways women grapple with appetite, self-worth, and trauma, which led her to struggle with anorexia, alcoholism, and drug use. Rachel started drinking and using marijuana at age 10. *Id.* at ¶¶ 130, 137. As she grew into her teenage years, her drug use expanded to include Sudafed and diet pills, and ultimately cocaine. *Id.* at ¶ 137. At one point, she was also hospitalized for anorexia.

Despite using alcohol and drugs, Rachel was involved in spirituality and community outreach as a young child, particularly Jewish activism. Judaism was an important part of her life, and she grew up speaking Hebrew with her father. When she was twelve years old, she began attending Jewish summer camp where she eventually became a counselor. Rachel also joined a Jewish youth group where she met one of her closest friends, Alana Dugandzic. *See* Exhibit 1. As Rachel grew older, she often hosted shabbat events and fundraisers, and volunteered at the local synagogue doing community outreach. Following her graduation from high school, Rachel moved to Israel and spent time in orthodox Jewish communities. She went on to practice Orthodox Judaism for five years.

Rachel graduated from college in 2006 with a bachelor's degree in rehabilitative studies, and a minor in Abuse and Addiction from the University of North Texas. PSR at ¶ 142. She became sober just a few months before she graduated from college. At around that same time, she was diagnosed with ███████████████████████████████████████████ ██████ *Id.* at ¶ 135. But what kept Rachel going and what ultimately saved her from self-destruction was her commitment to Alcoholics Anonymous ("AA"), which taught her many of the spiritual principles that she continues to live by today. *Id.* at ¶ 138.

Rachel was initially sponsored by a prominent 12-step circuit speaker, Mark Houston. She adopted what those in recovery call a "Big Book Awakening" approach: specific, disciplined study and application of AA's basic text, daily spiritual practices, and honest inventory work. Her 12-step program was very much aligned with her interest in Orthodox Judaism and spirituality in general. Indeed, helping other alcoholics was an integral part of that spiritual experience and of AA in general, which Rachel fully adopted. Furthermore, Rachel's experience with anorexia and addiction, together with her deep spirituality, taught her that trauma can become a catalyst for

healing and growth. She wanted to share that understanding with others, and potentially help others discover the same possibility for transformation.

From 2007 to 2023, Rachel sponsored countless men and women in AA. As described by John Camillieri, she worked deeply with people, meeting them with patience, honesty, and care, making herself available in the quiet hours when they might be struggling. Exhibit 12. Her sponsees often speak of how closely she listens, working with them step by step as they face challenges and begin to rebuild their lives. As a friend from the drug and alcohol recovery community described:

> As I have had the pleasure to get to know Rachel over the last 4 years, she has become someone I personally turn to for guidance. . . . Rachel is a woman who has freely given, and will no doubt continue to offer immense value to any community she plugs into. She has a brilliant way of reigniting the light in people who have lost hope and/or become disconnected with themselves, simply by giving them permission to be who they always were. Simply put, my world is a better place because Rachel is in it.

Exhibit 2.

While continuing her formal education, Rachel worked intensely with her former sponsor, Mr. Houston, who was preparing her to one day take over his treatment center. She traveled to conferences where he spoke, and was exposed to a comprehensive view of recovery. During her final semester in college, she kept a sustained pace with a full-time courseload, frequent meetings, and sponsorship of multiple sponsees.

In her twenties, Rachel was diagnosed by three separate doctors as anorgasmic, and was told that there was no cure. She was also suffering from endometriosis at the time, for which she underwent several surgeries. To help address these diagnoses, Rachel turned to yoga, where eventually a yoga teacher recommended Orgasmic Meditation ("OM") and OneTaste to better address her anorgasmia. Following that recommendation, in January 2007, Rachel, along with her then-boyfriend, Kal Holczler, and a friend, drove from Texas to California to explore OneTaste.

Rachel found the OM practice to be both healing and enlivening, and she immediately moved into to the residential program and began taking classes.

Robert Kandell, OneTaste's co-founder, recalled meeting Rachel when she arrived at OneTaste, and described her as energetic, a hard worker, and strong willed. Trial Tr. 3581:2–4. For her first year at OneTaste, Rachel was a student and took classes like the majority of OneTaste participants. She then became part of the leadership team in New York in 2008, during which she was supervised by Mr. Kandell. From 2011 through 2015, Rachel worked as middle management at OneTaste and was supervised by various people including Joanna Van Vleck and Kenan Wang. During her last three years at OneTaste, Rachel was the top sales employee, and she headed sales alongside Eli Block and Rachel Hemsi. Outside sales consultants, Murat Kizbaz, Duccio Zambrini, and Jason Drees, oversaw the sales team at various times from 2015 through 2018.

In February 2015, Rachel married Hamza Tayeb, which ended in divorce in 2017. Following her divorce, she began dating her now-husband Matt Pelletier. PSR ¶ 129. On July 22, 2021, Rachel and Matt were married in San Francisco, California, and the two continue to haved a healthy, supportive, and loving relationship. *Id.* at ¶ 127. Matt describes Rachel as a rare and exceptionally lovely human being. A person of tremendous integrity, someone you could rely on for anything, who has turned every circumstance of her life into something that can benefit others. She bears an uncommonly generous heart, which she shares freely with friends and strangers alike." *See* Exhibit 3. Matt's parents and two brothers happily welcomed Rachel into their family and continue to love and support her. Matt's mother, JoAnn Arruda, described Rachel as an "intelligent, caring, kind woman," and noted how she has "maintained grace and profound inner strength" and that she "still remains focused on women's rights and helping others finding spiritual balance." *See* Exhibit 20. Matt's father, Michael Pelletier ("Mr. Pelletier"), shared his "experience

of Rachel as a person and as part of our family." He described her as "kind, polite, and respectful" as well as a "decent, considerate person and a caring daughter-in-law." *See* Exhibit 21. Matt's father regularly attended the trial.

In 2018, Rachel resigned from her position at OneTaste and began her journey towards becoming a licensed clinician for addiction counseling. She enrolled in the addiction counseling master's degree program at Grand Canyon University and worked full time at a treatment center. Rachel graduated in April 2020 with honors and a 4.0 GPA, and was a member of the Honor Society. She then went on to complete several thousand hours of supervised training, and in 2021 she became a Licensed Advanced Alcohol Drug Counselor ("LAADC") and an Internationally Certified Advanced Alcohol and Drug Counselor ("ICAADC"), the highest level of certification in addiction counseling. As part of her professional training and continuing education, she took over a dozen courses in clinical practices, trauma, neuroanatomy, and other topics. In 2021, Rachel enrolled in a clinical psychology doctoral program at the California Institute of Integral Studies ("CIIS") and finished her first year in 2022 with a 4.0 GPA. In 2022 she received her Certificate of Traumatic Stress Studies from the Trauma Research Foundation and became a Certified Clinical Trauma Professional.

Rachel's interest in helping people recover from trauma led her to participate as a research assistant and author on a Phase 1 clinical trial on the efficacy of Orgasmic Meditation as a protocol for addressing and healing trauma. This study, led by psychologist Dr. Daniel Kriegman, examined the potential for OM as a non-pharmaceutical, inexpensive, and natural protocol for those with a history of trauma or PTSD. Rachel worked closely with Dr. Kriegman on facilitating this study, and contributing to its design, implementation, and Independent Review Board approval.

She is a co-author of "Phase 1 clinical trial on Orgasmic Meditation (OM): Assessing safety and feasibility as a meditation practice for individuals with PTSD" published in ScienceDirect on February 12, 2025.

In addition to helping others who are struggling with addiction and issues around trauma, Rachel has also dedicated her time to feeding the hungry.  Since 2007, she was a regular volunteer at Fill up America, an organization that redistributes surplus food to families and individuals in need in the San Francisco area.[1]  In 2024, she became heavily involved with Free Food, which provides nourishing sit-down meals with a restaurant feel to impoverished people.  The goal of this organization is not only to alleviate hunger, but to restore dignity.  It rescues otherwise imperfect food from waste, transforming surplus ingredients into nourishing meals.  *See* https://unconditionalfreedom.org/free-food/.  Rachel regularly served guests dining at Free Food Harlem's restaurants and organized fundraising efforts for the program.

Rachel was also instrumental in growing a program called Women Over Dinner – an initiative that organizes gatherings for women to connect, share, and empower each other through facilitated round-table discussions.  *See* https://womenoverdinner.org/.  In 2024, Rachel took a leadership position for Women Over Dinner, and transformed it from a gathering of five to ten women into an international movement serving over 3,700 women in 93 cities and in 18 countries.  Under her leadership, she helped build out in-kind donations so that women-owned restaurants and caterers in the community participated by donating food for the meals.  This cut the costs of the dinners, which allowed for more women to be served.  Rachel also helped organize an event held inside the Taconic Correctional Facility with the goal of reminding the incarcerated women

---

[1] Fill Up America eventually changed its name to "Love to Table" and then to "Unconditional Freedom."  Free Food started as a branch of Unconditional Freedom, later becoming an independent non-profit.

"of their inherent value and dignity."  [Women Over Dinner, Unconditional Freedom](). Mary Valdovinos, a Women Over Dinner participant and volunteer described Rachel's impact on her and the organization:

> Her character, her consistency, and her heart for service all speak to the kind of growth and awareness that cannot be faked. She has shared pieces of her own story with vulnerability and courage, and I've seen how that honesty helps others open up, heal, and begin to believe in their own capacity to change. Rachel is a beacon of hope to many women, myself included. She models what it means to turn pain into purpose.

Exhibit 4.

In March 2025, just two months before her trial, Rachel organized and hosted a Women Over Dinner in collaboration with Providence House Brooklyn, an organization that works with formerly incarcerated individuals. The dinner hosted 150 women, many who were formerly incarcerated, in the hope of helping these women succeed. Although facing trial at this time, Rachel continued her mission to help others. And now, even while in prison, she has been lifting the spirits of those around her.

## ARGUMENT

## I.     THE PROPER GUIDELINES RANGE IS 21 TO 27 MONTHS

The Court's analysis must begin with a correctly calculated advisory guidelines range in accordance with the United States Sentencing Guidelines Manual[2] (the "Guidelines" or "U.S.S.G."); *Gall v. United States*, 552 U.S. 38, 49 (2007). The PSR significantly over-calculates a total offense level of 36 and a criminal history category of I, yielding an advisory sentence of 188–235 months. PSR ¶¶ 115, 118. And Probation recommends a sentence of 188 months – 15.7

---

[2] There are no relevant substantive changes between the 2018 edition (*i.e.*, when the government asserts the conspiracy ended) and the 2025 edition of the Guidelines. Therefore, for ease of reference, we cite to the 2025 edition.

years.  This offense level and recommended sentence are incorrectly calculated and riddled with multiple factual and legal errors, and drastically overstate the seriousness of the offense.

To begin with, Probation incorrectly started its base offense level at U.S.S.G. § 2H4.1 with no explanation as to how it arrived there.  The correct starting point for the analysis is U.S.S.G. § 2X1.1 because the offense of conviction was a conspiracy to commit forced labor under 18 U.S.C. § 1594(b).  *See* U.S.S.G. § 1B1.1; *id.* at § 1B1.2; *id.* at § App. A (where the conspiracy is not specifically enumerated in the offense guideline, § 2X1.1 (Attempt, Solicitation, or Conspiracy) applies).  Thus, the Court must be guided by § 2X1.1(a), which directs the Court to the Guideline for the substantive offense (here § 2H4.1), plus any adjustments from that Guideline for any intended offense conduct that can be established with "reasonable certainty."  Reasonable certainty is a higher threshold than the preponderance standard.  *United States v. Nadirashvili*, 655 F.3d 114, 122 (2d Cir. 2011).  The "reasonable certainty" standard set forth in §2X1.1(a) requires a court to determine the conspirator's intent.  *See United Ermichine*, No. 99-cr-419, 2002 WL 869825, at *4 (S.D.N.Y. May 3, 2002).  The *Ermichine* court noted that the Guidelines are less clear on what "with reasonable certainty" means in terms of burden of proof but it appears to be more than a mere preponderance of the evidence.  *Id.*  In addition, U.S.S.G. § 2X1.1(b)(2) provides that in the case of a conspiracy, the Court must consider whether a three-level deduction is appropriate.  *See* U.S.S.G. § 2X1.1(b)(2) ("If conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts of the conspiracy believed necessary on their part for the successful completion of the substantive offense . . . .").

Because Probation skipped this analysis and inappropriately went straight to § 2H4.1, it failed to apply the higher standard of "reasonable certainty."  As set forth below, however, even under a preponderance standard, the Court should reject the enhancements applied by Probation.

*First*, the Court should reject the application of § 2H4.1(b)(1)(B), which adds two levels if any victim sustained "serious bodily injury." *See* § 1B1.1, comment. (n.1(L)) (explaining that "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law"). Probation based this enhancement on the OM demonstration involving Rebecca Halpern, but that conduct does not meet the requirements for either federal sexual abuse under 18 U.S.C. § 2242 nor any similar state offense.

*Second*, the Court should reject the enhancement under § 2H4.1(b)(3) for holding a victim in a condition of peonage or involuntary servitude because the defendants were convicted only of a conspiracy, and the victims in this case all testified that they were free to leave at any time, made a choice to participate and work at OneTaste, and had access to the outside world. Indeed, there are no comparable cases in which this enhancement has been applied.

*Third*, the Court should reject the application of § 2H4.1(b)(4) for committing any other felony offense during the peonage or involuntary servitude offense, which as applied by Probation, brings the offense level to 32. To achieve that steep jump to this exorbitant base offense level, Probation argued that the OM demonstration amounts to federal sexual abuse under 18 U.S.C. § 2242, and therefore, the base offense level of 30 for criminal sexual abuse is applicable, plus two points for a total base offense level of 32. *See* § 2H4.1(b)(4)(B). But Probation has taken the facts and molded them to fit into this enhancement – one that belongs in forced labor cases when the employer forces sexual abuse as a condition of employment, or when the victim has no choice but to submit to sexual abuse. And it used these inappropriately applied facts to raise the Guidelines almost to the statutory maximum (the top of the Guidelines is 19.6 years, and the statutory maximum is 20 years), which absurdly, would place this case in the range of other cases involving

extreme abuse of minors, sexual violence, and rape. *See, e.g.*, *United States v. Ghislaine Maxwell*, No. 1:20-cr-330 (S.D.N.Y.) (240 months for conspiracy to entice minors to travel to engage in illegal sex acts, conspiracy to transport minors to participate in illegal sex acts, transporting a minor to participate in illegal sex acts, sex trafficking conspiracy, and sex trafficking of a minor); *United States v. Kelly*, No. 1:19-cr-567 (N.D. Ill.) (240 months for three counts of producing child pornography and three counts of enticing a minor to engage in sexual activity); *United States v. McEwen*, No. 7:25-cr-193 (S.D.N.Y.) (210 months for receiving sexually explicit materials of a minor after having previously committed a state crime related to sexual abuse of a minor); *United States v. Hernandez-Velazquez*, No. 1:19-cr-306 (E.D.N.Y. July 10, 2025) (188 months for sex trafficking multiple victims by force, fraud, and coercion). Such an outcome defies common sense and does not align with the principles of justice and fairness.

*Finally*, the Court should also reject the role enhancement under § 3B1.1. The PSR overstates Rachel's role at OneTaste and fails to acknowledge that Rachel did not supervise the co-conspirators and did not financially benefit from the conspiracy.

The Court should, however, consider various decreases in the Guidelines range. First, pursuant to § 2X1.1(b)(2), the Court should apply a three-level deduction because the crime of conviction was a conspiracy. The substantive act of forced labor was not completed because the victims had a choice to labor, could leave at any time, and, in fact, did leave on their own. Second, the Court should consider the trial penalty and apply a one-level reduction. Lastly, the Court should also apply a two-level downward adjustment because Rachel is a zero-point offender. Therefore, the proper total offense level should be calculated as follows:

| Base Offense Level: | The Guideline for 18 U.S.C. § 1594(b) is U.S.S.G. § 2X1.1, which provides the base offense level from the Guidelines for the substantive offense (18 U.S.C. § 1589(a)), which is level 22. | **22** |
|---|---|---|
| Specific Offense Characteristics: | Since this is charged as a conspiracy, three levels are subtracted under U.S.S.G. § 2X1.1(b)(2). | **-3** |
| Trial Penalty Adjustment: | Rachel should not be penalized for exercising her Sixth Amendment right to trial, and therefore one level should be subtracted. *See United States v. Tavberidze*, 769 F. Supp. 3d 264, 268 (S.D.N.Y. 2025). | **-1** |
| Zero Point Offender Adjustment: | Rachel is a first-time offender who meets the criteria under U.S.S.G. § 4C1.1. | **-2** |
| Total Offense Level: | | **16** |

Calculated correctly, this offense yields a Guidelines range of 21 to 27 months, which more accurately reflects the single count conspiracy conviction, and takes into account the fact that Rachel did not act out of greed or selfishness, but rather out of her belief in the OM practice. Accordingly, for the reasons set forth more fully below, the Court should adopt defense counsel's proposed Guidelines calculation and reject the government's calculation.

> A.    *The Base Offense Level for Sexual Abuse Is Inapplicable*

Given that Probation ultimately concluded the Court should apply the extraordinarily high base offense level of 32 pursuant to § 2H4.1(b)(4)(B), we begin our analysis there. That section provides that "[i]f any other felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense," two levels are added "plus the offense level from the offense guideline applicable to that other offense." *See* § 2H4.1(b)(4)(B). Probation improperly asserts that the OM demonstration involving Rebecca Halpern constitutes sexual abuse, causing a dramatic impact to Rachel's sentencing guideline – increasing it from a level 22 to 32. For the many reasons set forth below, this enhancement, which effectively triples Rachel's sentence, should be rejected.

1.    <u>Rachel Did Not Have the Required Intent to Establish Sexual Abuse</u>

The OM demonstration involving Ms. Halpern does not constitute sexual abuse because Rachel lacked the requisite intent.  To establish sexual abuse under 18 U.S.C. § 2242(3), a sexual act must have occurred "without that other person's consent, to include doing so through coercion."  To meet the definition of a "sexual act," there must be penetration "with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  *See* 18 U.S.C. § 2246.  Probation focuses on Ms. Halpern's inner thoughts in an attempt to establish coercion without regard to what she actually communicated to Rachel in that context.  *See* Second PSR Addendum ("SA") at 9.  But given the context of the OM practice that Ms. Halpern and others engaged in daily, Rachel could not have known that Ms. Halpern did not consent.  Furthermore, because Rachel was an OM instructor who believed the practitioners wanted to be trained in the OM demonstration, she did not have the requisite intent to degrade anyone.

a.    *The Analysis of Intent Must Begin with the Context of the OM Practice for Serious Practitioners*

To demonstrate that Rachel could not have known that Ms. Halpern did not consent, and that there was no intent to "abuse, humiliate, harass, [or] degrade," it is first necessary to review the evidence on the OM practice and OM demonstrations to put it into the proper context.  As recognized by many of the witnesses at trial, the OM practice was the raison d'etre of OneTaste, and offered spiritual and psychological benefits.[3]

---

[3] This is also supported by several peer reviewed scientific publications.  *See* Nicole Prause et al., *Partner Intimate Touch Is Associated With Increased Interpersonal Closeness, Especially In Non-Romantic Partners*, PLoS ONE (Mar. 10, 2021), https://doi.org/10.1371/journal.pone.0246065; Greg J. Siegle & Nicole Prause, *Intense Positive Affect Without Arousal Is Possible: Subjective and Physiological Reactivity During a Partnered Sexual Meditative Experience*, 178 Int'l J. Psychophysiology 99 (2022); Nicole Prause & Greg Siegle, *Sex Film Viewing, But Not Hypersexual Concerns, Are Associated with More Sexual Arousal in Anticipation of an Intimate Partner Experience*, 19 Sexual Health 79 (2022); Andrew B. Newberg et al., *Alterations in Functional Connectivity Measured by Functional Magnetic Resonance Imaging and the*

Indeed, the government conceded this point and advised the Court that the OM practice was not on trial, which presumably led to the Court precluding the defense from presenting expert testimony concerning OM's validity. *See* Trial Tr. at 4187:16–23 ("[T]he way this case has come out has been that people feel differently about the practice. It's not the practice that's on trial, it's the defendants and the question of whether or not there was a conspiracy to commit forced labor which has nothing to do with the scientific benefits of orgasmic meditation."); *id.* at 5250:1–11. And at trial, there was testimony that not only did people go to OneTaste for the OM practice, but also they found it beneficial. *See id*. at 1355:25–1356:5; *id.* at 1756:7–11; *id*. at 2204:8–13 (Q: And you did, in fact, credit the practice of orgasmic meditation of saving you from a pretty dark past, right? A: Correct.). Notably, during Ms. Halpern's three and a half years at OneTaste, she had a daily OM practice, and thus engaged in the practice thousands of times. *Id.* at 516:10–23. In fact, she credited the OM practice with allowing her to open up and tell her now husband that she loved him. *Id.* at 649:14–651:16. And she acknowledged on a video at her Coaching Program 6 graduation, that she "never would have gotten to that place if it hadn't been for OM." *Id.* at 651:5–8; *see also* Exhibit 6 (DX21BU, which is a video recording of Rebecca Halpern at the Coaching Program 6 graduation, which was marked as an exhibit but not admitted at trial following the government's objection); Exhibit 7 (transcript of DX21BU).

*Relationship With Heart Rate Variability in Subjects After Performing Orgasmic Meditation: An Exploratory Study*, 12 Frontiers Psych. 708973 (2021); N. Prause, H. Cohen & G. J. Siegle, *Effects of Adverse Childhood Experiences on Partnered Sexual Arousal Appear Context Dependent*, Sexual & Relationship Therapy 479 (2023); et al., *Alterations in Cerebral Glucose Metabolism Measured by FDG PET in Subjects Performing a Meditation Practice Based on Clitoral Stimulation*, F1000Research (Dec. 7, 2023), https://f1000research.com/articles/11-1015/v2; Andrew B. Newberg et al., *Neuroimaging Evaluation of the Long Term Impact of a Novel Paired Meditation Practice on Brain Function*, 3 Frontiers Neuroimaging 368537 (2024); Caroline Griggs & Rachel Regan, *An Analysis of Practitioners Journaled experiences of Orgasmic Meditation (OM)*, 40 Sexual & Relationship Therapy 654 (2025).

Moreover, Ms. Halpern lived in the Morellino community house – the house where only those most dedicated to the OM practice chose to live. She testified she was aware prior to moving into the Morellino that it was "an intense place." Trial Tr. 694:21–695:6. People had to apply to live at the Morellino, and those who lived there were the "most committed to the life of OM and the life of OneTaste," and "that's the community [Ms. Halpern] wanted to live in." *Id.* at 695:14–18; *id.* at 696:13–15. She lived there to immerse herself in Orgasmic Meditation, but it was certainly not required. *Id.* at 697:11–14. Indeed, 33% of OneTaste employees did not live in any community, and many employees lived in OM houses that were participant run.[4]

Ms. Halpern testified that the OM Residential Handbook (the "Handbook") provided the guidelines for living in the Morellino. *Id.* at 508:19–509:10. Pursuant to the Handbook, residents agreed to be "push[ed]" to the edge and to be "responsible for communicating [their] own boundaries." 3500-RW-12 (emphasis added). People moved into the house "because [they] want[ed] something: a deeper sense of [their] orgasm, actualization, and connection." *Id.* The Handbook notes that residents would "most likely be up against [their] demons." *Id.* It also emphasizes the importance of using safe words and communicating boundaries. *Id.* These are all guidelines Ms. Halpern agreed to when she moved into the Morellino.

Accordingly, when the OM demonstration is viewed within the context of OM at OneTaste, and more specifically the OM practice at the Morellino, it is evident that the Halpern OM demonstration does not constitute sexual abuse.

---

[4] Witnesses testified that employees were not required to live in OneTaste communal residences, and it was a choice to live in them. *See, e.g.*, Trial Tr. 4114:17–4115:2; *id.* at 4258:11–13. There were 148 W2 employees through OneTaste and its subsidiaries, and of those, 49 employees (33%) did not live in any OM house or residence. Over the course of the time that the Morellino was a OneTaste Community home, from 2013 through March 2014, 24 people in total lived there, including seven non-staff OM practitioners.

As an instructor for OM demonstrations, Rachel's mandate was to train serious OM practitioners – practitioners who were honored to be chosen for the demonstration. Indeed, Ms. Halpern testified that doing an OM demonstration "was really, frankly, kind of an honor" and "was a really prestigious thing" and "felt like an important part of [her] work." Trial Tr. 302:25–303:3. And others testified similarly. *Id.* at 1189:4–6 ("Q: . . . And, in fact, OM demonstrations were somewhat of an honor within that community, correct? A: That's right."); *id.* at 1845:4–6 ("Q: . . . You felt it was prestigious to do an OM demonstration, right? A: That's correct."); *id.* at 2273:2–4 ("Q: And, in fact, doing an OM demonstration within OneTaste is a prestigious thing to be asked to do, correct? A: Correct."); *id.* at 3619:17–19 ("Q: And it was seen as an honor within the organization to be asked to do [an OM demonstration], right? A: Yes.").

Given that background, Rachel's intent with respect to the OM demonstration at the Morellino was to train those who had immersed themselves in the community – not to degrade anyone. While Ms. Halpern claims the OM demonstration happened at an "impromptu meeting," *see* SA at 5, Hamza Tayeb, who was at the demonstration, told the government ███████ ████████████████████████████████████████████████████████████ ███████████████████████ Exhibit 24 at 1 (3500-HT-6). This directly contradicts Ms. Halpern's testimony that it was an "impromptu meeting," and provides context for why Rachel would have presumed everyone wanted to participate - to learn and improve as OM practitioners, as had been done countless times before.

Probation also asserts that Rachel referring to Ms. Halpern as a "virus" is evidence that Rachel intended to degrade Ms. Halpern. SA at 5. Mr. Tayeb, however, explained to the government that ███████████████████████████████████████████████████

████████████████████████ Exhibit 24 at 2.  But regardless, even assuming Rachel said this as criticism, it does not follow that the entire purpose of the OM demonstration was to degrade Ms. Halpern.  Indeed, this statement must be understood in the context of the training environment in which the Morellino practitioners were participating.  Similar dynamics occur in many athletic settings, where coaches on the sidelines can be heard shouting at their players, or where fitness participants register for an intense boot-camp or CrossFit class knowing they will be yelled at; sometimes pushed to tears.  Outside of these environments, this shouting would appear insensitive and mean, but within them they are expected and welcome.

*c.      Rachel Could Not Have Known That Ms. Halpern Did Not Consent*

The evidence also demonstrates that Rachel did not know that the interaction was not consensual.  The *mens rea* in § 2242 (*i.e.*, "knowingly") requires the defendant to have known of the other person's lack of consent.  *See Rehaif v. United States*, 588 U.S. 225, 228–30 (2019); *Flores-Figueroa v. United States*, 556 U.S. 646, 650, 652 (2009) (citing *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 79 (1994) (Stevens, J., concurring) and *Liparota v. United States*, 471 U.S. 419, 433 (1985)).

As explained above, those who lived in the Morellino were the most committed to OneTaste and the OM practice.  Ms. Halpern testified that "having a daily practice was an integral part of being a member of the community" and she "of course" knew that she would be OMing daily when living in the Morellino, which is why she went there to live.  Trial Tr. 516:16–23.  OMing involved women getting undressed from the waist down multiple times a day and undergoing a practice of orgasmic meditation – something Ms. Halpern and others knowingly went to the Morellino to participate in.  And Rachel was aware that Ms. Halpern practiced OM daily, particularly because they lived together in the Morellino.  It is therefore illogical that Rachel would somehow know that on this particular day, out of the thousands of OMs that Ms. Halpern had

18

participated in at that point, that Ms. Halpern did not want to participate in this particular OM. Further, Ms. Halpern's OM demonstration at the Morellino was ████████████████████████ ████████████████████████████████████. *See* Exhibit 24 at 1.

Finally, Ms. Halpern's own testimony shows that Rachel had no indication that the OM demonstration was not consensual. Indeed, Ms. Halpern testified that she faked her enjoyment during the demonstration. *Id.* 305:22–23 ("I'm like faking it and trying to do the right thing just to get out of it."). As set forth in the Handbook, Ms. Halpern agreed to communicate her boundaries. *See* 3500-RW-12. Faking enjoyment, if she did not want to participate in the OM demonstration, is the opposite of communicating her boundaries, and indeed, all participants were trained to use safe words. *See* Trial Tr. 454:22–455:10; *id.* at 1777:6–13; *id.* at 2557:8–15; *id.* at 2760:11–15. And, Ms. Halpern testified under oath that she did not recall whether she gave Rachel her consent to touch her. *Id.* at 305:1–2 ("I don't remember her asking me, if she did, I don't know."). When asked if she told Rachel that she did not want to participate, she testified, "I don't know if I said anything. *Id.* at 304:5–6. Moreover, Mr. Tayeb explained to the government that ████████████████████████████████████████████████████. *See* Exhibit 24.[5]

---

[5] Not only ████████████ given the context discussed above, but Ms. Halpern continued to practice and embrace OM at OneTaste following this demonstration. Indeed, on February 3, 2014 right before she left OneTaste, she posted on Facebook about her OM practice, saying:

> I just want to say, yet again, I love this life. This weekend at the Mastery program I was listening to one of the lectures it really hit me that we are pioneers. Being someone out in the world who talks openly about sexuality is…rare. The other day I was sitting at TurnON and hear the leader say the word 'clit.' It's a word that I hear multiple times a day every day. Maybe I was feeling the other people in the room, but for some reason it struck me. Wow, that a charged word. Clit. Yikes! She just said clit in a crowded room! Everyone thinks about it; we talk about it. Simply by being who you are you are giving other people permission to be who they

Finally, while Ms. Halpern testified that she cried after the demonstration, Mr. Tayeb explained ████████████████████████████████ *Id.*; Trial Tr. 306:10–11. Ms. Halpern herself admitted that crying could occur after an OM because OMing creates a lot of emotions. Trial Tr. 627:16–21. She also testified that after the demonstration, she went to Costco with Pixley and could not stop crying and shaking; however, Pixley ████████████████████ ███████████████████████. *Id.* at 306:14–17; Exhibit 25 (3500-MPI-32).[6] Had Ms. Halpern been sobbing and shaking in Costco as she portrayed, it is unlikely that Pixley would not recall the incident. Moreover, had Ms. Halpern been vehemently saying "no" to Rachel when asked to do the demonstration, it would follow that either Mr. Tayeb or Pixley who were both at the demonstration ████████████████████████████.[7]

---

are. Simply by stroking or being stroked you show other human beings that intimacy is something that we all want.

Exhibit 5. When asked about the sentiments expressed in the post, Ms. Weiner testified that "[t]hat's how [she] felt" at that time. Trial Tr. 656:3–657:3.

[6] Notably, the government violated its *Brady* obligations by failing to timely produce Pixley's FD-302 report ("302") in which she stated s██████████████████████████████ ██████. The government did not produce this 302 to the defendants until May 22, 2025 – over one week after Pixley took the stand. Following disclosure of this 302, the government gave the defense the option of a stipulation or calling Pixley back to the stand; however, the government conditioned this offer – if the defense chose to do either, it would call Mr. Tayeb to the stand (whom the government previously said it was not calling). Given that Ms. Halpern's testimony made it clear that Rachel could not have known that she did not consent to the demonstration because she "faked" it, and given that this demonstration had nothing to do with the forced labor at issue, the defense advised the government that it was not going to call Pixley back or enter a stipulation so that the government would not call another witness to the stand. But now, given that the government is using this conduct to establish sexual abuse, it troubling that it fought to keep out Pixley's lack of memory by essentially extorting the defense. If the crime of sexual abuse was so clear, the government would not have been concerned about this contradictory testimony.

[7] There were others at the demonstration as well, and thus, if Ms. Halpern was clearly saying no, presumably someone would have stepped in or recalled this incident. Further, she testified that she "d[idn]'t know if [she] said anything." Trial Tr. 304:5–6.

Accordingly, these facts demonstrate that Rachel did not have the necessary intent to establish sexual abuse. The OM demonstration must be viewed, not in a vacuum, but within the context of the OM practice.

<ol start="2" type="1">
<li>The Mechanics of Orgasmic Meditation Does Not Meet the Definition of a "Sexual Act"</li>
</ol>

Orgasmic meditation also does not meet the definition of a "sexual act" because it lacks the requisite penetration. A sexual act is defined under 18 U.S.C. § 2246(2) as "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object." The statute distinguishes this from "intentional touching" of the genitalia, which is only considered a sexual act if the person is under 16 years old.

Witnesses at trial testified that OMing does not involve penetration, but rather the stroking of a woman's clitoris. Indeed, Ms. Halpern herself testified that "the stroker will stimulate her clitoris, which is the most sensitive part of a woman's anatomy, for about that 15 minutes, and then afterwards they share something that they felt during that meditation." Trial Tr. 107:2–7. The clitoris is located at the top of the vulva and is separate from the introitus, which is the opening to the vagina located below the clitoris. Ms. Halpern further testified that the stroker rests their thumb at the introitus, but there was no testimony that the stroker, in this instance Rachel, ever "penetrated" Ms. Halpern "however slight," or that OMing involves any penetration whatsoever. *Id.* 302:8–308:14.

Furthermore, from a policy perspective, the fact that it is necessary to so closely analyze the mechanics of the OM demonstration to determine whether it even meets the technical definition of a "sexual act" should tip the scales towards rejection of this enhancement.

3.       The Sexual Abuse Enhancement Should Also Be Rejected Because There
         Was No Coercion by Means of a Fear of Imminent Bodily Harm

The Court should also reject the sexual abuse enhancement because 18 U.S.C § 2242 requires more than psychological coercion; the victim must be coerced through fear of bodily harm.  Indeed, a judge in this Circuit recently adopted a similar interpretation in declining to apply the sexual abuse enhancement.  *See United States v. Combs*, No. 1:24-cr-542-AS (S.D.N.Y.).  While that case examined the application of § 2242(1) rather than § 2242(3), the underlying rationale for not applying the enhancement is equaly applicable to both sections.  Essentially, the *Combs* court analyzed what kind of threat or fear of harm is necessary to apply the sexual abuse enhancement under § 2242(1).  In finding that the victim must be placed in fear of some "imminent concrete harm, such as bodily harm," the court focused on the clarification that the fear is something "other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping," language borrowed from § 2241.  Exhibit 8 at 14 (Sent'g Tr., *Combs*, No. 1:24-cr-542 (S.D.N.Y. Oct. 3, 2025)).  By incorporating the structure of § 2241, it reflects Congress's intent to limit § 2242(1) to imminent, concrete threats of harm akin to but less severe than those in § 2241.  The *Combs* court reasoned:

> By its terms, the statute applies to harms other than those for death, serious bodily injury, or kidnapping. . . .  Those are all imminent concrete harms relating to physical violence or restraint, and Congress' use of parallel language in Section 2242 suggests that it should apply to harms of the same kind, even if they are not as severe.

*Id.* at 14:10–17.

The court then contrasted that with the language in 18 U.S.C. § 1591 (sex trafficking), which explicitly includes psychological, reputational, or financial harm.  The absence of such language in § 2242 means that generalized or psychological coercion – without a corresponding

threat of imminent bodily harm – does not satisfy the statutory standard. Accordingly, the *Combs* court adopted a narrower reading. *Id.* at 14:8–25.

The court's reasoning is instructive. The court referenced the Sand treatise and stated that "allowing threat and harm to have unlimited reach would certainly raise constitutional questions" *Id.* at 14:6–7. Those concerns for constitutional vagueness are equally applicable in relation to § 2242(3). The Court noted that its "adoption of a narrower reading is reinforced by the rule of lenity, which applies to the guidelines under binding Second Circuit case law, *United States v. Parkins*, 935 F.3d 63 (2d Cir. 2019)." *Id.* at 14:2225.

This same rationale also applies to § 2242(3), meaning that the coercion necessary to meet the elements of sexual abuse must done through fear of imminent bodily harm.[8] It is illogical that threat of bodily harm is necessary under § 2242(1) but not under § 2242(3), when they both constitute criminal sexual abuse that carries a base Guideline level of 30 (97 to 121 months' imprisonment). And as the *Combs* court found, there must be more than psychological coercion. *Id.* If Congress meant to include psychological coercion, it would have done so. Indeed, Congress included psychological harm in the sex trafficking statute. Unlike in the sex trafficking statute – the very statute the government tried to and could not charge here – coercion is undefined. Coercion should be interpreted, however, to proscribe only the same conduct as § 2242(1) – *i.e.*, coercion through threat or fear of bodily harm. Congress could have defined coercion to encompass other types of compulsion. It chose not to do so in § 2242. And when Congress "uses

---

[8] This also makes sense given that sexual abuse under New York law requires the defendant to subject another person to sexual conduct by "forcible compulsion," meaning to compel by either use of physical force, or a threat, express or implied, which places a person in fear of immediate death or physical injury to themself, or in fear that they or another person will immediately be kidnapped, or if the other person is psychically unable to communicate unwillingness to an act. *See* N.Y. Penal Law §§ 130.65, 130.00. Therefore, even under state law, psychological coercion is not enough.

particular language in one . . . statute and different language in another, we presume its word choice was intentional." *United States v. Fishman*, 2025 WL 2692069, at *5 (2d Cir. Sept. 22, 2025). Accordingly, the Court should also apply the narrower reading of the statute, which would require coercion through fear of bodily harm.

Moreover, as the *Combs* court suggested, the principles of lenity and fair notice also militate in favor of a narrow reading of § 2242(3). Section 2242(3) was enacted only three years ago, PL 117-103, March 15, 2022, 136 Stat 49, 924, and it has yet to be interpreted by the Second Circuit. Particularly given the potentially drastic impact on Rachel's Guidelines range and ultimate sentence, the Court should cabin the statute's reach to avoid punishing her based on conduct not clearly covered by the statute. *See, e.g.*, *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) (lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered" (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)).

Certainly, the "fear" here was not of bodily harm, restraint, or violence, but rather that Ms. Halpern might lose Rachel's approval or fall from her good graces, that she could be demoted, kicked out, or get a "long talking to" if she refused to participate. *See* Trial Tr. 264:24–265:11; *id.* at 282:1–11. That "fear," however, is not the "imminent concrete harm" contemplated by the statute. It cannot be satisfied by a perceived threat to one's relationship, social standing, or favor within a group. To hold otherwise would improperly expand § 2242 to encompass psychological or reputational coercion – precisely the kind of harm Congress chose *not* to include in this statute.

4.  Because the Jury Did Not Make a Specific Finding of Sexual Abuse, the Enhancement Under § 2H4.1(b)(4)(B) Should Not Apply

This enhancement should also not apply because the jury did not make a specific finding of sexual abuse. Generally, cases applying a cross reference for "any other felony offense"

24

committed during the commission of, or in connection with, the peonage or involuntary servitude offense under § 2H4.1(b)(4)(B) involve either (i) a conviction of that "other felony offense" or (ii) a specific finding by the jury that the "other felony offense" indeed occurred. *See, e.g.*, *United States v. Callahan*, 801 F.3d 606, 628 (6th Cir. 2015) (applying § 2H4.1(b)(4)(B) cross reference when jury's special verdict found defendant's forced labor offense involved kidnapping); *United States v. Botsvynyuk*, 552 F. App'x 178, 184 (3d Cir. 2014) (applying an enhancement for "another felony offense" when the jury found the defendant "committed an aggravated sexual assault during the course of the offenses of involuntary servitude and peonage").

The defense cited the *Callahan* case in the objections to the PSR, and Probation improperly dismissed it without understanding its proposition. Probation confusingly referred to the discussion in *Callahan* regarding jury instructions for kidnapping, and incorrectly stated that the argument in *Callahan* "is not related to a guideline enhancement, but rather a statutory enhancement." SA at 9. The defense does not cite to *Callahan*'s discussion regarding jury instructions, nor is it relevant here. The relevance of *Callahan* is that the enhancement for "other felony offense" under § 2H4.1(b)(4)(B) (in that case kidnapping) was appropriately applied because the jury returned a special verdict. *Callahan*, 801 F.3d at 628. In contrast, here, the government did not seek a special verdict form. Therefore, unlike in *Callahan* and other cases in which an enhancement was applied by cross reference through § 2H4.1(b)(4)(B), the cross reference to sexual abuse should not apply because the jury did not find that the Rachel committed the "other felony offense" (*i.e.*, sexual abuse).

There only appears to be one reported case in which the "other felony offense" enhancement was applied without a jury finding. *See United States v. Maksimenko*, No. 05-80187, 2007 WL 1834708 (E.D. Mich. June 25, 2007). In that case, however, the defendant pled guilty

25

and waived his right to a hearing on the "other felony conduct." The conduct at issue there was particularly egregious – the defendant raped multiple victims while they fought back. *Id.* at *6–8; SA ¶¶ 9, 10. Thus, having waived a factual hearing on the issue, there was no question that the conduct met the definition of federal sexual abuse. In contrast, here, where Rachel had no intent to sexually assault anyone, where consent was assumed under the circumstances, and where the parties must dissect the OM practice and analyze whether a single OM demonstration even involved a penetration to satisfy the technical aspect of sexual abuse, a specific finding by the jury of sexual abuse is necessary. And while Probation correctly acknowledged that there was "ample evidence" of sexual abuse in *Maksimenko*, there is certainly not "ample evidence" of sexual abuse here. Accordingly, the enhancement should not apply.

     5.     <u>The Jurisdictional Element of Sexual Abuse Under 18 U.S.C. § 2242 Cannot Be Met</u>

The enhancement for sexual abuse also fails because the government lacked jurisdiction to charge Rachel with sexual abuse and is now attempting to sentence her as if she were convicted of it. Federal sexual abuse under 18 U.S.C. § 2242 criminalizes conduct only "in the special maritime and territorial jurisdiction of the United States," or in a federal prison or similar institution. "[S]pecial maritime and territorial jurisdiction of the United States" is a highly circumscribed jurisdictional grant that includes, among other things, "the high seas," specified vessels and aircraft, and certain types of federal land or facilities. 18 U.S.C. § 7. But § 2242 goes beyond just a jurisdictional issue because the setting in which it takes place – a facility with some kind of federal custody, contract, or agreement – makes the act inherently coercive. Although U.S.S.G. § 1B1.5 Application Note 3, states "such other offense includes . . . conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States," that note is a purely jurisdictional issue

that generally applies without regard to the coercive element of any specific statute, such as 18 U.S.C. § 2242.

Moreover, the Guidelines commentary must be interpreted in line with the limitations provided by Supreme Court cases. In *Stinson v. United States*, the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." 508 U.S. 36, 38 (1993). Subsequently, the Supreme Court in *Kisor v. Wilkie* reduced its deference owed to agency interpretations of their own regulations, clarifying that "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."[9] 588 U.S. 558, 575 (2019); *see also Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 232 (2d Cir. 2020).

Here, the jurisdictional requirement of 18 U.S.C. § 2242 as applied through U.S.S.G. § 2A3.1 is a necessary requirement of the offense. Applying the "traditional tools" of construction reveals no ambiguity in that requirement. The question, therefore, is whether the commentary in § 1B1.5 Application Note 3 alters or eliminates the jurisdictional prerequisite in § 2242 when considering whether the sexual abuse enhancement should be applied through § 2A3.1. The answer is unambiguously no. The commentary to § 1B1.5 does not – and cannot – remove the jurisdictional requirement embedded in § 2A3.1 through § 2242.

Further, a well-established canon of construction provides that when two provisions conflict, the specific provision controls. *See, e.g.*, *Gozlon-Peretz v. United States*, 498 U.S. 395,

---

[9] The Second Circuit has held that *Stinson* controls even post-*Kisor*. *See, e.g.*, *United States v. Rainford*, 110 F.4th 455, 475 & n.5 (2d Cir. 2024). To the extent this argument is foreclosed by Circuit precedent, Ms. Cherwitz seeks to preserve it for further review.

407 (1991); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012).  The specific provision here is U.S.S.G. § 2H4.1, which applies a cross reference to § 2A3.1 – the applicable guideline for criminal sexual abuse under 18 U.S.C. §§ 2241 and 2242, both of which contain explicit jurisdictional requirements.  In contrast, the general commentary in Application Note 3 to § 1B1.5 does not reference any statute, offense, or jurisdictional scope.  As a result, the specific provision – requiring that the conduct occur "in the special maritime and territorial jurisdiction of the United States," or in a federal prison – must prevail.  Accordingly, the sexual abuse cross reference to U.S.S.G. § 2A3.1 is inapplicable here.

Even if some ambiguity could be found, *Kisor* makes clear that deference to commentary still requires a "reasonable" interpretation, and "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." *Kisor*, 588 U.S. at 579.  Applying § 2A3.1 as an enhancement through § 2H4.1(b)(4)(B), thereby increasing the base offense level from 22 to 32, would be both unreasonable and an "unfair surprise."  It would, in effect, treat Rachel as if she were convicted of a sex crime, which the government was unable to charge her with, gave no notice of, and never convicted her of.

The rule of lenity further underscores this point.  Any genuine ambiguity in the Guidelines must be resolved in favor of the defendant.  *Parkins*, 935 F.3d at 66.  Applying that rule here compels the conclusion that the jurisdictional element of U.S.S.G. § 2A3.1 based on 18 U.S.C. § 2242 cannot simply be read out of existence through the commentary.

Additionally, other Guidelines provisions indicate that § 2242's jurisdictional element must be met here.  Several Guidelines include a cross reference to the Guideline for 18 U.S.C. § 1111, which similarly criminalizes conduct only "[w]ithin the special maritime and territorial jurisdiction of the United States."  Yet unlike § 2H4.1(b)(4), these cross references apply only if

an individual was "killed under circumstances that would constitute murder under 18 U.S.C. § 1111 *had such killing taken place within the territorial or maritime jurisdiction of the United States.*" §§ 2A3.1(c)(1), 2A4.1(c)(1), 2B3.1(c)(1), 2B3.2(c)(1), 2D1.1(d)(1), 2E2.1(c)(1), 2G1.3(c)(2), 2G2.1(c)(1). The Commission did not include similar language in § 2H4.1(b)(4)(B) to clarify that the other Guideline's offense level would apply even if the alleged conduct occurred outside the special maritime and territorial jurisdiction of the United States. And, as noted above, when Congress "uses particular language in one . . . statute and different language in another, we presume its word choice was intentional." *Fishman*, 2025 WL 2692069, at *5. And, as noted above, when Congress "uses particular language in one . . . statute and different language in another, we presume its word choice was intentional." *Fishman*, 2025 WL 2692069, at *5.

Moreover, the enhancement applies only if "any other *offense* was committed," § 2H4.1(b)(4) – a reference to the entire offense, not just particular elements of it. The enhancement is thus inapplicable when, as here, it is undisputed that § 2242's jurisdictional element is not satisfied.

Lastly, while the government initially investigated this case for potential sex trafficking charges, it did not charge a sex offense, and it should not be permitted to circumvent the beyond a reasonable doubt standard. And despite knowing that OneTaste's focus was on the OM practice, the government's theory of prosecution – as it acknowledged up until trial – was not that OneTaste sexually abused participants, but that it coerced labor through psychological means. *See* Nov. 15, 2024 Tr. 54:10–55:10; *see also* Trial Tr. 5224:12–18 ("And I want to emphasize something else about the law here. If you believe that the Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single one, then they are guilty. Here, you have seen overwhelming evidence that the Defendants agreed to get labor and services from a number of

29

people, but it only takes one."). To now apply § 2A3.1 as a cross-reference would transform the nature of this case after the fact, punishing Rachel as though she were convicted of a sex crime that the government never charged and never proved. Doing so would produce a drastic and unjust result – raising her base offense level from 22 to 32. Such a severe increase, based on an inapplicable and jurisdictionally defective cross-reference runs counter to the fairness principles embodied in *Kisor*, *Stinson*, and the rule of lenity.

6.    <u>The Government Failed to Provide Notice of Its Sexual Abuse Allegations</u>

Applying this enhancement would also violate Rachel's Sixth Amendment right to understand the charges against her because the government failed to provide notice that the OM demonstration constituted sexual abuse. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."). The government investigated this case initially to charge it as a sex trafficking case, but was unable to, so it charged it as a forced labor case. Indeed, even now, the government and Probation must put the OM demonstration under a microscope to argue that it satisfies the sexual abuse statute. By forcing these facts into the sexual abuse statute, it pushes the Guidelines range beyond what is appropriate and fair, and violates due process. In fact, the government specifically informed the Court that it was not going to seek to present any benefits or deficiencies with the OM practice because "that's not the government's case," and there was no need for the defense to present an expert on the science behind OM. Indeed, the government stated:

> I think many of the Government's witnesses would say there was some benefit to them in the practice of orgasmic meditation, so that's not part of the Government's case seeking to prove or disprove whether it was a good or bad thing. It will come up, of course, because it was one of the main practices of the company and some witnesses were directed to perform OM with other people, but it's just one type of labor amongst many types of labor and services that the Government is alleging.

Nov. 15, 2024 Tr. 55:1–10. Accordingly, if anything, the defense was on notice that the government was *not* going to use the OM practice to allege anything other than it was part of OneTaste and in certain instances, was part of the charged labor and services to the extent someone was directed to perform an OM. But here, with respect to Ms. Halpern, this OM demonstration was a training and not a sales or investment opportunity. Thus, the defense had no notice that the government would contradict its prior statement and use OMing to try and establish a claim of sexual abuse.[10]

Lastly, as argued above, there was no notice that Rachel was being accused of sexual abuse because (i) she lacked the requisite intent and had no knowledge about a lack of consent, (ii) Orgasmic Meditation does not involve penetration, and (iii) a finding of coercion under § 2242(3) must involve means of a fear of imminent bodily harm and more than just psychological coercion, which was not the case here.[11] Accordingly, the record does not establish by any burden of proof

---

[10] Notably, as the government has conceded to the undersigned attorney, and as evidenced by the absence of any argument on the point in the government's objections to the PSR ( Dkt. No. 456), the facts here do not establish a state felony sex abuse charge. No one was on notice, including the government, that there was even an argument that the OM demonstration could possibly meet the elements for federal sexual abuse. Indeed, when the defense initially met with the government to discuss the sentencing guidelines, the government did not raise the federal sexual abuse enhancement.

[11] There is also no comparable state felony offense that is applicable here for the two-point enhancement under § 2H41.1(4)(A). The only possible felony offense is sexual abuse in the first degree under New York Penal Law § 130.65, which does not apply because the facts established at trial do not amount to forcible compulsion nor was Ms. Halpern physically helpless. *See* N.Y. Penal Law § 130.65 (requiring either forcible compulsion or that the victim be "incapable of consent by reason of being physically helpless" to find sexual abuse); *see also* N.Y. Penal Law at § 130.00(7), (8) ("Forcible compulsion" means to compel by either use of physical force, or a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, or in fear that he, she or another person will immediately be kidnapped. "Physically helpless" means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.). Indeed, Probation does not argue that any state felony offenses apply.

that Rachel committed the federal offense of criminal sexual abuse against Ms. Halpern. An application of the enhanced offense level for commission of the § 2242(3), therefore, would be contrary to the statute's plain language, case law, and the United States Constitution.

        *B.*       *The Offense Characteristics Enhancements Under § 2H4.1 Do Not Apply*

Assuming the Court agrees that federal criminal sexual abuse does not apply here, the base offense level would be 22, plus any enhancements that can be proven with reasonable certainty. *See* U.S.S.G. §§ 2X1.1(a), 2H4.1. As set forth below, none of the other enhancements apply under either the reasonable certainty standard or even the preponderance standard.

        1.       <u>The Enhancement Under § 2H4.1(b)(1)(B) Is Inapplicable Because No Serious Bodily Injury Occurred</u>

Probation incorrectly asserted that the OM demonstration involving Ms. Halpern constitutes "serious bodily" injury and that a two-level enhancement is warranted pursuant to § 2H4.1(b)(1)(B). PSR ¶ 96. But Ms. Halpern did not suffer from "serious bodily injury" as a result of the OM demonstration. Section 1B1.1, comment. (n.1(L)) states "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law."

For the reasons set forth above, this conduct at issue – the OM demonstration – does not constitute sexual abuse under §§ 2241 or 2242. Therefore, for this offense characteristic to apply, the offense conduct must have involved a similar offense under state law. Yet, there is no "similar offense" under New York State law that would govern the OM demonstration.

Probation argues that Rachel's conduct constitutes either sexual misconduct under New York Penal Law § 130.20 or forcible touching under § 130.52. Both §§ 130.20 and 130.52, however, are misdemeanors, and therefore do not constitute a "similar offense" to the federal sexual abuse statute under state law. Indeed, the term "serious bodily injury" connotes something

more than mere sexual contact or sexual touching. Rather, it logically follows that there must be a serious threat that coerces a person to engage in sexual activity with some aspect of penetration to amount to serious bodily injury.

But even if these state offenses were felonies, neither would apply here. First, § 130.20 requires "vaginal sexual contact," which is defined in § 130.00 as "conduct between persons consisting of contact between the penis and the vagina or vulva." It is undisputable that there was no contact between the penis and the vagina or vulva during the OM demonstration. Therefore, the OM demonstration does not involve sexual misconduct under § 130.20(1). Further, there is no disagreement that the OM demonstration does not constitute sexual misconduct under the remaining provisions of § 130.20, which require either oral sexual contact, anal sexual contact, or sexual conduct with an animal or a dead human body. § 130.20(2), (3), (4). Therefore, Rachel's conduct during the OM demonstration was not sexual misconduct under § 130.20.

Second, to satisfy forcible touching under § 130.52, a person must "intentionally, and for no legitimate purpose," touch the other person to "degrad[e] or abus[e]" the person or to "gratify[] the actor's sexual desire." There was certainly a legitimate purpose for Rachel to touch Ms. Halpern's clitoris – it was in the context of an OM demonstration for training purposes, which Ms. Halpern generally wanted to do. Indeed, she admitted that doing an OM demonstration was prestigious. The OM demonstration was not conducted to degrade or abuse Ms. Halpern, and certainly not to gratify Rachel's sexual desire. As detailed above in Section I.A.1.c., █

███████████████████████████████████████████████████████████████████████████

and there was no way for Rachel to have known the interaction was not consensual. Exhibit 24. Accordingly, because there *was* a legitimate purpose for the touching – one for which Rachel

33

assumed Ms. Halpern was consenting to given the context and circumstances detailed above in Section I.A.1.c. – there was no forcible touching under § 130.52.

2. The § 2H4.1(b)(3)(A) Enhancement Should Not Apply Because There Was No Finding That Victims Were Held in a Condition of Involuntary Servitude for More Than One Year

The Court should also reject the three-level enhancement under § 2H4.1(b)(3)(A) because no victim was held in a condition of peonage or involuntary servitude for more than one year.

a. The Enhancement Should Not Apply to a Conspiracy Conviction

This enhancement should not apply because the government charged a conspiracy to commit forced labor through psychological coercion, and the victims admitted they had a choice to leave at any time. Indeed, they all eventually left as did many others. *See* Section I.B.2.b. Applying the enhancement, therefore, would require the Court to determine that Rachel committed an offense for which she not only was not found guilty of, but also was not even charged with. Notably, there has *never* been a case in which the defendant was solely charged with a conspiracy to commit forced labor, and therefore, this enhancement has never been applied in this scenario.

Furthermore, had Rachel been convicted of the substantive offense of forced labor, the Court would properly have authority to decide the narrow factual question of whether any victim was held in a condition of involuntary servitude or peonage for more than one year. But that is not the case here. The jury was not asked to, and did not, find that Rachel committed forced labor.

In fact, the record confirms that the jury was specifically told that it did not have to find actual forced labor. The government repeatedly emphasized to the jury that this case was not about whether the witnesses suffered serious harm causing their labor. Trial Tr. 5222:11–20. Instead, the government argued that "if Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single victim, then they are guilty." *Id.* at 5224:12–18. In other words, the jury was instructed that an agreement with a single form of labor or service was

34

sufficient for a conviction. This was not asking the jury to find much at all. It would therefore violate Rachel's trial by jury and due process rights for the Court to now make an independent factual determination that forced labor occurred as a basis for applying this enhancement. Indeed, this is the reason why the Court must look to § 2X1.1 in the first instance – this is a conspiracy charge, and the government had ample opportunity to charge the substantive offense of forced labor if it had wanted to. It chose not to – presumably because it was concerned that it would not be able to prove actual forced labor beyond a reasonable doubt. It should not be permitted to now circumvent the evidentiary deficiencies in its case by seeking to impose punishment as though the substantive offense had been proven.

            *b.*     *The Facts Here Do Not Align with Cases in Which Courts Have Applied This Enhancement*

Even if the Court were to conclude that it could apply the enhancement without a jury finding of actual forced labor, the evidence does not support its application. Courts have applied this enhancement in cases where the victims had *no choice* but to continue to labor, including where victims were deprived of travel documents and passports, confined to residences, denied contact with the outside world for extended periods of time, or threatened with harm if they attempted to leave. For example, in *United States v. Sabhnani*, the defendant confiscated the victims' passports and travel documents and told them that if they ran away the police would shoot them and that one of the victim's husbands would be arrested in Indonesia. *In*, 599 F.3d 215, 228 (2d Cir. 2010) *United States v. Dann*, the defendant did not allow the victim to leave the apartment without her permission, instructed her to not speak with anyone, made her hide in the apartment complex's gym when the defendant had friends over, and also told the apartment complex's property manager "to order Spanish-speaking personnel not to talk with [the victim]." 652 F.3d 1160, 1165 (9th Cir. 2011). These are just a few examples. *See, e.g.*, *Callahan*, 801 F.3d at 628

35

(affirming the district court's finding that the three-level enhancement in § 2H4.1(b)(3)(A) applies, citing that the defendant locked the victim in the basement and later in a room upstairs); Sent'g Transcript at 10, 15,146, *United States v. Raniere*, No. 18-cr-204 (E.D.N.Y. Oct. 27, 2020) (applying the three-level enhancement and noting the defendant confined one victim to a room without human contact for nearly two years and threatened that if she left the room, she would be sent to Mexico without any identification). In contrast, the instant case bears no resemblance to those cases in which the enhancement was applied because here, every single witness testified that that they were free to leave OneTaste at any time and they stayed by choice:

- "Q: And that's because you did choose to be at OneTaste, because you wanted to change and grow, right? A: Absolutely." Trial Tr. 589: 16–18.

- "Q: But you chose to stay instead, correct? A: Yes." *Id.* at 1185:22–25.

- "Q: Each time you left, you made a choice to come back and keep associating with OneTaste, right? A: Yes." *Id.* at 1392:1–3.

- "Q: And you could have stayed in San Francisco in your own apartment, right? A: I could have chosen not to move – well I could have stayed in San Francisco. I could have made different choice, but I did of my own free will move into the Morellino knowing that there was going to be very little, if no privacy." *Id.* at 1826:2–7.

- "Q: And you chose, based on whatever suggestion you received, to spend your time at OneTaste, correct? A: Correct." *Id.* at 2230:21–23.

- "Q: . . . [Y]ou had an apartment in Brooklyn that you could have gone back to any time, correct? A: During – yes. Mm-hm." *Id.* at 2817:11–15.

- "Q: Bottom line, ma'am, you were able to leave OneTaste at any time, correct? A: Yes." *Id.* at 3147:1–3.

36

- "Q: So we can agree that you were free to come and go as you please at One Taste? A: Yes. Q: No one locked you in anywhere; right? A: No. Q: No chains on the door? A: No. Q: If you wanted to leave go to your sister's place in SOHO you could do that; correct? A: Yes. Q: You always had the ability to leave One Taste at any time; right? A: Yes. Q: And when you stayed it was because you chose to stay; correct? A: Yes." *Id.* at 3108:12–3109:1.

- "Q: . . . You could have decided to live somewhere else other than 1080 Folsom, right? A: Yes, yes." *Id.* at 4025:20–23.

In fact, numerous witnesses testified that they did leave OneTaste when they chose to, and that no one prevented or obstructed them from doing so.

- "Q: And you told people at OneTaste you were leaving, right? A: I would imagine so. Q: Okay. In response, no one forced you to stay, right? A: No. . . . Q: When you told people at OneTaste that you were moving out, they just let you go, right? A: Yes. No one chained me up anywhere." *Id.* at 1455:18–1456:01.

- "Q: And at any day, through whatever period of time that you lived there, you could have walked out the door and not come back, correct? A: Yes, and eventually that's essentially what I did." *Id.* at 1902:14–17.

- "Q: Right. It felt emotional leaving, but nothing obstructed you from leaving, right? A: Once we made the decision, nothing obstructed us." *Id.* at 2919:14–16.

- "Q: Fair to say if you didn't like your hours or your wages you could get a different job; right? A: Yes. Q: That's a decision you ultimately made; correct? A: Yes." *Id.* at 3108:7–11.

And even at the end of Ms. Halpern's testimony, when asked on cross if she regretted her time at OneTaste, she emphatically testified "[n]o, I actually don't regret it." *Id.* at 805:10. Had Ms. Halpern been held against her will for over a year, it is inconceivable that she would testify years later that she did not regret her time there. Accordingly, the above testimony directly contradicts any notion that victims were held in "peonage or involuntary servitude," let alone for more than one year, and thus, the three-level enhancement in § 2H4.1(b)(3)(A) is inapplicable.

> c.  *Even If the Enhancement Were to Apply, the Requisite Time Period Has Not Been Established*

Finally, even if the Court were to accept the government's theory, neither the government nor Probation has identified when any alleged condition of "peonage or involuntary servitude" began. Determining whether such a condition lasted more than one year necessarily depends on when it purportedly started and ended. And particularly here, when the only argument is that the victims were psychologically coerced to labor for over a year, the Court would have to determine when the psychological coercion started. Without those temporal findings – which are wholly absent and were necessarily *not* an element of the crime charged – the enhancement cannot apply.

> C.  *Rachel Was Not an Organizer, Leader, Manager, or Supervisor Under § 3B1.1*

The aggravating role enhancement is also inapplicable because Rachel did not have sufficient control over any co-conspirator as an organizer, leader, manager, or supervisor of OneTaste. U.S.S.G. § 3B1.1.

"To qualify for an adjustment under [§ 3B1.1], the defendant must have been the organizer, leader, manager, or supervisor *of one or more participants*." § 3B1.1, comment. (n. 2) (emphasis added). A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted," *i.e.*, a co-conspirator. *Id.* at comment. (n. 1). Contrary to the PSR, the three participants identified with respect to this enhancement, CC-2 (Yia

Vang), CC-6 (Rachel Hemsi), and CC-8 (Aubrey Fuller) were not managed by Rachel. Dkt. No. 456 at 19; SA at 10. Specifically, Ms. Vang joined OneTaste in 2005, before Rachel, and was never on the sales team nor did Rachel ever supervise her. Ms. Vang's roles included events coordinator, center manager, Nicole's assistant, coaching program ("CP") teacher, and CP/curriculum director. Similarly, Rachel Hemsi never reported to Rachel. She was the New York sales lead from 2007 to 2008 (during which she reported to Mr. Kandell), then head of production, manager of the 1080 Folsom Street communal home, director of OneTaste London, and then director of OneTaste San Francisco. Lastly, Ms. Fuller was never on the sales team and was initially supervised by Mr. Kandell. Ultimately, Ms. Fuller became a part owner of OneTaste New York in 2015, for which Rachel was contracted to assist in sales. Accordingly, because there is no basis for the Court to make the "specific factual findings" required to support that Rachel managed or supervised any of the alleged participants, *United States v. James*, 151 F.4th 28, 44–45 (2d Cir. 2025), an aggravating role should not apply.

1. The Four-Level Enhancement Does Not Apply

Despite Probation advocating for a four-level role enhancement, even the prosecutors agree that Rachel was not an organizer or leader. *See* Dkt. No. 456 at 19 ("[T]he record makes clear that Cherwitz's role was not that of the overall organizer or leader of the conspiracy, which the Guidelines reserve for those who create, direct and control the entire conspiracy."). Furthermore, because Rachel never supervised the three co-conspirators identified by Probation, the facts certainly do not support the degree of control or authority contemplated by § 3B1.1(a)'s four-level enhancement, which applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

Moreover, Rachel was not a co-founder of OneTaste and thus could not be considered an organizer. As the government stated, "the Guidelines reserve [the organizer/leader enhancement]

for those who create, direct *and* control the conspiracy." *Id.* (emphasis added); *see also United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000) (finding defendants were organizers or leaders when they "played a crucial role in the planning, coordination, *and* implementation of a criminal scheme" (emphasis added)). It would be impossible for Rachel to have created, planned, coordinated, or implemented the conspiracy – indeed, the government alleged the conspiracy began in 2006, before Rachel even joined OneTaste. She became involved with OneTaste in 2007, and even then, she first joined as a participant, before eventually becoming a coach and a teacher. Only later did she work her way up in the Company, eventually becoming one of Company's top sales generators. During Rachel's tenure, she was supervised by various people, which further demonstrates that she was not a leader warranting a four-point enhancement.

Rachel also lacked the degree of discretion, planning and organization of the offense, and control over the other members of the conspiracy necessary to warrant a four-point enhancement. *See id.*; *see also United States v. Bandrich*, 636 F. App'x 65, 67 (2d Cir. 2016) (Courts consider "the degree of discretion exercised by [the defendant], the nature and degree of [the defendant's] participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy"). Certainly, Rachel's involvement does not rise to the level of the organizers and leaders in these other cases. *See, e.g.*, *United States v. Destine*, No. 20-CR-293, 2024 WL 1479777, at *1–2, *5 (E.D.N.Y. Apr. 4, 2024) (applying the four-level enhancement for a gang leader who, amongst other things, ordered his co-defendant to recruit people to commit a shooting); *Botsvynyuk*, 552 F. App'x at 185 (applying the four-level enhancement to a defendant who "was the only person who was involved in every aspect of the Organization's operations" and who multiple victims testified was the leader of the organization and ultimate decisionmaker). Rachel could not have planned or organized the conspiracy as she

was not even involved with OneTaste during the period when the government asserts the conspiracy began.

In addition, per Note 4 of § 3B1.1, another factor considered when distinguishing between the leader/organizer role on the one hand and the mere manager/supervisor role on the other hand, is the claimed right to a larger share of the fruits of the crime. In the under 12 years that Rachel was involved with OneTaste, she made a total of $421,883. That is an average of $35,156.92 per year, which is minimum wage for the work that Rachel actually performed herself. In addition, Rachel did have control or oversight as to what others were being paid.

2.      The Two- and Three-Level Enhancements Do Not Apply

Additionally, the three-level enhancement for a manager or supervisor pursuant to § 3B1.1(b) does not apply. While Rachel had a managerial or supervisory role at OneTaste, she did not have that role over other co-conspirators, which is necessary to warrant a three-level enhancement. As detailed above, Rachel did not supervise or control any of the co-conspirators. And even if there was a participant whom she managed, managing or supervising one participant is not what the Commission had in mind for applying the three-level enhancement. *See* U.S.S.G. § 3B1.1 comment. (back'd) ("The Commission's intent is that this adjustment should increase with both the size of the organization *and the degree of the defendant's responsibility*." (emphasis added)).

Further, the two-level enhancement set forth in § 3B1.1(c) also does not apply. Section 3B1.1(c) increases the offense level by two for those whose actions did not rise to the level of heavy involvement or responsibility for the actions of other participants set forth in § 3B1.1(a) or (b). Rachel should not receive any aggravating role increase because (i) she did not supervise any of the participants (*i.e.*, co-conspirators) in the crime, (ii) she ultimately rose in the organization because she worked harder than anyone, and (iii) she did not benefit financially from her hard

work or from anyone's labor. Accordingly, Rachel should not receive an aggravating role enhancement.

<strong>D. <u>A One-Point Reduction Should Apply to Take Into Account the "Trial Penalty"</u></strong>

Rachel exercised her constitutional right to a jury trial and should not be penalized for doing so. Taking this case to trial was Rachel's only realistic option. The government charged a single count of conspiracy to commit forced labor based on a novel theory that the victims were forced to labor because they were psychologically coerced. Because Rachel lived with many OneTaste members in community and witnessed them asking to work for OneTaste, requesting to be trained in the OM practice, signing up for classes with the intent to become coaches themselves, and shouting from the rooftops about their love for OM and OneTaste, she could not have been expected to plead guilty to a conspiracy for forced labor, particularly when no such case like this has ever been tried before. Rachel also believed at the time that she was helping people achieve their goals. Indeed, as evidenced from the hundreds of attached letters, many people credit Rachel with doing just that. Moreover, Rachel learned early in the case that the government's star witness's journals were fabrication, and she spent over a year trying to prove it. Given all of this, Rachel had no choice but to put the government to its proof.

Thus, particularly because of these unique circumstances, Rachel's offense level should be reduced by one point due to the unconstitutional trial penalty imposed on those who choose to exercise their Sixth Amendment right to trial by a jury. In a recent decision in the Southern District of New York, Judge Rakoff noted that the Guidelines unconstitutionally penalize defendants who go to trial rather than plead guilty, also known as the "trial penalty." *United States v. Tavberidze*, 769 F. Supp. 3d 264, 268 (S.D.N.Y. 2025). Specifically, Judge Rakoff stated that § 3E1.1(b) of the Guidelines allows a one-point reduction in the offense level calculation of defendants who

plead guilty if the government believes the defendant "pled guilty quickly enough to permit the prosecutor to avoid preparing for trial." *Id.* at 267. He stated:

> [S]ection 3E1.1(b) in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sixth Amendment right to trial. . . . [T]he only ground given for imposing the additional penalty under 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial. This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right. Worse still, on this flimsy basis section 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it.

*Id.* at 270. As such, Rachel's offense level should be reduced by one point "because the effect of not giving the one-point reduction to someone who chose to exercise, or considered exercising, [her] right to go to trial rather than save the Government some time and money is effectively an unconstitutional penalty on all who made that choice." *Id.* at 273.

Furthermore, a guilty plea in such a novel case would have been untenable not just for Rachel, but for our criminal justice system as a whole, which must "command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970); *see also* Stephanos Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L. Rev. 1361, 1386 (2003) ("Allowing innocent defendants to plead guilty creates serious negative externalities because society has a strong interest in ensuring that criminal convictions are both just and perceived as just."). Accordingly, at the very least, it would "promote respect for the law" for the Court to use these Sixth Amendment concerns as a basis to vary downward under the §18 U.S.C. § 3553(a)(6) factors.

E. <u>Rachel Is a Zero-Point Offender</u>

Rachel also qualifies for a two-level downward adjustment under the zero-point offender guidelines in U.S.S.G. § 4C1.1. She did not receive any criminal history points, *id.* at §

43

4C1.1(a)(1), PSR ¶118; she did not receive an adjustment for terrorism, § 4C1.1(a)(2); she did not use violence or credible threats of violence in connection with the offense, § 4C1.1(a)(3); the offense did not result in death or serious bodily injury, § 4C1.1(a)(4); the instant offense of conviction is not a sex offense § 4C1.1(a)(5); she did not personally cause substantial financial hardship, § 4C1.1(a)(6); no firearm or dangerous weapon was involved in the offense, § 4C1.1(a)(7); the offense is not covered by § 2H1.1, § 4C1.1(a)(8); she did not receive an adjustment under § 3A1.1 or § 3A1.5, § 4C1.1(a)(9); and she was not engaged in a continuing criminal enterprise, § 4C1.1(a)(11).

The only criterion at issue is whether Rachel should receive an aggravating role adjustment under § 3B1.1, § 4C1.1(a)(10).[12]  But, as argued above in Section I.C., Ms. Halpern did not suffer "serious bodily injury" as a result of the OM demonstration and Rachel should not receive an aggravating role adjustment given that she did not supervise any of the co-conspirators.  Therefore, Rachel is entitled to a two-point downward adjustment for being a zero-point offender.

### F.    *Rachel Is Entitled to a Downward Departure Under § 5H1.11*

Finally, a downward departure is warranted pursuant to U.S.S.G. § 5H1.11 because Rachel has devoted her life to helping others to an "exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  *Koon v. United States*, 518 U.S. 81, 96 (1996).  As the letters submitted in support of Rachel demonstrate, there is nothing usual or ordinary about Rachel's devotion to helping others.  Indeed, a familiar theme across those letters described in Section II.A.1 and appended to this submission is Rachel's instinctive commitment to helping persons in distress or in need – not for recognition, not for money, influence or vanity,

---

[12] Section § 4C1.1(a)(4) precludes the zero-point offender if "the offense" involved serious bodily injury.  While Probation argues that the offense involved serious bodily injury, but the OM demonstration was not part of the labor. And even if it was, as argued above in Section I.B.1, Ms. Halpern did not suffer "serious bodily injury" as a result of the OM demonstration.

but out of pure goodness and decency of heart. These essentially life-changing acts of kindness described in the letters, along with Rachel's commitment to helping others with trauma and addiction, as well as feeding the hungry, are both exceptional and sufficiently unusual as to warrant a departure under § 5H1.11. *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (holding that defendant's community service warranted a downward departure because the letters in support "contain substantive descriptions of [the defendant's] generosity with his time as well as his money," and "[s]everal constituents and friends described situations in which [the defendant] extended himself to them in unique and meaningful ways during times of serious need"). Furthermore, unlike wealthy individuals who can help by donating money, Rachel could never afford to do so. But instead of donating money, Rachel donated the most precious thing of all – time. She donated her time over and over again with patience, attention, and devotion. Even during the months leading up to her trial when many would be focused on themselves, she was focused on helping others. Just two months before the start of her trial, Rachel organized and hosted a collaborative dinner with Providence House Brooklyn aimed to connected formerly incarcerated women with the general public to aide in welcoming them back into the community.

## II.   <u>RACHEL SHOULD RECEIVE A SENTENCE OF TIME SERVED</u>

The Guidelines for sentencing are merely a "starting point," *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), and "truly advisory," *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). Under 18 U.S.C. § 3553(a)(6)(1), courts must "carefully consider on an individualized basis 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017); *see also Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (recognizing "the principle that the punishment should fit the offender and not merely the crime" (internal quotation marks omitted)). Importantly, courts "need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Finally, courts must "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)(B)-(C)," in other words, "proportionality, deterrence, incapacitation, and rehabilitation." *Douglas*, 713 F.3d at 700.  The Court should impart the lowest possible sentence that takes into account the factors set forth in that section.  *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a district court were explicitly to conclude that two sentences equally served the statutory purposes of § 3553, it could not, consistent with the parsimony clause, impose the higher."); *see also United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) (remanded for resentencing where the court reflected more on its "personal view of the opprobrium of the crime charged . . . than a careful weighing of mitigating factors and the relative levels of culpability and involvement of each defendant"); *United States v. Wardlaw*, 576 F.2d 932, 938 (1st Cir. 1978).

> *A.       Section 3553(a) Factors*

As this Court is aware, it must consider and weigh all of the factors enumerated in 18 U.S.C. §3553(a) and "shall impose a sentence sufficient, but not greater than necessary," to achieve the goals of sentencing.  The factors the Court considers include the defendant's history and characteristics, the nature and circumstances of the offense, the need to avoid unwarranted sentencing disparities, deterrence, protecting the public, the kinds of sentences available, the sentencing range in the Guidelines, pertinent policy statements, the seriousness of the offense, and just punishment.  As discussed below, the Section 3553(a) factors weigh strongly in favor of a sentence of time served.

> 1.       Rachel's History and Characteristics

The letters submitted on Rachel's behalf combined with the work that she has done for others in her lifetime, demonstrate a common thread: Rachel has compassion and empathy that is

fueled by a desire to help others. At her core, Rachel's heart has always been in the right place, even if the methods by which she helps people are not conventional. This is exemplified by Rachel's life's work in addiction recovery and counseling, and from her every day random acts of kindness.

To the extent the court interprets the evidence a trial in the light most favorable to the government, the conduct that Rachel was convicted of must certainly be viewed as an anomaly in the scope of her life.

While there was testimony during the trial from witnesses about how Rachel treated them on text message or otherwise, which Rachel regrets, her actions came from a place of caring. Indeed, there were many other people during that time that Rachel helped and touched. For example, Drea Marz, has known Rachel most of her life from summer camp when they were children, to youth groups during their teenage years, and throughout their time at OneTaste together. Ms. Marz describes Rachel as "an exceptionally sensitive and empathetic person," and that she has had a "lasting, positive impact on her life." Exhibit 9. She also described witnessing Rachel "in countless exploratory sessions and follow-up conversations with students and client, where she offered kindness, respect, and open-ended opportunities for grown, never pressure." Similarly, Rachel's lifelong friend, Alana Dugandzic also described her interactions with Rachel in 2018, 25 years into their friendship, as having evolved professionally and spiritually, but remaining at her core, the same person. "She had the same intense love for people, a laid-back, cool personality, and a fierce loyalty that never waivered." Exhibit 1. Another childhood friend, Adam Secore, concurs saying:

> From childhood to the present, she has remained steadfast in her compassion and loyalty, maintaining meaningful relationships and showing deep concern for the well-being of those around her. . . . Throughout the years, Rachel has consistently demonstrated a willingness to help others and an unwavering

commitment to doing what is right. Her kindness is not performative, it's simply who she is. Whether through her personal relationships or her involvement in her community, she has been a steady and supportive presence for many.

Exhibit 10.

Others described Rachel as a mentor and friend who changed the course of their lives. For example, Lissa A. Boileau met Rachel in 2016 when she came to OneTaste "fighting for her life" and Rachel became one of the most "pivotal mentors in [her] recovery and growth." Exhibit E. Due to trauma in her past, Ms. Boileau explained that Rachel was the one who suggested that she approach the coursework at OneTaste very slowly and deliberately: "She held a firm, caring boundary (as I did not have many) and asked that I complete preliminary coursework on consent, boundaries, and personal agency before entering any of Onetaste's more advanced offerings." As Ms. Boileau went on to become a board-certified psychiatric nurse practitioner, she described Rachel as "a guiding force — helping me merge the clinical world of psychiatry and with the spiritual principles that had helped save my life." At a time when Ms. Boileau was ready to quit, "Rachel sat with me in one of the darkest seasons of my life and helped me hold the pieces long enough to see the light return." Ms. Boileau credits Rachel with helping her graduate because "she believed in me when I could not believe in myself." She also described how Rachel supported their mutual friend who suffered from the loss of her father, through housing instability, and emotional hardships: "Rachel, without ever seeing credit, continually check in on her well-being, often reading out to me privately to ensure someone had eyes on her mental and psychical health." Ms. Boileau recognized that Rachel helped people because that is who she is and never did it for recognition, "[w]hether it was feeding someone who was hungry or sitting with someone in grief, Rachel showed up. Not because it was convenient. Not for applause. But because it was who she was."

Ms. Boileau's sentiments about who Rachel is – someone whose purpose in life is to help others – is echoed in all the letters submitted to the court. For example, Rachel's direct supervisor at the Alternative Med Center, John Camillieri, discussed Rachel's "compassion and empathy," as evidenced by her ability to both assist in the technical role as a Clinical Liaison/Behavioral Tech, and at the same time be able to turn that off and serve "as an empathetic and unconditionally loving case worker to a person in profound distress." He also discussed how Rachel possessed the most important ingredient for the role – "compassion," and how she would sit with patients for "hours and hours at a time."

> In this way she inspired not just myself but all the members of the team who consistently acknowledged that she was uniquely suited to helping others. She spoke the language of the soft heart but did so with great ingenuity and discernment which helped even the most entrenched addicts show willingness to confront long sequestered emotions.

Exhibit 12.

Alison Stevens, who is currently a Project Manager professional, also spoke about the help that Rachel gave to her. "It was one of the hardest seasons of my life and she showed up for me. She sat with me and listened. She treated the information she learned about me from that experience with the utmost care and confidence." Exhibit [STEVENS LETTER]. Ms. Stevens worked in sales with Rachel at OneTaste and recognized that even when Rachel made mistakes, her heart was always in the right place:

> Rachel's aim is and has always been love, and by human error has missed the mark at times. I have only seen her become more skillful and kind over time. Through her continuing education in mental health, I saw her commitment to helping others and getting the best training possible to do her job well. She improves the lives of those around her wherever she is, and I know society and my life is better with her in it.

*Id.*

Another friend, Caitlin McDuff, wrote about how Rachel helped her after she was diagnosed with multiple sclerosis:

49

> Rachel was one of the first people in my life to be able to tell me the painful truths that I needed to hear. Nobody had ever been that brave. She told me that if I didn't learn to slow down, I was essentially going to face major consequences with my body. It was completely true. And she delivered that feedback with so much love and grace. That moment of truth with her has echoed through my life in every moment since then.

Exhibit 14. Ms. McDuff met Rachel through OneTaste, but their friendship continues to this day. She described how Rachel helped her in 2003 when she was in a difficult place in her life. "And that's the kind of person Rachel is – showing up when it really matters to bring love and truth."

Kerri Russi, who Rachel met in 2020 while they were both working in the drug and alcohol recovery community, wrote about how "Rachel had dedicated much of her life to supporting others in recovery." Exhibit 2. Ms. Russi owned a sober living home, and many of Rachel's patients went to live there following their treatment with Rachel. Those patients often shared stories with Ms. Russi about "the positive impact Rachel had on people in early recovery. Residents described her as someone who listened deeply, offered hope, and reminded them of their own ability to find solutions in difficult moments. Her presence helped people feel seen, heard, and empowered." Ms. Russi commented that Rachel "is able to rekindle hope in people who have lost their way and helps them reconnect to their sense of self-worth."

Marissa Ward met met Rachel while at OneTaste in 2014 and worked alongside her almost every day from 2015 through 2018. This gave Ms. Ward the opportunity to observe Rachel in various settings, including formal workspaces, informal living spaces, classroom settings, and casual women's groups. Ms. Ward said:

> I was often in awe while watching her work with students. I remember one specific women's course where she created an experience for an exhausted single mother of two, putting her in a big comfy chair with cozy blankets and having the back-of-house volunteers bring her favorite type of tea and snacks. She wanted this woman to have the experience of care that she always gives to others, one weekend where she could be taken care of rather than being a caretaker.

Exhibit 15.  When Marissa was sick before she was supposed to teach, and Rachel insisted she not teach, brought her soup, covered the class, and texted her throughout the day to see how she was feeling.  "This is the kind of human being Rachel Cherwitz is: generous and compassionate."[13]  *Id.*

These qualities of Rachel's can also be seen in the work that she did for FreeFood and Women over Dinner.  Rachel supported fundraising efforts and was a consistent volunteer at events.  Up until the trial began, Rachel was a server at FreeFood restaurant in Harlem, and passed out the additional 150 meals to those who take to go meals home to their families or friends who could not make the trip in.  As Ms. Dugandzic noted: "She feeds and clothes the homeless, talks with them like human beings, and helps them see their worth and dignity beyond their current circumstances.  Her impact is not performative.  It is deeply personal.  Her presence enriches lives.  Mine included."  And customers of FreeFood have been touched by Rachel's kindness.  One of those customers, Novelette Gordon, described her first encounter with Rachel and how she feels about her in general:

> She was very kind.  She told me to come back and I didn't have to do anything, just sit and have dinner.  We will serve you she said.  There should be more people like Rachel.  We would have a better world to live in if you have more people like her. . . .  You have to be born with that good strength, nobody can train you for that.

Exhibit 16. Dimitri Mugianis also discussed Rachel's devotion to helping others.  He met Rachel after her arrest during an On Point outreach event for active drug users and noted that "Rachel was there, personally ensuring those society overlooks received critical support.  Her commitment to people battling addiction and homelessness was unmistakable.  Her work is a lifeline." Exhibit 22.

Her husband, Matt Pelletier, described Rachel's "uncommonly generous heart, which she shares freely with friends and strangers alike," and shared this example:

---

[13] Ms. Ward is currently a marriage and family therapist intern at a faith-based organization and is soon to become a licensed marriage and family therapist.

> In 2022, we lived on Market Street in San Francisco, where there is a lot of drug use and homelessness nearby. Rachel would often bring any extra food or clothes we had to the people outside… She would remember specific people and check in on them when we took walks. If we passed by someone who was not moving, who might be overdosing, she would stop to check whether they were breathing, or call 911 to get them help.

Exhibit 3.

Rachel has changed people's lives because of her kindness, empathy, honesty, and fierce loyalty. She has helped people because she wanted to – not because anyone was watching; not because she was seeking a reward. While the victims in this case felt that she manipulated them and treated them poorly, there were many people whose lives she touched in a positive way, including after she left OneTaste. Even some of the witnesses at trial testified about Rachel's kindness. Michelle Wright called Rachel a "mentor and a friend," and Anthia Gillick, after she sold her interest in OneTaste, posted on August 28, 2015 a thank you to Rachel "for the inspiration [she had] been in the last year." Trial Tr. 2504:4–8   ;   *id.* at 4212:5–22. Mr. Kandell described Rachel on *direct* testimony as "everything":

> She was a passionate, inspiring leader. We talked a lot about the negative terms, but she was also incredibly dedicated, worked with people, were patient with people, wanted them to succeed, wanted the organization to succeed. At the best of times, that's what came across. In the worst of times, she got annoyed because people weren't doing what they were doing or they were lazy or they were argumentative. And so the whole spectrum of what a sales manager has to deal with.

*Id.* at 3416:9–17.

Rachel believed she was doing good for others even though there were times when she pushed people, was argumentative, or came off mean. Those actions were taken because she believed that the serious participants wanted to be pushed, which is why they chose to live in OM houses and chose to take classes.

Notably, Rachel was paid only a small salary for her work as head of sales – work that she did because she believed in the practice of OM. It was not something she did for greed or personal

gain.  And while the government argued that her motive in this case was "[p]ower and prestige," *see* Trial Tr. 5018:9–10, Mr. Kandell testified about how hard Rachel worked to become head of sales and to maintain that position.  *Id.* 3417:2223 ("She worked harder than any of us for sure."); *see also id.* at 3588; *id.* at 624:21–23; *id.* at 581:2–4.  Accordingly, the Court should consider the good that Rachel has done for people throughout her life, and how many lives she has touched both before, during, and after her work with OneTaste.  *See Adelson*, 441 F. Supp. 2d at 513–14 (""[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.")[14]

> a.  *Rachel Has Continued Her Commitment to Helping Others at the Metropolitan Detention Center*

Since her remand on June 10, 2025, Rachel has not only been a model prisoner, but has also continued her dedication to helping others and has improved the lives of her fellow inmates.  Upon arrival to the Metropolitan Detention Center ("MDC"), Rachel spent many hours a day engaged in various Buddhist meditation practices, and other inmates soon began to sit and meditate with her.  Following a request by other inmates and the approval by the MDC, Rachel began hosting classes for between 12 to 20 fellow inmates, which include a range of Buddhist practices including Tummo (a Tibetan breathing technique), Tonglen (compassion meditation), and the Eight Fold Path (Buddhist ethics) – all aimed at giving inmates the tools to find freedom within

---

[14] *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his "generosity of spirit," and his "good deeds . . . not performed to gain status or enhance his image"); *United States v. DiMattina*, 885 F.Supp.2d 572, 582 (E.D.N.Y. 2012) (support letters attesting to defendant's "good character and many acts of charity" justified reduction); *see also United States v. Canova*, 412 F.3d 331, 358–59 (2d Cir. 2005) (affirming downward departure based on extraordinary public service and good works); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming district court's consideration of charitable works as appropriate basis for Guidelines departure).

and be of benefit to their community. In a dorm that ranges from 30–40 women, this is having a significant impact. There was so much demand for the class that certain inmates offered to translate it into Spanish and Chinese to allow more inmates to participate. The MDC administration recently approved a third series of the class. Each class is an hour long and a number of women from the class have written letters expressing how personally beneficial the program has been. Rachel also hosts a weekly non-denominational prayer and meditation group every Sunday.

Rachel was also the inspiration to some of her fellow inmates to do daily walking, and they now have a daily exercise club. Two fellow inmates have reported measurable improvements in their blood pressure, which had been a significant health concern for them, and one has even lost 20 pounds since joining their daily exercise club. Rachel also participated in a breast cancer walk to raise awareness for breast cancer research.

2.     Nature and Circumstances of the Offense

The nature and circumstances of the offense counsel strongly in favor of a sentence of time served.

*First*, while many forced labor cases result in harsh sentences, those cases all involve acts of violence, or threats of violence, deportation, or financial ruin. In contrast, this forced labor conspiracy conviction involved no such conduct, nor an intent to commit any violence. As set forth above, the government argued at trial that the victims were forced to work because they were "brainwashed" or psychologically coerced into doing so. But that coercion was not based on any physical threats to them or their family, nor threats of deportation or financial harm as is typical in forced labor cases.

*Second*, the victims here went to OneTaste of their own free will with a full understanding that OneTaste was based on the OM practice. And the victims were not forced to work for

OneTaste – they chose to do so. They were all college educated, and many had master's degrees. Some quit their jobs to work for OneTaste because they wanted to despite knowing they would not be able to make a lot of money at OneTaste. And no one was forced to stay and labor – they could leave at any time.

*Third*, there were many people who worked or interacted with Rachel at OneTaste who attested through their letters about how much Rachel helped them, and how she changed their lives for the better. *See* Section II.A.1.

*Fourth*, Rachel could not have known the victims felt forced to work because their contemporaneous statements during the time they worked there showed otherwise. *See, e.g.*, Exhibit 17. The details and length of these posts demonstrate that these individuals gave serious thought to their posts and spoke with passion about how they were feeling at the time. And, as set forth above, many at trial testified about their positive views of Rachel, including Ms. Wright and Mr. Kandell. *See* Section II.A.1. And Lianna Lifson admitted at trial that during the ten times she met with the government, she only referred to Rachel as a victim, and claimed that Rachel was manipulated. Trial Tr. 2270:5–10. These contradictory statements must be considered in the context of this case when considering the nature and circumstances of this particular offense.

*Finally*, an objectively reasonable person operating within the context of the OM community would not have known that she could be prosecuted for a forced labor conspiracy. The government's novel theory of psychological coercion to establish serious harm has no precedent in a criminal case. Indeed, the only similar cases that involve psychological coercion are *civil cases* in which, even under the lesser preponderance of the evidence standard, the courts failed to find serious harm because (i) the alleged victims could leave at any time and (ii) being ostracized was found not to be serious harm. *See, e.g., Headley v. Church of Scientology Int'l*, 687 F.3d 1173,

1179–80 (9th Cir. 2012) (church members' fear of being "excommunicated" from church – thereby losing contact with their friends and family members – and their opportunities to leave church undermined their claim of being psychologically "coerced" into forced labor for church); *Muchira v. Al-Rawaf*, 850 F.3d 605, 618–22 (4th Cir. 2017) (employee was not psychologically "coerced" into labor because she had ample opportunities to walk away from situation); *Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, No. 20-cv-5023 (CS), 2023 WL 2504744, at *10 (S.D.N.Y. Mar. 14, 2023) (holding plaintiff's allegations insufficient as a matter of law and stating "freedom of communication and movement belies the notion that [p]laintiff felt so psychologically imprisoned that she was unable to terminate her employment and walk away"). Here, the application of psychological coercion to this type of conduct is not one that a reasonable person would have known constituted criminal conduct. Indeed, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). At the very least, the novel nature of this prosecution warrants a lesser sentence.

On their own, each of the above factors take this case well beyond the heartland of forced labor cases. Together, they present a unique collection of circumstances for which a sentence beyond time served is unwarranted.

### 3. The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) instructs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when determining a defendant's sentence. Indeed, there are no similar defendants who have been found guilty of similar conduct, because there are no forced labor cases that only charged conspiracy and not a substantive offense. However, there are numerous cases in which the

56

defendant was convicted of the substantive forced labor offense along with more serious crimes, and yet received a significantly shorter sentence than or one comparable to what Probation has recommended.

Moreover, the defense is unaware of any other criminal case involving psychological coercion during which witnesses testified they were able to leave at any time. Indeed, as stated above, the only similar cases the defense is aware of are in the civil context. *See, e.g.*, *Headley*, 687 F.3d at 1179–80; *Muchira*, 850 F.3d at 618–22; *Tegete*, 2023 WL 2504744, at *10. Therefore, there are no comparable sentences for this set of circumstances.

<blockquote>

*a.     Defendants Convicted of the Substantive Forced Labor Offense Have Received Significantly Shorter Sentences Than the 188 Months That Probation Recommends*

</blockquote>

Remarkably, there are countless cases in which the defendants were convicted of the substantive offense of forced labor (in addition to other crimes) and received much lower sentences than what Probation recommends for Rachel. Here is an overview of some of those cases, which are described in more detail below:

| Name | District Court / Docket Number | Alleged Conduct | Count(s) of Conviction | Sentence |
|---|---|---|---|---|
| Jefferson and Elnora Calimlim | 1:04-cr-248 (E.D. Wisc.), Dkt. No. 360 | Victim<br>• Not a U.S. citizen<br>• Barely left the house in 19 years<br><br>Defendants<br>• Took victim's passport<br>• Threatened victim with immigration consequences<br>• Prohibited victim from seeking medical care outside the home | 18 U.S.C. §§ 2, 371, 1589, 1594;<br><br>8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(B)(i), 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(I) | 72 months (both) |
| Mohamed Toure and Denise Cros-Toure | 4:18-cr-230 (N.D. Tex.), Dkt. No. 163 | Victim<br>• Not a U.S. citizen | 18 U.S.C. §§ 2, 1589, 1594(a)<br><br>8 U.S.C. §§ 1324(a)(1)(A)(iii), | 84 months (both) |

| | | | 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(i), and 1324(a)(1)(B)(ii) | |
| | | • Began working for defendants as a minor<br><br>Defendants<br>• Physically abused victim<br>• Forced victim to sleep outside | | |
| Mabelle Dann | 4:08-cr-390 (N.D. Cal.), Dkt. No. 168 | Victim<br>• Not a U.S. citizen<br><br>Defendant<br>• Took victim's passport and Peruvian identification<br>• Threatened to send victim back to her home country<br>• Forbade victim from leaving the home without permission<br>• Forced victim to sleep on the floor | 18 U.S.C. §§ 371, 1546, 1546(a), 1589, 1592, 1594<br><br>8 U.S.C. §§ 1324 (a)(1)(A) (iii), (B)(i) | 60 months |
| Varsha and Mahender Sabhnani | 2:07-cr-429 (E.D.N.Y.), Dkt. No. 659 | Victims<br>• Not U.S. citizens<br><br>Defendants<br>• Physically abused and starved victims<br>• Locked away victims' passports<br>• Threatened victims with immigration consequences<br>• Threatened one victim's husband | 18 U.S.C. §§ 2, 371, 1589, 1594(a)<br><br>8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(iii) | 132 months (Varsha)<br><br>40 months (Mahender) |

Rachel is facing 188 to 235 months' imprisonment for conspiring to force people – who were U.S. citizens, spoke English, were college educated, and free to come and go as they pleased – to labor.  In contrast, in *United States v. Calimlim*, Jefferson and Elnora Calimlim received 72 months' imprisonment for essentially prohibiting their housekeeper, Irma Martinez, from leaving their house for 19 years.  *United States v. Calimlim*, No. 1:04-cr-248 (E.D. Wisc. June 9, 2009), Dkt. No. 360.  The Calimlims confiscated Irma's passport once she arrived from the Philippines.  *United States v. Calimlim*, 538 F.3d 706, 708 (7th Cir. 2008).  In the 19 years she worked for the Calimlims, she never walked out of the front door of the Calimlims' first house and answered the

door to their second house only once, on Halloween.  *Id.* at 709.  Further, she was not allowed to play outside with the Calimlim children and was confined to her room in the basement or the bathroom during social gatherings.  *Id.*  She could only answer the phone when the Calimlim children called and no one else, and she was prohibited from seeking medical care outside of the house.  *Id.*  Over the 19 years that she worked for the Calimlims, she was allowed to speak with her family only four or five times and even then, she could not speak with them alone.  *Id.*  The Calimlims repeatedly told Irma that "if anyone discovered her she could be arrested, imprisoned, and deported, and she would not be able to send any more money back to her family."  *Id.*

Even when defendants were convicted of the substantive forced labor charge against a *minor*, the sentence was much lower than what Rachel is facing.  *See United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020).  In *Mohamed Toure*, the defendants were each sentenced to 84 months' imprisonment for forcing the victim, who was nine or ten years old when she began working for the defendants, to labor for a total of 16 years.  *Id.* at 396.  During those 16 years, the defendants never paid the victim for her labor and she suffered from medical neglect.  *Id.* at 396–97.  Even more egregious, the defendants frequently beat her and at one point, one defendant sat on her back while his wife beat her.  *Id.* at 397.  Another incident occurred in which one of the defendants "ripped [the victim's] earring through her ear, permanently splitting [her] earlobe," and then ripped another earing through the victim's other earlobe.  *Id.*  The defendants would also ban the victim from staying in the house, forcing her to sleep on a park bench.  *Id.*  None of these facts, which led to a much lower sentence, come even close to the facts in the present case.

In *United States v. Sabhnani*, Varsha Sabhnani was sentenced to 132 months for forcing one of her "domestic servants" to sleep on the floor and wear clothes made from old rags and cut remnants of other clothing, starving her to the point that she ate out of the garbage, beating her and

pouring scalding hot water on her arm, mutilating her, forcing her to eat hot chili peppers until the point of vomiting, and threatening to murder her and her children. *Sabhnani*, 599 F.3d at 224–26. Varsha accused another woman working for her of stealing two pieces of chocolate and forced her to stand in one place for ten hours as punishment. *Id.* at 228. She also hit that same woman in the face with a metal spoon, leaving a scar, for apparently handing her the wrong spice. *Id.* Like many victims of forced labor, the victims here were not U.S. citizens. *Id.* at 225, 227. And like many defendants convicted of forced labor, Varsha took the victims' passports and travel documents and locked them away. *Id.* at 228. Varsha's husband, Mahender, was sentenced to only 40 months' imprisonment – his actions largely entailed informing his wife of the victim's "misdeeds" and witnessing his wife's horrendous behavior and doing nothing. *Id.* at 224, 227.

In *United States v. Dann*, the defendant was sentenced to 60 months' imprisonment for conspiracy to commit visa fraud, visa fraud, forced labor, unlawful conduct regarding documents in furtherance of servitude, and harboring an illegal alien for the purpose of private financial gain. 652 F.3d at 1162. There, the defendant never paid the victim (who did not speak English) for taking care of the defendant's home and children, forced the victim to sleep on the floor, forbade her from leaving the apartment without permission or from speaking to anyone, rationed her food, and took her passport and Peruvian identification. *Id.* at 1164–65, 67.

Imposing a sentencing on Rachel for a forced labor conspiracy charge that is significantly higher than sentences of those convicted of the completed offense with much worse facts would create unwarranted and enormous sentencing disparities.

b.      *The Two Post-*Booker *Cases Sentenced Under U.S.S.G. § 2H4.1 with the Same Total Offense Level and Criminal History Category as Rachel Have Been Sentenced to Less Time than Probation's Recommendation*

Indeed, since *United States v. Booker*, 543 U.S. 220 (2005), there have been only two defendants sentenced under U.S.S.G. § 2H4.1 with a Total Offense Level of 36 and a Criminal History Category I (who did not receive a § 5K1.1 downward departure), and both of those defendants were sentenced to less time than Probation's recommendation despite the much more egregious facts. In *United States v. Walter Alexander Corea*, No. 4:05-cr-468 (S.D. Tex. May 12, 2008), Dkt. No. 400, Corea was sentenced to 180 months' imprisonment – which constituted the statutory maximum to which he was exposed – three years' of supervised release, and no fine. He also was ordered to pay $1,715,588.05 in restitution. The defendant lured young Central American women to the United States by promising them good jobs. Press Release, Man Sentenced for Human Trafficking and Alien Smuggling, Dep't of Just. (May 12, 2008). However, once they arrived in the United States, the defendants forced the women to work at their bars and cantinas and sell high-priced drinks to male customers. *Id.* "The women were subjected to numerous threats of harm to themselves and family members in order to compel their servitude, and some suffered sexual assaults at the hands of the defendant and his co-defendants." *Id.* Per the Bureau of Prison ("BOP") records, Corea was released from custody on December 18, 2018, 127 months after sentencing.

In *United States v. Mohammad Nauman Chaudhri*, No. 3:19-cr-85 (E.D. Va. Jan. 23, 2023), Dkt. No. 295, Mohammad Nauman Chaudri was sentenced to 60 months' imprisonment, which constituted the statutory maximum term to which he was exposed, one year of supervised release, and no fine or restitution. In 2002, the victim married defendant Zahida Aman's son, and the brother of defendants Nauman and Rehan Chaudhri. *See* Press Release, Midlothian Family

*Sentenced for Conspiracy for Years-Long Forced Labor of Pakistani Woman*, Dep't of Just. (Jan. 24, 2023). She then lived in the defendants' home and over a twelve-year period, the three defendants forced her to perform domestic services. *Id.* "To coerce that labor, the defendants verbally assaulted and physically abused the victim[,] . . . slapped, kicked, and [her], even beat her with wooden board, and, on one occasion, hog-tied her hands and feet and dragged her down the stairs in front of her children." *Id.* Similar to many other victims in force labor cases, the victim was not native to the United States. *Id.* She "had temporary immigration status in the United States, [and] defendant Aman took the victim's immigration documents." *Id.* The defendants then threatened the victim with deportation if she did not obey their demands. *Id.* They also threatened to separate her from her children to coerce her labor. *Id.* Per BOP records, Chaudri will be released from custody on April 25, 2027, 51 months after his sentencing.

> c. *Defendants Convicted of More Egregious Conduct Have Received Significantly Lighter or Comparable Sentences to the Guidelines Probation Seeks to Impose*

Moreover, defendants who have been convicted of far worse crimes than Rachel have received significantly lower than the 188 to 235 months Rachel faces under Probation's recommended Guidelines, or similar. They are summarized here and described in more detail below:

| Worse Conduct, Lighter Sentence | | | | |
|---|---|---|---|---|
| Name | District Court / Docket Number | Alleged Conduct | Count(s) of Conviction | Sentence |
| Sean Combs | 1:24-cr-542 (S.D.N.Y.), Dkt. No. 535 | • Used violence, coercion, and abuse against his victims <br> • Forced victims to engage in unwanted sexual activity | 18 U.S.C. § 3421(a) | 50 months |
| Brian Mark Lemley, Jr. | 8:20-cr-33 (D. Md.) Dkt. No. 169 | • Involved in white supremacist organizations | 8. U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), (a)(1)(A)(v)(II) | 108 months |

| Name | District Court / Docket Number | Alleged Conduct | Count(s) of Conviction | Sentence |
|------|-------------------------------|-----------------|------------------------|----------|
| | | • Discussed committing acts of violence against minority communities | 18 U.S.C. §§ 922(d)(5), 924(b) | |
| John Ragano | 1:24-cr-50 (E.D.N.Y.), Dkt. No. 103 | • Extorted victim<br>• Threatened victim with violence<br>• Forced victim to strip naked while having men approach him with tools | 18 U.S.C. §§ 2, 894 (a)(1) | 37 months |
| Teimuraz Tavberidze | 1:23-cr-585 (S.D.N.Y.), Dkt. No. 146 | • Threatened to break the victim's bones<br>• Threatened to render victim unrecognizable to his family if he did not pay the criminal organization | 18 U.S.C. §§ 2, 1951 | 21 months |

| Worse Conduct, Similar Sentence | | | | |
|------|-------------------------------|-----------------|------------------------|----------|
| Name | District Court / Docket Number | Alleged Conduct | Count(s) of Conviction | Sentence |
| Efrain Granados-Corona | 1:16-cr-324 (E.D.N.Y.), Dkt. No. 331 | • Conduct involved minors<br>• Used physical and sexual violence, threats, and lies to force and coerce victims to work as prostitutes | 18 U.S.C. §§ 1591(a), 1591(b)(1), and 1591(b)(2) | 212 months |
| Hugo Hernandez-Velazquez | 1:19-cr-306 (E.D.N.Y.), Dkt. No. 220 | • Operated a sex trafficking operation<br>• Subjected victims to physical beatings, forced abortions, and threats of violence against their loved ones | 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and 1591(b)(1) | 188 months |
| Robert Kelly | 1:19-cr-567 (N.D. Ill.), Dkt. No. 428 | • Enticed minors to engage in sexual activity<br>• Abused victims for years | 18 U.S.C. §§ 2422(b), 2251(a), 2251(d) | 240 months |
| Ghislaine Maxwell | 1:20-cr-330 (S.D.N.Y.), Dkt. No. 696 | • Conduct involved minors<br>• Recruited, groomed, and abused young girls, some as young as 14 years old, so she could sexually exploit them | 18 U.S.C. § 371, 2423, 1591 | 240 months |
| Cameron McEwen | 7:25-cr-193 (S.D.N.Y.), Dkt. No. 48 | • Extorted a minor victim into sending sexually explicit materials of herself | 18 U.S.C. § 2552A | 210 months |

| | | • Threatened victim's friends and family | | |
|---|---|---|---|---|
| Sean Merchant | 1:18-cr-527 (S.D.N.Y.), Dkt. No. 266 | • Trafficked minor victims<br>• Coerced minors into having sex with strangers for profit | 18 U.S.C. §§ 1591(a), 1591(b)(2) | 196 months |
| Paulino Ramirez-Granados | 1:11-cr-557 (E.D.N.Y.), Dkt. No. 44 | • Conduct involved minors<br>• Smuggled young women into the United States for sex work<br>• Used threats and violence to force victims to work as prostitutes | 18 U.S.C. §§ 1591(a)(1), 1591(a)(2) | 188 months |

In *United States v. Tavberidze*, the defendant received 21 months for threatening a victim with physical harm and death to extort the victim, including stating that he would "break the [v]ictim's bones and render him unrecognizable to his family." Gov't Sent'g Letter at 2, *United States v. Tavberidze*, No. 1:23-cr-585 (S.D.N.Y. Mar. 4, 2025), Dkt. No. 141; *Tavberidze*, No. 23-cr-585 (S.D.N.Y. Mar. 13, 2025), Dkt. No. 146. In *United States v. Combs*, the defendant was sentenced to 50 months for conduct involving "violence, coercion, and abuse" against "women who loved and depended on [the defendant]." Exhibit 8 at 154:18–22. There, the defendant stomped on a victim's face, kicking her as she lay motionless on the ground and dragging her by her hair. *Id.* at 45:7–9. To another victim, the defendant punched, kicked, choked, and slapped her all while knowing he was under federal investigation. *Id.* at 45:19–21. He made the victims engage in unwanted sexual activity that involved "sexual degradation and humiliate." *Id.* at 46:12–19. During one incident, he "had an escort urinate in [the victim's] mouth while she choked and put her hands up to make it stop." *Id.* at 46:19–20. The defendants' conduct in *Tavberidze* and *Combs* was truly worse than Rachel's and yet, they received around 14 years and 13.5 years less than the bottom of Rachel's Guidelines, respectively.

Ghislaine Maxwell – who was convicted of conspiracy to entice minors to travel to engage in illegal sex acts, conspiracy to transport minors to participate in illegal sex acts, transporting a

minor to participate in illegal sex acts, sex trafficking conspiracy, and sex trafficking of a minor – was sentenced to 240 months' imprisonment, just five months more than the top of Rachel's recommended Guidelines by Probation. *United States v. Maxwell*, No. 1:20-cr-330 (S.D.N.Y. June 29, 2022). Maxwell's behavior was truly heinous. She recruited, groomed, and abused young girls, some as young as 14 years old. Gov't Sent'g Memorandum at 7, 1:20-cr-330 (S.D.N.Y. June 22, 2022). She specifically targeted victims she knew were vulnerable to exploitation. *Id.* at 37. She would forge trust with her victims, promising to help them, so that she could then sexually exploit them. *Id.* at 37–38.

Cameron McEwen was sentenced to 210 months for receiving sexually explicit materials of a minor, an offense he committed after having previous committed a state crime related to sexual abuse of a minor. *United States v. McEwen*, No. 7:25-cr-193 (S.D.N.Y. Oct. 30. 2025); Press Release, [Sex Offender Sentenced To 210 Months In Prison For Child Pornography Offense](), Dep't of Just. (Oct. 31, 2025). McEwen extorted the minor victim, making threats against her friend and family to force her to send him sexually explicit photographs of herself. This was after he had been convicted in January 2022 of rape in the second degree.

Paulino Ramirez-Granados was sentenced to 188 months' imprisonment – the same sentence that Probation recommends for Rachel – for his role in an international sex trafficking ring that smuggled young women into the United States and forced them, using threats and violence, to work as prostitutes. *United States v. Ramirez-Granados*, No. 1:11-cr-557 (E.D.N.Y. Feb. 24, 2017). There were more than 135 victims, 39 of whom were minors. *Id.* Members of the organization routinely subjected victims to violence, threats, and sexual assaults. *Id.* Ramirez-Granados impregnated one victim and threatened that she would never see her child again if she

did not continue to prostitute for him. *Id.* It is outrageous for Probation to recommend, and for the government to support, the same sentence as this defendant.

These are just a few out of many instances in which the defendants received lighter or similar sentences than Rachel faces for far more egregious conduct. *See, e.g.*, *United States v. Hernandez-Velazquez*, No. 1:19-cr-306 (E.D.N.Y. July 10, 2025), Dkt. No. 220 (188 months' imprisonment for operating an illegal, abusive, and exploitative sex trafficking operation in which victims were subjected to physical beatings, forced abortions, and threats of violence against their family's if they did not continue to prostitute); *United States v. Granados-Corona*, No. 1:16-cr-324 (S.D.N.Y. Sept. 15, 2022), Dkt. No. 331 (212 months' imprisonment for member of an international sex trafficking organization that used physical and sexual violence, threats, lies, and coercion to force and coerce victims, including minors, to work in prostitution); *United States v. Merchant*, No. 1:18-cr-527 (S.D.N.Y. Oct. 12, 2021), Dkt. No. 266 (196 months' imprisonment for engaging in trafficking minor victims and coercing them to have sex with strangers for profit); *United States v. Kelly*, No. 1:19-cr-567 (N.D. Ill. Mar. 7, 2023), Dkt. No. 428 (240 months' imprisonment on three counts of producing child pornography and three counts of enticing a minor to engage in sexual activity); *United States v. Ragano*, No. 1:24-cr-50 (E.D.N.Y. Mar. 19, 2025), Dkt. No. 103 (37 months' imprisonment for mafia soldier who aggressively pursued the victim, threatened him with violence, and forced him to strip naked while having men approach him with tools all to extort collection of credit and while knowingly being under the court's supervision); *United States v. Lemley*, No. 8:20-cr-33 (D. Md. Sept. 30, 2021), Dkt. No. 169 (180 months for member of white supremacist organization, who discussed acts of violence against minority communities with an intent to kill federal employees, damage communication and energy

facilities, damage rail infrastructure, and commit arson or bombing of property used in interstate commerce).

Imposing a sentence on Rachel that is higher or around the same as those of defendants whose heinous conduct includes trafficking women and minors to engage in prostitution against their will, engaging in sex acts with minors and recording the abuse, threatening victims' families if they do not prostitute themselves, and defrauding hundreds of retirees to line their own pockets, defies common sense and does not align with the principles of justice and fairness.

    4.    <u>Affording Adequate Deterrence and Protecting the Public</u>

    *a.    Specific Deterrence and Protecting the Public*

With regard to specific deterrence and protecting the public, there is no basis upon which to believe that Rachel, a category I offender with no criminal history, needs any additional sentence – let alone an additional prison term. By the time Rachel is sentenced, she will have served over six months at the MDC, a difficult place for even the most hardened criminals, and any additional period of incarceration is not necessary "to afford adequate deterrence to criminal conduct" or "protect the public from further crimes of" hers. 18 U.S.C. § 3553(a)(2)(B)-(C).[15]

---

[15] Based on the conditions of confinement for defendants in the MDC, it has become common for judges in the Eastern and Southern Districts of New York to give reduced sentences. *See, e.g.*, Sent'g Tr. at 37–38, *United States v. Elias*, No. 1:22-cr-317 (LDH) (E.D.N.Y. Apr. 22, 2024), Dkt. No. 71 ("I apologize to you, sir, that you had to endure conditions that are unfit for any person, period. And I will take that into account, I assure you. And again, my apology is sincere. . . . [T]hese are individuals who are having to exist intolerable and inexcusable conditions in the United States of America. So I am going to take it all into consideration, I assure you."); Sent'g Tr. at 19–21, *United States v. Days*, No. 1:19-cr-619 (CM) (S.D.N.Y. May 12, 2021), Dkt. No. 35 at 19 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that. . . . I think you've suffered triply as a result. . . . I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); Sent'g Tr. at 37, *United States v. Morgan*, No. 1:19-cr-209 (RMB) (S.D.N.Y. May 8, 2020), Dkt. No. 90 (imposing a below-Guidelines sentences on account of "the conditions of the MDC," among other things).

The consequences Rachel has already endured are severe and are alone sufficient to deter her, including her arrest, the five-week trial, and being publicly disgraced, humiliated, and shamed in the press. She will have difficulty obtaining another job as a counselor, and she faces financial ruin from forfeiture and restitution. In fact, when Rachel was arrested, she was surrounded by a dozen agents from the Federal Bureau of Investigations ("FBI") – many of who were pointing semi-automatic rifles and pistols at her while a helicopter flew over overhead, – handcuffed, and then held overnight in jail before being released on bond. This alone is sufficient to deter Rachel, a person who had never encountered an issue with law enforcement. In addition, she is now a convicted felon, which limits her for the rest of her life. Certainly, an inherent qualification for those in Rachel's line of work as an addiction counselor who is responsible for particularly vulnerable people is trust. The stigma surrounding convicted felons in addition to the widespread press about this matter (including a Netflix film based on fabricated evidence) will make it difficult for Rachel to obtain a job in her field. Accordingly, the arrest, trial, and these resulting collateral consequences are adequate to ensure that Rachel does not commit any further crimes. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming trial court's consideration of impact of conviction on defendant's career as academic or translator); *United States v. Gupta*, 904 F.Supp.2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (holding that as to specific deterrence, when an arrest, trial, conviction cause the defendant to suffer such a blow to her reputation, the defendant is unlikely to repeat the transgressions, and no further punishment is needed to achieve this result).

Furthermore, the Court does not have to guess as to whether Rachel needs deterrence or whether the public needs to be protected from her because the record demonstrates neither are necessary. This conspiracy began almost twenty years ago (when Rachel was in her mid-20s) and

ended in 2018, seven years prior to Rachel's conviction. She has used her time since leaving OneTaste only to help others through her addiction and trauma counseling. Upon leaving OneTaste, she obtained her Master of Science in addiction counseling so that she could be better equipped to help others.

Aside from helping people through her professional career, she used her free time to help others. She was actively involved in organizations that help feed the unhoused, provide spaces for women to help empower them, and ensure that those who are incarcerated are reminded of their own worth and that they are more than their past mistakes. Moreover, Rachel has been a model prisoner at the MDC and has tried to make the best of her situation by helping others. Thus, her actions following the end of the conspiracy in 2018 and after her arrest in 2023 demonstrate that Rachel is focused on helping others. Indeed, the countless letters from those whose lives she has touched since leaving OneTaste bear that out. *See, e.g.*, Exhibit 19 at 148–49 (Rebecca Gardner, a retired high school teacher, noted that Rachel "guided people back to themselves with gentleness and wisdom"); *id.* at 4 (Amber Cooney, who met Rachel in 2023, reflected how "Rachel has taken time to talk to [her] in times of need, always helping [her] access greater peace and clarity in [her] life").

Overall, Rachel puts others before herself to make a positive, meaningful difference in the lives of those she meets. Rachel has also learned and evolved since her time at OneTaste and through this trial. She understands that, while she was always well intentioned, her methods were not always the best.

Finally, Sentencing Commission studies demonstrate that older women, particularly those who are non-violent offenders, have an extremely low recidivism rate. Specifically, they found that defendants over the age of forty when sentenced exhibit markedly lower recidivism rates in

comparison to younger defendants, and "that older offenders at sentencing are at lower risk for reoffending." *Recidivism Among Federal Offenders: A Comprehensive Overview*, 23–24 U.S. Sent'g Comm'n (Mar. 2016) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf. Accordingly, no further incarceration is necessary for specific deterrence. This is particularly true for Rachel who is 45 years old, a non-violent offender with no criminal history, and has already suffered harsh collateral consequences.

For these reasons, Rachel has been more than sufficiently deterred and the public does not need protection from her. Indeed, she was out on bail for two years and had no issues and posed no danger to the public during that time.

### b. General Deterrence

With respect to general deterrence, a lengthy period of incarceration is also not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As with many white-collar offenders, the real deterrent is the certainty of detection and prosecution, not the severity of the punishment. The very fact that the government was able to charge and convict under this unprecedented application of the psychological coercion prong has already sent the strongest conceivable warning to others; nothing further is required to achieve deterrence. Certainly, this case received extensive coverage not because of the harm it allegedly caused, but rather because of the subject matter and the fact that it was the first of its kind.[16]

---

[16] Alana Wise, *Leaders of 'Orgasmic Meditation' Company Were Convicted of Forced Labor: What to Know*, NPR (June 12, 2025, 11:59 AM), https://www.npr.org/2025/06/11/nx-s1-5429181/orgasmic-meditation-sexual-womens-wellness-forced-labor-conviction; Santul Nerkar, *Leaders of 'Orgasmic Meditation' Group Are Convicted of Coercion Charges*, N.Y. Times (June 9, 2025), https://www.nytimes.com/2025/06/09/nyregion/onetaste-orgasmic-meditation-verdict.html; Thessaly La Force, *The Orgasm Expert Who Ended Up on Trial*, New Yorker (Aug. 29, 2025),. https://www.newyorker.com/news/our-local-correspondents/the-orgasm-expert-who-ended-up-on-trial.

There is also no research or clinical evidence that justifies enhancing a defendant's sentence based on the prospect of influencing some putative future wrongdoer who is unidentified in any fashion (which is entirely speculative and inchoate), and who has yet to commit, and perhaps even contemplate, a crime. Such a person's knowledge, motivation, and compelling factors that would lead to criminal conduct are simply unknown. Defendants should receive the sentence *they* deserve, and not have, as a component of their sentence, what some other, future, unknown defendant deserves. Research also has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). This is particularly true when, as is the case here, the crime charged is not something that is easily replicated, unlike other types of types of crimes, such as fraud or insider trading where the opportunity presents itself more often.

Finally, looking at this conspiracy from Rachel's point of view does not provide a need for general deterrence. Rachel did not profit in any way from this crime; she made a modest income of an average of $35,000 per year, which is about $16.83 per hour (around minimum wage in both New York and California assuming an 8-hour workday, which is far shorter than the hours Rachel actually worked) for which she worked extremely hard. Those facts alone do not warrant the need to impose a harsh sentence for general deterrence purposes.

5.    The Kinds of Sentences Available, Sentencing Range, and Pertinent Policy Statements in the Guidelines

There are numerous kinds of sentences available to the Court beyond a term of imprisonment. Rachel could be sentenced to time-served for the months she has spent at the MDC; in addition, she could be sentenced to a term of supervised release; or she could be sentenced to a term of probation. The sole count of conviction is a Class C felony, which provides that Rachel is

eligible for not less than one nor more than five years' probation. *See* 18 U.S.C. § 3561(c)(1). Any of these sentences are more than sufficient but not greater than necessary to meet the purposes of sentencing here.

As set forth above, the applicable Guidelines range before considering any downward departures is 21–27 months' imprisonment. But regardless of the Guidelines' range, a downward departure is warranted given the novel facts here, the fact Rachel did not profit from the conspiracy, and due to Rachel's exceptional good works. And if the Court were to apply the enhancements, the Guidelines range would grossly overstate the seriousness of the offense and essentially permit the government to avoid charging substantive offenses at trial. *See supra* pp. 20–22. All of the factors above apply with equal force and lead to the same conclusion that no further prison term is necessary or appropriate to meet the purposes of sentencing.

6.    Seriousness of the Offense and Just Punishment

Conspiracy to commit forced labor is a serious offense. But when considering the seriousness of this particular offense, the Court must consider all of the unique circumstances described above, and the fact that this offense is missing the aggravating factors that exist in most forced labor cases. As set forth above, the victims here all admitted that they had a choice at OneTaste, that they chose to remain there and could leave at any time.

Further, no additional term of imprisonment is necessary to provide just punishment. Rachel's punishment began the instant she was arrested in this high-profile case. Her reputation has been damaged as a result of the tremendous media coverage in which OneTaste was cast as a sex cult, despite the government only charging one count of forced labor conspiracy. And much of her reputational damage came initially from Ayries Blanck's fabricated journals that were

featured on Netflix, an international streaming platform, as well as in a BBC podcast series.[17]  But for the Court's granting of the adjournment of the January trial, Rachel would have faced those fabricated journals as evidence against her at trial, despite her counsel's repeated assertions over the course of a year – which proved to be correct – that the journals were fabricated.  It was not until March 2025 that the government finally admitted the journals were fake.[18]  The stress of defending against these journals when Rachel knew they were fake, was, by itself, a punishment. Collectively, these harms should inform the Court's determination of a "just punishment."  *See, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering the "incalculable damage to [the defendant's] personal and professional reputation as a result of tremendous media coverage of his case," including his "unflattering [] portray[al] as the face of public corruption"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action").

7.    Victim Impact Statements and Restitution

Probation submitted several victim impact statements and claims of restitution.  While the victims are, of course, entitled to express their feelings and experiences at OneTaste, the Court should also consider the additional facts set forth below when determining the appropriate weight to be given to these statements.  With respect to restitution, Probation calculates restitution to be $2,794,399.61 for eight victims but provided no documentary support for these claims.  *See* Third PSR Addendum ("TA") at 3.  Therefore, given that the defense cannot analyze the restitution

---

[17] The BBC podcast episode concerning Ms. Blanck's story was removed from the series following the admission that her journals were fabricated.

[18] In addition to the Government's failure to prosecute Ms. Blanck for obstruction of justice and fraud, it continued to call her a victim at trial.

without the requisite documentation, we respectfully request that the Court hold a hearing on the issue of restitution after the necessary documents are produced.

To the extent the Court is inclined to consider the victim impact statements for purposes of sentencing, we ask that the Court also consider the information below.

Jane Doe 14 submitted both a restitution claim and a victim impact statement. *See* PSR at 20.[19] Jane Doe 14, however, was only a participant from 2006 through 2009 and claims she worked at a OneTaste cafe. She does not claim that she was forced to work, and asserts instead that she was psychologically harmed as a participant in an organization that she chose to join and participate in for three years. Notably, Rachel was not even at OneTaste for Jane Doe 14's first year at OneTaste. When Rachel arrived in 2007, she was also just a participant. While Rachel became part of the leadership team in New York in 2008, Jane Doe remained in California and left in 2009. Accordingly, there is no evidence that Rachel directed Jane Doe 14 to do anything.

Furthermore, Jane Doe 14's statements are not credible. She claims that she joined OneTaste under the belief that it was a simple roommate situation, but the evidence at trial was overwhelming that there was no mistaking OneTaste as a roommate situation, particularly in the Warehouse where she initially lived. Furthermore, the government's theory of the case was that the victims in this case were forced to labor, not that OneTaste pressured customers to participate without their consent or through coercion. Indeed, the waivers that every customer was required to sign belies such an allegation.

---

[19] Jane Doe 14's victim impact statement is attributed to "anonymous;" however, it is apparent from certain references in the letters – including the age upon which she joined OneTaste, the dates, the location, and the fact that both letters reference being in therapy for the past eight years/starting therapy in 2017 – that the impact statement was submitted by Jane Doe 14.

Regarding Jane Doe 22, the government disclosed to the defense prior to trial that Jane Doe 22 previously lied under oath in a sex assault case. The Court should take this into consideration when considering her claim here. Notably, Jane Doe 22 claims over $900,000 in total losses from the offense conviction – over twice as much as what anyone else claimed. Furthermore, her work from 2010 through 2013 was based on a work-trade agreement in which she worked at OneTaste in exchange for housing. The bulk of her restitution claim, $860,0000, is based on lost income because she claims that she could not work after OneTaste despite getting job offers. This claim is not credible, and should be rejected.

Additionally, John Doe 1's victim impact statement is filled with contradictions from his own blog and text messages. For example, in John Doe 1's victim impact statement, he blames Rachel and OneTaste for "eras[ing] [his] own relationship with [his] son," SA at 15, but yet, he wrote on a now erased blog post from 2018, a year after he left OneTaste, that he was responsible for his failures as a parent. Exhibit 18. Indeed, he admitted it was his decision to not be active in his son's life and he was not supportive of his son's mother decision to go through with the pregnancy. He wrote about how he "tried everything to get away from the profound life transformation of becoming a parent," and that his decision to not be involved with his son predated his time at OneTaste. And yet now, when he is claiming losses as a result of the offense conviction, he blames Rachel and OneTaste for his poor relationship with his son. John Doe also claims that he was "saddled with debts," SA at 15, but fails to mention that in 2015, Rachel paid off all of his debt (which was approximately $10,000). Exhibit 23.

Ms. Gill's victim impact statement is also contradicted by both her trial testimony and statements she made following her time at OneTaste. For example, Ms. Gill states in her victim impact statement that she agreed to a sham marriage to pay for OneTaste courses, which was

suggested to her by OneTaste leadership. SA at 17. Yet during trial, under oath, she testified that "it was not OneTaste" that made her enter into a sham marriage, and it was a choice that she made and that she takes personal responsibility for. Trial Tr. 1417:13–14; *id.* at 1418:11–15. Moreover, she testified that her co-worker approached her about entering into a sham marriage in exchange for $10,000 (as opposed to her approaching her co-worker). *Id.* at 1417:4–9.

Ms. Gill also claims in her victim impact statement that engaging in sex work to pay for courses and rent was normalized at OneTaste. SA at 17. Yet, at trial when confronted with her own voice on a podcast (following her time at OneTaste), she admitted to saying on that podcast that she had to keep her sex work "hush hush" from most people at OneTaste. Trial Tr. at 1349:2– 18. And contrary to her statement that she engaged in prostitution to pay for rent and courses, during trial she was also confronted with her own statement on the podcast saying that she decided herself to become a prostitute because she thought she "might actually get something out of it," and that "it was one of my favorite jobs ever. I loved having sex and I got paid to have sex with – this might sound a little weird, with random men and it's very exciting." *Id.* at 1350:19–1351:4; *id.* at 1347:1–11. In addition, there was no testimony that anyone in leadership suggested sex work to Ms. Gill. While she testified that Ms. Fuller told her about SugarDaddy.com, at that time, Ms. Fuller was in the same position as Ms. Gill – both were participants living on the same floor at 1080 Folsom and they had known each other prior to OneTaste. *Id.* at 1544:13–1545:4. While the Court can consider additional statements in her victim impact statement, it is worth noting that Ms. Gill did not testify at trial that she was sleep deprived or that her email was being surveilled. Accordingly, the Court should consider these points when determining the weight to afford Ms. Gill's statement.

Moreover, several victims are also claiming restitution for classes and memberships they purchased from OneTaste. *See, e.g.*, SA at 13, 16; TA at 1–2. They received a benefit in exchange for their payment, however, and thus money was not stolen from them. OneTaste was not found to be a fraud – it provided legitimate services to its participants. These participants who may now regret their involvement in the organization should not be allowed to essentially be refunded for courses and services they chose to purchase.

In addition, the Court should consider the fact that those who wrote victim impact statements included in Probation's PSR addendums are incentivized to do so in order to be paid. Some were only at OneTaste for a short time, including Jane Doe 23 who claimed she worked for only ten months at OneTaste, yet is claiming $69,951.80 in restitution (notwithstanding the fact that there is no record of her ever being employed by OneTaste, and in her civil case against OneTaste she did not claim that she worked for the Company). *See* TA at 1. She is also claiming $66,815 from "money stolen from the conspiracy," which presumably is money she spent on OneTaste classes. *Id.* However, she failed to mention that she was also refunded $32,170 from OneTaste and thus only spent a total of $45,274 on classes. As for Jane Doe 24, she does not claim that she worked at OneTaste, but claims that she is nevertheless entitled to lost income. *See id.* And Michal Neria (Jane Doe 3) admitted at trial that she only worked for OneTaste NYC LLC for six months, during which she spent much of that time taking intensive courses rather than working in sales. Despite knowing how little she could make in sales, she decided to quit her steady teaching job within one month of participating at OneTaste, and moved into an OM house while also having to pay rent for her apartment because she did not want to delay moving in. *See* Trial Tr. 2828:21–2829:3; *id.* at 286:24–2809:2.

In sum, the Court should consider these other facts when determining the weight to provide to these victim impact statements – most of which mainly consist of claims for restitution. With respect to restitution, given the many factual issues at dispute and the complete lack of supportive documentation for the losses claimed by the victims, we respectfully request the Court hold a hearing on the issue.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court impose a sentence of time served, which is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. To the extent necessary to resolve some of the disputed facts herein, we would request a *Fatico* hearing.

Dated: New York, New York
      November 19, 2025

Ballard Spahr LLP

By: _____
Celia Cohen

Celia Cohen
BALLARD SPAHR LLP
1675 Broadway
19th Floor
New York, NY 10019-5820
Telephone: 212.223.0200
Facsimile: 212.223.1942

*Attorneys for Rachel Cherwitz*