UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                     :

UNITED STATES OF AMERICA,       :

                                       :           23-Cr-146 (DG)

                                       :

-vs-                                 :

                                       :

NICOLE DAEDONE,              :

                                       :

                                       :

                  Defendant.     :
-----------------------------------------------------X

## **DEFENDANT NICOLE DAEDONE'S SENTENCING MEMORANDUM**

Jennifer Bonjean
Bonjean Law Group, PLLC
233 Broadway, Ste. 707
New York, NY  10279
718-875-1850

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………    1

ARGUMENT ………………………………………………………………………    3

I.     THE APPLICABLE GUIDELINES RANGE IS 21 TO 27 MONTHS………….    4

     A. The Applicable Offense Level is 16…………………………………………….    6

     B. This Court Cannot Apply Any Specific Offense Enhancements Without
       Violating Ms Daedone's Constitutional Safeguards…………………………    8

          1. A Judicial Finding that Ms. Daedone Committed the Uncharged
             Offenses of Forced Labor and Criminal Sexual Abuse by Proof
             Less than Reasonable Doubt Violates her
             Fifth and Sixth Amendment Rights…………………………………    10

     C. Constitutional Problems Aside, the Government Cannot Show With
       Reasonable Certainty that Ms. Daedone Specifically Intended To Commit the
       Crime of Forced Labor Or that She Committed the Offense of
       Criminal Sexual Abuse……………………………………………………..    19
          1. Application of SSG §2H4.1(b)(3)(A) …...…………………………    19
          2. Application of USSG §2A3.1 Rape Cross Reference……………......    24

     D. Ms. Daedone Is Entitled to a Three-Level Offense Decrease Where the
       Government Did Not Prove a Completed Offense of Forced Labor…………..    31

     E. The Abuse-of-Trust Enhancement Does Not Apply Because Ms. Daedone
       Did Not Occupy a Qualifying Position of Trust or Use It to Facilitate
       the Offense………………………………………………………………    31

     F. The Obstruction-of-Justice Enhancement Should Not Apply Because
       the Alleged Deletions Preceded Any Investigation and Were Not Willfully
       Directed at the Offense of Conviction……………………………………    33

     G. No Role Enhancement is Warranted ……………………………………….    38

     H. Ms. Daedone Is A Qualifying Zero-Point Offender ………………………….    41

     I. Ms. Daedone Is Entitled to a One-Point Reduction
       to Avoid a "Trial Penalty"………………………………………………..    41

J. Ms. Daedone Is Entitled to a Downard Departure Under §5H1.11 ………… 43

II. A SENTENCE OF 12 MONTHS WOULD BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING………………………………………………………………. 44

A. The Nature and Circumstances of the Offense……………………………… 45

B. History and Characteristics of Ms. Daedone……………………………… 50

C. The Need to Avoid Unwarranted Sentencing Disparities………………… 64

D. The Need for Specific Deterrence Weighs In Favor of a Minimal Sentence of Imprisonment……………………………………………………… 72

E. A Lengthy Period of Incarceration is Not Necessary for any General Deterrence……………………………………………………………… 74

F. The Kinds of Sentences Available, Sentencing Range, and Pertinent Policy Statements in the Guidelines……………………………...…………… 75

G. Probation's Addendums Fall Far Short of Demonstrating *Any* Restitution is Owed to Any Alleged Victim …………………………………………….. 76

CONCLUSION……………………………………………………………………… 77

# TABLE OF AUTHORITIES

## Cases

*Alleyne v. United States,* 570 U.S. 99, 111-112 (2013) ………………………………………... 13

*Almendarez-Torres v. United States,* 523 U.S. 224, (1998)………………….…...…………… 14

*Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 232 (2d Cir. 2020) …………………… 29

*Apprendi v. New Jersey,* 530 U.S. 466, 477-78 …………………………….……….. *passim*

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005) ……………...………….. 39

*Blakely v. Washington,* 542 U.S. 296, 306 (2004) ……………………………………….... 11, 13

*Cunningham v. California,* 549 U.S. 270, 282 (2007) ………………………………………… 13

*Duncan v. Louisiana,* 391 U.S. 145, 155 (1968) ……………………………...……… 11, 18

*Fischer v. United States*, 603 U.S. 480, 487 (2024) …………………………………………… 40

*Gall v. United States,* 552 U.S. 38, 49 (2007) …...………………………………………..… 3, 14

*Gozlon-Peretz v. United States,* 498 U.S. 395, 407 (1991) …………………………….….... 29

*Headley v. Church of Scientology Int'l,* 687 F.3d 1173, 1179–80 (9th Cir. 2012) …………… 49

*In re Winship,* 397 U.S. 358, 361 (1970)……………………………………...……………… 14, 43

*Kisor v. Wilkie,* 588 U.S. 558, 575, 580 (2019) …………………………………..…... 28-31

*Koon v. United States*, 518 U.S. 81, 96 (1996) ………………………………………………… 44

*Liparota v. United States*, 471 U.S. 419, 433-34 (1985) …………………………...……... 39

*Mullaney v. Wilbur,* 421 U.S. 684, 697-98 (1975) ………………………………………… 14

*Muchira v. Al-Rawaf*, 850 F.3d 605, 618–22 (4th Cir. 2017) ………………………………... 49

*Pepper v. United States,* 562 U.S. 476, 487-88 (2011) ………………………………..……… 3, 44

*Peugh v. United States,* 569 U.S. 530, 552 (2013) ……………………………...…….…... 4, 15

*Ring v. Arizona,* 536 U.S. 584, 602 (2002) …………………………………………........ 13

iv

*Stinson v. United States,* 508 U.S. 36, 38 (1993) ……………………………….......……… 28, 31

*Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, No. 20-cv-5023 (CS), 2023 WL 250477 at *10 (S.D.N.Y. Mar. 14, 2023) …………………………….…………... 49

*Townsend v. Burke,* 334 U.S. 736, 740-41 (1948) ………………………………………. 18

*United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) ………………………… 45

*United States v. Barrett*, 178 F.3d 643, 645–46 (2d Cir. 1999) ……………………...…… 31

*United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) ……………………………………… 43

*United States v. Booker,* 543 U.S. 220, 238 (2005) …………………………….…..…..14, 61

*United States v. Calimlim*, 538 F.3d 706, 708 (7th Cir. 2008) …………………...……… 65

*United States v. Calimlim*, No. 1:04-cr-248 (E.D. Wisc. June 9, 2009) ………………..…. 65

*United States v. Carrozzella*, 105 F.3d 796, 802 (2d Cir. 1997) ……………………...…… 38, 40

*United States v. Chapedlaine,* 989 F. 2d 28, 35 (1st Cir. 1993) ……………………….. 7, 19

*United States v. Cherry,* 938 F. d 748, 754 (7th Cir. 1991) …………...……………….... 25

*United States v. Combs,* 24 CR 542 (S.D.N.Y) …………………………………………... 25

*United States v. Dann,* 652 F.3d 1160, 1165 (9th Cir. 2011) ……………………..……... 23, 67

*United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) …………………………….. 44

*United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) ……………………………… 44

*United States v. Ermichine,* 99 Cr. 419 (LMM), 2002 U.S. Dist. LEXIS 8038 (S.D.N.Y. May 3, 2002)……………………………………………………...……..……... 7, 19

*United States v. Fishman*, 2025, WL 2692069 …..……………………………………….. 28

*United States v. Flaming,* 133 F. 4th 1011, 1024 (10th Cir. 2025) ……………………….. 25

*United States v. Gaudin,* 515 U.S. 506, 510-11 (1995) ……………………….......……10, 11

*United States v. Goodrich,* 12 F. 4th 219, 228 (2021) …………………………………… 76

*United States v. Granados-Corona*, No. 1:16-cr-324 (S.D.N.Y. Sept. 15, 2022) ………..... 70, 71

*United States v. Gupta*, 904 F.Supp.2d 349, 355 (S.D.N.Y. 2012) …………………………… 73

*United States v. Hernandez-Velazquez*, No. 1:19-cr-306 (E.D.N.Y. July 10, 2025) ……...…… 71

*United States v. Javice*, No. 1:23-cr-251 (S.D.N.Y. Sept. 29, 2025) ...……………………… 71

*United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017) …………………………………… 44

*United States v. Juwu,* 508 F. 3d 694, 700-01 (2d Cir. 2007) …………………………………… 18

*United States v. Kent*, 821 F.3d 362, 370 (2d Cir. 2016) ………………………………………… 40

*United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003) …………………...……………… 34, 35

*United States v. Lanier*, 520 U.S. 259, 266 (1997) …………………………………………….. 50

*United States v. Lewis*, 68 F.3d 987, 989-90 (6th Cir. 1995) ………………...………………… 39

*United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000) ………………………………...…… 39

*United States v. Maxwell*, No. 1:20-cr-330 (S.D.N.Y. June 29, 2022) ……...……..……… 46, 70

*United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001) ………………………...……….. 39

*United States v. McEwen*, No. 7:25-cr-193 (S.D.N.Y. Oct. 30, 2025) ……………...………….. 70

*United States v. Merchant*, No. 1:18-cr-527 (S.D.N.Y. Oct. 12, 2021) ………...……………… 71

*United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) …………………………… 45

*United States v. Mohammad Nauman Chaudhri*, No. 3:19-cr-85 (E.D. Va. Jan. 23, 2023) …… 68

*United States v. Nadirashvili,* 655 F. 3d 114, 122 (2d Cir. 2011) ………………………………. 7

*United States v. Nuzzo*, 385 F.3d 109, 115 (2d Cir. 2004) ………………………..………….... 32, 33

*United States v. Parkins,* 935 F. 3d 63 (2d Cir. 2019) ………………………...…………...…… 26, 30

*United States v. Pukke*, No. 1:23-cr-168 (S.D.N.Y. Sept. 22, 2025) ………...………………… 71

*United States v. Ragano*, No. 1:24-cr-50 (E.D.N.Y. Mar. 19, 2025) …………………………... 71

*United States v. Ramirez-Granados*, No. 1:11-cr-557 (E.D.N.Y. Feb. 24, 2017) …...………… 70

*United States v. Raniere*, No. 1:18-cr-204 (E.D.N.Y. Oct. 27, 2020) …………………………… 23

*United States v. Sabhnani,* 599 F.3d 215, 228 (2d Cir. 2010) …………..……………….... 23, 67

*United States v. Savarese,* 404 F. 3d 651, 654 (2d Cir. 2005) ………………………….. 6,19

*United States v. Skys*, 637 F.3d 146, 156 (2d Cir. 2011) ……………...……….………. 38-39

*United States v. Somerstein*, 20 F. Supp. 2d 454, 458-60 (E.D.N.Y. 1998) ……………….. 39

*United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ……………………………....… 73

*United States v. Tai,* 750 F.3d 309, 318 (3d Cir. 2014) …………………………….…....… 39

*United States v. Tavberidze*, No. 1:23-cr-585 (S.D.N.Y. Mar. 4, 2025) …………………. 42, 69

*United States v. Toure,* 965 F.3d 393, 399 (5th Cir. 2020) ………..……………..…….....…. 66

*United States v. Vilar,* 729 F. 3d 62 (2d Cir. 2013) ……………………………………….… 76

*United States v. Walter Alexander Corea*, No. 4:05-cr-468 (S.D. Tex. May 12, 2008) ……….. 68

*United States v. Wardlaw*, 576 F.2d 932, 938 (1st Cir. 1978) ……………………………… 45

*United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997) …………………..…………. 34, 37

**Federal Statues**

18 U.S.C. §1589 …………………………………………………….……….... 10, 16, 64, 65

18 U.S.C. §1594 ……………………………………………………………….. 6, 64, 65

18 U.S.C. §2242 ……………………………………………..…….............……………. *passim*

18 U.S.C. § 3553……….……………………………………………………….…. *passim*

18 U.S.C. § 3661 ……………………………………………………………………….. 75

**Other Authorities**

USSG §1B1.5 ……………………………………………………...……….... 28-29

USSG §2A3.1 ………………………………..…………….………………………. *passim*

USSG §2H1.1 …………………………………………………………………….. 41

USSG §2H4.1 ……………………………..…………………………....……............ *passim*

USSG §2X1.1 …………………………………………………...…….…... 6-7, 19, 31

USSG §3A1.1 …………………………………………………………….. 41

USSG §3A1.5 …………………………………………………………….. 41

USSG §3B1.1 …………………………………………………..……. 38-40

USSG §3B1.3 …………………………………………………………. 31-33

USSG §3C1.1 …………………………………………………….….... 33-38

USSG §3E1.1 …………………………………………....…..…... 41-43

USSG §4C1.1 …………………………………………………….….... 41

USSG § 5H1.11 ……………………………………………………...… 43-44

# INTRODUCTION

After a five-week jury trial, Nicole Daedone was convicted of a single count of forced-labor conspiracy. She vehemently maintains her innocence. The government's theory was that, over a span of sixteen years, Ms. Daedone and others conspired to obtain labor and services from individuals who lived, worked, or otherwise associated with OneTaste. Notably, the government did not charge Ms. Daedone with any substantive count of forced labor. Instead, its case rested on the testimony of eight complainants who alleged that Ms. Daedone coerced them into providing services ranging from ordinary domestic tasks to sexual services for her romantic partner. Each of the complainants was a highly educated adult with access to outside resources, social networks, and the unfettered ability to leave the community at any time. Several did leave—only to return months or years later.

At trial, the complainants acknowledged that no one forced them to remain at OneTaste or to participate in any of its practices, including orgasmic meditation, the central tenet of the community. Despite these admissions, the government urged the jury to find that Ms. Daedone conspired to keep these women in a condition of involuntary servitude through manipulation, shaming, and shunning. The government's primary theory of coercion was that these women remained at OneTaste because they feared they would be asked to leave OneTaste.

Ms. Daedone contested this theory at trial, maintaining that the complainants were not victims of forced labor but adults who made voluntary decisions—decisions they later came to regret. The jury ultimately returned a guilty verdict on the conspiracy count, but it was never asked to determine whether Ms. Daedone committed the substantive offense of forced labor, nor whether she caused anyone to remain in a condition of involuntary servitude through threats of serious harm or by inflicting serious harm.

Having declined to charge the substantive forced-labor offense—presumably because the evidence could not support such a charge—the government now seeks to sentence Ms. Daedone as though she had been convicted of it. Even more troubling, Probation urges this Court to sentence Ms. Daedone as if she was found guilty of sex crimes that were never charged. Probation recommends a near-statutory maximum sentence of 20 years' imprisonment based in large part because it expects this Court to make judicial findings by a mere preponderance of the evidence that Ms. Daedone committed the crime of sexual abuse. Doing so would violate Ms. Daedone's Fifth and Sixth amendment constitutional rights. Constitutional concerns aside, the government did not show by any standard that Ms. Daedone committed the offense of sexual abuse. But by endorsing Probation's unhinged sentencing report, the government implicitly concedes that it always sought to punish Ms. Daedone for sex crimes without having to prove them.

As set forth below, the applicable Guidelines range is 21 to 27 months' imprisonment. A below guidelines sentence would be appropriate in this case. Ms. Daedone is a 56-year-old woman with no criminal history. She has lived an uncommon and impactful life, and she is deeply respected by people from all walks of life, including many entirely unconnected to OneTaste. She is a prolific writer, teacher, and spiritual practitioner whose work has long focused on reducing suffering and fostering meaningful human connection. More than 200 individuals have submitted letters attesting to her character, her generosity, and her positive influence. While Ms. Daedone accepts the jury's verdict, Probation's suggested Guidelines range that exceeds the statutory maximum sentence and which is higher than that of notorious child sex traffickers is in a word – bonkers. Any lengthy term of imprisonment would be unwarranted and unjust.

## ARGUMENT

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). After a proper calculation, a sentencing judge considers the seven factors set forth in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant;" the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available;" the applicable Guidelines range itself; and relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants;" and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see also, Gall,* 552 U.S. at 50, n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a)(2). *See Pepper v. United States,* 562 U.S. 476, 487-88 (2011). The guidelines are but one factor, and are not determinative, as the Court "must made an individualized assessment of the appropriate sentence based on the facts presented." *Peugh v. United States,* 569 U.S. 530, 552 (2013).

A District Court may freely depart from the range recommended by the Guidelines based on an individualized determination that the Guidelines yield an excessive sentence in a particular case and based on policy disagreement with the Guidelines themselves. *Id.* Whatever Guidelines

range this Court adopts, a fair and justice sentence would not exceed 12 months' imprisonment when applying the § 3553(a) factors.

As set out below the proper Guidelines range for the offense of forced labor conspiracy for Ms. Daedone who has no criminal history is 21 to 27 months' imprisonment with probation as a possible sentencing disposition.

## I.    THE APPLICABLE GUIDELINES RANGE IS 21 TO 27 MONTHS.

The Probation Office posits that Ms. Daedone's Guidelines range is a whopping 235-240 months; the government places the range even higher. By endorsing Probation's Kafkaesque narrative (which came straight from the prosecution team), the government concedes that it always sought to punish Ms. Daedone for sex crimes without having to prove them. While courts enjoy *some* discretion in applying offense specific enhancements, that discretion is not without limits.

For example, sentencing Ms. Daedone for the uncharged and unproven offense of criminal sexual abuse based on judicial findings by a measure of proof less than beyond a reasonable doubt is plainly violative of Ms. Daedone's Fifth and Sixth rights. That the jury did not even find Ms. Daedone guilty of the substantive offense forced labor, let alone criminal sexual abuse, puts this case in unprecedented territory. This is not simply a matter of applying enhancements to offenses for which an accused is charged and convicted. The government is asking this Court to step into the shoes of the jury, find Ms. Daedone guilty of an uncharged sex crime by a mere preponderance of the evidence, and sentence her consistent with a conviction for that offense without the parties having an opportunity to litigate the issue at trial. What's more, in order for the Court to do as asked, it would need to make very close factual calls on a record

4

where the defense did not even know it was defending sex abuse charges which have distinct elements from forced labor conspiracy, most notably the defendant's *mens rea*.

As this record shows, Ms. Daedone complained from the start that the indictment was vague and failed to provide sufficient notice of the nature of the charges against her. Faced with an indictment that did little more than track statutory language, Ms. Daedone repeatedly asked the government to identify the conduct that it sought to prosecute and punish. The government opposed Ms. Daedone's request for a Bill of Particulars, adamantly refusing to shed light on the nature of the allegations. In opposing Ms. Daedone's request for a Bill of Particulars, the government stated, "the government has not charged a substantive offense. Accordingly, it need not prove that any individual was, in fact, at any time and at any location, subjected to forced, directed to engage in sexual activity, or the target of abusive and manipulative tactics." [Dkt. No. 77 at 17] What the government did not disclose is that despite having not charged any substantive offense, it intended to seek punishment for the substantive offense of forced labor and even for criminal sexual abuse which was *never* alleged even in discovery.[1]

The government's bait and switch ploy prevented Ms. Daedone from defending criminal sexual abuse charges for which the government now seeks to punish her. When judicially decided enhancements become the main story at sentencing rather than the offense of conviction, it should raise constitutional red flags. That the Guidelines range proposed exceeds the statutory maximum sentence for the offense of conviction for Ms. Daedone who has no criminal history reflects the government's intent to punish Ms. Daedone for a more serious crime that the jury

---

[1]     To the extent the government argues that discovery put Ms. Daedone on notice that individuals had accused her of the crime of criminal sexual abuse, that would have required reimagining the statute itself by removing any *mens rea* requirement and completely redefining the word consent in accordance with some undefined, vague, lay-person definition that *only* considers the mental state of the complainant as expressed decades later.

was never asked to consider and which the prosecution repeatedly stated was not at issue in the case.

A.    <u>The Applicable Offense Level is 16.</u>

The proper guidelines range for the convicted offense of forced labor conspiracy is 21 to 27 months. As set out in detail below, application of the proposed offense specific enhancements would violate Ms. Daedone's Fifth and Sixth amendment rights to a notice, a jury trial, and a fair proceeding.

Even if the Probation Office's proposed Guidelines range did not run afoul of the constitution, the sentencing guidelines would not support the proposed range because: (1) the enhancements proposed by the government and the Probation Office cannot be established with reasonable certainty; and (2) Ms. Daedone is entitled to a three-level decrease pursuant to USSG §2X1.1(b)(2) where the government did not show a completed offense of forced labor. In fact, this Court should consider a sentence of probation for this Class C offense which is objectively appropriate notwithstanding Probation and the government's unhinged characterization of the evidence.

Ms. Daedone was convicted of one count of forced labor conspiracy based on conduct alleged to have occurred between 2006 and 2018. Contrary to Ms. Daedone's PSR, ¶105, the guideline for the offense of forced labor conspiracy, 18 U.S.C. §1594(b), is dictated by USSG §2X1.1 which provides that in conspiracy cases, "the base offense level from the guidelines for the substantive offenses plus, plus any adjustments from such guidelines for an intended offense conduct *that can be established with reasonable certainty.*" USSG §2X1.1. *See United States v. Savarese,* 404 F. 3d 651, 654 (2d Cir. 2005) (emphasis added) Specific offense characteristics from the guidelines for the substantive offense that apply are those that are determined to have

6

been specifically intended or actually occurred. *Id.* USSG §2X1.1, Application Note 2. Speculative specific offense characteristics will not be applied. *Id.* Where the offense level adjustments for forced labor make no mention of a conspiracy, the reasonable certainty standard set out in USSG §2X1.1(a) applies. *United States v. Nadirashvili,* 655 F. 3d 114, 122 (2d Cir. 2011). The "reasonable certainty" standard set forth in §2X1.1(a) requires a court to determine the conspirator's intent. *United Ermichine,* 2002 U.S. Dist. LEXIS 8038, *11 (S.D.N.Y. 2002) *citing United States v. Chapedlaine,* 989 F. 2d 28, 35 (1st Cir. 1993). The *Ermichine* court noted that the Guidelines are less clear on what "with reasonable certainty" means in terms of burden of proof but it appears to be more than a mere preponderance of the evidence. *Id.*

The Guidelines further provide that Ms. Daedone is entitled to a three-level decrease in the offense level unless she or a co-conspirator completed all acts necessary for the successful completion of the offense or the circumstances demonstrate that the co-conspirators were on the verge of completing the substantive but were apprehended or interrupted by some event outside their control. USSG §2X1.1(b)(2). As set out below, the government did not prove at trial and cannot prove by the "reasonable certainty" standard that Ms. Daedone completed the offense of forced labor. A judicial court determination that Ms. Daedone completed the offense of forced labor would violate both her Fifth and Sixth constitutional guarantees.

Applying USSG §2X1.1(b)(2), the applicable offense level is 22 - the offense level for the substantive offense of forced labor. As set out below, applying any specific offense enhancements would violate Ms. Daedone's Fifth and Sixth rights. Constitutionality aside, no specific offense enhancements are applicable where the jury did not find the substantive offense occurred and the government did not establish those enhancements by a reasonable certainty standard. Moreover, Ms. Daedone is entitled to a three-level decrease in the offense level of 22

where the jury did not find and the evidence does not establish that all acts were committed

necessary to demonstrate the substantive offense of forced labor. Additionally, Ms. Daedone is

entitled to a one-level reduction as a trial penalty adjustment and a two-level reduction as a zero

point offender. The applicable offense level is 16, yielding a Guidelines range of 21 to 27 months

with probation as a possible sentencing disposition.

> **B.     This Court Cannot Apply Any Specific Offense Enhancements Without Violating Ms. Daedone's Constitutional Rights.**

As a preliminary matter, the government did not charge or prove to a jury the crime of

forced labor. The prosecution conceded as much, emphasizing to the jury that it was not required

to make a finding that the substantive offense of forced labor was completed. During her rebuttal

argument, the prosecutor emphasized to the jury that the case was not about whether witnesses

suffered serious harm causing their labor.

> And I also want to say there seems to be a big misconception here. This case is not about what is in the victims' minds. It's a conspiracy case. It's about the Defendants. It's about their intent. So the question for you is not whether these victims should have been stronger or whether they should have had the guts or resources or wherewithal to leave sooner or say no. *It's not about whether these victims actually suffered serious harm and whether they actually caused them to work. That is absolutely not the question of this trial.* (emphasis added) [Tr. R. 5222:11-20]

She continued:

> And I want to emphasize something else about the law here. If you believe that the Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single one, then they are guilty." [Tr. R. 5224 12:18]
>
> ***
>
> As you will hear when Judge Gujarati instructs you, this case is a conspiracy case. The focus is no what the defendants agreed and intended, not whether a particular victim had a choice. [Tr. R. 5272:8-11]

The jury was expressly told that the case was not about the complainants' intent, whether

they said no or consented, whether they suffered serious harm, or even whether the defendants

8

caused them to work – all elements that jury would have had to find beyond a reasonable doubt if forced labor was charged. The prosecutor made clear that to find the Defendants guilty of the charged offense, it needed to find only that that Ms. Daedone and Ms. Cherwich and/or a co-conspirator agreed to obtain a single form of labor or service from one person. The jury was repeatedly told and eventually instructed that its job was to decide whether Ms. Daedone *agreed* to commit a single act of forced labor - not that she had succeeded.

Having not charged the offense of forced labor or asked the jury to decide whether the offense occurred, the government now seeks to have this Court decide by a preponderance of the evidence that: (1) Ms. Daedone committed the offense of forced labor; (2) that enhancements specific to the offense of forced labor should apply; and that (3) she also committed the separate offense of criminal sexual abuse. Specifically, the Probation Office and the government contend that Ms. Daedone is subject to a three-level increase from the base offense level of 22 because multiple victims of forced were held in a condition of involuntary servitude for more than a year. USSG §2H4.1(b)(3)(a). From there, Probation recommends an additional seven-level increase pursuant to USSG §2H4.1(b)(4)(b), because Daedone committed the offense of criminal sexual abuse in violation of 18 U.S.C. §2242, yielding an offense level of 32 before considering any role-specific enhancements.

The Court's affirmative determination of any of the above would violate Ms. Daedone's Fifth and Sixth amendment constitutional rights to a jury determination by proof beyond a reasonable doubt along with Ms. Daedone's constitutionally protected notice rights. Even if the Court was permitted to dramatically increase Ms. Daedone's Guidelines range via judicial findings by proof less than beyond reasonable doubt without running afoul of the Constitution, the proper standard of proof is "reasonable certainty" which cannot be satisfied on this record.

Constitutional problems aside, a *Fatico* hearing would be necessary for the Court to apply the enhancements proposed by Probation and endorsed by the Government – but more on that later.

1.    A Judicial Finding that Ms. Daedone Committed the Uncharged Offenses of Forced Labor and Criminal Sexual Abuse By Proof Less than <u>Reasonable Doubt Violates her Fifth and Sixth Amendment Rights</u>.

The government asks this Court to find at sentencing by a mere preponderance that Ms. Daedone committed two uncharged offenses, namely forced labor in violation 18 U.S.C. §1589 and criminal sexual abuse in violation of 18 U.S.C. §2242. By so doing, the government seeks to end run Ms. Daedone's constitutional guarantees of notice and a jury determination by proof beyond a reasonable doubt on the elements of those offenses. That the government admits that Ms. Daedone's sentence cannot exceed the 20-year maximum sentence for the offense of forced labor conspiracy does not cure the profound constitutional errors implicit in raising Ms. Daedone's Guidelines range by 10 levels based on judicial findings that she committed these uncharged offenses.

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law" and the guarantee that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." *Apprendi v. New Jersey,* 530 U.S. 466, 477-78. Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt." *Id.* at 478 *citing United States v. Gaudin,* 515 U.S. 506, 510 (1995).

Turning first to the Sixth Amendment, Ms. Daedone's jury trial rights prohibit this Court from sentencing her to punishment that does not derive from the jury's verdict. The guarantees of jury trial in the Federal and State constitutions reflect a profound judgment about the way in

which law should be enforced and justice administered. *Duncan v. Louisiana,* 391 U.S. 145, 155 (1968). As the United States Supreme Court held in *Duncan* over half a century ago:

> [a] right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing the accused with the right to be tried by a jury of his peers gave him an estimable safeguard against the corrupt and overzealous prosecutor and against the compliant, biased, or eccentric judge. *Id.* at 155.

The Court has repeatedly reminded that "[t]he Sixth Amendment right of jury trial is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely v. Washington,* 542 U.S. 296, 306 (2004).

*Apprendi* carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended, that is, "[t]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties." Trial by jury has always been understood to require that "*the truth of every accusation* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours." *United Stated v. Gaudin,* 515 U.S. 506, 510-11 (1995) *quoting* 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added).

During the years surrounding our Nation's foundling, there existed no distinction between an "element" of a felony offense and a "sentencing factor." *Apprendi,* 530 U.S. at 478. As the *Apprendi* court observed, criminal proceedings were submitted to the jury after being initiated by an indictment containing "all the facts and circumstances that constitute the offense .

11

. . stated with such certainty precision, that the defendant…may be enabled to determine the species of offense they constitute, in order that he may prepare his defense accordingly . . . and *that there may be no doubt as to the judgment which should be given,* if the defendant be convicted" *Id.* The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from invariable linkage of punishment with crime. *Id.*

The practice at common law held true when indictments were issued pursuant to statute. *Id.* at 480. Just as the circumstances of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment. *Id.* "Where a statute annexes a higher degree of punishment to a common-law felony, if committed under particular circumstances, an indictment for the offense, in order to bring the defendant within that higher degree of punishment, must expressly charge it to have been committed under those circumstances, and must state the circumstances with certainty and precision. *Id.* The historic link between the verdict and "judgment," *i.e.* punishment, and consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removed the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone. *Id.* at 482

That Probation's recommended sentence falls just short of the 20-year statutory maximum sentence does not solve the Court's constitutional problem. The constitutional principles set forth in *Apprendi* exist even when a sentence shaped by judicial fact does not exceed the statutory maximum penalty for the offense. For *Apprendi* purposes, the maximum sentence a judge may impose is based *solely on the basis of facts reflected in the jury verdict or*

*admitted by the defendant. Blakely,* 542 U.S. at 303 *citing Ring v. Arizona,* 536 U.S. 584, 602 (2002) (emphasis in the original). Said differently, the relevant "statutory maximum" is the maximum sentence a judge may impose *without* any additional findings. *Blakely,* 542 U.S. at 303-304. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority. *Id.* at 304. As the United States Supreme Court in *Booker* made clear that "[m]ore important than the language used in our holding in *Apprendi* are the principles we sought to vindicate." *United States v. Booker,* 543 U.S. 220, 238 (2005). Simply put, there are constitutional limits to a court's authority to define away facts, and a sentencing structure that keeps from the jury facts that "expose [defendants] to a greater or additional" punishment raises serious constitutional concerns. *Apprendi,* 530 U.S. at 486. *See also, Cunningham v. California,* 549 U.S. 270, 282 (2007) (collection Supreme Court precedents affirming the rule of *Apprendi* in a variety of circumstances).

By way of example, in *Blakely* the petitioner pleaded guilty to facts that authorized a maximum sentence of 53 months. The sentencing judge, however, made a factual finding that increased his sentence to 90 months – outside the range authorized by his plea but still within the statutory maximum of 10 years. The *Blakely* Court rejected the state's argument that *Apprendi* was inapplicable because the petitioner's sentence did not exceed the 10-year statutory maximum. The *Blakely* Court reasoned that the judge was still required to find facts that were "neither admitted by petitioner nor found by a jury" to impose the 90-month sentence. At bottom, the sentence exceeded the maximum the judge could have imposed "*without* any additional findings." *Id.* at 542 U.S. at 303-04. *See also, Alleyne v. United States,* 570 U.S. 99,

111-112 (2013) (holding that the key Sixth Amendment inquiry is whether the fact found "increase[s] the prescribed range of penalties to which a criminal defendant is exposed.")

That the federal guidelines are now advisory does not undermine the constitutional principles articulated in *Apprendi* because the guidelines are still the "starting point and the initial benchmark" for sentencing judges to consider. *Gall,* 552 U.S. at 49. Guidelines provide the "framework for sentencing" are intended to "anchor[]" sentencing decision. *Peugh v. United States,* 569 U.S. 520, 541-42 (2013). Indeed, failing to properly determine a defendant's guidelines range can be reversible error. *See United States v. Cavera,* 550 U.S. F. 3d 180, 189-190 (2d Cir. 2008) (en banc); *Gall,* 552 U.S. at 51.

Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. *Apprendi,* 530 U.S. at 478. The reliance on the "reasonable doubt" standard among common-law jurisdiction "reflects a profound judgment about the way in which law should be enforced and administered." *Id. citing In re Winship,* 397 U.S. 358, 361 (1970). As the Supreme Court declared, "[s]ince *Winship,* we have made clear beyond peradventure that *Winship's* due process and associated jury protections extend to some degree 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" *Apprendi,* 530 U.S. at 483 *citing Almendarez-Torres,* 523 U.S. at 251 (Scalia, J. dissenting). Criminal law "is concerned not only with guilt or innocence in the abstract, but also with the degree of criminal culpability" assessed. *Apprendi,* 530 U.S. at 485 *citing Mullaney v. Wilbur,* 421 U.S. 684, 697-98. The *Mullaney* Court condemned any attempt to circumvent the protections of *Winship* by recharacterizing elements of an offense as mere factors that bear solely on the extent of punishment. *Id.* at 698.

Lastly, Ms. Daedone's right to notice of potential punishment is undermined by the government's failure to charge forced labor and more even problematically criminal sexual abuse. If Ms. Daedone's sentence is now significantly increased based on evidence purportedly demonstrating the offense of criminal sexual abuse, she is deprived of "fair notice to know the precise effect [the] jury's verdict [w]ould have on [her] punishment. *Tapia,* 2023 WL 2942922 at *2, n.2 (2d Cir. 2023).

Consistent with the foregoing constitutional tenets, judicial findings that Ms. Daedone committed the offenses of forced labor and criminal sexual abuse by proof less than by reasonable doubt – which are necessary to trigger the three-point enhancement under §2H4.1(b)(3)(a) and the seven-point enhancement under §2H4.1(b)(3)(a) -violate Ms. Daedone's Fifth and Sixth Amendment rights. While the government seeks to avoid these constitutional problems by characterizing §2H4.1(b)(3)(a) and §2H4.1(b)(3)(a) as mere sentencing enhancements, the government's position is hard to take seriously where each provision requires a finding that Ms. Daedone committed an offense distinct from forced labor conspiracy – the sole offense of which she was convicted. That the government does not seek a sentence that exceeds the statutory maximum for forced labor conspiracy does not cure the constitutional harm where there can be little question that the whole point of asking this court to find by a mere preponderance of the evidence that Ms. Daedone committed the two substantive offenses of forced labor and criminal sexual abuse is to artificially increase a guidelines range that will unquestionably expose her to greater punishment than she would face absent such findings. As the Supreme Court has explained, "when a Guidelines range moves up or down, offenders' sentences move with it." *Peugh,* 569 U.S. at 544.

To prove the offense of forced labor, the government must prove beyond a reasonable that: (1) the defendant obtained the labor or services of one or more persons; (2) the defendant did so through: (a) threats of serious harm, or physical restraint against that person or persons; or (b) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (c) by means of the abuse or threatened abuse of law or the legal process; and (3) the Defendant acted knowingly. 18 U.S.C. § 1589. The jury was never asked to decide whether each and every element of this offense was proved beyond a reasonable.

The evidence at trial was hotly contested, particularly on the question of whether any complainants performed labor as a result of threats of serious harm or under belief that they would suffer serious harm if they refused. Equally contested was whether Ms. Daedone knowingly used threats of harm to extract any labor or services. As addressed in detail below, the evidence was closely balanced on these issues and there is no reason to believe that if asked, the jury would have returned a guilty verdict on the substantive offense of forced labor. Again, the prosecution drilled the point home that the jury did *not* have to make such findings. That the government never charged forced labor suggests, at the very least, that it lacked confidence in the strength of its evidence as to every element of the offense of forced labor. Importantly, the question of whether the conduct as described by the complainants can even constitute the type of harm envisioned by the statute was vigorously debated (and will continue to be debated on appeal). This is all to say that if the government sought to punish Ms. Daedone for the completed offense of forced labor and any specific offense enhancements, the question should have been sent to the jury.

16

To have this Court make findings about the existence of these elements by a standard of proof less that beyond a reasonable doubt strips Ms. Daedone's of her Due Process and jury trial rights. Whether a prosecutor strategically avoids proving a charge beyond a reasonable doubt at trial and then seeks to punish the defendant for that same charge at sentencing based on a lower standard of proof, the jury becomes a mere "procedural formality" rather than the fundamental reservation of power in our constitutional structure" that the Framers intended. *Blakley,* 542 U.S. at 305-06

A judicial finding by a mere preponderance that Ms. Daedone committed the more serious offense of criminal sexual would be even more constitutionally offensive. Such a finding has the effect of substantially increasing Ms. Daedone's Guidelines range and will invariably lead to greater punishment than would otherwise by justified by the jury's verdict.

As a preliminary matter, Ms. Daedone was not charged with criminal sexual abuse in violation of 18 U.S.C. §2242, and no complainant alleged, even in discovery, that she committed the offense. To put a finer point on it, no complainant ever alleged that Ms. Daedone used any force, threats, or even coercion to engage in unwanted sexual contact with anyone including Reece Jones. Christina Berkely testified that she consented to sexual contact with Reece Jones and even enjoyed the experience. [Tr. R. 1136:3-6; 1159:5-14] Michelle Wright testified that she agreed to be Jones's handler and never communicated to Ms. Daedone that she did not want to be his handlers. In other words, no coercion was necessary to induce Berkely or Wright into sex with Jones. The failure to charge sexual abuse denied Ms. Daedone notice of the government's intent to use such an allegation at sentencing and the opportunity to defend against it. A judicial determination that Ms. Daedone committed the offense of criminal sexual abuse, that is, every element of the offense, creates a serious risk violating Ms. Daedone's "due process right to be

17

sentenced based on accurate information," particularly since Ms. Daedone did not know she was defending against such a claim. *United States v. Juwu,* 508 F. 3d 694, 700-01 (2d Cir. 2007); *see also Townsend v. Burke,* 334 U.S. 736, 740-41 (1948) (Jackson, J.).

As set out below, Ms. Daedone maintains that even if this Court was permitted dramatically increase her offense level by finding that Ms. Daedone committed the offense of criminal sexual abuse, no such evidence proves the elements of this offense – by any standard of proof. That said, the Fifth and Sixth amendments to the Constitution prohibits this Court from even engaging in such an analysis.

If Ms. Daedone is to be subject to the serious sentencing implications of a conviction for criminal sexual abuse – a whopping seven-point increase to her offense, §2H4.1(b)(4)(b), - she is entitled to a jury determination by proof beyond a reasonable that she committed the offense  A judicial finding that Ms. Daedone committed an uncharged offense more serious than the charged offense and with serious sentencing ramification clearly would render Ms. Daedone's jury trial right a nullity – the precise opposite of the "inestimable safeguard" and "bulwark" it is intended to be. *Duncan,* 391 U.S. at 156; *Apprendi,* 530 U.S. at 477. At the very least, there would be a profound chilling effect on an accused's jury trial rights if the government could charge a less serious offense, easier to prove, but still help themselves to a sentence based on a judicial finding by a mere preponderance of the evidence standard. After all, a defendant has no ability to demand a jury trial for uncharged crimes that may be used to greatly enhance a guidelines range and invariably lead to increased punishment. The government should not be permitted to end run the bedrock constitutional protections on which our criminal justice system rests by sandbagging defendants with more serious charges at sentencing that were never presented or proved to a jury.

C.   Constitutional Problems Aside, the Government Cannot Show With Reasonable Certainty that Ms. Daedone Specifically Intended To Commit the Crime of Forced Labor Or that She Committed the Offense of Criminal Sexual Abuse.

If this Court finds that the constitution is no impediment to making judicial findings that Ms. Daedone committed the offenses of forced labor and sexual abuse to increase Ms. Daedone's Guidelines range, the standard of proof this Court must apply is "reasonable certainty" not preponderance of the evidence. As set out, *supra,* the guideline for the offense of forced labor conspiracy is dictated by USSG §2X1.1 which provides that in conspiracy cases, "the base offense level from the guidelines for the substantive offenses plus, plus any adjustments from such guidelines for an intended offense conduct *that can be established with reasonable certainty.*" USSG §2X1.1. *Savarese,* 404 F. 3d at 654 (emphasis added) The "reasonable certainty" standard set forth in §2X1.1(a) requires a court to determine the conspirator's intent. *United Ermichine,* 2002 U.S. Dist. LEXIS 8038, *11 (S.D.N.Y. 2002) *citing United States v. Chapedlaine,* 989 F. 2d 28, 35 (1st Cir. 1993). Thus, in conspiracy cases, a court may not apply any adjustments unless they can be established with reasonable certainty – not by a preponderance of the evidence.

1.   Application of USSG §2H4.1(b)(3)(A)

Probation and the government recommend that this Court apply the enhancement set out in USSG §2H4.1(b)(3)(A). [PSR, ¶106] In order to so, it must be *established with reasonable certainty* that: (1) involuntary servitude occurred; and (2) at least one victim was held in a condition of involuntary servitude. As discussed above, because jury was never asked to find forced labor, any application of enhancements related to a substantive forced labor charge violates Ms. Daedone's constitutional rights. Constitutionality aside, the record does not show

with reasonable certainty (or by a preponderance of the evidence) that Ms. Daedone committed an offense of forced labor.

To prove the offense of forced labor, the government must show that Ms. Daedone, or a co-conspirator, caused or threatened serious harm to the witnesses to extract their labor. The government failed to make any such showing and the jury was repeatedly reminded that whether serious harm existed or caused someone to provide labor was an irrelevant inquiry. Irrespective of what standard of proof is applied, there was no threat of serious harm and the witnesses admitted that they were free to leave and chose to stay. Separately, no witness testified that they communicated their desire to "leave" OneTaste and were either physically restrained or threatened with harm to cause them to stay.

Without exception, the witnesses denied any physical restraint or threat of physical harm. Each and every one of them admitted that they were permitted to leave the OneTaste community and many did. Some of the witnesses left OneTaste altogether only to return months or years later of their own free will. They all admitted that there was no requirement that they live in any communal home or work for OneTaste to be part of the community. After all, tens of thousands of people took classes and participated in OneTaste events without ever having lived in one of the communal homes or having worked at OneTaste. Indeed, many witnesses worked outside the context of OneTaste while living in the communal residence. The complainants visited friends who were not associated with OneTaste, traveled with friends who were not part of the OneTaste community and often went home for family events or holidays. It is undisputed that these witnesses came and went as they pleased. The following are some examples of witness trial testimony:

- "Q: And that's because you did choose to be at OneTaste, because you wanted to change and grow, right?  A: Absolutely."  Trial Tr. 589:16-18.

- "Q: But you chose to stay instead, correct?  A: Yes."  *Id.* at 1185:22–25.

- "Q: Each time you left, you made a choice to come back and keep associating with OneTaste, right?  A: Yes."  *Id.* at 1392:1–3.

- "Q: And you could have stayed in San Francisco in your own apartment, right?  A: I could have chosen not to move—well I could have stayed in San Francisco.  I could have made different choice, but I did of my own free will move into the Morellino knowing that there was going to be very little, if no privacy."  *Id.* at 1826:2–7.

- "Q: And you chose, based on whatever suggestion you received, to spend your time at OneTaste, correct?  A: Correct."  *Id.* at 2230:21–23.

- "Q: . . . [Y]ou had an apartment in Brooklyn that you could have gone back to any time, correct?  A: During—yes. Mm-hm."  *Id.* at 2817:11–15.

- "Q: Bottom line, ma'am, you were able to leave OneTaste at any time, correct?  A: Yes."  *Id.* at 3147:1–3.

- "Q: So we can agree that you were free to come and go as you please at One Taste?  A: Yes.  Q: No one locked you in anywhere; right?  A: No.  Q: No chains on the door?  A: No. Q: If you wanted to leave go to your sister's place in SOHO you could do that; correct?  A: Yes.  Q: You always had the ability to leave One Taste at any time; right?  A: Yes.  Q: And when you stayed it was because you chose to stay; correct?  A: Yes."  *Id.* at 3108:12–3109:1.

- "Q: . . . You could have decided to live somewhere else other than 1080 Folsom, right?  A: Yes, yes."  *Id.* at 4025:20–23.

21

In fact, numerous witnesses testified that they did leave OneTaste when they chose to, and that no one prevented or obstructed them from doing so.

- "Q: And you told people at OneTaste you were leaving, right?  A: I would imagine so.  Q: Okay.  In response, no one forced you to stay, right?  A: No. . . .  Q: When you told people at OneTaste that you were moving out, they just let you go, right?  A: Yes.  No one chained me up anywhere."  *Id.* at 1455:18–1456:01.

- "Q: And at any day, through whatever period of time that you lived there, you could have walked out the door and not come back, correct?  A: Yes, and eventually that's essentially what I did."  *Id.* at 1902:14–17.

- "Q: Right.  It felt emotional leaving, but nothing obstructed you from leaving, right?  A: Once we made the decision, nothing obstructed us."  *Id.* at 2919:14–16.

"Q: Fair to say if you didn't like your hours or your wages you could get a different job; right?  A: Yes.  Q: That's a decision you ultimately made; correct?  A: Yes."  *Id.* at 3108:7–11.

At trial, the government conceded that the complainants were not physically restrained and were free to leave but claimed that the "serious harm" these complainants suffered were more subtle forms of coercion like manipulation, shunning, and "mean girl" activity. The government characterizes manipulation and shunning as "psychological abuse" that is of such a serious nature that it could cause someone to stay in a condition of involuntary servitude even though the complainants did not even realize in the moment that they were suffering such "serious harm."

The government's argument fails on the law and the facts. As a preliminary matter, there exists no case where the government has charged *only* forced labor conspiracy. Moreover, there exists no case in the history of forced labor cases where the complainants acknowledged that

they were free to leave and where the alleged "serious harm" did not involve impinging on anyone's ability to leave their circumstances except through subtle forms of manipulation that exist in every bad (and sometimes good) relationship. Rather, courts have routinely found that forced labor cannot exist unless the victim had no choice but to continue to labor. This normally occurs where vulnerable victims are deprived of their travel documents and passports, deprived of access to the outside world for extended periods of time, or threated with harm if they attempt to leave. None of which is the case here.

For example, in *United States v. Sabhnani*, the defendant took away the victims' passports and travel documents and told them that if they ran away the police would shoot them and also that one of the victim's husbands who remained in the victim's home country of Indonesia would be arrested. 599 F.3d 215, 228 (2d Cir. 2010). In *United States v. Dann*, the defendant did not allow the victim to leave the apartment without her permission, instructed her to not speak with anyone, made her hide in the apartment complex's gym when the defendant had friends over, and also told the apartment complex's property manager "to order Spanish-speaking personnel not to talk with [the victim]." 652 F.3d 1160, 1165 (9th Cir. 2011). These are just a few examples. *See, e.g., Callahan*, 801 F.3d at 628 (affirming the district court's finding that the three-level enhancement in § 2H4.1(b)(3)(A) applies, citing that the defendant locked the victim in the basement and later in a room upstairs); Sent'g Transcript at 10, 15, 146, *United States v. Raniere*, No. 1:18-cr-204 (E.D.N.Y. Oct. 27, 2020) (applying the three-level enhancement and noting the defendant confined one victim to a room without human contact for nearly two years and threatened that if she left the room, she would be sent to Mexico without any identification).

The instant case bears no resemblance to those cases in which a jury has found the

substantive offense of forced labor. If the government seeks to create new or unprecedented definitions of "serious harm" or "psychological harm," it should have presented that evidence to a jury rather than ask this Court to make this unprecedented finding by a lower standard of proof.

Lastly, neither the government nor Probation has identified when any alleged condition of "peonage or involuntary servitude" began. Determining whether such a condition lasted more than one year necessarily depends on when it purportedly started and ended. And particularly here, when the only argument is that the victims were psychologically coerced to labor for over a year, the Court would have to determine when the psychological coercion started. Without those temporal findings – which are wholly absent and were necessarily *not* an element of the crime charged – the enhancement cannot apply.

### 2.    Application of USSG §2A3.1 Rape Cross Reference

The Probation Office contends that USSG §2H4.1(b)(4)(B) applies, because Ms. Daedone committed the uncharged offense of criminal sexual abuse against Christina Berkely and Michelle Wright. Application of USSG §2H4.1(b)(4)(B) would subject Ms. Daedone to the applicable guidelines for criminal sexual abuse under USSG §2A3.1 plus two additional levels, yielding an offense level of 32. [PSR, ¶107]

Application of the sexual abuse enhancement would not only be unconstitutional for the reasons argued, *supra,* it would require this Court to defy the plain language of the statute and well-established precedent that "fear of bodily harm" requires some threat of *physical* harm. Whether applying the "reasonable certainty" or "preponderance of the evidence" standard, the record does not establish that Ms. Daedone committed the federal offense of criminal sexual abuse against Christina Berkely and Michelle Wright. Indeed, neither the government nor

24

Probation has identified precisely where, when, and how Defendant Daedone caused Berkely and Wright "to engage in a sexual act by threatening or placing that other person in fear."

In response to Ms. Daedone's objection to the PSR, Probation issued an addendum to the report claiming that Ms. Daedone caused Berkely and Wright to engage in sexual acts with Reece Jones by placing them in "fear of repercussions if they said no." Those specific fears include "fear of being shunned, losing their jobs and possibly housing and economic stability." [Second Add. At pg. 7-0] Probation's definition of "fear" is so broad as to render it meaningless. According to Probation, fear of literally *anything* would suffice.

No authority supports Probation's position on this point. Courts have generally held that that threatening or placing one in fear involves some threat of bodily harm. *See United States v. Flaming,* 133 F. 4th 1011, 1024 (10th Cir. 2025) (placing someone in fear under § 2242(1) requires the "defendant's actions to [at least] implicitly place the victim in fear of some bodily harm."); *United States v. Cherry,* 938 F. d 748, 754 (7th Cir. 1991) (acknowledging that "placed in fear" does not require force but the Defendants action must at the very least have implicitly placed the victim in fear of "at least some bodily harm.") 3 Leonard B. Sand et al., Modern Federal Jury Instructions-Criminal ¶61.03 (61-18) (requiring that defendant threatened or placed victim in fear of "some bodily harm").

United States District Court Judge Subramanian recently addressed this precise question in the matter of *United States v. Combs,* 24 CR 542 (S.D.N.Y) and concluded that §2242 requires "threatening or placing [the victim] in fear of an imminent concrete harm, such as bodily harm," – albeit something lesser than death, serious bodily injury, or kidnapping. Judge Subramanian observed:

> The *Sand* treatise recommends a requirement that the defendant's actions
> implicitly placed the victim in fear *of some bodily harm.* The treatise adopted this

view because although the statute has been upheld against a vagueness challenge, allowing threat and harm to have unlimited reach would raise constitutional questions. The text of Section 2242 suggests that a narrow reading, on that requires an imminent concrete threat of harm, such as bodily harm, makes more sense. By its terms the statute applies to harms other than those for death, serious bodily injury, or kidnapping. That borrows language from 18 U.S.C. Section 2241, which requires the threat of those things. Those are all imminent concreate harms relating to physical violence or restraint, and Congress' use of parallel language in Section 2242 suggests that it should apply to harms of the same kind, even if they are not as severe. [Ex B - Combs' Sentencing Tr. at pg. 14]

Judge Subramanian also pointed to the rule of lenity as support for his narrower reading of the guidelines citing *United States v. Parkins,* 935 F. 3d 63 (2d Cir. 2019).

Critically, Judge Subramanian observed that evidence showed that Combs had threatened Ms. Ventura with releasing sex tapes to gain her compliance with certain sex acts and had made certain threats against "Jane" concerning her home. But the court concluded that such conduct was not sufficient to satisfy the elements of criminal sexual abuse.

The evidence in this case falls far short from what the government presented in Combs. Threatening to ostracize someone from a group or threatening to fire someone could never reasonably cause someone to engage in unwanted sexual acts. Even if it could, Christina Berkely repeatedly told prosecutors during her many interviews and a trial that she *consented* to being Jones' handler at Daedone's request and even enjoyed the position. [Tr. R. 1159:5-14]

Q.      And you actually enjoyed that position as the assistant, fair?

A.      Yes.

Q.      In fact, you were excited about, correct?

A.      Yes.

Q.      And it's one of those experiences that you tell people was some of the cool, crazy shit you've done, right?

A.      Yes.

Q.      It was not a bad experience, right?

A.      Correct. [Tr. R. 1159:5-14]

26

As for Wright, she never claimed during any interviews with prosecutors or at trial that she accepted the "handler" position out of any fear, let alone an imminent concrete fear. Although decades later she claimed that she believes she was emotionally manipulated into being Jones' handler, she did not testify that she feared anything in the moment, and certainly no fear of some bodily harm. Notably, it is Probation that uses the word fear rather than any witness. Regardless, the type of "fear" described by Probation is not the "imminent concrete harm" contemplated by the statute. It cannot be satisfied by a perceived threat to one's relationship, social standing, or favor within a group. To hold otherwise would run afoul of the plain language of the statute, case law interpreting, and the constitution.

Application of USSG §2A3.1 is also prohibited because jurisdiction is lacking. As an initial matter, the enhancement applies only if "any another *offense* was committed," USSG §2H4.1(b)(4) – a reference to the entire offense, not just particular elements of it. The enhancement is thus inapplicable when, as here, it is undisputed that Section 2242's jurisdictional element is not satisfied.

Other guidelines provisions indicate that §2242's jurisdictional element must be met here. Several guidelines include a cross reference to the guideline for 18 U.S.C. §1111, which similarly criminalizes conduct only "[w]ithin the special maritime and territorial jurisdiction of the United States." Yet unlike §2H4.1(b)(4), these cross references apply only if an individual was "killed under circumstances that would constitute murder under 18 U.S.C. §1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." §§2A3.1(c)(1); 2A4.1(c)(1); 2B3.1(c)(1); 2B3.2(c)(1); 2D1.1(d)(1); 2E2.1(c)(1); 2G1.3(c)(2); 2G2.1(c)(1). The Commission did not include similar language in §2H4.1(b)(4)(B) making clear that the other guideline's offense level would apply even if the alleged conduct occurred outside

27

the special maritime and territorial jurisdiction of the United States.  And, as noted above, when Congress "uses particular language in one . . . statute and different language in another, we presume its word choice was intentional."  *Fishman*, 2025 WL 2692069, at *5.

Federal sexual abuse under 18 U.S.C. §2242 criminalizes conduct only "in the special maritime and territorial jurisdiction of the United States," or in a federal prison or similar institution.  "[S]pecial maritime and territorial jurisdiction of the United States" is a highly circumscribed jurisdictional grant that includes, among other things, "the high seas," specified vessels and aircraft, and certain types of federal land or facilities. 18 U.S.C. §7.  But §2242 goes beyond just a jurisdictional issue because the setting in which it takes place – a facility with some kind of federal custody, contract, or agreement – makes the act inherently coercive. Although USSG §1B1.5 Application Note 3, states "such other offense includes . . . conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States," that note is a purely jurisdictional issue that generally applies without regard to the coercive element of any specific statute, such as 18 U.S.C. §2242.

Moreover, the Guidelines commentary must be interpreted in line with the limitations provided by Supreme Court cases. In *Stinson v. United States*, the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." 508 U.S. 36, 38 (1993). Subsequently, the Supreme Court in *Kisor v. Wilkie* held that "before concluding that a rule is genuinely ambiguous, a court must

28

exhaust all the 'traditional tools' of construction.[2]" 588 U.S. 558, 575, 580 (2019); *see also Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 232 (2d Cir. 2020).

Here, the jurisdictional requirement of 18 U.S.C. § 2242 as applied through USSG § 2A3.1 is a necessary requirement of the offense.  Applying the "traditional tools" of construction reveals no ambiguity in that requirement.  The question, therefore, is whether the commentary in §1B1.5 Application Note 3 alters or eliminates the jurisdictional prerequisite in §2242 when considering whether the sexual abuse enhancement should be applied through USSG §2A3.1. The answer is unambiguously no.  The commentary to §1B1.5 does not – and cannot – remove the jurisdictional requirement embedded in §2242.

Further, a well-established canon of construction provides that when two provisions conflict, the specific provision controls. *See, e.g., Gozlon-Peretz v. United States,* 498 U.S. 395, 407 (1991); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) Here the specific provision is USSG §2H4.1, which applies a cross reference to USSG §2A3.1, which is the applicable guideline for criminal sexual abuse under 18 U.S.C. §§2241 and 2242, both of which contain explicit jurisdictional requirements.  In contrast, the general commentary in Application Note 3 to §1B1.5 does not reference any statute, offense, or jurisdictional scope.  As a result, the specific provision – requiring that the conduct occur "in the special maritime and territorial jurisdiction of the United States," or in a federal prison – must prevail.  Accordingly, the sexual abuse cross reference to §2A3.1is inapplicable here.

Even if some ambiguity could be found, *Kisor* makes clear that deference to commentary still requires a "reasonable" interpretation, and "a court may not defer to a new interpretation,

---

[2]    The Second Circuit has held that *Stinson* controls even post-*Kisor. See, e.g., United States v. Rainford,* 110 F. 4th 455, 475, n.5 (2d Cir. 2024). To the extent this argument is foreclosed by Circuit precedent, Ms. Daedone preserves the issues for further review.

whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." *Kisor*, 588 U.S. at 575, 579. Applying § 2A3.1 as an enhancement through § 2H4.1(b)(4)(B), thereby increasing the base offense level from 22 to 32, would be both unreasonable and an "unfair surprise." It would, in effect, treat Ms. Daedone as if she were convicted of a sex crime, which the government was unable to charge her with, gave no notice of, and never convicted her of.

The rule of lenity further underscores this point. Any genuine ambiguity in the Guidelines must be resolved in favor of the defendant. *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019). Applying that rule here compels the conclusion that the jurisdictional element of § 2A3.1 based on 18 U.S.C. § 2242 cannot simply be read out of existence through the commentary. Moreover, while the government initially investigated this case for potential sex trafficking charges, it did not charge a sex offense, and it should not be permitted to circumvent the beyond a reasonable doubt standard. And despite knowing that OneTaste's focus was on OMing, the government's theory of prosecution – as they acknowledged up until trial – was not that OneTaste sexually abused participants, but that it coerced labor through psychological means. *See* Nov. 15, 2024 Tr. 54:10–55:10; *see also* Trial Tr. 5224:12–18 ("And I want to emphasize something else about the law here. If you believe that the Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single one, then they are guilty. Here, you have seen overwhelming evidence that the Defendants agreed to get labor and services from a number of people, but it only takes one."). To now apply § 2A3.1 as a cross-reference would transform the nature of this case after the fact, punishing Ms. Daedone as though she were convicted of a sex crime that the government never charged and never proved. Doing so would produce a drastic and unjust result – raising her base offense level from 22 to 32.

Such a severe increase, based on an inapplicable and jurisdictionally defective cross-reference, runs counter to the fairness principles embodied in *Kisor*, *Stinson*, and the rule of lenity

In short, the record does not establish that Ms. Daedone sexually abused Ms. Berkely or Ms. Wright *as defined by the statute.* These women consented to these activities even if they have later decided that they were manipulated into doing so. They certainly did not comply because of any threat of serious harm. Thus, even if the Court could engage in this analysis without violating Ms. Daedone's Fifth and Sixth amendment rights, the cross reference is inapplicable for lack of proof.

D.    Ms. Daedone Is Entitled to a Three-Level Offense Decrease Where the
       Government Did Not Prove a Completed Offense of Forced Labor.

The Guidelines further provide that Ms. Daedone is entitled to a three-level decrease in the offense level unless she or a co-conspirator completed all acts necessary for the successful completion of the offense or the circumstances demonstrate that the co-conspirators were on the verge of completing the substantive but were apprehended or interrupted by some event outside their control. USSG §2X1.1(b)(2). As set out above, the government did not prove at trial and cannot prove by the "reasonable certainty" standard that Ms. Daedone completed the offense of forced labor. The government failed in all respects to prove that that the complainants provided serve or labors on account of serious harm or threats of serious harm. The prosecution all but admitted as much during its closing arguments. This is precisely the scenario where a defendant is entitled to a three-level decreased pursuant to §2X1.1(b)(2).

E.    The Abuse-of-Trust Enhancement Does Not Apply Because Ms. Daedone Did
       Not Occupy a Qualifying Position of Trust or Use It to Facilitate the Offense.

The Probation Department correctly declined to endorse the abuse-of-trust enhancement under USSG §3B1.3. The Probation Department considered—and rejected—the government's

request to add it, correctly concluding that Ms. Daedone's influence at OneTaste was not the kind of "trust and discretion" contemplated by the Guideline. PSR Addendum 12. As the addendum explains, the key question is whether her influence over others stemmed from a position of professional or fiduciary trust rather than from charisma, persuasion, or authority rooted in personality. *See id.* Probation found that it did not. Ms. Daedone's role as CEO and teacher was not analogous to that of a counselor, doctor, lawyer, or spiritual advisor who wields institutionalized discretion over another's welfare. She did not hold licensure, exercise confidential decision-making power, or occupy a gatekeeping role that gave her privileged access to victims' private affairs. Rather, OneTaste participants were attracted by the way she portrayed her expertise herself and how she taught—attributes that may explain why people were drawn to her message, but not why §3B1.3 applies.

The Probation Department was also correct that the enhancement cannot rest on the mere fact that some participants "trusted" Ms. Daedone in the colloquial sense. PSR Addendum 12. The Sentencing Guidelines and Second Circuit precedent distinguish between trust that arises from professional or managerial discretion and the ordinary confidence people may place in a persuasive leader or employer. *See* USSG §3B1.3 cmt. n.1 (defining a position of trust as one "characterized by professional or managerial discretion" that makes the offense difficult to detect); *United States v. Barrett*, 178 F.3d 643, 645–46 (2d Cir. 1999) (explaining that the enhancement applies only when the defendant "misused discretionary authority that the victim entrusted to him"); *see also United States v. Nuzzo*, 385 F.3d 109, 115 (2d Cir. 2004) ("The Government must meet its burden… by proving the position of ... trust must have contributed in some significant way to facilitating the commission or concealment of the offense) (cleaned up). Here, any influence Ms. Daedone exercised over OneTaste participants derived from personality,

ideology, and organizational hierarchy—not from institutionalized discretion or fiduciary authority. The fact that some individuals respected or admired her teachings does not convert her position into the kind of professional trust §3B1.3 contemplates.

The enhancement also does not apply because there is no evidence that Ms. Daedone's position as CEO and teacher significantly facilitated the commission or concealment of the offense of conviction. *See Nuzzo*, 385 F.3d at 115 (reversing application of § 3B1.3 where the government failed to show that the position "significantly facilitated" the crime). For §3B1.3 to apply, the position of trust must have been instrumental in committing or concealing the crime, not merely contemporaneous with it. Nothing in the record suggests that Ms. Daedone used discretionary authority or privileged access to carry out or hide the alleged agreement to obtain labor by force, threats, or coercion. The government's evidence shows influence and persuasion, not the exploitation of a trust-based relationship that "significantly facilitated" the offense. § 3B1.3. In short, conflating generalized allegations of exploitation with the specific mechanisms of the forced-labor conspiracy cannot satisfy the Guideline's second prong.

Because the record supports the Probation Department's conclusion on both fronts—Ms. Daedone did not occupy a qualifying position of trust, and any influence she held did not significantly facilitate the commission or concealment of the offense—the §B1.3 enhancement should not be applied.

F.    The Obstruction-of-Justice Enhancement Should Not Apply Because the Alleged Deletions Preceded Any Investigation and Were Not Willfully Directed at the Offense of Conviction.

The obstruction-of-justice enhancement does not apply. Section 3C1.1 requires a finding first that "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the

instant offense of conviction." USSG §3C1.1. Second, the conduct in question must be "related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *Id*. The record here does not support either element. The enhancement applies only where a defendant acts with the specific purpose of interfering with the administration of justice. *See United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003). Conduct that is ambiguous, self-protective, or equally consistent with innocent motives cannot satisfy §3C1.1's willfulness requirement.

The Government argues that Ms. Daedone's March 9, 2016 message to Joanna Van Vleck—"erase your texts"—was a deliberate instruction to destroy evidence of criminal activity. Gov't Obj. at 6. When read in context, that exchange is disconnected from any investigative concern. On the afternoon of March 9, a colleague texted Ms. Daedone that another person "is wearing the Doc Martens boots she wore when she came to OT." GX 2075-D-R. Ms. Daedone replied by suggesting that her colleague frame the interaction in a positive light—encouraging her to tell the person she was "thrilled" she was "finding her desire" and that she did not "care not one bit what [the desire] is." GX 2075-D-R. Immediately before Ms. Daedone's "erase your texts" remark, she added that she thought the person "wants to go but is scared about losing the money of London." GX 2075-D-R. Nothing in this thread references law enforcement, litigation, or any threat of investigation. In that setting, "erase your texts" most naturally reads as an effort to avoid other seeing potentially awkward internal messages—not as an attempt to conceal evidence from federal investigators. The record contains no words, timing, or surrounding facts that suggest Ms. Daedone was attempting to impede any official process. At most, the message reflects caution in a personal or organizational sense, not the deliberate interference that §C1.1 targets.

34

That interpretation is at least as plausible as the government's, which is fatal to the enhancement. *See Zagari*, 111 F.3d at 328 (§3C1.1 applies "only upon a finding that the defendant had the specific intent to obstruct justice") (citing *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir. 1994)). As in *United States v. Khedr*, where the Second Circuit reversed an obstruction enhancement based on conduct equally consistent with non-obstructive motives, the record here offers "any number of equally plausible explanations." 343 F.3d at 104. Without clear evidence that Ms. Daedone acted with the purpose of frustrating law enforcement, the government cannot meet its burden of proving willfulness by a preponderance of the evidence. Even on the government's reading, the March 9 exchange preceded any official inquiry, and nothing in the thread shows that Ms. Daedone anticipated a forced-labor investigation or any criminal investigation. The messages do not mention law enforcement, subpoenas, or evidence preservation; they reference someone's boots and internal feedback. That is not obstruction "during the course of the investigation" of the instant offense. USSG §3C1.1.

In a totally unrelated text exchange an hour later, Ms. Daedone texted Van Vleck about her concern that OneTaste's practices could be "seen as prostitution." GX 2075-D-R. The government—and now Probation—characterize this as part of "the same exchange" as the "erase your texts" message and as evidence that Ms. Daedone anticipated an investigation. Gov't's Obj. at 6. But the content more clearly shows an internal conversation about reputational and civil legal risk. Ms. Daedone and Van Vleck were discussing how OneTaste might be perceived publicly, not how to conceal evidence. The contemporaneous tone is measured, reflective, and geared toward public-relations management—not toward concealing crimes. This exchange does not support the conclusion that Ms. Daedone believed a federal criminal investigation was imminent, much less that she intended to obstruct one. Nor does it satisfy the "instant offense"

requirement. The government and Probation equate concern about being "seen as prostitution" with obstruction of a forced-labor investigation. *See* Gov't's Obj. at 8; PSR Addendum at 13. Those are distinct theories. Nothing in the exchange ties the discussion to a forced-labor inquiry, and nothing shows intent to impede one. Using prostitution-related PR planning to satisfy § 3C1.1 would punish on an uncharged theory rather than the offense of conviction.

The government and Probation also cite a 2017 message in which Ms. Daedone wrote that she "erased everything when the legal scare last year." GX 2256-D-R. The meaning of that remark is uncertain, and again both assume a link to the forced-labor conspiracy without showing one. They do not identify what the message referred to, what was deleted, or what prompted her to act. And the record does not indicate that a federal investigation was underway or reasonably anticipated at that time, or that the deletion related to the conduct charged in this case. The phrase "legal scare" more likely reflects OneTaste's reputational concerns— complaints from former employees/students and online criticism that prompted concern within the company—than any effort to obstruct a federal inquiry into forced labor. Even if some messages were deleted, there is no evidence that Ms. Daedone did so with the specific intent to interfere with law enforcement. At most, the record reflects generalized anxiety about negative publicity and potential legal exposure.

The commentary's examples underscore the gap. Application Note 4(d) covers "destroying or concealing … evidence that is material to an official investigation or judicial proceeding." USSG §3C1.1 cmt. n.4(d) (U.S. Sent'g Comm'n 2024). Here, there was no identified official investigation when the alleged deletions occurred, and the record does not show what—if anything—was deleted or why. Application Note 3 instructs courts to compare the facts to those examples—generalized efforts to avoid reputational harm do not resemble

36

destroying material evidence in an ongoing official process. USSG §3C1.1 cmt. n.3 (U.S. Sent'g Comm'n 2024).

The addendum's claim posits that unspecified deletions "made it more difficult" to reconstruct timelines and corroborate accounts is speculative. PSR Addendum at 12. Neither Probation nor the government identifies a single specific message that was lost, a witness whose testimony could not be corroborated because of it, or an investigative step that failed as a result. The government introduced thousands of documents and testimony covering the same period. Generalized "difficulty" is not proof that any deletion was material to the instant offense. *See* Zagari, *See United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997) (holding that § 3C1.1 requires specific findings that the obstructive conduct was material to the instant offense, not merely related to another proceeding).

Finally, while Probation and the government conclude that Ms. Daedone's conduct was "purposefully calculated and likely to thwart the investigation," that finding rests on the same assumption as the government's—that discussions about "prostitution" and "legal scare" were synonymous with a foreseeable federal investigation into forced labor. PSR Addendum at 13. They were not. Those communications arose from reputational and civil-liability concerns about OneTaste's sexual practices, not from any awareness of or intent to obstruct a federal criminal proceeding. The record shows no concrete nexus between the alleged deletions and the charged offense, and no evidence of willful intent to interfere with justice. Accordingly, the § 3C1.1 enhancement should not apply.

Lastly, the government also opines that the absence of text messages between Ms. Daedone and Rachel Cherwitz is indicative of obstruction. Probation is wrong again. The text messages that were provided to the government by OneTaste were voluntarily collected from

people working with OneTaste before there was any indictment and unrelated to any indictment. OneTaste did not have text messages to produce to the government between Ms. Daedone and Ms. Cherwitz. It had nothing to do with Ms. Daedone or Ms. Cherwitz having deleted any text messages between each other.

In short, §3C1.1 requires obstruction of the investigation of the instant offense, during that investigation, proved by specific intent and material effect. The record instead shows pre-investigative, reputation-focused exchanges with no awareness of a federal inquiry, no link to a forced-labor investigation, and no identified material impact. The enhancement should not apply.

G.    No Role Enhancement Is Warranted.

Probation increased Ms. Daedone's offense level by four, claiming she was an (1) "organizer or leader" of alleged criminal activity that (2) "involved five or more participants" and (3) "was otherwise extensive" within the meaning of USSG §3B1.1(a). [PSR ¶109] Assuming Ms. Daedone, as the co-founder and CEO of OneTaste, could be considered an "organizer or leader," a four-level enhancement would be appropriate only if the alleged criminal conduct involved "five or more participants" or was "otherwise extensive." USSG §3B1.1(a). Neither is true. Probation does not identify these five "participants" which is grounds alone to reject the four-level role enhancement.

In *United States v. Carrozzella*, the Second Circuit concluded: "Because the government does not dispute that the number of criminal participants in this case was under five, any application of Guidelines §3B1.1(a) must rest on [defendant's] criminal activity having been 'otherwise extensive.'" 105 F.3d 796, 802 (2d Cir. 1997) (citing definition of "participant" in Application Note 1 to §3B1.1). The Circuit later reiterated that the requirement of "five or more

participants" refers to "criminally responsible" participants. *United States v. Skys*, 637 F.3d 146, 156 (2d Cir. 2011) (same).

"Criminally responsible" means what it says: the alleged participant must have committed the elements of the crime with the required mental state. *E.g., United States v. Tai*, 750 F.3d 309, 318 (3d Cir. 2014); *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001). The Second Circuit has made clear, moreover, that to be a criminally responsible "participant," the individual must have "acted with knowledge that her conduct was criminal," *Skys*, 637 F.3d at 157-58, consistent with background mens rea principles equating knowledge with consciousness of wrongdoing, *see, e.g., Liparota v. United States*, 471 U.S. 419, 433-34 (1985); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005).

Accordingly, one who is "unwittingly" involved in the alleged criminal activity cannot be a "criminally responsible" participant. *E.g., Skys*, 637 F.3d at 158; *McCoy*, 242 F.3d at 410. Nor does that definition apply to those who were merely "aware of," "involved in," or "generally suspected" the alleged criminality of the conduct at issue. *E.g., United States v. Lewis*, 68 F.3d 987, 989-90 (6th Cir. 1995); *United States v. Maloof*, 205 F.3d 819, 830 (5th Cir. 2000); *United States v. Somerstein*, 20 F. Supp. 2d 454, 458-60 (E.D.N.Y. 1998).

As stated, *supra,* Probation did not identify the other participants (other than Ms. Cherwitz) who were participants in the forced labor conspiracy, that is, they were criminally responsible for the crime. That said, the government presumably will point to Rob Kandell, Yia Vang, Joanna Van Vleck, Rachel Hemsi, and Aubrey Fuller as co-conspirators who constitute the five participants that justify application of USSG §3B1.1(a).

Ms. Daedone argued that the government failed to satisfy the *Bourjaily* factors when finding that these individuals were co-conspirators in the forced labor conspiracy at trial. This

Court overruled those objections. Ms. Daedone maintained her objections in her Rule 29 motions. [Dkt. No. 401 at pg. 9-10]  Because Ms. Daedone maintains that the government failed to prove that Kandell, Vang, Van Vleck, Hemsi, and Fuller were co-conspirators or otherwise criminally responsible participants, a four-level role enhancement adjustment is not justified.

While an alternative basis for imposing the enhancement (i.e., alternative to there being at least five criminal "participants"), exists when the alleged criminal conduct was "otherwise extensive." Probation did not make such a finding, and no such finding is justified. Guideline 3B1.1 is "based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity." *Carrozzella*, 105 F.3d at 802. As the Second Circuit Court has acknowledged that determining whether alleged criminal is extensive is essentially a headcounting exercise. *United States v. Kent*, 821 F.3d 362, 370 (2d Cir. 2016). The focus on head counting follows directly from the guideline's text, which sets forth [1] "five or more participants" and [2] "otherwise extensive" in the same subprovision as two disjunctive triggers for the enhancement. §3B1.1(a). Under the noscitur a sociis canon, a word is known by the company it keeps, so the phrase "otherwise extensive" is "given more precise content by the neighboring words with which it is associated"—i.e., "five or more criminally responsible "participants." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

The Second Circuit read §3B1.1 the same way in *Carrozzella* and held that criminal activity is "otherwise extensive" within the meaning of §3B1.1 only if it is the "functional equivalent of an activity involving five or more participants." Id. at 803. This "functional equivalence" test requires the Court to look to "(i) the number of knowing [i.e., 'criminally responsible'] participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) the extent to which the

services of the unknowing participants were peculiar and necessary to the criminal scheme." *Id.* at 803-04. In short, the Court should decline any enhancement under §3B1.1.

      H.    <u>Ms. Daedone Is A Qualifying Zero-Point Offender</u>

Ms. Daedone qualifies for a two-level downward adjustment under the zero-point offender guideline. She has no criminal history points, USSG §4C1.1(a)(1); she did not receive an adjustment for terrorism, §4C1.1(a)(2); the offense did not result in death or serious bodily injury, §4C1.1(a)(4); she did not personally cause substantial financial hardship, §4C1.1(a)(6); no firearm or dangerous weapon was involved in the offense, §4C1.1(a)(7); the offense is not covered by §2H1.1, §4C1.1(a)(8); there is no basis for an adjustment under §3A1.1 or §3A1.5, §4C1.1(a)(9); as explained above, no aggravating role adjustment is appropriate, §4C1.1(a)(10); and he was not engaged in a continuing criminal enterprise, §4C1.1(a)(11).

That leaves only the questions whether Ms. Daedone "use[d] violence or credible threats of violence in connection with the offense," §4C1.1(a)(3), and whether the offense of conviction is a "sex offense," §4C1.1(a)(5). Both of those questions are clearly answered no for the reasons argued extensively above.

      I.    <u>Ms. Daedone Is Entitled to a One-Point Reduction to Avoid a "Trial Penalty."</u>

Probation concluded that Ms. Daedone was not entitled to a reduction for acceptance of responsibility under USSG §3E1.1 because "the defendant has not clearly demonstrated acceptance of responsibility for the offense." PSR ¶113. This finding was incorrect, and Ms. Daedone should receive a one-level reduction under §3E1.1(a).

A defendant's decision to "exercise[] his constitutional right to trial" does not prevent her from receiving an acceptance reduction. §3E1.1 App. Note 2. A reduction may nevertheless be appropriate when, for example, the defendant challenges the constitutionality of the prosecution

or the "applicability of a statute to his conduct." Id. Ms. Daedone has raised several constitutional challenges to her charge. Indeed, this prosecution is the first of its kind.

Moreover, while the Second Circuit has held that §3E1.1 is constitutional when "properly interpreted and applied," *Oliveras*, 905 F.2d at 628-29, denying a downward reduction here would severely risk penalizing Ms. Daedone for exercising her Sixth Amendment rights. Judge Rakoff recently reached this very conclusion, explaining that §3E1.1 "effectively penalizes" defendants who take their cases to trial. *United States v. Tavberidze*, 769 F. Supp. 3d 264, 270-73 (S.D.N.Y. 2025) (specifically holding that §3E1.1(b) violates the Sixth Amendment). If that is not necessarily true in all circumstances, it is at least true in this unique case.

Ms. Daedone took this case to trial because she wanted to defend herself against the government's allegations and evidence before a jury of his peers. The Sixth Amendment exists so that defendants can do exactly that. *See, e.g., Apprendi*, 530 U.S. at 477 ("[T]rial by jury has been understood to require that the truth of every accusation . . . should afterwards be confirmed by the unanimous suffrage of twelve of the defendant's equals and neighbours"); *Ramos*, 590 U.S. at 92 ("verdict of a jury of twelve persons" is required before a defendant's liberty is "taken from him").

In a recent decision in the Southern District of New York, Judge Rakoff noted that the Guidelines unconstitutionally penalize defendants who go to trial rather than plead guilty, also known as the "trial penalty." *United States v. Tavberidze*, 769 F. Supp. 3d 264, 268 (S.D.N.Y. 2025). Specifically, Judge Rakoff stated that § 3E1.1(b) of the Guidelines allows a one-point reduction in the offense level calculation of defendants who plead guilty if the government believes the defendant "pled guilty quickly enough to permit the prosecutor to avoid preparing for trial." *Id.* at 267. He stated:

42

> [S]ection 3E1.1(b) in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise his Sixth Amendment right to trial. . . .  [T]he only ground given for imposing the additional penalty under 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial.  This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right.  Worse still, on this flimsy basis section 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it.

*Id.* at 270.  As such, Ms. Daedone's offense level should be reduced by one point "because the effect of not giving the one-point reduction to someone who chose to exercise, or considered exercising, [her] right to go to trial rather than save the Government some time and money is effectively an unconstitutional penalty on all who made that choice."  *Id.* at 273.

Although the jury convicted Ms. Daedone of the single count of forced labor conspiracy, this is not a situation in which the defendant demanded a trial merely so she could falsely deny or frivolously contest her guilt. Cf. §3E1.1 App. Note 1 (discussing the unfounded denial of relevant conduct). Rather, there were ample factual and legal grounds with which Ms. Daedone was able to undermine the government's case. Ms. Daedone had no choice but to put the government to its proof on the single charge. Her only other option was to plead guilty to a crime she did not commit. That would have been untenable not just for Ms. Daedone, but for our criminal justice system as a whole—which must "command the respect and confidence of the community in applications of the criminal law." *Winship*, 397 U.S. at 364; *see also* Stephanos Bibas, *Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas*, 88 Cornell L. Rev. 1361, 1386 (2003) ("Allowing innocent defendants to plead guilty creates serious negative externalities because society has a strong interest in ensuring that criminal convictions are both just and perceived as just.").

At the very least, it would "promote respect for the law" for the Court to use these Sixth Amendment concerns as a basis to vary downward under the §18 U.S.C. § 3553(a)(6) factors.

J.     Ms. Daedone Is Entitled to a Downard Departure Under §5H1.11

Finally, a downward departure is warranted pursuant to USSG § 5H1.11 because Ms. Daedone has devoted her life to helping others to an "exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon v. United States*, 518 U.S. 81, 96 (1996). As the supporting material, letters, and video statements submitted in support of Ms. Daedone demonstrate, there is nothing usual or ordinary about Ms. Daedone's devotion to helping others. This case does not change that.

As set out in detail below in the section detailing Ms. Daedone's History and Characteristics and taking into account the voluminous support for Ms. Daedone detailing her lifetime achievements, Ms. Daedone is entitled to a downward departure pursuant to §5H1.11.

## II.    A SENTENCE OF 12 MONTHS WOULD BE SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING.

The Guidelines for sentencing are merely a "starting point," *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), and "truly advisory," *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). Under 18 U.S.C. § 3553(a)(6)(1), courts must "carefully consider on an individualized basis 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017); *see also Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (recognizing "the principle that the punishment should fit the offender and not merely the crime" (internal quotation marks omitted)). Importantly, courts "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Finally, courts must "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)(B)-(C)," in other words,

"proportionality, deterrence, incapacitation, and rehabilitation." *Douglas*, 713 F.3d at 700. The

Court should impart the lowest possible sentence that takes into account the factors set forth in

that section. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a

district court were explicitly to conclude that two sentences equally served the statutory purposes

of § 3553, it could not, consistent with the parsimony clause, impose the higher."); *see also*

*United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985) (remanded for resentencing where

the court reflected more on its "personal view of the opprobrium of the crime charged . . . than a

careful weighing of mitigating factors and the relative levels of culpability and involvement of

each defendant"); *United States v. Wardlaw*, 576 F.2d 932, 938 (1st Cir. 1978).

As this Court is aware, it must consider and weigh all the factors enumerated in 18 U.S.C.

§ 3553(a) and "shall impose a sentence sufficient, but not greater than necessary," to achieve the

goals of sentencing. 18 U.S.C. § 3553(a). The factors the Court considers include the

defendant's history and characteristics, the nature and circumstances of the offense, the need to

avoid unwarranted sentencing disparities, deterrence, protecting the public, the kinds of

sentences available, the sentencing range in the Guidelines, pertinent policy statements, the

seriousness of the offense, and just punishment. As discussed below, the Section 3553(a) factors

weigh strongly in favor of a sentence of no greater than one year.

    A.    <u>The Nature and Circumstances of the Offense.</u>

Without minimizing the seriousness of the offense for which Ms. Daedone has been

convicted, Probation's account of the circumstances of this offense are misleading, unsupported

by the record and in a word - irrational. According to Probation and the government, the forced

labor conspiracy offense for which Ms. Daedone was convicted is such a serious case as to share

company with the cases against Ghislaine Maxwell and Keith Raniere – cases where the

defendants were convicted of wide-ranging sex trafficking charges against children. The District Court in the *Maxwell* case applied a total offense level of 37 for her convictions for sex crimes against children. Incredibly, the Probation Office urges application of an offense level of 38 for Ms. Daedone's conviction for one count of forced labor conspiracy that involved no claims of child sex crimes or even physical harm or physical mistreatment of anyone. This false equivalency is not only unfair to Ms. Daedone but will create serious disparities in sentencing.

Unlike most forced labor cases, the allegations here do not involve physical restraint, threats of physical restraint, physical harm, threats of physical harm, nor do they involve serious "psychological abuse" as traditionally understood in false labor cases (*e.g.,* threatening to have a victim deported, threatening to release sensitive or explicit video or information, forcing victims to create Kompromat against themselves). What has been described by the complainants here is that they participated in unwanted conduct because of some form of coercion that was effectuated through tactics of manipulation and threats of being kicked out of the group – not threats causing them to stay in the group. The conduct described by the complainants did not constitute "serious harm" as intended by the statute, not even close. The "serious harm" described at trial can be fairly described as manipulation, bullying, and shunning – tactics that are used routinely in everyday relationships.

Critically, Ms. Daedone never concealed the mission or purpose of OneTaste. Ms. Daedone freely admitted that Orgasmic Meditation was her life's work. It was not created as a money-making venture (there are far easier products to sell) but rather was her contribution to modern spiritual philosophy – as unusual as it may strike some. More to the point, people joined the OneTaste community with a full understanding of what it offered. Christina Berkely began taking classes at The Warehouse with her husband in 2006. After living together in the

Warehouse, her husband decided that the experience did not resonate with him. Berkely loved it and decided to remain; she admitted on the stand more than once that it was her choice. [Tr. R. 1144:3-10; 1180:25-1181:10] Everyone who participated in OneTaste during the so-called "Warehouse Days" were there with a full understanding that the community was centered around researching relationship including the sexual aspect of relationships, and that the practice of OM was a central tenet of the community. No witness testified that they were ever forced or even pressured to remain part of the community against their will. The worse that was said of Ms. Daedone was that she could sometime be callous or bullying and interfered with people's relationships. Accepting these allegations as true cannot be equated to physically harming people, threatening people with physical harm, threatening deportation, threatening reputational harm, or *any* of the types of "serious harm" that is contemplated by the forced labor statute.

Ms. Daedone's ideas about orgasmic meditation became a national sensation after she published her first book Slow Sex in May 2012 and gave a TED talk on the subject matter. Again, Ms. Daedone never hid from the public that the OneTaste was a community built around the concept of OM. She and others conducted free introductory classes for people interested in exploring the practice. Anyone who took a class or became more intensely involved by signing up for coaching programs or living in one of the communal residences did so with a full understanding of what they were signing up for. Time and time again, the complainants testified that they went to OneTaste to explore sexuality and to have their boundaries pushed. [Tr. R. 2479: 1-8; 3074:24-3075:1] As addressed, *supra,* the witnesses admitted that no one prevented them from leaving and many did. [Tr. R. 884:23-25; 3105:5-7; 3460: 12-14; 3466:13-18] Becky Halpern even admitted that despite her negative feelings about OneTaste, she did not regret it.

It cannot be overlooked that many of the complainants came to OneTaste with an abundance of pre-existing mental health, financial, and/or addiction issues. Ultimately, the government presented no evidence showing that OneTaste targeted these individuals. They didn't need to. The record does not show that Ms. Daedone is to blame for the psychological troubles of many of these women. These women had agency; Ms. Daedone is not strictly liable for every bad or unhealthy choice the complainants made during their time in the OneTaste community and the years that followed.

The false equivalency promoted by Probation and the government is cooo cooo. Taking every allegation against Ms. Daedone as true is simply not the same as facilitating and participating in Jeffrey's Epstein's child sex trafficking enterprise. This is not a case where vulnerable people were forced to live in squalid living conditions, kept in extreme isolation from family and the outside world, and forced to provide labor or services under threats of physical harm upon themselves or family members or threats of deportation.

Importantly, the practice of OM is not itself an aggravating circumstance. While certainly some witnesses testified there were times when they felt pressured into OMing with people they did not want to, the vast majority if not all of the complainants do not take issue with the practice of OM itself. Nearly every witness found the practice of OM to be helpful and some endorse it to this day. To the extent Probation or the government views the practice of OM itself as somehow abusive, the record does not support this position.

Additionally, there remain questions about Ms. Daedone's intent to cause the harm that the government *now* accuses her of causing. Admittedly, the jury found that Ms. Daedone formed an intent to extract a single act of labor from one person through unlawful means, but this is a far cry of an intent to cause *serious* psychological harm to the complainants as the

48

government claims. As a reminder, every single complainant admitted that they never communicated to Ms. Daedone their displeasure with some of the "work" they participated in. In fact, the modest amount of evidence the defense was permitted to introduce revealed that at the time of the alleged conduct, the complainants were having the time of their lives. It is unclear how Ms. Daedone would have known the complainants' feelings if they kept them secret and only revealed them decades later with the encouragement of prosecutors who find no fairness problems with redefining experiences 20 years after the fact.

*Finally*, an objectively reasonable person operating within the context of the OM community would not have known that she could be prosecuted for a forced labor conspiracy. The government's novel theory of psychological coercion to establish serious harm has no precedent in a criminal case.  Indeed, the only similar cases that involve psychological coercion are *civil cases* in which, even under the lesser preponderance of the evidence standard, the courts failed to find serious harm because (i) the alleged victims could leave at any time and (2) being ostracized was found not to be serious harm.  *See, e.g., Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1179–80 (9th Cir. 2012) (church members' fear of being "excommunicated" from church – thereby losing contact with their friends and family members – and their opportunities to leave church undermined their claim of being psychologically "coerced" into forced labor for church); *Muchira v. Al-Rawaf*, 850 F.3d 605, 618–22 (4th Cir. 2017) (employee was not psychologically "coerced" into labor because she had ample opportunities to walk away from situation); *Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, No. 20-cv-5023 (CS), 2023 WL 2504744, at *10 (S.D.N.Y. Mar. 14, 2023) (holding plaintiff's allegations insufficient as a matter of law and stating "freedom of communication and movement belies the notion that [p]laintiff felt so psychologically imprisoned that she was unable to terminate her employment

and walk away"). Here, the application of psychological coercion to this type of conduct is not one that a reasonable person would have known constituted criminal conduct. Indeed, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). At the very least, the novel nature of this prosecution warrants a lesser sentence.

On their own, each of the above factors take this case well beyond the heartland of forced labor cases. Together, they present a unique collection of circumstances for which a sentence beyond 12 months is unwarranted.

     B.     <u>History and Characteristics of Ms. Daedone.</u>

Nicole Daedone is a writer, teacher, and spiritual practitioner whose life's work has centered on a singular aim: alleviating suffering and empowering individuals to lead more connected, meaningful lives. Although prosecutors have attempted to cast her as a polarizing figure, the objective record tells a different story. Ms. Daedone has long espoused innovative ideas, but she has never concealed her belief systems, nor sought to impose them on others. Instead, she has consistently invited people to examine complex issues, from sexuality to identity to healing, through alternative perspectives grounded in personal agency and spiritual growth.

Born and raised in California, Ms. Daedone is 58 years old and a graduate of Mesa College, where she earned her B.A. in Communications, magna cum laude. She has no prior criminal history. Her early life, including formative personal challenges, profoundly shaped her worldview. Rather than allowing those experiences to define her, she developed a philosophy rooted in questioning the narrative of victimhood and encouraging others, especially women, to

50

explore paths toward empowerment and resilience. Despite unfair characterizations by the government, her teachings have always been an invitation, not a mandate.

Ms. Daedone has important relationships that go back decades, long before her involvement in OneTaste. Without exception friends and family describe Ms. Daedone as a loving, caring, and generous person. Ms. Daedone maintains a strong relationship with her mother who recalls a time in her early 20s when Nicole immediately drove from San Francisco to San Diego upon learning of Beverly's possible cancer diagnosis:

> "Within an hour she was in a car on her way down from San Francisco to San Diego to be there for me. She didn't ask if I needed her….This is how she treats people. She is so intuitive and loving and I have been fortunate to be the beneficiary of those qualities…When my friends say they wish they heard from their children more, I think 'You mean you don't text back and forth every other day?' And I realize how fortunate I am that she is my daughter."

Ex. A 001.

Aaron Turner who has known Nicole for almost 30 years had this to say: "Nicole is a tireless crusader for the rights of women's health and wellness, but excludes no one, and is currently providing care for me, personally… Nicole and her friends have treated me more like family than has my own family…She is the most honest, loyal and sincere human being I have ever known (and I am 82 years old)." Ex. A 003.

Van Jones, a longtime advocate for criminal justice reform, CNN correspondent, and former Special Advisor to President Obama, first met Nicole in the early 2000s in the San Francisco Bay Area. From that time he observed:

> She struck me as someone rare, a woman of uncommon wisdom, grace and moral courage… I watched as she dedicated her life to helping others find healing, empowerment and a deeper sense of human connection. Her work was not easy, and at times it placed her at odds with cultural norms. But I always saw in her a sincere commitment to human growth and to bringing more understanding into the world.

Ex. A 004.

Spiritual study has been a cornerstone of Ms. Daedone's life for decades. Deeply influenced by Buddhist thought, and enriched through sustained study of Christianity and Judaism, she has devoted herself to understanding suffering and the possibilities for liberation from it. Her teachings weave together contemplative practice, philosophical inquiry, and her own lived experience to help others transform hardship into purpose.

Joan Hoebrichts, a licensed psychotherapist and Zen Buddhist priest, has had Nicole as her client since January 2018. Over seven and a half years of regular sessions Ms. Hoebrichts has observed: "[Nicole] has a daily meditation practice and has done numerous long retreats. She has studied with many spiritual guides, both Christian and Buddhist, and incorporated their teachings into her life. Her view of seeing sexuality as a spiritual practice is rooted in authentic and ancient spiritual rituals, and she is dedicated to teaching and empowering women in this area."
Ex. A 005.

Lindsey Wehking, Chief Strategy Officer for Nonfiction Research, testifies to the transformation she experienced over six years of study and practice with Nicole: "What Nicole has taught me has fundamentally changed my life… I've broken toxic relationship patterns, healed from addictions, risen to the C-suite of my organization, and become a more compassionate and involved community member…Like a doctor committed to the Hippocratic oath, Nicole too is deeply committed to an oath: 'get out of suffering, the causes of suffering, help others get out of suffering.'" Ex. A 007-008.

Noah Coad, a Principal Engineer at Amazon Web Services and a father of three recalls: "Before I found OM, I was having suicidal thoughts in a dead-end job I wanted out of. I consider the largest part of that transformation due to my work with OneTaste and the OM practice."

Ex. A 009.

Even before founding OneTaste, Ms. Daedone demonstrated a long-standing commitment to service and community-building. She launched the nonprofit "Fill Up America," in 2002  serving hundreds of thousands of meals from food banks or from freshly prepared food weekly at up to six locations around San Francisco, engaged deeply in the AA community as both participant and sponsor since 2004, championed women's empowerment initiatives, and helped catalyze scientific interest in the potential health and wellness benefits of Orgasmic Meditation (OM).

Reverend Mootoo of the historic Emanuel AME Church in Harlem met Nicole two years ago as the visionary leader behind Free Food Harlem, a program that serves more than 25,000 hot meals each year in partnership with his church. He writes: "I have come to know her as a woman of deep compassion, humility, and spiritual conviction. Her vision, expressed through action, has fed bodies and awakened hearts in my own community…Sis. Nicole, her apron and big smile, continuing the work of feeding those whom society often forgets, is where she belongs. We need her back in our kitchen, sanctuary, and in our community." Ex. A 010.

Roshi Edward Brown, ordained Zen priest in 1971 by Shunryu Suzuki Roshi and author of the classic Tassajara Bread Book, has known Nicole for 17 years. After participating in a service events feeding homeless individuals, he remembers: "The event was marked with extraordinary levels of joy, gratitude, and warm-heartedness. Food along with dignity and respect can be quite healing both for the givers and the receivers—healing and heart-lifting." Ex. A 012.

Deepa Roy, who grew up in Calcutta, India with Mother Teresa as her moral science teacher, is a customer at Free Food Harlem. She shares a recent conversation with a guest:

"There was a tall guy who sat at my table recently… he was talking about work and how disillusioned he is… I said, can you imagine, in that dark landscape, you've got 2 beacons of light. A Wednesday meal and a Friday meal at Free Food…And this is what Nicole has created. And the food has just been exponentially advancing. It is such a superior meal. Famous chefs come to serve with love and they say it's an honor for them to cook for us… Anybody who envisions this with so much golden-hearted generosity deserves to be held in high esteem."

Ex. A 014-015.

Megan Roseworn asked Nicole to be her Alcoholics Anonymous sponsor seven years ago after meeting her in Bali. One night close to relapse she called Nicole:

She stayed on the phone with me for hours that night, long past the point where either of us had words left. I was in extreme distress, and everything in me wanted to disappear back into old habits. But Nicole through this whole time remained calm, steady, not flinching at my chaos. She just kept gently reminding me why I started this journey: the mornings without shame, the relationships I'd started to rebuild, the quiet pride in being able to feel things again. She didn't lecture me or try to fix it. She simply listened with her whole heart, holding space until my storm had passed.

Ex. A 016.

Carol Kandell has been friends with Nicole since 1998. In 2003 Nicole approached her about her drinking: "Nicole was the person who had enough courage and compassion to confront me about an addiction to alcohol that I was slowly dying from. She valiantly encouraged me— much to my initial chagrin—onto a path of recovery that would eventually save and transform my life to one of usefulness and service." Ex. A 018.

Julia Barry, a licensed Marriage and Family Therapist specializing in trauma therapy, sees Nicole's core orientation: "I truly believe that Nicole is oriented around a desire to help as many women as possible experience the same freedom that she handed to me and so many others. I've seen that in in her bold willingness to discuss women's sexuality out in the daylight,

a topic that has been treated as taboo by our dominant culture and also in her work to help women in all circumstances to thrive through her Unconditional Freedom Project." Ex. A 019

Angela Richardson, non-profit consultant and licensed Spiritual Practitioner with the Agape International Spiritual Center states simply: "Nicole is an ally of every woman." Ex. A 022.

Kay Vogt, a 73-year-old licensed clinical psychologist, has known Nicole since 2016 when she first learned about Orgasmic Meditation said, "Nicole changed my life in a very radical way. It's a Lazarus story as far as I am concerned… I feel like I have gained another 30 years of life when I thought my life was effectively over. She changed the way I value myself as a woman, and taught me how to harness and to overcome the toxic youth culture that devalues women as we age." Ex. A 023.

A prolific author, Ms. Daedone has written fourteen books, beginning with her widely read *Slow Sex: The Art and Craft of the Female Orgasm* (2012), which has sold more than 115,000 copies. Her subsequent publications span spiritual philosophy, trauma healing, addiction, prison reform, social justice, and contemplative practice, including:

- *The Age of Eros: A Manifesto of Connectivity and Consciousness* (2022)
- *The Eros Sutras* series (Volumes 1–4; 2023–2024)
- *The Art of Soulmaking* series, including editions for incarcerated individuals (2023)
- *Erotic Justice: Making Social Change from Love* (2023)
- *From Guards to Guardians: Rebuilding Prisons from the Ground Up* (2023)
- *Play: A Path to Genius* (2023)
- *The Art of Addiction* (2023)
- *The Eros Sutras Workbook* (2024)
- *The Art, Science, and Spirituality of the Female Orgasm* (2025)

Amy Hertz, a publishing industry veteran of over 40 years who has published many New York Times bestsellers including  the Dalai Lama's, "*The Art of Happiness*," first heard about Nicole's work in 2008: "I immediately recognized that her approach and goal was to help

people—particularly women—become stronger, more confident, and have more control over their own destinies." Ex. A 024.

Marie Jones, a writer, editor, filmmaker, and produced screenwriter who has authored numerous books and appeared on over 2,500 radio shows worldwide, describes her experience working with Nicole as a writer and editor, "one of the most empowering and life-affirming times of my life because so much of what she was teaching and writing about was relatable to what I was going through on so many levels. I found myself growing and expanding in ways I had not thought I would when I first was hired to write and edit!" Ex. A 026.

Michelle Dacus is another editor that has worked on a volume of Nicole's written works over the past three years. As a professional editor of twelve years, she writes: "I have learned so much about Nicole and her endeavors since working with her, and to be able to be a part of it in my small way is an honor." She goes on to say:

> I have been editing professionally for 12 years and rarely, if ever, have I been impacted on such a personal and significant level as Nicole's writing. I am more mindful since reading her books; I am a calmer, kinder, more present parent to my young children—a more gracious, accommodating coparent. A better bonus-mom. I am more productive in my work. I have a rich prayer life. It is a tremendous joy every time something of hers lands in my inbox.

Ex. A 027.

Ms. Daedone began publicly working with criminal justice advocates around 2010, supporting their work as she built OneTaste. Prisons were a focus for Ms. Daedone due to the profound human and financial waste and inefficiencies seen in prisons today. Ms. Daedone used the COVID-19 pandemic to begin development of her own program, called the Prison Monastery. The program lays out a methodology for turning prisons into monasteries - using existing schedules and infrastructure but swapping in activities which focus on in-ward contemplation, transformation, and ultimately contribution back to society. Ms. Daedone wrote a

workbook, The Art of Soulmaking for the Incarcerated, designed as a pathway for the

incarcerated to use their time in prison toward contemplation, reflection, and transformation.

Next, the Prison Monastery was implemented in two consecutive and successful in-person pilot

programs. First, at a 300-bed county jail in Mendocino County, California, then at a Level IV

security women's state prison in Central California. The in-person program was centered around

workbook study, yoga, meditation, along with implementation of a prison farm and a farm-to-

table food program.

Both the correspondence and in-person pilot programs achieved disproportionally

successful results in its short time of operation and have been widely celebrated by leaders in the

criminal justice field. Since the Art of Soulmaking workbook was written in 2020, over 200,000

incarcerated individuals have gone through the program, and it is now available in over 1,450

prisons and jails nationwide. A study of 116 participants showed meaningful reductions in

depression, anger, and reliance on substances, with similar increases in optimism and gratitude. [3]

The California Department of Corrections and Rehabilitation recognized the program's

rehabilitative value in 2021 by authorizing Rehabilitative Achievement Credits for participants.

The in-person pilot program was celebrated by the largest criminology society in the United

States, The American Society of Criminology, and featured in its January 2023 publication.

Other criminal justice leaders and organizations such as Vera.org, Corrections1, Kosmos Journal,

Dr. Topeka K Sam of the Ladies Of Hope Ministries, John Liu (board member at the United

Nations Decade of Ecological Restoration), nationally recognize gang violence interventionist

Jay Davis, Dr Stefano M. Bertozzi UC Berkeley Dean Emeritus of Public Health, and over 30

---

[3] Unconditional Freedom Project, Impact, UNCONDITIONALFREEDOM.ORG,
https://unconditionalfreedom.org/impact/

veteran corrections officers from across the country have publicly celebrated the program. On the eve of the indictment, Ms. Daedone's non-profit was close to breaking ground on what would be the largest-ever prison farm in a California state prison, to be created in a partnership with UC Berkeley. The California Department of Corrections cancelled this program on the day of the indictment and banned inmate access to these programs despite a perfect three-year track record of safety and security. In addition to the widespread embrace by industry professionals and the programs prolific growth, Ms. Daedone's non-profit has demonstrated a perfect record of safety and security compliance.

Kate Feigin, former Restorative Justice Program Manager at Mendocino County Jail, invited Unconditional Freedom to establish its first in-custody Prison Monastery programs in 2019 and after witnessing "a profound transformation" in her own facility, later supported the pilot at Central California Women's Facility. She reflects:

> What began in Mendocino County paved the way for deeper collaboration. In 2022, I supported Unconditional Freedom in launching a six-month Prison Monastery pilot at Central California Women's Facility (CCWF), where they converted a 170-bed general population unit into a spiritually reflective, peaceful, and restorative environment. The results were visible and widely felt: staff observed reduced behavioral incidents, increased emotional self-regulation among residents, and a general shift toward calm and cooperation. In a setting where volatility is often the norm, this change was remarkable.

> Ex. A 028.

Debra Bailey spent 25 years cycling in and out of jails and prisons, battling addiction. While serving a 17-month sentence she encountered Nicole's book *The Art of Soulmaking*":

> It wasn't just a workbook or a program. It was a roadmap. A path inward. This book guided me step by step toward something I never thought possible: freedom inside a cage… I'm 50 years old. I used to think it was too late for someone like me. But the Art of Soulmaking reminded me that the soul doesn't keep time… There is a way forward, I am living proof!

Ex. A 030.

The program has changed not just the participants, but also the volunteers. Margot Koch, a 72-year-old retired schoolteacher lay-ordained in the Zen tradition, met Nicole at the San Francisco Zen Center in 2010 and got to know her better during the COVID-19 pandemic, writes: "The most profound experience afforded me by my relationship with Nicole was the opportunity to teach meditation in prison. I will never forget the powerful impact on everyone touched by the beautiful program that she herself envisioned." Ex. A 032.

Another component of the Prison Monastery is "Guards to Guardians," a program informed by her understanding of the profound stress and trauma experienced by correctional officers. Since 2022, the Guards to Guardians workbook has been introduced to over 1,500 correction officers and is supported by a coalition of 20 veteran mentor correction officers. Steve Maynard spent fourteen years in corrections and now works in corrections technology. He shares, "When I started going through these questions, I thought this should be integrated into mandatory training. It's honest self-evaluation. I'm actually jealous of the officers getting it now, because I would have loved to have had it when I started my career." [4] Anthony Gangi has worked for thirteen years on the custody side of corrections, including as a Sergeant at a maximum-security prison, and is now the Assistant Superintendent for the State Corrections. He says, "I have lost good friends. I have seen families be destroyed. This program could have given me a great resource so I can tell somebody 'Hey, did you read this? Do you know of this program? This can help.' So this program to me could have maybe saved some lives, before they decided to take their own." [5] Gary York, a 30-year corrections officer writes, "I believe the

---

[4] Unconditional Freedom Project,
https://unconditionalfreedom.org/guardians/#:~:text=Guidebook,new%20vision%20for%20the%20profession.
[5] Id.

program falls under that category chicken soup for the soul, the program is exactly that, it's a medication."[6]

Ms. Daedone also advocated for efforts to empirically study Orgasmic Meditation. Since 2016, researchers from institutions including UCLA, the Marcus Institute of Integrative Health, the University of Pittsburgh, and MIT have produced nine peer-reviewed papers examining OM's effects on trauma recovery, PTSD symptoms, emotional regulation, intimacy, and overall well-being. A phase 1 clinical trial demonstrated that OM is safe for individuals with moderate to severe PTSD, with participants showing a 47% decrease in PTSD scores.[7] Large-scale surveys have recorded mystical-type experiences in more than half of participants, on par with clinical experiences associated with psilocybin therapy.[8]

Studies showed OM activates the same areas of the brain as deep meditation, that OM may be effective in the treatment of mood and substance disorders, that OM increases positive emotions and decreases negative emotions, and that it may improve brain function.[9] [10] One particularly promising study has fundamentally challenged modern medical community perspectives on women with childhood sexual trauma; the study showed that OM results in greater sexual arousal for those with a history of childhood trauma as it allows them to feel safe

---

[6] Id.

[7] Daniel Kriegman, Rachel Pelletier, Caroline Griggs, Caryn Roth. Phase 1 clinical trial on Orgasmic Meditation (OM): Assessing safety and feasibility as a meditation practice for individuals with PTSD. *Contemporary Clinical Trials Communications*, Volume 45, 2025, 101451, ISSN 2451-8654, https://doi.org/10.1016/j.conctc.2025.101451

[8] Siegel V., Emmert-Aronson B. Both partners practicing orgasmic meditation report having a mystical-type experience: results using the Mystical Experience Questionnaire. F1000Research 2021, 10:638. https://doi.org/10.12688/f1000research.53496.1

[9] Newberg, Andrew B., Nancy A. Wintering, Christopher Hriso, Farhad Vedaei, Samuel Gottfried, and Robert Ross. 2024. "Neuroimaging Evaluation of the Long-Term Impact of a Novel Paired Meditation Practice on Brain Function." Frontiers in Neuroimaging 3:1368537. https://doi.org/10.3389/fnimg.2024.1368537

[10] Prause, Nicole, Hadas Cohen, and Greg J. Siegle. 2021. "Effects of Adverse Childhood Experiences on Partnered Sexual Arousal Appear Context Dependent." Sexual and Relationship Therapy. https://doi.org/10.1080/14681994.2021.1991907

to experience arousal. [4] The late Dr. Roland Griffiths, Professor in the Departments of Psychiatry

and Neurosciences at the Johns Hopkins University School of Medicine, considered "the

Godfather" of psychedelic studies, remarked that OM may offer access to a mystical experience,

offering practitioners "insight into self and relationships, increase in self-efficacy and agency."[11]

John Caldwell, a disabled veteran who served from 1979 to 2017, has this to say about

Orgasmic Meditation practice: "In the simplest terms this practice helped me feel again. It

interrupted patterns of dissociation, allowed me to regulate my nervous system, and most

importantly brought me back into intimate, honest contact with another human being. PTSD and

depression can isolate me and has created dissociation and separateness These practices

reconnected me in a wholistic and natural way." Ex. A 034.

Sherry Oehler, retired Army Lieutenant Colonel, discovered Orgasmic Meditation in

2014 after returning from Afghanistan seeking non-medical stress relief. She writes, "I enjoyed

her talks because she introduced me to a new way to relate with my body. She gave us all a

language to use to describe what's happening inside (emotionally and physically) but without the

story or limiting beliefs. I always had a story! Nicole helped me learn to drop the story, and just

feel." Ex. A 036. Bob Sabado, a police officer for 15 years who was seriously injured during his

third deployment in Iraq. He shares, "Through OM I was able to heal my trauma."[12] Andrew

Garcia after five years of service and a 13-month combat tour was medically discharged with a

PTSD diagnosis said, "The most powerful thing for me was the first time I did the Orgasmic

---

[11] "Cognitive Mechanisms in Psilocybin Research and Orgasmic Meditation with Dr. Roland
Griffiths," *YouTube video*, 0:58. Posted by IOM Foundation

[12] "Healing My War PTSD with OM," Bob and Michelle Sabado,
https://erosplatform.com/Orgasmic-Meditation-OM-Stories/healing-my-war-ptsd-with-om

Meditation practice I stopped feeling numb. Honestly, I suddenly felt alive. I don't know how else to describe it."[13]

Louise Petersen is a clinical psychologist working in adolescent psychiatry in Copenhagen who found OneTaste because she wanted to heal from sexual trauma. She said: "Even though the subject matter of sexual trauma is very difficult to work with in a big group, my experience was that it was always handled extremely professionally, And I have always felt safe in [Nicole's] class." Ex. A 038. Laura Walsh is an HR coordinator and therapist living in London. She shared: "Nicole's teachings had a very positive impact on me as a person…I overcame my depression and became a happier, more optimistic person because of the experiences I had with One Taste." Ex. A 039. Ana Christa Boksay is a non-practicing attorney admitted in NJ and NY who practiced at a top tier New York law firm for the past decade has worked at a global management consultancy. She reflects: "The practice of Orgasmic Meditation and Nicole's teachings on Eros have profoundly transformed me. I have pursued many avenues for self-improvement. Compared to countless hours of seated meditation, journaling, and therapy, her teachings have been infinitely more valuable. They have enabled me to be more in touch with myself, move through trauma, and live a more fulfilled life." Ex. A 040-041. These are just some of the nearly 500 stories of healing and transformation shared by practitioners of Orgasmic Meditation.[14]

Beyond her published work and scientific advocacy, Ms. Daedone founded "Women Over Dinner," a global movement uniting more than 3,700 women across 93 cities in 18 countries to foster connection, sisterhood, and conversations about empowerment.

---

[13] Veterans, Institute of OM Foundation, https://iomfoundation.org/veterans/

[14] OM Stories, EROS PLATFORM, https://erosplatform.com/Orgasmic-Meditation-OM-Stories

Since Mary Valdovinos met Nicole in May 2024 as a guest at Women Over Dinner Mary has come back to the event to volunteer regularly. She shares, "I have seen firsthand the powerful impact Nicole has on the people around her and the community as a whole…She listens deeply, makes people feel valued, and creates environments rooted in compassion and growth." Ex. A 042. Raven Perkins is another regular volunteer Women Over Dinner events. She said:

> The space Nicole has created—with vision, authenticity, and intention—ha transformed me both personally and socially. From the very first moment I stepped into a Women Over Dinner event, I could feel the care and thoughtfulness woven into every detail. Her ability to lead with grace, communicate with clarity, and inspire through wisdom is truly powerful. Nicole leads boldly in her purpose, yet she does so with warmth and compassion that makes everyone feel seen.

> Ex. A 043.

Since being remanded to custody on June 10, 2025, Nicole has continued to devote herself to the well-being of those around her. Nicole continued her personal practice of Buddhism when she arrived at Metropolitan Detention Center (MDC), often spending several hours each day in meditation. Fellow inmates quickly took notice and began joining her. At the request of the women and with permission from MDC administration, Nicole started leading structured group sessions attended by 12 to 20 participants. These hour-long classes introduce a variety of Buddhist techniques—including Tummo (Tibetan inner-heat breathing), Tonglen (the practice of taking and sending compassion), and teachings on the Noble Eightfold Path (the ethical path to enlightenment) —equipping participants with practical tools for inner peace and ethical living that benefit both themselves and the broader community.

In a dormitory housing 30 to 40 women, the program has proven transformative. Demand grew so rapidly that volunteers among the inmates stepped forward to provide simultaneous

translation into Spanish and Chinese, dramatically expanding access. The facility has now authorized a third cycle of the classes, and numerous participants have submitted written statements describing profound personal benefits, including reduced anxiety and greater emotional resilience. Every Sunday, Nicole also facilitates an open, non-denominational prayer and meditation circle. Nicole's daily movement practice has also inspired other women to join her women to join her in daily walking, an initiative that has evolved into a formal exercise group. At least two women have experienced significant drops in previously elevated blood pressure, and one woman has lost 20 pounds since the group began. Throughout her time in custody, Nicole has consistently demonstrated compassion and a commitment to improvement within the facility.

Through teaching, writing, program development, and decades of spiritual practice, Nicole Daedone has shown a sustained commitment to women's empowerment, addiction recovery, prison reform, and scientific inquiry. While the government presented a handful of women who testified at trial, that testimony does not define Ms. Daedone nor does it reflect an overarching perspective of her. Indeed, over 200 people have provided letters of support on behalf of Ms. Daedone. Overall, her history and characteristics weigh in favor of minimal terms of imprisonment.

C.     The Need to Avoid Unwarranted Sentencing Disparities.

Section 3553(a)(6) instructs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when determining a defendant's sentence.  Indeed, there are no similar defendants who have been found guilty of similar conduct, because there are no forced labor cases that only charged conspiracy and not a substantive offense.  However, there are numerous

cases in which the defendant was convicted of the substantive forced labor offense along with more serious crimes and yet received a significantly shorter sentence than or one comparable to what Probation has recommended.

Moreover, the defense is unaware of any other criminal case involving psychological coercion during which witnesses testified they were able to leave at any time. Remarkably, there are countless cases in which the defendants were convicted of the substantive offense of forced labor (in addition to other crimes) and received much lower sentences than what Probation recommends for Ms. Daedone. Here is an overview of some of those cases, which are described in more detail below:

| Name | District Court / Docket Number | Alleged Conduct | Count(s) of Conviction | Sentence |
|---|---|---|---|---|
| Jefferson and Elnora Calimlim | 1:04-cr-248 (E.D. Wisc.), Dkt. No. 360 | Victim<br>• Not a U.S. citizen<br>• Barely left the house in 19 years<br><br>Defendants<br>• Took victim's passport<br>• Threatened victim with immigration consequences<br>• Prohibited victim from seeking medical care outside the home | 18 U.S.C. §§ 2, 371, 1589, 1594;<br><br>8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(B)(i), 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(I) | 72 months (both) |
| Mohamed Toure and Denise Cros-Toure | 4:18-cr-230 (N.D. Tex.), Dkt. No. 163 | Victim<br>• Not a U.S. citizen<br>• Began working for defendants as a minor<br><br>Defendants<br>• Physically abused victim<br>• Forced victim to sleep outside | 18 U.S.C. §§ 2, 1589, 1594(a)<br><br>8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(i), and 1324(a)(1)(B)(ii) | 84 months (both) |
| Mabelle Dann | 4:08-cr-390 (N.D. Cal.), Dkt. No. 168 | Victim<br>• Not a U.S. citizen<br><br>Defendant<br>• Took victim's passport and Peruvian identification | 18 U.S.C. §§ 371, 1546, 1546(a), 1589, 1592, 1594<br><br>8 U.S.C. §§ 1324 (a)(1)(A) (iii), (B)(i) | 60 months |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | • Threatened to send victim back to her home country<br>• Forbade victim from leaving the home without permission<br>• Forced victim to sleep on the floor |  |  |
| Varsha and Mahender Sabhnani | 2:07-cr-429 (E.D.N.Y.), Dkt. No. 659 | Victims<br>• Not U.S. citizens<br><br>Defendants<br>• Physically abused and starved victims<br>• Locked away victims' passports<br>• Threatened victims with immigration consequences<br>• Threatened one victim's husband | 18 U.S.C. §§ 2, 371, 1589, 1594(a)<br><br>8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(iii) | 132 months (Varsha)<br><br>40 months (Mahender) |

Ms. Daedone is facing a near-statutory-maximum sentence as a first-time offender for conspiring to force people, who were U.S. citizens, spoke English, were college educated, and free to come and go as they pleased, to labor. In contrast, in *United States v. Calimlim*, Jefferson and Elnora Calimlim received 72 months' imprisonment for essentially prohibiting their housekeeper, Irma Martinez, from leaving their house for 19 years. *United States v. Calimlim*, No. 1:04-cr-248 (E.D. Wisc. June 9, 2009), Dkt. No. 360. The Calimlims confiscated Irma's passport once she arrived from the Philippines. *United States v. Calimlim*, 538 F.3d 706, 708 (7th Cir. 2008). In the 19 years she worked for the Calimlims, she never walked out of the front door of the Calimlims' first house and answered the door to their second house only once, on Halloween. *Id.* Further, she was not allowed to play outside with the Calimlim children and was confined to her room in the basement or the bathroom during social gatherings. *Id.* She could only answer the phone when the Calimlim children called and no one else, and she was prohibited from seeking medical care outside of the house. *Id.* Over the 19 years that she worked for the Calimlims, she was allowed to speak with her family only four or five times and even

then, she could not speak with them alone. *Id.* The Calimlims repeatedly told Irma that "if anyone discovered her she could be arrested, imprisoned, and deported, and she would not be able to send any more money back to her family." *Id.* at 709.

Even where defendants were convicted of the substantive forced labor charge against a *minor*, the sentence was much lower sentence than what Ms. Daedone is facing. *See United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020). In *Mohamed Toure*, the defendants were each sentenced to 84 months' imprisonment for forcing the victim, who was nine or ten years old when she began working for the defendants for a total of 16 years. *Id.* at 396. During those 16 years, the defendants never paid the victim for her labor and she suffered from medical neglect. *Id.* at 396–97. Even more egregious, the defendants frequently beat her and at one point, one defendant sat on her back while his wife beat her. *Id.* at 397. Another incident occurred in which one of the defendants "ripped [the victim's] earring through her ear, permanently splitting [her] earlobe," and then ripped another earing through the victim's other earlobe. *Id.* The defendants would also ban the victim from staying in the house, forcing her to sleep on a park bench. *Id.* None of these facts, which led to a much lower sentence, approach come even close to the facts in the present case.

In *United States v. Sabhnani*, Varsha Sabhnani was sentenced to 132 months for forcing one of her "domestic servants" to sleep on the floor and wear clothes made from old rags and cut remnants of other clothing, starving her to the point that she ate out of the garbage, beating her and pouring scalding hot water on her arm, mutilating her, forcing her to eat hot chili peppers until the point of vomiting, and threatening to murder her and her children. *Sabhnani*, 599 F.3d at 225–26. Varsha accused another woman working for her of stealing two pieces of chocolate and forced her to stand in one place for ten hours as punishment. *Id.* at 229. She also hit that

same woman in the face with a metal spoon, leaving a scar, for apparently handing her the wrong spice. *Id.* Like many victims of forced labor, the victims here were not U.S. citizens. *Id.* at 225, 227. And like many defendants convicted of forced labor, Varsha took the victims' passports and travel documents and locked them away. *Id.* at 228. Varsha's husband, Mahender, was sentenced to only 40 months' imprisonment – his actions largely entailed informing his wife of the victim's "misdeeds" and witnessing his wife's horrendous behavior and doing nothing. *Id.* at 224, 227.

In *United States v. Dann*, the defendant was sentenced to 60 months' imprisonment for conspiracy to commit visa fraud, visa fraud, forced labor, unlawful conduct regarding documents in furtherance of servitude, and harboring an illegal alien for the purpose of private financial gain. 652 F.3d at 1162. There, the defendant never paid the victim (who did not speak English) for taking care of the defendant's home and children, forced the victim to sleep on the floor, forbade her from leaving the apartment without permission or from speaking to anyone, rationed her food, and took her passport and Peruvian identification. *Id.* at 1164–65, 67.

Imposing a sentencing on Ms. Daedone for a forced labor conspiracy charge that is significantly higher than sentences of those convicted of the completed offense with much worse facts would create unwarranted and enormous sentencing disparities.

Indeed, since *United States v. Booker*, 543 U.S. 220 (2005), there have been only two defendants sentenced under U.S.S.G. § 2H4.1 with a Total Offense Level of 36 and a Criminal History Category I (who did not receive a § 5K1.1 downward departure), and both of those defendants were sentenced to less time than Probation's recommendation despite the much more egregious facts. In *United States v. Walter Alexander Corea*, No. 4:05-cr-468 (S.D. Tex. May 12, 2008), Dkt. No. 400, Corea was sentenced to 180 months' imprisonment – which constituted

the statutory maximum to which he was exposed – three years of supervised release, and no fine. He also was ordered to pay $1,715,588.05 in restitution.  The defendant lured young Central American women to the United States by promising them good jobs.  Press Release, Man Sentenced for Human Trafficking and Alien Smuggling, Dep't of Just. (May 12, 2008). However, once they arrived in the United States, the defendants forced the women to work at their bars and cantinas and sell high-priced drinks to male customers.  *Id.*  "The women were subjected to numerous threats of harm to themselves and family members in order to compel their servitude, and some suffered sexual assaults at the hands of the defendant and his co-defendants."  *Id.*  Per the Bureau of Prison ("BOP") records, Corea was released from custody on December 18, 2018, 127 months after sentencing.

In *United States v. Mohammad Nauman Chaudhri*, No. 3:19-cr-85 (E.D. Va. Jan. 23, 2023), Dkt. No. 295, Mohammad Nauman Chaudri was sentenced to 60 months' imprisonment, which constituted the statutory maximum term to which he was exposed, one year of supervised release, and no fine or restitution.  In 2002, the victim married defendant Zahida Aman's son, and the brother of defendants Nauman and Rehan Chaudhri.  *See* Press Release, Midlothian Family Sentenced for Conspiracy for Years-Long Forced Labor of Pakistani Woman, Dep't of Just. (Jan. 24, 2023).  She then lived in the defendants' home and over a twelve-year period, the three defendants forced her to perform domestic services.  *Id.*  "To coerce that labor, the defendants verbally assaulted and physically abused the victim[,] . . . slapped, kicked, and [her], even beat her with wooden board, and, on one occasion, hog-tied her hands and feet and dragged her down the stairs in front of her children."  *Id.*  Similar to many other victims in force labor cases, the victim was not native to the United States.  *Id.*  She "had temporary immigration status in the United States, [and] defendant Aman took the victim's immigration documents."  *Id.*  The

defendants then threatened the victim with deportation if she did not obey their demands. *Id.* They also threatened to separate her from her children to coerce her labor. *Id.* Per BOP records, Chaudri will be released from custody on April 25, 2027, 51 months after his sentencing.

Moreover, defendants who have been convicted of far worse crimes than Ms. Daedone have received significantly lower than the 240 months Ms. Daedone faces under Probation's recommended Guidelines, or similar.

In *United States v. Tavberidze*, the defendant received 21 months for threatening a victim with physical harm and death to extort the victim, including stating that he would "break the [v]ictim's bones and render him unrecognizable to his family." Gov't Sentencing Letter at 2, *United States v. Tavberidze*, No. 1:23-cr-585 (S.D.N.Y. Mar. 4, 2025), Dkt. No. 141; *Tavberidze*, No. 23-cr-585 (S.D.N.Y. Mar. 13, 2025), Dkt. No. 146.

Ghislaine Maxwell – who was convicted of conspiracy to entice minors to travel to engage in illegal sex acts, conspiracy to transport minors to participate in illegal sex acts, transporting a minor to participate in illegal sex acts, sex trafficking conspiracy, and sex trafficking of a minor – was sentenced to 240 months' imprisonment, the same sentence Probation recommends for Ms. Daedone. *United States v. Maxwell*, No. 1:20-cr-330 (S.D.N.Y. June 29, 2022). The record shows that Maxwell recruited, groomed, and abused young girls, some as young as 14 years old. Gov't Sent'g Memorandum at 7, 1:20-cr-330 (S.D.N.Y. June 22, 2022). She specifically targeted victims she knew were vulnerable to exploitation and facilitated their abuse by prolific child sex offender Jeffrey Epstein. *Id.* at 37.

Cameron McEwen was sentenced to 210 months for receiving sexually explicit materials of a minor, an offense he committed after having previous committed a state crime related to sexual abuse of a minor. *United States v. McEwen*, No. 7:25-cr-193 (S.D.N.Y. Oct. 30. 2025);

Press Release, Sex Offender Sentenced To 210 Months In Prison For Child Pornography Offense, Dep't of Just. (Oct. 31, 2025).  McEwen extorted the minor victim, making threats against her friend and family to force her to send him sexually explicit photographs of herself. This was after he had been convicted in January 2022 of rape in the second degree.

Paulino Ramirez-Granados was sentenced to 188 months' imprisonment – a lesser sentence than what Probation recommends for Ms. Daedone – for his role in an international sex trafficking ring that smuggled young women into the United States and forced them, using threats and violence, to work as prostitutes.  *United States v. Ramirez-Granados*, No. 1:11-cr-557 (E.D.N.Y. Feb. 24, 2017).  There were more than 135 victims, 39 of whom were minors.  *Id.* Members of the organization routinely subjected victims to violence, threats, and sexual assaults. *Id.*  Ramirez-Granados impregnated one victim and threatened that she would never see her child again if she did not continue to prostitute for him.  *Id.*  It is outrageous for Probation to recommend, and for the government to support, the same sentence as this defendant.

These are just a few out of many instances in which the defendants received lighter or similar sentences than Ms. Daedone faces for far more egregious conduct.  *See, e.g.*, *United States v. Hernandez-Velazquez*, No. 1:19-cr-306 (E.D.N.Y. July 10, 2025), Dkt. No. 220 (188 months' imprisonment for operating an illegal, abusive, and exploitative sex trafficking operation in which victims were subjected to physical beatings, forced abortions, and threats of violence against their family's if they did not continue to prostitute); *United States v. Granados-Corona*, No. 1:16-cr-324 (S.D.N.Y. Sept. 15, 2022), Dkt. No. 331 (212 months' imprisonment for member of an international sex trafficking organization that used physical and sexual violence, threats, lies, and coercion to force and coerce victims, including minors, to work in prostitution); *United States v. Merchant*, No. 1:18-cr-527 (S.D.N.Y. Oct. 12, 2021), Dkt. No. 266

(196 months' imprisonment for engaging in trafficking minor victims and coercing them to have sex with strangers for profit); *United States v. Ragano*, No. 1:24-cr-50 (E.D.N.Y. Mar. 19, 2025), Dkt. No. 103 (37 months' imprisonment for mafia soldier who aggressively pursued the victim, threatened him with violence, and forced him to strip naked while having men approach him with tools all to extort collection of credit and while knowingly being under the court's supervision); *United States v. Pukke*, No. 1:23-cr-168 (S.D.N.Y. Sept. 22, 2025), Dkt. No. 123 (defendant sentenced to 96 months for defrauding victims, many of whom were retirees, of approximately $77 million through a real estate scam in Belize called "Sanctuary Belize"); *United States v. Javice*, No. 1:23-cr-251 (S.D.N.Y. Sept. 29, 2025), Dkt. No. 449 (defendant sentenced to 85 months for perpetuating a $175 million fraud).

Imposing a sentence on Ms. Daedone that is higher or around the same as those of defendants whose heinous conduct includes trafficking women and minors to engage in prostitution against their will, engaging in sex acts with minors and recording the abuse, threatening victims' families if they do not prostitute themselves, and defrauding hundreds of retirees to line their own pockets, defies common sense and does not align with the principles of justice and fairness.

D. The Need For Specific Deterrence Weighs In Favor of a Minimal Sentence of Imprisonment.

With regard to specific deterrence and protecting the public, there is no basis upon which to believe that Ms. Daedone, a category I offender with no criminal history, needs any additional sentence – let alone an additional prison term. By the time Ms. Daedone is sentenced, she will have served over six months at the MDC, a difficult place for even the most hardened criminals, and any additional period of incarceration is not necessary "to afford adequate deterrence to

criminal conduct" or "protect the public from further crimes of" hers.  18 U.S.C. §3553(a)(2)(B)-(C).[15]

The consequences Ms. Daedone has already endured are severe and are alone sufficient to deter her, including her arrest, the five-week trial, and being publicly disgraced, humiliated, and shamed in the press.  Accordingly, the arrest, trial, and these resulting collateral consequences are adequate to ensure that Ms. Daedone does not commit any further crimes.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming trial court's consideration of impact of conviction on defendant's career as academic or translator); *United States v. Gupta*, 904 F.Supp.2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (holding that as to specific deterrence, when an arrest, trial, conviction cause the defendant to suffer such a blow to her reputation, the defendant is unlikely to repeat the transgressions, and no further punishment is needed to achieve this result).

Furthermore, the Court does not have to guess as to whether Ms. Daedone needs deterrence or whether the public needs to be protected from her because the record demonstrates neither are necessary. This conspiracy began almost twenty years ago and ended in 2018, seven

---

[15] Based on the conditions of confinement for defendants in the MDC, it has become common for judges in the Eastern and Southern Districts of New York to give reduced sentences. *See, e.g.*, Sent'g Tr. at 37–38, *United States v. Elias*, No. 1:22-cr-317 (LDH) (E.D.N.Y. Apr. 22, 2024), Dkt. No. 71 ("I apologize to you, sir, that you had to endure conditions that are unfit for any person, period.  And I will take that into account, I assure you. And again, my apology is sincere. . . . [T]hese are individuals who are having to exist intolerable and inexcusable conditions in the United States of America.  So I am going to take it all into consideration, I assure you."); Sent'g Tr. at 19–21, *United States v. Days*, No. 1:19-cr-619 (CM) (S.D.N.Y. May 12, 2021), Dkt. No. 35 at 19 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that. . . .  I think you've suffered triply as a result. . . .  I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); Sent'g Tr. at 37, *United States v. Morgan*, No. 1:19-cr-209 (RMB) (S.D.N.Y. May 8, 2020), Dkt. No. 90 (imposing a below-Guidelines sentences on account of "the conditions of the MDC," among other things).

years prior to Ms. Daedone's conviction.  She has used her time since leaving OneTaste only to help others through education and supporting efforts to support initiatives that demonstrate the scientifically backed health benefits of Orgasmic Medication. OneTaste ended formal OM practice nearly 10 years ago. She is a risk to no one.

Finally, Sentencing Commission studies demonstrate that older women, particularly those who are non-violent offenders, have an extremely low recidivism rate.  Specifically, they found that defendants over the age of forty when sentenced exhibit markedly lower recidivism rates in comparison to younger defendants, and "that older offenders at sentencing are at lower risk for reoffending." *Recidivism Among Federal Offenders: A Comprehensive Overview*, 23–24 U.S. Sent'g Comm'n (Mar. 2016) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.  Accordingly, no further incarceration is necessary for specific deterrence.  This is particularly true for Ms. Daedone who is 56 years old, a non-violent offender with no criminal history, and has already suffered harsh collateral consequences.

For these reasons, Ms. Daedone has been more than sufficiently deterred and the public does not need protection from her. Indeed, she was out on bail for two years and had no issues and posed no danger to the public during that time, notwithstanding baseless claims that Ms. Daedone engaged in some undefined witness harassment.

E.  A Lengthy Period of Incarceration is Not Necessary for any General Deterrence.

With respect to general deterrence, a lengthy period of incarceration is also not necessary "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  As with many white-collar offenders, the real deterrent is the certainty of detection and prosecution, not the severity of the punishment.  Furthermore, the fact that the government chose to bring this case

and then obtained a conviction has already sent a deterrent message to anyone seeking to use psychological coercion to force labor. Certainly, this case received extensive coverage not because of the harm it allegedly caused, but rather because of the subject matter and the fact that it was the first of its kind.[16]

There is also no research or clinical evidence that justifies enhancing a defendant's sentence based on the prospect of influencing some putative future wrongdoer who is unidentified in any fashion (which is entirely speculative and inchoate), and who has yet to commit, and perhaps even contemplate, a crime. Such a person's knowledge, motivation, and compelling factors that would lead to criminal conduct are simply unknown. Defendants should receive the sentence *they* deserve, and not have, as a component of their sentence, what some other, future, unknown defendant deserves. Research also has consistently established that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). This is particularly true when, as is the case here, the crime charged is not something that is easily replicated, unlike other types of types of crimes, such as fraud or insider trading where the opportunity presents itself more often.

F.    The Kinds of Sentences Available, Sentencing Range, and Pertinent Policy Statements in the Guidelines.

---

[16] Alana Wise, *Leaders of 'Orgasmic Meditation' Company Were Convicted of Forced Labor: What to Know*, NPR (June 12, 2025, 11:59 AM), https://www.npr.org/2025/06/11/nx-s1-5429181/orgasmic-meditation-sexual-womens-wellness-forced-labor-conviction; Santul Nerkar, *Leaders of 'Orgasmic Meditation' Group Are Convicted of Coercion Charges*, N.Y. Times (June 9, 2025), https://www.nytimes.com/2025/06/09/nyregion/onetaste-orgasmic-meditation-verdict.html; Thessaly La Force, *The Orgasm Expert Who Ended Up on Trial*, New Yorker (Aug. 29, 2025),. https://www.newyorker.com/news/our-local-correspondents/the-orgasm-expert-who-ended-up-on-trial.

There are numerous kinds of sentences available to the Court beyond a term of imprisonment. Ms. Daedone could be sentenced to time-served for the months she has spent at the MDC; in addition, she could be sentenced to a term of supervised release; or she could be sentenced to a term of probation.  The sole count of conviction is a Class C felony, which provides that Ms. Daedone is eligible for not less than one nor more than five years' probation. *See* 18 U.S.C. § 3661(c)(1).  Any of these sentences are more than sufficient but not greater than necessary to meet the purposes of sentencing in this case.

As set forth above, the applicable Guidelines range before considering any downward departures is 21–27 months' imprisonment.  But regardless of the Guidelines' range, a downward departure is warranted given the novel facts here and that a guidelines sentence would result in an excessive sentence. And if the Court were to apply the enhancements, the Guidelines range would grossly overstate the seriousness of the offense and essentially permit the government to avoid charging substantive offenses at trial. All of the factors above apply with equal force and lead to the same conclusion that no further prison term is necessary or appropriate to meet the purposes of sentencing.

G.    Probation's Addendums Fall Far Short of Demonstrating that *Any* Restitution is <u>Owed to Any Alleged Victim</u>.

Probation makes wild claims for restitution on behalf of Janes Does whose names are not even known. With no documentary support or analysis, Probation calculates restitution at $2,794,399.61 for eight victims, some of whom have not even been identified. *See* Third PSR Addendum ("TA") at 3.

No restitution should be ordered on the current record.  The Mandatory Victims Restitution Act ("MVRA") defines "victim" as "a person directly and proximately harmed as a result of an offense for which restitution may be ordered . . ." *United States v. Goodrich,* 12 F.

4th 219, 228 (2021). Thus, in determining to whom a defendant owes restitution, the statute requires the court (1) to identify the "offense" of conviction and (2) to ascertain whether the putative "victim" was "directly and proximately harmed" by the defendant's commission of *that* "offense." *Id.* (emphasis added) The Second Circuit explained in *United States v. Vilar,* 729 F. 3d 62 (2d Cir. 2013), restitution may be imposed only for losses arising from "the specific conduct that is the basis of the offense of conviction."

Separately, the Second Circuit has held repeatedly that the MVRA requires that the "offense" of conviction "directly and proximately harmed" the victim entitled to restitution. *Goodrich,* 12 F. 4th at 229. Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively. *Id.* This requires a showing that each and every "victim" demonstrate that the harm they suffered was directly and proximately caused by the specific forced labor conspiracy offense.

The government has failed to meet its burden of proving actual losses with a nexus to the offense of conviction by a preponderance of the evidence, and probation's conclusory claims don't count. On this record, no order of restitution should be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should sentence Ms. Daedone to a sentence not to exceed 12 months' imprisonment.

Respectfully Submitted,

/s/JENNIFER BONJEAN

## **CERTIFICATE OF SERVCE**

I, JENNIFER BONJEAN, an attorney at law, certify that I filed Defendant's Sentencing

Memorandum via ECF on November 19, 2025.

/s/JENNIFER BONJEAN