PA3MCOM1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                        24 Cr. 542 (AS)
 4
     SEAN COMBS,
 5       a/k/a "Puff Daddy,"
         a/k/a "P. Diddy,"
 6       a/k/a "Diddy,"
         a/k/a "PD,"
 7       a/k/a "Love,"

 8                   Defendant.           Sentence
     ------------------------------x
 9                                        New York, N.Y.
                                          October 3, 2025
10                                        10:15 a.m.
     Before:
11
                       HON. ARUN SUBRAMANIAN,
12
                                          District Judge
13                                        -and a Jury-

14                         APPEARANCES

15
     JAY CLAYTON
16       Interim United States Attorney for the
         Southern District of New York
17   BY:  MADISON R. SMYSER
         EMILY A. JOHNSON
18       MEREDITH FOSTER
         MITZI STEINER
19       MARY C. SLAVIK
         Assistant United States Attorneys
20

21

22

23

24

25
```

PA3MCOM1

```
 1                        APPEARANCES CONTINUED

 2

 3    AGNIFILO INTRATER LLP
             Attorneys for Defendant
 4    BY:  MARC A. AGNIFILO
             TENY R. GERAGOS
 5           -and-
      HARRIS TRZASKOMA LLP
 6    BY:  ANNA M. ESTEVAO
             -and-
 7    SHAPIRO ARATO BACH LLP
      BY:  ALEXANDRA A.E. SHAPIRO
 8           JASON A. DRISCOLL
             CHRISTOPHER JOHNSON
 9           -and-
      XAVIER R. DONALDSON
10    BRIAN STEEL
      NICOLE WESTMORELAND
11

12    Also Present:  Sean Quinn - HSI Special Agent
                     Phil Adaszewski - HSI Detective/Task Force Officer
13
                     Chanel-Ashley Foster
14                   Shannon Becker
                     Paralegal Specialists
15
                     Angelica Deniz, U.S. Probation
16

17

18

19

20

21

22

23

24

25
```

PA3MCOM1

1              (Case called)

2              MS. SLAVIK:  Good morning, your Honor, Christy Slavik,

3     Madison Smyser, Emily Johnson, Mitzi Steiner, and Meredith

4     Foster for the United States.  We are joined at counsel table

5     by paralegal specialist Shannon Becker and Chanel Foster, as

6     well as Special Agent Sean Quinn of HSI and Task Force Officer

7     Phil Adaszewski, also of HSI.

8              THE COURT:  Good morning.

9              MR. AGNIFILO:  Good morning, your Honor.  We have Marc

10    Agnifilo, Teny Geragos, Xavier Donaldson, Nicole Westmoreland,

11    Brian Steel.  We have Chris Johnson, we have Jason Driscoll, we

12    have Alexandra Shapiro, we have Anna Estevao, and we all

13    represent Mr. Sean Combs.

14             THE COURT:  Good morning.

15             Good morning to you, Mr. Combs.

16             THE DEFENDANT:  Good morning.

17             THE COURT:  First thing, do we have the signed consent

18    preliminary order of forfeiture?

19             MS. SLAVIK:  Yes, your Honor.  I have three copies for

20    each of the parties and one for the Court for your signature.

21             THE COURT:  Why don't you go ahead and hand it up.

22             THE DEPUTY CLERK:  Your Honor, I note for the record

23    that we also have the probation officer, if she may give her

24    appearance.

25             MS. DENIZ:  Angelica Deniz from United States

PA3MCOM1

1    Probation.

2          THE COURT:  Good morning.

3          Let me give you an overview of how we are going to

4    proceed.

5          First, I'll go over the materials that I have received

6    and deal with the presentence report.  Then I will review the

7    sentencing guidelines calculations.  I will then hear from the

8    government and from the defense and from Mr. Combs.  Next I

9    will review the sentencing factors that I must consider in

10   imposing a sentence that is sufficient but no greater than

11   necessary to achieve the goals of sentencing.  Finally, I will

12   impose the sentence.

13         In terms of the materials that I have received, there

14   are a lot of them.  I have received from Ms. Geragos the

15   defense's September 22 sentencing memorandum, as well as the

16   exhibits, including letters from family, friends, colleagues,

17   fellow inmates at the MDC, and reports from that facility, as

18   well as the examination reports from Mr. Combs' doctors.  I've

19   also received the September 24 letter from Mr. Steel and the

20   exhibits and the second supplement from October 1.  I have also

21   received the defense's reply memorandum from October 2, and I

22   received the letters from Mr. Combs, Ian Melnick, and Brian

23   Steel last night, on October 2 as well, as well as the video

24   that the defense plans to play here in court.  I have read all

25   of the materials, and especially the letters, I greatly

PA3MCOM1

1    appreciated those.  I read them very closely.  So thank you for

2    submitting those.

3         I have also received the government's September 30

4    memorandum and the exhibits, including letters from Ms. Ventura

5    and others.  Again, the Court greatly appreciates receiving

6    those letters, all of which the Court has closely reviewed.  I

7    have also reviewed the presentence report prepared on

8    August 28, 2025 and revised on September 18.

9         Does anyone have any further documents for the Court

10   or did I miss anything?

11        Ms. Slavik.

12        MS. SLAVIK:  Your Honor, just the consent forfeiture

13   order which you have.

14        THE COURT:  Which I have now received.  Thank you.

15        Mr. Agnifilo.

16        MR. AGNIFILO:  I believe that's everything, Judge.

17   Thank you.

18        MS. WESTMORELAND:  Actually, Marc.  Sorry.

19        Yes, your Honor.  We are going to submit Exhibit 85.

20   We just received it this morning.  It's a course evaluation

21   from MDC that you have not seen yet.

22        THE COURT:  Can you hand it up.

23        MS. SLAVIK:  The government has not received this

24   exhibit.

25        THE COURT:  You have a copy for Ms. Slavik?

PA3MCOM1

1        MS. WESTMORELAND:  It's on the way.

2        THE COURT:  Thank you very much.  This will be made

3   part of the record as well.

4        MS. WESTMORELAND:  Thank you, your Honor.

5        THE COURT:  Ms. Slavik, other than Mia, does the

6   government have any plan for any victim to provide an oral

7   statement during these proceedings?

8        MS. SLAVIK:  Your Honor, no.  And in fact this morning

9   the government learned that Mia no longer wishes to address the

10  Court here today.

11       I'm comfortable representing to the Court that that is

12  at least in part due to the letter submitted by defense on

13  Wednesday, which can only be described as bullying and I think

14  in contravention to your Honor's individual rules about

15  civility in proceedings, so Mia will not be making a statement

16  here today.  She has submitted a victim-impact statement, a

17  written statement, and we urge the Court to consider Mia's

18  experience in fashioning a sentence today.

19       THE COURT:  That's the letter that was attached to the

20  government sentencing memorandum?

21       MS. SLAVIK:  That's right, your Honor.

22       THE COURT:  Which I have reviewed.  Thank you very

23  much.

24       Mr. Agnifilo.

25       MR. AGNIFILO:  I am going to turn it over to Mr. Steel

PA3MCOM1

1    on this question, Judge.

2           THE COURT:  I will say that the tone of the defense's

3    letter was inappropriate, so I agree with Ms. Slavik on that

4    point.

5           MR. AGNIFILO:  I understand.

6           THE COURT:  And that should not be done again.

7           MR. AGNIFILO:  Very good.

8           THE COURT:  Mr. Steel, does the defense plan for any

9    individual other than Mr. Combs to make a statement during

10   today's proceedings?

11          MR. STEEL:  Yes, sir.

12          THE COURT:  Who?

13          MR. STEEL:  Two or three of Mr. Combs' children.  They

14   are in your courtroom, your Honor.  They will all come up, with

15   the Court's permission, to stand next to each other, but there

16   will be two or three of them speaking.  In addition to that,

17   Dr. Reverend Gary Johnson, you have a letter from him, your

18   Honor, as well, your Honor, if you want to hear from

19   Dr. Kruger, Dr. Kaplan.  They are not in your courtroom, but

20   they are in your courthouse in the overflow room.  And IF you

21   have any questions about their analysis, they are here to talk

22   about Mr. Combs and their evaluation of him.

23          THE COURT:  Just so I understand, in addition to

24   Mr. Combs' children and the second individual, Mr. Johnson, is

25   that right?

PA3MCOM1

1          MR. STEEL:  Correct.

2          THE COURT:  They will be speaking and then the

3    doctors, if we need to hear from them, they are in the

4    courthouse.  That's what you're telling me?

5          MR. STEEL:  There is one other person, your Honor.  He

6    wrote you a letter about the reentry program, Giovanni.  He

7    will be speaking as well, with the Court's permission.

8          THE COURT:  Ms. Slavik.

9          MS. SLAVIK:  Your Honor, I believe that all of these

10   individuals that Mr. Steel just mentioned have submitted

11   written letters, and I believe that several are featured on the

12   video that the defense intends to play as well.

13          As your Honor knows, rule 32 provides for a limited

14   subset of individuals to address the Court at sentencing, and

15   the Second Circuit has interpreted this narrowly.  It's

16   interpreted Rule 32 to apply to the parties, the defense, the

17   defendant, and the government, as well as victims, and the

18   Court is well within its rights to circumscribe other

19   individuals, including character witnesses, from speaking at

20   sentencing.  That is from the Second Circuit case, the *Degroate*

21   case at 940 F.3d 167 from 2019.  Judge Furman has recently

22   invoked this law and this precedent to limit defense witnesses

23   speaking at sentencing.

24          And I will just note for your Honor that there is some

25   level of irony in the defense objecting to Mia speaking, one

PA3MCOM1

1  witness speaking for five minutes.  It appears that the defense

2  is trying to drown out the voices of victims in favor of

3  character witnesses, and the Court is well within the law to

4  circumscribe that.

5         THE COURT:  But you would agree, in the same way that

6  I overruled the defense's objection to Mia speaking here, I

7  would be within my discretion to permit the individuals

8  identified by Mr. Steel to speak, right?

9         MS. SLAVIK:  Yes, your Honor.  The Court has every

10  right to impose its discretion.  It can permit these folks to

11  speak.  It doesn't have to.  And I will note, again, that these

12  individuals have all provide letters and some are featured on

13  the video.

14         THE COURT:  Understood.

15         Mr. Steel, obviously, Mr. Combs' children will be

16  permitted to speak.  Is it Pastor Johnson?  I don't want to be

17  disrespectful.

18         MR. STEEL:  You are never disrespectful.  Dr. Reverend

19  Johnson.

20         THE COURT:  Dr. Reverend Johnson.  It's going to be a

21  brief statement.

22         MR. STEEL:  Correct.

23         THE COURT:  That's fine.  I am going to think about

24  the other individuals that you referenced to determine whether

25  there is any need for the Court to hear from those people.  OK.

PA3MCOM1

1          MR. STEEL:  Of course.

2          THE COURT:  Mr. Agnifilo, have you read the

3    presentence report and discussed it with Mr. Combs?

4          MR. AGNIFILO:  I have, your Honor.

5          THE COURT:  Mr. Combs, have you read and discussed

6    with Mr. Agnifilo the presentence report?

7          THE DEFENDANT:  Yes, I have, your Honor.

8          THE COURT:  Mr. Agnifilo, is that correct?

9          MR. AGNIFILO:  It is correct.

10          THE COURT:  There are a number of objections to the

11    presentence report, so we will go through them first.

12          A foundational objection raised by the defense is the

13    extent to which the Court may consider so-called acquitted

14    conduct in determining the correct range under the sentencing

15    guidelines.

16          In 2024, the guidelines were amended to provide that

17    for purposes of determining the correct guidelines range,

18    relevant conduct does not include conduct for which the

19    defendant was criminally charged and acquitted in federal court

20    unless such conduct also establishes, in whole or in part, the

21    instant offense of conviction, from the guidelines Section

22    1B1.3(c).

23          There is no guidance from any court on the proper

24    application of the acquitted conduct provision, and the

25    guideline is ambiguous, given that, in most cases, including

PA3MCOM1

 1   this one, juries don't acquit defendants of conduct.  They

 2   acquit them of charges.  And we don't have a crystal ball to

 3   tell us what the jury in this case was thinking when they

 4   acquitted Mr. Combs of the RICO and sex trafficking charges.

 5          However, the application note to the guideline refers

 6   to overlapping conduct, suggesting that the real test is

 7   simple, to determine whether conduct that underlies an

 8   acquitted charge also establishes, in whole or in part, the

 9   instant offense of conviction.  That's what we are meant to

10   determine.

11          As to what establishes in whole or in part means, it's

12   best understood as a relevancy test.  Evidence is not relevant

13   if it does not tend to prove or disprove an element of the

14   offense.  Nothing in the guidelines suggests that the

15   commission intended for courts to ignore conduct relevant to

16   establishing the offense in question, so a more restrictive

17   reading of this language is untenable.  Of course this will

18   lead to some line drawing questions, which the commission

19   recognized, stating that the Court will be in the best position

20   to determine whether such overlapping conduct establishes, in

21   whole or in part, the instant offense of conviction and,

22   therefore, qualifies as relevant conduct.  The Court has done

23   its best to do that.

24          The Court observes that even though the defense

25   originally proposed a different definition, at page 11 of their

PA3MCOM1

1    reply brief filed yesterday they end up proposing pretty much

2    exactly the approach that the Court has adopted.

3          Having said all this, it is important to understand

4    how narrow and, in this case, inconsequential all of this is.

5    The limitation on considering acquitted conduct only applies to

6    determining the guidelines range, not for any other purpose

7    under the guidelines, and the guidelines themselves are only

8    advisory.  For every other purpose the guidelines in 18 U.S.C.

9    Section 3661 make clear that no limitation shall be placed on

10   the information concerning the background, character, and

11   conduct of a person convicted of an offense which a court of

12   the United States may receive and consider for the purpose of

13   imposing an appropriate sentence.

14         For those purposes, the Supreme Court and the Second

15   Circuit have made clear that acquitted conduct may be

16   considered.  For this I cite *United States v. Muir*, 710

17   F.App'x, 510 (2d Cir. Circuit 2018); *United States v. Vaughn*,

18   430 F.3d 518 (2d Cir. 2005); and *United States v. Watts*, 519

19   U.S. 148 (1997).

20         So even if the Court is foreclosed from considering

21   certain conduct in determining the correct guidelines range, it

22   considers all of the facts applying a preponderance of the

23   evidence standard to impose a sentence sufficient but not

24   greater than necessary to comply with the purposes set out in

25   18 U.S.C. 3553(a).

PA3MCOM1

1         With that, we move to the parties' specific objections

2    to the presentence report which will also address the parties'

3    objections to various guidelines calculations.  We will start

4    first with the government's objections.

5         The government first argues that the cross-reference

6    in guidelines Section 2G1.1(c)(1) should apply and that the

7    correct guidelines range should be the criminal sexual abuse

8    guideline, which is in Section 2A3.1.  The application of that

9    guideline dramatically increases Mr. Combs' guidelines range,

10   imposing a six-fold increase in the minimum guidelines sentence

11   alone.  The cross-reference applies if the offense involved

12   conduct described in 18 U.S.C. Section 2242.  The conduct

13   described in Section 2242 is engaging in or causing another

14   person to engage in a sexual act with another person by

15   threatening or placing the victim in fear other than by

16   threatening or placing the victim in fear that any person will

17   be subject to death, serious bodily injury, or kidnapping.

18   That tracks the language of the statute at Section 2242.

19        Looking to cases interpreting that statute, there is

20   little precedent on what kind of threat or fear of harm is

21   required, binding, or otherwise.  The government cites to

22   United States v. Dnjen, 101 F.App'x 362 (2d Cir. 2004), a

23   summary order in which the Court did not directly address the

24   issue because the defendant's sole argument was based on the

25   wrong statute.  It was also a Rule 11 case and didn't really

PA3MCOM1

1    get into what the standard is or should be.

2         The *Sand* treatise recommends a requirement that the

3    defendant's actions implicitly placed the victim in fear of

4    some bodily harm.  The treatise adopted this view because

5    although the statute has been upheld against a vagueness

6    challenge, allowing threat and harm to have unlimited reach

7    would certainly raise constitutional questions.

8         The text of Section 2242 suggests that a narrow

9    reading, one that requires an imminent concrete threat of harm,

10   such as bodily harm, makes more sense.  By its terms, the

11   statute applies to harms other than those for death, serious

12   bodily injury, or kidnapping.  That borrows language from 18

13   U.S.C. Section 2241, which requires the threat of those things.

14   Those are all imminent concrete harms relating to physical

15   violence or restraint, and Congress' use of parallel language

16   in Section 2242 suggests that it should apply to harms of the

17   same kind, even if they are not as severe.  Contrast that with

18   the language in 18 U.S.C. Section 1591, which defines serious

19   harm to include any harm, whether physical or nonphysical,

20   including things like psychological, financial, or reputational

21   harm, language absent from Section 2242.

22        The Court's adoption of a narrower reading is

23   reinforced by the rule of lenity, which applies to the

24   guidelines under binding Second Circuit case law, *United States*

25   *v. Parkins*, 935 F.3d 63 (2d Cir. 2019).

PA3MCOM1

1          That brings the Court to the evidence that Mr. Combs

2     caused Ms. Ventura and Jane to engage in sex acts by

3     threatening or placing them in fear of an imminent concrete

4     harm, such as bodily harm.

5          In this case the government points to evidence of

6     force, fraud, and coercion as supporting application of the

7     cross-reference.   This conduct was the conduct underlying the

8     acquitted sex trafficking charge and it counts as acquitted

9     conduct based on the Court's analysis.

10          As to whether that conduct also establishes, in whole

11     or in part, the offenses of conviction, the government argues

12     that evidence of coercion and the victim's resulting fear is

13     relevant to establishing the defendant's intent that Ventura

14     and Jane were being transported for the purpose of engaging in

15     acts of prostitution with escorts.   That's from the

16     government's brief at page 63.

17          On pages 63 and 64 of its brief, the government cites

18     to two things fitting that category:  The defendant's threats

19     to release sex tapes of Ms. Ventura, including during a flight

20     back from Cannes, France, and his demand that she engage in a

21     freak-off, which, in the case of the Cannes trip, happened

22     right after the flight.   For Jane they point to evidence of the

23     defendant coercing Jane into engaging into a hotel night while

24     he was arranging it by employing threats concerning her home.

25     That's all from the government's brief, again, at page 63 to

PA3MCOM1

1    64.

2            There is no doubt that this evidence counts as

3    coercion.  What is not clear is whether it meets the technical

4    definition under Section 2242.  To be very clear, and as the

5    Court will later address, there was fear of bodily harm and

6    other kinds of threats in this case.

7            The Court listened carefully to the witnesses during

8    the eight weeks of trial.  Ms. Ventura and Jane testified

9    credibly that there was psychological, emotional, and physical

10   violence in connection with the freak-offs and hotel nights.

11   But for the technical question the Court is dealing with, the

12   intersection between the acquitted conduct provision and the

13   2A3.1 cross-reference complicates things.

14           The question is whether there is evidence that would

15   establish, in whole or in part, the prostitution charges that

16   also proves by a preponderance of the evidence that the

17   defendant caused Ventura and Jane to engage in sex acts by

18   threatening or placing them in immediate fear in the kind

19   addressed in 2242.  The government hasn't made that case here.

20           For that reason, and in light of the dramatic impact

21   of an application of the cross-reference, the constitutional

22   questions raised by *Sand*, the acquitted conduct guideline, and

23   general principles of lenity, the Court declines to apply the

24   cross-reference.

25           However, as I previously noted, the Court considers

PA3MCOM1

1    all relevant conduct, including what might otherwise count as

2    acquitted conduct under the guidelines, in determining the

3    appropriate sentence under the 3553(a) factors.  So the Court's

4    resolution of this guideline issue would not affect the

5    sentence ultimately imposed.

6         Because the Court does not apply the cross-reference

7    to Section 2A3.1, it also does not apply the enhancement for

8    serious bodily injury in that guideline provision, although,

9    again, it considers that evidence in fashioning the appropriate

10   sentence here under 18 U.S.C. Section 3553(a).

11        Next, the government objects to the lack of an

12   adjustment for obstruction to justice.  The Court overrules the

13   objections for the reasons set forth by the probation

14   department in paragraph 79 through 80 of the PSR and on page 58

15   of the PSR.

16        As to the incident relating to the bail application

17   concerning Mr. Combs' marking of pads as legal, this was

18   troubling conduct.  For purposes of the obstruction of justice

19   enhancement, however, a full record was never made as to what

20   happened exactly or who was responsible for it, Mr. Combs, his

21   counsel, present or former, or both.

22        If the government wanted to press for the record to be

23   completed as to this issue it could have, including after

24   trial, but it did not.  The first time the issue resurfaced was

25   in the PSR.  The Court declines to apply the enhancement on the

PA3MCOM1

1    basis of the record it has.  The government's objection is

2    overruled.

3          The government objects to the probation department not

4    applying the vulnerable victim enhancement under guidelines

5    provision 3A1.1 as to Ms. Ventura and Jane.  The Court

6    overrules the objection.  The application note to this

7    provision has an express carve-out that applies if the factor

8    that makes the person a vulnerable victim is incorporated into

9    the offense guideline.  It further points to an example where

10   there is an age enhancement in the relevant guideline and says

11   that the victim enhancement could only be applied for reasons

12   unrelated to age, indicating a broad conception of this

13   language.

14         The Court agrees with probation in the PSR that the

15   offense guideline here incorporates the factors that made

16   Ventura and Jane vulnerable, as it includes an enhancement for

17   fraud and coercion, with coercion focusing on the voluntariness

18   of the victim, which is tied to the factors that the government

19   points to as rendering Jane and Ventura unusually vulnerable.

20   What made Combs' coercion effective was that the victim were

21   vulnerable and that was for lots of reasons, including prior

22   sexual and violent experiences and age.

23         The Court also observes that there are some questions

24   as to whether Ms. Ventura and Jane would count as unusually

25   vulnerable or particularly susceptible under the case law cited

PA3MCOM1

1    by the defense.  However, the Court need not reach that

2    question.  Once again, the Court observes thought would reach

3    the same ultimate sentence whether or not this enhancement as a

4    technical matters applies or not.

5            Next, we move to Mr. Combs' objections to the PSR.

6    Mr. Combs objects to a number of paragraphs in the PSR, not

7    based on their factual content but on the Court's consideration

8    of information that he deems related to the RICO and sex

9    trafficking counts of which he was acquitted.  Those objections

10   are overruled for the reasons I laid out earlier.

11           The Court may consider acquitted conduct for any

12   purpose other than determining the guidelines range.  There is

13   a small objection to the nomenclature in paragraph 70 that was

14   resolved by the probation department changing the language of

15   that paragraph, but, in any event, the nomenclature of

16   commercial sex act is irrelevant for any purpose of sentencing.

17   Nevertheless, prostitution is a commercial sex act.

18           Next, Mr. Combs objects to the characterization of Ms.

19   Ventura and Jane as victims.  That objection is overruled.  The

20   evidence at trial and the material in the presentence report

21   establishes by a preponderance of the evidence that Ms. Ventura

22   and Jane were victims.  That is especially true given the

23   definition of victim in the guidelines, which is a person

24   transported for the purpose of engaging in a commercial sex act

25   whether or not the person consented to the commercial sex act

PA3MCOM1

1    or prohibited conduct.  Even after the Supreme Court's decision

2    in *Kisor v. Wilkie*, the Second Circuit has held that the

3    application note is entitled to *Stinson* deference.  That's

4    *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024).

5            Mr. Combs also objects to the escorts being classified

6    as victims.  The objection here is overruled for the same

7    reasons.  The application notes' definition of victim is

8    expansive, and the escorts were plainly transported for the

9    purpose of engaging in a commercial sex act.  That's

10   established by, among other things, Government Exhibit 1402.

11   There is no contradiction between the text and the application

12   notes so *Stinson* again applies.  Evidence at trial supported at

13   least seven escort victims:  Clayton Howard, Jules Theodore,

14   Paul Arthur, Kabrale Williams, Julian Sapp, Reggie, and Rico.

15   I point to the PSR at paragraph 84, Government Exhibit 1402 and

16   Government Exhibit 1406.

17           Next, Mr. Combs objects to the coercion enhancement

18   based on the jury's acquittal on the sex trafficking counts.

19   That objection is overruled.  The Court agrees with the

20   probation department and government that this enhancement

21   applies.  The enhancement applies where the offense involved

22   fraud or coercion, with coercion being defined as any form of

23   conduct that negates the voluntariness of the victim.

24           In *United States v. Sweargin*, 935 F.3d 1116 (10th Cir.

25   2019), the Court noted that coercion often involves an

PA3MCOM1

1    impending threat of some negative consequence that will

2    affirmatively befall a person if he or she does not succumb to

3    the pressure that is being exerted, and it found coercion where

4    the defendant substantially impaired the victim's ability to

5    choose her own course of conduct.

6         When something is voluntary in this context, that

7    means that it is unconstrained by interference, not impelled by

8    outside influence.  That's from Black's Law dictionary.

9    According to Merriam-Webster, it also means something that is

10   proceeding from the will or from one's own choice or consent.

11   That's a very broad concept.

12        The two instances cited by the government concerning

13   Combs' threats to release videos of freak-offs to Ventura and

14   threats concerning Jane's home in connection with the hotel

15   nights alone prove by a preponderance of the evidence that

16   coercion was used under the definition provided in the

17   guidelines, and these are squarely permissible to consider even

18   if counted as acquitted conduct.

19        The evidence cited here to support this, the trial

20   transcript at pages 701-703, at 3278-79; Government Exhibit

21   B-315; Government Exhibit B-619; Government Exhibit A-104-68 at

22   1353; Government Exhibit A104-70, at 1380-83; and Government

23   Exhibit A-10473 and 74.

24        And, obviously, if the acquitted conduct exception had

25   any narrower sweep than what the Court has concluded today, the

PA3MCOM1

1    credible evidence at trial and the facts detailed throughout

2    the PSR unquestionably support application of this enhancement.

3             Again, though, the Court would impose the same

4    sentence applying the 3553(a) factors even if this enhancement

5    did not, as a technical matter, apply.

6             Mr. Combs objects to the application of the

7    enhancement in guidelines Section 3B1.1 for an organizer or

8    leader of a criminal activity that involved five or more

9    participants or was otherwise extensive.  The guideline

10   provision defines participant as a person who is criminally

11   responsible for the commission of the offense but need not have

12   been convicted.  It does not define otherwise extensive except

13   to say that in assessing whether an organization is otherwise

14   extensive, all persons involved during its course of the entire

15   offense are to be considered.  Thus, a fraud that involved only

16   three participants, but used the unknowing services of many

17   outsiders, could be considered extensive.

18             In determining whether a scheme is otherwise

19   extensive, the Second Circuit focuses on primarily on the

20   number of people involved.  That's from *United States v.*

21   *Carrozzella*, 105 F.3d 796 (2d Cir. 1997).

22             Here, Ventura and Jane qualify as participants.  They

23   were victims, and the application notes to Section 3B1.1

24   provide that victims can be participants only if they promote

25   the sexual conduct with respect to another victim.

PA3MCOM1

1        The Court overruled Mr. Combs' objections to counting

2    the escorts as victims, so Ventura and Jane count as

3    participants because by a preponderance of the evidence they

4    promoted the sexual conduct with respect to them by finding the

5    escorts, texting them to set up appointments, and handing them

6    money.  That's, among other things, from trial transcript at

7    pages 516-17, 540-41, 531, 4727, 4738-39, and 4744.

8        The Court finds by a preponderance of the evidence

9    that the offense also involved Combs and at least three

10   criminally other responsible participants -- Kristina Khorram

11   Garren James, and Bridget Collins -- and that it used the

12   services of numerous outsiders that were peculiar and necessary

13   to this offense, including Faheem Mohammed and Combs' various

14   assistants.

15       Combs was plainly the organizer of the freak-offs and

16   hotel nights.  All of that staff and all of the staff that he

17   was using were acting for his benefit and his direction and it

18   was his money that was used to pay the escorts.

19       Even if some of this evidence overlaps with the

20   acquitted RICO conspiracy count, it plainly establishes, in

21   whole or in part, the offenses of conviction, as it goes to the

22   defendant's intent, the transport of escorts, Jane and Ventura,

23   for sex, and proof that the acts were in fact acts of

24   prostitution.  The enhancement applies and the objection is

25   overruled.  But the Court again notes that the guidelines are

PA3MCOM1

1    only advisory and that it would impose the same sentence,

2    regardless of whether the enhancement applies.

3         Mr. Combs objects to the characterization of Ms.

4    Ventura as a victim and will object to any restitution for her.

5    Mr. Combs even objects to Ms. Ventura's filing of any victim

6    impact statement pursuant to the Crime Victims Rights Act.

7         As to restitution, the objection is moot because Ms.

8    Ventura is not seeking restitution.  Mr. Combs' objection is

9    otherwise overruled.  Ms. Ventura was plainly a victim of

10   Mr. Combs' conduct and plainly fits under the CVRA's definition

11   of victim.

12        Mr. Combs also appears to object to Ms. Ventura's

13   statement not being included in the PSR pursuant to Rule 32.

14   That provision states that the PSR must contain information

15   that assesses any financial, social, psychological, and medical

16   impact on any victim.  The PSR does that throughout, and the

17   final PSR summarizes in quotes from her statement.  Of course

18   the PSR need not contain all information on impact to a victim.

19   If it were otherwise, no victim could ever make a statement on

20   impact during sentencing because that oral statement would of

21   course not be contained in the PSR.  For the same reasons, the

22   Court overrules Mr. Combs' similar objection as to Jane.

23        Mr. Combs next objects to the presentence report not

24   giving him acceptance of responsibility credit under guidelines

25   Section 3E1.1.  That provision is clearly inapplicable.  The

PA3MCOM1

1    application notes make clear that this reduction is

2    inapplicable to defendants who deny the essential facts of

3    guilt at trial and only later admit guilt and express remorse.

4         Mr. Combs denied the essential facts of guilt,

5    disclaiming his intent to hire escorts for prostitution, saying

6    he was paying for time, not sex.  He has not admitted his

7    guilt.  And while he has expressed remorse for some things, he

8    has not expressed remorse for the actual offense of

9    transporting people for prostitution, and in general the

10   narrative that he and his counsel have put forward, that this

11   case involves nothing more than adults paying for time, not

12   sex, is flatly inconsistent with both reality and any

13   acceptance of responsibility.

14        The defense points to the application note to the

15   guidelines stating that there are rare situations in which a

16   defendant may clearly demonstrate an acceptance of

17   responsibility for his criminal conduct, even though he

18   exercises his constitutional right to a trial, such as where a

19   defendant goes to trial to assert and preserve issues that do

20   not relate to factual guilt.

21        Here, however, Combs has challenged his factual guilt

22   full throatedly and even does so after trial.  Cite here to

23   *United States v. Kamara*, 85 F.App'x 231 (2d Cir. 2003).  We

24   have held that a defendant who goes to trial to deny his

25   factual guilt may not receive the adjustment for acceptance of

PA3MCOM1

1   responsibility.

2         Mr. Combs next wants the Court to apply the zero-point

3   offender provision from the 2023 guidelines, but the rest of

4   the 2024 guidelines.  The Second Circuit has prohibited

5   precisely that approach under its one-book rule.  *See United*

6   *States v. Ramirez*, 846 F.3d 615 (2d Cir. 2017).  Mr. Combs

7   would have to show that, as a whole, the 2023 guidelines would

8   produce a lower sentence, but he doesn't even make that

9   argument in this case.

10         Further, even under the 2023 guidelines, the

11   zero-point offender reduction would not be applicable because

12   Mr. Combs received an enhancement under 3B1.1.  For these

13   reasons, the objection is overruled.  Again, the Court notes

14   that the application of this reduction would not affect the

15   final sentence imposed.

16         Next, Mr. Combs objects to imposition of the $5,000

17   assessment under the Justice for Victims of Trafficking Act

18   because there are no victims.  Here the PSR and the offense of

19   conviction establishes that the JVTA's mandatory assessment

20   unquestionably applies, so the objection is overruled.

21         In the PSR, Mr. Combs had objected to forfeiture, but

22   the parties have agreed to a consent order of forfeiture, and

23   so this objection is now moot.  At this time I have a consent

24   preliminary order of forfeiture as to specific property.

25         Mr. Combs, is this your signature on the last page of

PA3MCOM1

1    the order, dated October 3?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Did you review this order before you

4    signed it?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Did you discuss the order with your

7    lawyers before you signed it?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Mr. Steel, did you review and discuss this

10   order with Mr. Combs before he signed it?

11             MR. STEEL:  I personally did not, your Honor.

12             MS. GERAGOS:  Your Honor, I went over this with

13   Mr. Combs.

14             THE COURT:  Ms. Geragos, did you review and discuss

15   this order with Mr. Combs before he signed it?

16             MS. GERAGOS:  Yes, I did.

17             THE COURT:  The Court will sign this order and it will

18   be incorporated into the judgment in this case.

19             Next, the defense makes a request for a downward

20   departure on the basis that Section 2G1.1 overstates the

21   seriousness of the offense.  That request is denied.  The

22   language is not in the 2G1.1 guideline and the standard would

23   not have been met in this case, in any event.

24             To the extent not specifically addressed here, all

25   remaining objections by the government and the defense are

PA3MCOM1

1    overruled.

2            Are there any objections that I have not addressed?

3    Let's start with Ms. Slavik.

4            MS. SLAVIK:  No, your Honor.

5            THE COURT:  Mr. Agnifilo.

6            MS. GERAGOS:  I just want to make one point for the

7    record, your Honor.  I am not going to go objection by

8    objection.  Our live feed isn't working.

9            You had mentioned that it's inconsequential, I think

10   was the word, to whether or not you view acquitted conduct in

11   the PSR, and I just want to put on the record for your Honor

12   how consequential it is to have acquitted conduct in these

13   certain factual allegations in the PSR for Mr. Combs in the

14   event that he gets an incarceratory sentence that's higher than

15   what we have requested, because the way that it is worded and

16   the acquitted conduct for which we have objected to over and

17   over again would land him likely in a low, and I may get to

18   this later in the proceeding, but it is not inconsequential at

19   all for Mr. Combs in terms of what his incarceration at the BOP

20   would be like, given the factual recitation, the offense

21   conduct in the PSR.  I really wanted to just make that point.

22           THE COURT:  I understand the point, and I thank you

23   for raising it.  And it was perhaps not the right word to use.

24   So I'll make that clear in case it causes any issue down the

25   line.

PA3MCOM1

1           The point was that for purposes of the sentencing

2    analysis, and I went through this, the acquitted conduct

3    provision solely applies to the determination of the correct

4    guidelines range and not those other purposes, such as figuring

5    out where within a guideline you might put a sentence, the

6    purposes of departures, or the purpose of applying the 3553(a)

7    factors.  That's what I meant to say.  But if there is some

8    other consequence and we can address that, I'm happy to --

9           MS. GERAGOS:  We will address that, if necessary,

10   later in the proceeding, but I just wanted to make that point

11   clear now and make sure your Honor understood it at this

12   juncture.

13          THE COURT:  Understood.

14          Hearing nothing else --

15          MS. SHAPIRO:  I understand that your Honor has ruled.

16   I know the briefing was extensive, that we are preserving all

17   the objections that we made.  I don't know if this is the right

18   point, but I wanted to make a few additional points to

19   supplement the record with respect to your Honor's record on

20   acquitted conduct and a few of these guidelines.

21          THE COURT:  OK.

22          MS. SHAPIRO:  Should I do that now?

23          THE COURT:  You may proceed.

24          MS. SHAPIRO:  Thank you, your Honor.

25          I just want to be clear, and I think this is clear

PA3MCOM1

 1    from the papers because the briefs -- both the opening and

 2    reply brief were quite extensive.

 3            THE COURT:  I believe it was 380 pages in total.  No.

 4    It's more than that.

 5            MS. SHAPIRO:  I was talking about the briefs.

 6            Your Honor, I'll be very brief.  I just want to be

 7    clear that the constitutional issues we raised, the Fifth and

 8    Sixth Amendment issues, the right to jury trial, the double

 9    jeopardy, the due process, the right to findings beyond a

10    reasonable doubt, the fairness concerns, which I think are

11    most -- are set forth quite eloquently by, in particular,

12    Justice Sotomayor in her *McClinton* opinion, but all of those

13    constitutional and fairness concerns, we believe, militate not

14    only in favor of our interpretation of the acquitted conduct

15    guideline, but that they also preclude the Court in balancing

16    the 3553(a) factors or choosing a point within the range,

17    should it choose to apply the guidelines and adopt a guidelines

18    sentence, that all of those militate heavily against any use of

19    acquitted conduct.

20            The jury had to find the element of force, fraud, and

21    coercion as defined in the jury instructions.  It's clear they

22    rejected that, and that verdict and that finding should be

23    honored, so that's our position.  And I think, to be clear, for

24    that same reason, the coercion enhancements, the victim

25    enhancement, and the organizer/leader enhancement should not be

PA3MCOM1

1    applied.  And I won't repeat the other points we made in our

2    brief, but I just wanted to be clear on that, your Honor.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PA3ACom2

1           THE COURT:  All right.  Understood.

2           And as I noted, the Second Circuit, for example, in

3    the *Muir* case indicated that the Constitutional arguments

4    against acquitted conduct and its use at sentencing were

5    squarely foreclosed by other precedence.  I think that's almost

6    a verbatim quote from *Muir*.  And but I understand the issue you

7    raised, and it was extensively addressed in the papers so

8    you've made those arguments.

9           MS. SHAPIRO:  Thank you, your Honor.

10          I don't want the government saying we waived them on

11   appeal, should there be an appeal on the sentence.

12          THE COURT:  For these reasons and subject to the

13   rulings made and the modifications that are addressed in what

14   I've said, the Court will adopt the presentence report and the

15   factual findings therein.  It will be made part of the record

16   in this matter and placed under seal.  If an appeal is taken,

17   counsel on appeal may have access to the sealed report without

18   further application to this Court.

19          Now we go to the calculation of the guidelines range.

20          Mr. Combs was convicted of two counts of

21   transportation to engage in prostitution under 18, U.S.C.,

22   Section 2421A, each of which is punishable by not more than ten

23   years of imprisonment, five years to a lifetime of supervised

24   release, and other monetary penalties.

25          The presentence report reflects an offense level of 27

PA3ACom2

1    and a criminal history category of I.  I have reviewed the PSR.

2    I now calculate and find that the defendant's offense level is

3    27 based on the analysis above that I've given and the findings

4    that I've made, including the factual findings in the

5    presentence report.  The Court agrees with the probation

6    department's calculation of the offense level for each group as

7    well as the number of groups.

8         So the offense level is 27.  The defendant's criminal

9    history category is I, as the defendant has zero criminal

10   history points.  An offense level of 27 and criminal history

11   score of I yields an advisory guidelines range of between 70 to

12   87 months of incarceration.

13        Additionally, after determining the defendant's

14   ability to pay, the Court may impose a fine under the

15   guidelines, Section 5E1.2(c)(3).  At offense level 27, the

16   applicable fine range is between 25,000 and $250,000.

17        Ms. Slavik, are there any guidelines arguments that I

18   have not addressed or any further objections?

19        MS. SLAVIK:  No, your Honor.

20        THE COURT:  Mr. Agnifilo?

21        MR. AGNIFILO:  Nothing from us.  Thank you.

22        THE COURT:  All right.  I do not see a basis for a

23   departure here.  After calculating the guidelines and potential

24   departures, I must now consider the relevant factors set out in

25   18, U.S.C., Section 3553(a) to ensure that I impose a sentence

PA3ACom2

1    sufficient but not greater than necessary to comply with the

2    purposes set forth in subparagraph (a)(2).

3              At this point, does the government wish to make any

4    final statement?

5              MS. SLAVIK:  Yes, your Honor.

6              And before I begin my statement, I just would note

7    that given what I expect to be the length and the breadth of

8    counsel's remarks, I ask that the Court permit me to respond,

9    if appropriate, after those remarks.

10             THE COURT:  All right.

11             MS. SLAVIK:  Your Honor, today is about accountability

12   and justice.  Accountability for the defendant who committed

13   serious federal crimes repeatedly over the course of 15 years,

14   and justice for the public, including for the victims whose

15   lives have been shattered by the defendant's acts of abuse and

16   exploitation.

17             As the Court noted in its remarks just now, the law

18   requires the Court to consider all information about the

19   defendant, and all information about the conduct to impose an

20   appropriate sentence.  And when you step back to consider all

21   the information available to the Court, including all the

22   evidence presented over seven weeks this past spring, it's

23   clear.  This isn't just a case about freak-offs or hotel

24   nights.  It's not just a case about sex.  It's a case with real

25   victims who have suffered real harm at the hands of the

PA3ACom2

1    defendant, who because of the defendant have questioned their

2    own self-worth and desire to live.  It's about a man who did

3    horrible things to other people to satisfy his own sexual

4    gratification.  He didn't need the money.  His currency was

5    control.  And he weaponized that currency to devastating

6    effects on the victims.

7         All of the 3553(a) factors that the Court is required

8    to consider support a significant sentence of at least 135

9    months' incarceration.  And let me just say a word on the

10   recommended sentence.

11        The government very carefully considered what sentence

12   to recommend here today.  As this Court knows, it's incredibly

13   hard to take into account all of the specific features of a

14   case and of a defendant.  Among other things the government

15   considered, the guidelines range that we believe applies, and

16   compared defendants whose conduct most resembled the

17   defendant's conduct in this case.  And based on those

18   considerations, we believe that a sentence of at least 135

19   months reflects the conduct appropriately, is consistent with

20   other similarly situated defendants, and fully respects the

21   jury verdict.

22        And, your Honor, just to directly respond to an

23   accusation that was made in the defendant's reply brief

24   yesterday, the government is not seeking 135 months simply

25   hoping that the Court will split the baby to get the 60 months

PA3ACom2

1    recommended by probation.  That's not the case at all.

2    Respectfully, we believe that probation's recommendation of 60

3    months does not adequately account for the separate harms to

4    Cassie and to Jane.

5           We are seeking this sentence because we think it's the

6    right sentence for the Court to impose given all the factors

7    that I just mentioned.

8           So I want to just lay out how I intend to structure my

9    remarks this morning.  First, I want to speak about the offense

10   of conviction.  The defense has tried to turn this into a

11   technical violation, just a minor consequence of a sex, drugs,

12   and rock and roll lifestyle.  This is a gross

13   mischaracterization of the conduct.  The offenses of conviction

14   are serious federal crimes.  Other defendants convicted of Mann

15   Act defenses involving abuse and violence receive significant

16   sentences.  Sentences similar to what the government is

17   recommending today.  And that's because this is not just a case

18   about transportation for prostitution.  It's a case about

19   transportation for prostitution and violence.  The defendant

20   admitted to the violence at trial.  And to not account for it

21   now would be to let the defendant get away with years of

22   domestic violence and abuse.

23          The second thing I want to focus on, is to zoom out

24   and speak about the people that were harmed by the defendant's

25   offenses, Cassie and Jane specifically, but multiple others

PA3ACom2

1    were subject to the defendant's abuse and violence.

2          And, finally, I want to speak about the other 3553(a)

3    factors, including deterrence and the history and

4    characteristics of the defendant.

5          Throughout these proceedings, I think it's clear that

6    the defendant doesn't understand or appreciate the gravity of

7    his criminal conduct.  Even now at sentencing for his

8    convictions on two federal crimes for which he sought

9    acceptance points, he doesn't fully grapple with how his

10   actions got him here.  His respect for the law is just lip

11   service.

12         The defendant himself made this point clear.  He's

13   facing a maximum sentence of 20 years.  The probation office

14   recommends 60 months, and the government is asking for over 11

15   years.  And yet, as his supplemental submission on Wednesday

16   indicated, he has booked speaking engagements in Miami for next

17   week.  That is the height of hubris, your Honor.  Assuming this

18   Court is going to ignore the guidelines, ignore the law, ignore

19   the recommendation of the probation office, and the government

20   and just let him be in Miami on Monday, that is the opposite of

21   demonstrating respect for the law.

22         Focusing first on the nature and circumstances of the

23   offense, and particularly the scope of the conduct, which is

24   staggering.  The defendant's criminal conduct was not

25   incidental or casual or a momentary lapse in judgment.  The

PA3ACom2

1    defendant engaged in freak-offs and hotel nights from 2009

2    until 2024.  That's 15 years.  And freak-offs and hotel nights

3    happened all the time, often on a weekly basis.

4         The defendant was responsible for transporting many

5    individuals across state lines to participate in the freak-offs

6    and hotel nights.  And as the trial record made clear,

7    sometimes several escorts were transported for the same event.

8    That's a lot of freak-offs and a lot of hotel nights, and it's

9    a lot of travel for freak-offs and hotel nights.  And the

10   defendant knew that this was illegal.  His lawyers may have

11   tried to argue that this wasn't prostitution, but just as this

12   Court knew it was, the defendant knew that it was, too.  He

13   knew that he was engaging in illegal conduct over and over

14   again, but he did it anyway.  Our criminal justice system does

15   not let people do that without consequences.

16        So, your Honor, the scope of the conduct is

17   significant and it separates the defendant from many other

18   defendants who are sentenced for Mann Act convictions, which

19   I'll talk about more in a moment.  But the most remarkable

20   thing about the manner in which the defendant committed the

21   offenses is the abuse, the violence.  The freak-offs and hotel

22   nights took place in the context of long-term relationships.

23   The defendant tries to paint these relationships as mutual, but

24   the record speaks for itself.

25        The Court heard Cassie testify about having a

PA3AСom2

1   freak-off as she was overdosing on drugs.  What's mutual about

2   that?  Or Jane begging to use a condom to have sex with a

3   stranger, and the defendant refusing her.  Cassie being beaten

4   in the bedroom while an escort sits in the living room waiting

5   for another session.  There's nothing mutual about that.

6        These relationships were abusive.  Time and again the

7   defendant exploited power dynamics, physical violence, and

8   financial control over Cassie and Jane to get what he wanted.

9        Now, the Court was very understandably interested in

10  other defendants convicted of Mann Act defenses, and I just

11  want to spend a moment speaking about similarly situated

12  defendants.  This is all laid out in the papers, as you noted,

13  several hundred pages.  But looking at these cases, there are a

14  couple of high-level takeaways that I think are worth noting.

15       First, mathematical equations matching up the count of

16  conviction and criminal history is certainly an interesting

17  exercise, but I think it ultimately provides limited value, and

18  that's because sentencing is an inherently fact-specific

19  exercise.  That's what the statute contemplates and that's what

20  the Supreme Court instructs.  3553(a) directs the Court to

21  consider the need to avoid unwarranted sentence disparities

22  among similarly situated defendants, but even that provision

23  relates to defendants who have committed "similar conduct."  So

24  we have to focus on the conduct.

25       And this brings me to my second point.  When you look

PA3ACom2

1  at the conduct here and compare it to the facts of other Mann

2  Act cases, the defendant is most similarly situated to other

3  defendants who have used violence and other abuse, even when

4  that abuse isn't directly tethered to the prostitution.

5        Several of those cases are highlighted in the

6  government's submission.  They are the cases in which the

7  defendants have physically and emotionally abused victims of

8  Mann Act offenses.  As your Honor undoubtedly sees, many of

9  these cases apply the same cross reference that the government

10  believes applies here.  We understand the Court's ruling on

11  that issue, but this brings me to my third point, which is that

12  even in cases that decline to apply that cross reference,

13  significant sentences are handed down when there's evidence of

14  abuse and manipulation, or otherwise extensive conduct,

15  including in this district.

16        And I just want to draw your attention, your Honor, to

17  the *Dillon Jordan* case, which is a case from this district.

18  It's at 21 Crim 423, and it was in front of Judge Cronan

19  recently.  That case involved a defendant who was convicted of

20  a Mann Act conspiracy for his role in running an international

21  prostitution business for approximately seven years.  It was

22  charged as a 371 conspiracy, so that had a statutory maximum

23  sentence of 60 months.  And the conduct at issue in *Jordan* is

24  similar to the conduct here.  In *Jordan*, the defendant love

25  bombed victims and gave them drugs to decrease their inhibition

PA3ACom2

1    and get them to engage in unwanted sexual encounters with other

2    men.  Jordan was also in a romantic relationship with one of

3    the victims who explained her fear of Jordan's sexual abuse in

4    a way that's very reminiscent of Cassie and Jane's testimony.

5    Specifically, this victim testified that Jordan physically

6    abused her and emotionally manipulated her.  Jordan told the

7    victim to keep going despite the victim not wanting to engage

8    in sex.  And Jordan's promise of exciting events would end in

9    abuse and drug use and unwanted sex.

10        And just to be clear, I think I misspoke, your Honor,

11   the victim I don't believe testified.  I believe that that came

12   from a victim impact statement.  There was no trial in this

13   case.

14        The relevant guideline in the *Jordan* case was 2G1.1,

15   which is the same guideline here, and the guidelines range was

16   21 to 27 months' imprisonment.  In fashioning the sentence,

17   Judge Cronan considered the duration of the conduct, which was

18   almost seven years of transporting women for prostitution, and

19   he also considered the exploitative nature of the conduct and

20   the devastating permanent harm suffered by the victims, as well

21   as the need to prevent harm for future victims.  And in

22   considering all of those things, Judge Cronan imposed an above

23   guidelines sentence of 60 months.  In other words, the

24   statutory maximum sentence.  And said that, based on the

25   offense here and the charge -- this is a quote -- "he very well

PA3ACom2

1   may have gone higher than five years if he had the authority to

2   do so."

3         We submit, your Honor, that the *Dillon Jordan* case is

4   the most comparable case in this district.  And that case, the

5   conduct only lasted for seven years, which is of course half

6   the duration of the defendant's conduct here.  But this is one

7   of the very few Mann Act cases in this district that has

8   anywhere near the level of abuse that's at the heart of the

9   defendant's conduct here.

10       THE COURT:  In *Jordan*, am I correct that the defendant

11   had been convicted and imprisoned in Cuba in the years

12   immediately preceding the offense conduct on charges arising

13   from a similar prostitution business, and that foreign

14   conviction was not included in the criminal history

15   calculation, and so that was one of the grounds under which

16   Judge Cronan had varied upward?

17       MS. SLAVIK:  Yes, your Honor.  That is correct.

18       The defendant in that case had served a term of

19   imprisonment in a foreign country, and that did not count

20   towards his criminal history.  And so your Honor is correct

21   that the judge did consider that as well as the other factors

22   that I just mentioned, the duration of the conduct, the serious

23   and permanent harm to the victims, and the threat of future

24   harm and general deterrence concerns in fashioning -- in

25   imposing the 60-month stat max sentence.

PA3ACom2

1          THE COURT:  So, to be fair, in that case, there was

2     the prior conduct and conviction in a foreign jurisdiction,

3     that's a distinguishing feature, but you say on balance, the

4     circumstances of that case most closely resemble this one?

5          MS. SLAVIK:  Exactly.  Considering the extensive abuse

6     and other conduct in that case, yes.

7          THE COURT:  All right.  And so the sentence imposed

8     there was 60 months.

9          MS. SLAVIK:  Which was the stat max.  And as I noted,

10    Judge Cronan noted if he had the authority, he may well have

11    gone higher.

12         THE COURT:  All right.

13         MS. SLAVIK:  So that case is similar to this case in

14    the involvement of violence and abuse.  But even cases that

15    don't involve violence are met with significant sentences in

16    this district.

17         And I want to point your Honor to the *Mi Sun Cho* case,

18    which I think supports our recommendation for a substantial

19    sentence.  In that case, there was no allegation of violence,

20    but the defendant still got an above guidelines sentence of 70

21    months.  The guidelines range in that case was 51 to 63 months,

22    and Judge Wood imposed a sentence of 70 months.  Judge Wood

23    there noted the seriousness of the offense and the societal

24    harm caused by facilitating prostitution.

25         So the defendant there, I believe, also had some

PA3ACom2

1    limited criminal history in connection with previous

2    prostitution offenses, but I think the point is, even

3    prostitution cases that don't involve violence get significant

4    sentences in this district.

5           And, finally, on the similarly situated defendant

6    point, the cases in the defense chart and in their submission I

7    think are just unlike the facts and circumstances of the case

8    here.  Many of the cases that appear on the chart don't involve

9    violence.  Many just don't involve the same duration of conduct

10   or the same level of culpability.  So I think relying on the

11   means and medians generated from those cases without

12   significantly deeper analysis would generate disparities

13   because the defendant is so much more culpable than those

14   defendants.

15          Comparable cases, as I'm sure your Honor has found,

16   certainly probation noted this, comparable cases on all fours

17   are difficult to find here.  But Mann Act cases involving fear,

18   violence and threats routinely get significant sentences.

19   There is a lot of information to weigh in looking at all of

20   these cases, but I think the point is simple.  Even though the

21   defense wants to frame this as a simple transportation case,

22   that's not what it is.  It's a transportation case with major

23   aggravators, including uncontested violence.  The Court should

24   account for that with a serious sentence that's comparable to

25   sentences given in cases with violence in this district and in

PA3ACom2

1    other districts.

2        I want to move on to the harm to the victims.  As I

3    mentioned, the violence in this case was uncontested.  The

4    conduct here very clearly involved violence.  This evidence is

5    largely undisputed and that's because the evidence of what the

6    defendant did is overwhelming.  The defendant's abuse of Cassie

7    was pervasive.  He hit her.  He kicked her.  He threw her into

8    walls and on the ground.  He stomped on her face.  He dragged

9    her by the hair.  The video of the defendant's assaults of

10   Cassie at the InterContinental Hotel was played multiple times

11   during the trial, and it never got easier to see.  The

12   defendant threw Cassie to the ground and kicked her as she lay

13   motionless, just waiting for it to end.  That was just one of

14   many violent outbursts, but one that took place in a public

15   hallway in a Los Angeles hotel in the middle of the day.

16   Imagine how much worse it was behind closed doors.

17       The defendant's physical abuse of Jane was limited to

18   a single incident, but it was a brutal incident.  He kicked

19   down doors.  He choked her.  He punched her.  He kicked her.

20   He slapped her.  He did all of this just over a year ago when

21   he knew that he was under federal investigation.  And,

22   critically, the defendant did not deny abuse.  In fact, a

23   central theme at trial for the defense was owning the abuse,

24   owning the violence.  But the superficiality of that claim

25   couldn't be more clear.  He owned that violence only insofar as

PA3AKCom2

1    it benefited him.

2         Throughout the defendant's multiple sentencing

3    submissions, the defendant grossly downplays the violence, but

4    it happened and it was real.  And the Court's sentence has to

5    reflect that brutal violence that the defendant perpetrated

6    against Cassie and Jane.  Admitting to violence in front of a

7    jury as part of a trial strategy, that's not accountability.  A

8    substantial sentence is.  And now is the time that the Court

9    can and must account for that violence.

10        But the physical violence isn't the only abuse that

11   the defendant was responsible for.  Freak-offs and hotel nights

12   were extended performances of sexual degradation and

13   humiliation.  Neither Cassie nor Jane wanted to have sex with

14   strangers.  They testified to that repeatedly.  The only person

15   that they wanted to have sex with was the defendant.  But that

16   wasn't enough for the defendant.  He insisted on subjecting

17   them to significant risk to their health, safety and dignity by

18   making them engage in freak-offs and hotel nights for hours and

19   hours.  The defendant had an escort urinate in Cassie's mouth

20   while she choked and put her hands up to make it stop.  He

21   wouldn't let Jane stop after she had already had sex with two

22   men and vomited because she wasn't using drugs to help her get

23   through the experience.

24        This type of harm is real.  It's a deeply intimate and

25   personal harm that affects victims significantly.  We don't

PA3AСom2

1   need to speculate about the impact to Cassie or Jane.  Cassie's

2   victim impact statement makes very clear that despite ending

3   her relationship with the defendant seven years ago, she is

4   still dealing with the consequences of his abuse.  She still

5   has nightmares and flashbacks of the abuse she endured for ten

6   years, in addition to the permanent scars on her body.  The

7   horrors of what she endured drove her to have suicidal

8   thoughts, which she almost acted on.

9        Jane's text messages and notes to herself make clear

10   the anguish and trauma she experienced in her relationship with

11   the defendant.  She, too, had thoughts of wanting everything to

12   go black as she testified at trial.  But Cassie and Jane

13   weren't the only ones to suffer long-lasting harms from the

14   defendant's abuse.  Multiple witnesses testified about the

15   physical, sexual, and psychological abuse that they endured.

16        Mia writes that the defendant stripped her of her

17   freedom, safety, identity, instincts, and autonomy, which led

18   to lasting psychological scars, PTSD, depression, and crippling

19   anxiety.

20        Deonte Nash was also a victim of the defendant's

21   abuse, and writes that the defendant's brutality caused lasting

22   damage to him and other members of his inner circle.

23        Capricorn Clark writes that when she spoke up about

24   the defendant's abuse, he blacklisted her from the industry,

25   stopping her promising career in its tracks.

PA3ACom2

1          Jourdan Atkinson wrote about the abusive working

2     environment and how the defendant's verbal, psychological, and

3     physical abuse affected her.

4          The defendant's abuse was consistent.  Casual even.

5     But life altering for those on the bruised end of it.  It

6     affected these people in very real and very serious ways.

7          The defendant has claimed that he's moved on, that he

8     now has full control over his emotions and anger.  There are

9     reasons to view that representation skeptically, but it's

10     important for the Court to recognize that his victims don't

11     have that luxury of moving on so easily.  They're still picking

12     up the pieces.

13          I want to move on to the history and characteristics

14     of the defendant as well as the need for deterrence here.  For

15     the conduct that I've just described, the defendant has not

16     adequately acknowledged responsibility.  Despite all the

17     evidence of domestic violence that was presented at trial, that

18     the defendant freely characterized as domestic violence, he now

19     tries to walk away from it.  He downplays the abuse, calling it

20     rare, and blaming just about anyone besides himself for beating

21     his girlfriends.

22          But the defendant's physical abuse was not rare.

23     Cassie's testimony made that very clear.  From early in their

24     relationship, the defendant was frequently physically violent

25     with her at any perceived slight.  Footnote 52 of the

PA3ACom2

1   government's submission lists over a dozen times in which the

2   defendant was violent with Cassie — in hotel rooms, at

3   freak-offs, at parties, on vacation, in private, in public.  It

4   didn't matter.  And these aren't the only incidents in the

5   trial record.  And no doubt there are countless others.  To say

6   this violence is rare evidences a fundamental misunderstanding

7   of how serious and how dangerous the conduct is.  Once is bad

8   enough.  Dozens and dozens of time is something the public must

9   be protected from.

10      The defendant suggests that the violence was the

11  result of mutually toxic relationships, but there was nothing

12  mutual about the dynamics of these relationships.  The

13  defendant held all the power.  You saw the photos of Cassie and

14  Jane with injuries, bruises, black eyes, gashes.  You saw zero

15  photos of the defendant with injuries.

16      And the mutually toxic relationship excuse does

17  nothing to explain the instances of violence that he committed

18  against other people, people other than his romantic partners.

19  So blaming mutually toxic relationships is nothing more than

20  victim blaming.  Plain and simple.  But the defendant doesn't

21  stop at victim blaming.  He also blames physicians were

22  overprescribing medications.  He blames the drugs and alcohol

23  that he freely consumed and gave to others, and he blames

24  psychological challenges for his violence.

25      Even in his submission last night, his remorse was

PA3ACom2

1    qualified.  He talks about my domestic violence will always be

2    a heavy burden that I will forever have to carry, like he's the

3    victim in this scenario.

4         And with Jane, the defendant claims that he only just

5    realized that he hurt her after hearing her testimony.  But

6    what about the dozens of text messages when she told him that

7    she didn't want to do hotel nights?  That her spirit and soul

8    were tired.  That he treated her like an animal.  That hotel

9    nights were hurting her entire being.  What about when he

10   kicked her legs out from under her and held her in a chokehold?

11   He didn't realize he was hurting her then?  Your Honor, this is

12   not a person who has accepted responsibility.  He hasn't

13   accepted responsibility for his criminal conduct.  And as your

14   Honor noted earlier, he has not accepted responsibility for the

15   offenses of conviction either.

16        To be clear, the government is not faulting him for

17   exercising his Constitutional right to go to trial.  But it is

18   relevant to deterrence in particular, whether the defendant

19   shows any recognition that he's done anything wrong.  The

20   obvious answer to this is no given that at every point in time

21   in this case, he has denied guilt under the Mann Act.  And

22   despite that, he has even sought acceptance points, which the

23   Court correctly rejected.

24        The defendant has continued to insist that he paid

25   escorts for their time, not for prostitution.  This is a

PA3ACom2

1  ridiculous argument that the jury clearly rejected by returning

2  verdicts on the Mann Act counts.  He knew at the time that his

3  conduct was wrong and illegal.  That's why he asked escorts if

4  they were cops, and that's why he told Cassie to do the same

5  thing.

6        It's as though he does not think that the law should

7  apply to him.  The Court should have no comfort that the

8  defendant is in the right mindset or committed to changing his

9  ways.

10       The defense argues that he is unlikely to recidivate,

11 but the conclusions drawn by the psychiatrists that were hired

12 by the defendant should be given little credence.  The

13 government's view is that the information provided to those

14 experts was incomplete, and that's in part because the

15 defendant dramatically minimized his conduct in the interviews

16 with those psychiatrists.  The Court has that information.  The

17 Court can make that assessment for itself.  But the undisputed

18 record shows that this is a defendant who will pose a danger at

19 any age.  Case in point, when the defendant hit, kicked,

20 punched and choked Jane in June 2024, he was 54 years old and

21 he knew that he was under federal investigation.  The evidence

22 shows that when his control is challenged, he reacts

23 unpredictably and abusively.

24       The last 3553(a) factor that I want to talk about is

25 general deterrence, which is particularly important here

PA3ACom2

 1   because this is a difficult crime to detect.  The actual act of

 2   prostitution as well as the abuse and exploitation happens

 3   behind closed doors.  As the Court noted in its Rule 29 ruling,

 4   prostitution carries a host of ills, including drugs, pimping,

 5   physical abuse and rape, all of which were at issue here.  But

 6   these problems are difficult to detect because it happens out

 7   of public view and depends largely on the courage of victims

 8   coming forward.

 9        The only way to reduce demand for prostitution and

10   prevent harmful secondary effects associated with prostitution

11   is to make sure that when sentences are imposed, they

12   appropriately reflect the seriousness of the offense.  And the

13   only way to encourage victims of this sort of abuse to come

14   forward, particularly when their abuser is wealthy and

15   powerful, is to impose a significant sentence reflecting the

16   harm caused to those victims.

17        Your Honor, today, the Court has the opportunity to

18   send a message to the victims in this case, to all victims of

19   abuse and exploitation, and to the public, that the defendant's

20   crimes are serious, that victims matter, and that people who

21   abuse, exploit, and manipulate will be punished.

22        The Court's sentence has the power to encourage or

23   deter abusers from committing devastating harm, to encourage

24   victims of abuse to come forward, and to encourage victims to

25   trust the criminal justice system and the Courts.

PA3ACom2

1          For all these reasons, your Honor, and for the reasons

2     set forth in our submission, the government submits that a

3     sentence of at least 135 months of imprisonment is necessary

4     and warranted.

5          THE COURT:  Thank you, Ms. Slavik.

6          Mr. Agnifilo, do you need a moment before you go, or

7     are you ready?

8          MR. AGNIFILO:  Yeah.  We will take a moment, Judge.

9     Thank you.

10         THE COURT:  Let's take five minutes and come back.

11         (Recess)

12         THE COURT:  Please be seated.

13         MR. DRISCOLL:  Good morning, your Honor.

14         THE COURT:  Mr. Driscoll you may proceed.

15         MR. DRISCOLL:  Thank you.  And before I begin, it's

16    nice to be back in your courtroom and I appreciate you being so

17    permissive with the microphone today.

18         I'm going to talk about sentencing disparities, which

19    is Section 3553(a)(6).  And just taking a step back for a

20    moment, your Honor ruled on the guidelines range.  And what

21    3553(a) teaches us is that the guidelines range is just one

22    factor.  There's a separate section, (a)(6), that counsels that

23    the Court must also fashion a sentence recognizing the need to

24    avoid unwarranted sentence disparities.  Why?

25         The guidelines were designed to create uniform federal

PA3ACom2

1   sentencing practices.  So why do we need (a)(6)?  And the

2   recognition there is that a technical, mechanical, blind

3   reliance on the guidelines can actually create disparity.  And

4   respectfully, your Honor, if you applied the guidelines range

5   that you find today in this case, that would exacerbate serious

6   disparities in federal Mann Act sentencing.

7          This is a case in point.  For 75 years, long before

8   Sean Combs was even born, the Department of Justice has said,

9   "as a general rule, prosecution should not be instituted in the

10  so-called noncommercial cases." The Department of Justice

11  recognized commercial gain as a serious aggravating factor, and

12  the government does not dispute today that Sean Combs did not

13  make a single cent off of his Mann Act offense conduct.  That

14  aggravating factor, it's completely off the table in this case.

15         Now, that brings me to the *Jordan* case the government

16  just cited.  Respectfully, it is not comparable to this case at

17  all in any way.  In *Jordan*, the defendant received a 60-month

18  sentence.  As your Honor just noted, he served eight years in a

19  Cuban prison for sex crimes prior to committing that offense.

20  In other words, that was his second chance.  He got out of

21  jail.  He did it again.  But his offense conduct looks nothing

22  like Sean Combs.  That defendant ran an international

23  prostitution ring over a span of seven years.  He recruited

24  dozens of young, vulnerable women to be prostitutes.  He had

25  over 100 clients.  He made $1.4 million.  Do you know how many

PA3ACom2

1    commercial sex acts you need to sell, how much abuse, how much

2    suffering women have to go through for you to make $1.4 million

3    off of Mann Act conspiracy violations?

4           Mr. Combs' offense is nothing like that.

5           Jordan's case was worse in other ways.  Three of the

6    victims reported unwanted sexual advances and other forms of

7    traumatization.  One of the victims there was actually raped by

8    the defendant after being drugged.

9           Notably, your Honor, back to my initial point about

10   overly technical application of the guidelines, the government

11   didn't even seek the fraud or coercion enhancement in that

12   case.  This office, the Southern District of New York, didn't

13   even seek the fraud or coercion enhancement based on my reading

14   of that case.  And it was not applied.

15          The government also mentions the *Mi Sun Cho* case.  And

16   respectfully, again, that case is nothing like this case.  *Mi*

17   *Sun Cho* was an international prostitute broker of sorts.  She

18   had connections to brothels and other sex trafficking rings,

19   and she, too, profited from the offense.

20          Worse, this was her fourth time dealing with the

21   criminal justice system.  I believe she had three prior

22   instances of arrests for prostitution, one of which resulted in

23   a suspended one-year sentence.  Again, a court gave her, in

24   that case, a fourth chance and she blew it.  So she got a

25   60-month sentence.

PA3ACom2

1          The offense conduct in these cases is no doubt more

2     heinous.  They are recidivists, in some instances serious

3     recidivists, who were given second, third, or fourth chances.

4     And, respectfully, they're simply not comparable.  The 60-month

5     sentence in *Jordan* and the 70-month sentence in *Mi Sun Cho*,

6     they grossly overstate what would be appropriate in this case.

7          The government mentions violence, and this is a theme

8     that they harp on over and over and over again as one of the

9     most aggravating factors here.  In our reply brief, your Honor,

10    we mentioned multiple cases in which there were serious

11    allegations of violence, and defendants received sentences akin

12    to what the defense is asking for here, and we think those

13    cases are representative of what is appropriate in such a case.

14    But there are many others.

15         I would cite the *Saulsberry* case, that's 19-cr-691

16    from the Western District of Texas.  There, the defendant

17    received a 27-month sentence.  He met a woman on Facebook who

18    he drugged and transported.  He coerced her into at least three

19    instances of prostitution with other men through threats of

20    violence, and one of the victims eventually fled to seek help

21    from law enforcement.

22         I would point to the *Clemons* case, 14-cr-134 out of

23    the Middle District of Florida.  That defendant also received a

24    27-month sentence.  He solicited two victims under the guise of

25    working for him as dancers, enlisted them as prostitutes.  He

PA3ACom2

1    took their IDs.  He used force and threats to cause them to

2    engage in prostitution.  He hit one victim, slammed another,

3    took her phone, and used gesturing acts of violence to coerce

4    women, even when they did not want to work because they were

5    menstruating.

6         I cite the *Pierson* case, 22-cr-136 out of the Central

7    District of California.  Another 27-month sentence for a

8    defendant in criminal history category III.  There, one of the

9    victims complained about severe eye pain from an eye injury and

10   the defendant said, no, you need to thug for one more night.

11   The government there argued that there was evidence that the

12   defendant assaulted another victim and even threatened to fire

13   her and kick her out of her home that he was paying for to

14   render her homeless.

15        These are just examples of cases of heinous acts of

16   violence or coercion in which defendants are given sentences

17   far below what the government is asking for here and far below

18   the guidelines range that the Court has calculated.

19        Judge, I reviewed every single Mann Act case that's

20   available on PACER.  There were over 900, and we submitted to

21   your Honor's court a list of 378 where the defendants were

22   actually convicted and sentenced of Mann Act conduct.

23        What does the Department of Justice actually do with

24   the Mann Act?  Your Honor, you said in your post-trial motions

25   and ruling that this is a heartland case.  And, respectfully, I

PA3ACom2

1    don't know if that's exactly what you meant in the ruling, but

2    this is not a heartland case.  And on that point, actually, the

3    PSR agrees with the defense.

4         The Mann Act is used in certain categories of cases

5    where there are minors being abused, where there are sex and

6    human trafficking rings, where there are brothels or sole actor

7    pimps who coerce women into a life of prostitution.

8         The victims in these cases also share common themes.

9    Most of them are immigrants with unlawful status here in the

10   United States.  They have no families.  They have no friends.

11   They have no homes here or any reliable source of income, and

12   they find their way into a life of prostitution, normally

13   because the defendants trick them into that working

14   arrangement.

15        Many of the victims are drug addicts who are plied

16   with drugs to not only fuel their addictions but also to

17   continue coercing them into a life of prostitution.  Many

18   victims are homeless or mentally ill.  I saw many cases in

19   which defendants had bonded women out of prison and then forced

20   them into prostitution.  Otherwise, they would be forced to

21   return.

22        THE COURT:  What do you say to the government's

23   argument, you mentioned pimps, that Mr. Combs acted in this

24   case like a pimp who coerced two women into over a decade

25   collectively of prostitution?  Why doesn't that fit into the

PA3ACom2

1    kinds of cases that you're talking about that would be within

2    the heartland of the statute?

3             MR. DRISCOLL:  Because all pimps, your Honor, share

4    one of the most culpable aggravating factors in Mann Act cases.

5    They make money prostituting women.  The defendant, it's

6    undisputed, again, he did not make money off of his Mann Act

7    offense conduct.  The government says he somehow benefited from

8    power and control.  And that's just a spin on the argument that

9    they tried to convince the jury of.

10            They said that he used his power and control to

11   somehow coerce these women.  Now they're saying -- the jury

12   rejected that argument flatout.  Now they're saying, well, he

13   actually did the offense for power and for control because

14   those are somehow things he liked.  That's not why pimps engage

15   in prostitution.  And I think we'll talk about this later when

16   we get to deterrence, and specific deterrence.  Profit motive

17   is essential in Mann Act cases, because a lot of these

18   defendants, they make their living off of a life prostituting

19   women.  It's a reliable source of income for them.  It

20   increases their chances of recidivism.  And it provides a

21   motive for other pimps to join in on the conduct.  That's not

22   this case.

23            So that's my response to the government when they try

24   to equate Sean Combs to a pimp.  He's not, and he did not

25   commit this Mann Act offense conduct in any way for any type of

PA3ACom2

1    personal gain.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PA3MCOM3

1        MR. DRISCOLL:  Judge, Exhibit 68 is a list of cases

2   where defendants share Mr. Combs' criminal history category and

3   2G1.1(a)(2) applies, which is the guideline that you were

4   applying in this case.

5        The median sentence in those cases, I know you know

6   this, it's 12 months and a day.  In other words, it's shorter

7   than the time that Mr. Combs has already served.  The average

8   of those cases is 14.9 months.  And if you just limit it to

9   cases in which the fraud coercion enhancement is applied, which

10  again, your Honor, we respectfully object, but if you just

11  limit the list to those cases, the average sentence is 28

12  months.  That's substantially lower than the guideline range

13  the Court has calculated in this case.

14       There are certain other enhancements that is

15  motivating the range here, and I'd like to talk about them.

16  Because if they in any way factor into the ultimate sentence,

17  that too would create an unwarranted sentence disparity.

18       I'll start with the grouping enhancement, the victim

19  grouping.  That adds five levels to Mr. Combs' offense level,

20  according to the Court.  I have seen dozens, maybe hundreds of

21  cases in which there are multiple victims, sometimes dozens,

22  sometimes hundreds.  The government does not seek a grouping

23  enhancement.  The Court does not impose one and the sentence

24  does not end up reflecting one.

25       One comparable case is the *Nabit* case.  There, it was

PA3MCOM3

1    undisputed there were seven victims.  There was no grouping

2    enhancement applied.  The defendant was sentenced initially to

3    18 months and released after just nine months.

4          With respect to the organizing role enhancement, I'd

5    cite the *Revoredo* case, your Honor, that's 18 CR 20376 out of

6    the Southern District of Florida.  There the defendants

7    operated a widespread prostitution network.  They recruited

8    dozens of women from Central and South America, they employed

9    many others who organized the travel and the prostitution, and

10   their operation generated at least $1.8 million.  Both

11   defendants were sentenced to 15 months.

12         In the *Compos Mario* case, that's 11 CR 578, Eastern

13   District of Virginia, there the defendant admitted to

14   trafficking between 50 and a hundred women as the leader of an

15   international prostitution ring.  His conduct spanned at least

16   five years.  He fled the country after he was arrested and was

17   only arrested a decade later.  In that case the women that he

18   employed would service about 30 clients a day, and they would

19   charge about $30 for 15 minutes of commercial sex.  He was

20   sentenced to 18 months after serving, I think, six or seven

21   months in extradition proceedings.

22         So, again, back to my initial point, your Honor, a

23   blind reliance on the guidelines, it can exacerbate sentence

24   disparities, and that's why 3553(a)(6) instructs the Court to

25   equally consider sentence disparities, regardless of the

PA3MCOM3

1    guidelines.

2            Judge, there is a whole other category of cases that

3    the defense submits is more akin to Sean Combs' offense

4    conduct, and those are the four John cases that we cited for

5    the Court in our papers.  The average sentence among those

6    individuals is 6.7 months.

7            I just want to highlight one case, the *Nabit* case,

8    which we briefed, and then another case that we haven't

9    briefed.  In the *Nabit* case, the government says that there

10   were no significant aggravators in any of the cases in Exhibit

11   68, and, respectfully, that is a gross misreading not only of

12   the offense conduct in all of those cases but particularly the

13   *Nabit* case.  In their opposition they concede that the *Nabit*

14   case actually shares many of the features of the instant case.

15           I just want to read some of the portions of the

16   government's sentencing memorandum in *Nabit*:  "The defendant

17   berated, degraded, and manipulated the victims.  Victim 1

18   expressed that the defendant was verbally and sexually

19   aggressive towards her.  And despite her being in tears on at

20   least one occasion, the defendant did not stop."  That's from

21   docket number 34 of the *Nabit* case.

22           Another quote:  "The defendant knew the victims were

23   desperate for money, for drugs, food, and/or shelter.  The

24   defendant's manipulative and malevolent conduct is further

25   demonstrated by his repeated payments of just a single dollar

PA3MCOM3

1    at a time to several of the victims until they met his

2    demands."

3          Here is a text that *Nabit*, the defendant in that case,

4    sent to victim 7.  You're a lowlife lying sack of shit.  I

5    meant what I said about making a mold of your pussy.  The rest

6    of you isn't worth a shit.  That victim later died of a drug

7    overdose.

8          THE COURT:  Am I correct that in *Nabit* there was no

9    threat of physical force, that that was one of the things that

10   the Court had acknowledged?

11         MR. DRISCOLL:  That's a conclusion the Court made.  I

12   think the government contested that in the case.

13         Your Honor, I challenge the government here now to

14   point to a single text message in the decades of communications

15   that we saw from the trial in which Sean Combs said anything

16   remotely as heinous and reprehensible as the message I just

17   read.  It doesn't exist.

18         Ms. Slavik just basically blamed Sean Combs for having

19   a drug addiction over the past 25 years.  We find that to be

20   completely inappropriate.  But one of the key themes that you

21   see in Mann Act offense conduct is that the pimps, they don't

22   usually abuse drugs.  They use drugs to abuse others, but they

23   themselves are not users.  I think my colleagues will speak to

24   this, but that in this case is a serious mitigating factor, one

25   that didn't take place in *Nabit*.

PA3MCOM3

 1          I want to talk about one more case.  This is the

 2    *Lamden* case, 13 CR 294, out of the District of Oregon.  And

 3    specifically I want to talk about defendant Riggs.  Defendant

 4    Riggs was a 64-year-old man who was a repeat customer of a

 5    so-called madam who requested one day the services of a

 6    prostitute.  She supplied him with a 14-year-old girl.  Instead

 7    of turning the girl away or telling her to go home to her

 8    parents, he paid for a session of oral sex.  He photographed

 9    the oral sex and later that madam supplied the 14-year-old girl

10    to another John who was a pedophile.

11          This is what the government admitted in that case in

12    its sentencing memorandum.  This is a difficult case and the

13    government understands that all John or buyer cases will

14    present difficult questions for courts at sentencing.  That's

15    from docket 85 in that case.  This court must answer the

16    important question of what penalty is appropriate to punish an

17    adult who buys oral sex from a 14-year-old girl and who

18    memorializes his exploitation of the young girl with

19    photographs.  That's what the government said there.

20          What sentence did Riggs get?  Twenty-four months, half

21    of his guidelines range, and that is significant, your Honor,

22    because when the sentencing commission first drafted the

23    guidelines, they recognized that in a John case, where the

24    defendant is not making money, that equated to a 57 percent

25    reduction on the sentence and that's precisely what the Court

PA3MCOM3

1   did there and what, I respectfully submit, everyone in this

2   courtroom would agree is more heinous conduct than the offense

3   conduct we are dealing with in this case.

4          Your Honor, 3553(a)(6) instructs the Court to consider

5   the need to avoid unwarranted sentence disparities among

6   defendants with similar records who have been found guilty of

7   similar conduct.  I have read all of 900 Mann Act cases

8   available on Pacer.  Sean Combs' case is categorically

9   different.  Of course there are some aggravating circumstances

10  here.  There are many more mitigating circumstances which you

11  will hear about in a moment.

12         But the Court should not dispense with what courts

13  around the country do in these cases all the time.  The

14  government says in Exhibit 68 there is no discernible pattern

15  or logic.  That is not true.  In fact, the sentencing band of

16  those cases, it's rather tight, and, respectfully, for that

17  reason, I submit that a 14-month sentence is the only sentence

18  that would be consistent with the need to avoid unwarranted

19  sentence disparities.

20         That's all I have to say, your Honor, unless you have

21  particular questions.

22         THE COURT:  Thank you.

23         Who is next?

24         Ms. Westmoreland.

25         MS. WESTMORELAND:  Thank you, your Honor.

PA3MCOM3

1          Your Honor, I want to focus on two very important

2    aspects of Mr. Combs' life.  One, I want to focus on the help

3    and inspiration that Mr. Combs has given throughout his life,

4    and I would like to focus on the commitment that he made while

5    at the MDC.

6          Your Honor, you're aware of some of Mr. Combs'

7    business endeavors, and the Court is aware that Mr. Combs was

8    successful.  But I want to speak with the Court about how he

9    used his success to help others.

10         Mr. Combs, in a very positive way, touched many more

11   lives than the Court has been able to hear about over this past

12   year and, frankly, many more lives than I'll probably be able

13   to cover in the next few minutes.

14         When Mr. Combs started his own record label, Judge,

15   there were not a lot of black-owned record labels at the time.

16   Mr. Combs starting his own label as a young black male back

17   then was almost kind of jokeable, but he had the audacity to do

18   it anyway.

19         Mr. Combs poured hisself into that label.  He was a

20   writer, a producer, an artist, and a record label owner.  And

21   by Mr. Combs wearing all of those hats and pouring hisself into

22   that label the way he did, it sent a message.  It sent a

23   message that you can do it.  You do not have to just be signed

24   to a label.  You can be the label.  You do not have just have

25   to choose between being an artist or producer, you could be

PA3MCOM3

1    both, and that you could start a label and make the label

2    successful, no matter what race that you are.

3          Mr. Combs actually owning this label and being able to

4    create a real distribution deal in the music industry, this

5    changed the industry and it changed the culture.  But, more

6    importantly, it changed countless of individuals' lives because

7    what people recognized was that if Mr. Combs could do it, then

8    they could do it too, and Mr. Combs would tell everyone who

9    would listen that they could do it.  He spent so many years of

10   his career in the music industry helping and teaching others,

11   to be the best artist that they could be, writers, producers,

12   try all three, do not be scared, and, very importantly, you can

13   be an owner.

14         The way Mr. Combs inspired the community during that

15   time was like nothing we had ever experienced.  When Mr. Combs

16   entered into the fashion industry, there definitely was not

17   many black-owned clothing lines.  Mr. Combs starting this line

18   showed the black community that you could more than just have

19   an appearance in someone else's line.  You can actually have

20   your own clothing line, and you could actually market it.  You

21   were smart enough to market the line and to make it successful.

22         Your Honor, when Mr. Combs -- I think you heard a

23   little bit about this.  When Mr. Combs was awarded Menswear

24   Designer of the Year, it wasn't just about an award.  It was

25   about breaking barriers.  Mr. Combs was the first black male

PA3MCOM3

1    awarded the award in the award's 23-year history.  And once

2    Mr. Combs received the award, what he spent his time doing was

3    teaching others and helping others create their own clothing

4    line, and it sent a message.  You can do it.

5         I do want to say, your Honor, I want to explain

6    something about Mr. Combs' clothing line.  It was not just the

7    traditional urban streetwear.  It was upscale and it was

8    purposely designed to overcome the preconceived notions that

9    only certain races would wear what.

10        Mr. Combs' clothing line was for all people, and the

11   reason why that's important is because it brought unity.  It

12   inspired change.  The fashion industry no longer just stuck to

13   trends and keeping -- well, if you're from this neighborhood

14   you dress like this, but if you're from this neighborhood, you

15   dress like that.  And implementing this change affected the way

16   that that business is treated to this day.

17        But, your Honor, what's also very important is that

18   after Mr. Combs figured out how to break barriers with his own

19   line, he then helped others open up theirs, young individuals,

20   individuals within his own community that most people would not

21   have given a shot.  But he wanted to show others and help

22   others by sending a message that they could do it too.

23        When Mr. Combs entered into the spirits industry, you

24   have heard about that, Judge, I want to explain to the Court

25   that this was so important because he created a model for black

PA3MCOM3

1    brand collaboration.  And so the message is that we went from

2    association or the appearance of inclusion to actual

3    leadership, and the inspiration that Mr. Combs gave with this

4    endeavor to this day is immeasurable.  Our community finally

5    had a seat at the table, a voice, a real voice.  And after

6    Mr. Combs figured out how to move within that industry, he then

7    moved on to help others.

8         Your Honor, when Mr. Combs started Revolt, it was one

9    of the few black-owned multi-platinum platform network.  It

10   focused on black culture, it focused on social justice, and it

11   gave black journalists the opportunities to have a voice on

12   multiple networks.  This was one of Mr. Combs' missions, to

13   show his community that they are important and that the issues

14   affecting the black community that they are important.

15        Mr. Combs told the world social justice is important.

16   Mr. Combs did not just sit around and enjoy his success,

17   because he could have, your Honor, plenty of people do.  They

18   go out, they start businesses, they make a lot of money, and

19   they enjoy their success, and it is not high on their priority

20   list to help others around them or to help their community.

21        Mr. Combs has spent a lot of time and effort and focus

22   on helping his community, people who are struggling to find

23   their way or constantly hit with barriers, individuals that are

24   trying to achieve their goals and follow their dreams.  He has

25   dedicated so much of his life to breaking the chains of

PA3MCOM3

1    systemic racism.

2           Your Honor, in the media world Mr. Combs inspires so

3    many to follow their dreams in media.  He sent a message that

4    you can do it, and Mr. Combs, although he spends a lot of

5    effort building up his community, he often all the time says it

6    doesn't matter your race or your nationality, we can all do it

7    the same.  He is just trying to help his community also achieve

8    the same heights.

9           When Mr. Combs opened up three charter schools, your

10   Honor, they were in poverty-stricken neighborhoods where the

11   public school systems were inadequate.  They were neighborhoods

12   where these kids were left behind.  The charter schools, they

13   were of high quality.  They were college preparatory focused.

14   And one of the main models of the school was excellence, black

15   excellence.  Mr. Combs focused and dedicated hisself with those

16   schools to give inspiration to the youth because they are our

17   future leaders, and Mr. Combs really felt like this was one way

18   to implement true change.  And he went and he told these

19   students, and by investing in these students' future that these

20   kids, even though you live in a certain neighborhood, that you

21   can be anything that your heart desires and do not let anybody

22   tell you any differently.

23          Your Honor, Mr. Combs has touched the lives of so many

24   through these businesses endeavors and other endeavors.  He has

25   employed thousands, thousands of people.  He has employed

PA3MCOM3

1    individuals of all races, nationalities, gender.  He has given

2    opportunity to inner city individuals who never had real

3    corporate opportunities.

4          Your Honor, Mr. Combs' companies, they were very

5    diverse.  Your Honor, it goes so much deeper for Mr. Combs

6    because he has really inspired the community.  Mr. Combs has

7    inspired generations and generations to follow.

8          For example, Judge, vote or die.  Your Honor, vote or

9    die was focused on convincing young individuals and minorities

10   to vote.  And often the minority individuals and the youth,

11   they were just kind of, they weren't considered the important

12   vote that many of the politicians were going after, but

13   Mr. Combs said no.  He went around to educate minorities and

14   the youth about how important voting actually was and that they

15   had a voice, and they needed to be heard, and this is how you

16   help implement change.  Vote or die changed the way voting

17   campaigns happen to this day.

18         Your Honor, Mr. Combs personally inspired me.  About

19   eight years ago, during the month of September, I was already a

20   lawyer, and I was trying to figure out and find my way.  And

21   one of my main goals is doing something about mass

22   incarceration of the black community.  And so I went to this

23   event in Washington, D.C., and Mr. Combs was there and he was a

24   guest speaker.  I did not know he was going to be there before

25   I arrived, but he was.  And so it is several individuals there,

1    Mr. Combs, and he is speaking and he is giving us advice.

2         And I'm never going to forget.  He said:  Listen,

3    everyone.  Sorry.  He said:  Don't be afraid to dream.  Just

4    remember to wake up and to put actions behind your dreams.  And

5    then he said:  And if you do not remember anything that I'm

6    saying today, remember as you accomplish your dreams, don't

7    forget to help others.  And that changed my life.

8         Mr. Combs is not larger than life.  He is just a human

9    being.  He is just a man.  And he has made some mistakes.  He

10   has flaws, like we all do.  But, Judge, how many of us can say

11   that we have helped so many lives, countless lives, past our

12   family or past our friends, or the people just in our close

13   circle, how many of us has spent decades helping other

14   individuals' lives.

15        This is an important aspect of Mr. Combs' life and it

16   wouldn't be right to take that from him, because he has made

17   mistakes, and it wouldn't be right for the Court not to

18   consider the years of his life that he has given, that he has

19   inspired, and the countless individuals that he has helped.

20        Now, Mr. Combs will be the first to tell you that

21   somewhere along his way that he lost his journey, he lost his

22   way.  But, your Honor, I will tell you that Mr. Combs has been

23   sitting in a jail cell for 13 months.  He is clearheaded, he is

24   drug free, he is determined, he is focused, and he is

25   remorseful.  I can look the Court in the eye and tell you that

PA3MCOM3

1    he's remorseful because I spend almost every single day

2    speaking to Mr. Combs.  Your Honor, he gets it, simply put.

3         Your Honor, I want to move to the work that Mr. Combs

4    has been doing at the MDC.  While at the MDC, after getting

5    hisself together, Mr. Combs came to recognize that many of the

6    individuals around him were actually talented, that many of

7    them were smart and had potential.  A lot of them had just

8    given up on life.

9         Although Mr. Combs was initially and primarily focused

10   on hisself, his personality, he can't help it, he starts

11   wanting to help others, so Mr. Combs started speaking to the

12   individuals that he is housed with and asking them their

13   dreams, asking them their backgrounds.

14        He noticed, number one, that most of them just lacked

15   education, and he couldn't help but notice that at the MDC

16   there weren't many educational tools or programs that the

17   individuals housed with him could take, but so many around him

18   seem hungry for knowledge, daily people there would come up to

19   Mr. Combs and ask him, how did you become successful?  What did

20   you do?  And he would give them advice one by one.  And that's

21   really how Free Game with Diddy was born.

22        Now, coming up with Free Game for Diddy, it was not

23   easy because of the individuals incarcerated with him were very

24   divided, divided by race, by gangs, by association.  And so

25   Mr. Combs went to his unit and he said to them, I tell you

PA3MCOM3

 1   what, I'll do this class, and I'll teach you all everything --
 2   I'll teach you all what I know, but we have to make an
 3   agreement, we have to make a deal.  If I teach you and we do a
 4   class, everybody has to be in the class together.  I won't
 5   teach one group and not teach the other group.  Everyone has to
 6   be in the class together, and you have to agree that you will
 7   be peaceful.  And the unit agreed, so he started teaching the
 8   six-week course on business skills.  Your Honor, this is
 9   change.  This is inspiration.  This had not happened at MDC
10   ever.
11          You know, your Honor, I want to tell you one of the
12   very special aspects of it to me is that, yes, he is teaching
13   business skills.  But what he's also doing is telling
14   individuals incarcerated, inmates, that they are worth
15   teaching.
16          Your Honor, you're in receipt of MDC's evaluation.
17   You had one before.  We submitted another one to you today.
18   And, you know, that evaluation, the staff at MDC, they sat
19   through a class because they really wanted to see, was this
20   real, are individuals learning, what is this about?  And they
21   sat through the class, and they have been monitoring the class.
22          And, your Honor, you saw the work performance.  They
23   said it's excellent, excellent, that so many people -- they are
24   learning, they are learning new skills.
25          And I believe one of the markers on the evaluation is

PA3MCOM3

1  how dedicated has Mr. Combs been to teach in the class, and

2  they gave him the highest mark that's possible because he spent

3  countless hours on that curriculum, and he takes the class very

4  seriously, and he's teaching it.

5       Your Honor, you have read the letters from several

6  individuals that took the class, but I just want to briefly

7  mention two that stuck out to me that I want to tell the Court

8  about.  One is that one of the individuals said, I have someone

9  else writing this for me because I can't read and I can't

10 write, but he just wanted to let the Court know how much the

11 class meant to him and how much it means to him that Mr. Combs

12 basically thought he was worthy of teaching.

13      Your Honor, you received another letter from someone's

14 mother, and they told the Court, it's like I'm looking at my

15 kid again.  I have not seen him this hopeful in years.

16      Your Honor, in closing I am going to say this to the

17 Court.  Mr. Combs can reach so many more on the outside that he

18 can on the inside.  It is of no benefit to anyone to warehouse

19 him in a prison.

20      Unless you have any questions, your Honor, that's all

21 for me.

22      THE COURT:  Thank you.

23      MS. WESTMORELAND:  Thank you.

24      THE COURT:  Mr. Steel, can you give me a general

25 estimate on what's coming next.  At some point we will need to

PA3MCOM3

 1    take a break for lunch, so I am just trying to figure out when

 2    the best time for that would be.  We also need to fix the Live

 3    Note, if we can.

 4              MR. STEEL:  Your Honor, we were going to ask the Court

 5    to permit Mr. Combs' children to speak to this Honorable Court.

 6    It will not be long, though.  Then I was going to ask this

 7    Honorable Court if we can play sentencing Exhibit number 84,

 8    which is the video, which is approximately 11 minutes, 10

 9    minutes, and then I was going to address this Honorable Court

10    on 3553 factors as well.

11              THE COURT:  Would it make sense for us to do those two

12    things and then for us to take a break and then, Mr. Steel, you

13    could speak after lunch?

14              MR. STEEL:  Of course.

15              THE COURT:  Please proceed.

16              MR. STEEL:  Your Honor, with the Court's permission

17    can Mr. Combs, one at a time, or collectively, whatever the

18    marshals say and the Court says, come up to this podium.

19              THE COURT:  Of course.  Please come forward.

20              MR. QUINCY BROWN:  Good afternoon, your Honor.

21              THE COURT:  Good afternoon.

22              MR. QUINCY BROWN:  First off I want to say thank you

23    for reading my letter.

24              THE COURT:  Thank you for sending it.

25              MR. QUINCY BROWN:  My name is Quincy Brown.  I'm the

PA3MCOM3

 1   eldest son.

 2           No matter what, Sean Combs is my father.  This is our

 3   father.  We are going to love him unconditionally through his

 4   struggles.

 5           But in front of you, in front of us is a changed man.

 6   Our father has learned a major lesson.  Week after week we have

 7   seen him evolve.  It's something we haven't seen in 15 years.

 8   He is completely transformed.

 9           Our father will never, ever do anything to jeopardize

10   his freedom.  As his children, we want to thank you, and we

11   only wish to heal together.

12           MR. JUSTIN COMBS:  Good afternoon, your Honor.

13           THE COURT:  Good afternoon.

14           MR. JUSTIN COMBS:  My name is Justin Combs.  I'm the

15   firstborn son of Sean Combs.  Thank you for giving me the

16   opportunity to speak.

17           Your Honor, I ask you to give my father a second

18   chance, a second chance at life, a second chance to right his

19   wrongs, a second chance to be the man that he truly is.

20           This has been the toughest time I have ever been

21   through in my life.  My father is my superhero.  Seeing him

22   broken down and stripped of everything is something I will

23   never forget.

24           My father always told me to believe in God and never

25   question him and God makes no mistakes.  Going through this

PA3MCOM3

 1    tough time, this time probably saved my father's life, as crazy

 2    as it sounds.  He is drug free, he is clear, and he refound his

 3    purpose.

 4         I talk to my father every day and every other hour and

 5    I can truly sincerely say, he is changed for the better.  Your

 6    Honor, I believe my dad still has so much more to give the

 7    world, but even more importantly, so much more to give his

 8    children.  I humbly ask you to see my father the way I do, the

 9    way his family does, and the way he truly is.  Thank you.

10         THE COURT:  Thank you.

11         MR. CHRISTIAN COMBS:  Good morning, your Honor.  My

12    name is Christian Combs.  I'm my father's third son, and I'm

13    the one that people say most likely resembles my pops, not just

14    from obviously how I look, but from my mannerisms and how I

15    interact with people.  And I'm this way because my whole life,

16    my entire life, I studied my dad up and down.  And to me my dad

17    is the greatest man in the world.  He is my hero, always been

18    my hero, and still is my superhero.

19         And my whole life, he has always taught me to treat

20    women with respect.  I've seen him treat my mom with respect

21    and treat her like a queen and that has made me want to treat

22    women like a queen and inspired me to treat women with respect.

23    Throughout my life all I've seen him do is help people, put

24    people in better positions, and take care of people's families

25    and just spread positive energy and be a good person, and I

PA3MCOM3

 1  know that because I've studied him and I know my dad.

 2          Over the past year I had to travel across the country

 3  every week just to see him for two hours.  And in these

 4  conversations is where I really realized that he has changed.

 5  I can tell by his conversations, by the way he carries himself.

 6  He is more patient, more relaxed, more trusting, more

 7  understanding, and he just a better man.  And I know by the way

 8  he carries himself and just by the conversations that he has

 9  changed.

10          Your Honor, I'm asking you not only as his son, but as

11  somebody who has watched him closely throughout every season of

12  his life, and I'm telling you that I see in his eyes, as his

13  twin who has been watching him his whole life, that he has

14  changed.

15          I'm asking you, please, with the utmost respect,

16  please give my family grace, please let my father out to take

17  care and lead this family, please give him mercy and get out

18  and become the man that we all know that he is.  Thank you so

19  much.

20          THE COURT:  Thank you.

21          MS. JESSIE COMBS:  Good afternoon, your Honor.  My

22  name is Jessie Combs, and I'm 18 years old.  I am here speaking

23  with my sisters D'Lila and Janice.

24          I want to start by saying throughout the trial

25  everyone has had their own views on our dad.  We know he isn't

PA3MCOM3

1    perfect, and he has made many mistakes, and we aren't here to

2    excuse any of those mistakes.  But, your Honor, he is still our

3    dad and we still need him present in our lives.

4          When my mother died, I was just a little girl trying

5    to understand along the way too big for words.  I remember my

6    dad sitting us down that day, holding us close, even though his

7    own heart was breaking, and promising that he would always be

8    there to keep us safe, that he would always walk beside us

9    through life.  It was the thing that helped me survive the

10   hardest nights, the birthdays, and the very important

11   milestones we had to experience without her, the moments when I

12   just wanted my mom.

13         MS. CHANCE COMBS:  Good afternoon, your Honor, my name

14   is Chance Combs.  I am Sean Combs' oldest daughter.

15         Your Honor, with our dad incarcerated we have all felt

16   a huge emptiness in our lives.  People often tell my sisters

17   and I how strong and how resilient we have been, and maybe we

18   have had to be.  But, your Honor, we are still just daughters

19   who need our father.

20         Over the past year I have seen my dad change in ways

21   that feel real and lasting.  When we talk he speaks with a

22   clear mind and a sense of purpose that I didn't always hear

23   before.  He is more patient, more thoughtful, and more open

24   about his mistakes.  Instead of making excuses, he talks about

25   how he wants to do better for himself and for us.  He shares

1    the ways he is working on becoming a better man and a more

2    present father.  I could feel the difference in the way that he

3    listens in response.

4              I see this most in the way he parents our two-year-old

5    sister, Love.  This past year I have watched him parent our

6    two-year-old sister from behind bars through calls and brief

7    visits here and there.  Watching him nurture her, even from a

8    distance, has been unexpectedly healing.  I get to see glimpses

9    of the father he was to us as babies, but also breaks my heart

10   because my baby sister deserves so much more than this.  She

11   deserves a father who tucks her in at night, who is there when

12   she wakes up scared, who teaches her to ride a bike, who exists

13   in her daily life, not just a voice on a phone or a visit

14   behind bars.

15        MS. D'LILA COMBS:  Good afternoon, your Honor, I'm

16   D'Lila Combs.  We are scared.  We are scared of the thought of

17   not having our dad nor mom present in our lives.  We are scared

18   for our two-year-old little sister that runs to us every night

19   asking where daddy is and how much she misses him.  We cannot

20   watch our baby sister grow up fatherless the same way we had to

21   grow up motherless.  These are the years she will never get

22   back.  These are the memories she will never have.

23             I know how much those -- sorry.  I know how much those

24   missing years hurt because I lived that with my mother.  I know

25   how they leave a hole that never quite heals.  It's a struggle

PA3MCOM3

1   that many cannot imagine.  We are tired of being strong.  We

2   have already lost so much.  We lost our mother, we lost time

3   with our father, and every day he remains incarcerated we lose

4   more and more.

5           Please, your Honor, please give our family the chance

6   to heal together, to rebuild, to change, to move forward, not

7   as a headline but as human beings who are trying to do better.

8           Thank you for your time and for considering what we

9   have shared today.  It means more than we can express.  Thank

10  you.

11          THE COURT:  Thank you.  Thank you all for those words.

12  I know how hard it was to stand up here and to tell me those

13  things, but it's very important for me to hear.  I really

14  appreciate you all coming up and speaking.  So thank you.

15          MR. STEEL:  Your Honor, with the Court's permission,

16  we would like to display a sentencing exhibit of Mr. Combs,

17  number 84.

18          THE COURT:  Please proceed.

19          (Video played)

20          (Continued on next page)

21

22

23

24

25

PA3ACom4

1          THE COURT:  All right.  Mr. Steel, we're going to take

2     our break now.  Who is going to be speaking after the lunch

3     break?

4          MR. STEEL:  We would like the Court to -- Reverend

5     Dr. Gary Johnson, your Honor.

6          THE COURT:  All right.

7          MR. STEEL:  As well as a gentleman from the reentry

8     program, if the Court permitted.  You said you would consider

9     that.

10         THE COURT:  And are there any other attorneys who are

11    speaking?

12         MR. STEEL:  I apologize, yes.  After I speak, with the

13    Court's permission, Mr. Donaldson, Mr. Agnifilo will be

14    speaking, with the Court's permission.

15         THE COURT:  Very good.  And understood.

16         Ms. Slavik, anything else before we take our break?

17         MS. SLAVIK:  No, your Honor.

18         THE COURT:  All right.  Let's take a break.  We'll be

19    back at 2:00 p.m.

20         (Luncheon recess)

21         THE COURT:  Mr. Steel, you may proceed when ready.

22         MR. STEEL:  Your Honor, I want to especially thank you

23    for allowing me to practice in your courthouse, in this

24    majestic building.

25         As Ms. Westmoreland just discussed with you Mr. Sean

PA3ACom4

1    Combs' life, and Mr. Driscoll talked about the cases.  And I

2    watched the video, which I've watched lots of times.  I sit

3    here with tears in my eyes because I can't believe we're here.

4            Sean has impacted so many, from his family, his local

5    community, America, and the world in such a positive manner.

6    So I ask myself -- and I've done this, your Honor.  I did it

7    during trial.  How did we get here?  How does this happen to a

8    life?  And now we all come to you for your guidance and your

9    wisdom and we trust you to fashion a sentence, because the jury

10   has spoken and we've been convicted of two counts of the Mann

11   Act.  And we come to you, and I tell you that this moral man,

12   the hardest working person that I have ever known, strong man,

13   he's religious, he's a family man.  The way we came here, your

14   Honor, I believe when you fashion your sentence, please

15   consider the following two reasons.

16           I believe we're here because, first of all, there was

17   untreated trauma, great trauma in Sean's life, and a ferocious

18   drug addiction that got out of hand and saw Sean at time

19   flatline.

20           I've represented some people who grew up in total

21   poverty.  They had no food in their cupboards.  They had no

22   clean clothing to wear.  They had no education.  No hope.  And

23   that is not Sean's life.  That is not his life.  But at age

24   three, his father was murdered, not far from your courthouse,

25   and Sean has no memory of his father.  I can't imagine.

PA3ACom4

1          A few years later, his uncle, his mother's brother,

2    overdosed on drugs, a drug addiction that later in life would

3    haunt also Sean.  He was raised in Harlem.  And Sean is now 55

4    years of age, your Honor.  And Harlem in the 1970s was not

5    Harlem today.  Police were afraid to go there.  It was filled

6    with prostitution, drug abuse, shootings, stabbings, killings,

7    gangs.

8          At age 12, his mother, who besides Sean, is the

9    hardest working person I know.  As the Court knows, you've been

10   educated on it, his mother, who is in your courtroom, your

11   Honor, she worked three jobs.  She drove a school bus.  She

12   worked at a clothing store.  And at night, she went to a local

13   facility where people who couldn't use their muscles, stricken

14   with disease, she would care for them, take them to the

15   bathroom, shower them, stroke and brush their hair, play music,

16   touch their skin to try to bring some happiness to people who

17   are otherwise forgotten except by their families.  And she

18   saved up all this money and she moved the family to Mount

19   Vernon.  That's beautiful.  It was beautiful.  It was

20   prosperous.  But there were problems there.  Sean's family was

21   one of the only African American families in the area.  So for

22   the first time, Sean encountered racism.  He was not played

23   with.  He was called the N word.  Doors were shut to him.

24   Teams wouldn't have him.  So he went back to Harlem to stay

25   there during the day with his friends while his mother worked.

PA3ACom4

1             But he got a great education.  And Sean is one of the

2    most intelligent people I have ever met, on every level.  He

3    goes to Howard University, and in his second year, he withdraws

4    because he says I have a vision of something that I can do

5    outside of this educational facility.  Although, he loved

6    Howard University.  But he interns with a record label for

7    free.  He cleans the bathrooms and the toilets.  He gets other

8    people food.  He runs errands.  But he's given an opportunity,

9    your Honor, which is all he wanted.  And he's in the studio

10   with artists.  And his ear is better than everyone's.  And he

11   can tell what is a good album, what is going to be a number one

12   hit.  And how people should change the way that they're singing

13   or the way that the beat is constructed.  And music videos were

14   coming alive at that time.  And Sean would change the fashion

15   and the appearance of the people in the music industries.  And

16   soon, it became obvious that he is a true talent.  He became

17   the head of A&R.  Hit after hit was coming, and Sean's name was

18   known throughout the music industry as a genius.

19           He then started, as Ms. Westmoreland knows and you

20   know, Bad Boy Records.  That becomes arguably the best record

21   label in the world.  And he's finding all the talent, because

22   he has the eye for that and the ear for that.  And he is doing

23   great.  But, your Honor, just like his mother, he will not stop

24   working.  He is working endlessly.  No matter what's going on

25   in his life, he's working endlessly.  But he has rules, and one

PA3Acom4

1    of the rules include no drugs.  There are no drugs in the

2    studio.  Mr. Combs has not had any drugs.  He's anti-drugs.  He

3    would tell people, it's in your work that you're aware of, if

4    you do drugs, you're going to be behind.  Drugs make you

5    stupid.  You can't function on drugs.

6            And then, more trauma.  Not only his father, not only

7    what he sees in Harlem, not only racism, but his best friend is

8    shot in a drive-by shooting in Los Angeles.  His blood is

9    gushing from his body and Sean is holding his best friend.

10   Sean's clothing is soaked with his blood, and his best friend

11   dies in his arms.  A year later, Sean's two roommates in

12   Atlanta are murdered in gun violence.

13           But Sean just keeps working.  He won't stop.  He's not

14   getting treated.  He is angry.  He is upset.  He's hurt.  But

15   he just keeps on working, trying to help others, trying to

16   break racism, trying to breakdown the barriers to business and

17   education and make it fair, but he neglects himself.

18           By year 2000, he has an operation, your Honor, and he

19   gets addicted to the painkillers that he's given to recover

20   from the operation.  Until September 16th, 2024, Sean has been

21   high every single day since those painkillers were prescribed

22   to him.  And the drugs were anything, as you know, we tried the

23   case, you heard all the drugs.

24           He lost his way.  He was medicating because his body

25   was hurt, his emotions were hurt.  But he never stopped

PA3ACom4

1  working.  And all of that, that combined drug addiction and

2  trauma, untreated, your Honor, caused him to hit, on occasion,

3  it was not every day as the prosecutors said throughout the

4  trial, it was not every time.  This is on occasion.  He would

5  hit the woman he loved.  He loved Ms. Ventura.

6      The prosecutors state that he has not taken

7  responsibility.  I have been with Sean more than I have been

8  with my family in the past since I met him.  He has only taken

9  responsibility.  He would not have tried the case if there was

10 a plea offer to the Mann Act.  The prosecutors would not offer

11 that.

12      Every day, your Honor, whether it's the

13 InterContinental video or not, Sean remembers every strike in

14 his mind, and he bangs his head against the wall begging for

15 apology.  He is so remorseful.  He is going to go through the

16 rest of his life carrying that burden, as he wrote to you in

17 his own words.  I have been with Sean when he has prayed, not

18 only for forgiveness for himself, but prayed for healing of

19 anyone that he has harmed or injured.  Sean wants nothing for

20 himself.  This sentence today is not about him.  He wants to

21 get back to his family, to them.

22      The prosecution said you have to send a message to the

23 community.  Sean has been punished severely already.  It is now

24 12 months and 17 days at the MDC in Brooklyn.  Sean is not a

25 typical person in custody.  Everyone knows him.  There are

PA3ACom4

 1  certain people who it's a trophy for them, they get recognition

 2  if they harm him.  As the Court may not know, or may know, and

 3  it's on file, the guards stopped a person who was armed with a

 4  shank who was right on top of Sean and was about to cut him.

 5  Every day he lives in fear.

 6          He has not slept more than two hours consecutively in

 7  the year that he's been in custody as required by the rules.

 8  He has not seen daylight, except when transported to the

 9  courtroom.  There are no windows in his area.  He eats out of

10  bags.  He eats chips all day long.  He lives with approximately

11  25 other people who are incarcerated.  They live in a small

12  area.  It's one room.  In that room, your Honor, if you have

13  gone there and seen it, there's a bathroom, next to the

14  kitchen, and a shower, and the supposed bed that he lays on,

15  the steal area that he lays on, and the TV area.  And they're

16  all there.  And there's drugs there, your Honor.  Sean has not

17  taken any drugs.  He swears he cannot do that.  He needs help.

18  But he cannot go backwards.

19          And there's violence there.  The water is polluted.

20  Sean has to, and the other people have to, boil the water

21  before it's usable.  And there's screams from other people all

22  day and night.

23          But for Sean, as horrible as that is, it's a

24  separation from his family.  He can't believe the position he

25  put himself in.  He grew up without a father, his mother

PA3AComM4

1    working all the time.  He swore that he would be there for his

2    children, especially November 2018, when Ms. Porter suddenly

3    and unexpectedly passed away.  She is the mother of four of his

4    children.

5           That's what Sean is fighting for.  He sometimes would

6    tell me it's not worth going on.  There's nothing here.

7    There's no more hope.  But his family, he could not again bring

8    suffering on them.  That would just be more trauma to them.

9           Sean has been punished in the sense of his businesses.

10   His businesses meant everything to him.  He made a great deal

11   of money.  It was not the money.  He had a lot of prestige.  It

12   was not the prestige for him.  His pride was in the fact that,

13   your Honor, he gave opportunities to people who went to Harvard

14   and homeless people, and he put them on the same track and said

15   whoever can out work the other person, you will be elevated.

16   He does not care the color of skin, the nationality of the

17   person, the sexual preference of the person, the religion of

18   the person.  Sean sees life the way it should be.  We are all

19   humans.  We are all together in this, and we stand here for the

20   next generation to have a better life.  That's what he was

21   trying to do with his life.  That's what he did with his life.

22   The prosecution wants this Honorable Court to agree with them

23   and have tunnel vision and say Sean Combs should be defined by

24   what you heard in this courtroom.  That's not sentencing.  This

25   Court takes the totality of the person.

PA3ACom4

1          The businesses are gone.  They're gone, your Honor.

2    The great name recognition of the Combs Enterprise, Sean Combs

3    himself, it has prestige at one time, respect, your Honor,

4    power.  He stands for a change for the better.  He is a fighter

5    for civil liberties and equality.

6          Mr. Combs has walked with Presidents and homeless.  He

7    can connect to the young and the old.  We need him.  That

8    prestige, that name is gone.  And what Sean cares about is not

9    for himself, but he has said over and over again how he has

10   cursed his children with that name now.

11         Sean has dedicated himself to this hard work, to this

12   euphoria that he can help people who otherwise did not have

13   opportunities.  It was like a utopia that he wanted to build,

14   build these schools for children who were neglected, run the

15   New York Marathon when he was not in shape to do it.  He's had

16   several operations on his knee at that time, part of the

17   prescription pills.  But he did it because he raised millions

18   of dollars and gave it all to the New York City public school

19   inner cities.

20         What hurts him about his business gone is the

21   thousands of people that now potentially removed from their

22   résumé that they ever worked with him or his businesses.  They

23   can't be an equalizer, where they'll give equal opportunity to

24   anyone no matter where they come from.  His money is gone, your

25   Honor.  He currently has hundreds of lawsuits, most of them

PA3AcOm4

1    frivolous, but he's paying attorneys.  Sean doesn't care about

2    the money.  He wants to go home to his family.

3         The prosecutor told you, in essence, this Court's

4    sentence must send a message to this community to respect the

5    law and a message to the victims.  I don't know who among us

6    would trade places with Sean Combs.

7         Some of the media, I am not saying all of the media,

8    some of the media has written up and called Sean a disgrace, an

9    outcast.  Like a leper.  Those people are wrong.  I know Sean,

10   personally.  He's a great man who is being sentenced.  But he

11   still has done things that I would dream of doing.

12        Your Honor, you will hear from Sean, but he is

13   completely broken.  No one needs to give Sean any speeches.

14   Nobody needs to tell him that he needs to take responsibility,

15   like the prosecutor said.

16        Your Honor, he has punished himself more than anyone

17   will ever be able to punish him, and it will stay with him for

18   the rest of his days.  Mr. Combs does not need any additional

19   time in custody.  That is not how we treat drug addiction and

20   trauma and violence today.  That is the way we treated it when

21   I started practicing law.  A person puts their hands on

22   somebody else, nobody thought about psychiatrists and

23   psychologists and therapy.  No one did that.  It was

24   incarceration.  But in 2025, we have to come further.  We ask

25   this Court to see whether that's just.

PA3ACom4

1          Sean's family loves him.  You've heard from his
2    children.  He still has some true friends.  He knows who his
3    friends are.  Some of them are here, your Honor, because they
4    know his heart.  They know that he lost his way and they know
5    he is so remorseful.  But there is a clear change in Sean.
6    From the time that he was met by Marc and Teny to the time he
7    stands before you, everyone has said the same thing.  Everyone
8    has said the same thing.  Off the drugs, he is a different
9    person.  The drugs affected his thinking.
10          Even in this broken state though, all Sean thinks
11    about is others.  As I told you, his family.  And as
12    Ms. Westmoreland told you, your Honor, that jail is built for
13    hopelessness, pain.  People go there to die.  And I don't mean
14    just physically die, although that does happen.  I'm talking
15    about emotionally and mentally and spiritually.  So Sean
16    noticed that, and he pulled together -- as you heard
17    Ms. Westmoreland and you read the notes -- these people who
18    hated each other.  There were constant fights.  The BOP will
19    tell you.  There were constant fights.  There were Crips and
20    there were Bloods and other gang members and they hated each
21    other.  Racism was ramped.  And Sean went individually to each
22    one of these people and explained, we're living together, we
23    all have common interests, I'm in here with you, we all come
24    from different backgrounds, let's learn from each other.  And
25    next thing you know, these people are eating together, shaking

PA3ACom4

1   hands, laughing.  There has not been a fight in that unit since
2   Sean pulled everyone together with Free Game.
3         There's a gentleman who was released, but he's on
4   total house arrest.  I spoke with his lawyer.  I'm permitted to
5   say this.  His name is Charles Scruggs, S-C-R-U-G-G-S.  And
6   he's home now.  And if this Honorable Court thought it
7   appropriate, he is sitting by his charged up cellular telephone
8   to give this Court the number.  He was incarcerated with Sean
9   and he will tell you firsthand what it's like to be
10  incarcerated before Sean Combs was at MDC and what Sean Combs
11  has brought to not only him, but all the other people at MDC.
12        Sean has this ability that I don't have, that probably
13  very few have.  And incarcerating him is warehousing him.  But
14  this Court can use him.  If you think it's appropriate to allow
15  him to get the therapy and counseling that he needs, be with
16  his family, to help heal his family, to help heal himself.  And
17  October 6th is not a speaking engagement.  It'll be discussed
18  by the honorable attorney Donaldson.  October 6th is because
19  other people realize, your Honor, that Sean Combs is different.
20  He has more experiences now.  He has credibility.  He can go to
21  people who are incarcerated or about to be incarcerated or at
22  risk to be incarcerated.  He can go to any community and he can
23  tell about, you want to hear how you waste your life, let me
24  tell you about drugs, let me tell you about putting your hands
25  on a woman, let me tell you about thinking that you are above

PA3ACom4

 1    the law.

 2         He can change people's lives.  That's what October 6th

 3    is.  It's not a speaking engagement.  It is a healing for Sean

 4    as well as the community.  He has that opportunity to do that

 5    all over the United States of America.  He can save people from

 6    being before your Court criminally accused.

 7         The science speaks to us, your Honor.  As I told this

 8    Honorable Court, if you want to hear from them, they're in this

 9    courthouse.  Dr. Krueger and Dr. Kaplan.  They have evaluated

10    Sean.  There is no malingering like the prosecutor said.  These

11    are the best at what they do.  They test Sean and they will

12    tell you, your Honor, if you want to hear from them directly,

13    they are here.  But we have to get to the root of the problem.

14    You have to get to the trauma, the violence, why it's there,

15    the drug adduction, why it's there.  And it must be treated.

16    The Department of Justice will not be able to treat Sean.  They

17    may tell you they will.  We've spoken with everybody.  But

18    it'll be told to you by Dr. Kaplan and Dr. Krueger, an

19    environment where people are afraid for their life, an

20    environment like a prison where there's orders to sleep, when

21    to stand, when to use the bathroom, that is not proper fertile

22    ground for counseling.  It does not work.  It works in a home

23    setting where people can be themselves and have support of

24    their friends, family and community.  That does not mean that

25    Sean is running around.  It's just the environment.

PA3ACom4

1          The community can use Sean.  You can use him, your

2    Honor, if you think it's appropriate as a tool so other people

3    do not sit in this seat.  He can be a spokesperson.  And if

4    Sean steps a centimeter out of place and does something outside

5    of the bounds of this Court's sentencing disposition,

6    supervised release or probation, your Honor will drag him right

7    before your Court, and he will be revoked.  You have the hammer

8    over him.

9          Prosecutors tell the Court, and the Court seemed to --

10   potentially, I'm not saying you have, but made a finding that

11   this was coerced sex, that this was forced, threatened with

12   violence and the release of the sex videos.  I would just like

13   to read a few lines from the transcript, if I may.  And just

14   ask the Court to also consider the following.  This is from

15   Ms. Ventura when questioned on both direct examination and

16   cross-examination.

17         Ms. Ventura agreed to engage in her first freak-off

18   because, and I'm quoting, she loved him very much and wanted to

19   make him happy.  Transcript 409, 477, 917, 916, 1340.

20         Ms. Ventura doesn't remember when she told Sean

21   afterwards and going forward that she did not want to say no,

22   she didn't want to say no to freak-offs because she did not

23   want to regret -- want Mr. Combs to regret that he shared this

24   vulnerable side of himself with her.

25         Ms. Ventura said, and I quote, your Honor:  His trust

PA3ACom4

1    meant a lot to me.  Transcript 483, 918 and 919.  Ms. Ventura

2    did not want to affect, and I'm quoting, how he felt about me

3    and our relationship.  And really didn't want to make him think

4    that I didn't want to do it anymore.  This is transcript 404,

5    917.

6            Ms. Ventura testified that she enjoyed, I'm quoting,

7    time spent with Mr. Combs during the freak-offs.  And that

8    during these times together, she did feel very close to

9    Mr. Combs.  It's 486.  It became an integral part of their

10   relationship early on.  940.  And she wanted to be around Sean

11   because she loved him, she wanted to make him happy, and it was

12   exciting.  That's at 422.

13           It was important to Ms. Ventura to get more time with

14   Sean, and the time during the freak-offs was special time that

15   she cherished.  914, 1064.

16           Ms. Ventura did not want to engage in freak-offs, but

17   this was not a sentiment she ever shared with Sean.  She did

18   not want Sean to, and I'm quoting, find somebody else to do it

19   with, so she treaded lightly.  487, 410, 438 -- that's wrong,

20   938 through 939.  Quote, I didn't know if he would be upset

21   enough to be violent or if he would write me off or just not

22   want to be with me at all.  Ms. Ventura went on to say, your

23   Honor, I'm quoting, when you really care about somebody and

24   you're in love with them, you don't want to disappoint them.

25   That's transcript 1331.

PA3ACom4

1        Over and over again, your Honor, during this trial,

2   Ms. Ventura testified, and I'm quoting, she was just in love

3   and wanted to make Sean happy.  That's at 409.

4        Your Honor, I am not here to retry the case.  I

5   believe, and I still believe, that this Court understands the

6   verdict.  And the verdict on the RICO count and the two sex

7   trafficking counts mandate a finding that the jury -- I heard

8   what you said, your Honor, we don't know why the jury

9   acquitted, I understand that.  But the only issue really

10  litigated was that this was a voluntary sexual encounter,

11  consented to by adults.  That's what we argue.  I understand

12  what you said.  I respect what you said.  But in this

13  particular case, I agree with Ms. Shapiro.  This is issue

14  preclusion or double jeopardy.  It's a due process violation.

15  And the prosecutors never recognize that.  And they should.

16  And society is better off if the verdict is recognized.

17        You are not sentencing Sean for RICO or sex

18  trafficking.  You are sentencing him for the Mann Act.  And

19  Mr. Driscoll gave you those 900 cases dissected.

20        Your Honor, seeing Sean take full responsibility for

21  his conduct, he makes no excuses.  He does not call them

22  mistakes.  He calls them his conduct that is unconscionable.

23  He will never lay a hand on anyone, but he needs treatment.  He

24  can touch the lives like no one else or maybe just a few.

25        If released, he would like to go back to Miami,

PA3ACom4

1    Florida where he's in walking distance of his mother, to care

2    for his mother.  He will also, if you allow it, Dr. Melnick and

3    Dr. Bryant, they have already stated that they have the

4    resources in that Miami area to get Sean every bit of

5    counseling, therapy that he would ever need.

6         Sean wants to care for his children, and his children

7    want to care for him.  He needs to repair, not be warehoused.

8    And then Sean is going to be used by the community in a

9    positive way, which is what he's done his whole life.  He is in

10   the unique position that if this Honorable Court believes that

11   it is something that goes into his special conditions of his

12   release, he will be speaking openly about what it's like to be

13   incarcerated, what it's like to be on drugs, what it is like to

14   lose a global business, what it is like to harm people you

15   love, what it is like to take the happiness from your family.

16   Sean looks in the mirror and all he sees is the pain that he's

17   given others.

18        John Lennon once explained that he's a violent man

19   whose done violent things.  John Lennon attacked his mother,

20   his significant others.  He said I don't know why I do it.

21   John Lennon lived in a different time than us.  They didn't

22   have all these studies and data and science.  He could have

23   been helped.

24        Sean does not want to be looked at as a celebrity.  He

25   doesn't care if he's never spoken about again.  He does not

PA3ACom4

1    want to be looked at as somebody who is special or above.  He

2    doesn't want any names.  He wants to be a dad, a son, and a

3    person who is crying out for help from experts.  He will do

4    everything asked for by this Court.  He will never disappoint

5    you.  He will not be before you again.

6         We ask you to allow Sean to have a 14-month sentence

7    under the cases and the particular individual that you are now

8    pronouncing sentence.  He has taken full accountability, your

9    Honor.  For the prosecutors to read his letter and say that

10   even now he has not taken accountability, that is just not

11   true.  He's not using drug addiction as a crutch.  He's not

12   using the trauma that he has seen and suffered in his life as a

13   crutch.  He's saying that he is too weak, that he has failed

14   the community, his family and himself.  He wants to repair.  He

15   will never be a danger to anyone.

16        Sean Combs is a leader.  He is a civil rights leader.

17   His good outweighs his bad by far.

18        I will answer any of your questions.  And the Court

19   may have this experience, but in order to represent people,

20   I've been given permission by wardens as well as sheriffs to

21   spend time in the jails or prisons as an inmate, so I can

22   understand what my client is going through.  And before the

23   prosecutors ask for 11 years in prison, they should -- be safe,

24   I'm not saying general population, but spend two days in

25   custody.  Two days in custody, your Honor, is like walking

PA3ACom4

 1   dead.

 2          There is no such thing as only a five-year sentence,

 3   only a 60-month sentence, only a 135-month sentence, only a

 4   24-month sentence.  Every day, your Honor, it rips the fabric

 5   of the heart, the mind, and the soul apart.

 6          Dr. Gary Johnson has come to your courtroom, if you

 7   don't mind hearing from him.  He is a community leader in

 8   Miami, and he has ideas that Sean can help the community as

 9   well as he can help Sean.  If he can come forward if that's

10   okay with the Court.

11          THE COURT:  All right.

12          REVEREND JOHNSON:  I guess it's afternoon by now, to

13   the Honorable Judge.

14          THE COURT:  Good afternoon.

15          REVEREND JOHNSON:  Thank you, sir, for allowing me to

16   speak.  Excuse my voice.  I've been speaking.

17          My name is Reverend Gary Johnson.  I'm the former

18   President of Florida SCLC, Southern Christian Leadership

19   Conference, which was founded by Dr. Martin Luther King.  And

20   now I am the national president of King Clergy.

21          I'm, too, like attorney Brian Steel.  My heart is at

22   turmoil to see our brother in these conditions.  But I was

23   asked by a friend of his, Joy Buttafuoco who called me and

24   asked me have you heard and seen about Sean.  And I got a call

25   from Stan Cobar.  He said, bump, I pay for your hotel if you

PA3ACom4

1   go.  And then I got a call from junior, who is over Miami Dade

2   Corrections, over the prison system, he said, man, I will pay

3   for your flight.

4         And then it dawned on me, your Honor, is that it takes

5   a community.  It takes the people, the community, to get behind

6   Sean, to helping with his condition, to helping with his

7   mistakes and the things he's done, to reconcile.  Being a man

8   of God, I also believe that it's redemption.  Who without sin

9   casts the first stone.  We all have sinned.  We all have fallen

10   short.  But no matter how much we assign the blame on this one

11   or that one, it's not making this problem go away.  It's when

12   Sean decided he wanted to make a change to himself and be a

13   part of change.

14         And so I was with his mother a month ago and she said

15   something to me that touched my heart.  And she said I prayed

16   that God gives me Sean.  When she was pregnant, she said he's a

17   special kid.  She says I love my son.  My son has been good to

18   me.  Every day she gets up, she's hoping she can wake up to her

19   son being here.

20         So we decided that we won't sit back and watch

21   anything happen.  We want to be a part of change.  And so we

22   know if you gave us an opportunity from this bench, we are

23   asking you to allow us to be an extension from the bench to the

24   community.

25         If you free him, free his body from this incarceration

PA3ACom4

1    and allow him to have probation, we'll help free his mind.

2             As most of the attorneys articulated earlier, we

3    concur with them on the fact that Sean is not a man that takes

4    sides.  When he makes his mind up, you see, he'll take over.

5             So I believe that if you give him the opportunity

6    under us to work with us, he won't be back in here because he

7    made a mistake.  He'll be back in here to tell you thank you.

8    And the community will be thanking you for a decision that can

9    only help our community.  Any abuse is any type of abuse is the

10   worst type of abuse, whether it's verbal abuse.

11            So I ask of you, if you would consider giving him to

12   us, I will be personally responsible for seeing him

13   rehabilitate.  Because no matter how much you give him time in

14   incarceration, that's not going to change his condition.

15   That's not going to change anything.

16            And I close with this, as Michael Jordan, Mother

17   Jordan said this:  These sneakers are just sneakers, but when

18   my son puts them on.  Sean needs an opportunity.  If he gets an

19   opportunity, he'll turn it into an empire, and the empire to

20   help people, help women, help children become young

21   millionaires, become young business people.  I'm asking you to

22   give him to us and we won't let you down.  And I thank you so

23   much for this time.  And you've been very honorable in this

24   Court, like the Courts in Miami.  Judge de la O operates the

25   same way.

PA3ACom4

1         If a man can be redeemed, then why not give him that

2    opportunity as well.

3         Thank you, your Honor.

4         THE COURT:  Thank you very much.

5         Mr. Agnifilo.

6         MR. AGNIFILO:  I think we have Mr. Donaldson and then

7    I'm going to speak briefly.

8         THE COURT:  All right.  Mr. Donaldson.

9         MR. DONALDSON:  Your Honor, good afternoon.

10        THE COURT:  Good afternoon.

11        MR. DONALDSON:  It's been a long day, but I think it's

12   worth it.  I was told a long time ago that brevity is the soul

13   of wit, so I'll try to be brief but I want to get to it.

14        I don't want to repeat a lot of what my colleagues

15   said because I think they pretty much summarized, if you could,

16   what we think is the appropriate sentence for Mr. Combs, what

17   we know.  I do want to hit a few things, and I think Mr. Steel

18   called me the honorable, not yet, but the honorable.  I want to

19   hit a few things Mr. Steel talked about just briefly about this

20   comment that the government made earlier.

21        Before I get to that, I want to emphasize that we do

22   believe that the up to 14 months is the appropriate sentence.

23   And for a lot of reasons, many of which we've already talked

24   about.  But we didn't -- or we did talk a little bit about

25   these collateral consequences.  And I think we should really

PA3ACom4

1    consider those in conjunction with what Mr. Driscoll talked

2    about earlier, the data that is important as well.  Because

3    then you start getting into objective information about why a

4    sentence is appropriate, and Mr. Driscoll gave you -- and he

5    did read 900 cases -- a lot of information.  And what was also

6    important with what Mr. Steel said regarding the collateral

7    consequences that Mr. Combs is suffering, those are immense,

8    immeasurable, and something that quite frankly I've never seen

9    in 30 years.  And I do appreciate that collateral consequences

10   are normally associated with when we talk about impoverished

11   persons.

12           I'm here in this courthouse, I don't know, almost

13   every week talking about how difficult it is for young folk of

14   color to come back after being sentenced or convicted of

15   federal felonies.  I don't say that Sean Combs suffers similar

16   collateral consequences, because of course he's wealthy.  Or

17   was wealthy.  But we can't treat him any differently because of

18   that, of course.

19           And I took the pain to go back and check some things

20   out.  And Judge Koeltl in this district in *U.S. v Stewart*

21   indicated that deterrence and protection of the public is

22   lessened because a conviction itself already visits substantial

23   punishment on the defendant.  That's important here because the

24   conviction in this case and the sentence will itself visit

25   substantial punishment on Mr. Combs.

PA3ACom4

1          But the Second Circuit then went a step further in

2     *U.S. v Stewart* and said, it is difficult to see how a court can

3     properly calibrate a just punishment if it does not consider

4     the collateral effects of a particular sentence.  Why is that

5     important?  Because as we indicated in our letters, the

6     collateral consequences suffered by Mr. Combs are enormous.

7     And I say that not to give him some middle class or wealth

8     discount, because he doesn't get that.  He shouldn't get that.

9     But he should be considered to receive a just punishment.  And

10    the collateral consequences associated with his family, the

11    loss of business -- and when I say loss of business, it's not

12    one of those businesses that you wake up and you're born with.

13    It's one of those businesses that you earn, that you literally

14    earned.  He earned it.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

PA3MCOM5

1          MR. DONALDSON:  And then he lost it all because these

2    mistakes, crimes, and the crime of conviction.

3          When we talk about avoiding disparities, I'm asking

4    the Court, I'm strongly suggesting to the Court to consider

5    that a just punishment requires this Court to look at the

6    significant and substantial collateral consequences that

7    Mr. Combs has endured.

8          You also, before I get to another section, asked

9    Mr. Driscoll earlier this morning the government associating or

10   equating Mr. Combs as a pimp.  And I don't want this record to

11   be -- let me say it a different way.  I want the record to be

12   clear that Mr. Combs is not a pimp.  The record should be clear

13   of that.

14         Why is Mr. Combs not a pimp?  Pimps seek out and

15   recruit women with one sole intent, to prostitute them out to

16   other people.  Intent is what I'm talking about.  Their intent,

17   their sole intent is to seek out women, prostitute them to

18   other persons for money.  That's their sole intent.

19         Like when we talk about in this district, oftentimes

20   when we distinguish between drug dealers who are in the

21   business of selling drugs, we distinguish between people who

22   commit fraud from people who are in the business of committing

23   fraud.  We have to distinguish pimps from people in the

24   business of pimping and the business of prostituting women and

25   the business of subjugating women.  Mr. Combs is not in the

PA3MCOM5

1    business of doing that.  Therefore, Mr. Combs, is not, should

2    not be considered a pimp like those nefarious individuals are.

3    He is not that man.

4         What I also found myself thinking about over the last

5    two weeks, after reading all the letters, listening to

6    Mr. Combs' family members, and watching the video and going

7    through the discovery again and reading the transcript, I tried

8    to put myself in the Court's position, if I could briefly.  And

9    I said to myself, honestly, we have done this enough, I think.

10   The Court is in a difficult position, I think, if I may say

11   that respectfully.

12        You have these witness-impact statements from Cassie

13   and Jane and Mia and Diontae and other people, and the

14   government saying that Mr. Combs should get 11 years, and I

15   read the Court's decision from the hearing that we had last

16   week, and I appreciate all of it.  I do.  So you have that

17   part.  The Court is looking at and weighing and saying, OK,

18   this is who these people are saying Sean Combs is.  But then

19   you heard that family, then you have read those letters, and

20   then you have seen that video.  And then you've also heard from

21   the government's witnesses, of people who spoke about Sean

22   Combs about who he is, what he did, and what he did for them.

23        So you find yourself, I think, saying you have -- I

24   have two people here.  What's the real Sean Combs?  I would

25   like to believe that the real Sean Combs is in the grain of all

PA3MCOM5

1    those letters that you have read and what you heard from that

2    family.  That's the real Sean Combs.  There is no way we can

3    get around that consistent strain inside all those letters and

4    inside those people's voices, inside that video of who the real

5    Sean Combs is.  And that is that person, as Mr. Steel said,

6    before he started using drugs, that person who -- one of those

7    characters letters wrote before he started using drugs, drugs

8    that's not allowed around me.

9         When he was that person, he was focused.  When he was

10   that person, he was determined.  When he was that person, he

11   had this idealistic view of the world.  That person still

12   exists.  The letters clearly say that.  And the jail course,

13   the MDC course, supports that.

14        I'm a big fan of consistency.  At one point Sean Combs

15   was sober, focused, determined, and doing everything to help

16   out everybody he could.  That's consistent.  At some point he

17   started using drugs.  He became addicted.  He started suffering

18   trauma.  He started doing bad things.  We know that's what

19   happens in this courthouse when drugs get involved, when you

20   start using drugs.  We know that's what happens.  That's what

21   happened here.

22        In any sentence I think the Court always asks

23   themselves, why are we here?  It's not an excuse to say that we

24   are here partly because the man was addicted to drugs.  That's

25   not an excuse.  It's not a voluntary thing.  That's not an

PA3MCOM5

1    excuse.  There are persons we know, high end in the

2    entertainment industry, who literary die from these drugs, and

3    we call it a tragedy.  When Prince died of these drugs, we

4    called it a tragedy.  When Whitney Houston died of these drugs,

5    we called it a tragedy.  When Michael Jackson died of these

6    drugs, we called it a tragedy.  We know that Mr. Combs

7    flatlined off these drugs.  It was a tragedy.

8            Am I making an excuse?  Absolutely not.  Should he

9    have done anything he did?  Absolutely not.  Is that part of

10   the Court's calculation?  Absolutely it is, because it goes to

11   the why we are here, which gets me to my next point.

12           It's not lip service to say that Mr. Combs has

13   engagements after he gets out of jail.  That's not lip service,

14   respectfully, to the government.  And to be clear, they aren't

15   speaking engagements.  When I heard about these classes in the

16   jail, I literally was shocked because, like Ms. Westmoreland

17   said, it has never been done at MDC.  And I'm saying, in my 30

18   years of being here, and having hundreds of clients in MDC and

19   MCC, I concur.  It has not been done and it's not like he is

20   special.  He doesn't like me saying that.  I am saying it now.

21   It's not like he's special when it comes to SDNY.

22           We have United States senators prosecuted here.  We

23   have had billionaire people prosecuted here.  We have had

24   assemblymen inside MDC and MCC.  We have had legislators inside

25   MDC and MCC.  We have had lawyers, judges, doctors.  We have

PA3MCOM5

1    had them all inside MDC.

2         But I dare anyone to tell me in the last 30 years that

3    anyone took the time to do what that man did in that jail, and

4    it's not because he wanted to get out and make it look like he

5    is faking it.  Persons incarcerated see through fakeness, so

6    that couldn't be it.  What it was was the true Sean Combs came

7    back.  That's what happened.

8         The question is, my question was, what do I do about

9    that?  So I confirmed it.  I spoke to the people at MDC.  I got

10   on a phone call and called down to the Bureau of Prisons in

11   Miami, and I spoke to someone in the Bureau of Prisons because

12   these aren't speaking engagements.  I spoke to the people at

13   the BOP in Miami.  I spoke to chiefs of police in Miami.  I

14   spoke to Department of Corrections in Miami.  I spoke to the

15   board of education in Miami.  I spoke to superintendents in

16   Miami.  And I gave them all the curriculum, and I gave them all

17   the letters.  I spoke to the lawyers of the young men inside of

18   MDC.  And without question or hesitation, everyone said, this

19   is something different.

20        The people down in Miami immediately contacted me with

21   someone else who they use because they want to see how that can

22   help their facility.  And then national facilities.  Why?

23   Because it's not just about helping himself, but it's about

24   helping others, and that is important.  That's probably more

25   important than helping yourself.

PA3MCOM5

```
1        Why do we do that?  Because contrary to what the

2   government said, and I am going to say this blatantly, we do

3   need something for him to do if he gets out today.  That's one

4   of the questions the Court has asked.  That's one of the

5   questions the government normally talks about in these

6   sentencing proceedings, how does the Court know that Mr. Combs

7   is not going to be a danger to society.  How does the Court

8   know that Mr. Combs, if he gets out, what he is going to be

9   doing.

10       So what do we do?  We answered those questions.  Not

11  with speaking engagements, but with teaching engagements.  To

12  continue to help those people who have been convicted of crimes

13  who society has cast aside to get them back ready to be

14  productive in society.  That is not speaking.  That is not some

15  engagement that Mr. Combs is saying, hey, I want to go and make

16  some money off these.

17       These are teaching engagements that we contacted folk

18  about to see, if the Court let Mr. Combs out, we could answer

19  that question, how does the Court know he will not be a danger

20  to society if released.  Because he will be at Bureau of

21  Prisons Department of Corrections sanctioned events helping out

22  or continuing to teach those individuals to make sure that they

23  don't recidivate, which has been of issue to the courts and to

24  society.  That's why he is doing that, and that's the questions

25  that must be answered.
```

PA3MCOM5

1              I say all that to say that when I think about the two

2    people, I know who the person is.  It's not I.  I don't want to

3    speak from a personal opinion.  Objectively we know who it is.

4    It's back to where he was.  And when we talk about the why

5    again, which the Court must always consider, why he came to

6    this courthouse has something to do with drug dealing, drug

7    use, and drug addictions.  Why he came to the courthouse has

8    something to do with his anger issues.  How do we know he won't

9    be back?  It's because he no longer has those issues.  What

10   brought him to the courthouse does not exist anymore.  Those

11   are the answers to the Court's questions.

12             I want to close by saying this, and it's important.  I

13   grew up in Liberty City in Miami in the 1980s.  Liberty City in

14   Miami was a tough place to be.  It's clear to me that when I'm

15   standing in these courthouses often, my purpose is to inform

16   the courts that people like myself, from places where I came up

17   in, have a voice and supposed to be here to let the Court know

18   that we can do it.  Mr. Combs going back to Liberty City in

19   Miami and speaking to those folk who have been incarcerated to

20   teach them, to help them, to get them to make the right choices

21   is nothing short of invaluable.

22             I know we have heard this a lot in this courthouse

23   today about what he can do, but it's important.  And to that

24   point we, with the Court's permission, Mr. Steel said earlier,

25   the person who will be in charge of that to make sure that he's

PA3MCOM5

1   doing that, the person who has the contracts with the Bureau of

2   Prisons, the person who has the contract with the GO

3   facilities, the person who has the contract with the Department

4   of State corrections, the person who has assisted folk in their

5   reentry to make sure that they remain compliant on supervised

6   release, he is present.  I think Mr. Steel spoke about him

7   earlier and would like to speak, if possible, to let the Court

8   know that these aren't speaking engagements, these aren't

9   entertainment.  These are purposeful.  These are intentional.

10  They say are designed to ensure that Mr. Combs remains

11  compliant and is doing something productive for society and for

12  the community.

13          So I would ask the Court, if the Court thinks it's

14  appropriate, to allow the executive director of Re Entry One to

15  speak for a minute or two so the Court understands what we are

16  talking about when we say we have a release plan for Mr. Combs,

17  if he is released, to make sure he's in a structured

18  environment so he is not a recidivist.  I think that's

19  important, with the Court's permission.

20          THE COURT:  Thank you.

21          What is the gentleman's name?

22          MR. DONALDSON:  His first name is Giovanni.  His last

23  name is Sairras.

24          THE COURT:  Let's hear from Mr. Agnifilo.

25          MR. AGNIFILO:  I'm ready.

PA3MCOM5

1          THE COURT:  We will hear from you.

2          As for the additional individuals related to reentry

3     and to Dr. Kruger and Dr. Kaplan, as to all three, I have

4     fairly comprehensive reports from the doctors and the letter

5     from the reentry representative here.  If the concern on your

6     part is that I did not regard the engagements as being

7     purposeful, I did not have that reaction in reading the letter.

8     So if that's the concern, then I do not need to hear --

9          MR. DONALDSON:  My concern, Judge --

10          THE COURT:  If it's going to be a minute or two, let's

11     bring him in and hear from him.  Let's do that first.

12          Mr. Agnifilo, you can go next.

13          MR. SAIRRAS:  Good afternoon, Judge.

14          I'm the executive director of Re Entry One.  Re Entry

15     One is a nonprofit organization that provides support services

16     to those who have spent a stint of time in jail or prison.  Our

17     organization serves about a couple of hundred people per year.

18     And by serving these individuals we are able to promote public

19     safety and reduce recidivism within those areas where they

20     live.

21          From doing our assessments, when we come in contact

22     with our program participants, we notice that there is a

23     constant factor in those that have participated in constructive

24     programming.  We noticed that once they are released, they are

25     less likely to recidivate or reoffend.

PA3MCOM5

1           I have read some of the letters written by those that

2  were impacted by the teachings and mentorship of Mr. Sean

3  Combs.  And as a formerly incarcerated individual myself, I

4  have noticed that his impact is so great that it changed the

5  lives of those within the housing unit where Mr. Combs is

6  housed.

7           Well, I know something about that because I've done

8  the same thing.  When I was incarcerated, I created life skills

9  and mentorship programs that impacted the lives of those within

10  my housing unit and within the institutions where I was housed.

11  I can say that since my release many years ago, I have impacted

12  the lives of thousands of individuals who are formerly

13  incarcerated and their families.  And, your Honor, because of

14  this, we have been able to change the narrative.

15           Now, I know this is a very sensitive topic and subject

16  to talk about for myself because I've been where Mr. Combs is,

17  and what I can say is that when an individual has the

18  willingness to create his own life skills and entrepreneurship

19  programs, in spite of the fact that he is going through these

20  legal challenges, demonstrates reform and rehabilitation.  I

21  know because that was me many years ago.  And since my release,

22  as I stated earlier, not even a parking ticket, your Honor, not

23  even a parking ticket.

24           And the many families and formerly incarcerated

25  individuals that depend on our programs and services, I speak

PA3MCOM5

1    within various correctional facilities, state and federal.  I

2    work with the federal care court program, and we work with

3    probation.  Your Honor, I also speak at many different

4    functions hosted by the private prison operators that we work

5    with.

6            And, Judge, I would just like to say that when I see

7    the smiles on these people's faces, when I hear -- when I see

8    the just thank you for changing my life, I saw the same

9    sentiments within those letters that was written about the work

10   that Mr. Combs is doing at MDC.

11           And I like to also highlight this, your Honor.  When I

12   read those letters, it brought me back.  What Mr. Combs is

13   doing has reignited a spark within me to start doing more,

14   because if an individual like him, undergoing his own personal

15   legal battles, if he can put the -- his personal needs to the

16   side and just think about others speaks volumes.  I believe

17   that Mr. Combs has shown that he's an asset to those

18   individuals within his housing unit, and he has also become an

19   asset to the government because the programs that he's teaching

20   promote rehabilitation and reform.

21           Similarly, it's something that we do inside of

22   correctional facilities when I speak about my personal

23   experience to the youth and young adults and other individuals

24   who feel that there is no hope for them, those that are in

25   despair.  And your Honor, as I've been told by wardens and

PA3MCOM5

1    other staff members at these correctional facilities, that,

2    Mr. Sairras, you are a great asset, not only to the

3    organizations that you work with, not only to the community

4    members, but also to the state and Federal Government.

5            Judge, I'm speaking to you today as someone that is a

6    formerly incarcerated individual who has created similar

7    programs like that of Mr. Combs' program, and that these

8    programs helped me with my own rehabilitation and reentry back

9    into society, and our organization is also eager to work with

10   Mr. Combs in the same way.  We have already established several

11   teaching engagements within various correctional facilities and

12   also within marginalized communities, those communities that we

13   serve that are in need of Mr. Combs' teachings and his wisdom.

14           Lastly, your Honor, our organization's mission is

15   centered within the principle that those who are closest to the

16   problem are normally closest to the solution.  And by employing

17   individuals with the lived experience of incarceration, we have

18   not only personally and professionally -- I have not only

19   personally and professionally experienced levels of success

20   that other organization have not seen, because they don't

21   employ returning citizens, they do not utilize their lived

22   experience to connect and communicate with others who are

23   undergoing their own legal challenges.

24           Your Honor, Mr. Combs, working with our organization,

25   speaking in the community, and connecting with folks within the

PA3MCOM5

1    corrections system will prove invaluable to correctional

2    employees.

3            Mr. Combs, from what I've read in those letters, he

4    has been able to bring together individuals who were warring

5    inside of that jail.  This is what we have been able to do in

6    our local area within the jails and the other facilities that

7    we dispense our programs.

8            Your Honor, to close with this.  When you have someone

9    who has gone through all of this stuff, all of these legal

10   challenges, your Honor, when you have someone that was on high

11   and has fallen from grace and realized the mistakes that they

12   have made, and has gone beyond just their personal calling, but

13   to incorporate other individuals within their thoughts and

14   within their prayers, your Honor, that shows rehabilitation and

15   reform.  And from my personal and professional experience, when

16   individuals are involved in that way, they are not only less

17   likely to reoffend and recidivate, but, most of all, they have

18   become an invaluable asset to not just state and Federal

19   Governments, but to their families and the communities that

20   they serve.

21           THE COURT:  Thank you very much.

22           MR. SAIRRAS:  Thank you.

23           MR. AGNIFILO:  Your Honor, it's getting late in the

24   day.  I am going to be very brief.

25           I am going to try and give the Court a perspective.

PA3MCOM5

1    We are asking for a lot.  We are asking for a 14-month

2    sentence.  And in a very short amount of time I want to try and

3    give the Court some reasons to believe that that is the right

4    sentence.

5          About 30 years ago, Kings County did something that

6    had never been done before.  It created a domestic violence

7    court.  It had never been done.  It's the first one in the

8    country.  And what we started to see -- and I think the reason

9    for this, just taking a quick step back is, I started in the

10    Manhattan DA's office in 1990.  In 1990, the only option we had

11    was to put people in jail.  There really was no other option.

12    There were over 2,000 murders a year.  There were over 44,000

13    assaults in 1990.

14          Somehow we got our arms around the problem and, by

15    1996, things were starting to get better, and something called

16    the Center For Court Innovation started.  And studies were

17    done.  John Jay did a lot of studies.  We have some of the

18    studies referenced in our principal memorandum, I think, at

19    around pages 50 and 51.  But there are dozens and dozens of

20    studies.

21          And what the studies indicate is that domestic

22    violence tends to come from childhood trauma, from psychiatric

23    issues, and there has been so much -- your Honor has been

24    exposed to all of this.  Your Honor has seen it in the PSR.

25          Let me just say, I am always amazed at the quality of

PA3MCOM5

1    the presentence investigation reports being done in this

2    district and other districts.  Mr. DiMaria, our probation

3    officer, who wrote this PSR, at paragraphs 195 to about 198,

4    goes through all of the psychiatric records and it's masterful.

5    What he basically does in three lengthy detailed paragraphs

6    probably saves me quite a bit of time, which is why I can be

7    brief about this.  But it's very clear that Sean Combs has

8    genuine psychological challenges.

9            Just very quickly, in 2014, 2017, and 2020, he

10   reported to three different doctors that -- and those doctors

11   found that he had posttraumatic stress disorder.  What was the

12   stressor?  We don't really know.  We know he grew up without a

13   father.  We know, as has been said, I am not going to belabor

14   the point, his father was murdered when he was a baby,

15   practically.

16           We know that, in the interest of kind of keeping him

17   safe from this information, and I think this is common, the

18   family didn't tell him how his father died.  But because he was

19   a young man in Harlem, he kind of picked up that information

20   sort of from the street.  And I think it is an interesting sort

21   of peek into his psyche.

22           And he gave a commencement address at Howard

23   University.  I think it was 2014.  And what he said was, as

24   soon as he got away from his family, he was at Howard, he went

25   to the microfilm and he put in his father's name.  And he says

PA3MCOM5

1    this in the commencement speech.  Because he wondered and he

2    wondered.  And he saw that Melvin Combs was murdered as part of

3    a drug deal gone bad, essentially.

4           And so where does the trauma come from?  We don't

5    really know, and I don't know that we need to know, but not

6    having a father, having the, I suppose, anxiety, the unsettled

7    questions, the burning questions of, why don't I have a dad?

8    Where is he?  I don't know that I trust the information that

9    I'm getting about it.  Obviously, it stayed with him.  And the

10   first thing he did when he went to Howard is to check the

11   microfilm to see what happened to his father.  Maybe that's the

12   trauma.

13          But what's clear is he had posttraumatic stress

14   disorder.  He also had major depressive disorder.  He was

15   diagnosed with that.  He had major anxiety disorder.  He was

16   diagnosed with that.  So that's the first component.  We will

17   say mental health challenges.

18          What goes along with that?  Your Honor sat through the

19   eight-week trial.  Has drug use was overwhelming.  I think at

20   one point Cassie said that he was addicted to painkillers.  She

21   too was addicted to painkillers.  There are benzodiazepines

22   that he is being prescribed.  The medical records in the PSR,

23   again, is very fulsome with all of that.  I don't need to go

24   through all that.  We have mental health challenges and we have

25   drug addiction and abuse, and we have domestic violence.

PA3MCOM5

1          What started to happen in the New York courts in 1996,

2     and it was a gradual thing, is that they started to develop

3     something called problem solving courts.  And problem solving

4     courts had a different mission than the typical New York

5     Supreme Court, New York Criminal Court.  It was basically to

6     try and take a situation and make it better.  That's really

7     what it was, solving a problem.  There is a problem and let's

8     try and solve it.  And the solution to the problem, not that it

9     didn't involve incarceration, but we already have that.  So

10    they were trying to find other ways of solving the problem, and

11    resources were devoted to this and we learned more.  And I

12    think we became more enlightened about what works and what

13    doesn't work.

14         And one of the things I think worth noting is, there

15    was a tremendous reduction in crime in the City of New York

16    between the early '90s and the mid 2000s.  And that's for a lot

17    of reasons, but part of it is that we started addressing the

18    core problems of why are people violent and how do we solve

19    that problem.

20         And we have a problem we need to solve here, and

21    that's really what I'm going to talk about.  In less than five

22    minutes I am going to sit down, give it back over to

23    Ms. Slavik, and then I think it would be fair if Mr. Combs has

24    the final word.  But I am not going to belabor all these

25    points.

PA3MCOM5

 1          My wife, who is in court, started the Manhattan mental

 2   health court in 2011.  And by then it was sort of picking up

 3   speed.  And what we saw was that these were situations that

 4   could be treated; not so much through punishment, not by

 5   punishing force with force, but by punishing drug addiction,

 6   mental health, domestic violence with treatment, with

 7   understanding.  And something started to develop, and it was

 8   called the integrated domestic violence courts.  And I think

 9   there are at least 60 of them in the different counties and

10   there is -- there is one in New York, New York County.  It's an

11   IDVC.

12          And the idea was, we need to basically have a

13   situation where one court can understand the totality of the

14   situation, which is, so much of what we are throwing at your

15   Honor today -- your Honor has heard it from every angle.  And

16   the idea is, one judge hears from the prosecutor, hears from

17   the purported victims, hears from the family, as your Honor has

18   today, so one court has all of this data because it affects

19   everybody, because your Honor's decision today and the path

20   forward affects Mr. Combs' children directly.  It affects the

21   people who wrote victim-impact letters to your Honor.  It

22   affects everyone.  And so the motto was, one family, one case,

23   one judge, and you are our judge.  And so here is one view of a

24   solution forward.

25          I know it's a lot to ask that your Honor release him,

PA3MCOM5

 1    but he has been punished.  He has been punished in maybe one of

 2    the most public ways I can think of anyone being punished in 35

 3    years of doing this.  The raid at his homes, his children, some

 4    of you who you met today, were held at gunpoint.  That's

 5    punishment.  And it's punishment that this all happened on such

 6    a grand public stage.

 7         We are all social beings.  And I think probably what

 8    so many of criminal defendants yearn for is, I just don't want

 9    too many people to know.  I told my wife, I told my kids.  I

10    don't want anyone else -- well, everybody knows.  Everybody

11    knows every twist and turn in this case, and that is a form of

12    deterrence.  It's a form of specific deterrence.  It's a form

13    of general deterrence.

14         At the end of the day, Mr. Combs couldn't get out of

15    jail.  We made a bail application.  He stayed in.  That's a

16    form of general deterrence.  The publicity that he got is a

17    form of general deterrence.  This is all probably one of the

18    greatest general deterrence cases I can ever imagine because

19    everybody knows what happened to Sean Combs.  And what happened

20    to Sean Combs is just immensely destructive in every way.  I

21    think Ms. Ventura said on the witness stand that her lawsuit

22    alone destroyed his businesses.  She said -- I think her answer

23    was:  That's fair to say.

24         Everything is just ruined.  His family is together and

25    they love each other and they care for each other, but as he

PA3MCOM5

1    said, they need their father.  This has been just a devastating

2    destructive case for this man on the largest of stages.

3        So I don't know that we need any more of a sentence to

4    achieve the very important and statutorily mandated factor of

5    general deterrence.  General deterrence is important.  It's

6    something I know the Court is going to think about, because

7    it's in the statutes, in 3553(a).  But I think that this case

8    has shown there is tremendous general deterrence because of the

9    publicity.  Mr. Combs was treated, I am going to use neutral

10   words, in a very stern, punishing fashion, and the world knows

11   all of that.

12       How do we go forward from here?  How we go forward

13   from here is, I think your Honor has all the tools that the

14   Court needs.

15       If your Honor looks at the PSR on page 76, there are a

16   number of conditions that I think are all very important for

17   what we need to try and accomplish here today.

18       There is mental health treatment.  I think that's a

19   very important condition.  It's in the PSR for good reason.  I

20   think anything that your Honor does going forward, Mr. Combs

21   needs meaningful mental health treatment.

22       A domestic violence program.  What the two doctors

23   that we have attached sealed reports to the Court say is that

24   when it comes to domestic violence treatment, sometimes group

25   programs are the best, having, for the most part, men, but I

PA3MCOM5

1    suppose it could be women too, having people in a group talking

2    about sort of their shared experiences, and that's in the

3    medical report and that's also in the PSR at page 76.

4            Drug program.  I think drugs are very much at the

5    heart of this.  I think it is essential that Mr. Combs not

6    return to illegal drug use.  And so I think a fair condition,

7    as we move forward, is that we have him only take things that

8    are prescribed by a medical doctor or any medical health

9    professional, but that's it.  He has to be tested in that

10   regard.  And that is serious.  This is getting to the heart of

11   the problem.

12           I note that October is domestic violence awareness

13   month.  So here we are in a case that probably has put domestic

14   violence in the forefront of people's minds, maybe more than

15   any other case.

16           And I'm asking your Honor to do something serious.

17   I'm not asking for a light sentence.  I'm asking to get to the

18   root problem.  And the root problem is his mental health, and

19   there is just a demonstrated history of that.  This is not just

20   his lawyers talking.  This has been going on for years and

21   years.

22           Obviously, there is domestic violence and there is

23   tremendous drug use.  These things can all be addressed in the

24   same way.  We don't have to resort to early 1990s methods.  We

25   have learned a lot since then.  We have learned a lot about how

PA3MCOM5

1  these things work.  We have learned a lot about how to treat

2  these things.  And it works.

3          Crime has gone down because I think that we have

4  gotten enlightened.  We have gotten smarter.  We have used

5  research, and we have relied on places like the John Jay

6  Institute of Criminal Justice to do studies for us.

7          I know we have thrown so much your Honor's way.  I am

8  going to sit down in two minutes, so this is probably the last

9  thing I say to you.  I'm really so grateful for the time that

10  your Honor has devoted to the case, your Honor's -- 300

11  something pages and all the other studies and whatnot we gave

12  you.  Thank you so much.

13          If your Honor has any questions, I'm free to answer

14  them, obviously, but at this point I want to turn it over to my

15  colleagues with the government, and I think it's only fair that

16  Mr. Combs has the last word.  Thank you, Judge.

17          THE COURT:  Thank you.

18          Ms. Slavik.

19          MS. SLAVIK:  Yes, your Honor.  I'll be brief.  There

20  are just a couple of things that I wanted to respond to in the

21  defense presentation.

22          Taking us back a couple of hours to Mr. Driscoll's

23  presentation, I think that presentation really makes clear how

24  much of an individualized exercise sentencing is, and

25  specifically how differently situated the defendant is from

PA3MCOM5

1    many other Mann Act cases.

2         Just as an example, in Defense Exhibit 68, the highest

3    total offense level in that chart is 20.  The defendant here is

4    at 27.  Also in that chart only two of the cases went to trial,

5    as far as we can tell, and here we have an eight-week trial

6    record.

7         The other thing is, for every case that Mr. Driscoll

8    cited that involved violence in some way, there are more cases,

9    many of which are included in the government's submission, with

10   very significant sentences, 120 months, 135 months, 180 months.

11        And, yes, many of those cases do apply the

12   cross-reference, but the point of the cross-reference, the

13   reason that the cross reference is even applicable is because

14   it accounts for the abuse and the violence present in those

15   cases.  And we have the exact same facts here.  We have the

16   abuse, we have the violence that, respectfully, warrants a high

17   sentence.

18        The other thing I'll say just generally is that

19   3553(a)(6) is, of course, one sentencing factor that the Court

20   has to consider.  But the Second Circuit has specified that the

21   district court has discretion to weigh those factors

22   differently.  So in a case like this, where there aren't many

23   comparators, the Court need not afford significant weight to

24   that factor.

25        I want to just focus a little bit on the Jordan case

PA3MCOM5

1   again.  Mr. Driscoll emphasized that that case was different

2   because there was criminal history in that case for similar

3   conduct.  And, yes, that is correct.

4        But I just want to zoom out and bring the Court's

5   attention to why that criminal history is relevant.  Why is

6   that important?  In other words, why did Judge Cronan consider

7   that criminal history that was unaccounted for in the

8   guidelines range?  I think the answer to that is that because

9   the defendant was punished for similar conduct previously, it

10  means that what he knew -- what he was doing, he knew it was

11  wrong.  And we have that here.  The defendant very clearly knew

12  that what he was doing was wrong and illegal, and he did it

13  anyway for 15 years.

14       Another important factor in that case to Judge Cronan

15  was that the defendant there, Jordan, quit the business before

16  he was prosecuted, and that is obviously not the case here.

17  Even here, even when the defendant was under federal

18  investigation, he continued to commit crimes.

19       And, yes, Jordan was a pimp in the classic sense, but

20  really what are pimps?  Pimps exploit and control their

21  victims.  That's what the defendant did here.  There was

22  significant money involved in this case too, albeit in a

23  different way.  Mr. Driscoll asked how many commercial sex acts

24  would $1.4 million cover?  That was the amount that the Jordan

25  defendant profited from the prostitution business.  And in this

PA3MCOM5

1    case, where escorts were paid, conservatively, around $5,000,

2    and there were usually three escorts per freak-off, $1.4

3    million would cover 94 freak-offs.  The similar charts that the

4    government entered into evidence here, that included 117

5    freak-offs, so the amount of money -- and that, of course, was

6    underinclusive.  The amount of freak-offs in those charts was

7    underinclusive.  So the amount of money here is very

8    significant as well.

9           Mr. Driscoll challenged the government to find text

10   messages showing verbal abuse, like the text message that he

11   cited from the *Nabit* case.  There were dozens of text messages

12   showing verbal abuse.  I think many of them were entered into

13   evidence at trial.  But this case involves more than just

14   verbal abuse.  It involves physical abuse.  And that physical

15   abuse is on video.  I'm speaking of the Intercontinental video,

16   of course.  The production quality of the Intercontinental

17   video is obviously much different from the video that the

18   defense played before lunch.  It's pixilated.  The picture

19   sometimes jumps.  There is no musical overlay.  But it shows

20   the defendant for who he is when he doesn't realize that the

21   cameras are rolling.

22          The defendant is a master puppeteer of his own image.

23   He uses his wealth and power to convey a very specific image to

24   the world, but that image is incomplete and it's misleading.

25          We saw this same dynamic at play at trial in an

PA3MCOM5

1    Instagram video that the defendant released after the

2    Intercontinental video was leaked publicly, and in that video

3    he claimed that he had hit rock bottom and that he was a

4    changed man.  But for months after that, for months after he

5    claimed to be a changed man, he continued committing crimes.

6    He continued violating the Mann Act.  He viciously assaulted

7    Jane.  He had drugs in his hotel room when he was arrested.  He

8    was not a changed man then, and, despite what he says now, he's

9    not a changed man now.  You can't trust his words.

10          Unfortunately, what this case shows is that despite

11   what the defendant was projecting publicly, behind closed

12   doors, when cameras were off, he wasn't helping others.  He was

13   exploiting and violently abusing them.  The defendant's

14   comments about being a model for others is also worth

15   commenting on.  Consider how the defendant could model now what

16   true remorse looks like.  Consider how he could credit and

17   apologize to his victims.

18          Five attorneys just spoke for the defendant now and

19   really the only time that they mentioned any of the defendant's

20   victims in any sort of meaningful way was when Mr. Steel just

21   spoke at length about how Cassie wanted it.  That's untrue and

22   it's offensive.

23          The defendant has modeled disdain for his victims,

24   disrespect for this problem of justice, and a complete lack of

25   accountability.

PA3MCOM5

1          Ms. Westmoreland emphasized the defendant using his

2    success to help others, that he had the ability to change

3    countless people's lives.  I want to read the words of one

4    person whose life the defendant changed.  Sean Combs used

5    violence, threats, substances, and control over my career to

6    trap me in over a decade of abuse.  I spent the last seven

7    years of my life slowly rebuilding myself, physically getting

8    clean from the drug abuse Sean Combs forced and encouraged, and

9    mentally understanding how to live with a seemingly

10   insurmountable level of trauma.  The horrors I endured drove me

11   to have thoughts of suicide, ones that I almost followed

12   through on, if not for my family's intervention and urging that

13   I seek professional care.  I still have nightmares and

14   flashbacks on a regular everyday basis and continue to require

15   psychological care to cope with my past.  For over a decade

16   Sean Combs made me feel powerless and unimportant, but my

17   experience was real, horrific, and deserves to be considered.

18          Your Honor, it's unfortunate that the defense's

19   tactics resulted in a victim no longer feeling comfortable to

20   address the Court in person today, but the Court has several

21   letters from several victims.  And the Court has heard

22   firsthand from some of these victims at trial, sometimes in

23   moments of excruciating testimony.

24          We ask that the Court take into account these

25   experiences in addition to all of the other 3553(a) factors in

PA3MCOM5

1    imposing a significant sentence here.

2            THE COURT:  Thank you, Ms. Slavik.

3            If there is no one else, Mr. Combs, you do not need to

4    say anything, but if you'd like to be heard, I am here to

5    listen.

6            MR. STEEL:  Your Honor, can I ask the Court a

7    question.

8            THE COURT:  Yes.

9            MR. STEEL:  Mr. Combs and others, can we take a brief

10   comfort break before Mr. Combs speaks?

11           THE COURT:  Absolutely.  We will take a 10-minute

12   break.  We will come back at 4 p.m.

13           (Recess)

14           (Continued on the next page)

15

16

17

18

19

20

21

22

23

24

25

PA3ACom6

1          THE COURT:  Please be seated.

2          And, Mr. Combs, take your time but whenever you are

3   ready, if you would like to speak, I'm happy to listen to you.

4          THE DEFENDANT:  Okay.  Thank you.  Give me one minute.

5          I want to thank you for giving me the chance to

6   finally speak up for myself.  One of the hardest things that

7   I've had to handle is having to be quiet, not being able to

8   express how sorry I am for my actions.  I want to personally

9   apologize again to Cassie Ventura for any harm or hurt that

10  I've caused to her emotionally or physically.  I don't take

11  that lightly.  I would like to apologize to her family.  I'm so

12  sorry.

13         I would like to apologize to Jane.  I didn't mean to

14  hurt you.  I'm sorry that I brought you into my mess.

15         I also want to personally apologize to all the victims

16  of domestic violence, because I know that that video, that

17  disgusting, despicable video, triggered a lot of people all

18  around the world.

19         Domestic violence will always be a heavy burden that I

20  will have to forever carry.  My actions were disgusting,

21  shameful, and sick.  I was sick.  Sick from the drugs.  I was

22  out of control.  I needed help, but I didn't get the help.

23  Because of that, I can make no excuse.  I could really make no

24  excuse because, because I knew better.  My mother raised me

25  better.  I was taught better.  My faith taught me better.

PA3ACom6

1    I got lost in my journey of life.  I'm not this larger

2 than life person.  I'm just a human being.  And I be trying my

3 best.  I got lost in the excess.  I got lost in my ego.

4    And because of my decisions, I lost my freedom.  I

5 lost the opportunity to effectively raise my children and be

6 there for my mother.  I lost all my businesses.  I lost my

7 career.  I totally destroyed my reputation.  But most of all, I

8 lost my self-respect.

9    I been humbled and broken to my core.  I hate myself

10 right now.  I been stripped down to nothing.  I really am truly

11 sorry for it all, no matter what they say.

12    I want to apologize to my seven children, Quincy,

13 Justin, Christian, Jessie, D'Lila, Chance, Love, I failed as a

14 father.  I'm so sorry.  Y'all deserve better.

15    To my mother, mommy, I failed you as a son.  I'm

16 sorry.  You taught me better.  You raised me better.

17    I know to whom much is given, so much is expected.  I

18 know I failed my community.  Growing up as a kid, I just wanted

19 to be a shining example of what we could do.  When I say we, we

20 as people of color, that we could own our own businesses, take

21 care of our own communities, raise our own children, solve our

22 own problems, create our own wealth, take care of our own

23 problems.  And that was my mission.  And I got lost.  I'm not

24 this bad person.  I'm sorry to my community for letting y'all

25 down.

PA3ACom6

```
 1          I want your Honor to know that if given a chance,

 2   people can change.  I know I've changed.  I know this because

 3   there's events -- there's sometimes something can happen in

 4   your life that no matter who you were before, what you were

 5   going through, you get so shaken that it just changes your

 6   trajectory.  It just changes you.  And it changes you for the

 7   better.  Sometimes you have to go through life experiences.

 8          These are not excuses.  I know that I've been changed

 9   for the better.  I can't change the past, but I can change the

10   future.  I ask your Honor for mercy.  I beg your Honor for

11   mercy.

12          I ask your Honor for a chance to be a father again.  I

13   ask your Honor a chance to be a son again.  I ask your Honor

14   for a chance to be a leader in my community again.  I ask your

15   Honor for a chance to get the help that I desperately need to

16   become a better person.  Because I don't want to let God down.

17   I don't want to let my family down.  They need me.  I let them

18   down.  They don't have no other parent.  They're scared.  I'm

19   scared.  And I have nobody to blame but myself.

20          I know I'll never put my hands on another person

21   again.  I know that I've learned my lesson.  I'm willing to

22   comply with any conditions the Court puts upon me.  Given a

23   chance, when we talk about the possibility of me sharing my

24   story, it's not for a scheme to try to get less time.  It's

25   that this story is real.  This story is tragic.  And if there's
```

PA3ACom6

1   any way, I don't have nothing else.  I have my family, and

2   that's all I need.  I don't care about the fame or the money or

3   making records or performing.  If there's a chance for me to go

4   into, and touch some kids and touch some inmates that have lost

5   hope.  I feel like if your Honor gives me a chance by sharing

6   that story, that this will have a positive outcome.  This will

7   have a healing effect.  So that at least I could help one

8   person for not ending up like this.

9           I want to say thank you to the jury.  And, your Honor,

10  your Honor gave me the confidence to believe in the jury and to

11  believe that I didn't have to testify.  And the jury came and

12  they sacrificed their time, eight weeks in the summer.

13  Sacrificed time with their children.  And they weighed the

14  evidence.  And I thank them for the not guilty verdicts.

15          And I don't take lightly my Mann Act conviction.  I

16  understand the severity of it, and I'm having to deal with the

17  consequences.  And I take full accountability and

18  responsibility.

19          Your Honor, I know that the prosecution wants you to

20  make an example of me.  I just want you to think about making

21  an example of what a person can do if they get another chance.

22  If you give me another chance, I won't let you down.  And the

23  evidence of that are those beautiful children that got up there

24  and spoke for me.

25          Thank y'all.  I love y'all so much.  Proud of y'all.

PA3ACom6

1          I would never, ever, ever jeopardize being in this

2     situation again, being away from my family that needs me.

3     That's my deterrence.  I don't think nobody wants to come and

4     be in this position.

5          No matter what anybody says, I know that I'm truly

6     sorry for it all.  Thank you.

7          THE COURT:  Thank you, Mr. Combs.

8          Let's take five minutes, and we'll come back.

9          (Recess)

10          THE COURT:  Please be seated.

11          So at the outset, I just want to make clear that,

12     Mr. Combs, you're being sentenced for the offenses of

13     conviction, the Mann Act charges here and not the 1591 sex

14     trafficking charge and not the RICO charge that you were

15     acquitted of.

16          However, the statute that the Court is required to

17     follow when sentencing any defendant, 18, U.S.C., Section

18     3553(a), requires the Court, it says:  The Court shall consider

19     the nature and circumstances of the offense and the history and

20     characteristics of the defendant.  And that's what the Court is

21     required to do.

22          And as the Court previously noted, in Section 18,

23     U.S.C., Section 3661, Congress further made clear that no

24     limitation shall be placed on the information concerning the

25     background, character, and conduct of a person convicted of an

PA3ACom6

1    offense which a court of the United States may receive and

2    consider for the purpose of imposing an appropriate sentence,

3    and the Court has followed those dictates from Congress.

4            As mentioned, under 18, U.S.C., Section 3553(a), the

5    Court is required to consider the nature and circumstances of

6    the offense and the history and characteristics of the

7    defendant.

8            Mr. Combs, I've considered the fact that you are a

9    self-made artist and businessman who has innovated, inspired

10   and lifted up communities, including communities of color

11   worldwide.  The Court agrees with the defense and

12   Ms. Westmoreland that your work history, impact on the black

13   community, and entrepreneurship are celebrated and iconic.

14   That's especially impressive given the early violent death of

15   your father and the trauma that that must have left.  You have

16   donated your time and millions of dollars to benefit worthy

17   causes, including providing schooling for underprivileged

18   children in New York City.  And we saw that in the video.  And

19   that is commendable.

20           Your development of the Free Game course for inmates

21   while at the MDC is impressive, and the Court hopes that you

22   will continue to work with those who are incarcerated and

23   expand on that curriculum.

24           There is no doubt that you are devoted to your family,

25   including your mother, your children, your sister, your nephew.

PA3ACom6

1    And the Court of course considers all the collateral

2    consequences of your incarceration and your conviction,

3    including all of the things that Mr. Donaldson mentioned,

4    including the impact of any sentence on your family, including

5    your mother and your children.

6         The Court also notes that you have had problems with

7    addiction, and the Court is glad to hear that due to your

8    incarceration, you are on the path to beating those demons.

9         The Court also understands that these drugs may have

10   exacerbated your erratic and violent behavior over the years.

11        However, the Court has to consider all of your history

12   here.  And with respect to the freak-offs and hotel nights and

13   your relationships with Ms. Ventura and Jane, the Court rejects

14   the defense's attempt to characterize what happened here as

15   merely intimate, consensual experiences, or just a sex, drugs,

16   and rock and roll story.  A history of good works can't wash

17   away the record in this case, which showed that you abused the

18   power and control that you had over the lives of women you

19   professed to love dearly.  You abused them physically,

20   emotionally, and psychologically.  And you used that abuse to

21   get your way, especially when it came to freak-offs and hotel

22   nights.  The defense's argument that all of this was unrelated

23   to the offense conduct in this case doesn't hold up.

24        The evidence of the abuse in connection with

25   freak-offs and hotel nights is massive.  I was sitting right

PA3ACom6

1    here for the testimony from Ms. Ventura and from Jane.  We read

2    about it in text messages and e-mails.  We saw it in the images

3    of gashes, bruises, broken doors, and we saw the video of your

4    savage beating of Ms. Ventura.

5         This was subjugation, and it drove both Ms. Ventura

6    and Jane to thoughts of ending their lives.  That is the

7    reality of what happened.

8         With that, we move to the Court's obligation to impose

9    a sentence that is sufficient but no greater than necessary to

10   accomplish the goals of sentencing set forth in subsection

11   (a)(2).  First, the need for the sentence to reflect the

12   seriousness of the offense, to promote respect for the law, and

13   to provide just punishment for the offense.

14        These were serious offenses that irreparably harmed

15   two women.  Physical harm, emotional harm, and again,

16   psychological harm, the effects of which continue to this day.

17   You plied Ms. Ventura and Jane to drugs, forcing Ms. Ventura to

18   opioid addiction, which she struggles with even today.  The

19   conduct occurred for over a decade and with tremendous

20   frequently over that time period.  Why did it happen so long?

21   Because you had the power and the resources to keep it going,

22   and because you weren't caught.  And you paid for and organized

23   these acts.  You were no John.  You were more than that.  Even

24   if your currency was satisfying your sexual desires, instead of

25   money.  But the coercion was the same, if not worse.

PA3ACom6

1          The Court next considers the requirement to afford

2    adequate deterrence to criminal conduct.  Both specific and

3    general deterrence here require a significant sentence.

4          As for specific deterrence, while you have said here

5    in court, and I've read it in your letter, that you're sorry,

6    you won't do this again, one thing strikes me in particular.

7    After Ms. Ventura's civil lawsuit had been filed, detailing

8    many of the things she testified about here in court, after the

9    government had executed search warrants on your residences,

10   after the brutal video of the 2016 beating had been made

11   public, and just one month after you issued your Instagram

12   apology where you said many of the things you said here today,

13   you had another hotel night where you brutally assaulted Jane.

14         As the government describes it, you kicked down five

15   doors in Jane's home, lifted her off the floor by her neck in a

16   chokehold, punched Jane in her head, kicked Jane's body,

17   dragged Jane by her hair, and slapped Jane so hard that she

18   fell down.  Jane creditably testified to those things.

19         According to her, you said the following:  Take this

20   fucking pill.  You're not going to ruin my fucking night.  You

21   better go out there.  You're not going to ruin my fucking

22   night.  Get out there.  Suck his dick.  Fuck him.  I don't

23   care.  Just you're not going to ruin my fucking night.  You

24   asked Jane, mockingly, is this coercion?

25         Clearly deterrence is a key consideration.  And the

PA3ACom6

1    Court is not assured that if released these crimes will not be

2    committed again.

3         The Court has considered everything that it has heard

4    here in the courtroom and the materials submitted about

5    programs that Mr. Combs would engage in and has considered the

6    analysis of Dr. Krueger and Dr. Kaplan.  But those are

7    outweighed by the entirety of the trial record in this case,

8    which the Court was here for, for eight weeks.  And the Court

9    saw the testimony and saw the messages and saw the evidence.

10        The need for general deterrence also warrants a

11   significant sentence.  These acts of sexual violence are

12   unfortunately commonplace.  A substantial sentence must be

13   given to send a message to abusers and victims alike that

14   exploitation and violence against women is met with real

15   accountability.  Victims who have the courage to report their

16   abusers and relive the excruciating trauma of that abuse by

17   testifying in court should see that their efforts can result in

18   meaningful accountability.  That promotes respect for the law,

19   furthers just punishment, all the values that we're supposed to

20   serve today.

21        In terms of the interest to protect the public from

22   further crimes of the defendant, for the same reason, a

23   meaningful sentence is necessary to protect the public from

24   further crimes.

25        In terms of providing the defendant with needed

PA3ACom6

1    educational or vocational training, medical care, or other

2    correctional treatment in the most effective manner, the Court,

3    again notes that there are the reports from the doctors, and

4    the Court has considered those in determining what the

5    appropriate sentence would be.  But again, there are other

6    factors that militate in the opposite direction.

7        The Court has also considered the factors in Section

8    3553(a)(3) through (7), including in particular the guidelines

9    range and the need to avoid unwarranted sentencing disparities.

10       Weighing these factors, the Court reaches a few

11   conclusions.  First, the sentence that the government proposes,

12   135 months, would be more than necessary to comply with the

13   purposes in Section 3553(a)(2).

14       The statute requires parsimony when sentencing

15   defendants, and the Court is not allowed to impose a sentence

16   that is more than necessary to achieve the purposes of

17   sentencing.  The Court agrees that a serious sentence is

18   warranted that reflects the aggravating factors that I have

19   addressed.  The profound impact on Ms. Ventura and Jane, the

20   time span, over a decade, during which these acts of

21   prostitution occurred, the fact that these offenses occurred

22   with intimate partners, the evidence of physical violence, and

23   the coercion.  But a sentence of over 11 years, over the

24   statutory maximum of the sentences on these offenses ran

25   concurrently is not reasonable.

PA3ACom6

1           The Court observes that in the exhaustive data

2     provided by the parties, while there are some cases with

3     sentences in the range urged by the government, most of these

4     cases involved defendants with more extensive criminal history

5     scores, and they also involved things like murder, minor

6     victims, an expansive prostitution enterprise with numerous

7     victims and the like.

8           Even the probation department, which took special care

9     to evaluate the aggravating factors here, including noting that

10    the impact that this case has had on Ms. Ventura and Jane are

11    paramount concerns, recommends a sentence less than half of

12    what the government proposes.  The government's recommendation

13    also takes no account of Mr. Combs' mitigating circumstances,

14    such as his lack of recent criminal history, his family ties

15    and ties to the community, his substance abuse, and mental

16    health history, which the Court has considered.

17          On the other hand, the defense's proposal of a

18    14-month sentence, effectively a sentence of time served, would

19    not be sufficient to comply with the purposes set forth in the

20    statute, which is the other part of the parsimony requirement.

21    Just as the government's proposal does not account for the

22    mitigating factors identified by the Court and the probation

23    department, the defense's proposal does not adequately account

24    for the aggravating factors:  The severity of the conduct at

25    issue, the violence, the drugs, the coercion, and the

PA3ACom6

1   devastation that it caused to Mr. Combs' victims.  The

2   defense's proposal is insufficient to satisfy the goals of

3   sentencing, including to reflect the seriousness of the

4   offense, to promote respect for the law, to provide just

5   punishment, and to afford adequate deterrence among others.

6           Here, the data shows a wide variance of sentences

7   below the outlier cases in the range of the government's

8   proposal.  And as the government observes, every case has to be

9   evaluated on its own facts and circumstances, and the facts and

10  circumstances of this case are unique.

11          Weighing all the relevant factors and considering the

12  evidence that the Court heard at trial, and the information

13  provided by the parties and the probation department, the Court

14  determines that the sentence sufficient but not greater than

15  necessary to comply with the purposes set forth in 18, U.S.C.,

16  Section 3553(a)(2) is a sentence of 50 months of incarceration.

17          This is a serious sentence that reflects the gravity

18  of your crimes and conduct.  This is hard time in prison away

19  from your family, friends, children, and your community.  But

20  you will have a life afterward and it provides you with a path

21  toward rehabilitation.  The Court notes that this sentence

22  matches the sentence recommended by the probation department,

23  which also comprehensively evaluated the facts here.

24          I will now state the sentence I intend to impose, but

25  the attorneys will have a final opportunity to make legal

PA3ACom6

1    objections before the sentence is finally imposed.

2          The defendant will be sentenced to a term of 50 months

3    of incarceration.

4          Mr. Agnifilo, is there a recommendation as to

5    facility?

6          MR. AGNIFILO:  Your Honor, if it's okay with the

7    Court, can we get that to the Court by Monday so we can sort of

8    discuss now in light of the fact that there's a specific

9    sentence that we know about?

10         THE COURT:  Yes.  There will be a recommendation

11   included that will reflect what you provide to the Court.

12         MR. AGNIFILO:  That's right.

13         THE COURT:  The Court imposes the minimum term of

14   supervised release of five years.  No objections have been

15   raised as to the conditions of supervised release.

16         Are there any objections to the conditions?

17         MR. AGNIFILO:  No, your Honor.

18         THE COURT:  The Court will impose the mandatory

19   standard and special conditions of supervised release as stated

20   on pages 73 through 76 of the presentence report.

21         Does the defense waive the public reading of those

22   conditions?

23         MR. AGNIFILO:  We do.

24         THE COURT:  As indicated in the presentence report.

25   As to the search condition, this is justified by the nature and

PA3ACom6

1    circumstances of the offense, as well as the history and

2    characteristics of the defendant, and the protection of the

3    public, deterrence, and to prevent recidivism as stated in the

4    PSR.

5              As to the no contact provision, again, this is

6    supported by the nature and circumstances of the offense and

7    protection of the public, deterrence, and to prevent

8    recidivism.

9              As to access to financial information, given that

10   there is a forfeiture obligation and a fine, and given the

11   circumstances of the offense, this condition is warranted.

12             The outpatient treatment and outpatient mental health

13   treatment programs are warranted based on the nature of the

14   offense and the nature and characteristics of Mr. Combs

15   concerning his mental health and substance abuse issues.

16             And I think I might have misspoke earlier.  I think I

17   said that -- the Court's sentence is 50 months.  I think I

18   might have said that this was the same as the PSR, the

19   probation's sentence.  It's ten months less than the probation

20   sentence.

21             MR. AGNIFILO:  Yes, Judge.

22             THE COURT:  Just to make that clear.

23             The Court imposes a fine of $500,000, the maximum

24   provided for each count of conviction.  The Court has

25   considered the factors under Sections 3553(a), 3571, and 3572,

PA3ACom6

1    as well as the guidelines factors and range.

2         The maximum fine is warranted based on the need to

3    reflect the seriousness of the offense and provide just

4    punishment, provide for deterrence, and is justified in light

5    of the defendant's immense financial resources, the lack of any

6    financial burden, no other restitution obligation, and the cost

7    to the government of Mr. Combs' imprisonment and supervised

8    release.

9         This is an upward variance from the guidelines, but is

10   warranted given the guideline does not adequately reflect the

11   severity of the defendant's conduct nor the defendant's immense

12   resources, which enabled his crimes.

13        There is no restitution.  The Court orders forfeiture

14   of property used or intended to be used to commit or facilitate

15   the commission of the offenses charged in Counts Three and Five

16   of the indictment as reflected in the consent preliminary order

17   of forfeiture, which is incorporated into this sentence.

18        There is a special assessment of $100.  There is also

19   a special assessment of $5,000 under the JVT Act of 2015.

20        Do counsel know of any legal reason other than those

21   already argued why the sentence should not be imposed as

22   stated?  Ms. Slavik?

23        MS. SLAVIK:  Your Honor, I believe the special

24   assessment should be $200 given that there are two counts of

25   conviction.

PA3ACom6

```
1              THE COURT:  Very well.

2              Any objection, Mr. Agnifilo?

3              MR. AGNIFILO:  No, your Honor.

4              THE COURT:  All right.  The special assessment is

5    $200.  Thank you.

6              Ms. Slavik, anything further?

7              MS. SLAVIK:  No, your Honor.

8              THE COURT:  Mr. Agnifilo?

9              MR. AGNIFILO:  Nothing.

10             THE COURT:  And there are no open counts.

11             Mr. Combs, you have the right to appeal your sentence.

12   If you are unable to pay the cost of an appeal, you may apply

13   for leave to appeal in forma pauperis.  You may also apply for

14   court-appointed counsel.  The notice of appeal must be filed

15   within 14 days of the judgment of conviction.

16             To both sides, is there any other objection that you

17   have that I have not addressed?  Ms. Slavik?

18             MS. SLAVIK:  No, your Honor.

19             THE COURT:  Mr. Agnifilo?

20             MR. AGNIFILO:  No, your Honor.

21             THE COURT:  Is there anything else that either side

22   would like to raise before the Court offers some final words to

23   the parties?

24             MS. SLAVIK:  Not from the government.  Thank you.

25             MR. AGNIFILO:  Nothing, your Honor.  Thank you.
```

PA3ACom6

1          THE COURT:  All right.  Thank you.

2          I want to speak first to the strong women who came

3    forward to tell the world their stories.  Horrific stories, but

4    stories of courage.

5          Ms. Ventura and Jane, you've been through abuse and

6    trauma that most of us can't imagine.  As Ms. Ventura says, the

7    defense's narrative that her relationship with Mr. Combs was a

8    "great modern love story" is false.  These are her words:

9    Nothing about this story is great, modern or loving.  This was

10   a horrific decade of my life, sustained by abuse, violence,

11   forced sex, and degradation.

12         To Ms. Ventura and the other brave survivors who came

13   forward, I want to say first, we heard you.

14         As Ms. Ventura points out, because of the testimony of

15   the women in this courtroom, these horrible acts were made

16   public.  And it's not something, Mr. Combs, that you will ever

17   be able to wash away.  You will forever be associated with

18   them.

19         So to Ms. Ventura, Jane, and the other victims who

20   testified here, for coming forward, I can only say that I know

21   your families are proud of you, and your children, when they

22   are old enough, will be proud of you.  And I am proud of you

23   for coming to the Court to tell the world what really happened.

24         You weren't just speaking to the 12 folks in the jury

25   box.  You were speaking to the millions of women out there who

PA3ACom6

1    have been victims but who feel invisible and powerless and have

2    had to suffer in silence.  You gave them a voice.  You stood up

3    to power.  It's not easy.  You told those women and the world

4    that violence behind closed doors doesn't have to stay hidden

5    forever.  The number of people who you reached is incalculable.

6    There are millions of survivors out there.  Most of those

7    people will never speak up about their abuse.  The consequences

8    are often tragic, as they were in this case.

9            I know you still bear the trauma of what happened to

10   you.  You likely always will.  But what you've taught us here

11   by coming forward is that even if you were a victim, you don't

12   always have to be.  Your strength in coming forward are an

13   example for us all.

14           Nothing about this case was good.  Nothing.  Except

15   for the victims who came forward.  As Dr. King taught us, "out

16   of the mountain of despair, a stone of hope."  Thank you for

17   your courage.

18           Turning to Mr. Combs, I know you feel like you're in a

19   dark place right now, but these crimes were serious ones, and

20   your violence, coercion, and abuse have had devastating

21   consequences for the women involved, women who loved and depend

22   on you.  From Ms. Ventura:  "The horrors I endured drove me to

23   have thoughts of suicide — ones I almost followed through on."

24   "What he did to me is always present, but I am slowly learning

25   how to live my life free of the fears and horrors I endured."

PA3ACom6

1          But, Mr. Combs, you and your family, you are going to

2     get through this.  There is a light at the end of the tunnel.

3     These letters, all those letters that I saw, show that you have

4     a universe of people who love you.  Let them lift you up now,

5     just like you've lifted them up for so many years.

6          Your mom writes that you have "always been a loving

7     and caring son."  Your sister Keisha calls you the emotional

8     anchor of your family.  To your son Justin, you have always

9     been there for him every day of his life.  Not just physically,

10    but emotionally, spiritually and in the deepest sense of what

11    it means to be a father.  Chance writes that you have always

12    been our foundation.  And D'Lila and Jessie make clear that you

13    taught us how to become great young women as we grow into

14    adults.  And to your son Christian, you are the best father you

15    could ever imagine.  Quincy writes, pops has always empowered

16    us to be who we want to be.  Even your two year-old daughter,

17    Love, when she hears your voice, she lights up.  It is clear

18    how important you are to her sense of safety, happiness, and

19    belonging.

20         Your sister Keisha, citing the wisdom of *Corinthians*

21    and *Jeremiah*, notes this is a chance for renewal and redemption

22    for you.  And we've heard a lot about that today.  She's right.

23    The things that the women in this case talked about, it's

24    happening all over this country.  Every day, every minute.  You

25    have the power to help it stop.  The same power that enabled

PA3ACom6

1    you to hurt these women, you can use it to help others like

2    them.  We all have voices, but you have a megaphone.

3          Keisha marks out the path that you can forge today

4    even during the time you're in prison.  "Being a champion and

5    uplifting our black and brown children and communities,

6    reaffirming to them that they can be educated and through hard

7    work be successful, and to help provide the tools and

8    opportunities needed to build stronger communities."  That's

9    what you set out to do from the beginning of your career, over

10   three decades ago.  We saw a snapshot of that in the video.

11   But as you yourself said in your letter to me, you've lost your

12   way.

13         But as your friend Karen Lindsey said, there is "a

14   true path to redemption here."  You have the chance to not only

15   recognize "what went wrong, but what can be made right."  You

16   will have a chance to show your children and the world what

17   real accountability, change, and healing can look like.  And

18   I'm counting on you to make the most of your second chance.

19         With that, court is adjourned.

20         (Adjourned)

21

22

23

24

25