EMR:KTF/KCB/NCG/SMF
F.# 2018R01401

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          Docket No. <u>23-CR-146(DG)</u>

RACHEL CHERWITZ,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


<u>THE GOVERNMENT'S SENTENCING MEMORANDUM</u>


JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Kayla C. Bensing
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT ......................................................................................... 1

BACKROUND ............................................................................................................. 2

I.   The Offense Conduct .......................................................................................... 2

    A.  OneTaste's Beginnings ................................................................................ 4

    B.  OneTaste's Shift to Sales and Expansion ................................................... 6

    C.  The Defendants' Abusive Tactics of Coercion ........................................... 7

    D.  The Labor and Services Performed ............................................................ 12

    E.  The Benefits Cherwitz Accrued ................................................................. 13

II.  Procedural History ............................................................................................. 13

LEGAL FRAMEWORK ................................................................................................ 15

I.   The Sentencing Framework and Applicable Guidelines Calculations .................. 15

    A.  The Government's Guidelines Calculation .................................................. 15

    B.  Probation's Guidelines Calculation ........................................................... 16

    C.  The Defendant's Guidelines Calculation ................................................... 17

II.  The Parties' Guidelines Disputes ....................................................................... 17

    A.  The Defendant's Guidelines Calculation Errs by Narrowly Construing the Scope of Relevant Conduct ................................................................... 18

    B.  The Criminal Sexual Abuse Cross-Reference Under U.S.S.G. § 2H4.1 Applies ....... 19

    C.  The Defendant is Not Entitled to a Three-Level Reduction Under U.S.S.G. § 2X1.131

    D.  The Government Need Only Prove Sentencing Enhancements By A Preponderance Standard ............................................................................. 33

    E.  The U.S.S.G. § 2H4.1(b)(1)(B) Enhancement for Serious Bodily Injury Applies ..... 34

    F.  The U.S.S.G. § 2H4.1(b)(3) Enhancement for a Victim Being Held in a Condition of Involuntary Servitude for More Than One Year Applies ........................................... 35

    G.  The Court Should Add Three Levels Under U.S.S.G. § 3B1.1(b) for the Defendant's Role as a Manager or Supervisor ................................................................. 37

H.   The Court Should Not Apply the Various Reductions the Defendant Proposes ........ 42

I.    The Defendant Is Not Entitled to a Downward Departure Under U.S.S.G. § 5H1.11 49

J.    Conclusion ................................................................................................................. 50

III. The 3553(a) Sentencing Factors ........................................................................................ 50

ARGUMENT ...................................................................................................................................... 52

I.    The Court Should Impose a Sentence of 168 Months' Imprisonment.................................. 52

A.   The Nature and Circumstances of the Offense ........................................................... 52

B.   The Defendant's History and Characteristics ............................................................. 58

C.   The Need for the Sentence to Reflect the Seriousness of the Offense, Promote
     Respect for the Law, and Provide Just Punishment..................................................... 59

D.   The Need for Deterrence.............................................................................................. 59

E.   The Need to Avoid Unwarranted Sentencing Disparities............................................ 60

II.   Supervised Release .............................................................................................................. 62

III. Restitution and Other Financial Aspects of Sentencing ...................................................... 63

CONCLUSION.................................................................................................................................... 64

Cases

Abdallah v. United States,
    No. 14-CV-4037 (JFB), 2015 WL 7454182 (E.D.N.Y. Nov. 24, 2015) ................................. 32

Apprendi v. New Jersey,
    530 U.S. 466 (2000)............................................................................................................. 27

Corbitt v. New Jersey,
    439 U.S. 212 (1978)............................................................................................................. 45

Ellerby v. United States,
    187 F.3d 257 (2d Cir. 1998) ............................................................................................... 38

Gall v. United States,
    552 U.S. 38 (2007).......................................................................................................... 15, 51

Kaplan v. United States,
    663 F. App'x 69 (2d Cir. 2016) ......................................................................................... 32

Kisor v. Wilkie,
    139 S. Ct. 2400 (2019)........................................................................................................ 29

Pipkins v. United States,
    544 U.S. 902 (2005)............................................................................................................. 22

Portalatin v. Graham,
    624 F.3d 69 (2d Cir. 2010) ................................................................................................. 27

Rita v. United States,
    551 U.S. 338 (2007)............................................................................................................. 51

Stinson v. United States,
    508 U.S. 36 (1993)............................................................................................................... 29

United States v. Alexander,
    860 F.2d 508 (2d Cir. 1988) ............................................................................................... 51

United States v. Archer,
    671 F.3d 149 (2d Cir. 2011) ............................................................................................... 39

United States v. Baldrich,
    471 F.3d 1110 (9th Cir. 2006) ........................................................................................... 46

United States v. Banks,
    190 F. App'x 825 (11th Cir. 2006) .................................................................................... 22

United States v. Benitez,
    531 F.3d 711 (8th Cir. 2008) ............................................................................................. 46

United States v. Blount,
    291 F.3d 201 (2d Cir. 2002) ............................................................................................... 38

United States v. Booker,
    543 U.S. 220 (2005)............................................................................................................. 15

United States v. Brinkworth,
    68 F.3d 633 (2d Cir. 1995) ................................................................................................. 39

United States v. Bronfman,
    No. 18-CR-204, 2024 WL 1740484 (E.D.N.Y. Apr. 23, 2024) ............................................. 48

United States v. Callahan,
  801 F.3d  (6th Cir. 2015) ........................................................ 27

United States v. Canova,
  412 F.3d 331 (2d Cir. 2005) ................................................... 50

United States v. Capanelli,
  270 F. Supp. 2d 467 (S.D.N.Y. 2003) ..................................... 34

United States v. Carrozzella,
  105 F.3d 796 (2d Cir. 1997) ................................................... 38

United States v. Cheatwood,
  No. 22-4652, 2025 WL 18098 (4th Cir. Jan. 2, 2025).............. 44

United States v. Chu,
  714 F.3d 742 (2d Cir. 2013) ................................................... 43

United States v. Cordoba-Murgas,
  233 F.3d 704 (2d Cir. 2000) ................................................... 19

United States v. Deas,
  768 F. App'x 81 (2d Cir. 2019) .............................................. 32

United States v. DiMassa,
  117 F.4th 477 (2d Cir. 2024) .................................................. 45

United States v. Downing,
  297 F.3d 52 (2d Cir. 2002) ..................................................... 33

United States v. Figueroa,
  682 F.3d 694 (7th Cir. 2012) ................................................. 42

United States v. Fishman,
  631 F. Supp. 2d 399 (S.D.N.Y. 2009) ..................................... 50

United States v. Gilmore,
  599 F.3d 160 (2d Cir. 2010) ................................................... 28

United States v. Gittens,
  701 F. App'x 786 (11th Cir. 2017) .......................................... 46

United States v. Goffer,
  529 F. App'x 17 (2d Cir. 2013) ............................................... 45

United States v. Gowing,
  No. 05-CR-782 (GBD), 2024 WL 3607112 (S.D.N.Y. July 30, 2024) ............................ 48, 49

United States v. Guang,
  511 F.3d 110 (2d Cir. 2007) ................................................... 28

United States v. Heffernan,
  43 F.3d 1144 (7th Cir. 1994) .................................................. 60

United States v. Howard,
  28 F.4th 180 (11th Cir. 2022) ................................................ 59

United States v. James,
  No. 24-84-CR, 2025 WL 2486539 (2d Cir. Aug. 29, 2025).......... 40

United States v. Jimenez-Rodriguez,
  No. 21-CR-11-2 (EK), 2024 WL 1199991 (E.D.N.Y. Mar. 20, 2024).................... 28

United States v. Johnson,
  221 F.3d 83 (2d Cir. 2000) ................................................. 22, 29

United States v. Kennedy,
  233 F.3d 157 (2d Cir. 2000) ................................................... 38

United States v. Kent,
  821 F.3d 362 (2d Cir. 2016) .......................................... 39, 41, 42

United States v. Kuhlman,
  711 F.3d 1321 (11th Cir. 2013) ........................................... 60

United States v. Lancaster,
  112 F.3d 156 (4th Cir. 1997) ............................................. 46

United States v. Lutchman,
  910 F.3d 33 (2d Cir. 2018) ............................................... 32

United States v. Martin,
  No. 23-6091, 2024 WL 5001844 (2d Cir. Dec. 6, 2024)....................... 47

United States v. Medina,
  74 F.3d 413 (2d Cir. 1996) ....................................... 30, 32, 33

United States v. Molina,
  106 F.3d 1118 (2d Cir. 1997) ............................................ 30

United States v. Nicolescu,
  541 F. App'x 93 (2d Cir. 2013) .......................................... 32

United States v. Ortiz,
  No. 19-CR-161, 2023 WL 1929690 (E.D.N.Y. Feb. 10, 2023) ................. 48

United States v. Padilla,
  961 F.2d 322 (2d Cir. 1992) ......................................... 19, 21

United States v. Pagartanis,
  No. 18-CR-00374, 2024 WL 2111544 (E.D.N.Y. May 10, 2024) ............... 48

United States v. Pipkins,
  378 F.3d 1281 (11th Cir. 2004) .......................................... 22

United States v. Plaza,
  752 F. App'x 37 (2d Cir. 2018) .......................................... 21

United States v. Portillo-Valenzuela,
  20 F.3d 393 (10th Cir. 1994) ............................................ 46

United States v. Rocha,
  145 F.4th 1247 (10th Cir. 2025) ......................................... 44

United States v. Rosa,
  17 F.3d 1531 (2d Cir. 1994) ......................................... 32, 34

United States v. Rubenstein,
  403 F.3d 93 (2d Cir. 2005) .............................................. 39

United States v. Ruggiero,
  100 F.3d 284 (2d Cir. 1996) ..................................... 19, 23, 24

United States v. Sabhnani,
  599 F.3d 215 (2d Cir. 2010) ............................................. 63

United States v. Sarlo,
  269 F. App'x 30 (2d Cir. 2008) .......................................... 21

United States v. Saunders,
  973 F.2d 1354 (7th Cir. 1992) ........................................... 46

United States v. Singletary,
  458 F.3d 72 (2d Cir. 2006) .............................................. 27

United States v. Skys,
  637 F.3d 146 (2d Cir. 2010) ............................................. 39

United States v. Spencer,
    129 F.3d 246 (2d Cir. 1997) ................................................................ 41

United States v. Sterkaj,
    138 F.4th 95 (2d Cir. 2025) ................................................................ 45

United States v. Tavberidze,
    769 F. Supp. 3d 264 (S.D.N.Y. 2025) ........................................... 42, 43

United States v. Tejeda,
    No. 11-CR-1015 (DC), 2024 WL 1676329 (S.D.N.Y. Apr. 18, 2024) ................... 47

United States v. Trevino,
    7 F.4th 414 (6th Cir. 2021) ................................................................ 44

United States v. Vargas,
    961 F.3d 566 (2d Cir. 2020) ................................................................ 42

United States v. White,
    240 F.3d 127 (2d Cir. 2001) ................................................ 19, 26, 27

United States v. White,
    869 F.2d 822 (5th Cir. 1989) ................................................................ 46

Statutes

18 U.S.C. § 1589 ............................................................... 20, 33, 37
18 U.S.C. § 1589(a)(2) ................................................................ 37
18 U.S.C. § 1589(c)(2) ................................................................ 26
18 U.S.C. § 1589(d) ..................................................................... 27
18 U.S.C. § 1591 ......................................................................... 26
18 U.S.C. § 1591(e)(2) ................................................................ 26
18 U.S.C. § 1591(e)(5) ............................................................ 23, 26
18 U.S.C. § 1593(a) ..................................................................... 63
18 U.S.C. § 1594(b) ............................................... 13, 15, 20, 62
18 U.S.C. § 2241 .................................................................... 34, 47
18 U.S.C. § 2242 ................................................................... *passim*
18 U.S.C. § 2242(1) ................................................................ 20, 30
18 U.S.C. § 2242(3) ................................................................ *passim*
18 U.S.C. § 2246(2) ..................................................................... 25
18 U.S.C. § 2246(2)(C) ................................................................ 25
18 U.S.C. § 3500 ......................................................................... 24
18 U.S.C. § 3553(a) ..................................................................... 50
18 U.S.C. § 3553(a)(2) ................................................................ 51
18 U.S.C. § 3559(a)(3) ................................................................ 62
18 U.S.C. § 3583(b)(2) ................................................................ 62
18 U.S.C. § 3661 ......................................................................... 51
18 U.S.C. § 3664(d)(5) ................................................................ 63
U.S.C. § 2242 ............................................................................. 35

<u>PRELIMINARY STATEMENT</u>

Following a five-week trial, a jury found the defendants Rachel Cherwitz and Nicole Daedone guilty of forced labor conspiracy, in violation of Title 18, United States Code, Section 1594 for their roles running OneTaste, Inc. ("OneTaste"), a purported sexual wellness company. ECF No. 408. For nearly twelve years, from approximately 2006 through 2018, Cherwitz, Daedone, and other OneTaste leaders conspired to obtain the unpaid or substantially underpaid sexual services, menial labor, and other work from individuals, primarily young women, whom they subjected to physical, economic, sexual, emotional, and psychological abuse, causing lasting harm to these women.

As the Head of Sales and second-in-command at OneTaste, Rachel Cherwitz occupied a core role in the conspiracy and employed abusive and coercive tactics against a group of OneTaste participants, leaving victims physically, emotionally, financially, and psychologically scarred—many of whom testified before this Court. Cherwitz's crimes continued for over a decade. Meanwhile, Cherwitz received a salary and a position of power and authority from her involvement in the scheme.

For the reasons set forth below, a sentence of 168 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, avoid sentencing disparities, and provide the specific and general deterrent effect called for by the defendant's offense.

## BACKGROUND

### I. The Offense Conduct

   The evidence adduced at trial and set forth in the Pre-Sentence Investigation Report ("PSR") and its addenda established the following facts. Nicole Daedone co-founded OneTaste in San Francisco in 2004 with Robert Kandell. Tr. 3245-52.[1] OneTaste was a privately held, for-profit company. Tr. 3347, 3413, 3449; GX 4056. OneTaste offered hands-on classes in orgasmic meditation or "OM": massaging a woman's clitoris for fifteen minutes for purported meditative or spiritual benefits. Tr. 106-07; 111-12; 3249-50; GX 3120. The company operated through various related entities and, at different points in time, maintained operations in Brooklyn, New York; San Francisco, California; Las Vegas, Nevada; Los Angeles, California; Boulder, Colorado; Austin, Texas; New York, New York; and London, United Kingdom. PSR ¶ 4. OneTaste also operated communal residences known as OM houses, including in Brooklyn, New York. Id. ¶ 5.

   Nicole Daedone served as OneTaste's Chief Executive Officer from approximately 2006 through 2017. Id. ¶ 7. She resigned from her position on March 2, 2017, but remained involved in a variety of OneTaste events, courses, and projects until at least July 5, 2018. Id.

   Rachel Cherwitz joined OneTaste in January 2007 and became the Head of Sales. Tr. 3276, 3352. When Rachel Cherwitz joined OneTaste, Daedone and Cherwitz quickly took to each other, and Cherwitz became Daedone's top student and protégé. Tr. 3301-02. Cherwitz departed OneTaste in May 2018. PSR ¶ 8.

---

   [1]  Unless otherwise indicated, "Tr." refers to the Trial Transcript in this case.

As proven at trial, between 2006 and May 2018, Daedone and Cherwitz, together with others, participated in a scheme to obtain the labor and services of a group of OneTaste participants by subjecting them to economic, sexual, emotional, and psychological abuse, surveillance, indoctrination, and intimidation. Daedone and Cherwitz executed the charged conspiracy with agents and co-conspirators who were members of OneTaste's "inner circle" and who each maintained senior positions at and acted as agents on behalf of OneTaste, including: Joanna Van Vleck, who also previously served as the CEO, President, and Director of Marketing at OneTaste; Yia Vang, a senior executive at OneTaste whose responsibilities included, among other things, management of OneTaste's payroll; Robert Kandell, a co-founder, former Chief Operating Officer, and senior executive at OneTaste whose responsibilities included managing OneTaste's finances; Rachael Hemsi, a senior executive at OneTaste who for a time served as OneTaste's Head of Sales and oversaw a communal home in San Francisco; and Aubrey Fuller, a senior executive at OneTaste. Id. ¶ 10.

Cherwitz, Daedone, and members of the OneTaste inner circle conspired to obtain the labor and services of at least the following OneTaste participants:

- Christina Berkley, a former OneTaste student and staff member who worked for OneTaste between approximately 2006 and 2010, in both San Francisco and New York;

- Ayries Blanck, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2013 through early 2015, including in New York City;

- Dana Gill, a former OneTaste student and staff member who worked for OneTaste from approximately 2009 through 2013, primarily in San Francisco;

- Anthia Gillick, a former OneTaste student and part-owner of the OneTaste NYC affiliate who became involved in OneTaste beginning in 2013 through 2015 in New York;

- Becky Halpern, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2010 through 2014, including in New York City;

- Lyndsi Keves, a former OneTaste student and staff member who worked for OneTaste, including by assisting with sales, from approximately November 2016 through October 2017, primarily in New York City;

- Lianna Lifson, a former OneTaste student and staff member who worked for OneTaste, including in sales, from approximately 2008 through 2012, primarily in San Francisco, Boulder, Colorado, and New York;

- Michal Neria, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste from approximately 2014 through 2015, including in New York City;

- Max Pixley, a former OneTaste student and staff member who began working for OneTaste in 2012, including by assisting with event production and sales, primarily in New York City; and

- Michelle Wright, a former OneTaste student and staff member who worked for OneTaste, including in sales, beginning in 2010 through 2014, primarily in San Francisco and Las Vegas.

Id. ¶ 12.

Cherwitz, Daedone, and their co-conspirators manipulated and exploited such OneTaste participants by causing them, and conspiring to cause them, serious harm—including psychological, financial, sexual, and reputational harm sufficiently serious under the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or continue performing such labor and services, id. ¶ 13, as detailed below.

A.      OneTaste's Beginnings

OneTaste began in 2006 in a small communal warehouse in San Francisco known as the "Warehouse."  Id. ¶ 14.  In its early days, OneTaste struggled to make money.  Tr. 3322. Beginning in 2006, Daedone sought to finance OneTaste through the capital investment of a

wealthy entrepreneur, Reese Jones. Tr. 844-45, 3304-06. Daedone, Cherwitz, and others worked to keep Jones satisfied and interested in OneTaste by, among other things, orchestrating elaborate sexual scenes for him and coercing a series of women to serve as his unpaid or underpaid "handlers." The women directed to serve as Jones's handlers—who were primarily young women who had joined OneTaste looking for community and healing—were coerced into providing him with daily sexual services, including stroking his penis to climax, using sex toys on him, walking him around naked on a leash, and "topping" him. Tr. 1085-86, 1228, 1247, 1270, 1294-99, 1596, 2318-19, 2402-07, 2412, 3272, 3313-15; PSR ¶ 15.

In exchange, Jones financed OneTaste (and Daedone personally), and, for several years, OneTaste was dependent on him for its survival. Tr. 3303-04, 3310, 3321-35. Beginning in 2007 and through 2011, while Jones was being sexually and otherwise serviced by women on OneTaste's behalf, Jones invested at least $800,000 in the company. PSR ¶ 16. He also provided equipment, advice, housing, and hotels to OneTaste staff and financially supported Daedone's lifestyle. Throughout the entirety of the time that Jones made payments to OneTaste and Daedone personally, he was sexually serviced by women at OneTaste. Tr. 3314-15.

Multiple witnesses testified at trial about the circumstances that led each of them to serve as Jones's handler. They cited "brainwashing," psychological abuse, financial coercion, employment retaliation, threats, and emotional and sexual abuse perpetrated by Daedone, Cherwitz, and other OneTaste leaders. See, e.g., Tr. 1015, 1056, 1077, 1229, 1270, 1287, 1300, 1301, 1308, 2350, 2404, 2410, 2422, 2320, 2784, 2319, 3313-15. Both Daedone and Cherwitz knew that several of Jones's handlers did not want to sexually service him. See GX 4501-K-D, 2148-D, 1258-D-R, Tr. 2422-2425; PSR ¶ 22-23. For instance:

- Christina Berkley served as Daedone's assistant, which required her to be on call 24/7, and as Jones's handler. PSR ¶ 18. When Daedone offered Berkley these positions, she

5

asked Berkley, "How good are you at sucking cock?" Tr. 1077. As Jones's handler, she masturbated Jones to climax every morning. She also sexually serviced him. Berkley testified that during this time she felt "brainwashed" and, because of Daedone's and others' psychological abuse, was "totally ready and willing to do everything." Tr. 1201.

- Michelle Wright also served as Jones's handler. PSR ¶¶ 19-20. Specifically, in 2011, Daedone asked Wright and her romantic partner to live in Jones's home, cook for him, and make sure that he had what he needed. Wright testified that she understood that request to include sexual services. Thereafter, Yia Vang and another OneTaste participant took Wright to Jones's house where they showed Wright how to "jerk []off" Jones and how to put a dildo in his anus. Tr. 2319. Wright testified that she did this work in response to a variety of fear tactics, like "ostracization" and control, and other psychological abuse. Tr. 2320-21.

- Dana Gill was recruited to become Jones's handler in December 2012 after Wright moved to Las Vegas and after Gill suffered a miscarriage. PSR ¶ 21. Gill moved into Jones's home, where she was shown Jones's sex toys, advised on how to use them on Jones, and instructed to "top" him and walk him on a leash. Gill testified that she did this because she suffered from a variety of harms, including economic and psychological harm. Tr. 1226-28.

B.    OneTaste's Shift to Sales and Expansion

By 2011, Jones began demanding repayment of certain loans that he had made to OneTaste. Tr. 3335-39. To make money and fuel OneTaste's growth, Daedone directed Cherwitz to engage a full-fledged sales team dedicated to selling increasingly expensive courses. Id. Men willing to pay for certain courses, typically taught by Daedone, Cherwitz, or other OneTaste leaders, could expect to have their penises stroked or their prostates massaged, or otherwise engage in OM, often by female OneTaste workers. Tr. 1342, 1721, 1856, 3783, 3956-59; PSR ¶ 24. Daedone set aggressive sales goals, and Cherwitz implemented them. Tr. 3414-15; PSR ¶ 25.

By the spring of 2012, OneTaste became profitable, in large part due to its expensive coaching program. Tr. 3347. Using the money from these and their predecessor courses, OneTaste leaders, including Daedone, Cherwitz, and Kandell, continued paying Jones

back for his loans to OneTaste, and Daedone also continued directing women to provide sexual services to Jones. Cherwitz checked in on and received reporting from women sexually servicing Jones, <u>see, e.g.</u>, Tr. 2410-11, GX 2148-D, and she knew many of these women were struggling. <u>See, e.g.</u>, GX 1258-D-R. By June 2013, OneTaste had finished repaying Jones. <u>See</u> GX 1263. In August 2014, Daedone texted another OneTaste participant, "when I paid him [Jones] off that ended all 'favors.'" GX 1604-D-R.

But even after the sexual favors to Jones ended, sexual services for prospective clients, VIPs, and other community members at OneTaste continued. Over the next several years, Daedone and Cherwitz instructed female workers to engage in various unpaid sex acts with clients or prospective customers. Tr. 114-15, 1280-81, 1282-83, 1687-88, 1691-92, 1721-22, 2347-48, 2419, 2709, 2133, 2164, 3957, 3958-59; PSR ¶ 26. They also instructed employees to have sex with one another and to use dating sites to identify men for sexual acts and involvement in OneTaste. Tr. 3959-64. Daedone and Cherwitz insisted that employees engage in these sex acts even if they found them disgusting; those who resisted were punished with negative employment consequences, shunning, sexual abuse, and threats of physical violence, among other things. Tr. 257, 260-61, 297-306, 1268, 1679-80, 1722, 1734-35, 2347, 2419-41, 2444-48, 2458, 3002.

As money came in from the sale of OneTaste courses, OneTaste rapidly expanded, opening in cities throughout the United States, including Las Vegas, Nevada; Los Angeles, California; Boulder, Colorado; Austin, Texas; Philadelphia, Pennsylvania; Brooklyn, New York; and New York, New York; and in London, United Kingdom. PSR ¶ 27.

C. <u>The Defendants' Abusive Tactics of Coercion</u>

Nearly every trial witness described how Daedone, Cherwitz, and their co-conspirators engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of

past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion, and financial harm to force the labor of certain employees. PSR ¶¶ 28, 69-80. The totality of these coercive tactics caused the victims to perform labor and services under serious harm and threat of the same. Id. Daedone and Cherwitz knew the harm and trauma they were causing their victims. Id. ¶ 29.

### *Psychological Harm*

Every victim who testified described the serious psychological harm they experienced while at OneTaste, including the specific harm the defendants inflicted on them, Tr. 1014-16, 1608, 1639-40, 1742-43, 1748-49, 2963, 3806; DX 3EA, and how that harm in turn caused them to provide labor or services to OneTaste. Tr. 118-122, 1287, 1919-20, 2102-03, 2320-23; GX 4513-A-R, 4514-A-R. Every one of the victims described a version of the defendants' "slow whittling down of who I was and how I saw the world and my own personal boundaries," Tr. 1639-40 (Max Pixley testimony), and causing an "immense amount of anxiety and depression and various forms of . . . . physical and emotional and psychological stress." Tr. 2320 (Michelle Wright testimony). Certain of the tactics that contributed to this psychological harm—which the victims testified caused them to work or continue working for OneTaste—included the following:

- Public shaming and verbally abusing their victims to coerce them to perform labor and services for OneTaste. Tr. 298, 1121-22, 1695, 2409, 2963; GX 2000-D-R; PSR ¶ 30.

- Indoctrinating the victims to believe that Daedone was a guru and spiritual leader, and that they should do as Daedone and her leadership team said. See, e.g., Tr. 213, 1243-44; 122, 1945, 2684, 3938; PSR ¶ 35.

- Isolating their victims so that they believed that OneTaste was all they had. See, e.g., Tr. 254-56, 1051-52, 1066, 1259, 2154, 2448-49, 2770; PSR ¶ 35.

- Shunning people who left OneTaste, which made those at OneTaste believe they too would lose everything if they left. See, e.g., Tr. 372, 1080, 1125, 2422, 2998-9; PSR ¶ 96.

- Keeping tabs on their victims and controlling nearly every aspect of their lives, including requiring employees to surveil and report on one another to Cherwitz and Daedone, see, e.g., Tr. 1698, 1839, 3930; GX 2676; directing their victims to prepare "fear inventories" or "withholds" of their deepest fears and read them to the executive team, including directly to Cherwitz, Tr. 1229; PSR ¶ 41, and directing victims to attend addiction meetings, such as Alcoholics Anonymous and Narcotics Anonymous, even if they were addicted to neither, see Tr. 2774-75; PSR ¶ 39.

- Using workers' past trauma against them. See, e.g., Tr. 149-50; 3949-50; PSR ¶ 38.

- Disrupting intimate relationships between OneTaste participants to further their own goals. Tr. 1040, 1120, 1312, 2449 3277; GX 3212-R; PSR ¶ 36.

- Using the information they obtained, combined with their positions of power and leadership over the victims, to employ tactics of manipulation as a means of directing labor, Tr. 3381, including techniques such as "[t]hreats," "fear of losing position," and retaliatory employment decisions, Tr. 3382-3385; see also id. at 3383-84 (Kandell testimony as to Cherwitz specifically that "she would basically do whatever it took to make our sales goals," including "us[ing] any tool she had, any knowledge of the person to push them in the direction of increasing sales and attention and dedication to the organization," which included "love bomb[ing]," making promises, "bring[ing] up their faults" and "embarrass[ing] them in front of a group"); id. at 3289, 3384-85 (Kandell testimony describing Daedone's manipulative tactics).

### *Financial Harm*

Many of the victims in this case also suffered extreme financial harm. See PSR ¶¶ 46-56. Victims testified that they were driven into debt because of OneTaste's expensive courses and the defendants' sales tactics, which the victims took because the defendants made their victims believe that they needed to take more OneTaste courses to reach enlightenment and sexual wellness. See, e.g., Tr. 1056, 1270, 2123, 2319, 2344, 2694-96, 2784, 2977; PSR ¶ 48. The defendants also pressured their victims to pay for programs that they could not afford. PSR ¶ 49. The defendants portrayed financial issues as a "third-dimensional problem" and taught that money was just an illusion. PSR ¶ 46. And meanwhile, the defendants paid the victims little to

9

nothing while the victims worked around the clock for the defendants.  See, e.g, Tr. 2102; GX 856, 1283-D-R, 1331-A-R, 1332-A-R, 2200; PSR ¶ 52.  Witnesses testified that they were constantly in debt to OneTaste in light of such financial tactics, which made it difficult for them to leave and kept them working for OneTaste.  See, e.g., Tr. 2102, 2123, 2319, 2784; GX 3501-3, 3501-5.

### *Sexual Abuse*

In addition to grooming the victims to participate in sexual acts, the defendants also subjected them to sexual abuse, contributing to both physical and psychological harm.  See, e.g., Tr. 290-91, 304-5, 1227, 1280-83, 1596, 1688-89, 2319, 2350, 2356, 2407-09; PSR ¶¶ 57-66.  The defendants directed women to sexually service Jones, VIP clients, prospective clients, and community members.  See id.; PSR ¶¶ 58-59.  Many of these sexual acts were non-consensual, PSR ¶ 61, and were obtained by lowering OneTaste participants' barriers and making it more likely that OneTaste participants would have sex and OM with others, which, in turn, would generate sales.  PSR ¶ 58.  As Michelle Wright testified, sexually servicing Jones contributed to "wearing [her] down emotionally," felt "degrading," and "removed [her] from reality," leaving her "numb" and unable to feel the effects until much later, which included depression, anxiety, and trauma.  Tr. 2412-13.  Notably, Cherwitz also forcibly massaged Becky Halpern's genitals without her consent during an OM demonstration after Halpern explicitly said she did not want to participate and was shaking and crying.  Tr. 304-06.

Sex was also used as a means of encouraging productivity, PSR ¶ 63, and as a means of working through trauma, id. ¶ 66.  For example, Cherwitz ordered Anthia Gillick, Ayries Blanck, and others on the New York sales team to have sex every day for a month to increase sales.  See, e.g., 1688-96, 3963-65, 3964.  Cherwitz repeatedly described these actions

as necessary to induce people to work harder for OneTaste. <u>See, e.g.</u>, Tr. 3961-65 (Gillick testimony). These tactics ensured that OneTaste participants would continue to have sex for Daedone's financial benefit. <u>Id.</u> ¶ 59.

<em><u>Physical Exhaustion</u></em>

Finally, every victim testified to being physically exhausted and overworked while at OneTaste. PSR ¶ 67. OneTaste participants were expected to work from early in the morning to late at night, and were discouraged from taking vacations or breaks. The defendants also subjected their victims to rigid schedules and to respond immediately to text message threads. <u>Id.</u> Victims who failed to meet these requirements were targeted with criticism and discipline. <u>Id.</u> For example, Michelle Wright and Lianna Lifson, who both served as city leaders for OneTaste in Las Vegas and Boulder, respectively, testified regarding the abusive employment conditions they experienced. Tr. 2425-26, 2107, 2137. Lifson testified that she was frequently sick from how much she was working and developed shingles. Tr. 2155-56. Anthia Gillick similarly testified regarding the hours she worked, the sleep deprivation, and the impact that her physical exhaustion had on her psychological state, as did many of the other victims. Tr. 3927; 244, 252, 2425-26, 2107, 2137, 2794.

Because Cherwitz was responsible for OneTaste's profitability, <u>see</u> GX 1136, 1141, 1159; Tr. 3414-15, Cherwitz made clear that employees could not sleep until they hit their sales goals, Tr. 2137, forced employees to constantly check in with her, and "led the sales thread that never slept." Tr. 2107. Indeed, the defendants' co-conspirators, including Yia Vang and Joanna Van Vleck, noted that Cherwitz "yell[ed] at people to motivate them," and treated employees so poorly that Vang and Van Vleck were concerned her behavior would "continue to get us in trouble the bigger we get." GX 2000-D-R. Additionally, Cherwitz and Daedone

directed employees to perform unpaid or underpaid menial labor, including cleaning Daedone's bathroom and being Cherwitz's assistant. Tr. 1663, 1697. Cherwitz also knew that people who worked at OneTaste were not being paid for their labor, see, e.g., GX 1331-A-R; 1332-R, calling the fact that people wanted to be paid "so fucking dumb ass stupid." GX 2200-D.

Daedone and Cherwitz, together with their co-conspirators, also subjected OneTaste participants to micro-regulation by governing minute aspects of their everyday life. PSR ¶ 68. They controlled how OneTaste participants dressed, restricted access to mainstream activities, and imposed strict conditions on their sexual activities and relationships. Id.

D.     The Labor and Services Performed

As proven as trial, an object of the defendants' conspiracy was to obtain the forced labor and services of a select group of OneTaste participants to financially benefit OneTaste and, in turn, so that Daedone and Cherwitz would benefit financially or increase their power and status within the company. The labor and services obtained included: domestic services; administrative and personal services; sales, marketing, pitching and recruitment work; video and website production; the operation of certain OneTaste locations; and the performance of physical labor to maintain OneTaste's properties. PSR ¶ 82. However, the labor and services obtained were also sexual in nature. Id. ¶ 83. This included the provision of OM and other sex acts to OneTaste customers, investors, and OneTaste members and employees. Id. Daedone and Cherwitz instructed their victims to have sex with potential clients and other OneTaste employees and/or members, including performing oral sex and using sex toys. Id. ¶ 84. Daedone also supplied women to Reese Jones to sexually service him and arranged for various sexual scenes for him to elicit investments in OneTaste. Id. ¶ 86-87.

E.    The Benefits Cherwitz Accrued

Cherwitz benefitted from the systematic exploitation of these employees. With Daedone at the helm and Cherwitz leading the sales team, OneTaste grew into an international, multi-million-dollar company; when the business sold in 2017, Daedone made $12 million. GX 4056; Tr. 4318. And many of the benefits from the scheme were not strictly financial: Cherwitz became an idolized leader and power broker at the company while making a salary greater than the victims. See, e.g., GX 862, 3808-A-1.

II.   Procedural History

On or about April 3, 2023, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment") charging Daedone and Cherwitz with forced labor conspiracy, in violation of 18 U.S.C. § 1594(b). See ECF No. 1.

Trial began on May 5, 2025. Over approximately five weeks, the government presented testimony from 16 witnesses, including one of the defendant's co-conspirators; numerous victims; an FBI agent; and an FBI forensic accountant. As the Court noted, many of the victims who testified at trial did so despite being in "fear" of the defendants and their supporters. June 9, 2025, Tr. of Proceeding ("Bond Hearing Tr.") at 27.[2]

In the lead up to trial, someone leaked materials that were under a protective order to an attorney associated with OneTaste, who subsequently referenced those materials in a threatening letter to a supervising Assistant U.S. Attorney. The Court has not yet made a finding

---

[2]    For instance, the Court had previously noted that one of the defendants' supporters was "making [] faces" at witnesses. Tr. 3908. The Court also admonished individuals sitting in the public gallery not to "intimidate and/or deter the presence of any member of the public or courthouse staff." Tr. 930. At the bond hearing, the Court stated that Daedone spent much of trial turned towards her supporters. Bond Hearing Tr. at 27.

as to who violated its Order.  Similarly, an agent of the defendants' made threatening comments in the press, including writing an article that bore a swastika over the Department of Justice seal. Id. at 31.

On June 9, 2025, the jury returned a verdict of guilty on the sole count of the Indictment.  The next day, the Court determined that the defendants did not meet their burden that they should be released pending sentencing, and the defendants were remanded to custody. See PSR ¶ 3.  The Second Circuit subsequently affirmed the Court's remand decision.

## LEGAL FRAMEWORK

### I.    The Sentencing Framework and Applicable Guidelines Calculations

For her conviction of forced labor conspiracy in violation of 18 U.S.C. § 1594(b), the defendant faces a sentence of up to twenty years' imprisonment.

The United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"), while advisory, are still a strong source of guidance for sentencing courts following Booker and its progeny.  See United States v. Booker, 543 U.S. 220, 264 (2005) (holding that while the Guidelines are not mandatory, they remain in effect and must be "consult[ed]" and "take[n] into account" at sentencing).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" as the "starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).

#### A.    The Government's Guidelines Calculation

The government estimates the defendant's adjusted offense level to be 35, based on the following Guidelines' calculation:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2H4.1(a)(1)) | 22 |
| Plus: Serious Bodily Injury (U.S.S.G. § 2H4.1(b)(1)(B)) | +2 |
| Plus: Victims Held in Condition of Involuntary Servitude For More than One Year (U.S.S.G. § 2H4.1(b)(3)(A)) | +3 |
| Adjusted Offense Level: Another Felony Offense Committed in Connection with the Offense (U.S.S.G. § 2H4.1(b)(4)(B); U.S.S.G. § 2A3.1(a)(2)) | 32 |
| Plus: Role as Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | +3 |
| **Total:** | **35** |

An adjusted offense level of 35 and a criminal history category of I results in a Guidelines' range of 168 to 210 months' imprisonment.

This calculation is based principally on the cross-reference in U.S.S.G. § 2H4.1 to § 2A3.1 for the commission of another felony offense. U.S.S.G. § 2H4.1(b)(4)(B) & cmt. n.2 (hereinafter, the "Criminal Sexual Abuse Cross-Reference"). PSR ¶ 96. In this case, another felony offense includes violations of 18 U.S.C. § 2242. The applicable Guidelines for such violations is U.S.S.G. § 2A3.1(a)(2). PSR ¶ 96. Because the evidence presented at trial, including in support of the offense of conviction, plainly establishes that the defendant's conduct constitutes criminal sexual abuse, as described more fully below, the Court should apply the Criminal Sexual Abuse Cross-Reference.[3]

The government submits that three levels should be added due to Cherwitz's role as a manager or supervisor at OneTaste under U.S.S.G. § 3B1.1(b). The defendant has not demonstrated any acceptance of responsibility for her conduct, so no adjustment under U.S.S.G. § 3E1.1 is warranted. The adjusted offense level is 35. Because the defendant's criminal history category is I, her corresponding Guidelines range of imprisonment is 168 to 210 months.

B.    Probation's Guidelines Calculation

In the PSR, Probation calculated the defendant's Guidelines range of imprisonment as 188 to 235 months' imprisonment, based on the following Guidelines offense level and a criminal history category of I:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2H4.1(a)(1)) | 22 |
| Plus: Serious Bodily Injury (U.S.S.G. § 2H4.1(b)(1)(B)) | +2 |

---

[3]    The enhancements for individuals held in involuntary servitude for more than one year and serious bodily injury ultimately do not impact the Guidelines calculation. See PSR ¶¶ 96, 108.

| | |
|---|---|
| Plus: Victims Held in Condition of Involuntary Servitude For More than One Year (U.S.S.G. § 2H4.1(b)(3)(A)) | +3 |
| Adjusted Offense Level: Another Felony Offense Committed in Connection with the Offense (U.S.S.G. § 2H4.1(b)(4)(B); U.S.S.G. § 2A3.1(a)(2)) | 32 |
| Plus: Aggravated Role as Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| **Total:** | **<u>36</u>** |

<u>See</u> PSR at ¶¶ 104-115, 169.

Generally, the government's and Probation's calculations of the Guidelines are the same, except that the government disagrees with Probation's application of the aggravated role four-level enhancement as an organizer or leader. Instead, a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) applies. As explained further below, unlike Daedone, Cherwitz was not the leader or primary decisionmaker at OneTaste, and she did not profit from the conspiracy in the same way that Daedone did.

C. The Defendant's Guidelines Calculation

In the defendant's sentencing submission, ECF No. 468, 472 (hereafter, "Def. Mem."), the defendant calculates the relevant Guidelines range as 21 to 27 months' imprisonment. Def. Mem. at 13. The defendant requests a sentence of time served. Def. Mem. at 45. For the reasons set forth below, the Court should adopt the government's Guidelines' calculation and reject the defendant's inaccurate calculation, which grossly minimizes her culpability.

II. The Parties' Guidelines Disputes

In the defendant's sentencing memorandum, the defendant lodged several objections to the Guidelines calculation set forth in the PSR and PSR addenda. Each of these objections is addressed below. For the reasons described below, first, the Court must consider all

relevant conduct under U.S.S.G. § 1B1.3.  Second, the Court should apply the cross-reference for the defendant's criminal sexual abuse.  Third, the defendant is not entitled to a reduction under U.S.S.G. § 2X1.1(b)(1).  Fourth, the government need only prove enhancements under U.S.S.G. § 2H4.1 by a preponderance of the evidence.  Fifth, the enhancements for serious bodily injury, involuntary servitude, and the defendant's role in the offense apply.  Sixth, the Court should reject the defendant's proposed reductions to the Guidelines range, which are inapplicable in this case.  And finally, the defendant is not entitled to a downward departure under U.S.S.G. § 5H1.11.

A.    <u>The Defendant's Guidelines Calculation Errs by Narrowly Construing the Scope of Relevant Conduct</u>

As an initial matter, the defendant appears to dispute the extent to which the Court may consider evidence of the proven conspiracy, including relevant conduct, and what that conduct entails in this case.  Indeed, throughout her submission, the defendant ignores relevant conduct entirely.  When conducting a Guidelines calculation, the sentencing range "<u>shall</u> be determined" by considering all "relevant conduct," which is defined in § 1B1.3 of the Guidelines.  U.S.S.G. § 1B1.3(a) (emphasis added).  That section explains that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  <u>Id.</u> § 1B1.3(a)(1).  Relevant conduct also includes, for a conspiracy or any other jointly undertaken criminal activity, "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity" whether they occurred during the offense, in preparation for the offense, or when attempting to avoid detection for the offense.

U.S.S.G. § 1B1.3(a)(1)(B).  Thus, though the Court must first identify the Guideline applicable to the offense of conviction, it must then consider relevant conduct, including uncharged conduct and reasonably foreseeable conduct by co-conspirators.  United States v. Padilla, 961 F.2d 322, 325-26 (2d Cir. 1992); see also United States v. White, 240 F.3d 127, 136 (2d Cir. 2001) (court may make factual findings based on relevant conduct when sentencing a defendant without violating a defendant's due process rights).

As the Second Circuit has made clear, at sentencing, judges are not limited to considering the facts found by the jury or admitted by the defendant but instead are obligated to make findings at sentencing using a preponderance standard.  See, e.g., United States v. Cordoba-Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000) (proof by a "preponderance of the evidence" is the applicable burden of proof when a sentencing judge is asked to assess disputed facts relevant to sentencing); United States v. Ruggiero, 100 F.3d 284, 290-91 (2d Cir. 1996) (same); see also U.S.S.G. § 6A1.3 cmt. ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").   A Court may make factual determinations to sentence a defendant to a sentence within the maximum allowed by statute based not only on conduct charged in an indictment but also on relevant conduct. White, 240 F.3d at 136.

B.     The Criminal Sexual Abuse Cross-Reference Under U.S.S.G. § 2H4.1 Applies

The Court should apply the Criminal Sexual Abuse Cross-Reference pursuant to U.S.S.G. § 2H4.1(b)(4)(B), which directs sentencing courts to apply the offense level for "any other felony offense committed during the commission of, or in connection with," the forced labor offense, if that results in a higher offense level, plus two levels.  This enhancement applies because the offense involved the defendant knowingly engaging in a sexual act with Becky

Halpern without her consent, to include doing so through coercion, in violation of 18 U.S.C. § 2242(3), and the offense involved the coercion and sexual abuse of at least three victims— Christina Berkley, Michelle Wright, and Dana Gill—who served as Reese Jones's handlers, in violation of 18 U.S.C. § 2242(1).

      1.   <u>Applicable Law</u>

In determining the applicable base offense level for forced labor conspiracy, in violation of 18 U.S.C. § 1594(b), the Sentencing Guidelines instruct a sentencing court to look to U.S.S.G. § 1B1.2(a), which explains: "if the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense." U.S.S.G. § 1B1.2(a) & cmt. n.1. Conspiracy under 18 U.S.C. § 1594(b) is not covered by a specific guideline in the Statutory Index, so a sentencing court must follow U.S.S.G. § 2X1.1 to determine the appropriate base offense level. Section 2X1.1(a), in turn, directs courts to apply "[t]he base offense level from the guideline for the substantive offense." U.S.S.G. § 2X1.1(a). For substantive forced labor, in violation of 18 U.S.C. § 1589, the applicable sentencing guideline is U.S.S.G. § 2H4.1.

Section 2H4.1(b)(4) directs that if "another felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of: (A) 2 plus the offense level as determined above, or (B) 2 plus the offense level from the offense guideline applicable to that other offense, but in no event greater than level 43." Application Note 2 explains that for purpose of this cross-reference, "'any other felony offense' means any conduct that constitutes a felony offense under federal, state, or local law." This includes offenses, such as 18 U.S.C. § 2242, that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States. <u>See</u> U.S.S.G. § 1B1.5, cmt. n.3 ("Consistent with the provisions of §1B1.3 (Relevant Conduct), such other offense

includes conduct that may be a state or local offense and conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States.").

Here, those other federal felony offenses include 18 U.S.C. § 2242(3), which criminalizes knowingly "engag[ing] in a sexual act with another person without that other person's consent, to include doing so through coercion" and § 2242(1), which criminalizes knowingly "caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)." The applicable Guidelines provision for a violation of 18 U.S.C. § 2242 is U.S.S.G. § 2A3.1, which, in this case, sets a base offense level of 30. See U.S.S.G. § 2A3.1(a)(2); see also § 2G1.1(c) ("If the offense involved conduct described in . . . 18 U.S.C. § 2242, apply § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse)." Two levels are added to the base offense level of 30 pursuant to U.S.S.G. § 2H4.1(b)(4)(B). PSR ¶ 108.

In assessing whether the Criminal Sexual Abuse Cross-Reference applies, the Court should look not only to the offense of conviction but to all relevant conduct. See U.S.S.G. § 1B1.3(a)(1)(A), (B); § 1B1.3(a)(3); United States v. Plaza, 752 F. App'x 37, 46 (2d Cir. 2018) (upholding application of murder cross-reference in determining that an uncharged murder was "relevant conduct" to defendant's participation in a narcotics conspiracy); Padilla, 961 F.2d at 326 (2d Cir. 1992) (noting that district courts should consider all relevant conduct for cross-references).

Where the cross-reference is satisfied, the Court must apply it. See United States v. Sarlo, 269 F. App'x 30, 31 (2d Cir. 2008) (noting that application of a cross-reference is

"mandatory" and "not a matter within the discretion of the sentencing court"); United States v. Johnson, 221 F.3d 83, 97-98 (2d Cir. 2000) (noting that the Guidelines mandated application of a cross-reference); United States v. Pipkins, 378 F.3d 1281, 1301 (11th Cir. 2004) ("A district judge confronted with [overlap between cross-reference and enhancement] is not free to choose between the enhancement and the cross-reference: when there is overlap, the judge must apply the cross-reference"), judgment vacated, 544 U.S. 902 (2005), and opinion reinstated, 412 F.3d 1251 (11th Cir. 2005); see also United States v. Banks, 190 F. App'x 825, 826 (11th Cir. 2006).

2.     Cherwitz's Conduct as to Becky Halpern Establishes Application of the Criminal Sexual Abuse Cross-Reference

The evidence here demonstrates precisely the type of conduct necessitating application of the Criminal Sexual Abuse Cross-Reference. The trial record proves by a preponderance of the evidence that Cherwitz "engaged in a sexual act with another person without that other person's consent," including "doing so through coercion," in violation of 18 U.S.C. § 2242(3). Section 2246(2)(C) defines "sexual act" as the "penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." While "coercion" is not defined within Section 2246, Title 18, United States Code, Section 1591 (sex trafficking), defines "coercion" as "threats of serious harm to or physical restraint against any person; [] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or [] the abuse or threatened abuse of law or the legal process." "Serious harm", in turn, means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background

and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

In this case, Cherwitz forcibly touched Ms. Halpern's clitoris without her consent, including doing so through coercion. The trial evidence established the following relevant facts that prove a violation of § 2242(3) by a preponderance of the evidence. Ms. Halpern testified that she and others received a text message one morning to attend a meeting at an OM house, the Morellino. Tr. 303. Cherwitz announced during the meeting that Ms. Halpern was no longer doing OM demonstrations. Id. At this point, Cherwitz had called Ms. Halpern a virus and had told others in the community not to speak to her, so Ms. Halpern testified that she was not surprised she was no longer selected to do OM demonstrations, which was considered an honor at OneTaste. Id. During the meeting, Cherwitz called two other OneTaste participants, Max Pixley and Hamza Tayeb, to the front of the room to conduct an OM demonstration. Id. Following that demonstration, Cherwitz directed Ms. Halpern to come to the front of the room and do an OM demonstration. Id. at 304. Ms. Halpern indicated that did not want to participate—and did not expect to participate, given Cherwitz had just announced that Ms. Halpern was no longer doing OM demonstrations—but Cherwitz told her to come up and Ms. Halpern eventually relented. Id. Cherwitz initially instructed another OneTaste participant to stroke Ms. Halpern's clitoris for a few minutes but then pushed that participant aside and began stroking Ms. Halpern's clitoris without asking her for permission. Id. at 305 ("I don't remember her asking me, if she did I don't know. I certainly did not want her to at all"). Ms. Halpern testified, "You're supposed to be looking like you're really into it. And I was not into it. And I was freaking out. And it didn't feel good. I didn't want to be there, and I said no." Id.

While touching Ms. Halpern, Cherwitz then directed Tayeb to walk to the end of a hallway and asked him repeatedly if he could "feel" Ms. Halpern's orgasm, to which he said he could not.  Id.  Cherwitz continued stroking Ms. Halpern's clitoris as she called out to Tayeb to ask if he could "feel" her.  Id.  Finally, Cherwitz stopped stroking Ms. Halpern and then berated and ridiculed Ms. Halpern (while she was still on the table in front of everyone half naked), stating why Ms. Halpern was not doing demonstrations anymore, that her "orgasm is broken," and that Ms. Halpern was a virus infecting everyone with her bad ideas.  Id. at 306; see also PSR ¶ 31 (Cherwitz "continued to mock and berate Jane Doe 2 in front of the other household members while Jane Doe 2 was on the table half dressed.  Cherwitz then announced to the other house members that they were not to speak with Jane Doe 2 for a period of time."); id. ¶ 76.  Ms. Halpern testified that she began violently shaking and crying, and that she has only ever felt that way after surgery.  Tr. 306.[4]

Cherwitz's various arguments against application of the Criminal Sexual Abuse Cross-Reference are incorrect and should be rejected.

---

[4]     Cherwitz complains that she did not have the opportunity to cross-examine Max Pixley regarding this encounter because of a late disclosure by the government.  Def. Mem. at 20 n.6.  Notably, the government offered to enter into a stipulation that Pixley did not recall this encounter or call Pixley back to testify, Tr. 2953, but Cherwitz chose to do neither.  See Tr. 3577-78.  The government vehemently disagrees with Cherwitz's characterization that it "essentially extort[ed] the defense," Def. Mem. at 20 n.6, when it made available two different options to address Cherwitz's concern.  The government's candid disclosure to the defendant that it was considering calling another witness, Hamza Tayeb, who did recall the incident does not change the calculus, given that he had been on the government's witness list for months, and his 18 U.S.C. § 3500 material had been disclosed, and was continued to be disclosed, on a rolling basis before and throughout the trial.  The government had every right to call, or not call, potential witnesses, as did the defense.  In any event, the government does not dispute that Pixley did not recall this incident, while Tayeb did.  This is unsurprising given Tayeb's involvement in the incident while Cherwitz stroked Ms. Halpern, whereas Pixley was simply present.

First, Cherwitz argues that the OM demonstration described above must be viewed in the context of the OM practice, which occurred every day at the Morellino. Def. Mem. at 14-19. But the testimony summarized above established that Cherwitz's actions were not part of the everyday OM practice at the Morellino. See Tr. 303 (Halpern: "This was not typical. This was not like, this was not something that had happened before in any meeting."). Instead, on this particular occasion, Cherwitz specifically singled out Ms. Halpern after announcing she was no longer doing OM demonstrations. Tr. 302-03. Because of her announcement, Ms. Halpern was not expecting to be part of any demonstration that day and did not freely consent to participating—and certainly did not freely consent to being stroked and berated by Cherwitz. Indeed, Ms. Halpern was initially stroked by another participant, until Cherwitz pushed him out of the way and began stroking Ms. Halpern without asking Ms. Halpern to OM. Cherwitz argues that she could not have known that Ms. Halpern did not consent to this particular OM, but Ms. Halpern's unwillingness to participate in the demonstration, at the very least, makes her lack of consent clear.

Second, Cherwitz argues that OMing is not a "sexual act" as defined by 18 U.S.C. § 2246(2). Def. Mem. at 21. But Ms. Halpern testified that, during an OM, the stroker rests their thumb at the introitus, the genital opening, and strokes the clitoris. Trial Tr. 133-34. Thus, for an OM to occur, there is a penetration, however slight, by a finger at the vaginal opening. See PSR Second Addendum at 9; 18 U.S.C. § 2246(2)(C). Further, Cherwitz forcibly touched Ms. Halpern with the "intent to abuse, humiliate, harass, [or] degrade" Ms. Halpern. As described above, prior to this demonstration, Cherwitz had called Ms. Halpern a virus and told others at OneTaste not to speak to her. During the demonstration, Cherwitz repeatedly called out to Tayeb to ask if he could "feel" Ms. Halpern. And following the demonstration, Cherwitz berated Ms. Halpern and again called her a "virus." Cherwitz's actions surrounding this demonstration make clear that her intent

in touching Ms. Halpern's clitoris and vaginal opening was to abuse, humiliate, harass, and degrade her.

Third, Cherwitz argues that "coercion" as used in 18 U.S.C. § 2242(3) does not include psychological coercion, citing United States v. Combs, 24-CR-542 (S.D.N.Y.), in support. Def. Mem. at 22. But, as Cherwitz concedes, the Combs case interpreted "fear" under § 2242(1), not the word "coercion" used in § 2242(3). See Cherwitz Exhibit 8 at 14. As described in the government's sentencing memorandum as to Nicole Daedone, the Court in Combs conducted a fact-specific inquiry and considered that Combs had been acquitted of certain conduct in determining that the cross-reference should not apply. The analysis in Combs is plainly inapplicable here, where Cherwitz was convicted of the lone count of the Indictment, and where "coercion" is already defined in 18 U.S.C. § 1591. Indeed, because the definition of "coercion" references "serious harm," 18 U.S.C. § 1591(e)(2), and "serious harm" includes non-physical harm, such as psychological harm, coercion plainly includes psychological coercion (and reputational and financial coercion).[5]

Fourth, Cherwitz is simply incorrect that the § 2A3.1 cross-reference can only apply if a jury found that Cherwitz violated 18 U.S.C. § 2242. The defendant is not entitled to a jury trial on Guidelines enhancements, nor is she insulated from judicial fact-finding about relevant conduct. See White, 240 F.3d at 136; U.S.S.G. § 6A1.3 cmt. Jury findings are only necessary when a sentencing court's findings increase the penalty faced by the defendant above

---

[5] "Serious harm" is defined in both 18 U.S.C. § 1591(e)(5) and 18 U.S.C. § 1589(c)(2), which was the definition applicable to the defendants in this case. The only difference in the two definitions is that, under 18 U.S.C. § 1591(e)(5), the harm must be sufficiently serious "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm," as opposed to performing labor or services.

the statutory maximum for a given count, and not when they merely affect the length of a sentence within the statutory range. Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); White, 240 F.3d at 135-36 ("Here, the district court did not exceed the maximum for any individual count. It cannot therefore be said that, as to any individual count, the court's findings resulted in the imposition of a greater punishment than was authorized by the jury's verdict.").

Cherwitz cites United States v. Callahan, 801 F.3d 628 (6th Cir. 2015), in support of her argument, but in Callahan, the purpose of a special verdict form was to determine whether the statutory maximum sentence should be raised from 20 years to life under 18 U.S.C. § 1589(d). See id. at 625 ("The district court submitted a special verdict form to the jurors (along with the jury instructions) on which they could render their verdict as to the kidnapping [statutory sentencing] enhancement."). Because the jury in Callahan had found that kidnapping occurred, thereby increasing the maximum sentence provided by the statute, the court also applied the cross-reference based on kidnapping as the other felony offense committed. Id. at 628-29. But the court never indicated that the special verdict sheet was a requirement to find the sentencing enhancement under the Guidelines.

Indeed, where factual findings do not allow for a sentence greater than the statutory maximum, judicial factfinding rather than jury factfinding is "required [ ] under an advisory Guidelines regime." United States v. Singletary, 458 F.3d 72, 80 (2d Cir. 2006) (emphasis omitted); see also Portalatin v. Graham, 624 F.3d 69, 88 (2d Cir. 2010) ("[J]udicial factfinding that is undertaken to select an appropriate sentence within an authorized range – up to and including the Apprendi maximum – does not offend the Sixth Amendment.") (emphasis in original). Cherwitz had a full and fair opportunity to challenge the government's evidence at trial through cross-examination. She is not entitled to a jury finding as to Guidelines'

enhancements.[6]

        <u>Fifth</u>, Cherwitz's jurisdictional arguments are also misplaced.  Def. Mem. at 26.

Cherwitz argues that 18 U.S.C. § 2242 does not apply to her conduct because of the jurisdictional

limitations set forth in that statute.  Def. Mem. at 26.  But as Application Note 3 to U.S.S.G.

§ 1B1.5 instructs, relevant conduct includes "conduct that occurred under circumstances that

would constitute a federal offense had the conduct taken place within the territorial or maritime

jurisdiction of the United States."  <u>See also</u> <u>United States v. Jimenez-Rodriguez</u>, No. 21-CR-11-2

(EK), 2024 WL 1199991, at *2 n.1 (E.D.N.Y. Mar. 20, 2024) ("Sections 2241 and 2242 both

contain references to conduct occurring in 'the special maritime and territorial jurisdiction of the

United States or in a Federal prison,' but those jurisdictional elements are not required for

application of Section 2A3.1." (citing <u>United States v. Gilmore</u>, 599 F.3d 160, 168 n.6 (2d Cir.

2010)); U.S.S.G. § 2H4.1 cmt. n.2 (referring, in its discussion of "any other felony offense," to

Application Note 3 of U.S.S.G. § 1B1.5)).  As the Second Circuit noted, use of the word "conduct"

in Application Note 3 of § 1B1.5, as opposed to "offense," "seems to refer to the defendant's

actions rather than to whether his actions occurred in circumstances that would give rise to federal

jurisdiction."  <u>Gilmore</u>, 599 F.3d at 168 n.6.  For purposes of the Guidelines, therefore, the

---

    [6]    Cherwitz's suggestion that a <u>Fatico</u> hearing may be necessary to resolve factual disputes is misplaced.  Def. Mem. at 78.  The defendant, through extensive testimony and robust cross-examination, already had a meaningful opportunity to rebut the allegations she now contests; she should not be given a second bite at the apple.  <u>See, e.g.</u>, <u>United States v. Guang</u>, 511 F.3d 110, 122 (2d Cir. 2007) (affirming district court's refusal to hold a <u>Fatico</u> hearing where: (i) trial court heard extensive trial testimony, observed the demeanor of the witnesses and assessed their credibility, (ii) defendants had notice of the proposed enhancements, including the evidence upon which the enhancements were based, and had an opportunity to dispute the evidence; and (iii) the trial court reviewed the parties' submissions).

jurisdictional limitations of 18 U.S.C. § 2242 do not apply.[7]

Sixth, Cherwitz's unsupported arguments that the government is seeking to punish the defendant for a sex crime of which she was not convicted is simply misguided. Def. Mem. at 29. Contrary to the defendant's arguments, the Indictment made clear that the allegations in this case included sexual abuse and sexual labor. See Indictment ¶ 6 (alleging that the defendants subjected victims to, inter alia, sexual abuse); ¶ 9 (alleging that defendants recruited and groomed victims to engage in sexual acts with OneTaste's current and prospective investors, clients, employees and beneficiaries, for the financial benefit of OneTaste and, in turn, the defendants), ¶ 9 (defendants also instructed OneTaste members to engage in sexual acts they found uncomfortable or repulsive as a requirement to obtain freedom and enlightenment and demonstrate their commitment to OneTaste and the defendants). The defendant cannot now feign ignorance of these explicit allegations of sexual abuse. In any event, these topics were in fact a central part of the trial; indeed, the government is relying on trial testimony and exhibits to establish the Criminal Sexual Abuse Cross-Reference.

Finally, Cherwitz's unsupported argument that she was entitled to notice that the OM demonstration constituted sexual abuse, Def. Mem. at 30, also fails. See, e.g., Johnson, 221 F.3d at 99 (rejecting appellant's claim that the Guidelines did not provide "adequate notice of what is prohibited and the punishment that will ensue"). Cherwitz argues that the government stated in advance of trial that the government would not argue that OMing was a good or bad

_____

[7]     "Commentary which functions to 'interpret [a] guideline or explain how it is to be applied' controls," and the failure to follow that commentary "constitute[s] an incorrect application of the sentencing guidelines." Stinson v. United States, 508 U.S. 36, 42-43 (1993). Kisor v. Wilkie, 139 S. Ct. 2400 (2019) does not undermine any commentary to U.S.S.G. § 1B1.5, and the government has located no case—and the defendant cites to none—calling into question U.S.S.G. § 1B1.5 Application Note 3.

thing on its own, and therefore, Cherwitz could not have known that the government would allege that Cherwitz sexually abused Ms. Halpern.  Def. Mem. at 30.  But as noted above, Cherwitz's sexual abuse of Ms. Halpern was markedly different from a typical OM at OneTaste.  And in addition to alleging sexual abuse in the Indictment, the government's motions in limine in advance of trial specifically described Cherwitz's abuse of Ms. Halpern.  See ECF 170 at 30-31 ("Cherwitz then pushed Jane Doe 2's ex-boyfriend out of the way and began OMing with Jane Doe 2 without her consent while berating her.").

For the reasons described above, the Sexual Abuse Cross Reference should apply, and the defendant's arguments to the contrary should be rejected.

3.  <u>The Court Should Find That The Defendants' Coercion of Reese Jones's Handlers Also Establishes Application of the Sexual Abuse Cross Reference</u>

In the alternative, the trial record also proves by a preponderance of the evidence that Cherwitz "cause[d] another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)."  18 U.S.C. § 2242(1).

As noted above, relevant conduct includes acts and omissions of others that were within the scope of and in furtherance of the jointly undertaken criminal activity and were reasonably foreseeable.  U.S.S.G. § 1B1.3(a)(1)(B).  Indeed, as the Second Circuit has made clear, "at sentencing, the defendant is responsible if an act performed in furtherance of a conspiracy by a co-conspirator was 'reasonably foreseeable,' regardless of whether the defendant acted to promote or facilitate it."  <u>United States v. Medina</u>, 74 F.3d 413, 417 (2d Cir. 1996); <u>see also</u> <u>United States v. Molina</u>, 106 F.3d 1118, 1121 (2d Cir. 1997).

Here, in addition to the sexual abuse of Ms. Halpern, Cherwitz was personally responsible for, and could have reasonably foreseen, the sexual abuse of Michelle Wright and

Christina Berkley, which Probation found applicable as to Daedone, Daedone PSR ¶ 107, and Dana Gill (whereby Gill was forced by Daedone's co-conspirators to have sex with Daedone's romantic and business partner Reese Jones, see Tr. 1298-1304; PSR ¶ 19). Not only was such conduct foreseeable, Cherwitz and Daedone, with other co-conspirators, ensured that these women provided sexual services to Reese Jones in exchange for Jones bankrolling OneTaste. See, e.g., Tr. 2410-11, GX 2148-D, GX 1136. Indeed, Cherwitz checked in on and received reporting from women sexually servicing Jones, see, e.g., Tr. 2410-11, GX 2148-D, and she knew many of these women were struggling. See, e.g., GX 1258-D-R. Likewise, Lianna Lifson performed oral sex on a student at Robert Kandell's direction, Tr. 2164, and numerous victims testified to being forced to OM and to have sex with OneTaste customers and other OneTaste participants, see, e.g., PSR ¶¶ 60-61. For the reasons set forth in Daedone's submission, such conduct also establishes application of the Criminal Sexual Abuse Cross-Reference as to Cherwitz.[8]

      C.     The Defendant is Not Entitled to a Three-Level Reduction Under U.S.S.G. § 2X1.1

Contrary to the defendant's arguments, Def. Mem. at 12, U.S.S.G. § 2X1.1(b)(2)'s three-level reduction does not apply. That provision applies only to incomplete conspiracies that were interrupted well before the substantive offense could be completed, whereas, here, the defendants and their co-conspirators performed all or nearly all of the acts necessary to complete the forced labor offense.

---

[8]     In the alternative, the conduct described herein may violate other federal and California state criminal laws. If the Court disagrees with the government that the Criminal Sexual Abuse Cross-Reference should apply based on conduct violative of 18 U.S.C. § 2242, the government requests additional time to brief the implications of other felony offenses.

A defendant convicted of conspiracy is entitled to a three-level reduction from the base offense level of the underlying substantive offense "unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(b)(2). "The relevant question in determining whether that reduction applies is whether the conspiracy ripened into a substantially completed offense or came close enough to fruition." United States v. Lutchman, 910 F.3d 33, 39 (2d Cir. 2018) (internal quotation omitted). The background commentary to § 2X1.1 confirms that the three-level reduction is appropriate only if "the arrest occurs well before the defendant or any co-conspirator has completed all the acts necessary for the substantive offense." U.S.S.G. § 2X1.1; United States v. Rosa, 17 F.3d 1531, 1550-51 (2d Cir. 1994) (finding three-level reduction appropriate only where arrest occurred well before defendant or any co-conspirator had completed acts believed necessary to complete offense). "Whether the reduction is granted depends solely on the conduct of the defendant . . . ." Abdallah v. United States, No. 14-CV-4037 (JFB), 2015 WL 7454182, at *10 (E.D.N.Y. Nov. 24, 2015) (citing Medina, 74 F.3d at 418).

Thus, the Guidelines explicitly contemplate situations such as this one in which a defendant was convicted of an inchoate offense, but where a court can find based on a preponderance of the evidence that the conspiracy ripened into a completed offense. Numerous courts have declined to impose the reduction despite the defendants being found guilty only of an inchoate offense. See, e.g., United States v. Deas, 768 F. App'x 81, 82-83 (2d Cir. 2019) (attempt); Lutchman, 910 F.3d at 39 (conspiracy); Kaplan v. United States, 663 F. App'x 69, 71 (2d Cir. 2016) (conspiracy); United States v. Nicolescu, 541 F. App'x 93, 99 (2d Cir. 2013)

(attempt and conspiracy); <u>Medina</u>, 74 F.3d at 418-19 (attempt and conspiracy).

Here, the defendant, with her co-defendant and other co-conspirators, completed the offense of forced labor or "came close enough to fruition." <u>See</u> <u>Lutchman</u>, 910 at 39. The defendants and their co-conspirators completed all the acts necessary to complete the crime of forced labor, in violation of 18 U.S.C. § 1589. The defendant points to no impediment to the completion of their crime; rather, she argues that she was charged and convicted of forced labor conspiracy alone. That fact is unavailing. As the trial record makes clear, numerous victims were compelled to work under threat of economic, psychological, and reputational harm. <u>See, e.g.</u>, Tr. 149-50; 254-56; 298; 372; 1051-52; 1056; 1080; 1121-22; 1125; 1259; 1270; 1695; 2102; 2123; 2409; 2422; 2963; 3949-50; PSR ¶¶ 12-13. The work included sexual and non-sexual services that the defendant knew her victims did not want to perform. PSR ¶¶ 22-23. And they did so for significant periods of time due to the defendants' coercion. Tr. 1250, 1326, 1015, 1100, 1129, 2319, 2318.

    D.    <u>The Government Need Only Prove Sentencing Enhancements By A Preponderance Standard</u>

As discussed further below, Cherwitz disputes several sentencing enhancements. As an initial matter, she argues that the enhancements under U.S.S.G. § 2H4.1 must be proved by "reasonable certainty" based on U.S.S.G. § 2X1.1(a) rather than by a preponderance of the evidence. Def. Mem. at 10. Contrary to the defendant's assertions, § 2X1.1(a)'s "reasonable certainty" standard is specific to findings of intended, but unexecuted, conduct. <u>See</u> U.S.S.G. § 2X1.1(a) ("The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any <u>intended</u> offense conduct that can be established with reasonable certainty." (emphasis added)); <u>see also</u> <u>United States v. Downing</u>, 297 F.3d 52, 65 (2d Cir. 2002) ("When specific offense characteristics have not actually occurred, they should be

applied only if the district court determines that they were 'specifically intended.'"); United States v. Capanelli, 270 F. Supp. 2d 467, 473 (S.D.N.Y. 2003) (applying reasonable certainty standard to intended offense conduct). Thus, the "reasonable certainty" standard is designed to prevent speculation about hypothetical acts that conspirators might have taken had the offense progressed further. See U.S.S.G. § 2X1.1(a) & cmt. n.2. ("Speculative specific offense characteristics will not be applied.").

Here, as described below, the government can establish by a preponderance of the evidence that the relevant conduct on which the sentencing enhancements at issue are based actually happened. See Rosa, 17 F.3d at 1550 (collecting cases).

E.  The U.S.S.G. § 2H4.1(b)(1)(B) Enhancement for Serious Bodily Injury Applies

The Court should impose a two-level sentencing enhancement under U.S.S.G. § 2H4.1(b)(1)(B) because Cherwitz caused a "serious bodily injury" to Ms. Halpern. Application Note 1(L) to § 1B1.1 states that a serious bodily injury "is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law."[9]  As the PSR notes, New York Penal Law ("N.Y.P.L.") § 130.52 (Forcible Touching) is similar to criminal sexual abuse under 18 U.S.C. § 2242(3) in that they both involve sexual contact with an individual without that person's consent. PSR ¶ 96.  N.Y.P.L. § 130.52 provides, "[a] person is guilty of forcible touching when such person intentionally, and for no legitimate purpose: 1. forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire," where forcible touching "includes squeezing, grabbing or pinching." As described above,

---

[9]    Notably, this provision does not require that the comparable state offense be a felony.

Cherwitz used her fingers to slightly penetrate the genital opening and stroke the clitoris of Ms. Halpern with the intent to abuse, humiliate, harass, and degrade Ms. Halpern and without her consent. <u>See</u> 18 U.S.C. § 2242(3); Tr. 302-08.

As the PSR notes, the New York State statute for forcible touching is a "similar offense under state law" to 18 U.S.C. § 2242. Both statutes prohibit the same core misconduct—nonconsensual sexual activity—secured through force, coercion, or the absence of consent. And both provisions target the same substantive harm: the imposition of unwanted sexual activity on an unwilling victim. Thus, N.Y.P.L. § 130.52(1) falls squarely within the category of "any similar offense" referenced in Application Note 1(L). It therefore provides an independent basis for finding that Ms. Halpern sustained "serious bodily injury."

As described above, Cherwitz's conduct—touching Ms. Halpern's vagina without her consent—constitutes criminal sexual abuse under 18 U.S.C. § 2242 and N.Y.P.L. § 130.52(1). Tr. 302-06. Notably, Ms. Halpern repeatedly said she did not want to participate in the OM demonstration and was shaking and crying throughout. Tr. 304-06. During and following the demonstration, Cherwitz berated Ms. Halpern in front of the group, making clear that her purpose in forcibly touching Ms. Halpern in this setting was to abuse and degrade her. Tr. 306.

Nonetheless, regardless of whether the Court imposes this enhancement, because the defendant's adjusted offense level is driven by U.S.S.G. § 2H4.1(b)(4)(B), which cross-references and applies the Criminal Sexual Abuse Cross-Reference, U.S.S.G. § 2A3.1(a)(2), the applicability of this separate Guidelines provision is immaterial; it ultimately drops out of the defendant's Guidelines computation.

F.     <u>The U.S.S.G. § 2H4.1(b)(3) Enhancement for a Victim Being Held in a Condition of Involuntary Servitude for More Than One Year Applies</u>

The Court should impose a three-level sentencing enhancement under

§ 2H4.1(b)(3)(A) because the record demonstrates that numerous victims were held under a condition of involuntary servitude for more than one year. Section 2H4.1(b)(3)(A) instructs a sentencing court to increase a defendant's offense level by 3 if "any victim was held in a condition of peonage or involuntary servitude for more than one year." Application Note 1 defines "peonage or involuntary servitude" to include forced labor. U.S.S.G. § 2H4.1 cmt. n.1.

In this case, the trial record establishes that the defendants' scheme subjected victims to involuntary servitude. Multiple witnesses, including Christina Berkley, Michelle Wright, and Dana Gill, described being compelled to provide unpaid labor and sexual services for years, often under constant threat of economic, psychological, and reputational harm. See, e.g., Tr. 149-50; 254-56; 298; 372; 1051-52; 1056; 1080; 1121-22; 1125; 1259; 1270; 1695; 2102; 2123; 2409; 2422; 2963; 3949-50. The jury's conspiracy verdict reflects that the defendants agreed to and executed a scheme to compel forced labor, and the Court may appropriately credit this evidence to find, by a preponderance, that victims were held in involuntary servitude for more than one year. That the defendants were convicted of conspiracy does not prevent the Court from considering such evidence. Notably, Dana Gill worked for OneTaste between 2009 and 2013 with no pay, Tr. 1250, 1326; Christina Berkley worked for OneTaste from 2007 to 2010, Tr. 1015, 1100, 1129; and Michelle Wright worked for OneTaste from at least 2010 to 2014, Tr. 2318. Wright did not leave OneTaste because "it was kind of unthinkable to leave. And if you were there, you were expected to help and do things. Like, that was just the agreement, that if you were part of the community, you were going to be of service to it." Tr. 2439; see also Tr. 2448 (noting that "you didn't leave, you didn't take vacations, you didn't step out to make a phone call to your friend."). And, for Gill, leaving "didn't feel" like an option. Tr. 1408. Just one victim suffices for the Court to impose the enhancement; here, multiple victims were held in a condition of

involuntary servitude for more than a year.

The defendant's argument that the victims were physically "free to leave" is no more relevant to application of the Guidelines enhancement as it was to the defendants' numerous pretrial and jury arguments regarding the same. Forced labor within the meaning of 18 U.S.C. § 1589 includes obtaining the labor or services of a person by any one, or by any combination of, specifically enumerated prohibited means, including serious harm or threats of serious harm. <u>See</u> 18 U.S.C. § 1589(a)(2). The term "serious harm," as noted above, means any harm, whether physical or nonphysical, and includes psychological, financial, or reputational harm. <u>Id.</u> § 1589(c)(2). In this case, as proven at trial, the defendants agreed to compel labor through a variety of coercive tactics. The victims testified that they were forced to work because they were subject to economic coercion, psychological manipulation, and reputational threats, among other harms. <u>See</u> PSR ¶ 28. That the victims could physically walk away from a building is irrelevant.

Nonetheless, regardless of whether the Court imposes this enhancement, because the defendant's adjusted offense level is driven by U.S.S.G. § 2H4.1(b)(4)(B), which cross-references and applies the Criminal Sexual Abuse Cross-Reference, U.S.S.G. § 2A3.1(a)(2), the applicability of this separate Guidelines provision is immaterial; it ultimately drops out of the defendant's Guidelines computation.

G.  <u>The Court Should Add Three Levels Under U.S.S.G. § 3B1.1(b) for the Defendant's Role as a Manager or Supervisor</u>

The Court should also apply a three-level enhancement due to Cherwitz's role as a manager or supervisor at OneTaste. As the Head of Sales and second-in-command at OneTaste, Cherwitz managed and supervised OneTaste participants. OneTaste's sales operations placed her squarely within the Guidelines' definition of a manager or supervisor.

1.     Applicable Law

Section 3B1.1 provides that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," her offense level should be increased by three levels.  U.S.S.G. § 3B1.1(b). Application Note 2 provides that "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1 n.2.  A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 n.1.

In determining whether a defendant is an organizer, leader, manager or supervisor, the Guidelines instruct the court to consider factors including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4.  A defendant is a "manager or supervisor" of criminal activity if she "exercised some degree of control over others involved in the commission of the offense . . .  or played a significant role in the decision to recruit or to supervise lower-level participants.'"  United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002) (quoting Ellerby v. United States, 187 F.3d 257, 259 (2d Cir. 1998)).

In determining whether a scheme is "otherwise extensive," the Second Circuit focuses "primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity."  United States v. Carrozzella, 105 F.3d 796, 802 (2d Cir. 1997), abrogated in part on other grounds, United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000). In this analysis, courts are to consider "all persons involved during the course of the entire offense."

U.S.S.G. § 3B1.1 cmt. n3.  Specifically, courts should consider: "(1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." United States v. Kent, 821 F.3d 362, 368 (2d Cir. 2016).  In the end, the district court determines whether the scheme was "the functional equivalent of one involving five or more knowing participants."  Id. (emphasis omitted); see, e.g., United States v. Archer, 671 F.3d 149, 166 (2d Cir. 2011) (affirming otherwise extensive enhancement where there were three knowing participants and a "fair number" of unknowing participants); United States v. Rubenstein, 403 F.3d 93, 99 (2d Cir. 2005) (same where there were two knowing participants and seven unknowing participants).  As an example of criminal activity that could be otherwise extensive, the Guidelines describe "a fraud that involved only three participants but used the unknowing services of many outsiders[.]"  U.S.S.G. § 3B1.1 cmt. n3.

Before imposing this enhancement, the court "must make specific findings as to why a particular subsection of the § 3B1.1 adjustment applies."  United States v. Skys, 637 F.3d 146, 156 (2d Cir. 2010). The court's analysis "is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account."  United States v. Brinkworth, 68 F.3d 633, 641 (2d Cir. 1995).

2.  Discussion

Cherwitz qualifies as a manager or supervisor within the meaning of U.S.S.G. § 3B1.1(b).  As OneTaste's Head of Sales, Cherwitz was entrusted with authority over a sales team that recruited new members, marketed courses, and generated revenue for the company.  She carried out orders from Nicole Daedone but also exercised independent discretion in setting sales strategies, training staff, and assigning responsibilities to subordinates.  The conspiracy's success

depended on this structure and Cherwitz's role in managing people, including co-conspirators such as Yia Vang, Rachael Hemsi, and Aubrey Fuller. See United States v. James, No. 24-84-CR, 2025 WL 2486539, at *10 (2d Cir. Aug. 29, 2025) (noting that for an enhancement pursuant to § 3B1.1 to apply, the PSR or the sentencing court must identify the "criminally responsible" participant). Cherwitz's authority to assign tasks, oversee implementation, and discipline subordinates demonstrates the type of managerial control § 3B1.1(b) contemplates.

Cherwitz argues that she did not manage other participants. Def. Mem. at 39. But the trial record makes clear that Cherwitz was Daedone's de facto second-in-command and Head of Sales. See, e.g., Tr. 122 (Halpern testimony that Daedone and Cherwitz were "a pair and a unit," including Nicole at the top and Rachel being her "right-hand woman"); Tr. 3301-02 (Kandell testimony that Cherwitz became one of Daedone's top students). At the very least, Cherwitz oversaw Aubrey Fuller, who was on the OneTaste sales team and was at least one of the defendants' co-conspirators. See Tr. 1584 (Gill testimony that Fuller reported to Cherwitz).

Contrary to Cherwitz's assertions, Cherwitz's role cannot be characterized as that of a mere participant. Unlike lower-level members who simply complied with orders, Cherwitz had a defined leadership role that gave her authority over others, placed her at the center of OneTaste's coercive sales and labor operations—essential components of the forced labor conspiracy—and required her to coordinate multiple people and resources in pursuit of the conspiracy's goals.

At the same time, the record makes clear that Cherwitz's role was not that of the overall organizer or leader of the conspiracy, which the Guidelines reserve for those who create, direct, and control the entire conspiracy. That role belonged to Daedone, who co-founded

OneTaste, set its philosophy, exercised ultimate authority, and received the largest share of the fruits of the crime, U.S.S.G. § 3B1.2 n.4, given her payout of $12 million when she sold OneTaste.

Further, the record leaves no doubt that the conspiracy "involved five or more participants or was otherwise extensive." These include the defendants themselves, Joanna Van Vleck, Yia Vang, Rachael Hemsi, Aubrey Fuller, and Robert Kandell; Maya Block, a senior sales executive at OneTaste; Eli Block, a senior sales executive at OneTaste; and Marcus Ratnathicam, a senior executive at OneTaste. Indeed, with respect to several of these individuals, the Court found at trial that the government proved they were the defendants' co-conspirators. See Tr. 4681-82 (the Court finding the government met its burden with respect to each of the coconspirator statements admitted at trial pursuant to Federal Rule of Evidence 801(d)(2)(E)).

Even if the Court does not find all these people to be knowing participants, the enhancement would still apply. All that is needed for an "otherwise extensive" scheme is at least one knowing criminal participant (at minimum here, Joanna Van Vleck or Robert Kandell), and a number of unknowing participants to form the "functional equivalent" of five knowing participants. See Kent, 821 F.3d at 368.

In addition to the individuals described above, there is an even larger contingent of the defendants' employees who may not have realized the extent of the criminal scheme but nevertheless facilitated the forced labor conspiracy. As just one example, the salespeople across the country who pressured victims to sign up for OneTaste courses and go into debt and who were essential to the forced labor scheme by inflicting economic harm on victims would qualify. Accordingly, the scheme was "otherwise extensive." See United States v. Spencer, 129 F.3d 246, 253-54 (2d Cir. 1997) (affirming otherwise extensive enhancement where there were three

knowing participants in addition to the defendant and a "large number . . . of employees" who "were also essential to the scheme").

Although the Second Circuit focuses primarily on the number of knowing and unknowing participants when determining whether an activity is "otherwise extensive," it has not ruled out that there can be other relevant factors to consider in the analysis. Kent, 821 F.3d at 368. The majority of circuits consider factors such as the geographical extent of the activity as relevant to the analysis. United States v. Figueroa, 682 F.3d 694, 696 (7th Cir. 2012). Here, the activity was undoubtedly extensive, involving, for example, hubs and locations in London, Boulder, New York, Austin, Los Angeles, and San Francisco, and spanning multiple years and harming many victims.

H.  The Court Should Not Apply the Various Reductions the Defendant Proposes

The defendant asks this Court to reduce her Guidelines' range by an additional three levels (in addition to her request for a three-level reduction under U.S.S.G. § 2X1.1(b)(2), addressed above). Def. Mem. at 13. First, the defendant requests a one-level reduction under United States v. Tavberidze, 769 F. Supp. 3d 264, 268 (S.D.N.Y. 2025). Second, the defendant requests a two-level reduction, alleging that Cherwitz is a zero-point offender. For the reasons below, both reductions should be rejected.

1.  The Defendant Is Not Entitled to a One-Point Reduction to Avoid a "Trial Penalty"

Because the defendant has failed to accept responsibility for her conduct, this Court should not reduce her offense level by any amount.

a.  Applicable Law

"Section 3E1.1 of the Guidelines provides, in two subsections, for reduction of a defendant's offense level by up to three levels for acceptance of responsibility." United States v.

Vargas, 961 F.3d 566, 571 (2d Cir. 2020).  First, if the defendant clearly demonstrates acceptance of responsibility for her offense, her offense level should be decreased by two levels. See U.S.S.G. § 3E1.1(a).  Second, if the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the government indicates the defendant has timely notified authorities of her intention to enter a plea of guilty, her offense level should be decreased by one additional level.

Section 3E1.1(a) most commonly applies in cases where a defendant pleads guilty and accepts responsibility for his or her conduct as part of that plea agreement.  However, Application Note 2 to § 3E1.1 notes:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.  Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations, a defendant may clearly demonstrate an acceptance of responsibility for [her] criminal conduct even though [she] exercises [her] constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to [her] conduct).  In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

In any event, a defendant bears the burden of demonstrating that she qualifies for a reduction under U.S.S.G. § 3E1.1.  See United States v. Chu, 714 F.3d 742, 747 (2d Cir. 2013).

Most recently, United States District Judge Jed Rakoff, Southern District of New York, held in a non-binding decision that the one-level reduction for timely acceptance of responsibility under § 3E1.1(b) creates an impermissible trial penalty in violation of the Sixth Amendment to the United States Constitution, requiring the remedy of a one-level reduction in

the Guidelines offense level for all defendants who do not qualify under § 3E1.1(b).  See United States v. Tavberidze, 769 F. Supp. 3d 264 (S.D.N.Y. 2025).

> b.      Discussion

The defendant is entitled to no reduction in her offense level pursuant to U.S.S.G. § 3E1.1 because: (i) she has never accepted responsibility for her criminal conduct; (ii) she put the government through the burden and expense of a trial; and (iii) she relies on an erroneous, non-binding decision issued in the Southern District of New York.

First, the defendant to this day has failed to accept responsibility for her conduct. Indeed, the second sentence of the defendant's sentencing memorandum begins: "As the defense maintained throughout the trial, we do not believe that Rachel committed a crime.  Rachel had no intent to force anyone to work for OneTaste, and the victims' contemporaneous statements during the time they were working for OneTaste expressed their choice to be there."  Def. Mem. at 1.

Second, rather than going to trial to assert and preserve issues that do not relate to her factual guilt, as noted in Application Note 2 to § 3E1.1, the defendant here contested her guilt, including by cross-examining the government witnesses, forcing several witnesses to relieve some of the most heinous events in their lifetime.  United States v. Rocha, 145 F.4th 1247, 1264 (10th Cir. 2025) ("[a]lthough a defendant has a constitutional right to trial, exercising that right will commonly render him ineligible for a § 3E1.1 reduction); United States v. Cheatwood, No. 22-4652, 2025 WL 18098, at *5 (4th Cir. Jan. 2, 2025) (denial of § 3E1.1 reduction affirmed where the defendant cross-examined each of the government witnesses and raised evidentiary objections to the documentary evidence the government sought to introduce); United States v. Trevino, 7 F.4th 414, 432 (6th Cir. 2021) ("Even where a defendant does 'admit substantial elements of the crime charged,'" § 3E1.1 does not apply "if the defendant contests even one factual element of the offense.").

Finally, this Court is not bound by the district court decision in Taveberidze, and, in any event, that decision is contrary to law. Importantly, § 3E1.1(b) comports with the Sixth Amendment. The Supreme Court has "unequivocally recognize[d] the constitutional propriety of extending leniency in exchange for a plea of guilty and of not extending leniency to those who have not demonstrated those attributes on which leniency is based." Corbitt v. New Jersey, 439 U.S. 212, 224 (1978); see also, e.g., United States v. Sterkaj, 138 F.4th 95, 101 (2d Cir. 2025) ("[I]t is one thing to extend leniency to a defendant who is willing to cooperate with the government; it is quite another thing to administer additional punishment to a defendant who by his silence has committed no additional offense."); United States v. DiMassa, 117 F.4th 477, 484 (2d Cir. 2024) ("We have long held that a district court may properly treat a guilty plea as a recognition of fault and that a show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial.").

Applying this distinction, the Second Circuit has held, in a summary order, that § 3E1.1 does not create an impermissible punishment for exercising one's right to go to trial; rather, it provides a benefit for acceptance of responsibility, which does not run afoul of the constitutional right to stand trial:

> [The defendant] contends that he was improperly punished for exercising his constitutional right to stand trial. His argument is premised on the district court's decision not to apply the acceptance of responsibility deduction pursuant to U.S.S.G. § 3E1.1. We maintain a distinction between increasing the severity of a sentence for a defendant's failure to cooperate and refusing to grant leniency. Here, the district court distinguished between the two and indicated that [the defendant] was being denied a benefit, but was not being punished. We find that [the defendant] was not punished for standing trial.

United States v. Goffer, 529 F. App'x 17, 19 (2d Cir. 2013) (internal quotations omitted).

Indeed, every other Court of Appeals that has addressed the constitutionality of §

3E1.1 has also upheld it, including in response to Sixth Amendment challenges.  See, e.g.,

United States v. Gittens, 701 F. App'x 786, 789 (11th Cir. 2017) (per curiam) (reaffirming that

"the denial of a § 3E1.1 reduction is not impermissible punishment for the exercise of Fifth or

Sixth Amendment rights"); United States v. Benitez, 531 F.3d 711, 717 (8th Cir. 2008) (rejecting

argument that § 3E1.1 is "unconstitutional on the ground that it has a chilling effect on a

defendant's exercise of his Sixth Amendment right to trial"); United States v. Baldrich, 471 F.3d

1110, 1115 (9th Cir. 2006) (rejecting claim that § 3E1.1(b) "is unconstitutional because it

penalizes defendants for exercising their constitutional right to go to trial and deprives

defendants of the right to effective assistance of counsel"); United States v. Lancaster, 112 F.3d

156, 159 (4th Cir. 1997) ("[The defendant] is not being punished for choosing to assert his

constitutional rights . . . he merely does not reap the benefit of the additional one-point reduction

given to others who volunteer information about their conduct in a more timely manner.");

United States v. Portillo-Valenzuela, 20 F.3d 393, 395 (10th Cir. 1994) (upholding

constitutionality of § 3E1.1 and explaining that "denying the reduction for acceptance of

responsibility is not a penalty for exercising any rights" because "[t]he reduction is simply a

reward for those who take full responsibility"); United States v. Saunders, 973 F.2d 1354, 1362

(7th Cir. 1992) (holding that "the approach embodied in § 3E1.1 does not constitute a per se

policy of punishing those who elect to stand trial, despite the fact that leniency is more often

granted to defendants who accept responsibility by pleading guilty"); United States v. White, 869

F.2d 822, 826 (5th Cir. 1989) (per curiam) (rejecting contention that § 3E1.1 "places an

unconstitutional premium on the exercise of an accused's right to a trial by jury under the sixth

amendment" and explaining that "[t]he fact that a more lenient sentence is imposed upon a

contrite defendant does not establish a corollary that those who elect to stand trial are penalized").

The unbroken line of cases uniformly upholding § 3E1.1 is plainly correct: § 3E1.1, including subsection (b), comports with the Sixth Amendment because it provides a reward for accepting responsibility, not a penalty for going to trial. See United States v. Powell, No. 24-1461, Dkt. Entry 74.1 (2d Cir. Oct. 29, 2025) (summary order) (affirming denial by a district court of a reduction under § 3E1.1 where the defendant argued his failure to receive a deduction was tantamount to a "trial penalty"). Accordingly, this Court should not reduce the defendant's offense level for the so-called "trial penalty."

2.      The Defendant is Not a Zero-Point Offender

The defendant argues that she is entitled to a two-level decrease in her offense level because she qualifies as a zero-point offender under U.S.S.G. § 4C1.1. Section 4C1.1 provides a decrease of two levels for offenders who have no criminal history points and whose offense did not involve specific aggravating factors. See United States v. Tejeda, No. 11-CR-1015 (DC), 2024 WL 1676329, at *2 (S.D.N.Y. Apr. 18, 2024). As relevant here, if the offense resulted "in death or serious bodily injury," id. § 4C1.1(a)(4), if the defendant "personally cause[d] substantial financial hardship," U.S.S.G. § 4C1.1(a)(6), or the defendant received "an adjustment under § 3B1.1 (Aggravating Role)," id. § 4C1.1(a)(10), she does not qualify for the adjustment.

To determine whether an offense "result[ed] in serious bodily injury," a court looks to U.S.S.G. § 1B1.1 cmt. n.1(L), which instructs that "serious bodily injury" is "deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law." See United States v. Martin, No. 23-6091, 2024 WL 5001844, at *4 (2d Cir. Dec. 6, 2024).

To determine whether a defendant's acts or omissions resulted in "substantial financial hardship," a court "shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to § 2B1.1." U.S.S.G. § 4C1.1(b)(3). These factors include whether the offense resulted in the victim: (i) becoming insolvent; (ii) filing for bankruptcy; (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment; (v) making substantial changes to his or her living arrangements; and (vi) suffering substantial harm to his or her ability to obtain credit. "Substantial financial hardship might also be present where the number of victims is high, the amount lost is high, or the victims are particularly vulnerable." United States v. Gowing, No. 05-CR-782 (GBD), 2024 WL 3607112, at *2-3 (S.D.N.Y. July 30, 2024); see also United States v. Pagartanis, No. 18-CR-00374, 2024 WL 2111544, at *2 (E.D.N.Y. May 10, 2024) (finding that "U.S.S.G. § 4C1.1(a)(6) is present because [the defendant] personally stole over $13 million from more than a dozen victims . . . through the sale of fraudulent investments and Ponzi scheme-like activity"); United States v. Ortiz, No. 19-CR-161, 2023 WL 1929690, at *5 (E.D.N.Y. Feb. 10, 2023) (finding that the defendant caused significant financial hardship due to his misappropriation of $224,500); United States v. Bronfman, No. 18-CR-204, 2024 WL 1740484, at *1 (E.D.N.Y. Apr. 23, 2024) (finding that taking advantage of immigration status or financial difficulties might qualify as causing substantial financial hardship).

In this case, the defendant does not qualify for the zero-point offender adjustment. First, as noted above, the offense resulted in "serious bodily injury." As described above, "serious bodily injury" occurred when Cherwitz sexually abused Ms. Halpern, and therefore, the zero-point offender reduction is inapplicable. Second, as described above, an aggravating role

adjustment under § 3B1.1 applies for Cherwitz's role as a manager or supervisor. This, too, disqualifies Cherwitz from the zero-point offender reduction.

Third, the defendant personally caused substantial financial harm. The defendant coerced vulnerable OneTaste participants, including OneTaste employees, into relinquishing their available assets or to incur debt. PSR ¶ 46. This included coercing OneTaste participants, such as Michal Neria, into opening lines of credit to finance expensive OneTaste courses they could not afford. Id. ¶¶ 46-47. Cherwitz's financial coercion also included pressuring the sales team she supervised to engage in high-pressure sales tactics. Id. ¶ 46. The defendants and their co-conspirators described financial issues as "third-dimensional problem[s]" and stated that money was just an illusion. Id. And meanwhile, the defendants paid their victims little to nothing. See, e,g, Tr. 2102; GX 856, 1283-D-R, 1331-A-R, 1332-A-R, 2200; PSR ¶¶ 52-53. Cherwitz called the fact that people wanted to be paid for their labor "so fucking dumb ass stupid." GX 2200-D. Witnesses testified that they were constantly in debt to OneTaste in light of such financial tactics, which made it difficult for them to leave and kept them working for OneTaste. See, e.g., Tr. 2102, 2123, 2319, 2784; GX 3501-3, 3501-5. Daedone, Cherwitz, and their co-conspirators also prevented OneTaste participants who worked for commissions from closing large sales such that they could not earn their way out of debt. See PSR ¶ 50. Consequently, given the number of victims and the financial difficulties these victims suffered as a result of the defendant's actions, the defendant is disqualified from receiving this adjustment. See Gowing, 2024 WL 3607112, at *2-3.

I. The Defendant Is Not Entitled to a Downward Departure Under U.S.S.G. § 5H1.11

The defendant is not entitled to a downward departure pursuant to U.S.S.G. § 5H1.11, which was deleted from the Sentencing Guidelines effective November 1, 2025. See

U.S.S.G. Amendment 836; see also 18 U.S.C. § 3553(a)(4)(A)(ii) (instructing courts to apply the Guidelines "in effect on the date the defendant is sentenced"); U.S.S.G. § 1B1.11(a). Because that provision has now been deleted, this Court lacks authority to provide a downward departure under this section. Instead, the Court can consider and weigh the defendant's charitable activities in connection with its analysis of the § 3553(a) factors.[10] See United States v. Fishman, 631 F. Supp. 2d 399, 404 (S.D.N.Y. 2009).

      J.      Conclusion

In sum, the defendant's adjusted Guidelines offense level is 35. Because the defendant falls within Criminal History Category I, her Guidelines range of imprisonment is 168 to 210 months' imprisonment.

III.      The 3553(a) Sentencing Factors

After calculating the Guidelines as the initial benchmark, the Court must consider the familiar sentencing factors of 18 U.S.C. § 3553(a). These include "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1); "the kinds of sentences available," Section 3553(a)(3); the Guidelines range itself, § 3553(a)(4); any relevant policy statement by the Sentencing Commission, § 3553(a)(5); "the need to avoid unwarranted sentenced disparities among defendants," § 3553(a)(6); "the need to provide restitution to any victims," § 3553(a)(7); and the need to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which include the following four objectives:

---

[10]    Then-Section 5H1.11 provided in relevant part that: "civic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." As such, the guideline generally discouraged departures on the grounds provided by the defendant. United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005).

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[s];

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the Sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 348 (2007).  Should a court choose to vary from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

<u>ARGUMENT</u>

The defendant's crime was serious, harmful, and far-reaching. The defendant's conduct lasted more than a decade, spanned the country, and caused untold harm to numerous victims.

The victim impact statements provided to the Court—and the trial testimony in this case—make clear the harmful impact that Rachel Cherwitz had. For over a decade, Daedone and Cherwitz conspired to obtain the unpaid and severely underpaid labor of a group of OneTaste participants through a variety of coercive tactics that resulted in serious harm to many victims. Meanwhile, OneTaste thrived, Daedone pocketed $12 million, and Cherwitz gained power, prestige, and respect by being Daedone's second-in-command.

The government respectfully submits that a sentence of 168 months' imprisonment is necessary to provide appropriate punishment, protect the public, promote respect for the law, avoid sentencing disparities, and discourage others from committing similar crimes.

I. <u>The Court Should Impose a Sentence of 168 Months' Imprisonment</u>

A. <u>The Nature and Circumstances of the Offense</u>

A primary consideration under § 3553(a) is the nature and circumstances of the offense. There is no question about the egregious nature of Cherwitz's crime. Cherwitz and Daedone used exploitative tactics to coerce victims into providing labor for over a decade. As demonstrated at trial, among the many abusive acts of manipulation, coercion, and exploitation that Cherwitz, Daedone, and her co-conspirators committed were the following:

- directing victims to serve as "handlers" for OneTaste's main investor, Reese Jones, including cooking for him, sexually servicing him each day, and performing other labor, and supervising victims in this role;

- coercing victims to allow OneTaste clients, prospective customers, and other OneTaste participants to stroke their genitals;

- compelling victims to stroke OneTaste clients', prospective customers', and other OneTaste participants' penises, and to have sex with them;

- directing that victims incur massive debt to pay for OneTaste courses, including opening lines of credit to do so, and to continue to remain part of the OneTaste community; and

- directing victims to work around-the-clock—including menial and sexual labor—for little or no pay, leading to physical exhaustion and financial harm.

The victims performed these acts, and others, out of fear of serious harm, including physical, psychological and financial harm. Indeed, nearly every trial witness described how Cherwitz, Daedone, and other co-conspirators engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion, and financial harm to force their victims' labor. PSR ¶¶ 28, 69-80.

Cherwitz, like Daedone, used language of empowerment to coerce victims into working long hours with little to no pay and performing sexual acts they found repulsive. By entwining labor demands with personal identity and belonging, Cherwitz and Daedone created a coercive environment that was uniquely difficult to escape and every bit as powerful as physical restraint. This psychological entrapment amplified the harm: leaving was not simply quitting a job, but abandoning a community and forfeiting the promise of "healing" that had drawn victims in.

At the center of this scheme was the practice of orgasmic meditation, an exercise that was deeply personal and intimate. Regardless of whatever benefits orgasmic meditation may have provided its practitioners, Daedone's and Cherwitz's victims were conditioned to accept repeated sexual touch in the name of therapy and empowerment. The intimate nature of

this practice magnified the coercion for particular victims. The defendants' fusion of forced

labor with sexual exploitation ultimately caused victims trauma in ways that extend beyond lost

wages or long hours. The abuse of trust, intimacy, and power in this context makes the gravity

of this offense particularly stark.

Relatedly, the conspiracy's integration of sexual coercion into its labor structure

magnified the offense's egregiousness. Cherwitz told victims that compliance with sexual

practices was essential to their growth and to maintaining their status within the community. As

just a few examples, as described in detail at trial, Anthia Gillick testified that Cherwitz directed

her to OM with and have sex with prospective clients, including people outside of her

preferences or who she was completely disgusted by. Tr. 3953-55. Ms. Gillick described how

Cherwitz directed her to make out with a student in the Coaching Program, which Ms. Gillick

found revolting, Tr. 3956-58, and to perform a prostate massage on a man during a Mastery

course. Tr. 3958-59. Ms. Gillick testified that although she did not want to do so, she was in no

position to question Cherwitz's command. Tr. 3959.

Ms. Gillick also testified that while she was at OneTaste, Cherwitz assigned her

and others in New York City to have sex with at least one person a day for 30 days. Tr. 3953-54.

At the time, Ms. Gillick testified that the New York team was not making their sales, so

Cherwitz said they needed to have more sex to fire up the orgasm and pull in more sales leads.

Tr. 3959-65. Pixley and Ms. Halpern similarly testified that Cherwitz demanded they OM with

other OneTaste participants, prospective clients, including anyone "off the street," Tr. 114, and

VIPs. Tr. 1689-92.

Cherwitz also obtained labor from victims by using coercive tactics to pressure

them into opening lines of credit to pay for OneTaste courses they could not afford and making

them financially reliant on OneTaste. For example, Dana Gill testified that Cherwitz signed her up for her first coaching program, a program Cherwitz knew Ms. Gill could not afford. Tr. 1239-40. From that point on, she was in debt to OneTaste and performed labor for OneTaste for years with no pay. Similarly, Michal Neria testified that, after she told Cherwitz she could not afford to pay for a coaching program in San Francisco, Cherwitz took out her laptop and directed Ms. Neria to a credit card application, which Ms. Neria filled out in front of Cherwitz. Tr. 2693-96.

In addition to obtaining labor through financial and sexual harm, Cherwitz worked her victims until they were physically exhausted. Max Pixley testified, for example, that working at OneTaste was a 24/7 job and there was never a time when they were not on. Tr. 1657. OneTaste workers were on multiple text threads and expected to respond immediately, even to those who were in the London office in the middle of the night—an expectation that Cherwitz set. Tr. 2107. Witnesses testified that Cherwitz implemented aggressive sales goals and expected workers to meet them. Tr. 2741.

At trial, multiple victims testified about how the trauma they suffered at OneTaste has affected them. For instance:

- Becky Halpern testified that after she left OneTaste she was "in really bad shape, like really, really bad." Tr. 390. For instance, she was unable to get out of bed and was depressed and confused. For Halpern, it was "the worst mental health period of [her] life. Tr. 391; see also PSR ¶ 76.

- Christina Berkley testified that her time at OneTaste had a "very dramatic impact on [her] psychologically that then took many years to come out of. It changed my identity and sense of self. . . . [M]y sense of my own instinct and intuition and feelings of what is right and wrong and values slowly became formatted into the style of—like a box or algorithm that was the appropriate one, that was the OneTaste one." She also described the totality of the impact that her time at OneTaste had on her: "there was not going to be anywhere to go to where anyone would understand anything about me. All of my previous relationships were gone. What would I do for a living because this was – I wasn't going to be an escort again . . . . [The idea of

leaving OneTaste] was, like, psychologically impossible." By the time Berkley left OneTaste, she had significant debt and had "survival level stress" such that her "hair started falling out." PSR ¶ 70.

- Dana Gill described how she became wholly dependent on OneTaste and that "[t]he trauma has not gone away. The pain . . . it is like death by a million paper cuts." She testified how her time at OneTaste "repulsed her" and, in hindsight, she saw "how far [her] values had been skewed." Tr. 1330. At the time she left OneTaste, she had no savings or income and was still recovering from a miscarriage. Tr. 1331. She is still "sorting through the trauma." Tr. 1332; see also PSR ¶ 74.

- Michelle Wright testified that during her time at OneTaste, "[t]he training from start to finish was about, like, being turned on. And what that meant in that world was being shiny, being bright, being your most powerful and empowered sexual self and, you know, being – we were, as employees of this company, we were meant to be representing people who were getting what they wanted, doing what they wanted without hesitation, without anything in the way. Like that was considered you were awake, you were enlightened. And the reality was like, I did not feel that way and I did not feel empowered. I felt manipulated and abused, and I was so trained not to pay attention to how I felt inside that I wasn't even – like I oftentimes wasn't even able to identify that that's how I was feeling." Tr. 2424.

- Michal Neria testified that during her time at OneTaste she was "in constant panic, fear, shakiness" and at times suicidal. After she left, she suffered from post-traumatic stress disorder and acute depression. PSR ¶ 75.

- Lyndsi Keves described her emotional condition at the time she left OneTaste as "really hard." Tr. 3030. Indeed, Keves became emotional recalling how hard it was for her to admit that she had been so "manipulated" by "the entire culture of OneTaste." Tr. 3030. She noted how she "lost touch with [her]self." Tr. 3030; see also PSR ¶ 80.

- Anthia Gillick described how she was "totally devasted" when she left OneTaste. Tr. 3989. She felt like there was no space for the things she wanted in life, like having a husband and children, or pursuits outside of OneTaste. Tr. 3990; see also PSR ¶ 77.

A sampling of some of the victim impact statements the government has received

reinforce the harm Cherwitz caused.[11] For example, Dana Gill wrote that she is "still unpacking

---

[11]     The government expects that some victims will attend the sentencing hearing in person and that, at that time, they will seek to address the Court orally. The government will separately request that the Court allow other  victims—who cannot attend the defendant's sentencing in person for varying reasons—to attend by telephone.

the harm caused by Rachel Cherwitz and Nicole Daedone. Their manipulation and grooming of me was insidious . . ." She noted that Daedone and Cherwitz "continue to cause harm so long as they refuse to acknowledge the devastating harm they have caused myself and others, and will continue these manipulative and coercive practices as long as they are able."

Michael Neria described that Cherwitz "knew how to bait and switch so I became emotionally dependent on her opinions and would follow her orders closely, overriding my own sense of self-preservation and boundaries. She used her power and influence over me to sell me almost all the courses I took in OneTaste, from the least expensive to the most ($36,000 for Nicole Daedone Intensive and $50,000 for membership). She knew that I didn't have the money to pay for these courses." She wrote, further, that Cherwitz "became more abusive and manipulative as time went on and I became more dependent on the Organization for my livelihood, housing, social circle, and intimate relationship."

Michelle Wright has written to the Court explaining the toll her time at OneTaste has taken on her. She described an erosion of trust and a destruction of her capacity for safe, healthy relationships. She described working around the clock, not sleeping sufficiently, and being constantly sexually stimulated so that she was easier to manipulate. Wright wrote, "I feel the effects still today on my identity, my self confidence, on my sexual identity, my understanding of and relationship to sex and power. My understanding of, and relationship to love and partnership. In every arena I was manipulated and coerced, my vulnerabilities used against me."

Other victims who did not testify at trial relayed similar traumatic effects that the defendants' conduct had on them. All of these victim impact statements are being provided to the Court as Exhibits A through F.

Finally, the seriousness of the offense is magnified by its scale and aftermath. Victims left OneTaste financially ruined, emotionally broken, and alienated from their families and friends. This combination of long duration, wide reach, calculated methods, and lasting victim harm warrants a sentence that fully reflects the gravity of the offense.

B.    <u>The Defendant's History and Characteristics</u>

Overall, Cherwitz's personal characteristics support a sentence of 168 months, and do not establish any extraordinary circumstances warranting a significant downward departure or variance from the applicable Guidelines range. Although she describes some of her family relationships as "complicated," the PSR indicates that her family remains supportive of and loves her. PSR ¶¶ 123-35.

The PSR and the defendant's sentencing submission indicate that throughout her childhood, the defendant struggled with substance abuse. Eventually, she became sober, regularly participated in therapy, including by attending Alcoholics Anonymous, and obtained a bachelor's degree in rehabilitative studies and a minor in Abuse and Addiction prior to joining OneTaste. Def. Mem. at 4. While the government sympathizes with the defendant's past substance abuse and other health issues—and commends the defendant's treatment and educational efforts—notably, the defendant's education in rehabilitative studies should have alerted her to the difficulties her victims experienced while at OneTaste. Indeed, it is particularly surprising that an individual with a background in rehabilitative studies and addiction treatment would direct individuals to have sex every day for 30 days, even while those individuals were visibly upset and sick. <u>See, e.g.</u>, Tr. 3964-65. Instead, the evidence at trial showed that the defendant abused victims even after she was put on notice regarding issues with respect to some of her victims, and even after multiple victims expressed that they could not pay for courses or

felt emotionally unstable.  See, e.g., GX 3501-3, 2274-DR, Tr. 1239-40.  Overall, the defendant's history and characteristics support a sentence of 168 months.

        C.        The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The defendant's conduct, as set out in greater detail in the PSR, strikes at the heart of federal prohibitions on forced labor.  Her conduct compelled victims who sought a better life to work for OneTaste, including through coercive tactics that forced victims to perform sexual acts in service of OneTaste.

The seriousness of Cherwitz's criminal conduct demands a sentence that reflects the scale of the harm she caused, the centrality of her role in the conspiracy, and the need to ensure that justice is served.  Cherwitz made numerous victims work for years, harming them psychologically, financially, sexually, and physically in the process.

Respect for the law is particularly salient in this case.  A serious sentence of 168 months will send a clear message that coercion under the guise of personal growth will be justly punished.

        D.        The Need for Deterrence

General deterrence is a primary consideration in cases involving organized exploitation.  The requested sentence would deter others inclined to engage in similar offenses. The forced labor conspiracy was not a crime of passion; it was coordinated and calculated over multiple years to maximize profits at the expense of the defendants' victims.  General deterrence is more apt in cases where the crime is calculated and financially motivated.  See United States v. Howard, 28 F.4th 180, 208-09 (11th Cir. 2022) (describing, in the context of a financial crime, how "[g]eneral deterrence is more apt, not less apt, in white collar crime cases" because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of

passion or opportunity,' which makes them 'prime candidates for general deterrence'") (quoting United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013)). A sentence that serves as general deterrence of crimes that are complex and difficult to investigate is also warranted here. See, e.g., United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Specific deterrence is equally critical. Cherwitz has not expressed genuine remorse or recognition of the harm her actions caused. Indeed, Cherwitz and Daedone continued to host OneTaste events in Harlem during their criminal trial. This suggests that absent a custodial sentence, Cherwitz and Daedone would attempt to recreate similar structures. Protecting future potential victims requires a sentence that deters her personally from reoffending.

Deterrence also aligns with the broader statutory goal of preventing the recurrence of forced labor conspiracies. The Court's sentence will be closely observed by both victims and potential wrongdoers. Ensuring that the punishment reflects the gravity of the conduct reinforces the rule of law and discourages others from attempting to replicate such schemes.

E.    The Need to Avoid Unwarranted Sentencing Disparities

Sentencing Cherwitz to 168 months' imprisonment is also necessary to avoid unwarranted disparities with similarly situated defendants. Courts have consistently imposed

similar sentences in cases where defendants exploited vulnerable individuals through forced labor, sexual coercion, or psychological control.

For example, in United States v. Raniere, Case No. 18-CR-204 (NGG) (E.D.N.Y.), Keith Raniere, who led NXIVM and manipulated followers into uncompensated labor and sexual servitude, received a 120-year sentence, while one of Keith Raniere's co-defendants, Clare Bronfman—who helped to promote and fund Raniere's criminal enterprise—pled guilty and was sentenced to 81 months' imprisonment. In United States v. Sabhnani, Case No. 07-CR-429 (ADS) (E.D.N.Y.), where domestic workers were forced into labor through threats and abuse, the lead defendant, Varsha Sabhnani, received a sentence of 11 years' imprisonment, and her co-defendant was sentenced to 40 months. In United States v. Majeed, Case No, 21-CR-20060 (JAR) (D. Kan.), Kaaba Majeed, a high-ranking member of the United National of Islam ("UNOI") who, for over twelve years, conspired to enforce rules that required UNOI members to perform unpaid labor using beatings, threats, punishments, isolation, and coercion to compel the unpaid labor of over a dozen victims, was sentenced to 10 years' imprisonment.

These cases illustrate that the federal criminal justice system treats long-running, coercive exploitation enterprises with the utmost severity. As the Head of Sales of OneTaste and Daedone's second-in-command, Cherwitz's conduct falls squarely within this spectrum of seriousness. To impose a materially lesser sentence here would suggest that the defendants' exploitation—couched in the rhetoric of "sexual wellness" and "enlightenment"—is less serious than other forms of forced labor, when in fact it was every bit as destructive.

Cherwitz cites a number of cases, contending that the conduct there was more serious, yet defendants received shorter sentences. Def. Mem. at 57-58 (collecting cases). But

none of the other cases involved a decade-long scheme with multiple victims, including sexual labor and abuse. Indeed, it is difficult to locate a case like this one, in which the forced labor conspiracy spanned states (and more than one continent), involved numerous victims, lasted 12 years, and involved psychological, financial, sexual, and reputational harms.

Avoiding disparity also means ensuring proportionality relative to her co-defendant. The difference in the Guidelines' sentences for Cherwitz and Daedone reflects Cherwitz's lower culpability relative to Daedone, who was the co-founder of OneTaste and devised the forced labor conspiracy in which Cherwitz participated. Additionally, Daedone, in contrast to Cherwitz, profited significantly from OneTaste, culminating in her $12 million sale of OneTaste. The sentences imposed in comparable cases, coupled with the differences between Daedone and Cherwitz, strongly support the requested sentence of 168 months' incarceration.

## II.     Supervised Release

The defendant's conviction under 18 U.S.C. § 1594(b) is a Class C felony, see 18 U.S.C. § 3559(a)(3), and the maximum term of supervised release is three years. See 18 U.S.C. § 3583(b)(2). Under U.S.S.G § 5D1.2(a)(2), the Guidelines range of supervision is one to three years. PSR Second Add. ¶ 171. To facilitate Cherwitz's reentry into the community, to ensure the safety of the community, and to prevent Cherwitz from reoffending, the government respectfully requests the Court impose the maximum term of supervision. In addition to imposing the mandatory and standard conditions of supervised release, the Court should require Cherwitz to make full disclosure of her financial records; to be prohibited from maintaining or opening any additional financial accounts without knowledge of the U.S. Probation Department; and to provide truthful monthly statements of her income and expenses. This special condition

will ensure that the defendant is complying with the full terms of any order of restitution the Court may impose.

III.    Restitution and Other Financial Aspects of Sentencing

The Court is required to impose a special assessment of $100.  In addition, restitution is mandatory pursuant to 18 U.S.C. § 1593(a).  See also United States v. Sabhnani, 599 F.3d 215, 254 (2d Cir. 2010).  The Court should order restitution to the defendant's victims, as the government has set forth in a separate submission filed today.[12]  The PSR notes that the defendant appears to be unable to pay a fine.  PSR ¶ 167.

_____

[12]    To date, the government has received affidavits of loss from ten victims.  The government has reached out to all the defendants' victims it has identified; however, to the extent other potential victims seek restitution, the government requests the Court set a date within 90 days of the defendant's sentencing to make a final determination of the victims' losses.  See 18 U.S.C. § 3664(d)(5).  The government intends to supplement its restitution submission filed today with any additional affidavits of loss it receives.

<u>CONCLUSION</u>

In this case, given all the facts and circumstances discussed above and set forth during trial, a sentence of 168 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Dated:     Brooklyn, New York
           December 10, 2025

                                        Respectfully submitted,


                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                                By:     /s/_____
                                        Kayla C. Bensing
                                        Kaitlin T. Farrell
                                        Nina C. Gupta
                                        Sean M.  Fern
                                        Assistant United States Attorneys
                                        (718) 254-7000