# Ballard Spahr
LLP

----------------------

1675 Broadway, 19th Floor
New York, NY 10019-5820

TEL 212.223.0200

FAX 212.223.1942

www.ballardspahr.com

Celia A. Cohen
Tel: 646.346.8002
Fax: 212.223.1942
cohenc@ballardspahr.com

March 22, 2026

*Via ECF*

Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    *United States v. Rachel Cherwitz and Nicole Daedone*, 23-CR-146

Dear Judge Gujarati:

On behalf of the defendants Rachel Cherwitz and Nicole Daedone, we write to respectfully request that the Court consider the below additional information that demonstrates that the restitution claims in this case are not supported by the evidence. While the defense included arguments in their sentencing submissions that raised concerns about the restitution claims and the lack of documentation, since that time the government produced additional restitution exhibits, including most recently on March 20, 2026.[1] The defendants urge the Court to review the evidence compiled by the defense regarding each restitution claim that demonstrates that not only has the government failed to meet its burden to prove the victims' actual losses, but also that there are serious inaccuracies in the restitution claims.[2]

---

[1] On March 20, 2026, the government filed a letter regarding sentencing which provided additional information and documents with respect to restitution that the defense may need to consider and address in a separate filing. *See* Mar. 20, 2026 Gov't Letter, Dkt. No. 506.

[2] The Probation Department provided victim impact statements on October 17, 2025, October 30, 2025, March 9, 2026, and most recently, on March 20, 2026. On December 12, 2025, the government provided additional documentation to support the claimants' requests for restitution. Following that production, the government advised the Court on January 14, 2026, that there was no further restitution documentation for the testifying victims in this case. Thereafter, on January 22, 2026, the Court ruled that it is not considering the "non-testifying victims." Jan. 22, 2022 Order, Dkt. No. 493.

Honorable Diane Gujarati
March 22, 2026
Page 2

I.      **Overview**

    A.      Legal Analysis

Section 1593 of Title 18 of the United States Code, which was enacted as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), requires the Court to impose restitution for victims of forced labor. Section 1593 provides that restitution orders are to be "issued and enforced in accordance with [18 U.S.C. §] 3664 in the same manner as an order under section 3663A [the Mandatory Victim Restitution Act ("MVRA")]." 18 U.S.C. § 1593(b)(2). The TVPA provides for mandatory restitution for "the full amount of the victim's losses" for crimes including forced labor, and the MVRA clarifies that restitution may be awarded only in the amount of losses directly and proximately caused by the defendant's conduct. 18 U.S.C. § 3663A(a)(1); *United States v. Gushlak*, 728 F. 3d 184,194 (2d Cir. 2013) (defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"). "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence." *Gushlak*, 728 F. 3d at 195. The government has the burden of demonstrating the amount of loss sustained by the victim as a result of the offense. 18 U.S.C. § 3664(e).

While Ms. Cherwitz and Ms. Daedone were not convicted of forced labor, under the statute the Court may consider at sentencing whether the government has proven by a preponderance of the evidence that anyone suffered a loss as a result of the conspiracy. *United States v. Finazzo*, 850 F. 3d 94, 117 (2d Cir. 2017); *Gushlak*, 728 F. 3d at 196 (restitution must be based on a "reasonable approximation of losses supported by a sound methodology"). It is notable, however, that in this case, the government specifically told the jury that it did not have to find actual forced labor and emphasized that this case was "not about whether the witnesses suffered serious harm and whether they actually caused them to work. That is absolutely not the question of this trial." Trial Tr. 5222:11–20. Instead, the government told the jury, "if the Defendants agreed to unlawfully extract even one form of labor or service from even one victim, any single victim, then they are guilty." *Id.* at 5224:12–18; *see also id.* at 5295 (jury charge). Accordingly, it is unclear what the jury actually found regarding any specific forced labor.[3]

---

[3] Furthermore, the Supreme Court recently held that restitution is "plainly criminal punishment" rather than solely a form of civil compensation for victims. *Ellingburg v. United States*, 607 U.S. __ (2026), 146 S. Ct. 564, 567 (2026). Because restitution is a criminal punishment, it therefore follows that the loss must be found by a jury. To hold otherwise would violate a defendant's Fifth and Sixth Amendments rights, as well as the holding of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Indeed, *Apprendi* and its progeny, held that any fact that increases the severity of a defendant's criminal punishment must be proven beyond reasonable doubt. *Id.*; *Blakely v. Washington*, 542 U.S. 296, 303 (2004); *see also Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., dissenting from the denial of certiorari); *United States v. Leahy*, 438 F.3d 328, 339 (3rd Cir. 2006) (McKee, J.,

Honorable Diane Gujarati
March 22, 2026
Page 3

And notwithstanding this assertion at trial, the government now asks this Court to impose restitution in the form of lost wages for each of the claimants based on the day each claimant first participated at OneTaste. Not only did none of the claimants begin working the moment they signed up for OneTaste classes, but also the government does not, because it cannot, explain its theory as to how these individuals were psychologically coerced to work the moment they began participating in the Orgasmic Meditation ("OM") practice. The government also ignores the evidence in this case that demonstrates that these individuals wanted to work for OneTaste, that most of them quit other jobs to do so, and that during many of the hours they claimed to have been working, trial testimony, texts, emails, and photographs demonstrate otherwise. While the jury found that Ms. Cherwitz and Ms. Daedone conspired to commit forced labor, both continue to maintain that no one was forced to labor and that no restitution for lost wages should be imposed. And regardless, as set forth below, the government has not met its burden of proving the claims for lost wages.

B.      The Government Has Failed to Meet Its Burden of Proving Restitution

The government is seeking $985,588.64 in restitution for testifying claimants. Yet, despite this extraordinary amount, the government has offered scant evidence in support of the witnesses' requests. In some cases, the government has offered nothing more than unsupported assertions of claimants regarding their costs, and in other cases provides support for assertions that are contradicted by known facts. Not only is the proffered supporting material insufficient to demonstrate the claimed losses, but also this Court will have to decide whether the government has shown the requisite nexus between the claimed losses and the charge of conviction. Based on the evidence set forth below, we submit that the government has not demonstrated the requisite nexus.

Overall, the claims for wages are based on testimony that the witnesses worked all day, every day, but the evidence in the case — which we have compiled and attached as Exhibits A through G — demonstrate that their claims are not supported.[4] In many cases, the claims for wages include the full time that the claimant was associated with OneTaste, regardless of the fact that the claimant was not working for OneTaste. We discuss each claim separately in Section II below.

---

concurring). Because restitution is a criminal penalty, imposition of restitution at sentencing by a Judge would increase the criminal penalty. Accordingly, any restitution imposed in this case would also violate *Apprendi* and Ms. Cherwitz and Ms. Daedone's Fifth and Sixth Amendment rights.

[4] The evidence contained in these exhibits include text messages. Some of the devices were set to Pacific Time when text messages were extracted from them, which is three hours behind Eastern Time.

Honorable Diane Gujarati
March 22, 2026
Page 4

With respect to the claims for medical expenses, the lack of supporting material makes it impossible for this Court to assess, as it must, whether the claimants have suffered actual losses related to the offense conduct. Furthermore, although the government continues to assert that OneTaste targeted people with existing trauma, the record refutes this claim. Not a single claimant testified that OneTaste sought them out. Rather, they sought out OneTaste. *See* Trial Tr. 2889:18–25, 1753:1–16. Even if it is true that OneTaste attracted people with pre-existing mental health challenges, it does not follow that Ms. Cherwitz and Ms. Daedone pursued people with psychological trauma or that Ms. Cherwitz and Ms. Daedone are responsible for every mental health cost that the claimants allegedly incurred.

Finally, it is also important to note that these claimants are also requesting more compensation than the government believes they are entitled to. For example, despite voluntarily signing up for courses and attending them, some of the claimants claim that Ms. Cherwitz and Ms. Daedone stole the money that they paid for the courses. One claimant, Dan Gill, requests $30,000 as "stolen" money for rent that she had to pay OneTaste for the time she actually resided at a retreat center associated with OneTaste of her own free will. Not only should the Court reject these claims, as the government has already done, but also the Court should consider the fact that the claimants are attempting to gain a windfall by making claims for money they now regret spending.

C.      Liquidated Damages Are Not Appropriate

The inclusion of liquidated damages in a restitution award under the Fair Labor Standards Act ("FLSA") is inappropriate here. While 18 U.S.C. § 1593(b)(3) provides that the victim's loss can be the value of the victim's labor as guaranteed under the FLSA's minimum wage and overtime guarantees as a guide to the appropriate restitution, the liquidated damages provision is part of a civil proceeding that is outside the criminal context. And here the jury was not asked to find whether these claimants were actually forced to labor. Thus, the government is essentially arguing that the Court should impose this civil remedy on behalf of third parties at the criminal sentencing of Ms. Cherwitz and Ms. Daedone.

Recently, the Supreme Court held that restitution is "plainly criminal punishment" rather than solely a form of civil compensation for victims. *Ellingburg*, 146 S. Ct. at 567. There the Court discussed the numerous features of the MVRA that demonstrate that it is a penalty for criminal offense and noted that "[w]hen viewed as a whole, then, the MVRA makes abundantly clear that restitution is criminal punishment." *Id.* at 568. The Court also cited three prior precedents characterizing MVRA restitution as criminal punishment: *Manrique v. United States*, 581 U.S. 116 (2017) (restitution is "part of the sentence"), *Pasquantino v. United States*, 544 U.S. 349, 365 (2005) (restitution is designed "to mete out appropriate criminal punishment"), and *Paroline v. United States*, 572 U.S. 434 (2014) (adopting the same characterization). *Id.* at 568–69.

Honorable Diane Gujarati
March 22, 2026
Page 5

To apply the civil remedy FLSA liquidated damages in this case, would be to impose a civil penalty in what the Supreme Court has held is plainly a criminal sanction. Indeed, if the Court were to do so, it would then have to also apply the civil statute of limitations of three years pursuant to 29 U.S.C. § 2559(a), which does not make sense in the criminal context.[5]

While the government cites two cases in which liquidated damages were applied in criminal cases as part of restitution, not only were those cases decided prior to *Ellingburg*, but they are also distinguishable on other grounds. *See United States v. Sabhnani*, 599 F.3d 215, 225–30 (2d Cir. 2010); *United States v. Edwards*, 995 F.3d 342, 345–47 (4th Cir. 2021). In both cases, the defendants were convicted of the substantive crime of forced labor. And in each case, there was no question that the victims were working for the defendants at all times and were unable to leave for fear of violence and due to the victims' limitations (*i.e.*, language barriers, lack of passports, and intellectual disability).

Specifically, in *Sabhnani*, the defendants were convicted of two counts each of substantive forced labor, in violation of 18 U.S.C. § 1589(a), harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), holding a person in a condition of peonage in violation of 18 U.S.C. § 1581(a), and document servitude in violation of 18 U.S.C. § 1592(a), as well as conspiracy to commit each of these substantive offenses. *Sabhnani*, 599 F.3d at 224. The two separate forced labor convictions were based on two separate victims. Each were sent to the United States for the sole purpose of working for the defendants. The victims did not speak English, had their passports and travel documents taken from them, and were physically harmed and threatened to make sure they did not run away. Both victims were there solely to work seven days a week, while being systematically denied food, sleep, and medical care — conditions so severe that both women were driven to eat food from the trash. *Id* at 226–28. With respect to one of the victims, the defendant poured scalding and boiling water on her on at least three separate occasions (leaving documented scars), beat her with household objects including a broom, umbrella, and rolling pin, cut her face and body with a knife, and mutilated her ears by digging her fingernails into the flesh behind them until blood trickled down her neck. *Id.* at 226–27. She also forced one victim to eat large quantities of hot chili peppers until she vomited or lost bowel control as punishment and controlled her through death threats against her children in Indonesia. *Id.* at 228. The other victim was similarly abused — struck in the face with a metal spoon with sufficient force to draw blood and leave a permanent scar, beaten with a fist and a glass Pyrex dish, and forced to stand motionless for approximately ten hours while the defendants laughed at her. *Id.* To prevent escape, one defendant threatened that the police would shoot the victim if she fled, and that her husband in Indonesia would be arrested.

---

[5] Notably, two of the complaining witnesses that the government argues should be awarded liquidated damages have brought civil cases against OneTaste, Ms. Cherwitz and Ms. Daedone.

Honorable Diane Gujarati
March 22, 2026
Page 6

Similarly, in *Edwards*, the victim who was intellectually disabled was controlled by the defendant who moved him into an apartment attached to his restaurant and forced the victim to work more than 100 hours a week without pay and without a single day off. *Edwards*, 995 F.3d at 344.  The defendant took advantage of the victim's intellectual disability and kept him isolated from his family, threatening to have him arrested, and verbally abusing him. *Id.*[6] His control over the victim also involved physical abuse. *Id.*  Once, when the victim failed to deliver fried chicken to the buffet as quickly as the defendant had demanded, the defendant dipped metal tongs into hot grease and pressed them to the victim's neck, resulting in a burn that fellow employees had to immediately treat. *Id.*  Other times, when the victim made supposed mistakes, the defendant whipped him with his belt, beat him with kitchen pans, and punched him with his fists. *Id.*

In contrast to *Sabhnani* and *Edwards*, Ms. Cherwitz and Ms. Daedone were convicted of a conspiracy to commit forced labor, not the substantive forced labor offense.  And what further complicates this case, is that the claimants were not at OneTaste just to work — they were also there to participate in the practice of OM and OneTaste classes.  They could leave anytime, there were no physical threats made against them, they were all college educated, spoke English, and regularly visited their families.  And unlike in *Sabhnani* and *Edwards* where there was no question that the victims' sole purpose of being with the defendants was work that they were forced to do at all times, here the jury did not make such a finding.  And now, particularly in light of *Ellingburg*, the Court should not impose the liquidated damages provision of the FLSA in this criminal proceeding where the jury did not make a finding of forced labor.

## II.    Analysis of Individual Restitution Claims

Below is an analysis of each restitution claim as compared to the evidence in this case, which demonstrates that not only has the government failed to meet its burden, but that the claims submitted are inaccurate.

### A.    Lyndsi Keves

Although she did not submit an affidavit of loss or victim impact statement, the government submits that Lyndsi Keves is entitled to $85,446.50 in lost wages.  This calculation is based on Keves's "involvement" with OneTaste (starting from before the very first interaction with OneTaste as a customer) from around November 2016 to October 17, 2017.  Because Keves "felt that she worked at OneTaste full-time and that there were 'very little boundaries around work hours,'" the government credited her testimony that she would work from 5 a.m. to 10 p.m. or 11 p.m., for a total of 17 hours a day totaling 6,205 hours

---

[6] The victim in this case had an Intelligence Quotient ("IQ") of 70.

Honorable Diane Gujarati
March 22, 2026
Page 7

(starting on November 1, 2016 before Keves even took her first class on November 12). In total, the government claims she would have been owed $44,986.25, minus the $2,263.00 she was already paid, which it then doubled under the FLSA's liquidated damage provision. But testimony in this case demonstrates that Keves only worked for OneTaste for two and a half months, and nowhere near the hours the government claims she worked.

Keves testified that she was taking classes at OneTaste from November 2016 to August 2017 and did not start working at OneTaste until August 2017. *See* Trial Tr. 3038:19–24. During this eight-month period prior to working for OneTaste, Keves was working as a nanny for her sister. *See id.* at 3060:24–3061:1. Before she started working for OneTaste, Keves also went to the Hamptons with her family. *See id.* at 3145. While Keves was hired on August 13, 2017, she only worked four days in August (August 14, 28, 30, and 31) per her timesheets, totaling 39.5 hours. She spent the rest of August either as a student in OneTaste classes or on a two-week vacation in Spain (August 15–27). *See id.* at 3145:11–12. Keves effectively did not begin regular work for OneTaste until September 2017. While she testified that on one occasion she started work at 5 a.m. by passing out flyers, *see id.* at 3061:13–22, there was no testimony that she began every day at 5 a.m.[7] Keves also testified that she was responsible for tracking and submitting the hours she worked, and while reviewing her time slips, said that she recorded between 22 and 56 hours a week. *See id.* at 3105:23–3108:3 (between 3.5 and 9.3 hours, six days a week). Accordingly, the government's claim that she worked for 17 hours a day, seven days a week for 365 consecutive days from November 1, 2016 — 11 days before she even walked into OneTaste — until she quit in October 2017, is an outrageous stretch and should be rejected.

The attached Exhibit A and corresponding documentation demonstrate that, during the time Keves was employed by OneTaste between August 13, 2017 and October 2017, she did not work every day.[8] She went on two vacations and attended a OneTaste retreat. Thus, Keves worked a total of 32 days between August 13, 2017 and October 31, 2017, for a total of 212.5 hours, and averaging 6.6 hours a day. At $7.25 per hour, this amounts to $1,540.63, which is less than the $2,263.00 she was paid.

---

[7] Indeed, no witness testified to starting work at 5 a.m. — most testified that they typically started their day by practicing Orgasmic Meditation at around 7 a.m.

[8] The government has not proven if, at any point, Keves's labor became "forced." While Ms. Cherwitz and Ms. Daedone maintain that no one was forced to labor, even if the Court finds that forced labor occurred, it certainly did not start in September 2017 when Keves proactively started working for OneTaste. It is implausible and unfounded that she was coerced in the first month of her employment — a job she chose to do over her prior job as a nanny for her sister.

Honorable Diane Gujarati
March 22, 2026
Page 8

### B.  Michal Neria

Despite being involved with OneTaste for a total of 10 months Neria requests a total of $310,921.00 in restitution, which includes $72,329.48 in lost income, ███████ in medical expenses,[9] and $13,964.00 in "money stolen or swindled" for money she paid for OneTaste classes.  She also claims a total of $31,641.20, which includes legal fees and hours without pay during testimony.  The government does not credit Neria's full claim but submits that Neria is entitled to a total of $181,049.14, which reflects: (i) $17,921.00 in owed wages (which is made up of $8,960.50 in lost wages doubled under the FLSA), and (ii) ██████ in medical expenses incurred (which is the amount Neria claims ██████

███████  The government further disagrees with Neria's claim for attorneys' fees, and credits her with only $4,080.00 in this category.[10]  Even the government's reduced claim for restitution, however, fails to account for the evidence in this case that demonstrates that the lost wages submitted by Neria are inaccurate.  In addition, no evidence was submitted to demonstrate that the medical expenses were losses related to the offense conduct.

#### 1.  Lost Wages

Neria claims that she worked at OneTaste from approximately December 2014 through September 2015.  She claims to have worked 40 hours per month in December 2014 and January 2015 and then 14 hours per day from February 1, 2015.  *See* Dec. 10, 2025 Gov't Letter re: Restitution at 7, Dkt. No. 484 (citing Trial Tr. 2686).  This claim is belied by the record and raises serious concerns about her credibility.  Her testimony at trial revealed that Neria first attended a OneTaste class at the recommendation of a teacher she met at a yoga instructor course.  Trial Tr. 2688:21–25.  When she attended the initial OneTaste class, Neria was working as a teaching assistant at a private school.  *Id.* at 2691:21–22.  In December 2014, she discussed her desire to leave her teaching position through text messages with her friend, Marissa Ward.  *Id.* at 2831:16–17, DX 11FF.  In January 2015, Neria voluntarily moved into the Brooklyn OM house even though she continued to pay rent at her apartment.  Throughout her three months at the Brooklyn OM house, she texted with the group throughout each day.

---

[9] This is the updated claim for medical expenses set forth in Neria's March 4, 2026 affidavit, which was produced to the defense on March 20, 2026.

[10] Third Circuit recently declined to permit restitution for attorneys' fees.  *See United States v. Abrams*, 165 F.4th 784 (3d Cir. 2026) (vacating the portion of the restitution order awarding attorneys' fees on the ground that 18 U.S.C. § 3663A(b)(4) does not authorize restitution for legal fees, and rejecting the government's reliance on the statute's residual phrase permitting restitution for "other expenses incurred during participation in the investigation or prosecution").

Honorable Diane Gujarati
March 22, 2026
Page 9

Indeed, those texts confirm that Neria was in Israel from January 6 to January 14 for her grandfather's funeral services, at the same time Neria now claims she was working 10 hours per week for OneTaste.

A cursory review of that the text thread from the Brooklyn OM house reveals that (i) she did not quit her teaching job until the end of February, *see* Trial Tr. 2832:12–17, (specifically February 20, 2015 (*see* Ex. B at 39–43)), (ii) she voluntarily practiced OM daily and was one of the most enthusiastic participants, *see id.* at 11, (iii) she was not working at OneTaste at the time, *see id.* at 11, 42, (iv) she began the coaching program in February 2015, for which she traveled to San Francisco each weekend except the first weekend due to strep throat, *see id.* at 18, and (v) that she began working at a coffee/juice shop in February 2015, *see id.* at 46; *see also* Trial Tr. 2736:9–24, 2839:7–2841:6, 2834:11–23.[11]  Accordingly, the record makes it clear that Neria was not working for OneTaste from October through February.

Neria herself testified on cross examination that she worked for OneTaste for under six months, from March 2015 through September 2015.  Trial Tr. 2886:8–16.  But even that claim is dubious where the evidence demonstrates that Neria worked for OneTaste very little during that time.  For example:

- Neria testified that throughout her time at OneTaste, including when she had other jobs and lived at the Brooklyn OM house, *see id.* at 2702:2–11, 2811:4–16, and while she was working for OneTaste NY, *see id.* at 2741:6–14, that she began her day with the practice of OM, a journaling exercise known as fear inventory, sitting meditation, and breakfast.  She also took a break at the end of the day to do another round of OM practice.  These practices were part of her desire to live with the OM community and practice OM, and were not work activities for which wages are due. *See id.* at 2810:2–6. The Brooklyn OM chat alone demonstrates how much Neria wanted to participate in these practices. These practices took several hours each day.

- Neria saw her family at least 21 times during the period for which she is claiming restitution, and spent 22 days with them, even while working at OneTaste NYC, which could not have occurred if she was working 15-hour days. *See id.* at 2841:10–2842:23, 2870:5–21; *see also* Ex. B at 77–10, 12, 42, 44, 53, 57–58, 61, 63, 70, 73, 75, 76, 80, 90, 99, 101, 103, 110, 113.

---

[11] Given the detailed texts during this time, the Court does not need to guess about Neria's whereabouts and work during this time because she openly discussed her days and her whereabouts in the OM chat.

Honorable Diane Gujarati
March 22, 2026
Page 10

- During the time she claims to have been working for OneTaste for 15 hours per day, the record reflects that Neria spent at least 34 days as a student in immersive OneTaste Classes:

  - 15 days in March–July for CP9, *see* Trial Tr. 2797:7–14;

  - 5 days in April for Magic School, *id.* at 2798:14–15;

  - Mastery Class, *id.* at 2798:14–15; and

  - 14 days in August for the Nicole Daedone Intensive class ("NDI"), *id.* at 2798:16–17.

- From March until May 10, 2015 was working at a coffee shop. Evidence shows in March, April, and May 2015, Neria repeatedly declined invitations to help at the OneTaste center because she was working at her café. *See* Ex. B at 51, 52, 65, 68, 69, 70, 81, 84.

Accordingly, during those periods, between travelling, class work, and the practice schedule of meditation, Neria could not have worked a total of 1,398 hours.

Finally, the attached chart, Exhibit B, and corresponding documentation further demonstrate the Neria was not working all of the hours that she is claiming. The government has not proven at what point Neria's labor became "forced." While Ms. Cherwitz and Ms. Daedone maintain no forced labor took place, it is implausible and illogical that any force could have taken place immediately upon Neria's hiring on May 15, 2015, given how enthusiastically she pursued a position at OneTaste. The defense submits that any alleged forced labor could not plausibly have started before June 15, 2015, reducing the allegedly forced period to approximately 3.5 months (mid-June through September 2015). As shown at Exhibit B, that 107-day window contains 22 class days, four travel days, and at least nine documented days of family visits and personal activities, leaving approximately 72 potential workdays. Even assuming Neria worked eight hours per day — a generous estimate given that her own texts and testimony establish that her mornings were spent in personal practices including OM, fear inventory, sitting meditation, yoga, and breakfast, with work not beginning until approximately 12:15 p.m., *see* Trial Tr. 2741:6–14, 2702:2–11 — that yields 576 hours at the federal minimum wage of $7.25 per hour, or $4,176. During this same period, Neria received approximately $1,600 in combined compensation ███████████████████

Honorable Diane Gujarati
March 22, 2026
Page 11

████████████████████████████████.[12] The maximum supportable award for lost wages would
be $2,576.

    2.    *Medical Expenses*

        Neria is seeking █████████ in medical expenses for █████████████ in addition to
the ████████████████████████████████████. *See* Dkt. No. 484 at 7.
Thus, she is claiming that OneTaste is responsible for a total of ████████████████
████████ based on her 10-month affiliation with the group. This extraordinary amount cannot
possibly be the actual losses related to the offense conduct for multiple reasons.

        First, Neria cannot possibly claim that OneTaste caused any harm to her from the time
she heard about it (October 2014) to the time she went to her first introductory class
(November 2014) and throughout her time at the Brooklyn OM house (she moved out in March
2015). Neria went to OneTaste freely, based on a recommendation of an instructor unaffiliated
with OneTaste following her disclosure that she had been on anti-depressants and was also not
able to achieve an orgasm. *See* Trial Tr. 2688:22–23, 2889:1–3, 23–25. Neria was well-
educated, close to her family, and remained close to her family during this time. In fact, Neria
took it upon herself to move into the OM house, which was almost immediate, even though
she had an apartment and a full-time job. And her own words during the time she lived in the
Brooklyn OM house reveal that she was ecstatic about practicing OM and about living in the
OM house, that every act she took was of her own free will, and that she did not like her job
and chose to quit (despite being given the opportunity to come back when she quit).[13]
Accordingly, at most, Neria could claim that she needed therapy for the last six months she
participated at OneTaste.

        Second, Neria claims ██████████████████ without acknowledging her preexisting
medical condition. Neria testified that she has struggled with depression since she was a
teenager, *see id.* at 2800:7–12, 2888:7–18, and testified that she had been on depression
medications since she was a teenager, *see id.* at 2888:7–13. Although Neria left OneTaste in
September 2015, ████████████████████████████████████████████

---

[12] OneTaste NYC LLC was an independent company, and the defendants do not have access
to its payroll records to verify Neria's claims about her compensation. It is difficult, however,
to credit Neria's statements in the 302 investigative report given that so much of the evidence
and testimony contradicts her statements. Neria claimed that she only received between ███
█████, and also received ████████████████████. Given the uncertainty of
the amount, the defendants base their calculations on a prior payment to Neria of $500 total.

[13] Notably, on February 18, 2026, Neria wrote to her housemates that she was going to tell her
assistant principle "adios motherfucker" in her exit interview. *See* Ex. B at 39–40.

Honorable Diane Gujarati
March 22, 2026
Page 12

████████████████████████████████████████████████████
████████████████████████████████████ Accordingly, given Neria's history with mental health, there is insufficient evidence to demonstrate that the full amount of these medical expenses were losses related to the offense conduct.

### C.    Anthia Gillick

The government submits that Gillick is entitled to $178,730.00, which includes: (i) $68,272.00 in owed wages, (ii) ██████████ in medical expenses, and (iii) ████████ in ████████████████. The government relied on Gillick's estimate that she worked 5,536 hours for 638 days straight from October 2013 through June 2015. It then applied the applicable federal minimum wage rate of $7.25 per hour, and submits that Gillick is owed $40,136.00, minus the $6,000.00 she earned, for a total of $34,136.00, which it then doubles under the liquidated damages provision. The government bases its estimate on Gillick's estimate and her testimony that she worked "crazy hours" from 6:00 a.m. to midnight, rarely took off, and worked on weekends. But Gillick's statements are refuted by other evidence and testimony in this case, and her work hours estimated by the government are otherwise not supported. In addition, Gillick did not provide sufficient receipts to support her medical claims, and she included ████████████████ that are not caused by OneTaste, but could potentially be related to her aerial silk activity.

### 1.    Lost Wages

Gillick's own texts during the time she claimed to be working from 6:00 a.m. to midnight contradict her lost wages claim. For example, Gillick posted the daily schedule for herself, which revealed that a typical day started at 7:45am with practices such as yoga, journalling, seated meditation, OM, and a meal. Accordingly, work did not begin until 12:15 p.m. with a sales call. *See* Trial Tr. 4148:4–4149:25, DX 12EC at Dkt. No. 417-1 at 182. In addition, Gillick was never a OneTaste staff member. Trial Tr. 4124:2–8. Rather, in January 2015, she became a part owner of OneTaste NYC, and prior to becoming an owner she volunteered at OneTaste and had no expectation of pay for her volunteer activities. *Id.* at 4043:7–4044:2.

Furthermore, she admitted at trial that she traveled frequently with her family, including a trip to Bali, a trip to the Hamptons, and one to Antarctica. *Id.* at 4073:2–5, 4073:7–10, 4073:11–13. She also spent time as a OneTaste student attending OneTaste classes, and was in aerial silk training at various times, including from July to September 2014 for 30 hours a week. *Id.* at 3925:5–9, 4094:22–23, 4152:1–2. Gillick also owned her own aerial silk business, and at times used OneTaste events to promote her business. *See id.* at 3812:16–17, 4092:4–23.

Honorable Diane Gujarati
March 22, 2026
Page 13

Indeed, of the 638 days the government claims as forced labor, 151 days (23.7%) were spent as a student in immersive OneTaste classes, and 63 days were spent travelling — visiting family in Aspen, Alaska (19 days), the Hamptons, DC, Hong Kong, Martha's Vineyard, and upstate New York. She attended three separate cousins' weddings during this period (September 2014, November 2014, March 2015). Gillick therefore spent more than a third of this period engaged in personal activities.

Indeed, the government acknowledged that Gillick was "situated different from the other victims." *See id.* at 4786:22–4787:2 ("And obviously, Ms. Gillick is situated differently from the other victims given her financial situation."). Gillick was different because she had money to travel and to take classes. Gillick was a sophisticated investor who consulted an independent accountant and attorney before deciding to become a co-owner of a company that acquired a license to operate the New York City part of the OneTaste business. *See id.* at 4097:20–4098:14, 4104:5–4105:3.

When she became an executive of her own company, she became exempt from hourly wages under New York law, and was paid $3,000 a month, totaling $18,000 for the six months she was in the position. Her monthly salary of $3,000.00 ($692.31/week annualized) satisfied both the federal and New York State exempt salary thresholds applicable during this period. *See* 29 C.F.R. § 541.600 (2004) ($455/week federal threshold); 12 N.Y.C.R.R. § 142-2.14 ($675/week New York threshold, uniform statewide prior to December 31, 2016). Her annualized compensation of $36,000.00 also exceeded the federal annual threshold of $23,660.00. *See* 29 C.F.R. § 541.600(b). When she sold her share of OneTaste NYC in June 2015, her business partner Ravi Agrawal, a third party entirely unrelated to OneTaste Inc, bought her out at a price that was only reduced by the money she had already been paid as a co-owner of their company.

The documented activity of Gillick during the period for which she claimed that she worked 18-hour days is set forth in Exhibit C and demonstrates that the government's claim should be rejected. Gillick was a OneTaste volunteer who ultimately became a part owner in her own company and was paid for her time during her sixth-month ownership period.

2.  *Medical Expenses*

Gillick is seeking ▮▮▮▮▮▮▮▮▮▮ expenses but has submitted only ▮▮▮ in receipts. Furthermore, there is no evidence to demonstrate that the full amount ▮▮▮ ▮▮▮▮ is attributed to the offense conduct. Gillick suffered the tremendous loss of her father's passing during her time at OneTaste, which may have also contributed to ▮▮▮ ▮▮▮▮. Trial Tr. 4087:2–17. Incredibly, she is also claiming ▮▮▮▮▮▮ ▮▮▮▮, when the need for that medical expense has nothing to do with OneTaste. In fact, Gillick testified that she injured herself during her aerial silk performance, and such a sport would likely lead to the need for chiropractic services. *See id.* at 4082:2–4083:1, 4083:7–20.

Honorable Diane Gujarati
March 22, 2026
Page 14

Accordingly, there is insufficient evidence to demonstrate that the full amount of these medical expenses were losses related to the offense conduct.

D.    Max Pixley

Max Pixley did not submit an affidavit of loss, but the government submits that Pixley is entitled to $35,001.00 in lost wages.  This calculation is based on the time Pixley joined OneTaste in the "middle of 2013," and the fact that they said they worked "24/7."  The government "conservatively" assumes that they worked 17 hours a day from June 1, 2013 through December 31, 2013, and therefore calculates 3,638 hours total.  Based on the federal minimum wage of $7.25 per hour, they would be owed $26,375.50, resulting in an underpayment of $17,500.50, and applying the FLSA's liquidated damage provisions, equals $35,001.00.

As set forth in Exhibit D, and consistent with Pixley's testimony, Pixley did not start working until June 20, 2013 (following a trip to Arizona with their father figure).  In addition, contrary to the government's assertion, Pixley resigned from OneTaste on November 4, 2013 and was removed from the company text threads by November 6, 2013.  While Pixley continued to take classes at OneTaste after that time and to volunteer, they were not working for OneTaste.  *See* Trial Tr. 1882:14–17.

The government's inaccurate claim that Pixley worked 213 days, therefore, includes an additional 75 days of which the evidence demonstrates that Pixley did not work. Furthermore, during the time Pixley was working, they spent 18 days as a student, bringing their total working days down to 120 days.  The government also claims that Pixley worked 17 hours a day based on the hours claimed by Halpern, whose claims are analyzed in more depth below.  But those hours include the hours spent on morning practice and OM, including fear inventory, sitting meditation, and yoga, which Pixley admitted was not labor for OneTaste.  *See id.* at 1823:25–1825:4.  Indeed, Pixley testified that morning practices lasted "quite a few hours every morning."  *See id.* at 1825:3–4.  Accordingly, assuming, like Halpern, Pixley worked for eight hours per day, seven days a week, their total compensation using the federal minimum wage of $7.25 per hour, would amount to $6,960, which is less than the $8,875.00 that Pixley was already paid.

E.    Rebecca Halpern

Rebecca Halpern is claiming $88,227.20 in restitution, which includes (i) $64,107.20 in lost income, (ii) ███████ in medical expenses, and (iii) $10,000.00 in money stolen or swindled for money she paid for OneTaste classes.  The government credits Halpern's claim for lost income but reduces them by the amount OneTaste NYC paid her ($21,207.00), and then applies the FLSA liquidated damages provision for a total of $42,245.  It further credits her claim for medical expenses and adds $3,000 in wages for the time she spent testifying, for

Honorable Diane Gujarati
March 22, 2026
Page 15

a total of $98,610. As set forth below, the wages claimed fail to account for the evidence at trial that demonstrates that, at the most, Halpern worked for only eight of the 19 months she is claiming to have worked for OneTaste.

> 1.      *Lost Wages*

The government claims Halpern worked 16 hours a day from July 27, 2012 to February 7, 2014 (547 days). The actual timeline is far more fragmented. As set forth in Exhibit E, and consistent with Halpern's testimony, Halpern was working at her father's advertising company when she signed up for coaching program ("CP") number five. She briefly worked on the OneTaste sales team from July 27, 2012 to October 26, 2012 when she emailed saying she was "no longer a city leader but wants to help." DX 21AE. She then returned to her father's advertising company, where she was still working in March 2013. *See* Trial Tr. 356:21–357:2, 586:8–12. She did not leave her father's company until May 2013. *See id.* at 537:20–538:11. For approximately seven months from November 2012 through May 2013, she was working for her father, not OneTaste, the evidence shows almost no OneTaste-related emails or texts during this period. On June 12, 2013, Halpern began working as an independent contractor for OneTaste where she earned sales commissions. In addition, from June through October 2013, Halpern attended CP6 classes, and in November and December attended the Mastery classes, for a total of 40 days of classes.

In October 2013, Halpern became a full-time employee at OneTaste until she signed a separation agreement on February 7, 2014. *See id.* at 427:18–21, 776:17–21; GX 3766. But even during that time, she was living at the Morellino and spent half the day on the OM practice, which included twice daily OMs, fear inventory, and Bikram yoga. The schedule she submitted at the time reveals that she did not start to do sales work until 12 p.m. each day. Thus, her claim that she worked 17-hour days should be rejected. Applying this schedule pattern to the potentially forced period (October 2013 through February 7, 2014): approximately 130 days, minus 15 class days and assuming she worked eight hours every remaining day (which is generous given the evidence provided by the defense), Halpern's 115 potential work days at the federal minimum wage of $7.25 per hour yield total owed wages of just $6,670.00, which is less than the $21,207 she was already paid.

> 2.      *Medical Expenses*

Halpern seeks ███████████████████, but it is entirely based on ███████ ███████. Moreover, Halpern's messages reflect an array of unrelated personal issues that surely were the source of whatever mental distress she claims she suffered and the subject of her treatment. *See* Trial Tr. 150:16–151:5, 536:18–21. Accordingly, there is insufficient evidence to demonstrate that the full amount of these medical expenses were losses related to the offense conduct.

Honorable Diane Gujarati
March 22, 2026
Page 16

      F.      <u>Dana Gill</u>

In Dana Gill's sworn affidavit, she requested a total of $254,445.00 in restitution, which included ▮▮▮▮▮▮▮ in medical expenses incurred, $194,760.00 in lost income and $30,000.00 in money stolen or swindled due to rent Gill had to pay OneTaste.[14]  The government does not credit Gill's full claim but submits that Gill is entitled to a total of $174,377.00, which reflects: (i) $144,692.00 in owed wages (which is made up of $72,346 in lost wages doubled under the FLSA),[15] and (ii) ▮▮▮▮▮▮ in medical expenses incurred. Even the government's reduced claim for restitution, however, fails to account for the evidence in this case that demonstrates that the balance of the wages submitted by Gill are not accurate. In addition, no evidence was submitted to demonstrate that the medical expenses were losses related to the offense conduct.

      *1.*      *Lost Wages*

The government credits Gill with having worked between January 1, 2010 until May 30, 2013 at eight hours per day for 1,247 consecutive days and 9,976 hours.  As set forth in Exhibit F, Gill was not a full-time employee of OneTaste, and she testified about other jobs that she had during the time she time while she was also working at OneTaste.  For example, Gill testified to the following:

- She was allowed to live in the 1080 residence rent free until she found eventually found a job at a restaurant called Lilia Bell's.  *See* Trial Tr. 1480:21–1481:8.

- During her participation at OneTaste, she had a job at a restaurant and a cafe.  *Id.* at 1251:14–17, 1369:10–16.

- In July 2012, she obtained a fulltime position at the Methodist Church in San Francisco where she worked 30 hours a week, Monday to Friday.  *Id.* at 1375:8–13.

- Toward the end of her participation at OneTaste she worked as a nanny in addition to her job at her church.  *Id.* at 1304:24–1305:2.

---

[14] The government does not include recovery for Gill's rent because it is not recoverable under the TVPA.  Regardless, Gill voluntarily lived at a retreat property associated with OneTaste and paid rent the same as any tenant.  Thus, her rent was an ordinary cost of housing and cannot be considered money "stolen or swindled."

[15] For the reasons set forth above in Section I.C, the Court should not imposed liquidated damages to any of the claims.

Honorable Diane Gujarati
March 22, 2026
Page 17

- While she sometimes helped cook dinner at 1080, the compensation for that work was credited toward the money she owed for rent. *Id. s*at 1369:1–5, 1378:14–23.

Gill also worked at the SOMA Inn café in San Francisco from September 2011 through May 2012. *See* Ex. F at 23 (September 2011 Facebook post); *see also* Ex. F at 45 (May 2012 email from Gill announcing to fellow OneTaste participants that she was quitting her job at the SOMA Inn café in one month).

In addition to these other jobs — which makes it impossible for Gill to have worked the hours she claims to have worked — the evidence from trial further demonstrates that not only was she not fully employed by OneTaste, but also she was proactively messaging OneTaste to request that she be more involved. For example:

- In April 2012, she emailed OneTaste staff saying she had been "missing being involved," and while she had a fulltime job outside of OneTaste at the time, she wanted to "help out as often as possible." *See* Trial Tr. 1425:25–1427:12, DX 2BG 417-1 at 21.

- Also in April 2012, she emailed a number of OneTaste executives expressing her desire to join the OneTaste PR team. *See* Trial Tr. 1427:13–1431:10, DX 2AX ("I want to join the PR team.").

Furthermore, Gill's request for lost wages also fails to take into account the time she spent away from OneTaste. While the defense does not have documentation of Gill's whereabouts at all times, the evidence presented at trial demonstrates that there were significant time periods that she was either enjoying personal time, or voluntarily taking OneTaste classes that would have prevented her from working. For example, the testimony and documents shown to Gill on cross examination show that during the three years at OneTaste, she took vacations and visited family. *See* Trial Tr. 1383:8–1392:3; Ex F at 27–32, 37, 44–45, 52–53.

There are at least 101 documented days of activities that directly contradict her sworn claim of consecutive daily labor: working at her café, at church, babysitting, visiting family in Sacramento, going to Disneyland, travelling to Maui, being hospitalized for a traumatic miscarriage and related ailments, attending OneTaste classes as a student, and leading evening discussion events at her church. Gill is not entitled to lost wages for personal time. Given the evidence of her enthusiastic, voluntary, and intermittent participation in OneTaste-related activities, Ms. Cherwitz and Ms. Daedone maintain that no one was forced to labor. Even if the Court finds that forced labor occurred, however, the defense submits that any calculation of alleged forced labor should begin no earlier than May 2010, at least four months into her participation. Gill's remaining work-like activity was limited to occasional assistance in course production. Based on the evidence available to the defense, this is estimated to be

Honorable Diane Gujarati
March 22, 2026
Page 18

approximately 180 hours across the period from May 2010 to May 2013, or roughly one hour per day, which at the federal minimum wage of $7.25 per hour amounts to $1,305.

### 2.   Medical Expenses

The lack of supporting material for Gill makes it impossible for this Court to assess whether she suffered actual losses related to the offense conduct. Indeed, Gill claims medical expenses for ███████████████████████. But Gill admitted at trial that she started therapy to deal with a miscarriage that occurred in late July 2012, and she described how she was a "shell" in the months following her miscarriage, and could not get out of bed. Trial Tr. 1300:4–17, 1566:17–22, 1567:1–3. Indeed, the therapist that Gill began seeing following her unfortunate miscarriage specializes in ████████████████████████████ ███████████████████████████████████████████████████████. Accordingly, the full amount of ███████ claimed by Gill is not attributed to the offense conduct.

Furthermore, Gill herself went "back and forth" with her therapist about whether to file for restitution and ultimately did not complete her application pre-trial, *see* Trial Tr. 1635:15–1636:7, suggesting even she was uncertain about attributing her therapy to OneTaste. Of the ████████ over █ years, only the ████████████████ could plausibly overlap with her time at OneTaste. █████████████████████ is far more consistent with long-term processing of her miscarriage and other life events.

### G.   Michelle Wright

Michelle Wright is claiming $422,095.00 in restitution, which includes (i) $321,120.00 in lost income, (ii) █████████ in medical expenses, and (iii) $2,600.00 of lost income for the week she was in New York testifying. The government does not credit Wright's full claim for lost wages, but submits that Wright is entitled to a total of $232,375.00, which reflects: (i) $131,400.00 in owed wages, comprised of $102,312.00 in lost wages minus the amount she was paid by OneTaste ($36,612.00), for a total of $65,700.00 that the government doubles under the FLSA, (ii) █████████ in medical expenses incurred, and (iii) $2,600.00 for lost income while testifying at trial. Even the government's reduced claim for restitution, however, fails to account for the evidence in this case that demonstrates that the wages submitted by Wright are not accurate. In addition, no evidence was submitted to demonstrate that the medical expenses were losses related to the offense conduct.

### 1.   Lost Wages

Wright's contemporary spreadsheets showing her hours demonstrate that she did not work the number of hours she now claims. Wright concedes in her statement provided to the defendants that the hours she recorded in December 2010 through April 2011 were more or

Honorable Diane Gujarati
March 22, 2026
Page 19

less correct, coming in approximately 50 hours per month. Dec. 10, 2025 Gov't Letter, Dkt. No. 484, Exs. I2, I3. However, Wright was compensated $18,543.75 more than the government claims for this period. Furthermore, Wright's self-reported timecards from September and October 2012 reveal that her workday typically started at 12 p.m. and ranged from 7.2 to 8.2 hours per day, not the 12 hours she claimed to have worked during that time. As set forth in Exhibit G, a comparison to the government's claim of hours worked and the actual activity based on the evidence demonstrates that Wright's and the government's claims are inaccurate. For the December 2010 through April 2011 period, Wright concedes her recorded hours were approximately 50 per month, yielding 250 hours and $1,812.50 at the federal minimum wage of $7.25 per hour. Applying the highest estimate of 8.2 hours per day from her own timecards to the entire May 2011 through October 2013 period, 915 days yield a total $54,396.75 in wages at the federal minimum wage of $7.25 per hour. For the subsequent October 2013 through May 2014 period, Wright claims that she worked 30 hours per week, but Facebook photographs show that she was frequently hiking, at the beach, and visiting family. Therefore, a more reasonable estimate is 20 hours per week, or approximately 693 hours, yielding an additional $5,024.25. Thus, the total minimum wage obligation across all periods is $61,233.50. Wright received approximately $55,155.75 in total compensation, including $36,612 in documented wages, *see* GX 856, and $18,543.75 in additional compensation the government does not account for. While Ms. Cherwitz and Ms. Daedone maintain that there was no forced labor, even if the Court finds that forced labor did occur, the appropriate compensation would be $6,077.75 to account for this shortfall.

### 2. *Medical Expenses*

Wright has provided no documentation or proof of the ████ in medical expenses claimed by the government. The defense submits that Wright should not be compensated for medical expenses unless and until she provides substantiation for these costs and how they were directly and proximately caused by the defendants.

## III. Office of Victims' Services Offset

The defense is aware that several of the claimants applied for payments from the New York and California Offices of Victims' Services ("OVS"). In its restitution submission, the government only acknowledged ██████████ payment from OVS, which it deducted from her claim. The defense is aware that ████████████, however, also applied for OVS payouts but they were declined pre-trial. The defense was precluded from subpoenaing any documentation as to why OVS declined to reimburse them. In addition, the defense is in the dark as to whether there were any additional applications to OVS or any additional awards that would offset claims for medical costs by any of the claimants.

Indeed, prior to trial, Ms. Cherwitz and Ms. Daedone were legitimately concerned about financial incentives available to the witnesses. They moved this Court for leave to issue

Honorable Diane Gujarati
March 22, 2026
Page 20

a subpoena to OVS for documents that reflected payments received by witnesses and supporting information submitted to OVS.  Mot. Requesting Rule 17 Subpoena, Dkt. No. 285.  The government objected and moved to bar the defense from cross-examining witnesses about their financial incentives.  A hearing on the motion was held on April 9, 2025, during which defense counsel argued that Ms. Cherwitz and Ms. Daedone were entitled to documents concerning any financial incentives that might cause the witnesses to testify in a particular way, and that they should be permitted to cross-examine the witnesses on these issues.  Financial incentives bear directly on witnesses' credibility.  This court denied Ms. Cherwitz and Ms. Daedone's motion and precluded the defense from cross examining on the issue.  *See* Trial Tr. 1635:22–25.  However, it is now the government's burden to prove that the claims for medical expenses are attributable to Ms. Cherwitz and Ms. Daedone and the OVS requests are squarely at issue here.  Accordingly, the Court should either (i) order the government to seek records from OVS to demonstrate that there were no additional requests, and to disclose the reason why the other requests were denied, or (ii) permit the defense to issue subpoenas to OVS for all materials that it received in connection with requests by the claimants, and its decisions regarding the claimants' requests.

Restitution is not intended to punish defendants or to provide a windfall for claimants.  Rather, it is to ensure that claimants are made whole for their losses.  *See, e.g.*, *Boccagna*, 450 F.3d at 117 (restitution must not "go beyond making the victim whole").  As such, it is critical that the Court examine the evidence to determine whether the requisite nexus has been met between the claimed losses and the charge of conviction.

Respectfully submitted,

/s/CELIA A. COHEN
Celia A. Cohen
*Counsel for Rachel Cherwitz*
Ballard Spahr LLP
1675 Broadway, 19th Floor
New York, NY 10019
212-223-0200


/s/JENNIFER BONJEAN
Jennifer Bonjean
*Counsel for Nicole Daedone*
Bonjean Law Group, PLLC
233 Broadway, Suite 707
New York, NY 10279
718-875-1850

Honorable Diane Gujarati
March 22, 2026
Page 21


cc:     Kaitlin T. Farrell, Assistant U.S. Attorney
        Kayla Bensing, Assistant U.S. Attorney
        Nina C. Gupta, Assistant U.S. Attorney
        Sean M. Fern, Assistant U.S. Attorney
        Meghan Wing, U.S. Probation Officer